# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR TAXPAYER RIGHTS,<br>P.O. Box 71278 Washington DC 20024<br><br>MAIN STREET ALLIANCE,<br>909 Rose Ave, Suite 400<br>North Bethesda, MD 20852<br><br>NATIONAL FEDERATION OF<br>FEDERAL EMPLOYEES, IAM AFL-CIO<br>1225 New York Avenue, NW<br>Suite 450<br>Washington, DC 20005<br><br>COMMUNICATIONS WORKERS OF<br>AMERICA, AFL-CIO<br>501 3rd Street, NW<br>Washington, DC 20001,<br><br>*Plaintiffs*,<br><br>*vs.*<br><br>INTERNAL REVENUE SERVICE<br>1111 Constitution Ave., NW,<br>Washington, DC 20224<br><br>MICHAEL FAULKENDER, in his official<br>capacity as Acting Commissioner, Internal<br>Revenue Service,<br>1111 Constitution Ave., NW,<br>Washington, DC 20224<br><br>U.S. DEPARTMENT OF THE<br>TREASURY,<br>1500 Pennsylvania Avenue, NW,<br>Washington, DC 20220<br><br>SCOTT BESSENT, in his official capacity<br>as Secretary of the Treasury,<br>1500 Pennsylvania Avenue, NW,<br>Washington, DC 20220<br><br>U.S. DIGITAL SERVICE (U.S. DOGE | Case No. 25-cv-457 (CKK)<br>**Jury Trial Requested** |

SERVICE)                                    :
736 Jackson Pl NW                           :
Washington, DC 20503                        :
                                            :
U.S. DOGE SERVICE TEMPORARY                 :
ORGANIZATION                                :
736 Jackson Pl NW                           :
Washington, DC 20503                        :
                                            :
AMY GLEASON, in her purported official      :
capacity as Acting Administrator of the     :
U.S. DOGE Service and U.S. DOGE             :
Service Temporary Organization,             :
736 Jackson Place NW                        :
Washington, DC 20503                        :
                                            :
ELON MUSK, in his official capacity as      :
the leader of DOGE                          :
1650 17th Street NW                         :
Washington, DC 20006                        :
                                            :
STEVE DAVIS, in his official capacity as    :
Chief Operating Officer of DOGE             :
736 Jackson Place NW                        :
Washington, DC 20503                        :
                                            :
U.S. DEPARTMENT OF THE                      :
TREASURY DOGE TEAM,                         :
1500 Pennsylvania Avenue NW                 :
Washington, DC 20220                        :
                                            :
U.S. OFFICE OF PERSONNEL                    :
MANAGEMENT,                                 :
1900 E Street NW                            :
Washington, DC 20415                        :
                                            :
CHARLES EZELL, in his official capacity     :
as Acting Director of the Office of         :
Personnel Management                        :
1900 E Street NW                            :
Washington, DC 20415                        :
                                            :
GENERAL SERVICES                            :
ADMINISTRATION,                             :
1800 F Street NW                            :
Washington, DC 20405                        :

1

STEPHEN EHIKIAN, in his official
capacity as Acting Administrator of the
General Services Administration,
1800 F Street NW
Washington, DC 20405

*Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

1.      The Internal Revenue Service ("IRS") houses some of the nation's most sensitive

information systems. Recognizing the sensitivity of confidential taxpayer information, Congress

has enacted specific protections governing access to the information well beyond those that apply

to other personal information held by the government. The security of that sensitive, protected

taxpayer information is now in grave jeopardy as the so-called Department of Government

Efficiency, or "DOGE" and its affiliated personnel move to access and share broad swaths of IRS

data in an unprecedented manner.

2.      Since President Trump's inauguration on January 20, DOGE, apparently led by

White House official Elon Musk, has launched a sweeping campaign to access highly sensitive

information systems and dismantle and restructure multiple federal agencies unilaterally.

3.      The speed of these efforts is core to the project. At every step, DOGE has violated

multiple laws, from constitutional limits on executive power, to laws protecting civil servants from

arbitrary threats and adverse action, to crucial protections for data held by the government

collected on hundreds of millions of Americans.

4.      The results have been catastrophic. DOGE has seized control of some of the most

carefully protected information systems housed at numerous agencies, including the Treasury

Department, the Social Security Administration, the Department of Labor, the Department of Health and Human Services, and the Consumer Financial Protection Bureau, and taken hold of all sensitive personnel information at the Office of Personnel Management. While some of this control has been limited through litigation, DOGE's efforts continue apace.

5.      DOGE's spread through the government includes the IRS. This case seeks to protect the privacy and legal rights of millions of Americans and thousands of small business owners who depend upon the IRS to take care that the sensitive data they provide to it will be protected.

6.      While the DOGE playbook at the IRS appears to mirror every other agency it has entered, the systems at issue, and the laws that govern access to them, are not.

7.      This nation already once experienced a President who sought to collect tax information on his political allies and enemies in the White House for use for favor and punishment and, following the Watergate era, Congress clearly and unequivocally acted to protect the American people from these intrusions.

8.      Recognizing the sensitivity of confidential taxpayer information, Congress has enacted specific protections governing access to the information well beyond those that apply to other personal information held by the government.

9.      Despite these significant protections, DOGE Affiliates continue to seek unfettered and unlawful access to the information. And since the original Complaint in this action was filed, DOGE has effected a dramatic shift in IRS policy towards consolidation and inter-agency sharing of taxpayer data, upending long-standing policies and practices intended to both ensure compliance with the law and protect the integrity and security of this highly sensitive data.

10.     DOGE claims power and authority that Congress has never granted it, and that it may not legally exercise.

11.     As detailed below, DOGE's sweeping efforts to upend the protections Congress has put in place and create a unified, inter-agency collection of personal data from sensitive information systems—including IRS systems—lacks statutory authority and violates the Tax Reform Act, the Privacy Act, and the Administrative Procedure Act.

12.     Absent this Court's intervention, this sensitive data will be broadly shared with agencies across the federal government, in a manner that violates the stringent protections Congress has put in place to restrict the use and disclosure of taxpayers' information, upending taxpayers' reliance on previously longstanding IRS policies and practices.

13.     The sensitive taxpayer data that DOGE seeks to share and use includes highly sensitive data that taxpayers submit with their legally mandated tax returns, including addresses; Social Security numbers; information about individuals' income and net worth; bank account information; tax liability; and sensitive information regarding deductions, such as charitable donations, dependents, and medical expenses; as well as whether an individual's tax return has been or is being investigated.

14.     Defendants have already taken action to make this happen, creating a "mega" application programming interface ("API") that will facilitate unprecedented cross-agency sharing of sensitive taxpayer data, and they have executed at least one agreement to share data with another agency—DHS—to support unspecified criminal investigations in connection with immigration enforcement.

15.     As Congress recognized nearly a half-century ago and codified in the Tax Reform Act, the privacy and confidentiality of tax filings are essential to a tax system that depends on

voluntary compliance. Defendants' actions both lack Congressional authorization and violate longstanding law and IRS practice. A DOGE-led, rushed effort to share that sensitive information freely across the federal government, without needed protections and controls, violates the law.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically the Tax Reform Act, 26 U.S.C. §§ 6103, 7213A, the Privacy Act, 5 U.S.C. § 552a, and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are (or purport to exercise the authority of) agencies of the United States and officers or employees of those federal agencies who are sued in their official capacity. Further, Defendants are headquartered in the District of Columbia, where a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

18.    Defendant Internal Revenue Service is a federal agency headquartered in Washington, DC, and established to help America's taxpayers understand and meet their tax responsibilities and to enforce the Internal Revenue Code and other tax laws.

19.    Defendant Michael Faulkender is the Acting Commissioner for the IRS and is sued in his official capacity.

20.    Defendant U.S. Department of the Treasury ("Treasury") is a federal Department headquartered in Washington, DC, and the IRS is a component bureau of Treasury.

21.    Defendant Scott Bessent is the Secretary of the Treasury and is sued in his official capacity.

22.    Together, Defendants IRS, Treasury, Acting Commissioner Faulkender, and Secretary Bessent will be referred to as the "Treasury-IRS Defendants."

23.    Defendant U.S. DOGE Service (previously the U.S. Digital Service) was established by Executive Order 14158, reorganizing and renaming the United States Digital Service as the United States DOGE Service, established in the Executive Office of the President. Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025).

24.    Defendant U.S. DOGE Service Temporary Organization is a temporary organization also created by Executive Order 14158 and headed by the U.S. DOGE Service Administrator. *Id.*

25.    Defendant Amy Gleason is purported to be the Acting U.S. Digital Service Administrator (for both U.S. DOGE Service and U.S. DOGE Service Temporary Organization).

26.    Defendant Elon Musk is putatively a Special Government Employee, serving as Senior Advisor to the President in the Executive Office of the President, and is the *de facto* head of DOGE.

27.    Defendant Steve Davis is a Senior Advisor in the United States Digital Service and is the *de facto* Chief Operating Officer and second-in-command of DOGE.

28.    Defendant Treasury DOGE Team is the group of employees identified by Defendant Bessent pursuant to Executive Order 14158 § 3(c). They are sued as an entity.

29.    Defendant U.S. Office of Personnel Management ("OPM") is a federal agency headquartered in Washington, DC. It serves as the "home" agency for a number of DOGE Affiliates and regularly details these individuals to other federal agencies to carry out the DOGE agenda.

30.     Defendant Charles Ezell is the Acting Director of OPM and is sued in his official capacity.

31.     Defendant General Services Administration ("GSA") is a federal agency headquartered in Washington, DC. It serves as the "home" agency for a number of DOGE Affiliates and regularly details those individuals to other federal agencies in order to carry out the DOGE Agenda.

32.     Defendant Stephen Ehikian is the Acting Administrator of the GSA and is sued in his official capacity.

33.     Together, Defendants U.S. DOGE Service, U.S. DOGE Service Temporary Organization, Musk, Davis, Treasury DOGE Team, OPM, Ezell, GSA, and Ehikian will be referred to as the "DOGE Defendants."

34.     All Defendants together will be referred to as "Defendants."

35.     Plaintiff Center for Taxpayer Rights (the "Center" or "CTR") is a 501(c)(3) not-for-profit organization, incorporated under the laws of Virginia and headquartered in Washington, DC, that focuses its work on advancing taxpayer rights, promoting trust in systems of taxation, and increasing access to justice in the tax system, particularly for the most vulnerable populations.

36.     In addition, the Center runs a federally-funded Low Income Taxpayer Clinic ("LITC").

37.     The Center's LITC provides free representation to low-income taxpayers who have tax disputes with federal, state, or local tax agencies.

38.     The close attorney-client relationship between the LITC's legal staff and their low-income clients allows the CTR to advocate for their clients' interests, which would be difficult for them to assert themselves. Many of these clients are involved in disputes with the IRS and fear

retribution, while others may not have the resources to protect these privacy interests or fear reputational harm for being identified as low-income filers that qualify for the Earned Income Tax Credit ("ETIC").

39.     The LITC's clients include individuals whose taxpayer information is especially sensitive.

40.     For example, the LITC represents domestic violence survivors. These individuals are often caught up in the IRS audit and dispute process, because the victims' abusers have often claimed their survivors or their dependents on their tax forms.

41.     The LITC also represents a high percentage of "EITC" and Child Tax Credit ("CTC") filers.  EITC claimants are audited at a rate approximately four times the rate of the rest of the population and the President's statements suggest they may be a focal point of DOGE's scrutiny.[1]

42.     The LITC also represents immigrants. Many of these clients want to pay their taxes but are fearful that submitting personal information to the government may lead to harm, despite the protections in place to safeguard the confidentiality of this information.

43.     Plaintiff Main Street Alliance ("MSA"), headquartered in Maryland and incorporated in Washington, DC, is a nationwide network of small businesses with members across the country.

44.     MSA works to help small businesses navigate challenges, strengthen their operations, and contribute to vibrant local communities.

---

[1]    How   do   IRS   audits   affect   low-income   families?,   Tax   Policy   Center, https://taxpolicycenter.org/briefing-book/how-do-irs-audits-affect-low-income-families      (last updated Jan. 2024).

45.    MSA has small business members that are sole proprietors, partnerships, family-run enterprises, or expanding local companies, with a resultant need to file various forms of individual and business tax returns. The IRS therefore houses their confidential information.

46.    MSA's small business members, especially when launching their sole proprietorship businesses, file individual tax returns with incomes low enough to qualify for and claim the EITC, CTC, and other refundable credits. MSA also has members that have suffered identity theft who are particularly distressed by broad-ranging, unlawful access to and overbroad sharing of their tax information.

47.    Plaintiff National Federation of Federal Employees ("NFFE"), IAM, AFL-CIO, is an unincorporated association with its principal place of business in Washington, DC, and is a national labor union representing approximately 110,000 professional and non-professional federal government workers across the United States.

48.    NFFE members file tax returns with the IRS, and the IRS therefore houses their confidential taxpayer return information.

49.    NFFE's ranks include federal government employees paid at the lower grades of the General Schedule Pay Table and Wage Scale.

50.    Some of NFFE's lower-income members have been eligible for, claimed, and will claim the EITC. Some of NFFE's members have been eligible for, claimed, and will claim the CTC.

51.    Plaintiff Communications Workers of America, AFL-CIO ("CWA") is a union of hundreds of thousands of public and private sector workers in communities across the United States, Canada, Puerto Rico, and other U.S. territories. Its members work in telecommunications and IT, the airline industry, manufacturing, federal service contracts, news media, broadcast and

cable television, education, health care, public service, and other fields. It is headquartered in Washington, DC.

52.    CWA members file tax returns with the IRS, and the IRS therefore houses their confidential taxpayer return information.

53.    Some CWA members have been eligible for, claimed, and will claim the ETIC. Some CWA members have been eligible for, claimed, and will claim the CTC.

## LEGAL FRAMEWORK

54.    Government information systems are subject to comprehensive privacy and information security protections.

55.    Information systems at the IRS are subject to even more stringent privacy protections given the breadth and sensitivity of the confidential information regarding individual Americans that they contain.

56.    Following the Watergate scandal and the public disclosure of widespread misuse of citizens' tax information for improper purposes, Congress enacted a comprehensive scheme for the control of tax return information collected by the IRS in the Tax Reform Act of 1976. Codified at 26 U.S.C. § 6103, the Act replaced the prior regime in which return information could be inspected "upon order of the President" and under regulations promulgated by the Secretary of the Treasury and approved by the President.[2]

57.    Section 6103 requires that tax information, including returns and return information, be treated as confidential and may be subject to inspection or disclosure only when expressly authorized by statute.

---

[2] Mark Berggren, *I.R.C. 6103: Let's Get to the Source of the Problem*, 74 Chi-Kent L. Rev. 825, 825 (1999).

58.     Even Treasury Department officers and employees are only granted access to inspect or disclose tax information where their "official duties require such inspection or disclosure for tax administration purposes." 26 U.S.C. § 6103(h)(1).

59.     Indeed, the IRS has made the right of confidentiality core to its "The Taxpayer Bill of Rights." This

> general ban on disclosure provides essential protection for the taxpayer; it guarantees that the sometimes sensitive or otherwise personal information in a return will be guarded from persons not directly engaged in processing or inspecting the return for tax administration purposes. The assurance of privacy secured by § 6103 is fundamental to a tax system that relies upon self-reporting.

*Gardner v. United States*, 213 F.3d 735, 738 (D.C. Cir. 2000) (internal citation omitted).

60.     In the later Taxpayer Browsing Protection Act, Congress acted to make it unlawful even to inspect return information without proper authorization. 26 U.S.C. § 7213A. This further stressed Congress's intent to protect taxpayer data from even being shared with IRS employees who did not have an authorized need to access the data.

61.     Taxpayers are also protected explicitly against political interference. Top officials within the Executive Branch, including the President, are prohibited by law from requesting an audit or investigation of a particular taxpayer or from interfering with an ongoing audit or investigation. 26 U.S.C. § 7217. Violation of this statutory provision is a crime punishable by fine or imprisonment.

62.     For a White House employee to obtain access to return information, the President must personally sign such a request identifying the specific taxpayer whose return information is sought and stating "the specific reason why the inspection or disclosure is requested." 26 U.S.C. § 6103(g).

63. These legal protections against disclosure of taxpayer return information extend explicitly to inter-agency sharing. While this data can be shared with other agencies, sharing can only occur in narrowly-prescribed circumstances.

64. Taxpayers have a statutory right to seek damages under 26 U.S.C. § 7431 for the knowing or negligent unauthorized inspection or disclosure of returns or return information in violation of 26 U.S.C. § 6103, but that statutory right does provide a remedy to prevent ongoing unlawful inspection or disclosure.

65. The term "disclosure" means "the making known to any person in any manner whatever a return or return information." 26 U.S.C. § 6103(b)(8).

66. The terms "inspected" and "inspection" mean any examination of a return or return information. 26 U.S.C. § 6103(b)(7).

67. The term "return" is broadly defined to include "any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed. 26 U.S.C. § 6103(b)(1).

68. The term "return information" encompasses nearly all the information that IRS may possess on individual taxpayers, including

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.

26 U.S.C. § 6103(b)(2)(A).

69.     Records of tax payments and tax deposits are tax return information under 26 U.S.C. § 6103.

70.     The Privacy Act of 1974, 5 U.S.C. § 552a, prohibits disclosure of information from systems of records except in enumerated circumstances.

71.     The Privacy Act further requires that, when an agency establishes or revises a system of records, it must issue a System of Records Notice ("SORN"), which discloses information about the records in the system, the manners in which those records may be used, and storage and access policies. 5 U.S.C. § 552a(e)(4).

72.     The E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899, requires that agencies conduct a Privacy Impact Assessment ("PIA") for new or substantially changed information technology which contains records. PIAs are intended to "demonstrate that system owners and developers have incorporated privacy protections throughout the entire life cycle of a system." *E-Government Act of 2002*, Department of Justice, Office of Privacy and Civil Liberties, https://www.justice.gov/opcl/e-government-act-2002 (updated Feb. 13, 2019).

73.     Federal agencies are also subject to standards and guidance developed by the National Institute of Standards and Technology ("NIST"). NIST develops and implements "standards to be used by all agencies to categorize all information and information systems" in order to provide appropriate levels of information security according to a range of risk levels and "minimum information security requirements for information and information systems." 15 U.S.C. § 278g-3(b)(1). The Secretary of Commerce is further empowered to make those standards "compulsory and binding to the extent determined necessary by the Secretary to improve the efficiency of operation or security of Federal information systems." 40 U.S.C. § 11331.

74.    Those mandatory standards for Federal information systems can be found in NIST Special Publication 800-53.[3] The standards require that when federal agencies process personally identifiable information ("PII"), they must design and adopt information security and privacy programs to manage the security risks for the PII in the system.[4]

## FACTUAL ALLEGATIONS

### I.    Taxpayer Data is Uniquely Sensitive, as Congress and the IRS Have Long Recognized

75.    As the nation's tax collector, the IRS collects and maintains sensitive and confidential data about over 150 million individual taxpayers and millions more businesses, including data such as SSNs or individual taxpayer identification numbers, addresses, marital status, employment information, income, bank and brokerage account information, information regarding eligibility for deductions and tax credits, medical expenses, and confidential business information like profits and losses.

76.    Because this data is so sensitive, both Congress and the agency itself have put in place heightened protections against its improper access, use, and disclosure.

### A.  Historical Abuses Prompted Stringent Protection of Return Information

77.    In the 1970s, the Watergate hearings revealed that the Nixon White House had sought to access IRS return information concerning both supporters under audit and individuals on its "enemies" list.

78.    But that was not the only use of private tax information at IRS that prompted an

---

[3] *NIST SP-800-53, Security and Privacy Controls for Information Systems and Organization, Rev. 5*, U.S. Dep't of Commerce: National Institute of Standards and Technology (Sept. 2020), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf.

[4] *Id*. at 13.

outcry. Even the Nixon Administration's authorization for the U.S. Department of Agriculture to access names and addresses drawn from farmers' tax returns for a statistical assessment regarding the scope and scale of American farming resulted in a public outcry, with commentators decrying the privacy risks and "big brother" surveillance that would result from this type of inter-agency sharing of tax information.

79.     Congress responded. One member of Congress observed the perils of an arrangement in which "sensitive tax information—which is supposed to be confidential—is given to the Department of Agriculture, an agency which has so much control over the destinies of farmers." Another argued that "American citizens expect and have a right to expect in our free society the confidentiality of their tax returns to be honored. This massive invasion of privacy of such a sizable segment of our country's population is deplorable."[5] Thereafter, Congress conducted detailed hearings on the need, or lack thereof, for federal agencies to have access to IRS-protected tax return information.[6]

80.     Shortly thereafter, Congress enacted the Tax Reform Act of 1976, reinforcing the confidentiality of return information in the IRS's control.

81.     Reflecting the outcry over both inter-agency sharing of tax information and

---

[5]     Nat'l   Taxpayer   Advocate,   *Annual   Report   to   Congress*   241   (2003), https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2020/08/nta_2003_annual_update_mcw_1-15-042.pdf.   Joseph   J.   Thorndike, *How a Dispute Over Counting Farms Shaped Taxpayer Privacy Protections*, Tax Notes (Apr. 21, 2025),   https://www.taxnotes.com/tax-history-project/how-dispute-over-counting-farms-shaped-taxpayer-privacy-protections/2025/04/18/7s0ly; Joseph J. Thorndike, *Nixon Gave USDA Access to   Tax   Returns;   Farmers   Decried   'Snooping'*,   Tax   Notes   (Apr.   28,   2025), https://www.taxnotes.com/tax-history-project/nixon-gave-usda-access-tax-returns-farmers-decried-snooping/2025/04/25/7s16t.

[6] Joseph J. Thorndike, *The 1973 Congressional Hearings That Reshaped Tax Privacy Protections*, Tax   Notes   (May   5,   2025),   https://www.taxnotes.com/featured-analysis/1973-congressional-hearings-reshaped-tax-privacy-protections/2025/05/02/7s4fb.

President Nixon's abuses, the Act strictly controls sharing of IRS tax information *within* the federal government.

82.    The importance of these protections remains clear today, as President Trump's former chief of staff has stated that the president expressed a desire in his first term to have the IRS investigate or audit his perceived political enemies.[7] In recent weeks, the President has repeatedly threatened to use the tax system to punish Harvard University for its perceived "political" sympathies.[8]

### B. Historically, the IRS Has Tightly Controlled Return Information, Even as to its Own Employees

83.    The IRS has longstanding, detailed privacy protocols limiting IRS employee access to return information to tax administration purposes only.[9]

84.    IRS employees may access return information only according to standard operating procedures and within the bounds of privacy protection plans.[10]

85.    For example, as set out by the Internal Revenue Manual (an authoritative manual for IRS staff regarding agency policies and procedures that is also publicly available), return information must only be placed in shared locations with "strong access controls" based on "need-to-know principles."[11] The Internal Revenue Manual is "the single, official compilation of IRS

---

[7] Michael S. Schmidt, *Trump Wanted I.R.S. Investigations of Foes, Top Aide Says*, N.Y. Times (Nov. 13, 2022), https://www.nytimes.com/2022/11/13/us/politics/trump-irs-investigations.html.

[8] Elissa Nadworny, *Trump again threatens Harvard's tax-exempt status, saying, 'It's what they deserve!,'* NPR (May 2, 2025), https://www.npr.org/2025/05/02/nx-s1-5384897/trump-harvard-tax-irs-antisemitism.

[9] Internal Revenue Manual 10.5 (IRS 2020), https://www.irs.gov/irm/part10/irm_10-005-002 [hereinafter "IRM"].

[10] IRM 10.5.2.1.1, 10.5.2.1.3 (IRS 2020), https://www.irs.gov/irm/part10/irm_10-005-002#idm140196468618800.

[11] IRM10.5.2.2.5.2 (IRS 2020), https://www.irs.gov/irm/part10/irm_10-005-002#idm140196468618800.

policies, procedures, and guidelines" and " the primary source of instructions to staff."[12]

86.    "IRS employees may access returns and return information only when there is a 'need to know' the information for their tax administration duties." That "need to know" must "be established on a *case by case basis*."[13]

87.    IRS employees are directed to consult with their supervisors or other IRS authorities when there is any uncertainty about whether access to return information is authorized.[14]

88.    If an IRS employee accesses return information that is even questionably in violation of the law—including inadvertently, in error, or because such information was merely *related* to the employee's assigned case—they are directed to complete and sign a specific IRS form for tracking such access (Form 11377)—and send it to their manager, documenting their access to return information that was not required for their duties.[15]

89.    The IRS regularly investigates cases of unauthorized access of return information by its own employees, has implemented technological controls to prevent unauthorized access, tracks the access of its personnel, and requires extensive training to protect return information.[16]

90.    The Treasury Inspector General for Tax Administration is the component of the Treasury Department charged with conducting audits and investigations of IRS operations,

---

[12] IRM 1.11.1 (IRS 2022), https://www.irs.gov/irm/part1/irm_01-011-001.

[13] IRM11.3.22.2.1 (IRS 2024), https://www.irs.gov/irm/part11/irm_11-003-022 (emphasis added).

[14] IRM10.5.5.3.5 (IRS 2023), https://www.irs.gov/irm/part10/irm_10-005-005.

[15] *Id.*

[16] U.S. Gov't Accountability Off., *Taxpayer Information Keeps Ending Up In the Wrong Hands. What Can IRS Do To Better Protect It?* (Sept. 26, 2023), https://www.gao.gov/blog/taxpayer-information-keeps-ending-wrong-hands.-what-can-irs-do-better-protect-it.

including reporting on IRS employee misconduct allegations.[17] In carrying out its responsibilities, the Inspector General for Tax Administration regularly investigates, identifies, and refers for criminal prosecution instances of fraud and issues reports on systemic fraud and waste.[18]

91.    Taxpayer data is stored across multiple different databases and systems across the IRS, accessed and used for specific purposes. In addition to supporting legal compliance, these measures—including the separation and segmentation of sensitive data—are important to cybersecurity. The consolidation of data in a single location, with a single point of access, makes that data more vulnerable to cyberattacks.

92.    The sharing of taxpayer data across agencies is also tightly restricted, by law and as a matter of well-established historical practice at the IRS.

93.    As a historical practice, IRS has tightly controlled its sharing of taxpayer data with other agencies, including with Treasury, to ensure that the data was only shared when lawfully permissible and in a manner that protected the sensitive information being shared. These controls on access implement the restrictions on IRS and other federal agency use found within the Taxpayer Protection Act and the Taxpayer Browsing Protection Act and have been implemented in IRS policy. *See, e.g.*, IRM 10.5.5.1.1, https://www.irs.gov/irm/part10/irm_10-005-005 ("Since the inception of the Integrated Data Retrieval System (IDRS) in 1972, IRS has worked continuously to prevent and detect unauthorized access, attempted access and inspection of taxpayer records.").

---

[17] Pub. L. No. 105-206, 112 Stat. 685 (1998).

[18] *See* Treasury Inspector Gen. for Tax Admin., *Recent Investigative Activities*, https://www.tigta.gov/recent-investigative-activities (last visited Feb. 16, 2025); Press Release, Treasury Inspector Gen. for Tax Admin., *TIGTA Identifies Fraud Scheme, Alerts IRS to Prevent $3.5 Billion in Potentially Improper Pandemic Tax Credits* (Apr. 24, 2024), https://www.tigta.gov/articles/press-releases/tigta-identifies-fraud-scheme-alerts-irs-prevent-35-billion-potentially.

## II.  The "Department of Government Efficiency."

94.    On November 12, 2024, then President-Elect Trump announced his intent to create the "Department of Government Efficiency" ("DOGE") to "provide advice and guidance from outside of Government" to "the White House and Office of Management & Budget," to help "pave the way" for the Trump-Vance Administration to "dismantle," "slash," and "restructure" federal programs and services.[19] Congress has neither established nor appropriated money for DOGE. It appears to be operating at the direction of the President and his White House advisor, Elon Musk.

95.    On the day of his inauguration, January 20, 2025, President Trump signed Executive Order 14158, Establishing and Implementing the President's "Department of Government Efficiency," ("the E.O."), reorganizing and renaming the United States Digital Service as the United States DOGE Service, established in the Executive Office of the President.[20]

96.    The E.O. established the role of U.S. DOGE Service Administrator in the Executive Office of the President, reporting to the White House Chief of Staff.[21]

97.    The E.O. further established within U.S. DOGE Service a temporary organization known as "the U.S. DOGE Service Temporary Organization." The U.S. DOGE Service Temporary Organization is headed by the U.S. DOGE Service Administrator and is tasked with advancing "the President's 18-month DOGE agenda."[22]

98.    The E.O. also requires each Agency Head to establish a "DOGE Team" comprised of at least four employees within their respective agencies. DOGE Teams are required to

---

[19] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 12, 2024, 7:46 PM ET), https://truthsocial.com/@realDonaldTrump/posts/113472884874740859.

[20] Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025).

[21] *Id.* § 3(b).

[22] *Id.*

"coordinate their work with [U.S. DOGE Service] and advise their respective Agency Heads on implementing the President's DOGE Agenda."[23]

99.    The E.O. directs Agency Heads to take all necessary steps "to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems."[24] The E.O. nominally directs the U.S. DOGE Service to adhere to "rigorous data protection standards."[25]

100.    The E.O. does not and cannot vest any statutory authority in DOGE.

101.    Multiple DOGE officials have asserted that U.S. DOGE Service was reorganized to "fall[] under the Executive Office of the President [EOP]" and is now "subject to [the] Presidential Records [Act],"[26] which applies to, in relevant part, individuals and components in EOP who are close to the President: "a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201.

102.    DOGE's structure has evolved over time and currently includes a network of individuals who are located at, and often detailed to, agencies across the federal government. Many of these DOGE staffers and affiliates have the Office of Personnel Management ("OPM"), the General Services Administration ("GSA"), or the Executive Office of the President ("EOP")

---

[23] *Id.* § 3(c).

[24] *Id.* at 4(b).

[25] *Id.*

[26] Minho Kim, *Trump's Declaration Allows Musk's Efficiency Team to Skirt Open Records Laws*, N.Y. Times (Feb. 10, 2025), https://www.nytimes.com/2025/02/10/us/politics/trump-musk-doge-foia-public-records.html?smid=url-share; *see also* Katie Miller (@katierosemiller), X (Feb. 5, 2025, 5:26 PM), https://x.com/katierosemiller/status/1887311943062499425 (contending that the E.O. made DOGE "subject to Presidential Records [Act]").

DOGE component as their initial or home agency, but they have been detailed or otherwise dispatched to multiple agencies, where they appear to hold positions concurrently across agencies.

103.    This network of personnel tasked with carrying out the President's DOGE Agenda—with partially overlapping employment across multiple agencies including the U.S. Digital Service Temporary Organization, OPM, GSA, and other host agencies—can collectively be referred to as "DOGE" or "DOGE Affiliates." They are responsible for, *inter alia*, unlawful access, use, and disclosure of data at and across agencies of the U.S. government. On information and belief, all DOGE Affiliates take instruction from and coordinate their work through central DOGE leadership.

104.    Regardless of their formal employer, these DOGE Affiliates are generally identified as representatives of DOGE by agency employees and publicly, and they are empowered to implement DOGE's agenda and directives.

105.    On information and belief, Gavin Kliger, Todd Newnam, and Sam Corcos have been the most prominent DOGE Affiliates located at and directing priorities and policies of the IRS since the Trump Administration took power.

### III. DOGE'S Pattern of Rapidly Entering Agencies, Seizing Critical Systems, and Unilaterally Dismantling and Restructuring Them

106.    Since Inauguration Day, DOGE Affiliates have sought and obtained, at least until stopped by court orders, unprecedented access to information systems across numerous federal agencies, including the United States Agency for International Development, the Department of Treasury, the Social Security Administration, the Department of Labor, the Department of Health and Human Services, the Consumer Financial Protection Bureau, the National Oceanic and

Atmospheric Administration, the Office of Personnel Management, and the Department of Education.

107.    Based on the pattern of conduct in subsequent months, DOGE personnel are seeking to develop the ability to facilitate large-scale transfers of data across agencies, rather than merely obtaining access for purposes of intra-agency review and analysis in support of their purported goal of stopping 'fraud, waste, and abuse.' One former DOGE Affiliate has said DOGE was collecting data for the sake of having it, describing DOGE Affiliates triumphantly returning to a DOGE 'war room' set up at the Eisenhower Executive Office Building with access to databases and laptops containing data; the purported need for or value of the data was beside the point.[27]

108.    DOGE Affiliates also played critical roles in the dismantling of the U.S. Agency for International Development and ongoing efforts to largely eviscerate agencies including the Department of Education, Consumer Financial Protection Bureau, U.S. Institute of Peace, and the Institute of Museum and Library Services.

109.    DOGE's behavior repeats itself across virtually every agency it enters: swooping in with new DOGE Affiliates, demanding sweeping access to sensitive systems and turning off key cybersecurity monitoring and protection measures, taking employment action against employees who resist their unlawful commands, and then giving themselves the ability and tools to carry out large-scale combination and exfiltration of data apparently unrelated to the efficiency of agency operations, for unknown purposes. At several agencies, DOGE Affiliates have simultaneously sought this data access while shutting down the agency. This process can move

---

[27] Hannah Natanson et al., *DOGE Aims to Pool Federal Data, Putting Personal Information at Risk*, Wash. Post (May 7, 2025), https://www.washingtonpost.com/business/2025/05/07/doge-government-data-immigration-social-security/.

incredibly quickly, with agencies transformed roughly overnight, or fully dismantled within a week.

110.    Many DOGE Affiliates are working across multiple agencies concurrently,[28] potentially collecting sensitive information from multiple databases across agencies and providing opportunities to combine and cross-reference data in ways that were never contemplated by the security plans for those systems.

111.    DOGE is reportedly working on building a "chatbot and other AI tools to analyze huge swaths of contract and procurement data" within the General Services Administration, and DOGE "moved swiftly" in the early days of the administration, "to bring aboard more AI tools" into the federal government.[29]

112.    DOGE is also reportedly using large-scale collection and analysis of data to surveil

---

[28] *See, e.g.*, Tim Marchman & Matt Giles, *This DOGE Engineer Has Access to the National Oceanic and Atmospheric Administration*, Wired (Feb. 5, 2025), https://www.wired.com/story/doge-engineer-noaa-data-google-musk-climate-project-2025/; Vittoria Elliott et al., *The US Treasury Claimed DOGE Technologist Didn't Have 'Write Access' When He Actually Did*, Wired (Feb. 6, 2026), https://www.wired.com/story/treasury-department-doge-marko-elez-access/; Avi Asher-Schapiro et al., *Elon Musk's Demolition Crew*, ProPublica (Feb. 6, 2025), https://projects.propublica.org/elon-musk-doge-tracker/ (DOGE staffer Nikhil Rajpal working at NOAA, CFPB, and OPM); Ella Nilsen & Sean Lyngaas, *Trump Energy Secretary Allowed 23-Year-Old Doge Rep To Access It Systems Over Objections From General Counsel*, CNN (Feb. 7, 2025), https://www.cnn.com/2025/02/06/climate/doge-energy-department-trump/index.html (DOGE staffer Luke Farritor working at HHS and Department of Energy); Evan Weinberger, *Musk's DOGE Descends on CFPB With Eyes on Shutting It Down*, Bloomberg Law (Feb. 7, 2025), https://news.bloomberglaw.com/banking-law/musks-doge-descends-on-consumer-financial-protection-bureau; Asher-Schapiro et al., *supra* (DOGE staffer Gavin Kliger working at CFPB, OPM, and USAID); Makena Kelly & Zoe Schiffer, *Elon Musk's Friends Have Infiltrated Another Government Agency*, Wired (Jan. 31, 2025), https://www.wired.com/story/elon-musk-lackeys-general-services-administration/; Laura Barrón-López (@lbarronlopez), X (Feb. 3, 2025, 2:05 PM), https://x.com/lbarronlopez/status/1886491276729544809 (DOGE staffer Edward Coristine working at OPM, Small Business Administration, and General Services Administration).

[29] Paresh Dave et al., *Elon Musk's DOGE is Working on a Custom Chatbot Called GSAi*, Wired (Feb. 6, 2025), https://www.wired.com/story/doge-chatbot-ai-first-agenda/.

federal workers, monitoring electronic employee communications, including emails, at the

agencies it engaged with[30] and using AI to analyze those communications for hostility to President

Trump and his agenda.[31]

113.    DOGE leader and Defendant Elon Musk confirmed in a March 2025 interview that

DOGE's efforts to obtain access to data at agencies were part of a broader attempt at

> reconciling all of the government databases to eliminate the waste and fraud. . . These
> databases don't talk to each other. And that's really the source of, that's the biggest
> vulnerability for fraud, is the fact that these databases don't talk to each other. So we need
> to reconcile the databases. It's a, frankly, painful homework, but it has to be done, and will
> greatly improve the efficiency of the government systems.[32]

DOGE's careless and unlawful behavior has not ended in merely accessing sensitive and protected

information. On February 12, 2025, DOGE reportedly posted classified information, including

classified personnel information, from the National Reconnaissance Office on its website.[33] In

---

[30] Jenna McLaughlin & Shannon Bond, *GSA Staff Facing Massive Cuts and Fears Of 'nonstop' Surveillance*, NPR (Feb. 12, 2025), https://www.npr.org/2025/02/11/nx-s1-5293258/trump-gsa-budget-cuts-doge ("Some employees were told that this would include monitoring of when employees logged in and out of their devices, when employees swipe in and out of their workspaces and monitoring of all their work chats. They were also told that 'keylogger' software that would keep track of everything the employees typed on their work machines would be installed on their work computers, the GSA officials said.")

[31] Alexandra Ulmer et al., *Exclusive: Musk's DOGE using AI to Snoop on U.S. Federal Workers, Sources Say*, Reuters (Apr. 8, 2025), https://www.reuters.com/technology/artificial-intelligence/musks-doge-using-ai-snoop-us-federal-workers-sources-say-2025-04-08/.

[32] Coral Davenport, *DOGE Accesses Federal Payroll System Over Objections of Career Staff*, N.Y. Times (Mar. 31, 2025), https://www.nytimes.com/2025/03/31/us/politics/doge-musk-federal-payroll.html.

[33] Jennifer Bendery, *Elon Musk's DOGE Posts Classified Data On Its New Website*, HuffPost (Feb 14, 2025), https://www.huffpost.com/entry/elon-musk-doge-posts-classified-data_n_67ae646de4b0513a8d767112; Will Steakin et al., *DOGE Data Release Criticized By Intel Community; Trump Admin Says It's Public Data*, ABC News (Feb. 16, 2025), https://abcnews.go.com/US/agency-data-shared-doge-online-sparks-concern-intelligence/story?id=118858837.

March 2025, Treasury admitted that a DOGE Affiliate improperly emailed unencrypted personal information within a spreadsheet to another agency.[34]

114.    A senior DOGE Affiliate was placed in the State Department in a role with potential access to sensitive and protected data despite recent allegations that he was terminated for disclosing his prior employer's sensitive, protected commercial information.[35]

115.    DOGE's pattern of entering agencies, obtaining access to data, and pushing out career IT staff who raise objections has unfolded at agencies across the government, including the following:

## Treasury

116.    Shortly before President Trump's inauguration, DOGE Affiliates demanded access to sensitive Treasury systems, including the system used by the Bureau of the Fiscal Service ("BFS"), to control the vast majority of federal payments.[36]

117.    The career official serving as Acting Secretary of the Treasury prior to Secretary Bessent's confirmation denied DOGE operatives' request for access to the BFS payment system and was subsequently placed on administrative leave.[37]

---

[34] Wes Davis, *A DOGE Staffer Broke Treasury Policy by Emailing Unencrypted Personal Data*, The Verge (Mar. 15, 2025), https://www.theverge.com/news/630894/doge-treasury-lawsuit-marko-elez-unencrypted-emails.

[35] Marco Quiroz-Gutierrez, *A 19-Year-Old Who Was Reportedly Fired From an Internship for Leaking Internal Information to Competitors Is Now a DOGE 'Senior Advisor' in the State Department*, Yahoo News (Mar. 13, 2025), https://www.yahoo.com/news/19-old-reportedly-fired-internship-134320960.html.

[36] Katelyn Polantz et al., *How an Arcane Treasury Department Office Became Ground Zero in the War Over Federal Spending*, CNN (Feb. 1, 2025), https://www.cnn.com/2025/01/31/politics/doge-treasury-department-federal-spending/index.htm.

[37] Jeff Stein et al., *Senior U.S. Official Exits After Rift with Musk Allies over Payment System*, Wash. Post (Jan. 31, 2025), https://www.washingtonpost.com/business/2025/01/31/elon-musk-treasury-department-payment-systems/.

118.    Following his confirmation, Secretary Bessent granted DOGE operatives access to BFS, though the precise identities of DOGE Affiliates with access, and their level of access, are not reliably known by the public.[38]

119.    According to some reporting, DOGE personnel had the ability to stop individual payments from the BFS system, to change data in the system, or to alter system code.[39]

120.    On February 8, a judge in the Southern District of New York issued a Temporary Restraining Order halting DOGE's access to Treasury systems, finding that granting DOGE access to those systems "presents the risk of disclosure and confidential information and [a] heightened risk that the systems in question will be more vulnerable than before to hacking." *Order Granting Temporary Restraining Order*, *New York v. Trump*, No. 25 Civ. 1144, slip op. at 2 (S.D.N.Y. Feb. 8, 2025). That Court subsequently entered a Preliminary Injunction.

121.    In the wake of that decision, a decision which Defendant Musk suggested in posts on his social media website X was issued by a "corrupt" judge who "needs to be impeached" and should be ignored,[40] Mr. Musk for the first time described at least some of DOGE's work at Treasury as seeking to ensure that payment categorization codes in outgoing government payments are no longer left blank, requiring every payment to "include a rationale for the payment," and

---

[38] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payment System*, N.Y. Times (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.

[39] Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, Wired (Feb. 4, 2025), https://www.wired.com/story/elon-musk-associate-bfs-federal-payment-system/.

[40] Alexandra Marquez, *Legal Experts Warn of 'Constitutional Crisis' as JD Vance and Elon Musk Question Judges' Authority Over Trump*, NBC News (Feb. 9, 2025), https://www.nbcnews.com/politics/white-house/legal-experts-constitutional-crisis-vance-musk-judicial-rulings-trump-rcna191387.

require more frequent updating of Treasury's "DO-NOT-PAY" list.[41] According to Mr. Musk, career Treasury employees rather than DOGE staff will be implementing these changes.[42]

122.    Defendant Musk said the DOGE team and Treasury had jointly agreed to this work, although he did not indicate whether it was the full extent of DOGE's work and plans in Treasury's sensitive systems.[43]

### **NLRB**

123.    In early March 2025, DOGE Affiliates arrived at the headquarters of the National Labor Relations Board, a federal agency responsible for investigating and adjudicating complaints about unfair labor practices, which maintains sensitive data about workers and unions as well as proprietary business information. The DOGE Affiliates gained access to NLRB's internal systems, with the stated goal of reviewing it for compliance with administration priorities and to look for cost savings.

124.    NLRB's case management system contains sensitive information about workers, whistleblowers, union activists, and businesses, rather than any operational data that would be relevant to evaluating potential agency cost savings.

125.    DOGE Affiliates reportedly accessed this information and deliberately evaded common cybersecurity measures, including demanding that their actions on these systems not be logged, turning off monitoring tools, deleting records of their access after the fact, and engaging in other strategies more typically used by threat actors to conceal cyberattacks. Even more

---

[41]    Elon    Musk    (@elonmusk),    X    (Feb.    8,    2025,    2:51    PM    ET), https://x.com/elonmusk/status/1888314848477376744.

[42] *Id.*

[43] *See id.*

troublingly, after they were provided access to the systems, NLRB staff also detected several suspicious log-in attempts from an IP address in Russia.[44]

**Labor**

126.    At the Department of Labor, agency leadership told employees in early February 2025 to do whatever DOGE Affiliates asked and provide access to any DOL system they requested access to.[45] As revealed in other litigation, DOGE Affiliates have been provided with access to eight systems containing sensitive information, justified on the basis of the Executive Order that created DOGE, Exec. Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 20, 2025), rather than any particularized need for access.

127.    DOGE Affiliates purport to have accessed and analyzed data from state unemployment insurance programs, which states originally had provided to DOL's Office of the Inspector General for narrow specified purposes, but which President Trump ordered the Inspector General to turn over to the Secretary of Labor in a March 20, 2025 Executive Order.[46]

128.    In April 2025, media reported that DOGE Affiliates at DOL had obtained access to systems housing sensitive data pertaining to immigrants. DOGE Affiliate Miles Collins was given access to DOL's National Farmworker Jobs Program, which provides funding to organizations

---

[44] Jenna McLaughlin, *A whistleblower's disclosure details how DOGE may have taken sensitive labor data*, NPR (Apr. 15, 2025), https://www.npr.org/2025/04/15/nx-s1-5355896/doge-nlrb-elon-musk-spacex-security.

[45] These facts are alleged in *AFL-CIO v. Department of Labor* and are discussed in the Court's ruling on the Motion to Dismiss, 25-cv-00339 (D.D.C. Feb. 5, 2025), ECF No. 78.

[46] Rebecca Rainey, *DOGE Overhypes Unemployment Audit Result, Ex-Labor Officials Say*, Bloomberg Law (Apr. 18, 2025), https://news.bgov.com/daily-labor-report/doge-overhypes-unemployment-audit-result-ex-labor-officials-say.

that work with migrant and seasonal farmworkers—individuals who are authorized to work in the United States.[47]

## **SSA**

129.    At the end of January 2025, two DOGE Affiliates—Michael Russo and Scott Coulter—arrived at SSA. The Acting Chief of Staff for the agency at the time was informed of their arrival by a mid-level employee, Leland Dudek; she directed him to stand down and not have further contact with DOGE and stated that the Commissioner's Office would handle it.[48]

130.    Mr. Russo was onboarded as Chief Information Officer on February 3, 2025 but introduced himself as a DOGE representative.[49] It is unclear who appointed him to the CIO role. He was shortly joined by DOGE Affiliate Akash Bobba—a 21-year-old software engineer and former Palantir intern, also associated with OPM and the Department of Education[50]—and the Commissioner's Office soon after began receiving demands from Mr. Russo, Defendant Steve Davis, and other White House-affiliated personnel to provide Mr. Bobba with extensive access to SSA data and systems before midnight on February 10. The DOGE Affiliates did not explain why such extensive data access was needed, and the Acting Chief of Staff for the agency has explained that this request was highly unusual—the agency would not generally provide full access to all

---

[47] Leah Feiger and Vittoria Eliott, DOGE Has Access to Sensitive Labor Department Data on Immigrants and Farm Workers, Wired (Apr. 18, 2025), https://www.wired.com/story/doge-access-immigration-data-department-of-labor/.

[48] Decl. of Tiffany Flick, *AFSCME v. SSA*, No. 25-cv-00596 (D. Md. Mar. 7, 2025), ECF No. 22-10, https://www.documentcloud.org/documents/25557185-tiffany-flick-lawsuit-v-ssa/ [hereinafter "Flick Decl."].

[49] *Id.* ¶ 11.

[50] Asher-Schapiro et al., *Elon Musk's Demolition Crew*, *supra* note 28.

data systems even to the agency's most skilled and highly trained experts because access is provided only as needed for an individual's position. [51]

131.    Following these events, President Trump named Mr. Dudek—who was, at the time, on administrative leave pending an investigation of his improper contacts with DOGE personnel— to the role of Acting Commissioner, prompting the departure of then-Acting Commissioner Michelle King, a thirty-year veteran of the agency, who had resisted the DOGE team's data access requests.[52]

132.    Subsequently, Acting Commissioner Dudek provided Mr. Bobba and other members of the DOGE team with access to at least one major data warehouse[53] and authorized an unprecedented agreement to share the last known addresses of 98,000 people with ICE.[54]

133.    Since at least mid-March 2025, DOGE reportedly has been uploading data from SSA to an existing U.S. Citizenship and Immigration Service ("USCIS") 'data lake,' or centralized repository of data, at DHS, which also reportedly contains data from the IRS and voting data from at least two states.[55] DOGE Affiliate Antonio Gracias has described at least some of the work

---

[51] Flick Decl., *supra* note 48.

[52] Associated Press, *Social Security head steps down over DOGE access of recipient information, sources say*, CNN (Feb. 18, 2025), https://www.cnn.com/2025/02/17/politics/social-security-head-steps-down-doge-access/index.html; Flick Decl., *supra* note 48.

[53] Flick Decl. ¶ 47, *supra* note 48.

[54] Alexandra Berzon et al., *Social Security Lists Thousands of Migrants as Dead to Prompt Them to 'Self-Deport'*, N.Y. Times (Apr. 10, 2025), https://www.nytimes.com/2025/04/10/us/politics/migrants-deport-social-security-doge.html.

[55] Makena Kelly & Vittoria Elliott, *DOGE Is Building a Master Database to Surveil and Track Immigrants*, Wired (Apr 18, 2025), https://www.wired.com/story/doge-collecting-immigrant-data-surveil-track/.

DOGE is doing with this data, explaining that they looked for instances of noncitizens voting.[56]

134.    In late March 2025, another DOGE Affiliate—Scott Coulter, who was also a member of the on-site DOGE team at NASA, where he obtained wide access to internal databases—was appointed to replace Mr. Russo as Chief Information Officer of SSA.[57]

135.    In April 2025, Ranking Member Gerry Connolly, of the House Committee on Oversight and Government Reform, disclosed that credible whistleblower information had been provided to the Committee that DOGE was building a "massive database of SSA data and data from across the federal government, including the Internal Revenue Service (IRS), Department of Health and Human Services (HHS), and other agencies" and that DOGE was conducting its work "in a manner that disregards important cybersecurity and privacy considerations, potentially in violation of the law."[58]

136.    Defendant Davis has reportedly told SSA staffers that they would soon begin work to link various sources of SSA data with the goal of "joining all data across government."[59]

### Federal Payroll Data (Multiple Agencies)

137.    Over the final weekend of March 2025, DOGE personnel gained access to the Federal Personnel and Payroll System, housed at the Department of the Interior, which processes

---

[56] Stephen Fowler and Jude Joffe-Block, How DOGE may have improperly used Social Security data to push voter fraud narratives, NPR (Apr. 11, 2025), https://www.npr.org/2025/04/11/nx-s1-5352470/doge-musk-social-security-voting.

[57] Matt Bracken, *Social Security Administration Swaps Out One DOGE Staffer at CIO for Another*, FedScoop (Mar. 27, 2025), https://fedscoop.com/social-security-administration-swaps-out-one-doge-staffer-at-cio-for-another/.

[58] Press Release, Rep. Gerry Connolly, Disturbing Whistleblower Information Obtained by Committee Democrats Leads Ranking Member Connolly to Demand Investigation into DOGE's Disruption of Social Security Operations, Collection of Americans' Sensitive Data (Apr. 17, 2025), https://connolly.house.gov/news/documentsingle.aspx?DocumentID=6404.

[59] Natanson et al., *DOGE Aims to Pool Federal Data*, *supra* note 27.

payroll for around 276,000 federal employees across dozens of agencies, including the Departments of Justice, Treasury, and Homeland Security. This system contains highly sensitive government personnel information, including the PII of government workers.[60]

138.    Leading up to this point, the DOGE Affiliates had tried for two weeks to obtain administrative access to this system but faced objections from senior IT staff who were concerned this access could compromise highly sensitive data, including by making it more vulnerable to cyberattacks, and flagging the irregularity of the request. On Friday, March 28, 2025, Tyler Hassan—a DOGE Affiliate who had recently been named acting assistant secretary of policy, management and budget for the agency—placed the agency's Chief Information Officer and Chief Information Security Officer on administrative leave and under investigation for their "workplace behavior." On Saturday, March 29, 2025, the DOGE Affiliates obtained the access they were seeking.[61]

### IV. DOGE's Access to and Control Over Protected Information at IRS

139.    DOGE and its game of governmental whack-a-mole has wreaked havoc on the American system of government (perhaps a feature, not a bug, of its aims) and caused incredible concern for the privacy of the American public.

140.    Working through DOGE Affiliates embedded at IRS, DOGE has also effected a dramatic shift in IRS policy regarding access to and control over protected taxpayer data. As a result, IRS has already decided to begin large-scale data sharing with other government agencies, which it is poised to dramatically expand, within weeks or months, via a new centralized

---

[60] Davenport, *DOGE Accesses Federal Payroll System Over Objections of Career Staff*, *supra* note 32.

[61] *Id.*

technological platform.

141.    The nation has, once before, experienced an Executive Branch that sought to obtain information regarding individual American taxpayers, and Congress put an unambiguous barrier in its way. Those protections, enshrined in federal law for decades, mandate that DOGE and the other Defendants be restrained here.

### A. DOGE-Affiliated Personnel Have Obtained Access to and Control over Sensitive and Personal Information About Taxpayers, Including Social Security Numbers, Banking Information, and Tax Returns.

142.    On February 13, DOGE Affiliate Gavin Kliger reportedly arrived at the IRS to "examine the agency's operations."[62]

143.    In first few weeks of the Trump Administration, Kliger identified himself as being employed by at least CFPB, OPM, and USAID.[63] On February 3, Kliger sent an email from a USAID mail address announcing that agency's headquarters was closed for business.[64] On February 6, CFPB staff were told that Kliger would require access to CFPB data and systems, and he was added to the CFPB staff directory on February 7.[65] Ultimately Kliger has reportedly been

---

[62] Nathan Layne, *Exclusive: Top Elon Musk Aide Arrives at IRS to Scrutinize Operations, Sources Say*, Reuters (Feb. 13, 2025), https://www.reuters.com/world/us/top-musk-staffer-goes-irs-examine-operations-sources-say-2025-02-13/.

[63] Asher-Schapiro, *supra* note 28 (DOGE staffer Gavin Kliger working at CFPB, OPM, and USAID); Kelly & Schiffer, *supra* note 28.

[64] Edward Wong et al, *Top Security Officials at Aid Agency Put on Leave After Denying Access to Musk Team*, N.Y. Times (Feb. 3, 2025), https://www.nytimes.com/2025/02/02/us/politics/usaid-official-leave-musk.html.

[65] J. David, *DOGE is Now Inside the Consumer Financial Protection Bureau*, Wired ( Feb. 7, 2025), https://www.wired.com/story/doge-access-consumer-financial-protection-bureau-data/; Bobby Allen et al., *Musk's Team Takes Control of Key Systems at Consumer Financial Protection Bureau*, N.P.R. (Feb. 7, 2025), https://www.npr.org/2025/02/07/g-s1-47322/musks-team-takes-control-of-key-systems-at-consumer-financial-protection-bureau.

placed at eight different agencies in the early months of the Trump Administration.[66] Around the time Kliger arrived at IRS, he listed his job on LinkedIn as Special Advisor to the Director at OPM.[67]

144.    Upon arriving at the IRS in February, Kliger attended meetings with as many as five different phones.[68]

145.    DOGE Affiliates also reportedly requested to review IRS systems used for internal accounting operations, such as payroll and purchasing.[69]

146.    On February 16, it was reported that DOGE Affiliates were also seeking broad access to IRS tax systems and datasets including the Integrated Data Retrieval System ("IDRS"), and "[u]nder pressure from the White House," the IRS was considering granting such access with a Memorandum already drafted to facilitate such access.[70]

147.    The IDRS enables "instantaneous visual access" to return information across an extraordinarily broad swath of IRS files including the Taxpayer Information File, which integrates

---

[66] Asher-Schapiro et al., *Elon Musk's Demolition Crew*, *supra* note 28 (showing Kliger as connected to IRS, USAID, OPM, CFPB, the National Institutes of Health, the Federal Trade Commission, the Department of Agriculture, and the Voice of America).

[67] Julianne Mcshanne, *DOGE Worker Says He Was Radicalized by Reading Writer Who Later Denied Holocaust*, Mother Jones (Feb. 16, 2025), https://www.motherjones.com/politics/2025/02/doge-elon-musk-ron-unz-holocaust-substack-post-sailer-vdare-trump/; Gavin Kliger, LinkedIn, https://www.linkedin.com/in/gavin-kliger-5a339b157/ (last visited May 15, 2025).

[68] Hunter Walker, *Inside The 'Bizarre' Meeting Where DOGE Requested 'Extensive System Access' At IRS*, Talking Points Memo (Feb. 14, 2025), https://talkingpointsmemo.com/news/doge-irs-extensive-system-access.

[69] *Id.*

[70] Jacob Bogage & Jeff Stein, *Musk's DOGE Seeks Access to Personal Taxpayer Data, Raising Alarm at IRS*, Wash. Post (Feb. 16, 2025), https://www.washingtonpost.com/business/2025/02/16/doge-irs-access-taxpayer-data.

return information from individual and organizational taxpayers.[71]

148.    The IDRS includes the personal identification numbers and bank information of taxpayers in the United States – individuals, businesses, and nonprofits.

149.    Specifically, the IDRS includes:

a.    Information about taxpayer returns subject to examination;

b.    Application information about pending adoptions, such that adoptive parents can claim the dependency exemption and child care credit;

c.    Details about the authorization taxpayers have provided to representatives for purposes of sending tax refunds;

d.    Bank information for any check for tax refunds returned to the IRS;

e.    Taxpayer Identification Numbers and Individual Taxpayer Identification Numbers; and

f.    Preparer Tax Identification Numbers.

150.    The administration has offered varying reasons for why such access is necessary, ranging from working on fraud related to Earned Income Tax Credits or the child tax credit payment system,[72] to identifying targeting of audits, [73] to apparently snooping around tax

---

[71]    IRS, *2023 Document 6209 - ADP and IDRS Information*, § 14 (2023), https://www.irs.gov/privacy-disclosure/2023-document-6209-adp-and-idrs-information.

[72] Alexander Rifaat, *Musk's Team Enters IRS; Trump Vows Scrutiny of Improper Payments*, TaxNotes (Feb. 14, 2025), https://www.taxnotes.com/featured-news/musks-team-enters-irs-trump-vows-scrutiny-improper-payments/2025/02/14/7r3s6; Elon Musk (@elonmusk), X (Feb. 15, 2025, 9:36 PM), https://x.com/elonmusk/status/1890953327069782337; Aimee Picchi, *Elon Musk's DOGE Presence at the IRS Raises Concerns About Taxpayer Data Security, Refund Delays*, CBS News (Feb. 17, 2025), https://www.cbsnews.com/news/musk-doge-trump-irs-taxpayer-data-idrs-wyden-warren-letter/

[73] Lauren Irwin, *Stephen Miller: DOGE Will Restore 'Faith and Confidence' in IRS,* Hill (Feb. 17, 2025), https://thehill.com/policy/technology/5149835-stephen-miller-doge-irs/.

information of senators critical of the administration.[74]

151.    It is highly unusual—and perhaps unprecedented in the contemporary era—to grant political appointees access to personal taxpayer data, and particularly to the IDRS.[75] Even IRS commissioners do not typically have access to all taxpayer data systems.[76]

152.    On February 19, following public reports of the anticipated data-sharing and the initial filing of this suit, OPM and Treasury entered into a Memorandum of Understanding regarding Mr. Kliger's detail to the IRS. It specified that Mr. Kliger's assignment was not intended to involve access to returns or return information, including taxpayer PII and that, if such access became necessary to his duties, he would only be provided with access to anonymized data.[77]

153.    The February 19 Memorandum of Understanding also specified that Mr. Kliger would report to and work under the supervision of John York, a Counselor to Secretary Bessent.

154.    Also on February 19, Mr. York provided a declaration in another case informing the Court that Treasury would soon be onboarding two new DOGE Affiliates to be principally assigned to the IRS.[78]

155.    Sam Corcos was appointed as a Consultant for Treasury on February 28, 2025, and

---

[74]    Elon    Musk    (@elonmusk),    X    (Feb.    17,    2025,    6:09    PM), https://x.com/elonmusk/status/1891625938108002407.

[75]    Lily    Batchelder    (@lilybatch),    X    (Feb.    17,    2025,    12:47    PM), https://x.com/lilybatch/status/1891544934265630939.

[76] Bogage & Stein, *supra* note 70.

[77] Memorandum of Understanding from Jonathan Blum, Principal Deputy Assistant Sec'y, Dep't of Treasury, to Mike Crapo, Chairman of Comm. on Fin., U.S. Senate (Feb. 27, 2025) (on file with TaxNotes, *see* https://www.taxnotes.com/research/federal/legislative-documents/congressional-tax-correspondence/treasury-official-sends-memo-doge-detail-crapo/7rl0x).

[78] Decl. of John York, *All. For Retired Ams. v. Bessent*, No. 25-cv-00313 (D.D.C. Feb. 20, 2025), ECF    No.    30-1, https://storage.courtlistener.com/recap/gov.uscourts.dcd.277055/gov.uscourts.dcd.277055.30.1.pdf.

was designated as a Special Government Employee ("SGE") as defined by 18 U.S.C. §202.[79] Due to unspecified "timing constraints," Treasury's Office of Security Programs—which conducts background vetting for Treasury employees and contractors—expedited the security clearance process.[80] As recently as April 22, 2025, OSP had still not completed his background check.[81] Mr. Corcos's principal professional experience appears to be as a founder and the CEO of Levels, a holistic health-focused start-up company, which he co-founded in 2019 with a former SpaceX engineer, using seed and Series A funding from Andreessen Horowitz, a venture capital firm led by Marc Andreessen,[82] an ally of and major donor to President Trump,[83] who played a key role in recruiting DOGE personnel in collaboration with Defendant Musk.[84]

156.    On Friday, February 28, Mr. Corcos—who an IRS Human Capital Officer described as a political advisor to Tom Krause, another member of the Treasury DOGE Team—arrived at the IRS, accompanied by Mr. Kliger. They demanded that Mr. Corcos be issued IT

---

[79] Defs.' Rep. in Supp. Anticipated Mot. to Dissolve Prelim. Inj., *State of New York v. U.S. Dep't of the Treasury*, No. 25-cv-01144 (S.D.N.Y. Mar. 5, 2025), ECF No. 98, https://storage.courtlistener.com/recap/gov.uscourts.nysd.636609/gov.uscourts.nysd.636609.98.0.pdf.

[80] Decl. of Kari Mencl, *State of New York v. U.S. Dep't of the Treasury*, No. 25-cv-01144 (S.D.N.Y. May 1, 2025), ECF No. 145, https://storage.courtlistener.com/recap/gov.uscourts.nysd.636609/gov.uscourts.nysd.636609.145.0.pdf [hereinafter "Mencl Decl."].

[81] *Id.*

[82] Jacqueline Sweet, *New DOGE Staffer Has Ties to a Sanctioned Russian Oligarch*, Rolling Stone (Mar. 7, 2025), https://www.rollingstone.com/politics/politics-features/doge-staffer-corcos-wife-ties-russian-oligarch-1235291673/.

[83] Raphael Hernandes et al., *Revealed: The Tech Bosses Who Poured $394.1m Into US Election - and How They Compared to Elon Musk*, The Guardian (Dec. 7, 2024), https://www.theguardian.com/us-news/2024/dec/07/campaign-spending-crypto-tech-influence.

[84] Elizabeth Dwoskin et al., *Musk and Ramaswamy Race to Build a 'DOGE' Team for War with Washington*, Wash. Post (Nov. 24, 2024), https://www.washingtonpost.com/business/2024/11/24/musk-ramaswamy-doge-trump/.

equipment and an identity card immediately, although no advance notice had been provided, no onboarding paperwork had been prepared, and the tax check required for all IRS employees had not yet been completed. A Human Capital Officer scheduled the onboarding as soon as possible, for the next business day. On Saturday, March 1, then-Acting Commissioner Krause called the Human Capital Officer and directed her to complete the tax check (a tax compliance check conducted for employment suitability[85]) that day; when the Human Capital Officer referenced above stated that this was not possible before the next business day, Acting Commissioner Krause said she was being uncooperative and was expected to "jump if DOGE told [her] to jump." The following Monday, Acting Commissioner Krause placed the Human Capital Officer on administrative leave with the intention of terminating her employment, stating—among other reasons—that she was being insubordinate and uncooperative with the DOGE Affiliates.[86]

157.    On information and belief, Treasury did not enter into a Memorandum of Understanding or other agreement regarding Mr. Corcos's work at IRS or restricting the data he would be permitted to access or control, either at the time he was onboarded or since.[87]

158.    Treasury also onboarded a second new Treasury DOGE Team member at some point after March 4, 2025—Mr. Todd Newnam—who has been described as "the Treasury DOGE

---

[85] IRM 11.3.31.1, https://www.irs.gov/irm/part11/irm_11-003-031#idm140030602046896.

[86] Decl. of Traci DiMartini ¶ 20, *State of Maryland v. USDA*, No. 25-cv-00748 (D. Md. Mar. 7, 2025), ECF No. 4-37.

[87] A status report the government filed in another case states that there is no MOU between Treasury and USDS regarding the Treasury DOGE team and that they are Treasury employees who report to Treasury leadership. Defs.' Rep. in Supp. Anticipated Mot. to Dissolve Prelim. Inj., *State of New York*, *supra* note 79.

Team Lead" for all Treasury components other than the Bureau of the Fiscal Service, including the IRS. As of at least April 24, 2025, Treasury claimed that Mr. Corcos reported to Mr. Newnam.[88]

159.    By mid-March 2025, Mr. Corcos ordered that nearly all of the IRS's congressionally funded programs and initiatives planned for the fiscal year and calendar year 2025 be halted (or, in DOGE parlance, "deleted"). An IRS employee said that employees were scrambling to figure out whether Mr. Corcos had the authority to direct these actions and, if so, where his authority came from.

160.    One IRS employee described how Mr. Corcos and the DOGE Affiliates operated: "They just randomly drop by people's offices, demanding access to systems; they're bullying us and there's no discipline in what they are doing, which really worries me."[89]

161.    In late March 2025, Mr. Corcos and Mr. Kliger put into motion plans to hold a 'hackathon' at the IRS's DC headquarters for the purpose of building an application programming interface ("API") that would allow control of and access to all data across IRS systems in one interface.[90]

---

[88] Decl. of Daniel Katz, *State of New York v. U.S. Dep't of the Treasury*, No. 25-cv-01144 (S.D.N.Y. May 1, 2025), ECF No. 143, https://storage.courtlistener.com/recap/gov.uscourts.nysd.636609/gov.uscourts.nysd.636609.143.0.pdf.

[89] Rene Marsh, *"'Delete' Is One of Their Favorite Terms': Inside DOGE's IRS Takeover Ahead of Tax Season*, CNN (Mar. 15, 2025), https://www.cnn.com/2025/03/15/politics/doge-irs-takeover-irs-tax-season.

[90] Makenna Kelly, *DOGE Is Planning a Hackathon at the IRS. It Wants Easier Access to Taxpayer Data*, Wired (Apr. 5, 2025), https://www.wired.com/story/doge-hackathon-irs-data-palantir/; Rebecca Heilweil, *DOGE Rep Sam Corcos is Treasury's New Chief Information Officer, Source Says*, FedScoop (May 6, 2025), https://fedscoop.com/doge-sam-corcos-treasury-chief-information-officer/.

162.    On Friday, March 28, 2025, IRS placed on administrative leave around fifty senior executive service IT staff, at the direction of DOGE;[91] this action, on information and belief, followed pushback and anticipated resistance regarding the DOGE-directed plans to create the API and allow large-scale transfers of IRS data outside the agency.

163.    Shortly after the senior IT leaders were placed on administrative leave *en masse*, it was reported that the Acting IRS Commissioner for the previous month, Melanie Krause, was leaving the agency, along with Chief Risk Officer Mike Wetklow, Chief Privacy Officer Kathleen Walters, and Chief Financial Officer Teresa Hunter.[92]

164.    Around the same time, it was reported that the Chief Information Officer for Treasury, Tony Arcadi, had resigned from his position.[93]

165.    Approximately two weeks later, on April 14, 2025, the IRS's Chief Information Officer, Rajiv Uppal, announced he was also leaving the agency.[94]

166.    Approximately two weeks after that, it was reported that Treasury's acting Chief Information Officer, Jeff King—who had only assumed the post in late March, after Mr. Arcadi's departure—would also be leaving the IRS. During his time at the agency, Mr. King reportedly played an instrumental role in IRS's cybersecurity and modernization efforts in the previous

---

[91] Matt Bracken, *IRS Cuts About 50 IT Executives, Sources Say*, FedScoop (Mar. 29, 2025), https://fedscoop.com/irs-it-layoffs-tax-agency-doge/.

[92] Nathan Layne & Kanishka Singh, *Top IRS Officials Join Chief in Quitting Following Immigration Data Deal*, Reuters (Apr. 9, 2025), https://www.reuters.com/world/us/us-irs-chief-quit-over-deal-share-data-with-immigration-officials-report-says-2025-04-08/; Erin Slowey, *IRS Head, Privacy Chief to Quit After Immigration Data Deal (1)*, Bloomberg Tax (Apr. 8, 2025), https://news.bloombergtax.com/daily-tax-report/irs-head-privacy-chief-to-quit-following-immigration-data-deal.

[93] Rebecca Heilweil, *Treasury Department Elevates Jeffrey King from Deputy CIO to the Top IT Spot*, FedScoop (Mar. 29, 2025), https://fedscoop.com/treasury-department-cio-jeffrey-king/.

[94] Matt Bracken, *IRS's Top IT Official Leaving the Tax Agency This Month*, FedScoop (Apr. 15, 2025),https://fedscoop.com/irs-top-it-official-rajiv-uppal-leaving/.

administration.[95] Treasury's Chief Technology Officer and Chief Information Security Officer also announced their departures.[96]

167.    Shortly thereafter, Mr. Corcos was named as the new Chief Information Officer of Treasury.[97]

## B. At the Direction of DOGE Personnel, IRS Has Adopted a Policy of Large-Scale Data-Sharing with Other Agencies, Unrelated to Tax Administration

168.    Upon arriving at the IRS, DOGE Affiliates quickly set to work pressing the IRS to engage in unprecedented consolidation and sharing of sensitive, protected taxpayer return information. The IRS has done so, adopting unprecedented changes to its data management and sharing practices. And since the filing of the original Complaint in this matter, these changes have escalated and revealed DOGE's ultimate objective: large-scale consolidation and sharing of taxpayer data with other agencies, for purposes having nothing to do with tax administration.

169.    On February 28, 2025—the day Mr. Corcos arrived at the IRS—he and Mr. Kliger began pressing agency officials to create an "omnibus" agreement that would allow other federal agencies broad access to taxpayer information for the purported purpose of cross-referencing with other government benefits and identifying fraud.[98]

170.    The agency programs with which DOGE seeks to allow cross-referencing IRS taxpayer information are sweeping and implicate critical benefits for tens, if not hundreds, of

---

[95] Rebecca Heilweil, *Jeff King, Acting CIO of Treasury Department, Is Leaving*, FedScoop (Mar. 29, 2025),https://fedscoop.com/jeff-king-acting-cio-of-treasury-department-is-leaving/.

[96] Rebecca Heilweil, *Two Top Tech Officials Are Out at Treasury, Sources Say*, Fedscoop (May 1, 2025), https://fedscoop.com/two-top-tech-officials-are-out-at-treasury-sources-say/.

[97] Heilweil, *DOGE Rep Sam Corcos is Treasury's New Chief Information Officer, Source Says*, *supra* note 90.

[98] Jacob Bogage & Jeff Stein, *DOGE Presses to Check Federal Benefits Payments Against IRS Tax Records*, Wash. Post (Mar. 1, 2025), https://www.washingtonpost.com/business/2025/03/01/doge-irs-tax-records-benefits/.

millions of people. This includes, at a minimum, the Supplemental Nutrition Assistance Program ("SNAP") and student loan and aid programs. DOGE has also, through the Department of Agriculture, demanded that states turn over personally identifiable data about SNAP recipients.[99]

171.    Indeed, with DOGE influencing IRS decision-making, the agency reached an unprecedented agreement to share broad swaths of taxpayer data with another agency—the Department of Homeland Security—for use in immigration enforcement. The agency entered into this agreement over the apparent objections of career leaders and the individuals with formal control over IRS policy.[100] It has been reported that this data-sharing prompted, in part, the departures of the then Acting Commissioner Krause, Chief Risk Officer Wetklow, and Chief Privacy Officer Hunter.

172.    Since mid-March 2025, DHS reportedly has been uploading IRS data to a 'data lake,' or centralized repository of data, housed within USCIS. A DHS employee told a reporter: "They are trying to amass a huge amount of data. It has nothing to do with finding fraud or wasteful spending . . . They are already cross-referencing immigration with SSA and IRS as well as voter data."[101]

173.    Pursuant to the Homeland Security Act, USCIS focuses exclusively on the administration of immigration benefit applications; it has no immigration enforcement or criminal

---

[99] Jude Joffe-Block and Stephen Fowler, *USDA, DOGE demand states hand over personal data about food stamp recipients*, NPR (May 9, 2025), https://www.npr.org/2025/05/09/nx-s1-5389952/usda-snap-doge-data-immigration.

[100] Jacob Bogage & Shannon Najmabadi, *Acting IRS Chief to Quit Over Deal to Share Data with Immigration Authorities*, Wash. Post (Apr. 8, 2025), https://www.washingtonpost.com/business/2025/04/08/irs-dhs-tax-data-immigrants/.

[101] Kelly & Elliott, *DOGE Is Building a Master Database to Surveil and Track Immigrants*, *supra* note 55.

investigation function.[102] USCIS also has no exception under 26 U.S.C. § 6103 for receipt of taxpayer data from IRS.

174.    As of March 28, 2025, DOGE Affiliates Kyle Schutt, Edward Coristine, Aram Moghaddassi and Payton Rehling had been granted access to the USCIS 'data lake.'[103]

175.    Schutt is a software engineer formally employed by the GSA but who has reportedly performed work at the Cybersecurity and Infrastructure Security Agency ("CISA"), Department of Health and Human Services ("HHS"), and DHS. Schutt has also been detailed to U.S. DOGE Service Temporary Organization.

176.    Coristine—a 19-year-old undergraduate student—is a GSA employee, also listed as an "expert" at OPM in internal records, and has reportedly performed work at CISA, the Department of State, DHS, the Federal Emergency Management Agency, GSA, HHS, U.S. Agency for International Development, and Department of Education. Coristine has also been detailed to the U.S. DOGE Service Temporary Organization.

177.    Moghaddassi, a 26-year-old software engineer who previously worked at Elon Musk-owned companies Neuralink and X and appeared with Defendant Musk and other DOGE members in a Fox News special that aired March 27, 2025,[104] is formally employed by DOL and has reportedly performed work at Treasury, SSA, HHS, DOL, and DHS.

---

[102] U.S. Customs and Immigr. Servs., Policy Manual, ch. 1, https://www.uscis.gov/policy-manual/volume-1-part-a-chapter-1 (last updated May 13, 2025).

[103] Rebecca Heilweil, *DOGE Granted Access to Naturalization-Related IT Systems, Memo Shows*, FedScoop (Apr. 2, 2025), https://fedscoop.com/doge-granted-access-to-naturalization-immigration-it-systems/.

[104] Sarah D. Wire, *Meet the Actual DOGE Staff: Musk Aides Give New Details in Fox Interview*, USA Today (Mar. 28, 2025),https://www.usatoday.com/story/news/politics/2025/03/28/department-government-efficiency-aides-musk-trump/82703804007/.

178.    Rehling is a 27-year-old data engineer who has reportedly performed work at SSA and USCIS, which has referred questions about Rehling to DOGE. He is also among a group of DOGE workers who were in April 2025 granted access to the Justice Department's Executive Office for Immigration Review's Courts and Appeals System, which contains highly sensitive information regarding the addresses and case histories of millions of immigrants.[105]

### C.  At the Direction of DOGE Personnel, IRS Has Expanded its Implementation of its New Data Sharing Policy Through the Creation of a "Mega API"

179.    Beginning in late March 2025, Mr. Corcos directed IRS to undertake a new effort to create a system for sharing protected taxpayer data broadly across the federal government.

180.    DOGE engaged federal contractor Palantir, in a highly irregular procurement process, to transform a project originally intended to improve IRS customer service into one focused on creating a "mega API" that would allow access to broad swaths of IRS taxpayer data, including names, addresses, social security numbers, tax returns, and employment information. Engineers working on the project intend to complete it within a thirty-day period.[106]

181.    While Palantir had been working on a contract to aid the IRS is making it more efficient for customer service representatives to access basic information concerning taxpayers that contacted the agency with questions and concerns, DOGE shifted Palantir's work to creating an application programming interface ("API") that will allow broad access to data across IRS

---

[105] Hannah Natanson et al., *Justice Dept. Agrees to Let DOGE Access Sensitive Immigration Data,* Wash. Post (Apr. 21, 2025), https://www.washingtonpost.com/immigration/2025/04/21/doge-ecas-justice-immigration-courts-trump/.
[106] Makenna Kelly, *Palantir Is Helping DOGE With a Massive IRS Data Project* (Apr. 11, 2025), https://www.wired.com/story/palantir-doge-irs-mega-api-data/.

systems. This required a modified scope of work for Palantir on existing contracts and new task orders.[107]

182.    DOGE reportedly intends for this work to facilitate use of Palantir's Foundry platform as a central access point for all IRS systems.[108] A person with access could view and potentially alter any records in any of those systems,[109] and other Palantir tools, such as its Artificial Intelligence Platform, could be applied to the data.[110]

183.    Despite the serious privacy interests at stake with the sensitive taxpayer data if hundreds of millions of Americans implicated, DOGE rushed this project with cursory engagement from senior privacy and risk officials in the agency, aiming to transform access to taxpayer data within a short period of time.[111]

184.    This mechanism for wide-ranging access to taxpayer information across systems—and across agencies—runs counter to IRS's historical and considered practice of carefully circumscribing access to taxpayer data to prevent risks of gravely harmful disclosures and to ensure data is only accessed for lawful and appropriate purposes.

185.    On information and belief, the primary goal of creating this "mega API" is to facilitate further rapid, large-scale IRS data-sharing with other agencies in the federal government.

---

[107] *See Blanket Purchase Agreement (BPA) Call (PIID 205AE925F00117)*, USA Spending, https://www.usaspending.gov/award/CONT_AWD_205AE925F00117_2050_2032H518A00029_2050 [https://perma.cc/69UC-BPMY] (last visited May 15, 2025).

[108] Kelly, *Palantir Is Helping DOGE With a Massive IRS Data Project*, *supra* note 106.

[109] *Id.*

[110] *Palantir Foundry: The Ontology-Powered Operating System for the Modern Enterprise*, Palantir, https://www.palantir.com/platforms/foundry/ (last visited May 15, 2025).

[111] Kelly, *Palantir Is Helping DOGE With a Massive IRS Data Project*, *supra* note 106.

186.    On information and belief, this type of data-sharing could be achieved through either mass transfers of data out of the agency or by creating a network of interoperable data sources among different agencies with a centralized access point.

187.    On information and belief, DOGE is also seeking to create a system for quick, template agreements to enable sharing IRS data with other agencies in unprecedented and expedited ways. This approach gravely risks the security and privacy of IRS data systems.

188.    There are also parallels between this work and Defendant Musk's private business interests. In February 2025, Palantir announced that it had integrated Grok—a large language model developed by Mr. Musk's artificial intelligence start-up company, xAI—into its Artificial Intelligence Platform .[112] In April 2025, DOGE recruiter Anthony Jancso[113] posted in an online forum of Palantir alumni that he was hiring for a "DOGE orthogonal project to design benchmarks and deploy AI agents across live workflows in federal agencies."[114] And in May 2025, Palantir and xAI announced they were partnering, along with an investment firm, to design and deploy AI-powered tools in the financial services and insurance sectors.[115]

---

[112] Harrison Brooks, *Palantir Enhances AIP with Elon Musk's AI Chatbot Grok*, AInvest (Feb. 6, 2025), https://www.ainvest.com/news/palantir-enhances-aip-with-elon-musk-s-ai-chatbot-grok-25021010bafa2d3a7bff8514/.

[113] Asher-Schapiro et al., *Elon Musk's Demolition Crew*, *supra* note 28.

[114] Caroline Haskins & Vittoria Elliott, *A DOGE Recruiter Is Staffing a Project to Deploy AI Agents Across the US Government*, Wired (May 2, 2025), https://www.wired.com/story/doge-recruiter-ai-agents-palantir-clown-emoji/.

[115] *Musk's xAI joins TWG Global, Palantir for AI push in Financial Sector*, Reuters (May 6, 2025), https://www.reuters.com/business/musks-xai-joins-twg-global-palantir-ai-push-financial-sector-2025-05-06/.

## HARMS TO PLAINTIFFS

189.   Plaintiff Center for Taxpayer Rights focuses its work on advancing taxpayer rights, promoting trust in systems of taxation, and increasing access to justice in the tax system, particularly for the most vulnerable populations.

190.   The Center will be harmed by the shift in IRS data management and sharing practices to facilitate large-scale inter-agency transfers of sensitive taxpayer return information and consolidation of that data with other sensitive data sources from across the federal government, as well as by the DOGE Defendants' actions to gather data from or facilitate transfers of data between agencies across the U.S. government. These actions will harm the Center's ability to encourage trust in the taxpayer process. For example, undocumented immigrants have often been fearful of filing taxes. The Center encourages them to do so, relying on the protections that numerous statutes and IRS policies afford to taxpayer information.

191.   Public reports of DOGE access to taxpayer information, and the access to such information itself, will result in taxpayer distrust of the confidentiality of the information they submit to the IRS—particularly among vulnerable populations.

192.   This will result in the Center needing to dedicate more resources to facilitating trust in the taxpayer system and to reach low-income or other vulnerable taxpayers and away from other mission-crucial activities. Without assurances that such protections—including protections against large-scale inter-agency data sharing—will be respected by DOGE and the agency employees that grant them access to taxpayer information, the Center will be unable to assure vulnerable populations that their information will be appropriately safeguarded.

193.   This will impede the Center's core activities of reaching taxpayers and furthering the rights of taxpayers.

194.    In addition, the Center runs a Low Income Tax Clinic (LITC). The Center's LITC represents clients who are low-income taxpayers in their tax disputes with federal, state, or local tax agencies.

195.    Further, the Center operates LITC Connect, a nationwide network of LITCs and attorneys, accountants, and enrolled agents, that promotes access to justice for low-income taxpayers and ensures a fair and just tax system for all. The Center holds weekly calls for LITC Connect members, matches LITCs with tax professionals, provides training and support, and carries professional liability insurance for the professional serving the LITCs that are members. LITC Connect members represent about 20,000 taxpayers nationwide and have educated many more taxpayers and service providers about their rights and responsibilities before the IRS.

196.    The Center's and the LITC Connect members' clients are all low-income taxpayers, many of whom have filed for tax credits, including the CTC and EITC, and who are eligible to receive other public benefits like SNAP. Many of these clients are also survivors of domestic violence or victims of identity theft who have particular distress surrounding the disclosure of their sensitive tax information.

197.    Plaintiff Main Street Alliance ("MSA") works to help its small business owner members navigate challenges and thrive, as they work toward long-term prosperity. This includes helping small businesses navigate challenges with taxes, tariffs, access to capital, and other matters that affect their members' financial health.

198.    IRS has collected and stored extensive confidential business information regarding MSA's members, including business income, profits and losses, and other information that would reflect operational details.

199.    MSA's members have understood the information they submit to IRS to be private, barring a discrete list of specific exceptions. Their trust in IRS is engendered by their understanding of the privacy laws the agency is subject to and the agency's own public commitments to data privacy.

200.    Treasury-IRS Defendants are required by law to protect the sensitive personal, business, and financial information that they collect and maintain about MSA's members from unnecessary and unlawful disclosure.

201.    Defendants' actions have thus harmed MSA's members by depriving them of privacy protections guaranteed by federal law, invading their privacy, and breaching the confidence of private information they provided to the IRS.

202.    Supporting small businesses as they seek to succeed financially is a key part of MSA's mission, and its members' interests are also harmed by DOGE's wide-ranging access to and/or control over its members' sensitive financial information contained in IRS tax return information databases, including the IDRS, and Defendants' management of that data in a manner that increases the risk of its improper disclosure.

203.    Additionally, as MSA represents small businesses and sole proprietorships, it has members with incomes low enough to qualify for the EITC, and these members have and will file for that credit. To the extent DOGE focuses its inspection on EITC recipients, as President Trump and Defendant Musk have suggested they might, MSA's members are even more likely to suffer harm.

204.    Plaintiff National Federation of Federal Employees ("NFFE") represents 110,000 professional and non-professional federal workers, some of whom are paid on the lower end of the

General Schedule and Wage Grade pay systems, and its mission is to, among other things, promote its members' "economic welfare."[116]

205.    IRS has collected and stored extensive personal and financial information about NFFE's members, including their Social Security or taxpayer identification numbers, names and addresses, taxable income, marital status, and information, such as medical expenses, relating to eligibility for tax deductions and credits.

206.    NFFE's members have understood the information they submit to IRS to be private, barring a discrete list of specific exceptions. Their trust in IRS is engendered by their understanding of the privacy laws the agency is subject to and the agency's own public commitments to data privacy.

207.    Treasury-IRS Defendants are required by law to protect the sensitive personal, business, and financial information that they collect and maintain about NFFE's members from unnecessary and unlawful disclosure.

208.    Defendants' actions have thus harmed NFFE's members by depriving them of privacy protections guaranteed by federal law, invading their privacy, and breaching the confidence of private information they provided to the IRS.

209.    NFFE and its members will be harmed by DOGE's broad access to and/or control over its members' sensitive financial information contained in its members' tax return information, Defendants' transfer of such information to other agencies in violation of the law, and Defendants' management of such information in a manner that increases the risk of its improper disclosure. In particular, NFFE represents some lower-income federal workers who qualify for the EITC and CTC, and these members have and will file for those credits. To the extent DOGE focuses its

---

[116] Nat'l Fed'n of Fed. Empls., *About Us*, https://nffe.org/about/ (last visited Feb. 17, 2025).

inspection on EITC recipients, as President Trump and Defendant Musk have suggested they might, NFFE's members are even more likely to suffer harm.

210.    CWA's members include hundreds of thousands of public and private sector workers.

211.    IRS has collected and stored extensive personal and financial information about CWA's members, including their Social Security or taxpayer identification numbers, names and addresses, taxable income, marital status, and information, such as medical expenses, relating to eligibility for tax deductions and credits.

212.    CWA's members have understood the information they submit to IRS to be private, barring a discrete list of specific exceptions. Their trust in IRS is engendered by their understanding of the privacy laws the agency is subject to and the agency's own public commitments to data privacy.

213.    Treasury-IRS Defendants are required by law to protect the sensitive personal, business, and financial information that they collect and maintain about CWA's members from unnecessary and unlawful disclosure.

214.    Defendants' actions have thus harmed CWA's members by depriving them of privacy protections guaranteed by federal law, invading their privacy, and breaching the confidence of private information they provided to the IRS.

215.    CWA and its members will be harmed by DOGE's broad access to and/or control over its members' sensitive financial information contained in its members' tax return information, Defendants' transfer of such information to other agencies in violation of the law, and Defendants' management of such information in a manner that increases the risk of its improper disclosure.  In particular, CWA represents some lower-income workers who qualify for the EITC and CTC, and

these members have and will file for those credits. To the extent DOGE focuses its inspection on EITC recipients, as President Trump and Defendant Musk have suggested they might, CWA's members are even more likely to suffer harm.

## CLAIMS FOR RELIEF

### Count I
### Actions *Ultra Vires*
*DOGE Defendants*

216.    Plaintiffs assert and incorporate by reference the foregoing paragraphs.

217.    In directing and controlling the use and administration of Defendant IRS' systems, DOGE Defendants have breached secure government systems and caused the unlawful disclosure of sensitive taxpayer return information.

218.    DOGE Defendants have also effected a shift in IRS data management and sharing practices to facilitate large-scale inter-agency transfers of sensitive taxpayer return information and consolidation of that data with other sensitive data sources from across the federal government, for unknown purposes.

219.    DOGE Defendants are also gathering data from or facilitating transfers of data between agencies across the U.S. government, with the objective of creating either a centralized database containing significant amounts of cross-agency data about individuals and businesses or an interoperable network of systems, across multiple agencies, that would allow for centralized queries or examinations of data.

220.    DOGE Defendants may not take actions which are not authorized by law.

221.    No law or other authority authorizes or permits DOGE defendants to access or administer these systems, nor to fundamentally shift long-standing U.S. policy to segregate highly

sensitive taxpayer return information and restrict its use—on the agency- and even individual employee-level—to only those who need to know the information for a specific, legally authorized purpose.

222.    No law or other authority authorizes or permits DOGE defendants to create a single, unified database or inter-agency network consolidating information about citizens and residents from across the federal government—including sensitive taxpayer return information from the IRS, which individuals and businesses are required by law to submit—for either all or a significant subset of U.S. citizens and residents.

223.    Through such conduct, Defendants have engaged (and continue to engage) in *ultra vires* actions which injure plaintiffs by exposing their protected private information and increasing the risk of further disclosure of their information.

## Count II
### Violation of the APA: Arbitrary and Capricious, Contrary to Law, 5 U.S.C. § 706
*Treasury-IRS Defendants*

224.    Plaintiffs assert and incorporate by reference the foregoing paragraphs.

225.    Treasury-IRS Defendants have made the decision and acted to disclose and continue disclosing highly sensitive, legally protected taxpayer data to at least one other agency— with imminent plans to expand the scope of this data-sharing to other agencies—without acknowledging that IRS was changing its policies with respect to inter-agency data sharing, identifying the source of its authority to do so, or providing any reasoning whatsoever for its decision, and without considering the consequences, including to the reliance interests of Plaintiffs and their members.

226.    Treasury-IRS Defendants have also made a decision and acted to consolidate taxpayer data contained across multiple databases and systems into a single point of access, without acknowledging that IRS was changing its policies with respect to inter-agency data sharing, identifying the source of its authority to do so, or providing any analysis whatsoever for why its decision is not arbitrary and capricious, and without considering the consequences, including the legal or security implications of this decision.

227.    Treasury-IRS Defendants have made the decision and acted to allow access to taxpayer data through a consolidated mechanism in a manner that facilitates and allows IRS and other federal employees to access and inspect personal data, including return information and other taxpayer data, without a need for the information in the performance of their duties or for tax administration purposes, or within other unlawful exceptions for inspection, access, or disclosure in violation of 5 U.S. Code § 552a(b), 26 U.S.C. § 6103, and 26 U.S.C § 7213A.

228.    The Treasury-IRS Defendants' conduct constitutes final agency action under 5 U.S.C. § 706.

229.    Treasury-IRS Defendants have thereby engaged in conduct that is contrary to law, in excess of statutory authority, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2).

## **Requested Relief**

WHEREFORE, Plaintiffs request that this Court:

1.    Enjoin Defendants' wrongful provision of access, inspection, and disclosure of return information and other personal information in the IRS system to members of DOGE

or other federal agencies or employees without lawful means of access, inspection, or disclosure;

2.      Enjoin Defendants from using the recently created mega API, or any other similar platform, to share IRS return information or other sensitive data outside of IRS, and within IRS to employees without a need for and tax administration purpose for the access;

3.      Declare unlawful and halt DOGE Defendants' access to, inspection, or disclosure of personal or other protected information;

4.      Declare unlawful and halt Defendants' use of IRS systems for purposes in excess of System of Records Notices (SORNs) and Privacy Impact Assessments (PIAs;

5.      Declare unlawful and halt DOGE Defendants' direction, control, or use of IRS systems;

6.      Declare unlawful Defendants' policy and actions to share IRS taxpayer data broadly with other federal agencies through the recently created mega API and through template agreements that do not conform to the specific, lawful reasons for inter-agency sharing of taxpayer data;

7.      Order Treasury-IRS Defendants to establish and maintain security protections that prevent the unauthorized access of return information or other personal information;

8.    Order Treasury-IRS Defendants to revoke access to return information or other personal information by DOGE Defendants and any other unauthorized entity or individual;

9.    Prohibit DOGE Defendants from collecting, accessing, disclosing, or retaining return information or other personal information in IRS systems;

10.    Award costs and reasonable attorneys' fees incurred in this action; and

11.    Grant such other relief as the Court may deem just and proper.

Dated: May 16, 2025                              Respectfully Submitted,

                                        */s/ Daniel A. McGrath*
                                        Daniel A. McGrath (Bar No. 1531723)
                                        Madeline H. Gitomer (Bar No. 1023447)
                                        Robin F. Thurston (Bar No. 7268942)
                                        Skye L. Perryman (Bar No. 984573)
                                        Democracy Forward Foundation
                                        P.O. Box 34553
                                        Washington, DC 20043
                                        Tel.: (202) 448-9090
                                        dmcgrath@democracyforward.org
                                        mgitomer@democracyforward.org
                                        sperryman@democracyforward.org
                                        rthurston@democracyforward.org

                                        *Counsel for Plaintiffs*

                                        Yvette M. Piacsek (Bar No. 980302)
                                        General Counsel
                                        National Federation of Federal Employees,
                                        IAM, AFL-CIO

1225 New York Ave. N.W., Suite 450
Washington, D.C. 20005
Tel.: (202) 216-4428
ypiacsek@nffe.org

*Counsel for Plaintiff NFFE*