**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR TAXPAYER RIGHTS, *et al.*,

        *Plaintiffs*,

    v.

INTERNAL REVENUE SERVICE, *et al.*,

        *Defendants*.

Case No. 1:25-cv-00457-CKK

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS'
AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 1

I.  The Court Should Dismiss Plaintiffs' Amended Complaint for Lack of
    Jurisdiction. ........................................................................................................... 1

    A.  Plaintiffs Lack Associational Standing. ................................................... 1

    B.  CTR Lacks Organizational Standing. ....................................................... 8

    C.  CTR Lacks Third-Party Standing. .......................................................... 11

II. Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted. ............... 12

    A.  Plaintiffs Fail to Plead the Exceedingly High Bounds of *Ultra Vires*
        Review. ................................................................................................... 12

    B.  Plaintiffs Cannot Assert Violations of the Internal Revenue Code or the
        Privacy Act on Behalf of Their Members Through the APA. ................. 15

CONCLUSION................................................................................................................ 16

# TABLE OF AUTHORITIES

**CASES**

*AFL-CIO v. Dep't of Lab.*,
    778 F. Supp. 3d 56 (D.D.C. 2025) ......................................................................... 8

*All. for Retired Ams. v. Bessent*,
    770 F. Supp. 3d 79 (D.D.C. 2025) ......................................................................... 3

*Am. Fed'n of Gov't Emps. v. Reagan*,
    870 F.2d 723 (D.C. Cir. 1989) ................................................................................ 3

*Am. Fed'n of Teachers v. Bessent*,
    --- F.4th ----, 2025 WL 2313244 (4th Cir. 2025) ....................................... *passim*

*Am. Fed'n of Teachers v. Bessent*,
    No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025) ...................................... 4

*Am. Immigr. Lawyers Ass'n v. Reno*,
    199 F.3d 1352 (D.C. Cir. 2000) ............................................................................ 12

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984) ............................................................................................... 15

*Caplin & Drysdale, Chartered v. United States*,
    491 U.S. 617 (1989) ............................................................................................... 11

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ..................................................................................... 2, 4, 11

*Doe v. Stephens*,
    851 F.2d 1457 (D.C. Cir. 1988) ............................................................................ 16

*Equal Rights Ctr. v. Post Props., Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) .............................................................................. 9

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024), *on remand to*, 117 F.4th 336 (5th Cir. 2024) ..................... 2, 9

*Fed. Aviation Admin v. Cooper*,
    566 U.S. 284 (2012) ............................................................................................... 16

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ............................................................................... 13

*Griffith v. Fed. Lab. Rels. Auth.*,
    842 F.2d 487 (D.C. Cir. 1988) ............................................................................... 13

*Grosdidier v. Chairman, Broad Bd. of Governors*,
    560 F.3d 495 (D.C. Cir. 2009) ............................................................................... 15

*Hastings v. Jud. Conf. of U.S.*,
    770 F.2d 1093 (D.C. Cir. 1985) ............................................................................. 15

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ................................................................................................. 9

*Hines v. United States*,
    658 F. Supp. 2d 139 (D.D.C. 2009) ........................................................................ 3

*Jeffries v. Volume Servs. Am. Inc.*,
    928 F.3d 1059 (D.C. Cir. 2019) ......................................................................... 7, 8

*Kowalski v. Tesmer*,
    543 U.S. 125 ........................................................................................................... 11

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
    --- F. Supp. ---, 2025 WL 1187730 (D.D.C. 2025) .............................................. 10

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ............................................................................................... 13

*Lepelletier v. Fed. Deposit Ins. Corp.*,
    164 F.3d 37 (D.C. Cir. 1999) ................................................................................. 11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................. 8

*Muransky v. Godiva Chocolatier, Inc.*,
    922 F.3d 1175 (11th Cir.),
    *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir. 2019),
    and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020) ............................................ 7

*Muransky v. Godiva Chocolatier, Inc.*,
    979 F.3d 917 (11th Cir. 2020) ........................................................................... 7, 8

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ................................................................................. 8

*New Mexico v. Musk*,
    --- F. Supp. 3d ---, 2025 WL 1502747 (D.D.C. May 27, 2025) .............................. 6

*Nuclear Regul. Comm'n v. Texas*,
　605 U.S. 665 (2025) ............................................................................. 13, 15

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
　280 F.3d 278 (3d Cir. 2002) ....................................................................... 12

*Powers v. Ohio*,
　499 U.S. 400 (1991) ................................................................................... 11

*Ry. Clerks v. Ass'n for Benefit of Non-Contract Emps.*,
　380 U.S. 650 (1965) ................................................................................... 13

*Selia Law, LLC v. Consumer Fin. Prot. Bureau*,
　591 U.S. 197 (2020) ................................................................................... 14

*Spokeo, Inc. v. Robins*,
　578 U.S. 330 (2016) ................................................................................. 2, 7

*Summers v. Earth Island Inst.*,
　555 U.S. 488 ................................................................................................ 8

*TransUnion LLC v. Ramirez*,
　594 U.S. 413 (2021) .......................................................................... *passim*

*Turlock Irrigation Dist. v. Fed. Energy Regul. Comm'n*,
　786 F.3d 18 (D.C. Cir. 2015) ..................................................................... 8, 9

*United States v. Nixon*,
　418 U.S. 683 (1974) ................................................................................... 14

*Warth v. Seldin*,
　422 U.S. 490 (1975) ................................................................................... 11

*Welborn v. IRS*,
　218 F. Supp. 3d 64 (D.D.C. 2016) ............................................................... 4

*Westcott v. McHugh*,
　39 F. Supp. 3d 21 (D.D.C. 2014) ............................................................... 15

*Wilson v. Libby*,
　535 F.3d 697 (D.C. Cir. 2008) ................................................................... 15

*Wolf v. Regardie*,
　553 A.2d 1213 (D.C. 1989) .......................................................................... 6

*Young v. U.S. Dep't of Just.*,
   882 F.2d 633 (2d Cir. 1989) ................................................................................. 8

**STATUTES**

5 U.S.C. § 552a ....................................................................................................... 3

5 U.S.C. § 704 ...................................................................................................... 16

**RULES**

Fed. R. Civ. P. 65 ................................................................................................ 14

**REGULATIONS**

Establishing and Implementing the President's "Department of Government Efficiency"
   90 Fed. Reg. at 8,441 (Jan. 20, 2025) .............................................................. 14

**OTHER AUTHORITIES**

Eli A. Meltz, *No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion
   Upon Seclusion*, 83 Fordham L. Rev. 3431 (2015) ........................................... 5

Restatement (Second) of Torts § 652B (A.L.I. 1977) .......................................... 5

## INTRODUCTION

Plaintiffs' Amended Complaint seeks to enjoin the Internal Revenue Service ("IRS") from entering into purported expanded data sharing arrangements within the Federal government. But Plaintiffs' lawsuit is untenable. To start, Plaintiffs lack Article III standing, as they have not alleged any non-speculative injury-in-fact similar to the harms courts have vindicated at common law. Nor does plaintiff Center for Taxpayer Rights ("CTR") have standing in its own right to assert statutory claims on behalf of third parties not before this Court, as CTR suffers no injury and those third parties may bring suit on their own.

Standing aside, Plaintiffs fail to state a claim on which relief can be granted. Plaintiffs' *ultra vires* claim is foreclosed by Supreme Court precedent, because Plaintiffs identify no express statutory boundary that Defendants have allegedly exceeded, and, in any event, its *ultra vires* claim is merely a restatement of its Administrative Procedure Act ("APA") claim in different clothes. Nor can Plaintiffs use the APA to seek forms of relief that Congress did not authorize within the comprehensive remedial schemes of the Internal Revenue Code or the Privacy Act.

Accordingly, the Court should grant Defendants' motion and dismiss Plaintiffs' Amended Complaint.

## ARGUMENT

## I.    The Court Should Dismiss Plaintiffs' Amended Complaint for Lack of Jurisdiction.

### A.    Plaintiffs Lack Associational Standing.

The alleged injuries described in the Amended Complaint fail to establish associational standing (or, indeed, any type of standing) under the standards set out in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). There, the Supreme Court explained that an intangible harm may be cognizable for standing purposes only when it "has a 'close relationship' to a harm traditionally

recognized as providing a basis for a lawsuit in American courts." *Id.* at 417 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Plaintiffs agree that *TransUnion*'s framework applies but seek to stretch the common law torts of "intrusion upon seclusion" and "breach of confidence" far beyond their limits. *See* Mem. in Opp'n to Defs.' Mot. to Dismiss, at 21–24, ECF No. 27 ("Opp'n").

1. Before turning to those common law torts, however, Plaintiffs' Amended Complaint fails at the outset because the alleged injury is far too speculative. To support standing, an alleged harm may not be premised on hypotheticals. Rather, the plaintiffs must allege "actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024), *on remand to*, 117 F.4th 336 (5th Cir. 2024). For injury to be imminent, it must be "*certainly impending*," and mere "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alteration in original) (citation omitted).

Plaintiffs themselves frame their members' alleged injury as an "increased risk" of some future violation of the Internal Revenue Code or the Privacy Act though alleged "permissive" data sharing agreements. Opp'n at 21–22. Even assuming the truth of the allegations in Plaintiffs' Amended Complaint for purposes of Defendants' motion to dismiss, the alleged increased risk is too attenuated to support this Court's jurisdiction; it is built on a speculative chain of events that is unlikely to occur.

Despite identifying several actions Defendants have allegedly taken to promote data sharing, such as creation of an application programming interface, or "API," Plaintiffs allege that Defendants have entered into only a single agreement to share data with another agency. *See* Am. Compl. ¶ 14, ECF No. 20. It is entirely speculative that any of Plaintiffs' members' data will be

shared under that agreement, and further speculation to assume Defendants will execute any additional data sharing agreements.

More fundamentally, it is pure conjecture to assume that data exchanged pursuant to any agreement with another agency will be done so unlawfully (*i.e.*, in violation of the Internal Revenue Code or the Privacy Act) such that Plaintiffs' rights would be implicated at all, much less sufficient for injury-in-fact. The government is entitled to a presumption of regularity, and the Court should thus not assume—even in the context of a motion to dismiss—that Defendants will not include any statutorily required protections in future data sharing agreements. *See Am. Fed'n of Gov't Emps. v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989) (explaining that the presumption of regularity "supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume [those officers] have properly discharged their public duties" (citation omitted)); *see also Hines v. United States*, 658 F. Supp. 2d 139, 144 (D.D.C. 2009) ("presum[ing] the regularity of IRS documents and official actions of the IRS").

The speculative nature of Plaintiffs' claims—based on an "increased risk" of the disclosure of data—distinguishes this case from *Alliance for Retired Americans v. Bessent*, where this Court concluded in the context of a motion for a preliminary injunction that the plaintiffs likely had standing. *See* 770 F. Supp. 3d 79, 99 (D.D.C. 2025). In that case, no speculation was required to know that the U.S. Department of the Treasury ("Treasury") established a DOGE team that was granted broad access to Treasury's Bureau of the Fiscal Service ("BFS") data systems. *See id*. at 95–96. Nor did the Court need to assume that the defendants in *Alliance for Retired Americans* would carry out their duties in bad faith, as Plaintiffs ask the Court to do here. In that case, it was undisputed that the defendants relied on the provision in the Privacy Act that allows an agency to access records if there is a "need" for the "record[s] in the performance of their duties." 5 U.S.C.

§ 552a(b)(1); *see also* Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., at 25–28, No. 1:25-cv-00313 (D.D.C.), ECF No. 61-1. There is an ongoing legal dispute in that case over whether the Treasury DOGE team may properly access BFS records under that provision of the Privacy Act. But the unsupported assumption that the defendants would exchange data without complying with the protections under Federal law is missing from that case.

Here, there are additional layers of speculation required to assume an Article III injury, including that the IRS will execute data arrangements and, in fact, share Plaintiffs' members data in such a way that violates the Internal Revenue Code or the Privacy Act. That further chain of uncertain events deprives Plaintiffs of standing. *See, e.g.*, *Clapper*, 568 U.S. at 410; *see also Welborn v. IRS*, 218 F. Supp. 3d 64, 77 (D.D.C. 2016) (rejecting alleged harm of increased threat of future identity theft and fraud as a result of a data breach as too speculative).

2. Even if the Court were to put aside the speculative nature of Plaintiffs' alleged injuries, their asserted harm is not cognizable under *TransUnion*. Beginning with intrusion upon seclusion, as Defendants explained in their opening brief, "'at its core, the harm contemplated by the common-law tort of intrusion upon seclusion includes an intrusion into an individual's private space.'" Defs.' Mem. in Supp. of Mot. to Dismiss, at 12, ECF No. 26-1 ("Mot.") (quoting *Am. Fed'n of Teachers v. Bessent*, No. 25-1282, 2025 WL 1023638, at *2 (4th Cir. Apr. 7, 2025) (Agee, J., concurring)). And as the Fourth Circuit explained in a published decision issued this week, "intrusion upon seclusion has long been understood to guard not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace." *Am. Fed'n of Teachers v. Bessent*, --- F.4th ----, 2025 WL 2313244, at *5 (4th Cir. 2025).

That type of intrusion is missing in Plaintiffs' allegations, which address alleged inter-agency data sharing arrangements regarding data lawfully housed within the government. The

allegations here stand in stark contrast to the facts of federal courts of appeal decisions that have concluded the tort of intrusion upon seclusion applies. *See* Mot. at 12–13 (discussing cases). Plaintiffs do not engage with any of those decisions in their opposition. *See* Opp'n at 22–23. And understandably so. An agency sharing (lawfully obtained) information, contained in data systems that the agency lawfully maintains, with another agency pursuant to a data-sharing agreement is in no way analogous to a "highly offensive" "intentional[] intru[sion], physical[] or otherwise, upon the solitude or seclusion of another or his private affairs or concerns." Restatement (Second) of Torts § 652B (A.L.I. 1977) ("Restatement"). In fact, Plaintiffs do not allege that their members would even know if a record containing their personal information was shared, barring some step taken by the agency to alert the person of the fact. *See TransUnion*, 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an injury sufficient to support standing where they did not "even *kn[o]w*" their files contained inaccurate information); *Am. Fed'n of Teachers*, 2025 WL 2313244, at *5 (explaining that, for purposes of intrusion upon seclusion, "it is not the information obtained, but the knowledge that a third party is engaged in targeted snooping, that causes the harm" (citing Eli A. Meltz, *No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion*, 83 Fordham L. Rev. 3431, 3453 (2015)).

Plaintiffs' theory of injury also diverges from the common law tort of intrusion upon seclusion because Plaintiffs do not allege that the purported data-sharing arrangements have targeted their members' information, or that government officials will ever look at their information pursuant to any such arrangement. That is difficult to square with the Restatement's description of an "intentional[] intrusion" into an individual's "solitude or seclusion." Restatement § 652B & cmt. a (referring in the singular to "the person" and "his" privacy interest).

It is also inconsistent with how courts describe the tort. Take *Wolf v. Regardie*, 553 A.2d

1213 (D.C. 1989), which Plaintiffs cite, Opp'n at 22. In that case, the court explained:

> the types of invasion intrinsic in the tort of intrusion upon seclusion are those such
> as harassment, peeping through windows or in other locations in which a plaintiff
> has chosen to seclude himself, opening personal mail, eavesdropping on private
> conversations, entering a plaintiff's home without permission or searching his
> personal belongings, examining a plaintiff's private bank account, or other
> invasions of that nature.

*Wolf*, 553 A.2d at 1217–18. Each of those examples describes a targeted intrusion into a specific

person's private information. They are nothing like the alleged conduct challenged here, which is

the agency's purported steps to facilitate data sharing through technical arrangements and data

sharing agreements. As in *American Federation of Teachers*, "Plaintiffs' [members] information

is one row in various databases that are millions upon millions of rows long[,]" and the "harm that

might come from [a] generalized grant of database access . . . seems different in kind, not just in

degree, from the harm inflicted by reporters, detectives, and paparazzi." 2025 WL 2313244, at *5;

*compare New Mexico v. Musk*, --- F. Supp. 3d ---, 2025 WL 1502747, at *8 (D.D.C. May 27, 2025)

(finding standing where the plaintiff States had alleged that defendants had "us[ed] threats or

undue pressure to access [*the plaintiffs'*] private financial information" (emphasis added)).

Finally, Plaintiffs' suggestion that the statutory requirements of the Internal Revenue Code

and the Privacy Act can salvage their intrusion upon seclusion theory (Opp'n at 24–25) runs

headlong into the Supreme Court's holding in *TransUnion*. Congress can create "a statutory

prohibition or obligation and a cause of action" but may not override Article III's injury

requirement. *TransUnion*, 594 U.S. at 426. Whatever Congress might have intended is irrelevant

to the question of whether Plaintiffs have established constitutional standing. *See Am. Fed'n of

Teachers*, 2025 WL 2313244, at *7 ("A plaintiff's theory of statutory liability and their standing

should not be conflated."). As discussed above and in Defendants' opening brief, both the

Restatement and case law demonstrate that the common law has never recognized a privacy injury for generalized intragovernmental data access, or anything less than targeted snooping for that matter. Congress's decision to impose additional statutory requirements on agency decisions to share information does not create a cognizable injury.

3. Plaintiffs' reliance on the tort of breach of confidence (Opp'n at 23–24) fares no better. That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (internal quotation marks omitted). To start, it is doubtful whether this tort qualifies as a traditional cause of action. *See TransUnion*, 594 U.S. at 427 (stating that the "lawsuit may not proceed because that plaintiff has not suffered any . . . harm *traditionally* recognized as providing a basis for a lawsuit in American courts" (emphasis added)). While the D.C. Circuit in *Jeffries* invoked the tort to find standing, that decision predates *TransUnion*, does not address whether the tort has a sufficient historical origin, and relies, in part, on an Eleventh Circuit panel decision that was later overturned by the Eleventh Circuit sitting en banc. *See Jeffries*, 928 F.3d at 1064 (citing *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175 (11th Cir.), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020)).

In that en banc decision, which came out after *Jeffries* was decided, the Eleventh Circuit questioned—without deciding—whether breach of confidence "can fairly be said to have 'traditionally been regarded as providing a basis for a lawsuit in English or American courts'" for standing purposes. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Eleventh Circuit found that the tort has been "emerging" only since the 1980s in a "rudimentary form after initially dying out

in its infancy." *Id.* (cleaned up). The Second Circuit has described it as "a relative newcomer to the tort family" and found that the tort is usually limited to the physician-patient or bank-customer relationships. *Young v. U.S. Dep't of Just.*, 882 F.2d 633, 640 (2d Cir. 1989). The tort's nascent and underdeveloped pedigree raises serious doubts about whether it can serve as a valid analogue under *TransUnion*'s requirement of a historically grounded cause of action.

Yet, even if the Court were to apply the elements of the tort, the analogy still falls flat. The tort "lies whe[n] a person offers private information to a third party in confidence and the third party reveals that information to another." *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025) (quoting *Jeffries*, 928 F.3d at 1064). Here, Plaintiffs do not allege that IRS will publicly disclose their information once they obtain it, and inter-agency data sharing pursuant to a lawful agreement cannot plausibly be analogized to disclosure to a "third party." Thus, Plaintiffs' reliance on the tort of breach of confidence necessarily fails.

### B.    CTR Lacks Organizational Standing.

CTR argues that it has standing in its own right as an organization. Opp'n at 27–32.  But CTR is not "the object of the government action or inaction [it] challenge[s]," meaning that, although "standing is not precluded, . . . it is ordinarily 'substantially more difficult' to establish." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). And organizations, like all plaintiffs, must prove an injury-in-fact that is fairly traceable to the challenged actions. For a plaintiff organization like CTR, that showing requires "more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (citation omitted). The organization must establish that the challenged conduct "'perceptibly impaired' the organization's *ability to provide services*." *Turlock Irrigation Dist. v. Fed. Energy Regul. Comm'n*,

786 F.3d 18, 24 (D.C. Cir. 2015) (emphasis added) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)).

CTR invokes *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), to support its assertion of standing. *See* Opp'n at 27–30. But as the Supreme Court explained in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), *Havens* was an "unusual case," and the Court "has been careful not to extend the *Havens* holding beyond its context." *Alliance*, 602 U.S. at 396. The *Alliance* Court explicitly rejected the organizations' assertion that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified that "*Havens* does not support such an expansive theory of standing." *Id.* at 395. In *Havens*, the realty defendant had provided false information about apartment availability that "perceptibly impaired" the organization's counseling and referral services, meaning that the realty's "actions directly affected and interfered with" the organization's "core business activities"—not dissimilar, the *Alliance* Court remarked, "to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*

The facts of this case are nothing like *Havens*. There is no concrete impediment to CTR's mission akin to the false information the realty provided in that case. Nothing about the increased data sharing Plaintiffs allege "directly affects" or "interferes" with CTR's "core business activities." CTR, through its Low-Income Taxpayer Clinic ("LITC"), is free to continue to counsel taxpayers on their rights without interference. CTR's "*ability* to provide services," *Turlock Irrigation Dist.*, 786 F.3d at 24 (emphasis added), remains undisturbed.

Attempting to show some direct interference with its work, CTR submits the declaration of its Executive Director and Founder, Nina Olson. *See* Olson Decl., ECF No. 27-1. Ms. Olson states that, in recent months, "[t]axpayers, particularly those who do not speak English as a first

language and are more likely to be immigrants, have become less willing to come to the Center's events, to seek its guidance, or to engage with the Center's education and outreach." *Id.* ¶ 8. Ms. Olson further states that "[t]his has also been the Center's experience with other populations particularly concerned about the security of personal information[.]" *Id.* Based solely on "the Center's experience and [her] long personal experience working as a taxpayer advocate," and without further explanation, Ms. Olson posits that "it is clear that the sudden difficulty the Center and other LITCs have experienced in reaching the population who we exist to serve is caused by the IRS's change in its data policy and shift to more open sharing of sensitive taxpayer information across the federal government." *Id.* ¶ 10.

CTR's attempt to draw a direct line between the conduct alleged in Plaintiffs' Amended Complaint and decreased use of CTR's services is speculative, to say the least. Whether the various individuals who declined CTR's services or programming in recent months did so because of the alleged increased data sharing, versus any number of other reasons (be it economic, social, or due to some other government policy, or for a different reason or a combination of reasons), is unknowable. Indeed, one might suspect that taxpayers who are worried about the use of their data would seek more guidance, not less, from an organization whose mission is to "advance[] taxpayer rights." *Id.* ¶ 3. But, either way, CTR offers no concrete reason to ascribe the decreased utilization of its services—or its increased expenditures—to Defendants' alleged conduct. *Compare League of United Latin Am. Citizens v. Exec. Off. of the President*, --- F. Supp. ---, 2025 WL 1187730, at *25, *32 (D.D.C. 2025) (concluding that a requirement of "documentary proof of United States citizenship" would be a "direct impediment" to the organization's core mission of registering eligible voters). The alleged impairment to CTR's operation, and CTR's increased expenditures in response to declining engagement, are too tenuous and require too many unsupported assumptions

for a finding of jurisdiction. *See Clapper*, 568 U.S. at 416 (an organization cannot establish standing based on actions it takes "in response to a speculative threat").

### C.    CTR Lacks Third-Party Standing.

CTR's argument that it has third-party standing to assert the interest of its clients is also flawed. A plaintiff in Federal court ordinarily may rely only on "his own legal rights and interests," *Warth v. Seldin*, 422 U.S. 490, 499 (1975). An exception to the rule, "jus tertii" or "third party standing," sometimes permits a plaintiff to assert the constitutional rights of third parties with whom it has a special relationship and who are impeded from suing themselves. *See Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004). Yet, as Plaintiffs acknowledge (Opp'n at 28), to have third-party standing, the litigant (here, CTR) must have suffered an injury-in-fact from the challenged action. *See Lepelletier v. Fed. Deposit Ins. Corp.*, 164 F.3d 37, 44 (D.C. Cir. 1999) (citing *Powers v. Ohio*, 499 U.S. 400, 41 (1991)); *see also Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989). Such injury as to CTR is lacking. CTR does not allege that its own data will be shared under the alleged augmented data sharing. *See* Am. Compl. ¶¶ 189–96. And CTR does not suffer an organizational injury for the reasons discussed above. *See* Part I.B, *supra*.

CTR's attempt to litigate on behalf of others falls outside the bounds of the third-party standing doctrine for other reasons, too. The Supreme Court has strongly suggested that the narrow exception for third-party standing applies only where constitutional rights are at issue, or to "allow[] standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *See, e.g.*, *Kowalski*, 543 U.S. at 130 (citation omitted). This case presents neither scenario. Plaintiffs do not assert any constitutional claims of third parties; CTR seeks to vindicate the rights of taxpayers

under the Internal Revenue Code and the Privacy Act. *See* Am. Compl. ¶¶ 224–29. And there is no challenged government action that applies directly to CTR.

Presumably recognizing that finding third-party standing as to CTR would be an extension of the doctrine, or at least at the doctrine's outer edge, Plaintiffs cite *Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*, 280 F.3d 278 (3d Cir. 2002), for the proposition that third-party standing is not limited to the context of constitutional claims. *See* Opp'n at 28. Plaintiffs cite no authority for that proposition from the D.C. Circuit, and even that Third Circuit case recognized that "successful third-party standing claims have involved violations of third parties' constitutional rights." *Pa. Psychiatric Soc'y,* 280 F.3d at 291. The statutory nature of Plaintiffs' claims therefore weighs heavily against allowing CTR to represent their non-party clients.

In addition, CTR cannot assert the rights of third parties because there is no obstacle to individual taxpayers bringing claims in their own names. *See Am. Immigr. Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1362–64 (D.C. Cir. 2000) (holding that organizations could not rely on the rights of persons subject to expedited removal because those persons were not hindered in asserting their own rights). For example, individuals in *American Federation of Teachers*, discussed above, have participated as first parties to assert similar claims under the Privacy Act. *See* Am. Compl., No. 8:25-cv-00430-DLB (D. Md.), ECF No. 13. Plaintiffs provide no persuasive reason why CTR's clients cannot do so here, or why the Court should deviate from the ordinary rule that the rights of an individual must be litigated by that person.

## II.    Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted.

### A.    Plaintiffs Fail to Plead the Exceedingly High Bounds of *Ultra Vires* Review.

For the reasons explained in Defendants' opening brief, Plaintiffs have failed to state an *ultra vires* claim. *See* Defs.' Mot. at 16–18. As the Supreme Court recently underscored in *Nuclear*

*Regulatory Commission v. Texas*, 605 U.S. 665 (2025), the bounds of that doctrine are exceedingly

narrow; an *ultra vires* claim is available only where "an agency has taken action entirely 'in excess

of its delegated powers and contrary to a *specific prohibition*' in a statute." *Id.* at 681 (quoting *Ry.*

*Clerks v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 660 (1965)).

Attempting to avoid the strict limitations on *ultra vires* review, Plaintiffs say that their *ultra*

*vires* claim is brought against the so-called "DOGE Defendants," and therefore the limitations in

*Nuclear Regulatory Commission* do not apply. *See* Opp'n at 37. But, as the Supreme Court and

the D.C. Circuit have stated repeatedly, *ultra vires* review is available only with respect to

challenges to *agency* action. *See, e.g.*, *Nuclear Regul. Comm'n*, 605 U.S. at 680 (explaining the

origins of equitable review "where an *agency's* action was *ultra vires*" (emphasis added)) ; *Leedom*

*v. Kyne*, 358 U.S. 184, 189, 191 (1958) (creating an exception for nonstatutory review for "*agency*

action taken in excess of delegated powers," where the agency's order "was an attempted exercise

of power that had been specifically withheld" (emphasis added)); *Fed. Express Corp. v. U.S. Dep't*

*of Com.* 39 F.4th 756, 764 (D.C. Cir. 2022) ("In assessing an *ultra vires* claim, we apply that

exacting standard of review in analyzing both the extent of the *agency's* delegated authority and

whether the *agency* has acted within that authority." (emphasis added) (citation omitted)); *Griffith*

*v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (discussing the exception in *Leedom*

*v. Kyne* as confined "to agency error so extreme that one may view it as jurisdictional or nearly

so"). Thus, the distinction Plaintiffs draw between the agency defendants and the alleged "network

of components and individuals in the Executive Office of the President and affiliated agencies and

individuals" that Plaintiffs refer to as the "DOGE Defendants," Opp'n at 36, is ultimately self-

defeating.

That *ultra vires* review is limited to challenges to agency action only makes sense, as the Executive Branch generally acts through Federal agencies. Plaintiffs themselves claim that the "DOGE Defendants have . . . effected a shift *in IRS* data management and sharing practices, *see* Am. Compl. ¶ 218 (emphasis added), underscoring that Plaintiffs' true challenge is to alleged changes to *agency* policy. And even if that is not Plaintiffs' intent, outside the context of actions taken through the IRS (*i.e.*, alleged data sharing), it is difficult to understand what Plaintiffs' assertion of an *ultra vires* claim would even hope to achieve. Plaintiffs appear to suggest the Court could enter an injunction to prevent specific defendants from "direct[ing] . . . policy" within the IRS, Opp'n at 38, but such an injunction would be plainly inappropriate. It would be fatally vague, *see* Fed. R. Civ. P. 65(d)(1), and would impermissibly interfere with Executive Branch's internal decisionmaking and operations, *cf. Selia Law, LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020); *United States v. Nixon*, 418 U.S. 683, 706 (1974). In any event, the Executive Order is already clear that DOGE teams within each agency merely "advise their respective Agency Heads on implementing the President's DOGE Agenda." Establishing and Implementing the President's "Department of Government Efficiency" 90 Fed. Reg. at 8,441, § 3 (Jan. 20, 2025).

As explained in Defendants' opening brief, Plaintiffs cannot prevail on their *ultra vires* claim because they have not identified any specific statutory bound the so-called "DOGE Defendants" have allegedly exceeded. Mot. at 16–17. Plaintiffs' *ultra vires* claim also fails because—even though brought against non-agency defendants—it is still another version of their APA claim in a different guise. *See id*. at 17–18. Plaintiffs went long with a "Hail Mary pass" by asserting an *ultra vires* claim, but the pass is incomplete. *Nuclear Regul. Comm'n*, 605 U.S. at 681. Plaintiffs' *ultra vires* claim should be dismissed.

**B.    Plaintiffs Cannot Assert Violations of the Internal Revenue Code or the Privacy Act on Behalf of Their Members Through the APA.**

Plaintiffs cannot smuggle alleged violations of the Internal Revenue Code or the Privacy Act through an APA claim. Mot. at 18–21. The argument is straightforward. The D.C. Circuit has recognized, as to the Privacy Act, that the statute sets forth a "comprehensive remedial scheme," akin to the Freedom of Information Act, the Civil Rights Act of 1964, and the Civil Service Reform Act ("CSRA"). *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008). That scheme permits certain forms of injunctive relief and, by implication, precludes all others. *See, e.g.*, *Hastings v. Jud. Conf. of U.S.*, 770 F.2d 1093, 1104 (D.C. Cir. 1985) ("[E]ven if a claim of a violation of the Privacy Act could be made out, appellant would not be entitled to the declaratory and injunctive relief he seeks, such relief not being among those expressly made available to remedy past disclosures made in violation of the Privacy Act."). The same is true for the Internal Revenue Code, which Plaintiffs acknowledge provide "similar remedies" to the Privacy Act.

In the face of comprehensive statutes, litigants are not permitted to "circumvent the [scheme's] requirements and limitations by resorting to the catchall APA," even when "the plaintiff cannot prevail in a claim" under the scheme. *Grosdidier v. Chairman, Broad Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (discussing the CSRA); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). Multiple decisions by this Court have reaffirmed this principle by dismissing APA claims alleging violations of the Privacy Act. *See Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014) (citing cases).

In the last week, moreover, the Fourth Circuit in *American Federation of Teachers* addressed similar claims in the context of DOGE team access to data at the Treasury Department, the Office of Personnel Management, and the Department of Education. Acknowledging that "both the Supreme Court and the [Fourth Circuit] have implied in footnotes that the Privacy Act does

15

not preclude suits seeking equitable relief under the APA," the court explained that "those footnotes are dicta, and the Supreme Court has more recently reserved the question." *Am. Fed'n of Teachers*, 2025 WL 2313244, at *8 (citing *Fed. Aviation Admin v. Cooper*, 566 U.S. 284, 303 n.12 (2012).

The Fourth Circuit also addressed *Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988), which Plaintiffs rely on here, explaining that it "contain[s] little to no reasoning why the Privacy Act fails to provide an 'adequate remedy' under the APA," *Am. Fed'n of Teachers*, 2025 WL 2313244, at *8 n.6. Indeed, the D.C. Circuit did not address the limitation on the APA's waiver of sovereign immunity in 5 U.S.C. § 704 at all, and therefore this Court is free to conclude that the APA does not authorize the broad relief Plaintiffs seek in the face of the Privacy Act's and the Internal Revenue Code's comprehensive remedial schemes.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Defendants' opening brief, Plaintiffs' claims should be dismissed with prejudice.

Dated: August 15, 2025                    Respectfully submitted,

                                          BRETT A. SHUMATE
                                          Assistant Attorney General
                                          Civil Division

                                          ELIZABETH J. SHAPIRO
                                          Deputy Director, Federal Programs Branch

                                          */s/ Bradley P. Humphreys*
                                          BRADLEY P. HUMPHREYS
                                          Senior Trial Counsel
                                          Federal Programs Branch
                                          Civil Division, Department of Justice
                                          1100 L Street NW
                                          Washington, DC 20005
                                          Telephone: (202) 305-0878

Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*