Exhibit 6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR TAXPAYER RIGHTS et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-457-CKK |
| INTERNAL REVENUE SERVICE et al., | |
| *Defendants*. | |

**DECLARATION OF NINA E. OLSON**

I, Nina E. Olson, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.      I am over eighteen years old and of sound mind, and I am fully competent to make this declaration.

2.      I serve as the Executive Director and Founder of the Center for Taxpayer Rights ("the Center" or "CTR"). I am personally knowledgeable about the organization's mission and operations. I previously served as the Internal Revenue Service ("IRS") National Taxpayer Advocate from 2001 to 2019, and earlier represented taxpayers in disputes with the IRS in private practice and at The Community Tax Law Project, the nation's first independent low-income taxpayer clinic. I've also testified before Congress relating to taxpayer rights and tax administration on more than 70 occasions.

1

<u>Center for Taxpayer Rights Mission, Activities, and Services</u>

3.    The Center's mission is dedicated to furthering taxpayers' awareness of and access to taxpayer rights, and deepening their understanding of the role taxation plays in achieving the common good.  We focus on (1) advancing taxpayer rights, (2) promoting trust in the tax system, and (3) increasing access to justice in the tax system, particularly for the most vulnerable populations, including immigrants, people whose first language is not English, low-income people, and domestic violence survivors.

4.    As a part of this work, the Center runs a Low-Income Taxpayer Clinic ("LITC"), which receives federal funds under the authorization provided by statute for such clinics in 26 U.S.C. § 7526.

5.    This Center also operates a nationwide network—LITC Connect—of other LITCs, as well as attorneys, accountants, and enrolled agents. LITC Connect has approximately 160 individual members and 90 LITC members.

6.    The Center also holds conferences, workshops, webinars, and other events to educate individuals on issues related to taxpayer rights, including privacy rights, and promoting trust in the tax system.  The Center also engages with the media and publishes written materials on these same issues.

<u>LITCs</u>

7.    Low Income Taxpayer Clinics, or LITCs, are organizations that provide *pro bono* (free) or nominal fee representation to low-income taxpayers who have tax disputes with the IRS, or related state or local tax disputes.  The disputes can involve audits, administrative appeals, collection, account adjustments, or litigation.  LITCs also provide outreach and education for low-

2

income taxpayers and taxpayers who speak English as a Second Language (ESL) about taxpayer rights and responsibilities.

8.     LITCs are required to "ensure the fairness and integrity of the tax system for taxpayers who are low-income or speak English as a second language."[1] This includes working to "inform individuals for whom English is a second language about their rights and responsibilities" under the Internal Revenue Code. 26 U.S.C. § 7526 (b)(1)(A)(ii)(II).  LITCs must also, in order to receive federal funding, identify and advocate for issues that impact these taxpayers.[2]

9.     Without LITCs, taxpayers who cannot afford representation in tax disputes with the tax agency are likely to get the wrong result, simply because they do not understand the tax law, or they do not understand what they need to provide the agency to support their case, or they simply give up because they are afraid or intimidated by the tax agency.

10.    Low income and other vulnerable taxpayer populations may not know they have the general right to challenge the tax agency and be heard, or that they have specific protections under the law.  LITCs ensure that low-income taxpayers are afforded the same rights and protections — due process — as taxpayers who can pay for counsel.

<u>The Center's Legal Services</u>

11.    At the Center, we integrate research and systemic advocacy with direct representation, litigation, and services through our own LITC.

12.    CTR's LITC provides free representation to low-income taxpayers who have tax disputes with federal, state, or local tax agencies.  Our LITC also provides outreach and

---

[1] Internal Revenue Service, National Taxpayer Advocate, Annual Report to Congress, 2024, at 197, https://www.taxpayeradvocate.irs.gov/reports/2024-annual-report-to-congress/full-report/.
[2] *Id.*

3

education for low-income taxpayers, and taxpayers who speak English as a second language,

about taxpayer rights and responsibilities, consistent with our obligations under 26 U.S.C. § 7526

(b)(1)(A)(ii)(II) as a condition of our federal funding.

13.     The Center currently has 22 active cases in-house; there are another 41 cases

pending assignment to volunteers through LITC Connect.  The Center has also conducted 49

consultations with taxpayers in 2025 thus far, providing guidance and advice where the taxpayer

did not require direct representation.; 18 of these consultations were with *pro se* taxpayers during

4 virtual trial sessions at the United States Tax Court.  The Center receives its cases from a

variety of sources, including direct referrals from the IRS and from taxpayers finding the

Center's LITC listing on the IRS website.  In addition to cases we receive as a result of our

outreach and education events, the Center also has referral arrangements with a network of

Volunteer Income Tax Assistance (VITA) sites serving the District of Columbia, and a network

of Domestic Violence shelters and other organizations serving this population in the District of

Columbia.  None of our clients would be able to afford paid representation in their cases; the tax

issues they are dealing with range from denial of credits relating to children, including the

Earned Income Tax Credit and the Child Tax Credit; worker classification issues; other types of

audits; and collection issues, including wage garnishments that cause our clients to be unable to

pay their basic living expenses.

14.     Since 1985, the Internal Revenue Code has taxed U.S. citizens and "resident

aliens" on their worldwide income, unless treaty provisions provide otherwise.  26 U.S.C.

§ 7701(b)(1), enacted by the Tax Reform Act of 1984, Pub. Law 98-369, Section 138.[3]   An

individual is considered a resident alien for federal tax purposes if they have the requisite

immigration status or they satisfy the substantial presence test defined in 26 U.S.C. § 7701(b)(3).

Thus, taxpayers who are unlawfully present in the United States and meet the substantial

presence test are required to file federal tax returns reporting their income.

      15.     The United States Supreme Court has held that "taxes are the lifeblood of

government and their prompt and certain availability an imperious need." *Bull v. United States*,

295 U.S. 247, 259 (1935). Accordingly, the tax code has distinguished itself from immigration

enforcement in defining resident aliens differently and more expansively than under immigration

law.  The law, policies, and practice pertaining to tax return and return information

confidentiality under 26 U.S.C. § 6103 have followed that distinction by ensuring the tax

agency—which collects the lifeblood of government—is not drawn into immigration

enforcement.  Section 6103 has walked a fine line by carving out extremely narrow exceptions to

tax return confidentiality such that voluntary tax compliance is not eroded by the IRS's

complicity in the use of tax return information to enforce laws unrelated to tax administration,

which would fatally impair the IRS's ability to collect the revenue that is government's

lifeblood.

      16.     The IRS created Individual Taxpayer Identification Numbers (ITINs) in 1996 as a

way for individuals who do not qualify for a Social Security Number, including resident aliens,

to file federal tax returns.  To obtain an ITIN, one must complete Form W-7, Application for an

---

[3] Prior to 1985, "[t]he question of residency [was] one of fact which must be determined based upon the circumstances of each individual case." *Hoskins v. Comm'r*, 46 T.C.M. (CCH) 1172 (T.C. 1983).

Individual Taxpayer Identification Number; the applicant must provide their name and address and other identifying information and submit original identity documents.  In most instances, the Form W-7 cannot be processed on its own; it must be submitted along with the taxpayer's Individual Income Tax Return.  Once an ITIN is assigned, the taxpayer must use that number for all subsequent returns, on which they must include their current address (which may be different from the address used to obtain the ITIN), as well as information regarding their dependents, marital status, and sources of income.

17.    Last year, in 2024, the Center handled 16 cases involving ESL taxpayers, including 14 cases involving taxpayers with ITINs, of which 8 involved ITIN processing or assignment issues.

18.    We have, until recently, counseled our clients and community members without Social Security Numbers (SSNs) to strongly consider obtaining an ITIN, so that they can participate in our country's tax system.  We have advised our clients, in alignment with our mission and consistent with our experience and professional judgment, that they have taxpayer rights, guaranteed by law, that protect the confidentiality of their information.  We have advised them that the law requires them to pay federal taxes, and that future hopes of an adjustment of status may benefit from consistent participation in the tax system. This advice is aligned with the Center's mission and consistent with its obligations to receive federal funding under 26 U.S.C. § 7526 (b)(1)(A)(ii)(II).

LITC Connect

19.    The Center also runs LITC Connect. Among other services, LITC Connect holds weekly calls with several dozen representatives of its member LITCs, provides training and

support, and carries professional liability insurance for the network of professionals that serve LITC members.

20.    LITC Connect also offers training in relevant tax issues to volunteers and LITCs, and developing resources for educating taxpayers about their rights and responsibilities, we ensure the protection of taxpayer rights. For example, we have conducted trainings on litigating refund claims in federal district courts and the Court of Federal Claims; on representing survivors of domestic violence; and on representing incarcerated or formerly incarcerated persons in tax disputes. We have also created a 10-week video series on the "Roadmap to a Tax Controversy" that is watched by new LITC staff and student interns. We host weekly strategy calls, where we help LITCs identify issues impacting low income and other vulnerable population.  We discuss approaches to legal issues, share advice, discuss litigation strategy, and provide guidance to other practitioners on the issues we are facing.

<u>The Center's Education and Outreach</u>

21.    CTR puts enormous effort into getting information about taxpayer rights and responsibilities to low-income taxpayers and their advocates.

22.    On a regular basis, we hold outreach and education events and activities for smaller groups of taxpayers, and we dedicate resources to targeting vulnerable populations. In 2024, we conducted five ESL outreach activities and five outreach activities to organizations that serve ESL or low-income taxpayers; during these sessions we discussed taxpayers' rights and responsibilities, including the responsibility of persons present in the US for a certain number of days (i.e. resident aliens) to file returns and the confidentiality protections for return information.

23.    During these events, we generally make a presentation targeted to the taxpayer population attending—for example, survivors of domestic violence or newcomers to the United

States.  When the events are held in-person, we set aside time for questions from the attendees but also for individual, anonymous consultations with attendees if they wish to discuss their issues in greater detail or are anxious about asking questions in public.  When the events are held virtually, we answer questions from the chat function and we also offer an opportunity to meet a lawyer in a private online breakout room to discuss specific case issues.  Another form of outreach event is appearing on podcasts that reach the populations we serve in the LITC.  Attendance at events can range from 5 people to 300,000, depending on the audience and mode of presentation.  All three CTR attorneys, including myself, conduct outreach and education, and the LITC has one staff position dedicated to outreach and education, and is about to hire another person who will assist in this work.

24.    The Center also conducts public education campaigns to educate taxpayers about their rights and obligations. For example, during the 2025 filing season, the Center, in partnership with the District of Columbia Office of Tax and Revenue, conducted a Metro poster campaign placed in stations serving low-income communities with a concentration of EITC filers.  These posters alerted taxpayers, including ESL taxpayers, to be alert to schemes, scams, and incompetent return preparers, and to take steps to protect their identities during the filing season.

25.    We also hold larger convenings to discuss these issues, such as conferences and webinars.  This year, we held our 10th International Conference on Taxpayer Rights, from June 4 to 6, 2025, focused on "Trust, Taxpayer Rights, & the Rule of Law."  We discussed issues related to specific groups of taxpayers and the challenges they may face in attempting to comply with tax laws in their country; we discussed trust in tax systems in the digital age of tax administration, and how automated tools can breed distrust; and we discussed how once trust in a tax system is lost, it is difficult to regain.  The conference is held in-person and live-streamed, and the US and

international audiences include LITC staff, tax practitioners and policymakers, academics, and tax agency officials.

26.     In 2024, the International Conference on Taxpayer Rights was entitled "Toward a Digital Taxpayer Bill of Rights" and focused on the implications of a digitalized tax system on under- and unrepresented taxpayers.  In 2023, we held a conference on moving towards an effective, trusted, and inclusive IRS, focused on ensuring the most vulnerable populations were protected by the tax system, including EITC recipients and ITIN filers.

27.     We also advocate for systemic change by connecting with national and international policymakers, advocates, and academics on issues impacting taxation and taxpayer rights; filing amicus briefs and participating in high-impact litigation in important tax cases; and promoting transparency through Freedom of Information Act requests and other research. We also file comments on regulations and procedures and amicus briefs in cases related to taxpayer rights.  This work is done in service of our mission to support the rights of low-income taxpayers in particular.

<u>The Center's Reliance on IRS Data Protections to Fulfil Its Mission and Provide Services</u>

28.     Section 6103 of the tax code provides that the information taxpayers provide to the IRS shall remain confidential, with limited exceptions.  An essential feature of Section 6103's exceptions is that information may be disclosed only for a designated purpose and pursuant to the exact procedures provided for each exception.

29.     The IRS also administratively adopted the Taxpayer Bill of Rights (TBOR) in the summer of 2014. Congress codified the TBOR in 2015. *See* Protecting Americans from Tax Hikes Act of 2015 (PATH Act), Pub. L. No. 114-113 § 401, 129 Stat. 3117 (2015) (codified at 26 U.S.C. § 7803). The TBOR's sixth enumerated right is the "Right to Confidentiality," now found at 26 U.S.C. § 7803(a)(3)(D), which provides that taxpayers have the right to expect that

"any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law." That right reflects nearly fifty years of congressional intent, beginning with the 1976 Tax Reform Act, to limit disclosure of tax data to narrow, carefully delineated exceptions in 26 U.S.C. § 6103.

30.    These confidentiality protections serve not only taxpayers' interests; they also strengthen the system of tax administration, which necessarily relies on voluntary compliance. By promising to safeguard taxpayers' privacy, the IRS encourages taxpayers to share wide-ranging information about their lives, sometimes including sensitive matters of family life, health status, and even behavior that may be contrary to other laws. All of this information is necessary to comprehensive and successful tax administration. As former IRS Commissioner Mark Everson testified to Congress in 2004: "We are broadly restricted under Section 6103 of the Code from sharing taxpayer information with third parties, including other government agencies, except in very limited circumstances."

31.    In fact, as early as 1982, six years after the enactment of 26 U.S.C. § 6103, the IRS vigorously defended the confidentiality of tax returns and return information against expansive interpretations of information sharing in the interests of maintaining voluntary tax compliance:

> The costs of IRS disclosure also seem high. Congress is likely to raise strong institutional objections, and will be strongly supported by various civil libertarian groups. A potentially costly and burdensome class action law suit is likely to be filed on behalf of those whose addresses were disclosed, and the publicity generated by the event will inevitably have some effect on the public's willingness to disclose information voluntarily to the IRS.

Memorandum from Peter J. Wallison, General Counsel, Department of the Treasury, to Secretary Regan, Disclosure to the Selective Service System (May 17, 1982) at 2.

10

32.      These protections have been a cornerstone of the Center's ability to (1) effectively counsel our clients, and (2) provide education and outreach that encourages participation in the tax system.

33.      For example, we have, for years, assured our clients who are worried about confidentiality of the stringent protection in place at the IRS with respect to the protection of information.

34.      Undocumented immigrants working in the United States are required by law to pay and file taxes.  Thus, we must advise our clients, and educate community members, of this legal responsibility.  In the past, we would do so while also assuring them of the confidentiality of their information.

35.      We have, for example, encouraged undocumented immigrants to file for an ITIN in order to participate in our tax system.  We have advised our clients and community members that filing allows certain ITIN holders to obtain dependent credits, like the Child Tax Credit, for their children who have a valid Social Security Number (SSN).

36.      We also advise our clients and community members that an ITIN can be used to open an interest-bearing checking or savings account or obtain a mortgage.

37.      Further, filing taxes as an ITIN holder or undocumented immigrant allow people without Social Security Numbers (SSNs) to pay taxes and contribute to essential programs, even though they cannot receive the benefits attached to them.  It benefits the entire tax system and country to have these individuals participate.

38.      Immigrants have also been led to believe that paying their taxes, even while without legal status in the United States, can lead towards a path to citizenship.  Legislative proposals for immigration reform often include, for example, language that payment of back

taxes can be used as evidence of good moral character in qualifying for a path towards citizenship. And USCIS explicitly requires proof of tax compliance to establish eligibility for naturalization.[4]

39.     We have, in our legal work and outreach efforts, advised clients and community members of all of this, for years.  That is no longer possible.

<u>The Data Sharing Policy Has Harmed and Continues to Harm the Center's Work</u>

40.     The Center's work, particularly through its operation of the Center's LITC, has become much more difficult in recent months as a result of the policy change at the IRS that has changed how the IRS accesses and shares data, and thus reduced confidence in the protection of taxpayer data.

41.     The reporting on the IRS's new policy to share taxpayer data much more broadly with other agencies, including ICE, has made it significantly more difficult for the Center to accomplish this mission. Taxpayers, particularly those who do not speak English as a first language and are more likely to be immigrants—to whom the Center is required to conduct outreach and education, as a statutory condition of its LITC's federal funding—have become less willing to come to the Center's events, to seek its guidance, or to engage with the Center's education and outreach.  This has also been the Center's recent experience interacting with other populations particularly concerned about the security of personal information, including the domestic violence survivors the Center serves—many of whom interact with the IRS regarding Earned Income Tax Credit and/or Child Tax Credit payment issues.

---

[4] USCIS, Form G-1151: Thinking About Applying for Naturalization? Use this List to Help You Get Ready!" (rev. Feb. 2024), https://www.uscis.gov/sites/default/files/document/guides/G-1151.pdf

42.    Potential LITC clients are also less willing to engage with the Center's services. The comparison from last year to this year makes clear the drastic impact this policy has had.  Last year the Center handled 14 cases involving taxpayers with ITINs.  To date in 2025, the Center has received only one new case involving an ITIN taxpayer.

43.    Last year, we conducted ten outreach and education activities related to ESL taxpayers; this year, the Center has only been able to conduct one virtual outreach/educational activity to ESL taxpayers and has been unable to host any in-person events, which are the most effective.

44.    The dramatic decline in interest and engagement with the Center's programming is due to taxpayers' reluctance to engage with the IRS for fear of drawing attention to themselves or having their current status or location shared with DHS/ICE.

45.    To attempt to adapt to this difficulty in carrying out the educational component of its mission, the Center has had to expend significant resources in recent months. First, the Center assigned additional education and outreach duties to an existing staff member and increased that staffer's pay as a result of the additional workload and responsibility.  In the last two weeks, the Center hired an additional staffer to focus on education and outreach in light of the reduced trust in the tax system engendered by the IRS's policy change to share taxpayer data more freely across the federal government. This need to expend additional resources is reflected in a FY 2026 grant application the Center submitted to the IRS on or around July 11, 2025.

46.    The Center has had to allocate approximately $75,000 to $100,000 on an annual basis out of its LITC's operating budget to education and outreach as a result of the reduction in trust and chilling effects of the IRS's policy change. This includes an allocation of approximately

13

$35,000 for the last quarter of 2025 and a planned allocation of $75,000 to $100,000 for 2026. This represents nearly 10 percent of the Center's LITC's operating expenses.

47.    When responding to questions or concerns from ITIN taxpayers about the privacy of the information they submit to the IRS, the LITC can no longer provide substantive advice about whether or not the taxpayers should or can safely submit information to the IRS.  We can only lay out their legal obligation to file and the consequences of failing to file.  And we can inform them that although the law provides certain privacy protections that should prevent this, the IRS has an information-sharing agreement with ICE, and that ICE may be able to obtain their address information from the IRS, which could put the taxpayer or members of their household/family at risk of detention and removal.  Before the IRS's new data-sharing policy, we were in a position to offer reliable advice about the risks and privacy protections associated with tax filings for this population. Now, under the new data-sharing policy, the Center is not in a position to provide reliable advice, consistent with our professional obligations, because we cannot reconcile the IRS's reported data-sharing conduct with our understanding of the laws that should constrain it. Instead, the Center can only lay out the relevant facts, and the taxpayer has to make the decision on whether to file, without the benefit of our advice.  This is an intolerable situation the undermines our ability to develop trusting relationships with our clients and to effectively represent them.

48.    This has resulted in immediate impairment to our ability to counsel our clients.  For example, we have represented clients in cases where, due to an IRS processing error, clients faced issues in obtaining an ITIN for their children, which prevented them from claiming their children as dependents and receiving a $500 credit to which they were entitled.  These clients had, prior to 2025, sought assistance from the LITC to rectify this error with the IRS. In at least one instance,

because they feared interaction with ICE, they walked away from the tax credit they were eligible

for, scared of providing information to or engaging further with the agency.

49.     In other cases, LITC clients have U.S. citizen children and adult dependents who

would qualify for the Other Dependent Credit (ODC). These clients are also entitled to a refund of

excess tax withholdings. In at least one instance, a client declined to file a return claiming the ODC

or refund of withholdings, for fear of their information being disclosed to ICE and subjecting them

to ICE raids or deportation, potentially preventing this client from ever obtaining the refund to

which they are entitled.

50.     Our clients and community members without SSNs that are not already ITIN

holders are much less likely to apply for an ITIN, now that their information is likely to be

imminently shared, unlawfully, with ICE. I am confident that some members of the communities

we serve will decide not to apply for an ITIN, or file taxes with an ITIN, because they are fearful

of how their data will now be shared. This understandable change in behavior by the populations

we serve directly contravenes our mission of increasing participation and trust in the tax system.

51.     The data sharing policy will drastically erode our pro bono legal services program,

which is central to our mission and vision to increase access to counsel for low-income individuals,

and in particular the ESL community. Our pro bono program provides representation to a

significant number of clients each year. As mentioned above, the data sharing policy makes this

representation drastically more complicated and burdensome.   This lack of clarity as to taxpayer

rights and how data will be protected or shared will make it harder for pro bono attorneys to take

cases and navigate their professional obligations in connection with those cases, and will increase

the burden of mentoring these cases when we do place them, as even experienced practitioners

will not be familiar with the new policy the agency has set forth, and its implications for how the Center counsels clients.

52.    Regardless of the money spent, and the resources dedicated to fulfilling the Center's mission, our activities are facing obstacles like never before.  We cannot fulfill our mission if we cannot reach the communities we serve.  We cannot fulfill our mission if we cannot effectively counsel our clients.  We cannot fulfill our mission or our obligations as counsel to LITC clients if we are unable to stand behind our representations of the rights that taxpayers are supposed to have and the trust they are supposed to be able to place in the tax system. The IRS's initiation of mass data sharing with ICE in recent weeks starkly threatens harms to the Center's ability to carry out its mission that cannot be reversed. An extended period of mass data sharing with ICE is very likely to permanently obstruct the Center's ability to accomplish its mission.

53.    The effective operation of the U.S. tax system is based on voluntary compliance; the IRS could not collect the trillions of dollars in federal revenue through enforcement actions alone.  It is an axiom of tax administration that taxpayer trust in the system is critical to maintaining and increasing voluntary compliance.[5] Taxpayer trust is generated by the tax agency both ensuring all taxpayers abide by the tax laws and its employees adhere to the taxpayer rights and protections provided for in the Internal Revenue Code, including the right to confidentiality in the Taxpayer Bill of Rights (26 U.S.C. § 7803(a)(3)(H)) and under 26 U.S.C. § 6103.   When taxpayers' trust in

---

[5] "Research shows that tax compliance is affected by (social and personal) norms such as those regarding procedural justice, trust, belief in the legitimacy of government, reciprocity, altruism, and identification with the group."  Marjorie Kornhauser, A Tax Morale Approach to Compliance: Recommendations for the IRS, 8 FLA. TAX REV. 601-602. (2006).  *See also* National Taxpayer Advocate 2007 Annual Report to Congress, Vol. 2, 1, Normative & Cognitive Aspects of Tax Compliance: Literature Review and Recommendations for the IRS Regarding Individual Taxpayers.

the tax system is eroded because their rights are not respected and the agency's promise of confidentiality is broken, they become less willing to engage with the tax agency, and it is very difficult to restore that trust. This loss of trust makes it difficult for the Center to reach its clients and convince them that they have rights and can challenge the IRS's position and be heard, resulting in a further loss of trust in the system.[6] The announcement of the policy change regarding data-sharing with ICE has already eroded our clients' trust in the system, and if these disclosures continue to go through, trust in the system will further plummet, creating almost insurmountable obstacles to our mission of promoting trust in the system and encouraging participation.

54.    Based on the Center's experience and my long personal experience working as a taxpayer advocate, including as National Taxpayer Advocate and in representing taxpayers, it is clear that the sudden difficulty the Center and other LITCs have experienced in reaching the population who we exist to serve is caused by the IRS's change in its data policy and shift to more open sharing of sensitive taxpayer information across the federal government.

<u>The Data Sharing Policy Has Harmed and Continues to Harm members of LITC Connect</u>

55.    The Center has heard repeatedly from its member LITCs across the country that they are also experiencing a significant drop-off in the willingness of taxpayers to attend and engage with their education and outreach efforts, particularly among those who do not speak English as a first language and who are more likely to be immigrants.

56.    An LITC Connect member shared that for their LITC, the volume of calls from Hispanic taxpayers has noticeably decreased and is nearing a standstill.

---

[6] "Once tax morale dips, it is hard to restore it to prior levels." *Id*. at 602.

57.    That member has also seen a significant decline in attendance at their education events. In the past, they were able to fill the venues where they were holding the event almost at capacity, but they are now fortunate to have ten attendees. Many individuals are no longer interested in filing taxes due to concerns that their information might be shared with ICE. While they are still reaching a small number of ESL taxpayers in the community, the overall impact of their efforts has decreased noticeably since the data sharing policy was announced.

58.    Another member shared that they are simply not hearing from their clients or the community.  Historically, for this LITC, ITIN holders had made up approximately eight percent of their client base, and in 2024, they received a larger number of calls than was typical from ITIN holders, or people who needed them to file in 2024. That changed this year, as reports of the data sharing policy were made public.

59.    That clinic has struggled with how to provide education to the community, and the ESL population in particular.  It is now difficult to do a presentation highlighting the benefits of filing a tax return without also noting the risk of alerting ICE.

60.    That clinic shared with LITC Connect that the breach of confidentiality feeds the distrust in government that many of their clients and community members already have due to culture and growing up in places where governments are more openly corrupt. It is extremely difficult to conduct their outreach related to taxpayer rights and participation in the tax system when there are such new, significant risks facing these populations as a result of the data sharing policy.

61.    LITC Connect members have also shared that their client counseling work has been significantly impacted by the Data Sharing Policy.  Their clients and community members have expressed anxiety about participating in the tax system at much higher rates this year.

18

62.     As one LITC Connect clinic member shared, in the past several months, those clients who have applied for ITINs, and those that have filed their tax returns with ITINs in the past (even earlier during this past tax season) have expressed regret of having done so because they fear that ICE is going to be knocking on their door.  Even though some of them know that there are certain requirements that ICE must fulfill to obtain information from the IRS, they do not trust ICE and have expressed how uneasy they feel.

63.     A clinic shared that clients with ITINs are experiencing anxiety and fear about law enforcement showing up at their door and breaking their family apart.

64.     Many of their clients who had previously come to them to get into filing compliance have decided to defer this pursuit for now, knowing all of the risks.

65.     Similarly, many clients who had filed jointly with US citizen spouses in the past are scared to file their 2024 taxes.

66.     One clinic shared with LITC Connect that their clients with ITINs either declined to be represented or withdrew from representation earlier this year.

67.     That clinic shared that many clients and prospective clients, after learning about the data sharing policy, have not returned to the clinic.

68.     LITC Connect member clinics are unable to provide their clients with legal advice and also serve their missions. Though they aim to meet their statutory requirements, including to inform individuals for whom English is a second language about their rights and responsibilities, they also must now underscore the risks that their clients face.  They can no longer assure clients of the confidentiality of their data or the trust they should have in the IRS and the tax system.

69.     This also harms the Center.  The Center's LITC Connect is designed to support these member clinics and practitioners.  The Center is unable to navigate this drastic and unlawful

change, and it has harmed its ability to provide advice, outreach, and support to the network. One of the services the LITC Connect provides is technical advice and guidance to LITC members. The Center has not been able to provide LITC Connect members with advice and guidance about how to advise their own clients in the face of this data sharing policy; members are left with many unanswered questions, undermining the very purpose for LITC Connect.

70.    The data sharing policy significantly impairs the work of LITC Connect. The Center is much less able to support the network it runs as they face these challenges.

<u>The Data Sharing Policy Harms the Center's and the LITC Connect Members' Clients</u>

71.    The harms to the Center's clients, and the clients of its network's members, are significant and irreparable.

72.    Clients, particularly those that have an ongoing immigration proceeding or that have been in front of an immigration judge before, are incredibly nervous and concerned about participating in the tax system. The IRS's new data sharing policy is heightening fear within immigrant communities and deepening the mistrust between immigrants and government institutions. Some clients have expressed that they have filed taxes in good faith with the assurance that this information would remain confidential and now they feel betrayed and scared.

73.    The clients I have experience working with do want to participate in the tax system and pay their taxes. They would like to obtain ITINs to obtain benefits for their children, to contribute to our society, or to use in establishing a bank account or taking out a loan. But they now fear immigration raids by ICE. They fear detention, even if not lawful. They ultimately fear separation from their families and loved ones. They fear deportation from the place they call home.

74.    Reports that ICE has requested 1.23 million records *in one day*, and ultimately seeks information on 7.3 million people, necessarily mean any taxpayer using an ITIN—including the

LITC's clients—is at imminent risk of having their data disclosed to ICE. According to published reports, there are likely fewer than 7.3 million active ITIN holders in total.[7]

75.    Even our clients not currently subject to deportation orders are incredibly fearful. The way the IRS is sharing data with ICE creates a significant risk of incorrectly linking taxpayers with different individuals who have similar names and address history. Under the terms of the MOU, and based on available reporting, ICE is not required to provide and has not provided ITINs for the majority of the taxpayers for whom it seeks information. From my time as Taxpayer Advocate, during which my office conducted many taxpayer surveys and wrestled with the IRS method of recording names in its systems, I know that government databases often fail to properly or consistently record the names of individuals whose names do not follow Anglo naming conventions. For example, many Spanish and Portuguese speaking individuals have two surnames. Likewise, individuals who speak languages that use writing systems other than the Latin alphabet, such as Chinese, Hindi, Cyrillic, or Arabic scripts, may have their names transliterated inconsistently. A recent article authored by the IRS's former Chief Data and Analytics Officer provides a description of these problems, which is consistent with my experience.[8]

---

[7] Treasury Inspector General for Tax Administration, Report No. 2024-400-012, *Administration of the Individual Taxpayer Identification Number Program* (Dec. 19, 2023), https://www.tigta.gov/sites/default/files/reports/2023-12/2024400012fr.pdf, p. 1 ("As of December 31, 2022 . . . there were more than 5.8 million active ITINs, and the IRS reported that almost 487,000 new ITINs were issued during CY 2022").

[8] *See also* Barry Johnson, Linking Tax and ICE Data May Hurt Many US Citizens and Other Legal Residents, Taxvox (May 6, 2025), https://taxpolicycenter.org/taxvox/linking-tax-and-ice-data-may-hurt-many-us-citizens-and-other-legal-residents.

76.     For that reason, the training guide for volunteers in the IRS Volunteer Income Tax Assistance (VITA) and Tax Counseling for the Elderly programs dedicates two entire pages to entering Spanish, IndoChinese, and other hyphenated or dual/triple surnames. *See* Internal Revenue Serv., Pub. 4012, 2024 Returns: VITA/TCE Volunteer Resource Guide: Entering Last Name Correctly B19–B20 (rev. Oct. 2024). The guide notes that the name and taxpayer identifying number must match exactly or the e-filed return will be rejected. As the VITA guide illustrates, the IRS name control is limited to the first 4 digits of the taxpayer's last name.  With the diversity of naming conventions for surnames, the name control alone is not a sufficient method for matching taxpayers.  The taxpayer identifying number must also match, to ensure that the correct person is identified in the IRS system.

77.     Because the IRS has agreed to run searches for ICE using only the name and former address, and because the name control in IRS databases is limited to the first 4 digits of the taxpayer's last name, there is a high probability of false positives (matching the wrong taxpayer with a name included in an ICE request) in the disclosures that have occurred, or the disclosures that will occur imminently. The consequences of these false positives for a taxpayer could be dire: exposure to ICE enforcement raids, criminal investigation and penalties, detention, or even removal.

78.     This insufficiently rigorous matching protocol also virtually ensures that IRS will violate Section 6103 in at least some cases by disclosing information for taxpayers that were not included in any request and about whom ICE has made no representations supporting disclosure under one of the Section 6103 exceptions. I have been told that a number of IRS personnel have quit or retired rather than face the risk of prosecution that would accompany what they see as flagrant violations of Section 6103, which can carry criminal penalties.

22

79.    The fears of the Center's clients have concrete, immediate impacts on their ability to engage safely with the tax system, to preserve their rights and satisfy their obligations.

80.    When our clients or prospective clients choose not to obtain an ITIN, this has significant impact on their lives.  In some states, ITINs are necessary to be eligible for state tax credits.  State education benefits may also require proof of state tax filing, which can require an ITIN.  The lack of an ITIN can also foreclose the ability to open a bank account or take out a loan.  For low-income clients, the absence of the ability to obtain these financial benefits or government services can lead to extreme difficulty in their participation in society and significant financial harm.

81.    In addition, some of these rights and obligations afforded to taxpayers are time sensitive.  There are several tax deadlines that, if missed, can cause irreparable harm.

82.    For example, the Internal Revenue Code requires taxpayers to timely file tax returns and pay their taxes. Taxpayers who miss these deadlines are subject to late filing penalties, late payment penalties, and accrual of interest.

83.    There are also taxpayer rights that must be timely invoked or are forfeited. For example, 26 U.S.C. § 6212 requires the IRS to issue a notice when it determines a "deficiency" in tax.  The notice is required to inform the taxpayer of the proposed deficiency; the taxpayer has 90 days from the date of the notice to petition the United States Tax Court. 26 U.S.C. § 6213(a).[9] The Tax Court (an Article I court) is the only judicial forum in which a taxpayer can dispute the amount of the deficiency before paying the proposed tax due.  The Tax Court takes the position that the

_____

[9] If the notice is addressed to a taxpayer outside of the United States, the taxpayer has 150 days to petition the Tax Court.  *Id.*

90-day deadline is jurisdictional—if a taxpayer misses it by an hour, they have no recourse to Tax Court.  If taxpayers, especially low-income taxpayers, are afraid of engaging with the federal government and miss the 90-day deadline, they will for all intents and purposes be deprived of judicial review of the tax liability because they cannot afford to pay the tax first and sue in federal district court or the Court of Federal Claims for a refund.  They will be forced to pay a debt they do not owe, which is a violation of Internal Revenue Code Section 7803(a)(3), which provides that taxpayers have the right to pay no more than the correct amount of tax.

84.    Internal Revenue Code sections 6320 and 6330 provide taxpayers who have an outstanding tax liability and against whom the IRS is proposing to levy on property (such as a bank account or the taxpayer's wages) or file a public federal notice of tax lien, with the right to a Collection Due Process hearing.  At this hearing, the taxpayer can challenge the IRS's proposed collection action and offer alternatives to that action.  If the taxpayer disagrees with the hearing officer's conclusions, the taxpayer has the right to petition the United States Tax Court for review of the determination.

85.    The time to request a CDP hearing before the IRS is 30 days from notice of intent to levy/file a lien; and the time to petition the Tax Court is 30 days from the hearing officer's determination notice.  26 USC 6330(d)(1). If the taxpayer misses the deadline, the IRS would proceed with the collection action which, for low-income taxpayers, could result in the taxpayer experiencing irreparable harm, including being unable to obtain food, housing, or transportation.

86.    Taxpayers with a qualifying child or a dependent spouse who does not have a SSN may be eligible for the "Other Dependent Credit" under 26 U.S.C. § 24(h)(4) if the child or spouse has an ITIN.  If the child or spouse does not yet have an ITIN, the taxpayer must file their return along with the appropriate ITIN applications by the due date for the return (April 15, or October

24

15 if an extension request is timely filed). If a taxpayer is fearful of interacting with the government and misses this deadline, the ODC (in the amount of $500) is irrevocably lost. The Center has a client who faces the loss of this benefit because they do not feel safe pursuing it.

87.    For Tax Years between 2018 and 2024, ITIN holders are eligible for the Child Tax Credit (CTC) for their US citizen children. In Tax Year 2021, the maximum CTC was $3,600 per child. For subsequent years, the maximum CTC is $2,000 per child.[10] Taxpayers must file a claim for a refund within 3 years of the due date of the return. LITCs and other organizations conducted a major campaign to remind taxpayers they generally had until April 15, 2025 to claim the 2021 CTC. Taxpayers who were afraid to file a return by that date, because of fears about data being shared, will not be able to obtain a refund attributable to the CTC. The Center has a client in this situation.

88.    Where taxpayers have paid the taxes they were assessed and then filed an administrative refund claim with the IRS that was disallowed, taxpayers have 2 years to file in federal district court or the court of federal claims. If they miss that deadline, then their ability to obtain that refund is forever foreclosed. Taxpayers fearing to file in federal courts for fear of deportation will thus incur irreparable harm.

89.    Each of these time-limited benefits are lost to taxpayers if they determine they cannot safely interact with our tax system and disclose information to the IRS. Consistent with the federal grant requirements, our clients are low-income, and thus, this money is critical to their ability to survive and provide for their families. Many of our clients depend on their annual tax

---

[10] 26 U.S.C. § 24(h)(7), as enacted by Tax Cuts and Jobs Act Pub. Law 115-97; changes enacted by Pub. Law 119-21 are not effective for tax years before January 1, 2025. *Id*. section 70104(f).

refund to pay for basic living expenses including housing, utilities, food and transportation. Our clients, and the communities we seek to educate, that miss these deadlines cannot later have these harms remedied.

90.    Yet some of our clients must weigh these risks against the risk of potentially subjecting themselves and their family members to ICE raids or even deportation. It is an impossible choice for our clients, and one that they would not have to make if the IRS followed the law and afforded them the confidentiality protections to which they are entitled.

August 19, 2025

Washington, DC                                    Nina E. Olson

                                                  Executive Director
                                                  Center for Taxpayer Rights