**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR TAXPAYER RIGHTS, *et al.*,

        *Plaintiffs*,

      v.

INTERNAL REVENUE SERVICE, *et al.*,

        *Defendants*.

Case No. 1:25-cv-00457-CKK

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY UNDER
5 U.S.C. § 705 OR, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

I.    Tax Return Information and Disclosure ............................................................................ 2

II.    IRS's Provision of Information to DHS under Section 6103(i)(2) of the Internal
Revenue Code. ................................................................................................................. 5

III.    The *Centro* Litigation ...................................................................................................... 7

IV.    This Case .......................................................................................................................... 7

LEGAL STANDARD ................................................................................................................. 8

ARGUMENT ............................................................................................................................. 10

I.    Plaintiffs Are Unlikely to Prevail on Their Claim that IRS's Provision of Information
to DHS Under the Terms of the MOU Violated Section 6103 of the Internal
Revenue Code. ............................................................................................................... 10

    A.    Plaintiffs Fail to Establish Standing for Their Claims. ....................................... 10

        1.    Plaintiffs Lack Associational Standing ................................................... 10

        2.    The Center Lacks Organizational Standing. ............................................ 17

    B.    Plaintiffs Do Not Challenge Final Agency Action ............................................. 20

    C.    Plaintiffs Cannot Bring Claims under Section 6103 through the APA. ............... 23

    D.    The IRS Has Complied Fully with Section 6103 ................................................ 26

    E.    Plaintiffs Are Unlikely to Prevail on Their Arbitrary and Capricious Claim ....... 31

II.    Plaintiffs Cannot Demonstrate Irreparable Harm. ......................................................... 32

III.    The Balance of Equities Favors Defendants ................................................................... 36

IV.    Plaintiffs Should Be Ordered to Post a Substantial Security in Connection with Any
Preliminary Injunctive Relief, and Any Preliminary Injunctive Relief Should Be
Stayed Pending Any Appeal ........................................................................................... 37

CONCLUSION .......................................................................................................................... 38

## INTRODUCTION

This case is now in its third iteration: it began when filed in February 2025 as a challenge to DOGE team access to Internal Revenue Service ("IRS") data systems, then morphed into a challenge to an alleged "Data Policy." And now, in their motion for a preliminary injunction, Plaintiffs attempt to shoehorn into the allegations in their Amended Complaint a challenge to the IRS's provision of information to the U.S. Department of Homeland Security ("DHS") pursuant to Internal Revenue Code Section 6103(i)(2) and a detailed and lawfully executed memorandum of understanding ("MOU").

The Court should deny Plaintiffs' motion. For one thing, it is indistinguishable from the request for preliminary injunctive relief, challenging the same MOU, that Judge Friedrich denied in *Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677, 2025 WL 1380420 (D.D.C. May 12, 2025) ("*Centro*"). Judge Friedrich's decision in *Centro* is currently on appeal to the D.C. Circuit, and oral argument is scheduled for October 3, 2025. Plaintiffs' motion, remarkably, does not discuss Judge Friedrich's decision or the pending appeal. As a matter of both comity and judicial efficiency, the Court should not allow Plaintiffs to obtain an end-run around *Centro*, based on the same facts and the same legal theories that are currently on appeal to the D.C. Circuit.

More fundamentally, the Court should deny Plaintiffs' motion because it does not satisfy the demanding standard for emergency injunctive relief in this Circuit. Plaintiffs lack standing to challenge the IRS provision of information under the MOU because they cannot establish injury in fact, either on behalf of their members or clients, or for themselves.

Plaintiffs' motion also fails on the merits. While Plaintiffs frame their challenge as one to an alleged "Data Policy," there is no such policy. There is only the sharing of information pursuant to the same subpart of Section 6103 and the same MOU at issue in *Centro*. Neither the MOU nor

the IRS's sharing of information pursuant to that MOU is a final agency action reviewable under the Administrative Procedure Act ("APA"). Nor can Plaintiffs pursue an APA claim that the IRS's provision of information violates the Internal Revenue Code given the comprehensive remedial scheme Congress established for violations of 26 U.S.C. § 6103.

Threshold issues aside, the provision of information to DHS under the terms of the MOU is fully consistent with Section 6103. Section 6103(i)(2) *requires* the IRS to provide address information to law enforcement agencies when the statutory prerequisites are satisfied. They are here, as confirmed by both the terms of the MOU and the accompanying declaration of John J. Walker, the IRS's Chief Privacy Officer. Moreover, as to Plaintiffs' arbitrary and capricious claim, it is hardly a violation of the APA to do what Congress has mandated.

Plaintiffs are also not entitled to injunctive relief because they cannot meet the high bar for a showing of irreparable harm required in this Circuit, as demonstrated by a recent data sharing decision before this Court and other decisions in this District. Any claim of harm is further undercut by Plaintiffs' months' long delay in moving for emergency relief.

Finally, the balance of the equities and the public interest weigh heavily in the government's favor. It is in the public interest to fulfill the requirements of Section 6103(i)(2), and—if there could be any doubt—the ongoing consideration of the issues presented in this case by the D.C. Circuit cautions against granting Plaintiffs' motion.

## BACKGROUND

### I.    Tax Return Information and Disclosure

Section 6103 of the Internal Revenue Code establishes a general rule that "returns" and "return information" shall be confidential and shall not be disclosed "except as authorized by this title." 26 U.S.C. § 6103(a). The statute defines "return" to include "any tax or information return,

declaration of estimated tax, or claim for a refund . . . which is filed with the Secretary [of the Treasury . . . ." *Id.* § 6103(b)(1). The term "return information" includes, among other things, "a taxpayer's identity, the nature of his income, [and] . . . whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing." *Id.* § 6103(b)(2)(A).

Section 6103(a)'s general prohibition against disclosure is subject to a series of statutory exceptions. *Id.* § 6103(c)–(o). The relevant exception here is Section 6103(i)(2), titled "Disclosure of return information other than taxpayer return information for use in criminal investigations." Upon receipt of a valid, legally compliant request, Section 6103(i)(2) requires the IRS to disclose certain return information—including the taxpayer's name, mailing address, and taxpayer identifying number—to officers and employees of a federal agency who are personally and directly engaged in:

> (i)     preparation for any judicial or administrative proceeding pertaining to the enforcement of a non-tax federal criminal statute,
>
> (ii)    any investigation which may result in such a proceeding, or
>
> (iii)   any grand jury proceeding pertaining to enforcement of such a non-tax federal criminal statute.

*Id.* § 6103(i)(2)(A).

Section 6103(i)(2) sets out certain requirements for an agency to obtain information from the IRS. A request under Section 6103(i)(2) must generally be made by the head of an agency or the inspector general thereof. *Id.* § 6103(i)(2)(A). The request must also be made in writing; set forth the name and address of the taxpayer to whom it relates; identify the taxable period or periods to which the requested information relates; identify the statutory authority under which the criminal investigation or proceeding is being conducted; and identify the reason why disclosure of the requested return information is, or may be, relevant to the investigation or proceeding. *Id.* § 6103(i)(2)(B)(i)–(iv).

3

Section 6103(i)(2) is also specific as to what information the IRS must disclose in response to an agency request that complies with the foregoing requirements. As relevant here, Section 6103(i)(2) requires that the IRS disclose certain information, including a taxpayer's address, upon the receipt of a compliant request for such information.

Specifically, Section 6103(i)(2) authorizes the IRS to disclose return information "other than taxpayer return information." *Id*. § 6103(i)(2)(A). "Taxpayer return information" is a subcategory of "return information," defined as that return information "which is filed with, or furnished to, the Secretary *by or on behalf of the taxpayer* to whom such return information relates (as opposed to return information that the IRS has obtained from another source). *Id.* § 6103(b)(3) (emphasis added). For purposes of Section 6103(i)(2), however, "a taxpayer's identity shall not be treated as taxpayer return information." *Id.* § 6103(i)(2)(C). And the statute defines "taxpayer identity" as the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number, or any combination of that information. *Id.* § 6103(b)(6). Thus, when properly requested, the express terms of Section 6103(i)(2) compel the disclosure of any of the following information: a taxpayer's name, mailing address, and/or taxpayer identifying number, regardless of the source from which the IRS obtained that information.

In contrast to other provisions of Section 6103 that use permissive language—for example Section 6103(c), (d)(5)(A), and (e)(11)—Section 6103(i)(2) states that "upon receipt by the Secretary of a request which meets the requirements of [Section 6103(i)(2)(B)] . . . the Secretary *shall* disclose" the return information requested. *Id.* § 6103(i)(2)(A). In other words, once the IRS receives a request that meets the requirements of Section 6103(i)(2), its compliance is mandatory.[1]

---

[1] There are narrow exceptions if the Secretary determines that "such disclosure would identify confidential informant or seriously impair a civil or criminal investigation," or if the

4

The statute also requires that the agency receiving return information under Section 6103(i)(2) must follow stringent safeguards for protecting the information. *See* 26 U.S.C. § 6103(p)(4). And because the receiving agency is bound by Section 6103(a)'s confidentiality mandate, redisclosures of return information must also be authorized under Section 6103. *See id.* § 6103(p)(2)(B), (p)(4)(C); 26 C.F.R. § 301.6103(p)(2)(B)-1. The receiving agency must establish and maintain a system of records that tracks its requests and the return information it receives. 26 U.S.C. § 6103(p)(4)(A). The records must be securely stored and access must be restricted to agency personnel whose duties require access and to whom disclosures may be made. 26 U.S.C. § 6103(p)(4)(B), (C). And the IRS has issued detailed guidance that recipients of return information must follow. *See* 26 C.F.R. § 6103(p)(4)-1; IRS Pub. 1075, *Tax Information Security Guidelines* (Nov. 2021), *available at* https://perma.cc/WSK5-FLVH. For instance, return information must be stored in a system that prevents unauthorized access and permits regular audits to ensure unauthorized access does not occur. Pub. 1075 at 50, 104. If return information is commingled in a file with information obtained from elsewhere, the entire file must be secured. *See id.* at 55. The return information must be returned or destroyed after it is used. *See* 26 U.S.C. § 6103(p)(4)(F)(ii).

## II.    IRS's Provision of Information to DHS under Section 6103(i)(2) of the Internal Revenue Code

On April 7, 2025, the U.S. Department of the Treasury ("Treasury Department") and DHS entered into a memorandum of understanding governing the sharing of information, including address information, between their respective subcomponents, the IRS and Immigration and Customs Enforcement ("ICE"). *See* Walker Decl., attached as Exhibit A. The MOU provides that

---

requesting agency does not establish or maintain appropriate safeguards "to protect the confidentiality" of the return information received. 26 U.S.C. § 6103(i)(6), (p)(4).

all ICE requests for return information will conform to Section 6103(i)(2)'s requirements, including that each request will provide the name and address of the taxpayer about whom information is requested; the taxable period or period to which the requested information relates; the specific non-tax federal criminal statute under which ICE is conducting an investigation or proceeding; and the reason that the requested information is, or may be, relevant to the investigation or proceeding. MOU § 6(C). Under the MOU, the IRS will disclose the return information to ICE only if the requirements of Section 6103(i)(2) are satisfied. *See* MOU §§ 1(e), 6(E).

The MOU also provides that ICE will safeguard any return information that it receives from the IRS. In particular, ICE will use the information solely in connection with non-tax federal criminal investigations and proceedings. MOU § 6(D). Any further disclosure of the information within ICE will be made consistent with that purpose on a need-to-know basis. MOU § 6(E)(3). And ICE will return or destroy the information in accordance with applicable record retention schedules when it is no longer needed. MOU § 9.

The IRS received a request for information from ICE under the terms of the MOU on June 27, 2025 for the last known address of 1.28 million taxpayers. Walker Decl. ¶ 6. The IRS responded to ICE on August 7, 2025. *Id.* ¶ 7. Pursuant to the terms of the MOU, for those names with respect to which the IRS could locate an address, and for which ICE had provided all of the information required by the MOU and Section 6103(i)(2), the IRS provided a last known address. *Id.*. The IRS provided last known addresses for 3.70 percent of the individuals requested by ICE. *Id.*.

### III.    The *Centro* Litigation

Another court in this District has already determined in the context of a preliminary injunction that the IRS's information sharing with DHS under the terms MOU is lawful. In *Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677-DLF, 2025 WL 1380420 (D.D.C.), four non-profit organizations sued the Treasury Department, the IRS, DHS, and ICE. After the denial of their motion for a temporary restraining order, the plaintiffs moved for a preliminary injunction, seeking to enjoin the IRS from disclosing addresses to DHS pursuant to the MOU. *Id.* at *2.

Judge Friedrich denied that motion, concluding that the plaintiffs were unlikely to prevail on the merits. Judge Friedrich concluded that the plan language of Section 6103(i)(2) not only authorizes, but also requires, the IRS to disclose return information to an agency that requests it in connection with a non-tax federal criminal investigation or proceeding. She further concluded that the terms of the MOU reflect the IRS's and DHS's intent to fully comply with Section 6103(i)(2). Judge Friedrich also determined that, although it was not clear that the IRS had changed its views about whether address information could be provided to DHS, the IRS's previous statements were, at most, general statements of policy that do not bind the IRS. *Id.* at *8.

The *Centro* plaintiffs appealed Judge Friedrich's decision. Oral argument on the *Centro* appeal is scheduled for October 3, 2025. *See* Order, No. 25-5181 (D.C. Cir. Aug. 15, 2025).

### IV.    This Case

Plaintiffs here are the Center for Taxpayer Rights (the "Center"), a 501(c)(3) organization focused on taxpayer rights; the Main Street Alliance, a "nationwide network of small businesses with members across the country"; and two labor unions, the National Federation of Federal Employees, IAM AFL-CIO and Communications Workers of America, AFL-CIO. Am. Compl. ¶¶ 35–53. They filed suit against the IRS, the Treasury Department, the United States Digital

Service ("USDS"), and the USDS Temporary Organization on February 17, 2025. Their initial Complaint asserted five causes of action, all of which challenged access allegedly granted to IRS data systems to what Plaintiffs refer to as "DOGE." *See generally* Compl., ECF No. 1. Defendants moved to dismiss the initial Complaint on April 25, 2025. *See* Defs.' Mot. to Dismiss Pls.' Compl., ECF No. 18.

Plaintiffs filed an Amended Complaint on May 16, 2025 that added Amy Gleason, Elon Musk, Steve Davis, the Treasury Department DOGE Team, the Office of Personnel Management, and the General Services Administration as Defendants. Whereas Plaintiffs' initial Complaint focused on the legality of allowing Treasury DOGE Team members access to IRS data systems, the Amended Complaint changed course. The Amended Complaint challenges an alleged "dramatic shift in IRS policy toward consolidation and inter-agency sharing of taxpayer data[.]" Am. Compl. ¶ 9. Plaintiffs assert that, to facilitate alleged data-sharing, Defendants have "create[ed] a 'mega' application programming interface ('API') that will facilitate unprecedented cross-agency sharing of sensitive taxpayer data, and [ ] have executed at least one agreement to share data with another agency—DHS[.]" *Id.* ¶ 14.

Defendants moved to dismiss Plaintiffs' Amended Complaint on July 10, 2025, and Defendants' motion was fully briefed as of August 15, 2025. Now, over six months into this case, Plaintiffs move for emergency injunctive relief.

## LEGAL STANDARD

A motion to stay agency action pending review under 5 U.S.C. § 705 is governed by the same standard as a motion for preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020); *Green Oceans v. U.S. Dep't of the Interior*, No. 24-cv-141-RCL, 2024 WL 3104945, at *2 n.3 (D.D.C. June 24, 2024);

*see also Nken v. Holder*, 556 U.S. 418, 433–34 (2009). Section 705, however, can only be invoked by a party entitled to proceed under the APA. *See* 5 U.S.C. § 705.

A preliminary injunction is an "extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). It is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To warrant preliminary injunctive relief, the moving party must show (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities "tips in his favor," and (4) that an injunction is in the public interest. *Id.* at 20. Where the government is the party opposing injunctive relief, as here, the latter two factors "merge." *Nken*, 556 U.S. at 435.

"Historically, these factors have been evaluated on a sliding scale." *Giri v. Nat'l Bd. of Med. Exam'rs*, 718 F. Supp. 3d 30, 38 (D.D.C. 2024) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009)). The D.C. Circuit has since "suggested without deciding that a movant must independently establish both likelihood of success on the merits and irreparable harm." *WhaleCo Inc. v. Shein Tech. LLC*, No. 23-cv-3706 (TJK), 2025 WL 445187, at *4 (D.D.C. Feb. 9, 2025) (*citing Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011)). But "[e]ither way, 'it is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion.'" *Id.* (quoting *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018)).

Additionally, Plaintiffs bear the burden of showing subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "standing is not dispensed in gross," Plaintiffs must "demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

**ARGUMENT**

I.    **Plaintiffs Are Unlikely to Prevail on Their Claim that IRS's Provision of Information to DHS Under the Terms of the MOU Violated Section 6103 of the Internal Revenue Code.**

A.    **Plaintiffs Fail to Establish Standing for Their Claims.**

Standing is a central component of Article III's case-or-controversy requirement and demands that plaintiffs have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted). In cases seeking to enjoin government action, standing also serves important separation-of-powers concerns, as ensuring federal court jurisdiction prevents courts from exercising "general legal oversight of the other branches of Government." *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) (cleaned up); *see also TransUnion*, 594 U.S. at 423–24.

At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560. The party invoking federal court jurisdiction "bears the burden of establishing each of those elements." *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025).

Plaintiffs in this case are two not-for-profit groups and two labor unions. As such, they must demonstrate that they possess either associational standing to bring claims on behalf of their members, or organizational standing to sue in their own right. Plaintiffs fail to establish either.

1.    Plaintiffs Lack Associational Standing.

To demonstrate associational standing, Plaintiffs must establish that "(1) at least one of [its] members has standing to sue in her or his own right, (2) the interests the association seeks to

protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Elec. Privacy Inf. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019) (citations omitted); *see also Ass'n of Flight Attendants—CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009). Plaintiffs fail to establish such standing.

Plaintiffs' alleged injuries fail to establish associational standing (or, indeed, any type of standing) under the standards set out in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). There, the Supreme Court explained that an intangible harm may be cognizable for standing purposes only when it "has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 417 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Plaintiffs agree that *TransUnion*'s framework applies but seek to stretch the common law torts of "intrusion upon seclusion" and "breach of confidence" far beyond their limits. *See* Mem. in Opp'n to Defs.' Mot. to Dismiss, at 21–24, ECF No. 27; *see also* Pls.' Mem. in Supp. Of Mot. for Stay or, in the Alternative, for Prelim. Inj. at 39, ECF No. 30-1 ("Pls.' Mot.").

1. Before turning to those common law torts, however, Plaintiffs' assertion of associational standing fails at the outset because the alleged injury is far too speculative. To support standing, an alleged harm may not be premised on hypotheticals. Rather, the plaintiffs must allege "actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024), *on remand to*, 117 F.4th 336 (5th Cir. 2024). For injury to be imminent, it must be "*certainly impending*," and mere "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alteration in original) (citation omitted).

11

Plaintiffs fail the injury-in-fact test, because it is entirely speculative that any of Plaintiffs' members' or the Center's clients' address information has been, or will be, transferred pursuant to the MOU. There is simply nothing like the indiscriminate "*en masse*" disclosure of information that Plaintiffs allege. *See* Pls.' Mot. at 9, 23. As explained in Mr. Walker's declaration, although ICE requested address information for approximately 1.28 million names, the IRS provided 3.70 percent of the total addresses requested, either because ICE did not provide all information required under the terms of the MOU (and therefore did not satisfy the requirements of Section 6103(i)(2)), or because the IRS was unable to match the individual to a known taxpayer. Walker Decl. ¶ 7. Moreover, since receiving the June 27 request, the IRS has not received any further request from ICE pursuant to the MOU. *Id.* ¶ 8. The likelihood that Plaintiffs' members' specific address information was included in the IRS's provision of information to ICE is remote, and any claim that Plaintiffs' members' addresses may be shared in the future is entirely speculative. *See Lujan*, 504 U.S. at 560–61; *Clapper*, 568 U.S. at 409.

Furthermore, and even assuming that some members' address information has or will be transferred to ICE, it is purely hypothetical to assume that the information will be "broadly disclosed" or "impermissibly used," as Plaintiffs contend. Pls.' Mot. at 40; *see also id.* at 43 (speculating that address information may be used in civil removal proceedings). The MOU executed between the Treasury Department and DHS includes strict limitations on the use of information provided under Section 6103(i)(2), including that the requested address information will "only be used by officers and employees of ICE *solely*" with respect to proceedings and investigations "pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), or other specifically designated Federal criminal statutes, or any subsequent criminal proceedings." MOU § 6(D) (emphasis added). The MOU further specifies that "ICE will use and redisclose [ ] address

information only as specifically authorized by [Internal Revenue Code] § 6103(i)(2) as implemented in 26 C.F.R. § 301.6103(i)-1." MOU § 6(E).

Plaintiffs acknowledge these restrictions, as they must, but suggest that ICE or others in the Executive Branch may not abide by them. *See* Pls.' Mot. at 41–42. But the government is entitled to a presumption of regularity, and the Court should thus not accept Plaintiffs' invitation to assume government officials will violate the requirements of Section 6103 or the terms of the MOU. *See Am. Fed'n of Gov't Emps. v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989) (explaining that the presumption of regularity "supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume [those officers] have properly discharged their public duties" (citation omitted)); *see also Hines v. United States*, 658 F. Supp. 2d 139, 144 (D.D.C. 2009) ("presum[ing] the regularity of IRS documents and official actions of the IRS"). Even without the presumption of regularity, Plaintiffs' theory requires an implausible assumption that government officials would open themselves up to potential disciplinary proceedings, dismissal, and criminal penalties by violating Section 6103. Such wild speculation is not a basis for this Court's jurisdiction.

The hypothetical nature of Plaintiffs' claims—based on an alleged risk that their members' information will be further disclosed or misused—distinguishes this case from *Alliance for Retired Americans v. Bessent*, where this Court concluded in the context of a motion for a preliminary injunction that the plaintiffs likely had standing. *See* 770 F. Supp. 3d 79, 99 (D.D.C. 2025). In that case, no theorizing was required to know that the Treasury Department established a DOGE team that was granted broad access to Treasury's Bureau of the Fiscal Service ("BFS") data systems. *See id*. at 95–96. Nor did the Court need to assume that the defendants in *Alliance for Retired Americans* would carry out their duties in bad faith, as Plaintiffs ask the Court to do here. In that

case, it was undisputed that the defendants relied on the provision in the Privacy Act that allows an agency to access records if there is a "need" for the "record[s] in the performance of their duties." 5 U.S.C. § 552a(b)(1); *see also* Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., at 25–28, No. 1:25-cv-00313 (D.D.C.), ECF No. 61-1. There are ongoing legal disputes in *Alliance for Retired Americans*, including over whether the Treasury Department DOGE team may properly access BFS records under that provision of the Privacy Act. But the unsupported assumption that the defendants would further disseminate information without complying with the protections under federal law is missing from that case.

2. Even if the Court were to put aside the speculative nature of Plaintiffs' alleged injuries, their asserted harm is not cognizable under *TransUnion*. Beginning with intrusion upon seclusion, as Defendants have explained, "'at its core, the harm contemplated by the common-law tort of intrusion upon seclusion includes an intrusion into an individual's private space.'" Defs.' Mem. in Supp. of Mot. to Dismiss, at 12, ECF No. 26-1 (quoting *Am. Fed'n of Teachers v. Bessent*, No. 25-1282, 2025 WL 1023638, at *2 (4th Cir. Apr. 7, 2025) (Agee, J., concurring)). And as the Fourth Circuit explained in a recent published decision, "intrusion upon seclusion has long been understood to guard not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace." *Am. Fed'n of Teachers v. Bessent*, --- F.4th ----, 2025 WL 2313244, at *5 (4th Cir. 2025).

That type of intrusion is missing from information sharing from the IRS to ICE under the terms of the MOU and provisions of Section 6103(i)(2). An agency sharing lawfully obtained information, contained in data systems that the agency lawfully maintains, with another agency pursuant to a memorandum of understanding is in no way analogous to a "highly offensive" "intentional[] intru[sion], physical[] or otherwise, upon the solitude or seclusion of another or his

14

private affairs or concerns." Restatement (Second) of Torts § 652B (A.L.I. 1977) ("Restatement").

In fact, Plaintiffs do not allege that their members would even know if a record containing their

personal information was shared, barring some step taken by the agency to alert the person of the

fact. *See TransUnion*, 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an

injury sufficient to support standing where they did not "even *kn[o]w*" their files contained

inaccurate information); *Am. Fed'n of Teachers*, 2025 WL 2313244, at *5 (explaining that, for

purposes of intrusion upon seclusion, "it is not the information obtained, but the knowledge that a

third party is engaged in targeted snooping, that causes the harm" (citing Eli A. Meltz, *No Harm,*

*No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion*, 83 Fordham

L. Rev. 3431, 3453 (2015)).

  Plaintiffs' theory of injury is also inconsistent with how courts describe the tort. Take *Wolf*

*v. Regardie*, 553 A.2d 1213 (D.C. 1989), which Plaintiffs cited in their opposition to Defendants'

motion to dismiss, *see* Pls.' Opp'n to Defs.' Mot. to Dismiss Pls.' Am. Compl at 22, ECF No. 27.

In that case, the court explained that:

> the types of invasion intrinsic in the tort of intrusion upon seclusion are those such
> as harassment, peeping through windows or in other locations in which a plaintiff
> has chosen to seclude himself, opening personal mail, eavesdropping on private
> conversations, entering a plaintiff's home without permission or searching his
> personal belongings, examining a plaintiff's private bank account, or other
> invasions of that nature.

*Wolf*, 553 A.2d at 1217–18. Each of those examples describes a targeted intrusion into a specific

person's *private* information—as opposed to the address where an individual receives mail. They

are nothing like the alleged conduct challenged here, where the Internal Revenue Code has long

permitted information sharing between the IRS and law enforcement when the requirements of

Section 6103(i)(2) are satisfied.

3. Plaintiffs' reliance on the tort of breach of confidence (Pls.' Mot. at 39) fares no better. That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (internal quotation marks omitted). To start, it is doubtful whether this tort qualifies as a traditional cause of action. *See TransUnion*, 594 U.S. at 427 (stating that the "lawsuit may not proceed because that plaintiff has not suffered any . . . harm *traditionally* recognized as providing a basis for a lawsuit in American courts" (emphasis added)). While the D.C. Circuit in *Jeffries* invoked the tort to find standing, that decision predates *TransUnion*, does not address whether the tort has a sufficient historical origin, and relies, in part, on an Eleventh Circuit panel decision that was later overturned by the Eleventh Circuit sitting en banc. *See Jeffries*, 928 F.3d at 1064 (citing *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175 (11th Cir.), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020)).

In that en banc decision, which came out after *Jeffries* was decided, the Eleventh Circuit questioned—without deciding—whether breach of confidence "can fairly be said to have 'traditionally been regarded as providing a basis for a lawsuit in English or American courts'" for standing purposes. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Eleventh Circuit found that the tort has been "emerging" only since the 1980s in a "rudimentary form after initially dying out in its infancy." *Id.* (cleaned up). The Second Circuit has described it as "a relative newcomer to the tort family" and found that the tort is usually limited to the physician-patient or bank-customer relationships. *Young v. U.S. Dep't of Just.*, 882 F.2d 633, 640 (2d Cir. 1989). The tort's nascent

and underdeveloped pedigree raises serious doubts about whether this tort can serve as a valid analogue under *TransUnion*'s requirement of a historically grounded cause of action.

Yet, even if the Court were to apply the elements of the tort, the analogy still falls flat. The tort "lies whe[n] a person offers private information to a third party in confidence and the third party reveals that information to another." *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025) (quoting *Jeffries*, 928 F.3d at 1064). Here, Plaintiffs do not allege that IRS will publicly disclose their information once they obtain it, and inter-agency information sharing pursuant to a lawful agreement cannot plausibly be analogized to disclosure to a "third party." Thus, Plaintiffs' reliance on the tort of breach of confidence necessarily fails.

4. Plaintiffs' remaining theories of injury likewise do not support standing. Plaintiffs' suggestion that the statutory requirements of the Internal Revenue Code somehow independently suffice for injury-in-fact (Pls.' Mot. at 40, 43) runs headlong into the Supreme Court's holding in *TransUnion*. Congress can create "a statutory prohibition or obligation and a cause of action" but may not override Article III's injury requirement. *TransUnion*, 594 U.S. at 426. Whatever Congress might have intended is irrelevant to the question of whether Plaintiffs have established constitutional standing. *See Am. Fed'n of Teachers*, 2025 WL 2313244, at *7 ("A plaintiff's theory of statutory liability and their standing should not be conflated."). And although Plaintiffs' attempt to draw an analogy to the deprivation of Fourth Amendment rights, *see* Pls.' Mot. at 40, Plaintiffs have not, in fact, alleged any constitutional violation in this case, meaning that Plaintiffs' cited cases are inapposite.

2.    The Center Lacks Organizational Standing.

The Center is the only plaintiff that articulates any alleged harm to itself as an organization. *See* Am. Compl. ¶¶ 189–215; *see also* Pls.' Mot. at 35–38. But the Center is not "the object of the

government action or inaction [it] challenge[s]," meaning that, although "standing is not precluded, . . . it is ordinarily 'substantially more difficult' to establish." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). And organizations, like all plaintiffs, must prove an injury-in-fact that is fairly traceable to the challenged actions. For a plaintiff organization like the Center, that showing requires "more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (citation omitted). The organization must establish that the challenged conduct "'perceptibly impaired' the organization's *ability to provide services*." *Turlock Irrigation Dist. v. Fed. Energy Regul. Comm'n*, 786 F.3d 18, 24 (D.C. Cir. 2015) (emphasis added) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)).

The foundational decision establishing the contours of organizational standing is *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). As the Supreme Court recently explained in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), however, the Court "has been careful not to extend the *Havens* holding beyond its context." *Alliance*, 602 U.S. at 396. The *Alliance* Court explicitly rejected the organizations' assertion that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified that "*Havens* does not support such an expansive theory of standing." *Id.* at 395. In *Havens*, the realty defendant had provided false information about apartment availability that "perceptibly impaired" the organization's counseling and referral services, meaning that the realty's "actions directly affected and interfered with" the organization's "core business activities"—not dissimilar, the *Alliance* Court remarked, "to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*

18

The facts of this case are nothing like *Havens*, and notably almost all of the cases Plaintiffs cite to argue that the Center has standing predate *Alliance*. *See* Pls.' Mot. at 35–38. There is no concrete impediment to the Center's mission akin to the false information the realty provided in *Havens*. Nothing about the MOU or IRS's information sharing under Section 6103(i)(2) "directly affects" or "interferes" with the Center's "core business activities." The Center, through its Low-Income Taxpayer Clinic ("LITC"), is free to continue to counsel taxpayers on their rights without interference. The Center's "*ability* to provide services," *Turlock Irrigation Dist.*, 786 F.3d at 24 (emphasis added), remains undisturbed.

Attempting to show some direct interference with its work, the Center submits the declaration of its Executive Director and Founder, Nina Olson. *See* Olson Decl., ECF No. 30-8. Ms. Olson states that, in recent months, "[t]axpayers, particularly those who do not speak English as a first language and are more likely to be immigrants, have become less willing to come to the Center's events, to seek its guidance, or to engage with the Center's education and outreach." *Id.* ¶ 41. Ms. Olson further states that "[t]his has also been the Center's experience with other populations particularly concerned about the security of personal information[.]" *Id.* Based on "the Center's experience and [her] long personal experience working as a taxpayer advocate," Ms. Olson posits that "it is clear that the sudden difficulty the Center and other LITCs have experienced in reaching the population who we exist to serve is caused by the IRS's change in its data policy and shift to more open sharing of sensitive taxpayer information across the federal government." *Id.* ¶ 54.

The Center's attempt to draw a direct line between the IRS's response to ICE's information request (or the broader alleged "Data Policy") and decreased use of the Center's services is speculative, to say the least. Plaintiffs cannot establish harm from the IRS's fulfillment of the

statutory *obligation* under Section 6103(i)(2). Nor should the Center's clients reasonably expect confidentiality in information Congress has required the IRS to turn over to law enforcement agencies when the requirements of Section 6103(i)(2) are satisfied.

Further, whether the various individuals who declined Center's services or programming in recent months did so because of the alleged increased information sharing, versus any number of other reasons (be it economic, social, or due to some other government policy, or for a different reason or a combination of reasons), is unknowable. Indeed, one might suspect that taxpayers who are worried about the use of their mailing addresses would seek more guidance, not less, from an organization whose mission is "dedicated to furthering taxpayers' awareness of and access to taxpayer rights[.]" *Id.* ¶ 3. But, either way, the Center offers no concrete reason to ascribe the decreased utilization of its services—or its increased expenditures—to Defendants' alleged conduct. *Compare League of United Latin Am. Citizens v. Exec. Off. of the President*, --- F. Supp. ---, 2025 WL 1187730, at *25, *32 (D.D.C. 2025) (concluding that a requirement of "documentary proof of United States citizenship" would be a "direct impediment" to the organization's core mission of registering eligible voters). The alleged impairment to the Center's operation, and the Center's increased expenditures in response to declining engagement, are too tenuous and require too many unsupported assumptions for a finding of jurisdiction. *See Clapper*, 568 U.S. at 416 (an organization cannot establish standing based on actions it takes "in response to a speculative threat").[2]

---

[2] In a footnote, Plaintiffs state that "[t]he Center also asserts third-party standing in this case to assert the interests of its clients." Pls.' Mot. at 35 n.58. For the reasons explained in Defendants' reply in support of their motion to dismiss, Plaintiffs have not adequately alleged third-party standing. *See* Defs.' Reply in Supp. of Mot. to Dismiss Am. Compl. at 11–12, ECF No. 29. Having relegated third-party standing to a footnote in their brief, the Court need not consider Plaintiffs' claim of third-party standing as a basis for Plaintiffs' requested injunctive relief. *See Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997).

B.      **Plaintiffs Do Not Challenge Final Agency Action.**

Plaintiffs are not entitled to relief through the APA because they do not identify any final agency action. Agency action is final—and therefore reviewable in a judicial action brought pursuant to the APA—only when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Plaintiffs' frame their APA claim as challenging a so-called "Data Policy" at IRS. Plaintiffs contend that this alleged policy is "apparent from recent IRS actions," including the development of a so-called "mega-API" and the creation of an "'omnibus' agreement" to "allow federal agencies broad access to taxpayer information." Pls.' Mot. at 10; *see also, e.g.*, Am. Compl. ¶¶ 161–62, 168–72. According to Plaintiffs, the "Data Policy": "(1) greatly expands access to and use of taxpayer information within the IRS; (2) consolidates data systems to facilitate broad, not segregated access within the agency; and (3) permits large-scale data-sharing with other agencies, unrelated to tax administration." Pls.' Mot. at 10.

Yet, there is no such "Data Policy," contrary to Plaintiffs' allegations.  As the MOU at issue in Plaintiffs' motion demonstrates, the IRS's information sharing is tailored to highly specific circumstances and conforms to the requirements of the Internal Revenue Code. *See generally* MOU. To the extent Plaintiffs contend that the MOU executed between the Treasury Departement and DHS, or IRS's response to DHS's June 27 request are themselves final agency action— separate from the non-existent "Data Policy"—that argument also lacks merit. The MOU does not represent a new "policy." It is merely a mechanism to effectuate the information sharing *required* by Section 6103(i)(2), and to ensure that appropriate security measures are in place to protect

sensitive information. *See id*. Similarly, as to IRS's response to DHS's June 27 request, it is not a new policy to provide statutorily required information.

Put differently, Plaintiffs' assertions satisfy neither of the *Bennett v. Spear* prongs. *See Bennett*, 520 U.S. at 177–78. First, information sharing between agencies does not "consummat[e]" a decisionmaking process in any formal sense. *Hawkes*, 578 U.S. at 597. Fulfilling the IRS's obligations under Section 6103(i)(2) is one of a variety of actions that may lead to, for instance, a criminal prosecution, but it is not the "consummation" of any agency process. Second, Plaintiffs' allegations that the information sharing violates Section 6103 (which Plaintiffs' motion fails to demonstrate) does not mean that any rights or obligations have been determined as the result of that action, or that legal consequences will flow. There is no final agency action where the challenged act "impose[d] no obligations, prohibitions or restrictions on regulated entities" and "does not subject them to new penalties or enforcement risks." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020). Plaintiffs' members and clients are not regulated by agency decisions to comply with a valid information request, nor have Plaintiffs identified any direct legal consequences that arise from the information sharing.

Even if such decisions could produce indirect, practical consequences for Plaintiffs, they would not be final agency action. Adverse effects "accompany many forms of indisputably non-final government action." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004). For example, "initiating an enforcement proceeding against a company . . . may have a devastating effect on the company's business, but that does not make the agency's action final." *Id*. What matters is that the alleged information sharing decisions here have no "direct and appreciable legal consequences" for Plaintiffs. *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). That forecloses Plaintiffs' APA claim.

Plaintiffs point the Court to the D.C. Circuit's decision in *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), but that case is not analogous to this one. In *Venetian*, the D.C. Circuit held that the Equal Employment Opportunity Commission's policy of disclosing an employer's confidential information (possibly including trade secrets) to third parties who were potential plaintiffs with discrimination claims against the employer constituted final agency action. Unlike this case, *Venetian* did not deal with disclosure within the federal executive branch to a federal law enforcement agency with statutory rights to the information in question. Disclosure of information to law enforcement authorities, as Congress required, is far different in kind from the facts of *Venetian*.

## C.    Plaintiffs Cannot Bring Clams under Section 6103 Through the APA.

Plaintiffs are also unlikely to prevail on the merits of their claim that IRS's provision of information to DHS runs contrary to the APA because it violates Section 6103, because the Internal Revenue Code's comprehensive statutory scheme precludes APA review.

The APA provides a vehicle for review only in circumstances where "there is no other adequate remedy." 5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action"). That is not the case here.

The Internal Revenue Code creates a comprehensive remedial scheme for violations of 26 U.S.C. § 6103, and it would be inappropriate to allow Plaintiffs to use the APA to create an end-run around those remedies. Congress created a waiver of sovereign immunity for violations of § 6103 by authorizing only civil damages against the United States in 26 U.S.C. § 7431. Specifically, Section 7431 authorizes a right of action against the United States if "any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information . . . in violation of . . . section 6103." 26 U.S.C. § 7431(a)(1). Damages

are authorized in the sum of "the greater of" (a) $1,000 for each unauthorized disclosure of a return or return information, or (b) the actual damages sustained by the plaintiff plus punitive damages for willful disclosures or disclosures that result from gross negligence. *Id.* § 7431(c). Civil damages under Section 7431 is the sole remedy that Congress provided for a violation of Section 6103, and it does not authorize injunctive relief. *See generally id.*; *see also Henkell v. United States*, No. 96-2228, 1998 WL 41565, at *5 (E.D. Cal. Jan. 9, 1998) (explaining that § 7431 does not authorize injunctive relief).

In addition, Section 7712A of the Internal Revenue Code provides that an officer or employee of the United States who willfully inspects return information in violation of Section 6103 is subject to dismissal from office or discharge from employment, a fine of up to $1,000, and imprisonment of up to one year. 26 U.S.C. § 7213A(a)(1), (b). Similarly, Section 7213 provides that an officer or employee of the United States who willfully discloses return information in violation of Section 6103 is subject to dismissal from office or discharge from employment, a fine of up to $5,000, and imprisonment of up to five years. *Id.* § 7213(a)(1). And Section 7213 also provides criminal penalties for individuals who receive return information unlawfully, but later willfully redisclose it in an unlawful manner; receive return information unlawfully, and later willfully print or publish it "in any manner not provided by law"; or willfully solicit return information in exchange for an item of material value. *Id.* § 7213(a)(2)–(5).

Considering this highly reticulated scheme, courts have held that the civil and criminal remedies discussed above represent the exclusive recourse for taxpayers aggrieved by the unlawful inspection or disclosure of their return information. *See United States v. Orlando*, 281 F.3d 586, 596 (6th Cir. 2002) ("Congress has provided civil and criminal remedies for violations of § 65013, but no statutory provision requires the exclusion of evidence so obtained."); *Nowicki v. Comm'r*,

262 F.3d 1162, 1164 (11th Cir. 2001) ("Congress saw fit to provide only certain remedies for violations of § 6103 . . . ."); *see also United Atates v. Michaelian*, 803 F.2d 1042, 1049–50 (9th Cir. 1986) (upholding district court's "refus[a] to fashion a dismissal or suppression remedy for a violation of § 6103," given other "legislatively created remedies"). Additional equitable relief is, therefore, unavailable, at least in the absence of a constitutional violation. *See Orlando*, 281 F.3d at 595–59; *Nowicki*, 262 F.3d at 1163–64; *Marvin*, 732 F.2d at 673.

Indeed, when Congress wanted to afford taxpayers the ability to bring a preemptive suit to prevent the disclosure of their tax information, it did so expressly. Section 6110 provides that a taxpayer who has obtained a written determination concerning his tax situation may petition the Tax Court to prevent the IRS from disclosing information contained therein. 26 U.S.C. § 6110(f)(3)(A). Congress's provision of such a remedy in this limited context confirms that its omission in other contexts should be respected.

In the face of a comprehensive statute, litigants are not permitted to "circumvent the [scheme's] requirements and limitations by resorting to the catchall APA," even when "the plaintiff cannot prevail in a claim" under the scheme. *Grosdidier v. Chairman, Broad Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (discussing the CSRA); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) (addressing the Agricultural Marketing Agreement Act). Given the remedies available to individuals whose return information is disclosed in violation of Section 6103—which is part of the complex statutory scheme Congress created in the Internal Revenue Code—there is another adequate remedy available, and Plaintiffs are not entitled to injunctive relief through the APA. *Cf. Agbanc Ltd. v. Berry*, 678 F. Supp. 804, 807 (D. Ariz. 1988)

(concluding that Section 7431 provides an adequate remedy at law that precludes equity jurisdiction).[3]

### D.    The IRS Has Complied Fully with Section 6103.

Even assuming Plaintiffs could overcome the threshold issues above, Plaintiffs are not entitled to injunctive relief because they are unlikely to prevail on their claim that the IRS's sharing of information under Section 6103(i)(2) is contrary to law. As Judge Friedrich explained in *Centro*, and as is apparent from the plain language of Section 6103, "the IRS must disclose limited taxpayer identity information (*e.g.*, the taxpayer's name and address) to assist another agency in criminal proceedings, if the agency has satisfied the statutory prerequisites in its written request." 2025, WL 1380420, at *5; 26 U.S.C. § 6103(i)(2). The MOU executed between the Treasury Department and DHS expressly incorporates those statutory requirements. *See generally* MOU; *see also Centro*, 2025 WL 1380420, at *5–6. And the IRS ensured that the requirements of the statute were satisfied before providing information to ICE under Section 6103(i)(2) and the terms of the MOU. *See* Walker Decl. ¶ 7. In short, the IRS followed the law.

Plaintiffs' efforts to resist that straightforward conclusion are unpersuasive. *First*, Plaintiffs contend that "IRS cannot have undertaken any meaningful review of the *en masse* request it received from ICE to ensure compliance given the speed with which it was processed." Pls.' Mot. at 24. There are several problems with that argument. For one, the IRS did not process the information request "within days," as Plaintiffs contend. *Id.* The IRS's responded to ICE on August 7, 2025, nearly six weeks after receiving ICE's request. *See* Walker Decl. ¶ 7.

---

[3] Because the APA is unavailable to Plaintiffs, the Court cannot grant injunctive relief pursuant to 5 U.S.C. § 705, which is contained within the APA.

In any event, Section 6103(i)(2) does not require the type of searching review that Plaintiffs appear to suggest was necessary. The statute requires the IRS to provide certain information, including addresses, upon receipt of written request that sets forth the name and address of the taxpayer to whom it relates; identifies the taxable period or periods to which the requested information relates; identifies the statutory authority under which the criminal investigation or proceeding is being conducted; and identifies the reason why disclosure of the requested return information is, or may be, relevant to the investigation or proceeding. 26 U.S.C. § 6103(i)(2)(B)(i)–(iv). The MOU requires that requests from DHS comply with those requirements, and the IRS independently confirmed that the request satisfied them. *See* Walker Decl. ¶ 7. Where the required information was lacking as to any specific person, the IRS did not fulfill ICE's request. *Id.*. Accordingly, the IRS complied with Section 6103(i)(2).

*Second*, Plaintiffs argue that ICE's requests for addresses were invalid because Section 6103(i)(2) requires the requesting agency to provide the "name and address" of the taxpayer to whom the request relates. Plaintiffs reason that, if the agency does not already have the *current* address of the taxpayer, it cannot receive information from the IRS, and thus Plaintiffs conclude that an agency can never request only address information under Section 6103(i)(2). *See* Pls.' Mot. at 25–25.

Judge Fredrich correctly rejected a nearly identical version of this argument in *Centro*. 2025 WL 1380420, at *6. Plaintiffs' argument fails because, "[b]y its plain language, the statute mandates that the IRS share a taxpayer's name and address with another agency, so long as its request for information is complete and valid and 'meets the requirements of [§ 6103(i)(2)(B)].'" *Id.* (citing 26 U.S.C. § 6203(i)(2)(A) (alteration in original); *see also* 26 U.S.C. § 6103(i)(C) (specifying that, for the purposes of Section 6103(i), a "taxpayer's identity" shall not be treated as

taxpayer return information"). Under the structure of the statute, the question of what must be included in an agency's request for return information is distinct from the question of what can be disclosed by the IRS. Indeed, Section 6103(i)(2) requires the IRS to disclose an address to a requesting agency notwithstanding that the agency must provide the taxpayer's name and address in its request. *See id.* § 6103(i)(2). Taken to its logical conclusion, Plaintiffs' argument would improperly read out of the statute Section 6103(i)(2)(C)'s reference to a "taxpayer's identity"—which is defined to mean "the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number . . . *or* a combination thereof," *id.* § 6103(b)(6) (emphasis added). *See Corley v. United States*, 556 U.S. 303, 314 (2009) (explaining that courts should construe statutes "so that no part will be inoperative or superfluous, void or insignificant" (cleaned up)). If an agency could only request name or address information that it already has, there would have been no reason for Congress to specify that a taxpayer's name and address must be disclosed.

Plaintiffs' argument is not saved by their citation to the Internal Revenue Manual and the Disclosure & Privacy Law Reference Guide. *See* Pls.' Mot. at 25 & n.41. "It is emphatically the province and duty of the judicial department to say what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (cleaned up). And it has long been understood that IRS publications do not bind the IRS and cannot be relied on in the face of a contrary statute. *See* Stephanie Hunter McMahon, *Classifying Tax Guidance According to End Users*, 73 Tax Law. 245, 264 (2020); *Miller v. Commissioner*, 114 T.C. 184, 195 (2000) (collecting cases). The Internal Revenue Manual is merely a complication of "[p]rocedures . . . intended to aid in the internal administration of the IRS." *Matter of Carlson*, 1265 F.3d 915, 922 (7th Cir. 1997). "It is well settled . . . that the provisions of the Manual . . . do not have the force of law." *Elec. Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1244–45 (D.C. Cir. 2018). The Privacy Law Reference Guide, for its

part, cautions that it "was prepared for reference purposes only; it may not be used or cited as authority for setting or sustaining a legal position." IRS Pub. 4639, *Disclosure & Privacy Law Reference Guide* *iii, https://perma.cc/3GQR-TPWT ("Reference Guide").

In any event, the statements in the Internal Revenue Manual and the Privacy Law Reference Guide do not bear the weight that Plaintiffs put on them. The Internal Revenue Manual states that "Requests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address." Internal Revenue Manual § 11.3.28.4(5), Disclosure of Return Information (Other Than Taxpayer Return Information) Pursuant to IRC 6103(i)(2), https://perma.cc/HY8W-QPJG. And the Privacy Law Reference Guide states that "Requests under section 6103(i)(2) seeking only taxpayers' addresses do not comply with the section." Reference Guide at 5–4. As Judge Friedrich noted in *Centro*, it is possible to read the Manual and Reference Guide as simply reinforcing the requirement that a request for return information under Section 6103(i)(2) must include the taxpayer's address. 2025 WL 1380420, at *6. But even if the Manual and Reference Guide are read to support the limitation Plaintiffs propose, the Court's interpretation must yield to the statutory text, which imposes no such limitation. *See id.*

Plaintiffs also attempt to bolster their argument by reference to another subsection of the statute, Section 6103(i)(5), which pertains to the "locat[ion of] fugitives from justice" and requires a court order prior to disclosure. *See* Pls.' Mot. at 26 (citing 26 U.S.C. § 6103(i)(5)). As Judge Friedrich explained, however, Section 6103(i)(5) "serves an entirely different purpose than § 6103(i)(2)." *Centro*, 2025 WL 10380420, at *6. "That the fugitive provision authorizes the IRS to release more extensive tax return information to the Department of Justice (assuming it meets the more onerous prerequisites in § 6103(i)(5)(B))) does not preclude the IRS from releasing a

taxpayer's name and address to an agency (assuming it satisfies the much less demanding procedure set forth in § 6103(i)(2))." *Id.*

*Third*, Plaintiffs argue (Pls.' Mot. at 26) that the IRS violated the proscription in Section 6103(i)(2) that information be disclosed only to officers and employees of the requesting agency who are "personally and directly engaged" in preparation for a criminal judicial or administrative proceeding, an investigation which may result in such a proceeding, or certain grand jury proceedings. 26 U.S.C. § 6103(i)(2). Plaintiffs question whether ICE has sufficient personnel to be "personally and directly engaged" in criminal investigations of the taxpayers for whom ICE requested information. Pls.' Mot. at 26. But Plaintiffs' argument reads the requirements of Section 6103(i)(2) too broadly. A law enforcement agency officer or employee could be "personally and directly" engaged in an investigation that starts with a high-level view of agency data. As Judge Friedrich explained in *Centro*, "if DHS is investigating an immigrant for remaining 90 days past a final removal order," in violation of 8 U.S.C. § 1253(a)(1), "a recent address could confirm that the immigrant did in fact overstay the order," *Centro*, 2025 WL 1380420, at *7. In other words, address information, even at a large scale, could allow ICE to investigate which taxpayers are potentially subject to criminal proceedings. At bottom, moreover, it is ICE's responsibility under the MOU to ensure that the "personally and directly engaged" requirement is satisfied, *see* MOU § 6(E), and it is neither unreasonable nor unlawful for the IRS to rely on ICE's representations in that respect.

*Fourth*, Plaintiffs cite two news articles to suggest that "the White House contacted [an] IRS agent on August 8 to follow up on ICE's requests, officials requested additional information on the taxpayers the IRS identified—specifically, whether any had claimed the [Earned Income Tax Credit ("EITC")]." Pls.' Mot. at 26–27. Plaintiffs assert that this alleged communication

violated Section 6103(i)(2), because whether a taxpayer qualifies for the EITC is "taxpayer return information" that cannot be disclosed. *Id.* at 27. Even if Plaintiffs' account of White House communications to IRS were accurate, however, Plaintiffs provide no indication that the IRS ever unlawfully disclosed any taxpayer return information in response. Thus, there is no evidence of any violation of Section 6103.

*Finally*, Plaintiffs speculate that the information the IRS provides to ICE will not be used "solely" for purposes of potential criminal investigations or proceedings. *See* Pls.' Mot. at 27–28. Plaintiffs' argument ignores, however, that the MOU expressly requires just that. *See* MOU § 6(D). The IRS did not act contrary to law by providing address information to ICE under the explicit expectation that ICE would use the information consistent with Section 6103(i)(2).

### E.    Plaintiffs Are Unlikely to Prevail on Their Arbitrary and Capricious Claim.

Should the Court conclude it must assess the likelihood of success on Plaintiffs' arbitrary and capricious claim, despite the lack of final agency action, Defendants are highly likely to prevail. "[R]eview under [this standard] is deferential," requiring a "court simply [to] ensure[] that the agency has acted within a zone of reasonableness and … reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Defendants' actions—entering into an MOU to ensure compliance with the provisions of Section 6103(i)(2) before transferring information as required by that statute—falls squarely within the "zone of reasonableness." Indeed, the IRS's strict compliance with Section 6103(i)(2) is confirmed by the MOU itself. *See* MOU § 6. And it cannot be unreasonable for an agency to do what is *required* by law. *See Centro*, 2025 WL 1380420, at *7.

Plaintiffs again point to statements from the Internal Revenue Manual. *See* Pls.' Mot. at 29–30. But, as discussed above, those statements do not have the force of law and, in any event

"do not categorically bar the IRS from sharing information with another agency so long as the agency first provides a taxpayer's name and address and satisfies the other statutory requirements" of Section 6103(i)(2). *Centro*, 2025 WL 1380420, at *7; *see also* Part I.D, *supra.* As to reliance interests, contrary to Plaintiffs' claim, there can be no expectation that the IRS will not share return information when the Internal Revenue Code explicitly authorizes—and, indeed, requires—its disclosure.

## II.    Plaintiffs Cannot Demonstrate Irreparable Harm.

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). To obtain such relief, the plaintiffs must establish injury that is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Although Plaintiffs' failure to demonstrate concrete injury sufficient to establish Article III standing would also mean they cannot demonstrate irreparable harm, the converse is of course not necessarily true: that a plaintiff has or will suffer an injury in fact does not mean that they have demonstrated irreparable harm for purposes of the preliminary injunction inquiry. *See, e.g.*, *All. for Retired Ams. v. Bessent*, --- F. Supp. 3d ----, 2025 WL 740401, at *20–24 (D.D.C. 2025) (finding, in denying preliminary injunction against DOGE access, that plaintiff had not demonstrated irreparable harm and thus was not entitled to preliminary injunction, despite concluding that plaintiff had Article III standing); *Comm. for a Constructive Tomorrow v. Dep't of the Interior*, No. 24-cv-774 (LLA), 2024 WL 2699895, at *4 (D.D.C. May 24, 2024) ("While Plaintiffs have shown a substantial likelihood of standing, they have not demonstrated that they

will suffer irreparable harm in the absence of a preliminary injunction or administrative stay. That is a sufficient basis to deny their motion.").

Critically, "[a] movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *Univ. of Cal. Student Ass'n*, 2025 WL 542586, at *4 (denying TRO in DOGE data access case because plaintiff failed to make a clear showing of irreparable harm and "leav[ing] for another day consideration of whether [the plaintiff] has standing to sue and has stated a claim upon which relief may be granted"); *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020) (explaining that "if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors").

1. Plaintiffs here fail to establish irreparable harm and therefore are not entitled to injunctive relief. For all the reasons discussed above, *see* Part I.A, *supra*, Plaintiffs have not suffered an injury-in-fact, much less any harm so "certain" and "great" as to warrant a preliminary injunction. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. As detailed in Mr. Walker's declaration, the IRS has followed the requirements of Section 6103(i)(2) and provided information only as required by the statute. It is entirely speculative to assume that any of Plaintiffs' members' or the Center's clients' address information has been, or will be, disclosed to ICE, and even further hypothesizing is required to conclude that address information will be broadly disseminated or used for an unlawful purpose.

Moreover, as this Court and others in this District have recognized in analogous circumstances, there is no irreparable harm warranting injunctive relief based on allegedly unlawful intragovernmental transfer of data. *See Alliance for Retired Americans*, 770 F. Supp. 3d

at 109 ("Plaintiffs inability to show a likelihood of future wrongful dissemination of their members' private information is fatal to their Motion."); *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025) ("[Plaintiff] . . . cites no authority for the proposition that mere "access" to personal data by government employees who are not authorized to view it, without more, creates an irreparable injury."); *AFL-CIO v. Labor*, Civ. A. No. 25-339 (JDB), 2025 WL 1783899, at *14 (D.D.C. June 27, 2025) ("Plaintiffs' argument that private disclosure of personal information alone amounts to irreparable harm holds no water in this Circuit."). Here, as in those cases, the information at issue is subject to strict restrictions on its use and dissemination, and available only to a limited set of federal government employees. *See* 26 U.S.C. § 6103(i)(2); MOU § 6(D), (E). In addition, as detailed above, the Internal Revenue Code sets out a comprehensive set of remedies for the unlawful disclosure of return information, including damages. *See* Background, Part I, *supra*. Even the "possibility" that adequate relief will be available after a full hearing on the merits "weighs heavily against a claim of irreparable harm." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Univ. of Cal. Student Ass'n*, 766 F. Supp. 3d at 123 (finding that "the remedies provided in the . . . Internal Revenue Code confirm that [plaintiff's members are not suffering (and will not suffer) an irreparable harm").

Plaintiffs' assertion of irreparable harm to the Center's organizational interests also cannot justify injunctive relief. As discussed above, there is no direct impediment to the Center fulfilling its mission, and Plaintiffs' contrary argument is inconsistent with the Supreme Court's decision in *Alliance*. It is hardly irreparable harm for the IRS to provide information to law enforcement agency in fulfilment of a statutory obligation.

2. There are other reasons, too, that preclude a finding of irreparable harm. For one, Plaintiffs' lengthy delay in seeking injunctive relief "stands in stark contrast to the high bar they

must clear to show irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014). "Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.'" *Id.* (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)). Indeed, the D.C. Circuit has viewed a delay in challenging agency action to be significant to its decision denying a preliminary injunction when the delay was only 44 days. *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) ("Our conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one.").

The Treasury Department and DHS executed the MOU at issue in Plaintiffs' motion in April 2025, and Judge Friedrich issued her decision denying the *Centro* plaintiffs' motion to enjoin information sharing under the MOU on May 12. *See Centro*, 2025 WL 1380420, at *1. Moreover, Plaintiffs' Amended Complaint demonstrates that Plaintiffs were aware of the MOU by May 15, at the very latest. *See* Am. Compl. ¶ 14. Yet, Plaintiffs delayed until August 20—over three full months while the parties briefed Defendants' motion to dismiss—before seeking emergency relief from this Court. That lengthy delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation and citation omitted).

Plaintiffs may claim that the breadth of the IRS's potential information sharing was not apparent until more recently. But that would hardly be credible, as it would be inconsistent with Plaintiffs' own theory of their case as stated in their May 2025 Amended Complaint. *See* Am. Compl. ¶¶ 140 (alleging that the "IRS has already decided to begin large-scale data sharing with other government agencies, which it is poised to dramatically expand, within weeks or months,

via a new centralized technological platform"). Having inexplicably delayed for months, Plaintiffs should not be heard now to obtain emergency relief from this Court.

Moreover, given Plaintiffs' delay, it is now far from apparent that the Court could even fashion effective relief to address Plaintiffs' alleged harm. The IRS completed its response to DHS's June 27, 2025 request on August 7, 2025. *See* Walker Decl. ¶¶ 6–7. There are no other pending requests from DHS. *Id.* ¶ 8. And to the extent Plaintiffs seek to have "Defendants [ ] destroy" information already provided, "or seek and facilitate the destruction of such data," *see* Proposed Order, ECF No. 30-2, that proposed injunctive relief ignores that neither ICE nor DHS is a party to this litigation, precluding an order directed to them. *See generally* Am. Compl.; *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2552 (2025) (explaining that "party-specific principles [ ] permeate" the Supreme Court's equity jurisprudence).

## III.    The Balance of Equities Favors Defendants.

The remaining two preliminary injunction requirements also favor the government. Initially, the purpose of a preliminary injunction is to preserve the status quo, and "courts must be 'institutionally wary of granting relief that disrupts, rather than preserves, the status quo[.]'" *Hanson v. Dist. of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (quoting *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022)). In this case, the status quo is that the IRS and DHS have a lawful MOU in place to share information under the terms of Section 6103(i)(2). Indeed, that MOU has been in place for well over four months. *See* Walker Decl. ¶ 5. It would disrupt, rather than preserve, the status quo to enjoin information sharing under the MOU.

Moreover, as discussed above, Plaintiffs' proposed injunction would prohibit information sharing that is *required* by Section 6103(i)(2). *See* Background, Part I, *supra*. Plaintiffs' proposed injunction therefore threatens significant and irreparable harm to the government and the public that greatly outweighs any claimed injury to Plaintiffs.  *See Nken*, 556 U.S. at 435; *Maryland v.*

*King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration and citation omitted)). The harm to the government is particularly acute because the purpose of Section 6103(i)(2) is to aid in the efficient conduct of law enforcement investigations and proceedings, which may be impeded or delayed by an injunction.

Finally, principles of comity and judicial efficiency weigh against the exercise of equitable relief. The D.C. Circuit is scheduled to hear oral argument on the *Centro* court's denial of the plaintiffs' motion for a preliminary injunction on October 3, 2025. The Court should reject Plaintiffs' request that this Court duplicate the efforts of Judge Fredrich when the D.C. Circuit will soon decide the same issue. *See Am. Chemical Paint Co. v. Thompson Chemical Corp.*, 244 F.2d 64, 66–67 (9th Cir. 1957) ("Considerations of comity and judicial restraint should deter one court from thus, in effect, overruling the decisions of a court of co-ordinate jurisdiction.").

## IV.    Plaintiffs Should Be Ordered to Post a Substantial Security in Connection with Any Preliminary Injunctive Relief, and Any Preliminary Injunctive Relief Should Be Stayed Pending Any Appeal.

For the reasons stated above, the Court can and should deny Plaintiffs' motion. If the Court is inclined to order any injunctive relief, however, it should order Plaintiffs to post substantial security with any preliminary injunction, commensurate with the disruption caused by the injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). "[I]njunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). In the event the Court issues an injunction here, the Court should require Plaintiffs to post a bond commensurate with the scope of any injunction.

*See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed pending appeal, if such appeal is authorized by the Solicitor General and taken by Defendants. In the alternative, Defendants ask for a stay for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a stay under 5 U.S.C. § 705 or, in the alternative, for a preliminary injunction.

Dated: August 28, 2025                Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Senior Trial Counsel
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*