**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR TAXPAYER RIGHTS et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-457-CKK |
| INTERNAL REVENUE SERVICE et al., | |
| *Defendants*. | |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY RELIEF**

# TABLE OF CONTENTS

**Factual Developments** ........................................................................................................... **2**

**Argument** ................................................................................................................................... **3**

   **I.**  **Plaintiffs Are Likely to Succeed on the Merits, As the Data Policy and Its Large Scale Implementation Are Unlawful and Harm Plaintiffs.** ........................................................ **3**

      A.   Plaintiffs Have Standing to Challenge the Data Policy and Its Large-Scale Implementation to Share Data with ICE. ............................................................................ 3

      B.   Plaintiffs Challenge Reviewable Final Agency Action. ............................................... 10

      C.   The Data Policy's Implementation Violates 6103 ....................................................... 12

      D.   Defendants' Adoption of the Data Policy is Arbitrary and Capricious. ....................... 15

      E.   The Internal Revenue Code's Provisions for Individual Instances of Improper Access or Disclosure Do Not Supplant APA Review. ...................................................................... 18

  **II.**  **Plaintiffs Are Irreparably Harmed by Large-Scale Sharing Data With ICE Under the Data Policy.** ................................................................................................................. **19**

  **III.** **The Balance of the Equities Favors Relief.** ...................................................................... **23**

  **IV.** **The Court Should Not Impose a Substantial Bond or Stay Any Preliminary Relief Pending Appeal.** ............................................................................................................... **24**

For 50 years, and consistent with Section 6103 of the Internal Revenue Code, the IRS has carefully guarded taxpayers' sensitive information. But Defendants' opposition confirms that IRS has now begun unprecedented, mass disclosure of taxpayer information to ICE. Defendants argue that such mass sharing is lawful under Section 6103's narrow exceptions for criminal proceedings because, they assert, law enforcement is permitted to access taxpayer data for "high-level" review to determine "which taxpayers are potentially subject to criminal proceedings." This view of Section 6103, which would permit sweeping law enforcement access to taxpayers' information to search for *potential* crimes, flatly contradicts the protective scheme Congress has enacted and the requirement that such information only be provided to law enforcement officers "personally and directly engaged" in specific criminal investigations or proceedings. Defendants' only response to many of Plaintiffs arguments is that the IRS is not only permitted but required by law to share this data with ICE. They do not address the IRS's unexplained about-face from a decadeslong policy against sharing such information with ICE for immigration enforcement purposes and requiring careful, individualized assessments before sharing information with any agency for criminal matters. Defendants' actions are contrary to law, arbitrary, and capricious.

Plaintiffs and their clients and members are suffering, and will imminently suffer, irreparable harm from this implementation of IRS's new Data Policy through mass disclosures, both through the invasion of individuals' privacy and the harms to the organizational operations and mission of Plaintiff Center for Taxpayer Rights.

The Court should halt Defendants' unlawful conduct and the resulting harms; it should therefore decline Defendants' suggestion to wait for the pending appeal of *Centro de Trabajadores Unidos v. Bessent*, No. 1:25-cv-00677, 2025 WL 1380420 (D.D.C. May 12, 2025). That decision centrally concerned the provisions of an IRS-ICE MOU as written, not the mass data sharing that

has now occurred. It did not consider, for example, whether ICE's request for more than a million individuals' data was handled in a manner to ensure that only officers "personally and directly engaged" in specific criminal investigations received protected information. To prevent further irreparable harm from Defendants' unlawful policy, Plaintiffs respectfully request preliminary relief.

**FACTUAL DEVELOPMENTS**

Since the Motion was filed, there have been two key factual developments that shed additional light on the IRS's sharing of taxpayer data *en masse* with ICE under the Data Policy. *First*, today IRS's implementation agreement for its April 2025 Memorandum of Understanding ("MOU") with ICE was made public. Implementation Agreement (Ex. 12).[1] This agreement states that ICE will maintain tax information received from IRS in three systems, including the "Alien Number" or "A-file" system that is the Department of Homeland Security's ("DHS") primary database for all of an immigrant's "immigration history" and "official immigration record" and which is accessible by other DHS agencies as well as ICE.[2] The agreement places no restrictions on who can access the tax information placed in these general files at DHS, nor any requirement that the information only be accessible to officers directly engaged in a particular criminal proceeding.

Second, Defendants' declaration of John J. Walker, ECF No. 31-1, provides new details regarding the scope and timeline of ICE's requests but raises additional questions. Mr. Walker

---

[1] IRS & ICE, *Implementing Agreement* (Apr. 18, 2025), https://perma.cc/E8TY-SZDM (obtained through FOIA *Immigrant Advocates Uncover Alarming IRS-ICE Implementation Plan to Share Taxpayer Data*, Asian Law Caucus, Sept. 3, 2025, https://www.asianlawcaucus.org/news-resources/news/alarming-irs-ice-plan-to-share-taxpayer-data).

[2] Ex. 12; Privacy Act of 1974; System of Records, 82 Fed Reg. 43556 (Sept. 18, 2017), *available at* https://perma.cc/2PEK-C9D3 ("System of Record Notice").

2

attests that ICE sent a letter on June 27, 2025 requesting "the last known address of approximately 1.28 million individuals identified by ICE." *Id*. at ¶ 6. He does not state whether ICE included any other types of information with this June 27 letter—for example, the details about each person that the April 2025 MOU between IRS and ICE requires. *See* Ex. 1 to Walker Decl. (ECF No. 31-1) ("MOU") at § 6(C) (listing data points ICE must provide with each request). The IRS and ICE did not develop the technical system used to transmit those details about each request until July 2025, Ex. 3 to Stay Mot. (ECF No. 30-5), so the processing of the information, whenever it was sent, almost certainly began at a much later date; Mr. Walker does not say.

Mr. Walker also attests that the IRS responded on August 7, 2025, providing ICE with the last-known address for over 47,000 people in response to this single mass request. Walker Decl. at ¶ 7. He does not represent that the IRS scrutinized the request before responding; rather, he attests that IRS provided the requested last-known address where ICE's request contained all the pieces of information required by the MOU and the IRS could "match the individual to a known taxpayer." He states that the IRS has received no further requests from ICE "pursuant to the MOU," *id*. at ¶ 8, but not whether work is ongoing to identify additional matches for the other 96.3% of individuals requested, whether IRS plans to provide further responses to that request, or whether IRS has received additional requests from ICE other than "pursuant to the MOU."

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits, As the Data Policy and Its Large Scale Implementation Are Unlawful and Harm Plaintiffs.

#### A.    Plaintiffs Have Standing to Challenge the Data Policy and Its Large-Scale Implementation to Share Data with ICE.

Plaintiffs have standing to bring this case and to seek the relief requested in this Motion, as explained in their Motion and in opposition to the pending Motion to Dismiss, *see* ECF No. 27. Here, Plaintiffs focus on the arguments Defendants raised in its Opposition.

First, Plaintiff CTR has shown it is already suffering concrete harms to its educational activities and in its representation of taxpayer clients. These injuries are squarely analogous to those in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In *Havens*, the Court held that an organization had standing to sue over racial steering practices that implicated its clients because the conduct impeded its ability to provide its housing counseling services and help low- and moderate-income homeseekers secure housing. *Id*. at 379. Defendants misread *Havens* to argue that the IRS's conduct must have directly stopped CTR from delivering its services to support standing. Defs.' Opp'n to Stay Mot. (ECF No. 31) ("Opp'n") at 19. The *Havens* plaintiff was not "challenging a law that prohibit[ed] its housing counseling service." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 190 (D.D.C. 2025). It challenged conduct that impacted the organization's clients in a way that made delivery of services more difficult, forcing the organization to "devote significant resources to identify and counteract" their conduct and perceptibly impairing the organization's ability to fulfil its mission. *Havens*, 455 U.S. at 379. As acknowledged in *FDA v. Alliance for Hippocratic Medicine*, such an organization is akin to a retailer, who has standing to sue the manufacturer of a defective product if it makes its business harder to run and less successful, 602 U.S. 367, 395 (2024), not just if the manufacturer directly shuts down its store. Courts have accordingly found organizational standing in cases where, as here, a defendant's action directed at third parties perceptibly impairs the organization's ability to provide services. *See*, *e.g.*, *NEA v. Dep't of Educ.*, 779 F. Supp. 3d 149, 176 (D.N.H. 2025) (agency action restricting DEI activities created a material obstacle to an organization's ability to provide training and legal counseling services in furtherance of its mission); *League of United Latin Am. Citizens,* 780 F. Supp. 3d at 190 (new voter identification requirements would impede effectiveness of organization's voter registration drives); *League of Women Voters of N.H.*

*v. Kramer*, No. 24-cv-00073, 2025 WL 919897, at *9 (D.N.H. Mar. 26, 2025) (robocalls impeded organization's efforts to counsel voters and combat voter suppression).

The cause of these harms is not speculative, as Defendants argue. Some of CTR's injuries—the drop in engagement with its services, for example—flow from the "predictable" response of the directly regulated parties (taxpayers) to the government action. *See All. for Hippocratic Med.*, 602 U.S. at 383 ("[plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs.") (citations omitted). Privacy protections are essential to building taxpayer trust, especially among immigrants, and the loss of that trust causes a significant drop in engagement with the tax system. ECF No. 30-8 (Declaration of Nina E. Olson) ¶¶ 15, 53-54; ECF No. 30-11 (Declaration of John Koskinen) ¶ 11. People who decide not to engage with the tax system do not seek out CTR's services, as CTR is already observing in its engagement and retention levels. Olson Decl. ¶¶ 41-44, 54.

Defendants speculate, without evidence, that "one might suspect that taxpayers who are worried" about the issues raised by Defendants' actions might "seek more guidance, not less" from the Center. Opp'n at 20. First, this unsubstantiated assertion conflicts with record evidence that the IRS's data-sharing with ICE caused the drop-off in engagement with CTR's services. Olson Decl. ¶¶ 44, 54. And second, this drop in engagement supports, rather than undermines, the conclusion that CTR is impeded in its work. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (finding standing where voter registration at the organization's drives "plummeted," despite organization's continued efforts, following defendants' new requirements). As in *Newby*, CTR has demonstrated a significant drop-off in engagement with its services, paired with a declaration from an expert with first-hand knowledge of CTR's operations explaining how and why Defendants' actions caused that result. *See* Olson Decl. ¶¶ 41-44, 54, 55-67.

The impediments to CTR's and LITC members' ability to effectively counsel their existing clients are likewise concrete, not speculative. Their attorneys can no longer effectively and responsibly advise clients given the IRS's violations of taxpayer privacy laws, Olson Decl. ¶¶ 47-49, 68, and it is now more difficult to secure pro bono representation for clients and mentor the cases, due to the complexity and burden the Data Policy adds to the cases, *id*. at ¶ 51. CTR's "ability to provide services," Opp'n at 19, has indeed been disturbed. This injury too provides a basis for organizational standing. *See, e.g., NEA v. Dep't of Educ.*, 779 F. Supp. 3d 149, 176 (D.N.H. 2025) (finding standing where government's imposition of a confusing prohibition impeded the organization's ability to provide its members representation and counseling).

Similarly, Plaintiffs have established that certain of their members and clients have suffered, or are at imminent risk of suffering, concrete harms as a result of their data being unlawfully shared.[3] Here again, Defendants argue that these harms are speculative and also that Plaintiffs cannot demonstrate that their members' and clients' data was already disclosed or is at imminent risk of being disclosed. Opp'n at 12. Defendants focus on the number of taxpayers whose data has been disclosed to date—in itself a large figure, at over 47,000 taxpayers—but ignores the full scope of ICE's requests and the White House's campaign to ensure they are fulfilled.

ICE seeks data for 7.3 million taxpayers—more than the total number of ITIN holders— and sent a mass request to that effect to the IRS on June 25. ECF No. 30-5. After the then-Acting

---

[3] Defendants argue in a footnote that Plaintiffs have not properly alleged third-party standing. As detailed in Plaintiffs' opposition to Defendants' motion to dismiss, CTR has established standing and set forth why it meets the requirements necessary to assert the rights of its clients as well. *See* Pls.' Opp. to Mot. to Dismiss Am. Compl. (ECF No. 27) at 27-32 ("Pls.' Opp'n to MTD"). The factual allegations underlying these arguments were properly pled and are cited therein. CTR also provided additional information regarding its clients' and LITC members' clients' standing and the irreparable harm they face in the Olson Declaration accompanying the Motion. *See* Olson Decl. ¶¶ 71-90.

Chief Counsel concluded the request was unlawful, he was fired on June 27, *id.*—the very day that the IRS sent another letter requesting 1.28 million taxpayers' data, *see* Walker Decl. ¶ 6. After IRS processed the spreadsheet listing these 1.28 million taxpayers and returned matches for approximately 47,000 on August 7, *id.* ¶ 7, the White House quickly complained that too few records were disclosed, and Commissioner Long was fired the same day.[4] The Administration continues to pursue these disclosures and has removed all independent leadership at the IRS who would object, replacing them with officials from Treasury,[5] where DOGE affiliate Sam Corcos holds a leadership role. Defendants' own arguments acknowledge the purpose of these transfers: to support a high-level analysis of data in search of "potential[ ]" criminal violations amongst immigrants—not to support existing *bona fide* investigations of specific individuals. Opp'n at 30.

There is no reason to expect the Administration's pursuit of this data will stop before they collect data on the full population that they seek—immigrant taxpayers, including Plaintiffs' clients and members. Defendants argue that any further disclosures are speculative, Opp'n at 12, but Mr. Walker's Declaration does not support such a broad conclusion. It states only that ICE has made no *new* requests, *under the MOU*, since June 27, Walker Decl. ¶ 8, and does not say whether the IRS will satisfy the balance of the existing requests. Given the Administration's pursuit of these data transfers, the removal of all IRS officials who object, and the mass transfer that has already occurred, the factual record demonstrates that such harms are imminent. *Sierra Club v.*

---

[4] Exs. 1 & 2 to Stay Mot. (ECF Nos. 30-3 & 30-4); Andrew Duehren, et al., *Trump Is Removing I.R.S. Chief 2 Months After He Was Confirmed*, Wash. Post (August 8, 2025), https://perma.cc/K8U3-UL55.

[5] The new acting Chief Counsel is Kenneth Kies, the Assistant Secretary for Tax Policy at Treasury; the new acting Commissioner is Treasury Secretary Scott Bessent. Organizational Chart (Exhibit 13).

*Jewell,* 764 F.3d 1, 7 (D.C. Cir. 2014) (plaintiff had standing where defendants had taken concrete steps to further their stated intentions, showing "'substantial probability' of injury").

Such a conclusion requires no speculation or improper inference. In June, ICE requested the taxpayer data of enough immigrants to cover every active ITIN holder in the country, ECF No. 30-5, and the Administration has since taken several steps to remove obstacles to that data transfer. Over 47,000 taxpayers' data has been disclosed, and the Administration has stated its intention to press forward. It is reasonable to infer IRS will continue transferring the same kind of data, under the agreements that remain in force, regarding the same population of people—immigrant taxpayers—who are among Plaintiff Main Street Alliance's ("MSA") members and CTR's clients. As the court found in *Klayman v. Obama*, courts are not required to "abandon all common sense," when confronted with facts such as these; an inference as to the scope of data access, once the parameters are properly demonstrated, is appropriate. 142 F. Supp. 3d 172, 188 (D.D.C. 2015).

Defendants are likewise mistaken to argue that disclosure or imminent risk of disclosure of taxpayers' data—even if it violates Section 6103—does not satisfy Article III's injury-in-fact requirement because there is no analogous tort at common law. This injury is analogous to the torts of "intrusion upon seclusion," *see All. for Retired Ams v. Bessent*, 770 F. Supp. 3d 79, 102 (Mar. 7, 2025); *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 72 (D.D.C. 2025), and "breach of confidence," *see Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019); *AFL-CIO*, 778 F. Supp. 3d at 73.[6] Even if "intrusion upon seclusion" required—as Defendants argue— that the injured persons *know* they had been subjected to "targeted snooping" such that they would experience "unease" as a result, Plaintiffs have shown those facts here. ICE's requests are, by

---

[6] These issues are fully briefed in Pls.' Opp'n to MTD, at 21-24.

definition, "targeted"; they have requested data for a specific population of people and attested in their requests that they are actively investigating those people. Immigrant taxpayers therefore reasonably feel targeted and are experiencing considerably more serious emotional impact than "unease." Olson Decl. ¶ 62 (taxpayer feeling regret after filing return, fearing ICE knocking on their door); *id.* ¶ 63 (taxpayers fearing law enforcement showing up at their door and breaking their family apart); *id.* ¶ 65 (clients too afraid to file 2025 taxes); *id.* ¶ 73 (clients fearing immigration raids, detention, separation from loved ones, and deportation). Defendants are likewise mistaken in characterizing home addresses as not sensitive information; Section 6103 deems confidential every piece of information a taxpayer supplies with his return, and the taxpayer fears cited above reflect the sensitivity around giving this information to ICE. The relevant legal question is not whether Plaintiffs satisfy every element of a tort they have not pled; it is whether the injury they have suffered—here, a violation of Section 6103—has "a close historical or common-law analogue" such that the court can be confident it is a sufficiently concrete injury-in-fact under Article III. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). Tax return information is analogous to, for example, private banking records, the intrusion into which would be actionable at common law. *See Wolf v. Regardie*, 553 A. 2d 1213, 1217–18 (D.C. 1989). Violations of Section 6103's protections are analogous to the harms recognized by this tort.

"Breach of confidence" is likewise analogous to the violation of Section 6103. Defendants argue that this tort is not old enough to suffice, citing out-of-circuit authority where the Eleventh Circuit specifically declined reach this conclusion. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931-32 (11th Cir. 2020) (en banc) (observing there was support for both sides of the debate as to "whether breach of confidence is sufficiently ancient"). In any event, in *Jeffries* the D.C. Circuit applied the common-law-analogue standard articulated in *Spokeo v Robins*, 578 U.S.

330, 341 (2016), which was not so altered by *TransUnion* as to render *Jeffries* unsafe. It controls here. And publication of the information outside the U.S. government is not required. *See AFL-CIO,* 778 F. Supp. 3d at 72 (citing *Jeffries,* 928 F.3d at 1064) (noting that "[n]othing beyond 'the plaintiff's trust in the breaching party [being] violated' must occur").

### B.  Plaintiffs Challenge Reviewable Final Agency Action.

Uncontroverted facts reveal that IRS has adopted a new Data Policy that permits wide consolidation and disclosure of the protected tax information of taxpayers, including Plaintiffs' members and clients. Defendants' recent initiation of *en masse* sharing with IRS, only plausibly possible through automated mechanisms, makes this policy's existence plain and is also, by itself, a final agency action affecting statutory rights to confidentiality. Such a policy—even if not reduced to a single agency writing—is final agency action subject to APA review under the law of this Circuit. Defendants fail to distinguish controlling case law or counter relevant facts, and the cases they turn to for support are inapposite.

*First*, the Data Policy is reviewable final agency action. In *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, the D.C. Circuit held that a "decision of [an agency] to adopt a policy of disclosing confidential information" is reviewable final agency action even where "the details" of the "policy are still unclear" and it is reflected in disparate agency statements and actions. 530 F.3d 925, 931 (D.C. Cir. 2008). *Venetian* is on all fours with this case, and Defendants' terse argument that it is distinct is unavailing. Indeed, here there is both a disclosure policy and agency action to actually disclose protected information. Defendants primarily seek to distinguish *Venetian* by arguing that there the challenged disclosures there were to "potential plaintiffs" who were private parties, while here the disclosure is to "a law enforcement agency" with "statutory rights to the information." But, in *Venetian*, the other parties also arguably had "statutory rights" to the relevant information under FOIA. *Id.* at 929. Nor does the recipient of planned disclosures alter their finality or impact

on taxpayers' statutory rights. Section 6103 is *primarily* concerned with restricting the sharing of taxpayer information *within government*. *See generally* 26 U.S.C. § 6103 (d), (f), (g), (h), (i), (j) (l), (m). IRS actions that violate taxpayers' rights to protect their confidential tax information under 6103 can involve intra-governmental disclosures, as the Data Policy does. Here, as in *Venetian*, this policy is thus the "consummation of the agency's decisionmaking process," and "one by which [] rights[] obligations have been determined." 530 F.3d at 931.

*Second*, Defendants do not meaningfully contest the facts Plaintiffs have presented to show IRS has adopted the Data Policy and it is final agency action. Instead, Defendants offer a bare assertion that the Data Policy does not exist. Opp'n at 21, but this ignores facts that they do not dispute: IRS has created an unprecedented technological infrastructure for mass data-sharing and initiated mass sharing in response to an ICE request for the taxpayer information of 1.28 million people. *See* ECF No. 30-5; Walker Decl. ¶ 7. Defendants' sparse declaration acknowledges the mass sharing with ICE and does not refute the facts—including creation of a "mega-API" and process changes—reflective of the Data Policy. *See id*. This Circuit has long held that Defendants cannot "avoid judicial review" of a policy simply by refusing to issue a "formal statement of the agency's position." *Her Majesty the Queen in Right of Ontario v. EPA,* 912 F.2d 1525, 1531 (D.C. Cir. 1990). Where there is "evidence of" the agency's "actual practice" an agency's policy is reviewable under the APA. *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 (D.C. Cir. 2018).

*Third*, Defendants' reliance on case law from other contexts is unpersuasive. Defendants point principally to *California Communities Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019) and *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020), to argue that the "information sharing decisions" under the Data Policy have no "direct legal consequences." Opp'n at 22. But both of those cases involved guidance that did not actually dictate agency action. Here it is

11

uncontested that IRS *is* sharing data that is protected by statute, 26 U.S.C. 6103(a), and directly impacts taxpayers' legal rights sufficient to meet *Bennett*'s second prong regardless of the consequences that "arise from the information sharing." Opp'n at 22; 26 U.S.C. § 7803(a)(3) (taxpayers' rights to privacy and to confidentiality). And the fact that IRS has initiated this mass data sharing under the Data Policy confirms the finality and reviewability of that policy, which further distinguishes this case from *California Communities* and *Sierra Club*. The D.C. Circuit has held that courts may consider "post-guidance events" to determine if agency guidance is "final" and reviewable. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250-52 (D.C. Cir. 2014). *California Communities* and *Sierra Club* involved no subsequent implementation of the guidance documents at issue that would support the conclusion that they were final agency actions. Here, IRS's mass, automated data sharing with ICE, by contrast, further demonstrates the Data Policy's finality.

Defendants are also wrong to assert that the IRS's decision to disclose tax information to ICE is not a final agency action because it "is not a new policy to provide statutorily required information." Opp'n at 21. The IRS has not previously interpreted 6103(i)(2) to require such disclosures, and so the decision to make those disclosures, is "designed to implement" a new policy as to its interpretation of the law—namely, what 6103(i)(2) requires. *See* 5 U.S.C. § 551(4). The sharing action has been authorized by the agency and directly impacts taxpayers' statutory rights to confidentiality. This, too, satisfies the *Bennett* prongs for final agency action independently. And the APA does not bar "a plaintiff from challenging a number of discrete final agency actions all at once." *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025).

### C.  The Data Policy's Implementation Violates 6103

Defendants' implementation of the Data Policy through mass sharing of taxpayer data violates Section 6103's requirements in numerous ways, and Defendants' reliance on the language of the MOU over how data *should* have been shared does not change that fact.

*First*, Defendants have now confirmed that ICE sent IRS a mass request for the tax information of 1.28 million people in a single request, and the agency has already provided the information of over 47,000 individuals in response Walker Decl. ¶¶ 6-7. By Defendants' own description this was a single mass request for a "high-level view of agency data." Opp'n at 30. Under 6103(i)(2), IRS can disclose an individual's tax information only to officers "personally and directly engaged" in preparation for, or an investigation leading to, "enforcement of a specifically designated Federal criminal statute." *Id*. (cross-referencing, in part, to (i)(1)). Defendants posit that giving broad access to "high-level view of agency data" "at a large scale" to "investigate which taxpayers are potentially subject to criminal proceedings" meets the statutory bar of providing information to officers personally and directly involved in specific proceedings and investigations. Opp'n at 30. It does not. To interpret Section 6103 in this manner would read its restriction on disclosure to officers "personally and directly" involved in a specific investigation out of the statute. Under this logic, a law enforcement agency need only assert that a handful of its officers intend to mine IRS data to snoop for leads on "taxpayers potentially subject to criminal proceedings" under a criminal provision to establish an end-run around 6103(i)'s general requirement for a court order before tax information is disclosed for use in a criminal matter. Congress cannot have enacted such strict restrictions on the disclosure of tax information to federal agencies for use in criminal proceedings only to facilitate mass disclosures for "high-level" reviews to fish for leads on "potential[]" criminal infractions.

*Second*, Defendants are wrong to state that it is simply "ICE's responsibility under the MOU to ensure that the 'personally and directly engaged' requirement is satisfied." Opp'n at 30. An MOU does not alter IRS's statutory obligations, and the "General Rule" of 6103 requires the IRS to treat return information as "confidential" and only to disclose it "as authorized" by 6103's

exceptions. 26 U.S.C. § 6103(a). Section 6103(i)(2) states that the IRS shall only disclose such information to officers "personally and directly engaged" in a criminal investigation or proceeding. The statute places the responsibility on the IRS to disclose only in accordance with this exception and does not permit IRS to make disclosures that fail even to plausibly comply with the "personally and directly engaged" requirement on the basis of a requesting agency's say-so.

*Third*, Defendants essentially concede that 6103(i)(2) and their MOU with ICE require that information disclosed under this provision be used "solely" for criminal investigations or proceedings. But as Plaintiffs noted, the Administration has stated unequivocally that the IRS sharing taxpayer data with ICE is "to carry out the mass deportation" of immigrants—a civil, not criminal, enforcement matter. *See* ECF No. 30-5. Defendants' declaration and brief do not contradict their admission that this information is sought for civil immigration enforcement, not solely for criminal proceedings as required by 6103(i)(2). They cite Judge Friedrich's observation, in *Centro*, that a "recent" address could help determine whether a person had overstayed a removal order, which is a criminal violation, Opp'n at 30, but the IRS is providing a "last known" address, not an address tied to a particular time period, Walker Decl. ¶ 7. If the purpose of these requests is—as it appears—to locate and detain people, then ICE would need to satisfy the higher standards of a different provision, 6103(i)(5), which they have not.[7]

Buttressing this conclusion, the recently released implementation agreement for the IRS-ICE MOU permits ICE to maintain tax information disclosed by IRS in DHS's primary database

---

[7] Defendants argue this is permissible, in part, because 6103(i)(5)'s court order requirements for "locating" fugitives also permit broader disclosures. But (i)(5) requires a court order for disclosure of any "return information" and permits disclosure "only to the extent necessary" to locate an individual. This requirement cannot be fairly read with (i)(2) to permit disclosure of information to locate individuals without a court order simply at the agency's discretion.

for all of an immigrant's "immigration history" and "official immigration record," their so-called "A-file," as well as two additional records systems.[8] A-files are broadly accessible by other DHS agencies, not only ICE.[9] And the implementation agreement places no restrictions on who can access IRS information placed in these general immigration files such that the information would only be disclosed for use in purported criminal proceedings or limited to officers "directly and personally engaged" in those proceedings.[10]

### D. Defendants' Adoption of the Data Policy is Arbitrary and Capricious.

An agency cannot act in an arbitrary and capricious manner, regardless of its interpretation of legal requirements and particularly when that interpretation changes. Here, the IRS has reversed course with its decision to share taxpayer information in bulk, without explanation or justification. Defendants' argument that it cannot be unreasonable for an agency to do what is required by law is beside the point; Defendants have no answer for the numerous deficits Plaintiffs have raised.

Defendants' actions are outside the zone of reasonableness, and they have failed to consider "the relevant issues" or "reasonably explain[] the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Defendants have failed to address, let alone justify, the IRS's abrupt changes in processing requests under 6103(i)(2)—to now include responding to requests *en masse*, through use of automated systems, rather than through individualized assessments by a particular disclosure officer. Defendants provide no argument or evidence that they have (1) sufficiently justified their change in Policy, (2) considered numerous key issues related to its adoption, or (3) considered the substantial reliance interests based on decades of past practices and statements regarding the treatment of taxpayer information.

---

[8] Implementing Agreement, Ex. 12.
[9] 82 Fed. Reg. at 43556 (System of Record Notice).
[10] Implementing Agreement, Ex. 12.

Plaintiffs identified significant evidence, including in the Internal Revenue Manual, that demonstrates the arbitrary and capricious nature of Defendant's action.  In response, Defendants argue that the Manual does not have the force of law and thus cannot be considered by the Court. Defendants misunderstand the law. As the D.C. Circuit explained in *Venetian Casino*, Plaintiffs do "not contend the Manual itself is a final agency action." 530 F.3d at 931. Instead, "the Manual is relevant insofar as it illuminates the nature of the policy." *Id*. And the Manual (in addition to Defendants' actions) makes clear that Defendants have *changed* their position and policy, without acknowledging or explaining that change. This is arbitrary and capricious.

*First*: the Manual states that "Requests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address."[11] This shows that the IRS viewed such requests as impermissible under 6103(i)(2) and so it did not disclose solely address information under that provision. Defendants have not acknowledged or explained this change in position.

*Second*: the Manual, prior to April 17, 2025, set forth a detailed, individualized process by which requests under 6103(i)(2) were carried out with numerous safeguards.[12] For example, Section 11.3.28.2 of the IRS Manual previously applied to IRC 6103(i)(2)[13] and set forth a process

---

[11] Internal Revenue Manual ("IRM") § 11.3.28.4(5), *Disclosure of Return Information (Other Than Taxpayer Return Information) Pursuant to IRC 6103(i)(2),* IRS (Apr. 17, 2025), https://perma.cc/AN57-7XR8.

[12] *See* IRM § 11.3.28.2 (setting forth that the detailed process set forth in Section 11.3.28.2 previously applied to disclosures under IRC 6103(i)(2)) and § 11.3.28-2 (setting forth a detailed checklist of steps to take prior to disclosures under 6103(i)(2)), both available at https://web.archive.org/web/20250403125859/https://www.irs.gov/irm/part11/irm_11-003-028 (as archived Apr. 3, 2025).

[13] The Manual states that on April 17, the section was revised to "correspond to changes in content" and to move much of the information to another section of the Manual, IRM 11.3.41.8.1(18) and (19), Disclosure Case Processing and Inventory Management, General Case Processing for Disclosure to Department of Justice Under an Ex Parte Court Order Pursuant to

that involved numerous communications between the requestor and the IRS employee, and requirements regarding documentation and safeguards.[14] Each of these processes, documentation requirements, or safeguards have been stripped from the internal IRS process used to effectuate disclosures under 6103(i)(2). The IRS has not explained these changes. Similarly, the Manual previously included an exhibit of steps to take when processing 6103(i)(2) requests. It required that an IRS employee "analyze the request," "discuss" it with the requestor, prepare an "authorization memo" for approval, and maintain such documentation into a case file, and "analyze" the information for "potential redactions."[15] This entire section has been struck from the Manual.[16] Defendants have, at no point, addressed the removal of these requirements to individually assess each request—removals that were necessary in order to effectuate a process that can now allow disclosures of data, *en masse*, through automated systems. The new Policy is arbitrary and capricious, as Defendants have provided no explanation or justification for it.

---

IRC 6103(i)(1). But critically, that part of the manual applies *only* to disclosures under 6103(i)(1). Which means that Defendants have altered the employee process for disclosing data under (i)(2) substantially, without acknowledgement or explanation.

[14] The process identified "disclosure managers" as having been delegated the authority to approve disclosures under (i)(2). It also stated that the caseworker assigned to process the request would "contact the requesting official, usually the Assistant United States Attorney (AUSA) named." That contact "must be recorded in the case history of the electronic inventory management system," and the contact should "inquire whether there is an imminent court date or discovery date," "discuss alternative[s]" to producing the return information. The assigned caseworker "will review all releases of documents" pursuant to the relevant statutory provision "to ensure that only covered documents and information are released."

[15] IRM § 11.3.28, Exhibit 11.3.28-2 *Processing IRC 6103(i)(2) Requests*, IRS (Aug. 11, 2023), https://perma.cc/YF9Y-XG3X (capture date April 3, 2025).

[16] Compare *id.* with https://perma.cc/47ZW-EYTX (which no longer includes Exhibit 11.3.28-2). Regarding the removal of this exhibit, the Manual states that it has "Removed former Exhibit 11.3.28-2" because that information is "now contained in Exhibit 11.3.41-6." But Exhibit 11.3.41-6 has remained unchanged, and the information described above has not been ported over to this Exhibit. Compare current Exhibit 11.3.41-6 at https://perma.cc/4ZRL-YK7M *with* the identical Exhibit as of April 4, 2025 at https://web.archive.org/web/20250404011943/https://www.irs.gov/irm/part11/irm_11-003-041.

Finally, in a sentence, Defendants attempt to brush away any concern over reliance interests because, in its view, the law "authorizes" and "requires" these disclosures, so any expectation to the contrary is unfounded. But Defendants do not respond to Plaintiffs' identification of the representations the government has made, including during President Trump's first term, when the IRS stated that "[t]here is no authorization under this provision to share tax data with ICE."[17]

### E. The Internal Revenue Code's Provisions for Individual Instances of Improper Access or Disclosure Do Not Supplant APA Review.

The Internal Revenue Code's limited damages provisions and criminal sanctions for discrete instances of unlawful disclosures do not provide an adequate remedy for Plaintiffs' challenge to IRS's ongoing policy of unlawful disclosure, and the strong presumption of reviewability under the APA is not supplanted here. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967). Defendants fail to address applicable D.C. Circuit precedent finding that the Privacy Act's analogous damages provisions do not offer an adequate remedy precluding APA review of disclosures made under agency policy. *See* Pls.' Opp'n to MTD at 32-36 (citing *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988)).

In *Doe*, the D.C. Circuit held that review and equitable relief under the APA was appropriate where Plaintiff showed the agency's policies of disclosure violated the Privacy Act's provisions despite the Privacy Act's damages provisions. 851 F.2d at 1466. As here, that disclosure policy concerned disclosures to other federal agencies and governmental bodies. *Id. Doe* applies here, but Defendants chiefly point to four out-of-circuit criminal cases where courts found that

---

[17] Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017), https://perma.cc/X4ZL-2CMT; *see also* Taxpayer Identifying Numbers ("TINs"), 61 Fed. Reg. 26,788, 26,789 (May 29, 1996) ("[h]aving the IRS as the sole issuer of ITINs will facilitate the general public's acceptance of the fact that the assignment of an ITIN creates no inference regarding . . . immigration status").

evidence could not be suppressed under the exclusionary rule under a claim that it was improperly disclosed under Section 6103. Opp'n at 24-25.[18] But as these cases acknowledge, the exclusionary rule in the criminal context is a "sanction" on government conduct, and they point to alternative criminal sanctions for unlawful disclosure of tax information as a reason this rule of criminal procedure need not be applied in individual instances of past unlawful disclosure. *See Michaelian*, 803 F.2d at 1048–50; *Marvin*, 732 F.2d at 673. Damages and penalty provisions for individual instances of past unlawful disclosures do not offer an adequate remedy for Plaintiffs challenging an agency policy dictating ongoing, mass disclosures.[19]

## II. Plaintiffs Are Irreparably Harmed by Large-Scale Sharing Data With ICE Under the Data Policy.

Plaintiffs describe in their opening brief and above, *supra* Section I.A., how both their members and clients and CTR have suffered, or are imminently facing, concrete injuries caused by Defendants' actions. Here, Plaintiffs respond to several specific issues Defendants raised in their Opposition regarding the irreparability of these harms.

---

[18] Citing *United States v. Orlando*, 281 F.3d 586, 596 (6th Cir. 2002); *Nowicki v. Comm'r*, 262 F.3d 1162, 1164 (11th Cir. 2001); *United States v. Michaelian*, 803 F.2d 1042, 1049–50 (9th Cir. 1986); *Marvin v. United States*, 732 F.2d 669, 672 (8th Cir. 1984).

[19] Defendants suggest in a single sentence that the Court cannot hear this challenge here because the Internal Revenue Code's damages provisions provide the type of detailed "comprehensive" scheme is implicitly exclusive and precludes APA review. Opp'n at 25. Not so. The damages provisions included within the Internal Revenue Code for individual instances of unlawful disclosure, 26 U.S.C. § 7431, are discrete and evince none of the characteristics of the detailed administrative adjudication schemes courts have found Congress intended to be exclusive. Defendants' own authorities support this conclusion. *Id*. at 25 (citing *Grosdidier v. Chairman, Broad Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) and *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) concerning the Civil Service Employment Act and regulatory scheme for milk markets including administrative appeal procedures). The Internal Revenue Code's damages provisions are closely akin to the Privacy Act's, which this Court has found were not intended to be exclusive. *All. for Retired Ams.*, 770 F. Supp. 3d at 105.

*First*, Defendants argue that Plaintiffs have known about the MOU for months and improperly delayed their Motion. Delay alone is not a justification for denying preliminary relief; it is merely a factor that may tend to show no irreparable harm has occurred. *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). Here, the relevant time period is between the date that irreparable harm could be shown and the date of filing. The IRS began its mass disclosure of data to ICE on August 7, it was publicly reported on August 8, and Plaintiffs filed their Motion on August 20—Plaintiffs did *not* delay. In fact, in *Centro*, the government argued that the plaintiffs had not shown an imminent cognizable injury based solely on the execution of the MOU, without evidence that data had been or imminently would be shared for an unlawful purpose. *Centro,* 2025 WL 1380420, at *4. Imminent, irreparable injury is a higher standard than the injury required to assert standing, which Plaintiffs pled in their May 2025 Amended Complaint. It was reasonable to wait for the facts to ripen before bringing this Motion to the Court.

*Second*, Defendants are incorrect that it is now too late to remedy the irreparable harms. Opp'n at 36. Section 6103(p) requires the IRS to ensure the data it shares is properly handled and requires the receiving agency to return or destroy the data once it has completed its authorized use of it. *See* 26 U.S.C. § 6103(p)(4). Per that obligation, under the MOU, the IRS retains the right to inspect ICE recordkeeping practices and facilities to ensure the data is being appropriately safeguarded. MOU § 9(E). The IRS has the authority to "terminate or suspend disclosures of returns and return information" if an "authorized recipient does not satisfactorily maintain the safeguards prescribed in law. 26 C.F.R. § 301.6103(p)(7)-1. Acting Commissioner Bessent plainly has the authority to require return or destruction of data already shared under this MOU, where ICE is mishandling or misusing it, which is the remedy sought here. Moreover, the Court can order prospective relief to stop additional disclosures, which would substantially preserve the status quo.

*Third*, Defendants' only substantive response to the harms imminently faced by Plaintiffs is to argue that any risk of subsequent disclosure or misuse of these taxpayers' data is "wild speculation." Opp'n at 13. The government asserts it is entitled to a "presumption of regularity" and that the Court should presume that ICE will comply with safeguards of Section 6103 after it receives the data. *Id.*[20] As an initial matter, it belies belief that Defendants would invoke a presumption of regularity for actions that have reversed the decades-long "regular" approach by the IRS to disclosures under 6103(i)(2). Further, a presumption of regularity is rebuttable with "clear evidence" that an official or agency did not "properly discharge their official duties." *Fed. Educ. Ass'n v. Trump*, No. 25-cv-01362, 2025 WL 2355747, at *9 (D.D.C. Aug. 14, 2025). Such is the case here. Plaintiffs have demonstrated that ICE has no intention of (and is not) complying with the safeguards of Section 6103, which distinguishes this case from those that Defendants rely upon. *See* Opp'n at 33-34. First, the White House has expressed its intention to use the data for civil immigration enforcement purposes—contrary to Section 6103(i)(2)—saying the data sharing system set up under the MOU is "to carry out . . . mass deportation." ECF No. 30-5. Defendants offer no reason why the Court should not take the White House at its word; the purpose of these data requests is plainly to support civil immigration enforcement efforts, not criminal investigations as Section 6103(i)(2) requires.

The way that ICE maintains the data received by the IRS further supports the conclusion that ICE is not following Section 6103(i)(2). The Implementing Agreement states that ICE will store the data it receives in three large internal databases, including the Alien File, Index, and

---

[20] Defendants discuss this point in connection with their standing arguments. But the argument to which it responds—that the lack of adequate safeguards against subsequent re-disclosure and misuse necessitate preliminary relief—is more relevant to the element of irreparable harm. *See All. for Retired Ams.*, 770 F. Supp. 3d at 108.

National File Tracking system of record, Ex. 12, rather than in a controlled-access location accessible only to persons "personally and directly involved" in the investigation. These databases are broadly available for use across ICE and other DHS components, well beyond the level of access authorized in Section 6103(i)(2). *See, e.g.,* 82 Fed. Reg. at 43556 (System of Record Notice) (The Alien File (or "A-File") is a "single file for each individual containing that individual's immigration record," used widely within DHS in connection with immigration benefits and enforcement and does not have a sole or even primary criminal investigation purpose).[21] The Implementation Agreement does not call for access controls limiting individual users' access to taxpayer data within these databases. Ex. 12.[22]

Finally, as discussed *supra*, the facts support an inference that ICE's purported criminal investigations are a pretext for gathering data that will help them locate and deport people—a misuse of the data. Defendants do not even assert that the requests from ICE do pertain to specific, *bona fide* criminal investigations for each of 1.28 million taxpayers, arguing instead that a "high-level review of agency data" in search of *potential* criminal infractions would justify the data requests. *See* Opp'n at 30.  Further, both the MOU and ICE's actual request directed the IRS to provide the "last-known address" for each person identified,  *see* MOU at § 5(C); Walker Decl. at ¶¶ 6-7, not the person's address as of a specific date, which belies the argument that address information alone would help ICE confirm whether a person overstayed a removal order by 90

---

[21]  The other two systems listed likewise have a broad set of uses, not limited to criminal investigations, including civil immigration enforcement. *See* 89 Fed. Reg. 55638 (July 5, 2024) (SORN for the CARIER System of Records); 85 Fed. Reg. 74362 (Nov. 20, 2020) (SORN for the External Investigations System of Records).

[22]  *See, e.g.,* IRS, Publication 1075, *Tax Information Security Guidelines*, https://perma.cc/GR5D-6WMF ("If FTI [Federal Tax Information] is recorded on electronic media (e.g., tapes) with other data, it must be protected as if it were entirely FTI.").

days, as the Defendants argue. Opp'n at 30. A last-known address would, however, be helpful in locating a taxpayer for purposes of detention and deportation, as the White House has said.

This evidence is sufficient to overcome the "presumption of regularity" that Defendants invoke. In fact, as Judge Friedman recently observed, "[i]n just six months, the President of the United States may have forfeited the right to such a presumption of regularity." *Fed. Educ. Ass'n*, 2025 WL 2355747, at *11 (collecting cases).

### III.    The Balance of the Equities Favors Relief.

The balance of the equities favors granting relief to Plaintiffs to prevent unlawful sharing of protected data. Defendants' contrary arguments are meritless. *First*, their assertion that Plaintiffs' seek to alter the status quo by preventing unprecedented mass sharing *required* by 6103 can scarcely be credited. The "status quo" in considering preliminary relief is the status quo before the challenged unlawful action—and that is the status Plaintiffs seek to preserve. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). Moreover, the IRS has for decades maintained that it could not share data with ICE for civil immigration enforcement purposes, and Congress has rejected measures that would authorize such sharing.[23] No law has changed, but now Defendants assert that this mass sharing under the Data Policy is *required* such that the equities weigh against relief.

---

[23] In the first Trump Administration, the IRS told ITIN holders "there is no authorization under this provision to share tax data with ICE." Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, https://perma.cc/8JVS-K4KR; Amanda Frost, *Can the Government Deport Immigrants Using Information It Encouraged Them to Provide*, Administrative Law Review Accord (2017) https://perma.cc/6482-Z8T5 (citing 2006 TAX NOTES TODAY 47 (Mar. 9, 2006)) ("In 2006, Senator Jeff Sessions proposed amending § 6103 to provide for increased disclosure of tax information to immigration enforcement, which suggests [] § 6103 does not currently permit the IRS to do so.")

*Second*, the pending appeal in *Centro* does not suggest that this Court should decline to enter preliminary relief to prevent irreparable harm to the Plaintiffs. The *Centro* district court considered the IRS-ICE MOU *as written* and issued its decision about the legality of potential IRS sharing of tax information with ICE before such sharing had commenced. *See Centro*, 2025 WL 1380420, at *1. Plaintiffs filed the instant Motion after IRS commenced data sharing *en masse* using the automated means under the Data Policy in a manner that cannot plausibly comply with 6103. These starkly different factual circumstances, and imminent irreparable harm, weigh against declining to enter relief here merely because the *Centro* appeal may concern similar issues.

### IV. The Court Should Not Impose a Substantial Bond or Stay Any Preliminary Relief Pending Appeal.

Plaintiffs seek a stay under the APA and "[t]he APA has no bond requirement." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 25-cv-00628, 2025 WL 1191844, at *23 n.14 (D. Md. Apr. 24, 2025); *see also Cabrera v. Dep't of Lab*, No. 25-cv-01909, 2025 WL 2092026, at *9 n.3 (D.D.C. July 25, 2025). Nor would a substantial bond be appropriate even if the Court considered Plaintiffs' motion under Federal Rule of Civil Procedure 65, as Plaintiffs are suffering irreparable harm, including the reallocation of resources, and a substantial bond would undermine the purpose of preliminary relief. For the same reason the Court should not stay the effect of any preliminary relief, as its purpose is to prevent ongoing irreparable harm.

Dated: September 3, 2025

Respectfully submitted,

/s/ Daniel A. McGrath
Daniel A. McGrath (D.C. Bar No. 1531723)
Johanna M. Hickman (D.C. Bar No. 981770)
Madeline H. Gitomer (D.C. Bar No 1023447)
Robin Thurston (D.C. Bar No. 1531399)
Steven Y. Bressler (D.C. Bar No. 482492)
Democracy Forward Foundation
P.O. Box 34553

24

Washington, DC 20043
(202) 812-7824
dmcgrath@democracyforward.org
hhickman@democracyforward.org
mgitomer@democracyforward.org
rthurston@democracyforward.org
sbressler@democracyforward.org

*Counsel for Plaintiffs*