## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS et al.,

      Plaintiffs,

      v.

INTERNAL REVENUE SERVICE et al.,

      Defendants.

Civil Action No. 25-cv-457-CKK

## BRIEF OF THE HONORABLE MEMBERS OF THE CONGRESSIONAL HISPANIC CAUCUS LEADERSHIP AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY OR PRELIMINARY INJUNCTION

Laura MacCleery
UNIDOSUS
1126 16th St NW #600
Washington, DC 20036
Phone: 202-489-7147
lmaccleery@unidosus.org

Andrew Weiner (DC Bar No. 498633)
Robert McLeod
KOSTELANETZ LLP
601 New Jersey Avenue NW
Suite 260
Washington, DC 20001
Phone: 215-901-0873
Fax: 212-808-8108
aweiner@kostelanetz.com

*Counsel for Amici Curiae the Honorable Members of the Congressional Hispanic Caucus Leadership*

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

INTERESTS OF *AMICI CURIAE* ............................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................2

ARGUMENT ................................................................................................................5

   I.    The MOU and Implementing Agreement Defy the Test, Structure, and Purpose
       of I.R.C. § 6103................................................................................................5

       A.    Return information is confidential subject to limited exceptions inapplicable
            in this case.......................................................................................................5

       B.    The MOU conflicts with the plain language of I.R.C. § 6103(i)(2) ...........7

  II.    The MOU and Implementing Agreement Violate the Administrative Procedure Act ......12

       A.    The IRS's decision to disclose return information to ICE is not in accordance
            with law and is arbitrary and capricious ....................................................12

       B.    The IRS is not entitled to the presumption of regularity ..........................16

CONCLUSION............................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

CASES

*Children's Hosp. Ass'n of Texas v. Azar*,
    933 F.3d 764 (D.C. Cir. 2019) ............................................................................ 12

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ...................................................................................... 16, 18

*Damus v. Nielsen*,
    313 F. Supp. 3d 317 (D.D.C. 2018) ..................................................................... 14

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019) ............................................................................... 16, 17, 18

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 52 (2020) ....................................................................................... 12, 13

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ...................................................................................... 12, 14

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................................ 12

*Judulang v. Holder*,
    565 U.S. 42 (2011) .............................................................................................. 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .............................................................................................. 12

*Padula v. Webster*,
    822 F.2d 97 (D.C. Cir. 1987) ............................................................................... 14

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) .............................................................................................. 14

*Reid v. Angelone*,
    369 F.3d 363 (4th Cir. 2004) ................................................................................. 8

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .............................................................................................. 12

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954) ............................................................................................ 14

*Wilkinson v. Legal Servs. Corp.*,
    27 F. Supp. 2d 32 (D.D.C. 1998) ......................................................................... 14

STATUTES

Adminstrative Procedure Act (5 U.S.C.):

    § 551 ...................................................................................................................... 3

    § 705 ...................................................................................................................... 4

    § 706(2)(A) .......................................................................................................... 11

8 U.S.C. § 1253(a)(1) ........................................................................................................... 2, 8

Internal Revenue Code (I.R.C.) (26 U.S.C.):

   § 6103 ................................................................................................................... *passim*

   § 6103(a) ........................................................................................................................ 5

   § 6103(i) ..................................................................................................................... 6, 7

   § 6103(i)(2) ......................................................................................................... *passim*

   § 6103(i)(2)(A) ........................................................................................................ 3, 10

   § 6103(i)(2)(B) ............................................................................................................... 8

   § 6103(i)(2)(B)(i) ...................................................................................................... 3, 8

   § 6103(i)(2)(B)(iv) .................................................................................................... 3, 9

   § 6103(i)(3)(C) ............................................................................................................... 6

   § 6103(i)(5) .................................................................................................................... 8

   § 6103(l) ......................................................................................................................... 6

   § 6103(l)(21) .................................................................................................................. 6

   § 6109 .......................................................................................................................... 15

   § 7525(b)(1)(A)(ii)(II) ................................................................................................ 16

   § 7526(a) ...................................................................................................................... 16

   § 7526A(a) ................................................................................................................... 16

28 U.S.C. § 2253(c)(1)(A) ......................................................................................................... 8

Immigration and Nationality Act, Pub. L. No. 82-414, § 101, 66 Stat. 163, 167 (1952)
(codified as amended at 8 U.S.C. § 1101) .......................................................................... 7

Tax Reform Act, Pub. L. No. 94-455, 90 Stat. 1520, (1976) ............................................... 5, 6

Victims of Terrorism Tax Relief Act of 2001, Pub. L. No. 107-134, § 201, 115 Stat. 2427 (2001) ... 6

**OTHER AUTHORITIES**

152 Cong. Rec. S4953 (daily ed. May 23, 2006) (statement of Sen. Chuck Grassley) ...................... 7

Alien File, Index, and National File Tracking System of Records,
82 Fed. Reg. 43556 (Sept. 18, 2017) ................................................................................ 10

Amendment to S. 2454, S. Amdt. 3267 to S. Amdt. 3192,
109th Cong., 152 Cong. Rec. 2814 (Apr. 4, 2006) ........................................................... 7

Amendment to S. 2611, S. Amdt. 4177,
109th Cong., 152 Cong. Rec. 5013 (May 23, 2006) ......................................................... 6

Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong. § 301 (2006) ................... 6

Dep't of Just., Exec. Off. for U.S. Att'ys, United States Attorneys' Annual Statistical Report,
Fiscal Year 2023 (2023), https://www.justice.gov/usao/media/1343726/dl?inline ...................... 11

Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025)................................................ 2, 10, 13

I.R.M. § 11.3.28.4(5) ............................................................................................................. 14

Internal Revenue Serv., Off. of Chief Couns., *Disclosure Litigation Reference Book* (2000)............ 6

IRS, *Disclosure and Privacy Law Reference Guide*, Pub. No. 4639 (rev. Oct. 2012) ..................... 14

IRS, *Topic No. 857—Individual Taxpayer Identification Number (ITIN)*, (Nov. 7, 2024)
    https://www.irs.gov/taxtopics/tc857........................................................................................ 15

Jacob Bogage & Jeff Stein, *IRS Nears Deal with ICE to Share Addresses of Suspected
    Undocumented Immigrants*, Wash. Post (Mar. 22, 2025),
    https://www.washingtonpost.com/us-policy/2025/03/22/ice-irs-immigrants-deport/ .................. 17

Jacob Bogage, *DHS Officials Ask IRS to Use Tax Data to Locate Up to 7 Million Immigrants*,
    Wash. Post (Apr. 5, 2025),
    https://www.washingtonpost.com/business/2025/04/05/irs-tax-data-immigration-enforcement/ . 17

S. Rep. No. 94-938 (1976) ........................................................................................................ 5

*Social Security Number and Individual Taxpayer Identification Number Mismatches and
    Misuse: Hearing Before the Subcomm. on Oversight & the Subcomm. on Soc. Sec. of the H.
    Comm. on Ways & Means*, 108th Cong. 12 (Mar. 10, 2004) (statement of Mark W. Everson,
    Commissioner of Internal Revenue) ......................................................................................... 13

Stephen Goss *et al.*, *Effects of Unauthorized Immigration on the Actuarial Status of the Social
    Security Trust Funds*, SSA, Actuarial Note No. 151 (Apr. 2013)................................................. 15

T.D. 8671, 61 Fed. Reg. 26 (May 29, 1996)............................................................................... 15

T.D. 10013, 89 Fed. Reg. 93 (Nov. 26, 2024) ........................................................................... 13

*Tax Payments by Undocumented Immigrants*, Inst. on Tax'n & Econ. Pol'y (July 30, 2024),
    https://itep.org/undocumented-immigrants-taxes-2024/ .............................................................. 15

Treasury Inspector Gen. for Tax Admin. (TIGTA), *Administration of the Individual Taxpayer
    Identification Number Program*, Rep. No. 2024-400-012 (Dec. 19, 2023)................................. 15

U.S. Dep't of the Treasury, Off. of Tax Pol'y, Report to the Congress on Scope and Use of
    Taxpayer Confidentiality and Disclosure Provisions, Vol. I: Study of General Provisions
    (Oct. 2000) .............................................................................................................................. 6

*What's in a Name*, United States Census Bureau (Dec. 15, 2016),
    https://www.census.gov/newsroom/blogs/random-samplings/2016/12/what_s_in_a_name.html .. 9

William Turton, Christopher Bing & Avi Asher-Schapiro, *The IRS Is Building a Vast System to
    Share Millions of Taxpayers' Data with ICE*, ProPublica (July 15, 2025),
    https://www.propublica.org/article/trump-irs-share-tax-records-ice-dhs-deportations ................ 17

## INTERESTS OF *AMICI CURIAE*

Amici Curiae are Honorable Members of the Congressional Hispanic Caucus Leadership Representative Adriano Espaillat of New York, Representative Joaquin Castro of Texas, Representative Gil Cisneros of California, Representative Sylvia Garcia of Texas, Representative Rob Menendez of New Jersey, Representative Andrea Salinas of Oregon, and Representative Norma Torres of California. These Members are well-acquainted with the legislative framework Congress enacted to protect federal revenue and the privacy of taxpayers. Amici seek to ensure that this carefully designed framework is protected consistent with the intent of Congress.

Pursuant to section 6103 of the Internal Revenue Code (26 U.S.C.) ("I.R.C."),[1] Congress has chosen to limit intrusions on the privacy of taxpayer returns and return information to tightly defined exceptions for specific purposes. The Administration now seeks to override Congress's carefully considered information-sharing regime without first seeking Congressional approval. Indeed, Congress has considered and rejected several immigration-related amendments to section 6103, choosing instead to address immigration enforcement through other mechanisms.

Amici submit this brief to demonstrate how the Administration's actions encroach upon powers reserved by the Constitution for Congress and contravene Congress's longstanding intent to prioritize collecting federal tax revenues by preserving the confidentiality of tax returns. Moreover, the confidentiality protections established by section 6103 apply to all taxpayers, regardless of immigration status. If the bulk data sharing at issue in this case between the Internal Revenue Service ("IRS") and the Department of Homeland Security ("DHS") is permitted, it will both threaten fundamental expectations for taxpayer privacy and adversely impact revenues for the federal government. Such data sharing also will compromise taxpayer privacy and raise the

---

[1] All "section" references are to the Internal Revenue Code (26 U.S.C.).

possibility of grave consequences for individuals misidentified by U.S. Immigration and Customs Enforcement ("ICE"), both of which are certain to chill participation in the tax system and impact our constituents.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Nearly 50 years ago, Congress required in I.R.C. § 6103 that taxpayer return and return information be kept confidential, even from other parts of the federal government, absent specific statutory exceptions. The IRS is currently sharing large batches of return information with ICE pursuant to a newly signed Memorandum of Understanding ("MOU") and Implementing Agreement for the MOU ("Implementing Agreement") without statutory authorization, and contrary to decades of IRS practice and assurances that it had no authority to share data on immigrant taxpayers with other federal agencies for immigration enforcement purposes.

The MOU, by its own terms, implements Executive Order 14161 to "take immediate steps to identify, exclude, or remove aliens illegally present in the United States." MOU at ¶ 1.a. The MOU concerns immigrants who are subject to an order of removal or "under criminal investigation for violations of one or more specifically designated Federal criminal statutes (not involving tax administration) including 8 U.S.C. § 1253(a)(1) [Penalty for Failure to Depart]." *Id.* at ¶ 1.b–c. The MOU provides that ICE will request "address information" from the IRS to locate these individuals. *Id.* at ¶ 6.A. Section 6103 does not allow disclosure of return information for this purpose.

To justify its unauthorized disclosures for immigration enforcement, the MOU invokes the narrow exception to the confidentiality of taxpayer information under section 6103(i)(2), which allows the IRS, upon specific request from specified individuals, to share return information directly with such individuals for use in preparation for a specified criminal proceeding or an investigation that may result in such a proceeding. While the statutory scheme includes many tailored exceptions crafted by Congress to the confidentiality of taxpayer information, none address sharing return

information for use in civil or criminal immigration enforcement. Congress considered such an exception on several occasions, most notably when it debated comprehensive immigration reform in 2005 and 2006, but never changed the law. None of those legislative debates considered—even as a possibility—that section 6103(i)(2) allowed disclosure of return information for use in immigration enforcement. If section 6103(i)(2) allowed such disclosures, the debate over the proposed amendments would have been irrelevant. This history underscores Congress's longstanding view of section 6103: that the IRS may not share taxpayer returns or return information with ICE, DHS, or any other federal agencies for immigration-related purposes.

The bulk sharing of information provided by the MOU further violates the explicit language of the statute that requires individualized requests and individualized disclosures. The Government acknowledges that ICE has requested addresses of 1.28 million taxpayers and that the IRS disclosed the last-known address of 47,360 taxpayers in response. Defs. Br. at 6. Such sweeping information requests from ICE, listing millions of individual taxpayers, do not satisfy the statutory requirements that a request set forth "*the* name and address of the taxpayer" and "*the specific reason or reasons* why such disclosure is, or may be, *relevant to such* proceeding or investigation." I.R.C. § 6103(i)(2)(B)(i) & (iv) (emphasis added). Further, disclosures of bulk information in response to requests are not limited to "officers and employees of such agency who are *personally and directly engaged in*" the criminal proceeding or investigation and used "*solely for*" that purpose. I.R.C. § 6103(i)(2)(A) (emphasis added). Contrary to these terms, the Implementing Agreement provides that ICE will maintain the information on general record systems and impose no restrictions on its use. To interpret the statute in a manner consistent with the MOU and the Implementing Agreement is to destroy the overall statutory scheme and the presumption of confidentiality that Congress intended as the foundation for section 6103 as a whole, as it would elevate seemingly boundless law enforcement objectives over the traditional and well-defended prerogatives of the IRS—to raise

3

revenues for the federal Treasury.

The MOU is also unlawful under the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* ("APA"), because it is not in accordance with law and is arbitrary and capricious. Under the APA, agencies must engage in reasoned decision-making, including considering material issues and articulating a satisfactory explanation for the decision. Here, the IRS abdicated both responsibilities. The IRS offers no explanation for its decision to deviate from its longstanding practice of protecting taxpayer information and to begin supplying prodigious volumes of return information in the service of ICE's mass deportation efforts.

At the very least, the IRS's unprecedented data-sharing implicates substantial and profound reliance interests among immigrants and others who obtained an Individual Tax Identification Number ("ITIN") or Social Security Number ("SSN") and filed tax returns based on assurances that their return information, including their name and address, would be kept confidential. Moreover, the IRS's action undermines historical efforts by Congress and the IRS to promote voluntary compliance in immigrant and other communities—efforts that raise revenues to advance all other government programs and objectives in which Congress has a strong interest.

In crafting the detailed exceptions of section 6103, Congress carefully exercised its judgment to resolve inherent tensions between collecting tax revenue and protecting the confidentiality of return information on the one hand, and using that information for non-tax purposes on the other. The Executive Branch may not unilaterally and fundamentally change how the law is applied and expand its own authority without regard for the principles and priorities reflected in the law enacted by Congress, including tax collection, taxpayer privacy, and public trust in the IRS.

The Court should grant Plaintiffs' Motion for Stay Under 5 U.S.C. § 705 or, in the Alternative, for Preliminary Injunction, and ultimately determine that the IRS's disclosure of return

information pursuant to the MOU and Implementing Agreement is unauthorized and invalid.

## **ARGUMENT**

I.     **The MOU and Implementing Agreement Defy the Text, Structure, and Purpose of I.R.C. § 6103**

A.     **Return information is confidential subject to limited exceptions inapplicable in this case**

Beginning with the Tax Reform Act of 1976, Congress has maintained strict limitations on the disclosure of taxpayer information under section 6103. The law establishes that tax returns and return information "shall be confidential," subject only to limited exceptions specifically authorized by statute. I.R.C. § 6103(a). Those exceptions (in subsections (c) through (o)) reflect Congress's painstaking and ongoing effort to balance the need for public trust and to raise revenues through our system of self-reporting with many competing demands on IRS records. The exceptions are complex—even by Internal Revenue Code standards—owing to the detailed line drawing undertaken by Congress over decades of refining the statute. There is no exception to the confidentiality of return information for immigration enforcement. The MOU clearly violates the statute by repurposing the limited exception at section 6103(i)(2) for criminal proceedings or investigations.

The legislative history of the Tax Reform Act of 1976 recognizes that "the IRS probably has more information about people than any other agency in the country," and "consequently, almost every other agency that has a need for information about U.S. citizens, therefore, logically seeks it from the IRS." S. Rep. No. 94-938, at 316–17 (1976). Congress sought in section 6103 "to balance the particular office or agency's need for the information involved with the citizen's right to privacy and the related impact of disclosure upon the continuation of compliance with our country's

voluntary assessment system."[2] *Id.* at 318. That effort continued long after the statute was first enacted. For example, following 9/11, Congress amended section 6103(i) to add subsection (3)(C) allowing disclosure of return information that may be related to terrorism incidents, threats, or activities. Victims of Terrorism Tax Relief Act of 2001, Pub. L. No. 107-134, § 201, 115 Stat. 2427, 2443 (2001). And in 2010, Congress added section 6103(l)(21), authorizing the IRS to disclose batch tax return information to determine eligibility for federal health insurance programs.

In contrast, Congress has repeatedly and deliberately chosen not to allow the IRS to share information related to immigration enforcement. Most notably, in 2006, Congress considered the Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong. § 301, which proposed to allow limited disclosure of return information to the Department of Homeland Security ("DHS") to facilitate implementation of the Electronic Employee Verification System now known as E-Verify. In the course of that debate, Senator Chuck Grassley proposed an amendment to section 6103(l) to allow DHS to obtain taxpayer information of certain employers with more than 100 employees whose names and taxpayer identifying numbers "did not match the records maintained by the

---

[2] Section 6103 was a deliberate effort by Congress to eliminate Executive discretion regarding the use of taxpayer information, as explained:

> By the mid-1970's, there was increased Congressional and public concern about the widespread use of tax information by government agencies for purposes unrelated to tax administration. This concern culminated with a total revision of section 6103 in the Tax Reform Act of 1976. There, Congress eliminated Executive discretion regarding what information could be disclosed to which Federal and state agencies and established a new statutory scheme under which tax information was confidential and not subject to disclosure except to the extent explicitly provided by the Code.

U.S. Dep't of the Treasury, Off. of Tax Pol'y, Report to the Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions, Vol. I: Study of General Provisions 3 (Oct. 2000); *see* Internal Revenue Serv., Off. of Chief Couns., Disclosure Litigation Reference Book 1-11 (Apr. 2000) (stating that, in Tax Reform Act of 1976, "Congress undertook direct responsibility for determining the types and manner of permissible disclosures").

Commissioner of Social Security" or with more than ten employees "with the same taxpayer

identifying number." Amendment to S. 2611, S. Amdt. 4177, 109th Cong., 152 Cong. Rec. 5013,

5018–19 (May 23, 2006). In remarks on the Senate floor, Senator Grassley explained:

> The protection of taxpayer information is a cornerstone of our
> voluntary tax system. . . . We identified the specific information that
> would be needed to identify potentially illegal workers and crafted an
> amendment to 6103 that permits such use while maintaining all of the
> privacy protections afforded by 6103.

152 Cong. Rec. S4953 (daily ed. May 23, 2006) (statement of Sen. Chuck Grassley).[3] The Grassley

amendment and the immigration reform bill both passed the Senate but failed in the House.

The history of section 6103 shows the extent to which Congress has safeguarded the

confidentiality of return information, including resisting proposals to allow limited disclosures to

DHS for use in immigration enforcement. Congress would never have debated these proposals if, as

stated in the MOU, section 6103(i)(2) already allowed information sharing with DHS. It does not.

The MOU is an end run around the statute and an attempt to usurp Congress's constitutional role to

create and amend the law. Indeed, if the mere pretense or possibility of being subject to a criminal

investigation on any federal statute is sufficient to require the IRS to share any taxpayer's return

information, that would signal the end of any meaningful protection for return information in direct

contravention of section 6103 and how it has been interpreted by agencies for decades.

**B.      The MOU conflicts with the plain language of I.R.C. § 6103(i)(2)**

Information sharing under the MOU and Implementing Agreement also violates the express

terms of section 6103(i)(2) intended by Congress to protect against: (1) misidentification; (2)

---

[3] Senator Ben Nelson made a more expansive proposal to amend section 6103(i) to provide for disclosure of tax information to DHS for use in "any judicial or administrative *civil* or criminal enforcement proceeding against an alien under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.)," or "any investigation which may result in [such] proceedings." Amendment to S. 2454, S. Amdt. 3267 to S. Amdt. 3192, 109th Cong., 152 Cong. Rec. 2814, 2825 (Apr. 4, 2006) (emphasis added). No action was taken on that amendment.

unjustified and abusive bulk requests of the exact type that the MOU and Implementing Agreement facilitates; (3) overbroad dissemination of return information (by restricting disclosure to government employees directly engaged in a criminal proceeding or investigation); and (4) misuse of return information for any purpose beyond the criminal proceeding or investigation that supported the request.

Section 6103(i)(2)(B) provides that a request for return information set forth:

> (i) the name and address of the taxpayer with respect to whom the requested return information relates;

> (ii) the taxable period or periods to which such return information relates;

> (iii) the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and

> (iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

The stated purpose of the MOU is "to establish the procedures and requirements for ICE's submission of valid section 6103(i)(2) requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statutes." MOU at ¶ 3. Without accurate address information, however, such requests necessarily fail the requirement to provide "*the* name and address of the taxpayer." I.R.C. § 6103(i)(2)(B)(i) (emphasis added); *see Reid v. Angelone*, 369 F.3d 363, 367 (4th Cir. 2004) (recognizing that "because Congress used the definite article 'the,' we conclude that . . . there is only one order" that is "'the final order in a habeas corpus proceeding'" under 28 U.S.C. § 2253(c)(1)(A)). Congress requires the address of the taxpayer and that the address provided match the requested records for obvious reasons: to confirm the identity of the taxpayer whose return information is requested and to ensure that the disclosure is legally authorized.[4] Accuracy is particularly important here, given the

---

[4] In section 6103(i)(5), by comparison, Congress provides for sharing address information to locate

stated purposes of the MOU to assist in mass deportations, because ICE could use address information from the IRS to summarily remove individuals without due process of law that could address potential errors related to misidentification of a taxpayer.[5] *See* Pls. Br. at 42.

Sweeping and indiscriminate requests for address information also violate the statute's requirement that a request set forth "the specific reason or reasons why such disclosure is, or may be, relevant to such [criminal] proceeding or investigation." I.R.C. § 6103(i)(2)(B)(iv). Identifying "the specific reason[s]" why return information may be relevant requires individualized evaluation of the nature of criminal proceeding or investigation—a task that is antithetical to bulk requests made by ICE. If the goal of the MOU is "to identify, exclude, or remove aliens illegally present in the United States," ICE will simply deport these individuals once they are located, contrary to section 6103(i)(2). MOU at ¶ 1.a. It strains credulity that DHS intends to criminally investigate 1.28 million taxpayers.

Beyond imposing specific requirements for a valid request for return information under section 6103(i)(2), the statute also provides that:

> the Secretary shall disclose return information (other than taxpayer return information) to officers and employees of such agency who are personally and directly engaged in—
>
> > (i) preparation for any judicial or administrative proceeding described in paragraph (1)(A)(i),

---

a fugitive but requires a court order to do so.

[5] Among minority populations, the prevalence of common surnames is quite concentrated. In 2016, the U.S. Census Bureau noted that "[t]wenty-six surnames cover a quarter of the Hispanic population, and 16 percent of Hispanic people reported one of the top 10 Hispanic names. The pattern is similar for Asians." What's in a Name, U.S. Census Bureau (Dec. 15, 2016), https://www.census.gov/newsroom/blogs/random-samplings/2016/12/what_s_in_a_name.html. The MOU risks thousands of unauthorized disclosures that would compromise taxpayer privacy, wrongly target individuals for criminal investigation, or worse, subject them to wrongful arrest or deportation, and expose IRS officers to penalties.

> (ii) any investigation which may result in such a proceeding, or
>
> (iii) any grand jury proceeding described in paragraph (1)(A)(iii),
>
> solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

I.R.C. § 6103(i)(2)(A). The MOU does not comply with these terms either.

First, the exchange of bulk requests for millions of addresses and bulk responses of such information is at odds with the requirement that the IRS disclose return information only to individuals within the federal government who are "personally and directly engaged in" the criminal proceeding or investigation. *Id.* The aggregate nature of the MOU process suggests broader disclosure of the return information in the form of a more generally accessible database or clearinghouse procedure in clear contravention of the statute. The government acknowledges that the IRS already disclosed 47,360 taxpayer addresses to ICE but does not describe the way in which that information was disclosed or the custodial arrangements to ensure appropriately narrow disclosures only to the personnel personally and directly engaged in each criminal proceeding or investigation.

Further, the information disclosed pursuant to the MOU is, by design, not "solely for" use in a criminal proceeding or investigation. The MOU makes clear that the return information is intended to aid ICE in the deportation of undocumented immigrants pursuant to Executive Order 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025), establishing that priority. The Implementing Agreement confirms this objective by providing that ICE will maintain information from the IRS on, among other places, the "Alien File, Index, and National File Tracking System of Records," which contains "the official record of an individual's immigration history." Implementing Agreement at ¶ III.02.b.1; Privacy Act of 1974; System of Records, 82 Fed. Reg. 43556, 43557 (Dep't Homeland Sec. Sept. 18, 2017). This system is used in operations far beyond criminal proceedings and investigations. *See*

*id.* at 43559 ("The purpose of this system of records is to facilitate administration of benefits and enforcement of provisions under the [Immigration and Nationality Act] and related immigration statutes," including "for immigration processing and adjudication"). Information from the IRS will be combined with other data maintained for immigration enforcement, and nothing in the Implementing Agreement prevents the return information from being used for that purpose. Moreover, the Implementing Agreement provides that ICE will not destroy or return information from the IRS until "no longer needed" for any purpose. Implementation Agreement at ¶ III.02.c.

ICE cannot practically pursue criminal investigations at the scale of the data sharing that is already occurring. In 2023, the most recent year for which data is available, ICE referred 6,624 criminal cases that contributed to the 23,954 criminal cases in total referred by DHS. Dep't of Just., Exec. Off. for U.S. Att'ys, United States Attorneys' Annual Statistical Report, Fiscal Year 2023 16 (2023), https://www.justice.gov/usao/media/1343726/dl?inline. ICE's requests for return information of 1.28 million taxpayers exceed those numbers by many orders of magnitude. Although the IRS provided only 3.7 percent of the records requested, it still produced nearly 50,000 records—more than double the total number of criminal cases DHS referred in 2023, including cases involving drug trafficking, human trafficking, and other serious offenses. ICE would need to dedicate all its resources to this singular effort, and still the scale of the operation would vastly exceed ICE's investigative capacity. ICE's flimsy posturing that it opened new criminal investigations involving millions of taxpayers cannot form a legal basis for breaching taxpayer confidentiality in the face of this reality.

Regardless, section 6103(i)(2) requires not only that a request be relevant to a criminal proceeding or investigation, but also that the return information be used solely for that purpose. Once the IRS discloses the information, there is no un-ringing the bell should ICE choose to use it to civilly deport immigrants instead.

## II.    The MOU and Implementing Agreement Violate the Administrative Procedure Act

### A.    The IRS's decision to disclose return information to ICE is not in accordance with law and is arbitrary and capricious

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As discussed above, the MOU conflicts with section 6103(i)(2) and is invalid for that reason. As explained below, the IRS's decision to enter into the MOU and Implementing Agreement is also arbitrary and capricious.

Before undertaking any action, an agency must "examine the relevant data and articulate a satisfactory explanation." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."). When an agency departs from past practice, it must also acknowledge the change, reasonably explain its reasons for it, and account for any serious reliance interests. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–23 (2016); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 52, 65–68 (2020). A failure by a federal agency to "display awareness that it is changing position," by itself, violates the APA. *Fox Television Stations*, 556 U.S. at 515; *Encino Motorcars,* 579 U.S. at 222. Whether adopting a new policy or revising an old one, the agency's basic duty under the APA is the same: the agency must reasonably consider the important aspects of the problem before it and provide a candid explanation for its decision. *Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764, 773 (D.C. Cir. 2019) (holding policy changes to the same standard of reasoned decision-making applied to new policies) (citing *Encino Motorcars*, 579 U.S. at 222).

12

None of those requirements are satisfied here. The IRS failed to explain or justify its decision to enter the MOU and Implementing Agreement, failed to acknowledge or consider that such a decision significantly departed from prior policy and practice, and ignored significant reliance interests in such policy and practices that the IRS deliberately cultivated for decades in service of effective tax administration.

The IRS offers only boilerplate assertions that the disclosure of return information under the MOU is legal.[6] The IRS's assertions confirm, however, its reliance on factors contrary to those underlying Congress's enactment of section 6103(i)(2). In particular, the MOU references Executive Order 14161, which directs other departments (not Treasury) to "take immediate steps to identify, exclude, or remove aliens illegally present in the United States." MOU at ¶ 1.a. But section 6103(i)(2) does not permit bulk sharing of return information to facilitate deportation, as described in the MOU and Implementing Agreement. Indeed, such data sharing is "unmoored from the purposes and concerns" of section 6103(i)(2). *Judulang v. Holder*, 565 U.S. 42, 55–56 (2011).

The IRS's failure to explain its decision-making is compounded by the MOU and Implementing Agreement's implicit repudiation of longstanding IRS policy—a change the IRS neither acknowledges nor justifies. For decades, the IRS maintained that "[t]here is no provision in the United States Code that authorizes the disclosure or redisclosure of returns or return information for enforcement of immigration laws." T.D. 10013, 89 Fed. Reg. 93,172, 93,174 (Nov. 26, 2024); *see Social Security Number and Individual Taxpayer Identification Number Mismatches and Misuse: Hearing Before the Subcomm. on Oversight & the Subcomm. on Soc. Sec. of the H. Comm.*

---

[6] The MOU is the only document or communication in the public record that offers a plausible source for an explanatory rationale. *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of California,* 591 U.S. 1, 20 (2020) (emphasizing the "judicial review of agency action is limited to the grounds that the agency invoked when it took the action") (internal citations and quotations omitted).

*on Ways & Means*, 108th Cong. 12 (Mar. 10, 2004) (statement of Mark W. Everson, Commissioner of Internal Revenue) ("The Service believes at this time that any sharing of confidential taxpayer information, directly or indirectly, with immigration authorities would have a chilling effect on efforts to bring ITIN holders, and potential ITIN holders, into the U.S. tax system. Such an initiative would deprive the Federal Government of tax revenue by discouraging illegal workers in the U.S. from participating in the tax system, when the Code requires them to pay tax on their U.S. earnings."); *see also* IRS, Disclosure and Privacy Law Reference Guide, Pub. 4639 (rev. Oct. 2012) ("Requests under section 6103(i)(2) seeking only a taxpayer's address do not comply with this section; the section contemplates requests for return information in addition to a taxpayer's address."); I.R.M. § 11.3.28.4(5) (Apr. 17, 2025) (similar).

While the IRS may reconsider its interpretation of section 6103(i)(2) consistent with the statute, it must at a minimum demonstrate awareness of this change and provide a public rationale consistent with the law and its purpose. *Encino Motorcars*, 579 U.S. at 221-22; *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105–06 (2015). In addition, under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), "agencies are bound to follow their own rules[.]" *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 34 n.3 (D.D.C. 1998). That command applies whenever an agency pronouncement, including agency guidance, is intended to be a binding norm, a determination that considers "the substance and intent of the agency action, as well as whether it confers individual protections or privileges." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018) (citing *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987)).

By distributing confidential address information to assist in the deportation of taxpayers, the IRS abandoned the very privacy safeguards Congress made central to tax administration, while ignoring reliance interests that the IRS deliberately promoted through decades of practice and public

14

assurances. Both the statute and well-grounded public expectations that the IRS deliberately cultivated confirm the arbitrary and capricious nature of the IRS's decision-making.

Congress built section 6103 on a simple premise: a presumption of confidentiality. Voluntary compliance requires taxpayer confidence that sensitive return information will not be repurposed for non-tax ends, absent compelling circumstances that are specifically excepted. For nearly fifty years, the IRS upheld this principle. *See supra* at 12–13.

In addition, the IRS cultivated an expectation of confidentiality, and concrete reliance interests, among taxpayers. Federal income tax applies to U.S.-earned income regardless of immigration status. In 1996, the IRS—exercising authority conferred by Congress under section 6109—created the ITIN program to enable those who are ineligible for a SSN to satisfy their legal tax obligations. The IRS explained that the new number was "designed to help" those who are ineligible for an SSN to "maintain compliance" with tax filing requirements, and that an ITIN is "intended for tax use only," and "creates no inference" about the individual's immigration status or right to work. T.D. 8671, 61 Fed. Reg. 26,788, 26,789 (May 29, 1996). Until the MOU, that remained the IRS's position. *See* IRS, *Topic No. 857—Individual Taxpayer Identification Number (ITIN)*, https://www.irs.gov/taxtopics/tc857 (last updated Nov. 7, 2024) ("An ITIN is issued for federal tax filing purposes only and . . . creates no inference concerning your immigration status or your right to work in the United States.").

Millions of taxpayers took the IRS at its word. Since ITINs were introduced nearly thirty years ago, the IRS has issued tens of millions of them, integrating tens of millions of individuals without SSNs into the federal tax system. *See* Treasury Inspector Gen. for Tax Admin. (TIGTA), Administration of the Individual Taxpayer Identification Number Program, Rep. No. 2024-400-012, at 1 (Dec. 19, 2023). As a result, billions in payroll taxes have been contributed by workers who are unlikely to ever file for Social Security. *See* Stephen Goss *et al.*, Effects of Unauthorized

15

Immigration on the Actuarial Status of the Social Security Trust Funds, Soc. Sec. Admin., Actuarial Note No. 151, at 2 (Apr. 2013); *see also* Tax Payments by Undocumented Immigrants, Inst. on Tax'n & Econ. Pol'y (July 30, 2024), https://itep.org/undocumented-immigrants-taxes-2024/ (stating that "undocumented immigrants paid $19.5 billion in federal income taxes alone in 2022, and $96.7 billion total in U.S. taxes, including $59.4 billion in payments to the federal government").

Recognizing these benefits to the Treasury and to the fiscal health of the Social Security Trust Fund, Congress repeatedly authorized and invested in return-preparation and taxpayer-assistance grants that expressly target underserved and limited-English-proficient communities (including many immigrant taxpayers), funding outreach and efforts to ensure that everyone with an obligation to pay federal taxes would have the information and reassurances necessary to do so. I.R.C. §§ 7526(a) & (b)(1)(A)(ii)(II) (LITC), 7526A(a) & (e)(2)(4).

Against this backdrop, the IRS's agreement to supply confidential address information to ICE and DHS to facilitate the deportation of immigrants represents a sharp break from prior policy and a denial of the confidentiality of taxpayer information set out by Congress. The IRS never publicly acknowledged the policy shift, nor did the agency explain why it is warranted. The IRS also has not provided an assessment of the likely and foreseeable harm to voluntary compliance and the public fisc—the cornerstone and primary objective of the tax system that the IRS is charged to administer. Congress has a vested interest in ensuring that agencies follow substantive law and the APA's procedural safeguards, especially in this case given the consequences of the IRS's arbitrary and capricious decision for our country's finances, tax system, and taxpayer privacy.

### B.    The IRS is not entitled to the presumption of regularity

As described above, the MOU and Implementing Agreement violate the plain text of section 6103. Moreover, the IRS's decision to enter into these agreements violate the APA. For these

reasons, the Court need not find that the MOU is pretextual to find it unlawful. Nevertheless, if such a determination was necessary to bar enforcement of the MOU, the Court has ample grounds to look beyond the bare recitation of statutory requirements in the MOU to the practical reality reflected by the Implementing Agreement that the sharing of information is for an improper purpose and unauthorized.

An agency abandons the presumption of regularity where its stated rationale is implausible or "contrived," or where there is a strong showing of bad faith. *See Dep't of Commerce v. New York*, 588 U.S. 752, 784 (2019) (rejecting "contrived" rationale and approving extra-record discovery); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (extra-record inquiry permitted upon a strong showing of bad faith or improper behavior). As discussed, *supra* at 11, the representation in the MOU that ICE seeks return information to pursue criminal investigations, rather than civil deportations, is facially absurd and belied by the handling of that information under the Implementing Agreement.

Extensive reporting confirms the only conclusion permitted by common-sense: the MOU's actual purpose is facilitating civil deportation. Credible reports based on IRS interviews reveal that ICE previously sought to obtain the same IRS address information for 700,000 people with outstanding removal orders. Jacob Bogage & Jeff Stein, *IRS Nears Deal with ICE to Share Addresses of Suspected Undocumented Immigrants*, Wash. Post (Mar. 22, 2025), https://www.washingtonpost.com/us-policy/2025/03/22/ice-irs-immigrants-deport/. When IRS leadership rejected this request, ICE reportedly escalated the dispute by broadening its request to 7 million individuals. Jacob Bogage, *DHS Officials Ask IRS to Use Tax Data to Locate Up to 7 Million Immigrants*, Wash. Post (Apr. 5, 2025), https://www.washingtonpost.com/business/2025/04/05/irs-tax-data-immigration-enforcement/.

There is also reporting that ICE requested over 7 million taxpayer addresses and that there is

17

a system in development that would allow the IRS to fulfill requests for "enormous swaths of confidential data in bulk through an automated, computerized process." William Turton, Christopher Bing & Avi Asher-Schapiro, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data with ICE*, ProPublica (July 15, 2025), https://www.propublica.org/article/trump-irs-share-tax-records-ice-dhs-deportations. As one former IRS official was reported as saying, the notion that ICE has 7 million "real criminal investigations" is a "fantasy."

Disclosing return information to ICE based on millions of criminal investigations is therefore delinquent or bad faith on the part of the IRS, bad faith on the part of ICE, or both. Regardless, the APA does not require courts "to exhibit a naiveté from which ordinary citizens are free." *New York*, 588 U.S. at 785 (internal citations and quotations omitted). In response to another instance of pretextual agency action regarding the inclusion of a citizenship question on the census, the Supreme Court in *Department of Commerce v. New York* concluded that "[r]easoned decisionmaking under the Administrative Procedure Act calls for an explanation for agency action" and "[w]hat was provided here was more of a distraction." *Id.* at 785. The same goes for this case. The Court should ignore the fiction that the information sharing under the MOU is solely for criminal investigation purposes and conclude that the IRS's actions to enter into the MOU and the Implementing Agreement and to disclose return information to ICE are improper and unlawful.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion for a stay or preliminary injunction.

Respectfully submitted,

/s/ Andrew Weiner
Andrew Weiner (DC Bar No. 498633)
Robert McLeod
KOSTELANETZ LLP
601 New Jersey Avenue NW
Suite 260
Washington, DC 20001
Phone: 215-901-0873
Fax: 212-808-8108
aweiner@kostelanetz.com

Laura MacCleery
UNIDOSUS
1126 16th St NW #600
Washington, DC 20036
Phone: 202-489-7147
lmaccleery@unidosus.org

*Counsel for Amici Curiae the Honorable
Members of the Congressional Hispanic
Caucus Leadership*

19

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with all the applicable requirements of LCvR 7(o),

including all formatting requirements set forth in this rule, and does not exceed 25 pages in length.

DATED this 5th day of September 2025.

/s/ Andrew Weiner
Andrew Weiner

*Counsel for Amici Curiae the Honorable
Members of the Congressional Hispanic
Caucus Leadership*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 5th day of September, I electronically filed the foregoing brief of amici curiae with the Clerk of the Court using the Court's CM/ECF system, which effected service upon all parties who have entered an appearance.

DATED this 5th day of September 2025.

/s/ Andrew Weiner

Andrew Weiner
