1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

2

3  Center For Taxpayer Rights,  )
    et al.,                  )

4                        )
          Plaintiffs,     )

5                        )
       vs.               )  CASE NO. 1:25-cv-00457-CKK

6                        )
  INTERNAL REVENUE SERVICE, et )

7  al.,                  )
                        )

8          Defendants.     )
  _____ )

9

10                TRANSCRIPT OF MOTION HEARING
   **BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY, DISTRICT JUDGE**

11             Friday - September 5, 2025
             1:08 p.m. - 4:37 p.m.

12               Washington, DC

13  **FOR THE PLAINTIFFS:**
      Democracy Forward Foundation

14      BY:  MADELINE GITOMER, JOHANNA M. HICKMAN,
          STEVEN BRESSLER and DANIEL ALEXANDER McGRATH

15      P.O. Box 34553
      Washington, DC 20043

16

17  **FOR THE DEFENDANTS:**
      U.S. Department of Justice

18      BY:  BRADLEY P. HUMPHREYS and ELIZABETH SHAPIRO
      1100 L Street, NW

19      Washington, DC 20005

20

21

22                   **SONJA L. REEVES**
            **Registered Diplomate Reporter**

23             **Certified Realtime Reporter**
           **Federal Official Court Reporter**

24            333 Constitution Avenue, NW
             Washington, DC 20001

25      Transcript Produced from the Stenographic Record

1              (Call to Order of the Court at 1:08 p.m.)

2          DEPUTY CLERK:  Civil Case 25-0457, *Center for Taxpayer*

3  *Rights, et al., versus Internal Revenue Service, et al.*

4          Counsel, would you please identify yourself for the

5  record, starting with the plaintiffs.

6          THE COURT:  If you could indicate which organization

7  you're representing.  And, once you start speaking, please take

8  the masks off; otherwise, we really can't get a record.  And if

9  you come to the podium, we have an open line so people can

10  actually hear what you say.

11          MS. GITOMER:  Good afternoon, Your Honor.  Madeline

12  Gitomer for the plaintiffs, Center for Taxpayer Rights,

13  Communication Workers of America, Main Street Alliance and

14  National Federation of Federal Employees.

15          THE COURT:  So you will be the principal speaker then

16  for the plaintiffs?

17          MS. GITOMER:  Yes, Your Honor.

18          THE COURT:  Okay.  Thank you.

19          Do you want to identify who everybody else is, unless

20  they are not going to say anything.

21          MS. GITOMER:  Yes, Your Honor.  With me are my

22  colleagues:  Dan McGrath, Hanna Hickman and Steve Bressler,

23  also representing all four plaintiffs.

24          THE COURT:  All right.  Good afternoon.

25          MR. HUMPHREYS:  Good afternoon, Your Honor.  Bradley

1     Humphreys of the United States Department of Justice

2     representing all defendants.  I have with me at counsel table

3     Elizabeth Shapiro, also of the Department of Justice.

4          THE COURT:  All right.  Let me proceed.  Because we're

5     using a public line for today's hearing, I would ask that you

6     speak clearly into the microphone and the microphone that's in

7     the podium.  Counsel should also, as I have indicated, remove

8     your masks when you're speaking so that we make sure that we

9     both have a clear record as well so they can hear what you're

10    actually saying.

11         Let me identify the parties.  The plaintiffs in this

12    case are the Center for Taxpayer Rights.  I'm going to label

13    you the Center, which is a 501(c)(3) organization focused on

14    the U.S. tax system.  The Center also runs a federally funded

15    low income taxpayer clinic that provides free representation to

16    low income taxpayers who have tax disputes with federal, state

17    or local tax agencies.

18         The Main Street Alliance, which is a nationwide

19    network of small businesses with members across the country;

20    the National Federation of Federal Employees, IAM, AFL-CIO and

21    FFE, the acronyms, which is a national labor union organization

22    representing approximately 110,000 federal government workers

23    across the United States; and the Communication Workers of

24    America, AFL-CIO, CWA, which is a union of hundreds of

25    thousands of public and private sector workers who work in the

1    telecommunications and IT, the airline industry, manufacturing,

2    federal service contracts, news media, broadcasting and cable

3    television, education, healthcare, public service and other

4    fields.

5         Before we begin, I'm going to give a very brief

6    history of the case for the benefit of members of the public

7    attending in the courtroom or those that are on the public

8    line.

9         On February 18, 2025, the Clerk of the Court assigned

10   this case to me because the plaintiffs designated the case as,

11   quote, "related" under the rules to a previous case that I

12   have, which is *Alliance For Retired Americans versus Bessent*.

13   The Clerk of the Court had previously assigned that to me

14   pursuant to Local Rule of Civil Procedure 40.3(a).  Defendants

15   moved to dismiss the plaintiffs' complaint on April 25th.   In

16   response, the plaintiffs filed an amended complaint on

17   May 16th.

18        On July 10th, the defendants moved to dismiss

19   plaintiffs' amended complaint for lack of subject matter

20   jurisdiction and for failure to state a claim.

21        The plaintiffs filed an opposition to defendants'

22   motion to dismiss on August 1st, which the defendants replied

23   to on August 15th.  Five days after the defendants filed their

24   reply in support of their motion to dismiss, which would have

25   been on August 20th, plaintiffs filed their present motion

1    seeking a Section 705 stay or a preliminary injunction.

2         On this date, the Court issued a minute order

3    directing the defendants to respond to plaintiffs' motion for

4    preliminary injunction on or before August 28th.  It also

5    directed the plaintiffs to submit any reply to the defendants'

6    response on or before September 3rd.

7         Both parties submitted their respective motions on the

8    deadlines that I provided, and so plaintiffs' motion for a

9    preliminary injunction is now ripe.

10        Before turning to the pending motion, I want to make

11   clear what issues are or not before the Court today.  The

12   motion we'll be discussing concerns a challenge to a data

13   sharing agreement between the IRS and ICE.  This agreement is

14   contained in a Memorandum of Understanding, an MOU, executed

15   between the Department of the Treasury on behalf of the IRS and

16   the Department of Homeland Security on behalf of ICE on

17   April 7, 2025.

18        On June 27, 2025, the IRS received a request from ICE

19   pursuant to the MOU for the last known address of approximately

20   1.28 million individuals.  The IRS responded to ICE's June 27th

21   request on August 7th of this year, providing to ICE the last

22   known address for 3.7 percent of the individuals requested by

23   ICE, which, as I understand it, equates to approximately 47,000

24   individuals.

25        It also appears -- and I'll ask the government to

1  confirm -- that the IRS received an earlier request for data

2  regarding approximately 7.3 million taxpayers, but the IRS did

3  not provide any taxpayer data to ICE in response to this

4  request.

5        Plaintiffs' motion asked me to decide whether the

6  April 7th memorandum of understanding, the MOU, ICE's June 27th

7  request, and the IRS's August 7th disclosure, taken together,

8  are lawful.  While the question presents a variety of legal

9  issues, standing, APA review, the core statute at issue is

10  Internal Revenue Code Section 6103(i)(2) which govern the IRS's

11  disclosure of certain taxpayer information to federal agencies

12  engaged in nontax criminal investigations or proceedings.

13        This motion does not ask me to decide whether the

14  defendants' conduct has violated the Privacy Act.  Although

15  plaintiffs brought this claim in their amended complaint, they

16  expressly refrain from bringing it in this motion.  This motion

17  also does not ask me to rule on IRS's data sharing practices

18  with other agencies.

19        Finally, because neither ICE nor DHS is a party to

20  this case, the pending motion doesn't ask me to decide whether

21  ICE's request to the IRS or ICE's use of IRS data has been

22  lawful.

23        Now, there is one final point on the background.  I'm

24  aware that I'm not the first judge in this district presented

25  with a challenge to data sharing policies between IRS and ICE.

1    In *Centro de Trabajadores Unidos versus Bessent*, Judge

2    Friedrich denied a motion for preliminary enjoining information

3    sharing between IRS and ICE under, as I understand it, the same

4    Memorandum of Understanding at issue in this case.  I won't go

5    through the cases.

6        However, at the outset, I want to make clear that I

7    think the motion that we'll be discussing today and that I need

8    to decide presents distinct issues from the motion Judge

9    Friedrich ruled on in *Centro*.  To start, the plaintiffs in this

10   case are different from the plaintiffs in *Centro*.  Therefore,

11   certain issues, such as standing and irreparable harm, for

12   instance, will not have a direct relation to *Centro*.

13        In addition, and perhaps most importantly, it appears

14   to me that I have a different factual record than the Court did

15   in *Centro*.  As mentioned above, a focal point of plaintiffs'

16   motion is the information sharing that took place between IRS

17   and ICE, specifically the June 27th request IRS received from

18   ICE and the IRS's subsequent response or data sharing on

19   August 7th.  This instance of information or data sharing was

20   not in front of the Court in *Centro,* as Judge Friedrich issued

21   her opinion denied the motion for preliminary injunction in

22   May.

23        So accordingly, while I understand -- and I'm

24   sensitive to issues of judicial comedy and efficiency -- the

25   fact of the matter is that the request for a preliminary

1    injunction at issue in *Centro* was different from the request

2    that's pending before me today.

3          So I think with that background in mind, we're ready

4    to proceed with the hearing on the plaintiffs' pending motion.

5          I think for some of you, this is the first time you

6    have appeared before me.  You should be aware that at the

7    outset, the hearing is not the usual appellate-style oral

8    argument sort of summarizing your briefs.  I have read the

9    briefs and all of the materials.  And if I don't ask you

10   questions about some of the arguments you made, it's not that

11   I'm ignoring them or don't think they are important; I just

12   don't have any questions about them, I understand them and I

13   don't need clarification.

14         But there are specific issues I need more clarity on,

15   so I'm going to ask that you answer the questions that I'm

16   bringing up.  I know this case presents complex legal issues

17   and a number of issues.  So if there is someone, either side,

18   that you feel would be better poised to answer one of my

19   questions, please feel free to switch off counsel.  That's not

20   a problem.  You don't have to go and consult to answer, the

21   other person can answer.  That's not a problem.

22         I just ask that for my benefit, when you come up to

23   the podium, please speak in the microphone, identify yourself

24   and your clients -- you can say plaintiffs since you're

25   representing all of them -- so that we can make a clear record

1    of who is speaking, particularly those not in the courtroom.

2          So this is the way I'm proposing to proceed.  I have

3    some preliminary questions for the defendants.  Then I have

4    some questions for the plaintiffs.  I then have some further

5    questions for the defendants.  I have broken things up into

6    some legal arguments versus factual.

7          Finally, I'll allow the plaintiffs to come back and

8    provide a brief response if there are new arguments that the

9    defendants have raised since the burden is on the plaintiff.

10   And if there are -- say, for about ten minutes, if no more than

11   that.  If there are additional things you wish to bring up that

12   I haven't asked about but you think are important to bring up,

13   but do understand I have read everything, gone over it and I

14   have not needed clarification.  But as I said, I'm giving you

15   an opportunity to bring things to my attention.

16         At the end of the hearing, we'll discuss next steps

17   and any kind of schedule.  But let me start with is there

18   anything that you want to bring to my attention at this point

19   that you think I should know, anything that's changed in the

20   record or anything else?  If I don't hear from you, I'll assume

21   no.

22         Okay.  All right.  So let me start with questions for

23   the defendants.

24         MR. HUMPHREYS:  Thank you, Your Honor.

25         THE COURT:  Some of the ones I'm going to start with

1    you will be factual.  In order to put these in context, I'm

2    going to give a little background and cite the sections of the

3    code or whatever so that you're not guessing at what I'm

4    talking about since it's going to move around.

5        So Section 6103(i)(2) of the Internal Revenue Code

6    appears to contemplate that IRS will perform a careful,

7    individualized assessment before sharing data with other

8    agencies.  And the plaintiffs allege that IRS could not

9    possibly have complied with those requirements in response to

10   ICE's request for the address information on 1.28 million

11   taxpayers, although ultimately 47,000.  But the plaintiffs,

12   like the Court, obviously don't know the specifics of what the

13   IRS actually did or did not do.

14       So the facts you provide about the IRS's handling of

15   requests from ICE are important to me in resolving the

16   plaintiffs' motion since I don't know a number of those facts.

17   With that in mind, I want to clarify a few points regarding the

18   information sharing between IRS and ICE that has taken place

19   already or is contemplated.

20       As of today, has there been any information sharing

21   between IRS and ICE under the MOU, other than IRS's August 7th

22   response to ICE's June 27th request for address information?

23       MR. HUMPHREYS:  No, Your Honor.

24       THE COURT:  Okay.  And I understand that there were at

25   least two separate requests from ICE for the taxpayer

1  information; the 7.3 million taxpayers which they received, I

2  believe, around June 25th, and then the one that's more at

3  issue, which was received June 27th.  Am I correct that there

4  was that earlier one?

5      MR. HUMPHREYS:  You are correct, Your Honor, that

6  there was an earlier request.  I am not sure of the exact

7  number of people, but yes.  And IRS did not provide any

8  information in response to that request.

9      THE COURT:  Okay.  So was IRS's August 7th response

10  its final response to ICE's June 27th request for data

11  regarding the 1.28 million taxpayers?  In other words, is it

12  possible that IRS is going to provide additional data in

13  response to that request since it provided only 47,000

14  responses?

15      MR. HUMPHREYS:  The response is complete, Your Honor.

16  If I could put a little more color on that.  In the data that

17  IRS sent back to ICE, there was sort of a response for each of

18  the rows included in the data file being no match for address

19  or -- I forget the exact verbiage, but it did provide a

20  response as to each of the 1.2 million.  It's just that

21  information -- address information was only provided for 47-odd

22  thousand.

23      THE COURT:  So they actually did a check and responded

24  to the 1.28 million, and the 47,000 is information they

25  actually provided?

1      MR. HUMPHREYS:  That's correct.

2      THE COURT:  So the other -- I won't do the math here,

3  but whatever the rest of this is, they did not provide it

4  because what?

5      MR. HUMPHREYS:  Either, one, these requirements of the

6  MOU and the statute were not satisfied as to a specific

7  individual or, two, the IRS could not match the name and

8  address that ICE provided with a last known address in the

9  IRS's files.  I'm happy to talk about the process of how IRS

10  went about that matching if you'd like, Your Honor.

11      THE COURT:  That's very helpful.  I didn't realize

12  that.

13      And in terms of the June 25th one, can we say they are

14  not planning on providing any information -- I just want to

15  make sure that none of these requests are going to require

16  anything further.

17      MR. HUMPHREYS:  That's correct, Your Honor.  There are

18  no further responses pending an -- IRS has not received any

19  further requests.

20      THE COURT:  Okay.  So based on the requests that were

21  made, I'll put it that way, there is no intention at this point

22  nor any request to be revisited to provide that information; is

23  that accurate?

24      MR. HUMPHREYS:  That's accurate, Your Honor.

25      THE COURT:  Moving to John Walker's declaration that

1  was dated August 28th, it says that since June 27th, quote,

2  "The IRS has not received a request pursuant to the MOU from

3  ICE," unquote.

4         So has the IRS received any additional requests from

5  ICE since he executed that back in August?

6         MR. HUMPHREYS:  No, Your Honor.

7         THE COURT:  Okay.  And since June 27th, has the IRS

8  received any additional requests from ICE for information that

9  were not pursuant to the MOU?  In other words, any other

10  requests based on not the MOU, but requests generally for

11  information.

12         MR. HUMPHREYS:  That, I'm not sure of, Your Honor.

13  The IRS receives, my understanding is, a couple of tens of

14  thousands of requests for information under six -- 6103(i)(2)

15  from other sources.  It could be there were one-off requests

16  but not pursuant to this MOU.  I'm confident under this MOU,

17  the June 27th request is the only one for which IRS has

18  provided information.

19         THE COURT:  So there is no pending -- whether MOU or

20  anything else, nothing pending from ICE at this point?

21         MR. HUMPHREYS:  That's right, Your Honor.

22         THE COURT:  Next, I want to understand a little bit

23  the context of the information sharing between IRS and ICE that

24  occurred on -- I shared some of those questions to you in

25  advance since they were factual to make sure you would have an

1    opportunity to gather some of the information.

2         So let me -- I'm going to set out what's in 6103

3    because my questions go to those.  If you will bear with me.

4    So Section 6103(i)(2)(A), the IRS code authorizes IRS to

5    disclose return information for use in a nontax criminal

6    proceeding or investigation only to, quote, "officers and

7    employees," in this case of ICE, "who were personally and

8    directly engaged in the relevant nontax criminal preparation,

9    investigation or grand jury proceeding, solely for the use of

10   such officers and employees in such preparation, investigation

11   or grand jury proceeding."

12        And then Section 6(C)(6) of the MOU includes a similar

13   limitation requiring ICE to provide the IRS with, quote,

14   "identity information for the ICE officers and employees

15   personally and directly engaged in the nontax criminal

16   investigation that may result in criminal charges against the

17   individual under the specifically designated federal criminal

18   statute ICE has identified."

19        So with that background, approximately, say, within

20   the factor of ten, how many different individuals did ICE

21   identify in its request as, quote, "ICE officers and employees

22   personally and directly engaged in the nontax criminal

23   investigation that may result in criminal charges against

24   individuals for whom IRS provided the last known address"?

25        MR. HUMPHREYS:  Exactly one, Your Honor.

1        THE COURT:  I'm sorry?

2        MR. HUMPHREYS:  One person.

3        THE COURT:  Okay.  And who was this one individual?

4        MR. HUMPHREYS:  I do not have that person's name.

5        THE COURT:  A title?

6        MR. HUMPHREYS:  I don't have that title.  I'm sorry,

7   Your Honor.

8        THE COURT:  Well, is this something you can find out?

9        MR. HUMPHREYS:  I think I probably can, Your Honor,

10  yes.

11        THE COURT:  Okay.  So is this one individual

12  considered the ICE officer and employee directly engaged in the

13  criminal investigation against -- let's see, personally and

14  directly engaged in this investigation solely for the use of

15  that individual?

16        MR. HUMPHREYS:  Yes, Your Honor.

17        THE COURT:  So that individual is involved in the

18  47,000 tax returns or investigations that you provided?

19        MR. HUMPHREYS:  Well, to some degree, IRS relies -- in

20  large degree, on ICE's representation to follow the statute and

21  the requirements of the MOU that it will only be sharing

22  information provided under the MOU with a person personally and

23  directly involved.  So --

24        THE COURT:  Well, wouldn't you expect that they would

25  have some question about only one person being directly and

1    personally involved in all of these investigations?

2          MR. HUMPHREYS:  No, Your Honor.  When you look at the

3    purpose -- or what the investigation is, I mean, I think an

4    important piece here is in addition to requiring the name and

5    address, which is required by the statute, and this is in the

6    MOU, the IRS also required that ICE provided the return --

7    excuse me, the date of the order of removal.

8          And so Section 1253(a) makes criminal staying 90 days

9    in the country past the date of the order of removal.  And so I

10   think from IRS's perspective, I mean, it is not a complicated

11   factor to figure out who may be subject to prosecution under

12   that statute.

13         However, again, we're relying largely on ICE to --

14         THE COURT:  So as a practical matter, the IRS in their

15   disclosures on August 7th, didn't give it to the officers or

16   employees that might have been involved in the investigation of

17   getting the order of removal in court, in other words, those

18   that might have been involved -- since you're going by orders

19   of removal -- those that were actually involved in seeking and

20   obtaining the order.  You just have one person?  You don't know

21   who it is.

22         MR. HUMPHREYS:  Well, IRS does know who it is, and we

23   will find out for Your Honor.

24         THE COURT:  I think less the name or more of that will

25   be helpful, but it would appear that it would be one person,

1  obviously, I'm assuming is not the person who went and got

2  orders of removal for all of these cases.  Would you agree with

3  that?

4         MR. HUMPHREYS:  I would agree with that, but I also

5  would point out, Your Honor, that as plaintiffs repeat

6  throughout the briefs, the civil deportation proceedings are

7  different than a potential criminal investigation.  And

8  information can only be provided for a potential criminal

9  investigation.

10        THE COURT:  Right.  But point is the criminal

11  investigation that you're speaking about, as I understand it,

12  is people who have remained beyond their court orders for there

13  to be removed and the court orders for removal is the lynchpin

14  for the criminal, right?

15        MR. HUMPHREYS:  Well, that's true, but I don't think

16  that it follows that a person who -- would need to be involved

17  in the civil deportation order in order to investigate whether

18  there has been a criminal violation of the statute if you know

19  the date of the order of removal.

20        THE COURT:  But the point is, is that you basically

21  have -- or IRS has sort of moved over not asking nor

22  considering whether -- as is required directly -- I'll do it

23  again.  Officers and employees, which would have been of ICE,

24  who were personally and directly engaged in this nontax

25  criminal preparation, investigation or getting the order,

1    solely for the use of those officers and employees.

2          So you actually did not -- IRS did not actually do

3    that.  They relied on one person telling them there is a bunch

4    of orders for removal and these people are still here.  Would

5    that be -- I put it a little colloquially, but is that in

6    essence what happened?

7          MR. HUMPHREYS:  I would not agree with that, Your

8    Honor.

9          THE COURT:  Explain how you would explain it.

10          MR. HUMPHREYS:  The purpose of the MOU executed

11    between Treasury and DHS is to make sure that DHS understands

12    the requirements of the statute and that they will be complied

13    with.

14          Under the terms of the MOU, IRS -- excuse me, IRS and

15    ICE being close is tripping me up a little.

16          But DHS committed on behalf of ICE that only those

17    individuals who are personally and directly engaged in for

18    their necessary use will get the information.  And in receiving

19    the request from ICE, IRS received an attestation that it would

20    be providing -- that ICE would be providing that information

21    only to those people.  It is ultimately up to ICE, as the

22    investigatory law enforcement agency that has determined who is

23    responsible for the investigation.

24          THE COURT:  So your idea is they -- ICE identifies one

25    person.  IRS gives it to this one person, and that person is

1    supposed to disperse it to others that would be directly or

2    such involved?

3            I mean, both the statute and the MOU are quite

4    specific in terms of who gets it, the data, that it's supposed

5    to be people that are -- have something to do with the criminal

6    investigation.  And the criminal investigation, as I understand

7    it, is people who have stayed beyond their orders of removal

8    and therefore should be deported and are here illegally, and

9    that's the criminal lynchpin.

10           But you're basically just having one person do this

11   and there is no -- it appears that ICE did not identify anybody

12   else but just one person, who clearly cannot be the only one

13   that had anything to do with 47,000 people.

14           MR. HUMPHREYS:  Right.  Well, a couple of things, Your

15   Honor.  For one, IRS relies on the representations of ICE that

16   it will follow the law and follow the MOU, which require that

17   only those people who are personally and directly engaged in

18   the criminal investigation will get the information.

19           THE COURT:  Right.  So that's one person.  What they

20   have identified, as I understand it, is one person, if I

21   understood you correctly.  So ICE came back and said it's one

22   person and that's their answer, and that's what IRS accepted.

23           MR. HUMPHREYS:  That's true.  But under the statute,

24   the law enforcement agency could continue to provide the

25   information to others within ICE, provided that they are also

1    directly and personally engaged.

2        THE COURT:  That's not exactly the way it's written.

3    If you look at it, it says only to -- return information only

4    to officers and employees who are personally and directly

5    engaged in the criminal preparation, et cetera, solely for the

6    use of those particular people that have been identified.

7        I'm beating a dead horse, but I want to make sure I

8    understand.  You got no other information, other than one

9    person, in response to that portion of the statute and MOU,

10   correct?

11       MR. HUMPHREYS:  It is correct that one person was

12   identified by ICE.  However, that person, based on ICE's

13   representations, which --

14       THE COURT:  The representation is in the response in

15   some way?  Is it in writing or is it --

16       MR. HUMPHREYS:  Yes, it's a written response that this

17   person is personally engaged in.

18       THE COURT:  Let me then -- do you have what the

19   response is in terms of what ICE came back and said?  I mean,

20   did they put in there that this is the one person, but this

21   person is going to share it or say anything else?

22       MR. HUMPHREYS:  It said this person is directly and

23   personally engaged in the investigations.

24       THE COURT:  In the investigation of 47,000 people, or

25   actually 1.8 million, since you went through all of it?

1           MR. HUMPHREYS:  That's right.  But I think if you --

2           THE COURT:  I take it back.  No, it's the 47 because

3    it's actually related to who the data is provided by IRS.  So I

4    rescind that.  It's the 47,000.

5           MR. HUMPHREYS:  One person was identified by ICE as

6    personally and directly involved.  That satisfies the

7    requirements of the statute.  And the MOU is very clear that

8    the information should only be shared further with others who

9    are personally and directly involved in those criminal

10   investigations.

11          THE COURT:  Further from whom?  You say further from

12   the individual that got it or further from something else or

13   what?

14          MR. HUMPHREYS:  From the individual who got it.  It

15   says that all information, this is in 6(E), will use and

16   redisclose the address information only as specifically

17   authorized by 6103(i)(2), as implemented by regulations, and it

18   shall be open to inspection or disclosure to ICE officers and

19   employees personally and directly engaged in and for their

20   necessary use in proceedings and investigations that may result

21   in such proceedings.  And --

22          THE COURT:  Okay.  So where exactly were you reading

23   from from the MOU?

24          MR. HUMPHREYS:  Yes, Your Honor.  It's ECF --

25          THE COURT:  Tell me.  I have the MOU in front of me.

1    Where is it?

2          MR. HUMPHREYS:  6(E).

3          THE COURT:  6(E).  Well, I have to say this says

4    exactly what I expected it to say.  It says the regulation

5    provides return information disclosed open to inspection or

6    disclosure to ICE officers and employee personally and directly

7    engaged in.

8          It doesn't say anything about getting one person and

9    then having it be one person and then proceeding to have --

10   authorizing it to be given to unnamed other individual, people

11   at ICE.  Okay?  But let me just clarify and then we'll move on.

12         As I understand it then, the interpretation of the MOU

13   is that you can give it to one person at ICE, that person can

14   disclose it to other ICE employees that supposedly meet the

15   MOU, although they don't identify for IRS who these -- or

16   anybody else for that matter, who these people are that

17   actually supposedly are personally and directly, et cetera,

18   involved with it.  Is that a correct statement?

19         MR. HUMPHREYS:  Yes.  I don't know that I would agree

20   with a little bit of the color, Your Honor, but --

21         THE COURT:  All right.  Okay.  Let me move on.

22         So I had some questions about how did they verify the

23   identity of the individuals in the request for whom it

24   provided?  Did they -- was there any verification on IRS's

25   perspective about -- and they couldn't verify actually who was

1    going to use this data ultimately that was personally and

2    directly involved in the case because they were not identified.

3    They only know that the first individual -- the one individual

4    who received it presumably had some contact with it.  But they

5    would have no way of doing any checking to see whether or

6    not -- where it was shared after that, whether these people

7    actually had anything to do with the specific investigations

8    relating to each of the individuals for whom the data had been

9    shared, which since it -- presumably there was an expectation

10   that you asked for these individuals and assume that they are

11   identified, that there is a purpose of IRS getting this

12   information to know that these are individuals that are

13   actually working on it.

14         Maybe I should put it this way:  Wouldn't you expect

15   that generally the way this is operated is that you can

16   identify them because usually it's specific people that are

17   doing the criminal investigation that you can identify in terms

18   of who they are.  While in this particular case, it could be a

19   very broad group of people or a narrow group of people, you

20   don't really know who within ICE is actually going to get to do

21   it, and IRS has nothing -- isn't doing any checking on it.

22         MR. HUMPHREYS:  No, Your Honor.  There is nothing in

23   the statute that requires a requesting agency to identify to

24   IRS every hands that will touch the information.

25         THE COURT:  No.  But it does talk about -- let me get

1    back in terms of it does discuss officers, employees,

2    personally and directly, which certainly sounds like you would

3    expect that they would at least at the first level be

4    indicating who these were.  They did not identify when they

5    brought it, when they shared the information or made the

6    request, who the officers and employees who were personally and

7    directly engaged solely for those particular people identified

8    to work on these criminal cases.

9           So, I mean, you have indicated that they didn't do

10   that.

11          MR. HUMPHREYS:  I indicated that they gave it to a

12   person who IRS attested was personally and directly involved.

13   And then there is also the MOU, which explains that the

14   information shall only be shared by ICE with people who are

15   personally and directly involved.

16          THE COURT:  It's not only shared.  The requirement,

17   the request is identity information for the ICE officers and

18   employees personally and directly engaged in this that may

19   result.  So that's straight out of the statute, and that is

20   under 6(C)(6).  You then look at (E), which says IRS will use,

21   and they can redisclose the address information only as

22   directed by that and is implemented by the CFR.  And it

23   provides the same information, open to inspection or

24   disclosures personally and directly.

25          But the point is that initially, there would be an

1    expectation that there would be some identification of who

2    these people are.

3             I think we need to move on, but at least at this

4    point, that wasn't done.  There was no identification in the

5    request of who would be looking at it other than the one

6    individual that requested it.

7             MR. HUMPHREYS:  I disagree, Your Honor.  One is that,

8    I mean, from IRS's perspective, one person may very well be

9    able to determine if 47,000 people are subject to criminal

10   investigation under 8 U.S.C. 1253(a)(1), because it is simply a

11   matter of looking at the removal order date and then the

12   current date to determine if 90 days has passed, and that makes

13   a person subject to criminal investigation.

14            THE COURT:  Okay.  That answer is from your end.  It

15   would be most helpful, frankly, to find out who it was that

16   they identified and how they presented the information -- who

17   they were in terms of their getting at -- but let me move on

18   because I have got a lot more questions here.

19            So now -- let me move on.  Did IRS conduct an

20   independent review of the addresses that were provided by ICE

21   on June 27th?  For instance, did they audit the ICE-provided

22   addresses to see whether they appeared to be, like, residential

23   addresses as opposed to addresses associated with businesses or

24   other organizations; do you know?

25            MR. HUMPHREYS:  I can tell you how the process went

1    forward, Your Honor.  For the addresses -- or the names and

2    addresses provided where --

3              THE COURT:  Provided by whom?

4              MR. HUMPHREYS:  By whom?  For the names and addresses

5    that ICE provided to IRS, IRS first determined to make sure

6    that all of the information as required by the MOU was present.

7              THE COURT:  When you say "all the information," tell

8    me, because you conclude it's all, but I might have a

9    disagreement.  So what did they provide?

10             MR. HUMPHREYS:  The information listed in paragraph

11   6(C) of the MOU.

12             THE COURT:  6(D) or (C)?

13             MR. HUMPHREYS:  6, and then there is paragraph (C),

14   which has a numbered list of six items.

15             THE COURT:  Right.  It's (C).  We're on the same page

16   with the different bullets, 1 through 6, which I had just

17   looked at.

18             MR. HUMPHREYS:  Yes, Your Honor.  So if all the

19   information was present under the MOU, those 1 through 6 items,

20   the IRS then looked for last known address information by

21   taxpayer identification number if it was provided by ICE.  And

22   then if the -- so a unique number assigned to the person about

23   whom ICE was asking.

24             If there was a match in the IRS's system with the

25   taxpayer identification number that ICE provided, then it

1    checked its system to see if the names matched exactly.  So a

2    high degree of confidence that this is the correct person

3    because you have a unique number plus an exact match of the

4    name.  And then that would give IRS the confidence that this is

5    the right person.

6            THE COURT:  Okay.  So they would have gotten the name

7    of the taxpayer and then what additional identification, since

8    names sometimes are harder to make sure you have the exact --

9            MR. HUMPHREYS:  That's right, a unique number.  It

10   would be perhaps not a Social Security number in this instance

11   because the individual wouldn't have a Social Security number,

12   but --

13           THE COURT:  Not necessarily, but --

14           MR. HUMPHREYS:  Either/or though.

15           THE COURT:  Either a Social Security number or what

16   else?

17           MR. HUMPHREYS:  A unique taxpayer identification

18   number.

19           THE COURT:  So they would have had the name plus

20   something else that would identify them as that individual, and

21   if they had the same address, then they indicated that back to

22   ICE.

23           MR. HUMPHREYS:  Well, they would provide the last

24   known address for that person.

25           THE COURT:  So if the address that ICE provided was

1    different than what IRS had, what did they do?

2            MR. HUMPHREYS:  Well, that would be -- so just to be

3    very clear.  If the name and the taxpayer identification number

4    matched up and an address was provided, IRS then provided the

5    last known address.  It may be the same one as that IRS

6    provided -- excuse me, that ICE provided or a new one.

7            THE COURT:  Okay.  So what happened is that the

8    information -- the identifying information, ICE would provide

9    the name, the Social Security number or the tax number; if that

10   matched up, then whatever address IRS had, whether it was the

11   same or different than ICE's address, they would provide it to

12   ICE?

13           MR. HUMPHREYS:  The last known address, that's

14   correct.

15           THE COURT:  Last known address.  But they would not

16   make a distinction as to whether it was the same or not the

17   same as what ICE was indicating?

18           MR. HUMPHREYS:  In those circumstances where there was

19   a taxpayer identification number provided, no, they would not.

20   They would provide whatever was in the system.

21           THE COURT:  Do you have some sense in terms of the

22   last known address that was materially different from what ICE

23   provided, do you have some sense of proportion of responses

24   that had different addresses?

25           MR. HUMPHREYS:  I don't, Your Honor.  We tried to get

1    that information, but it would require some data digging.  And

2    we weren't able to get it by today.  I can tell you that the

3    number of people with whom the IRS matched using a taxpayer

4    identification number was quite high, most of them around

5    39,000.

6              THE COURT:  Okay.  But that would be the 47,000,

7    right, out of the whatever 1-point-something million; is that

8    correct?

9              MR. HUMPHREYS:  That's right, the 47,000, the

10   denominator.

11             THE COURT:  Okay.  Back to the statute for a second,

12   6103(i)(2)(iii) authorizes IRS to disclose return information,

13   again, to use in this nontax criminal proceeding or

14   investigation if the request for information puts out the

15   statutory authority on which the proceeding or investigation is

16   being conducted.

17             And the MOU similarly provides that, specially

18   designated nontax and gave examples of 8 U.S.C. 1253(a)(1),,

19   which relates to the removal thing, or other designated.  So

20   how did IRS assess whether an investigation or proceeding was

21   being conducted with each of these individuals at the time, or

22   was it just that they had an order of removal and therefore

23   that was sufficient?  Or was there something more?

24             MR. HUMPHREYS:  It was two things, Your Honor.  It was

25   the attestation of ICE, that they were subject to criminal

1    investigation, and even though not required in the statute, IRS

2    went a step further, and through the MOU, requested the date of

3    the removal order.

4          THE COURT:  So were they all under 8 U.S.C. 1253,

5    which basically provides criminal penalties for failing to

6    deport following a final order of removal?  I mean, was that

7    pretty much it?

8          MR. HUMPHREYS:  That was all of them.

9          THE COURT:  So all of them were under that?

10          MR. HUMPHREYS:  Yes, Your Honor.

11          THE COURT:  No distinction, no indication why

12    they were being -- there was an order of removal as to whether

13    it was based on criminal conduct, they overstayed their visa,

14    none of that information was included?

15          MR. HUMPHREYS:  That's right.  The statute, 1253(a)(1)

16    talks about if you stayed 90 days past removal order.

17          THE COURT:  Okay.  So I understand that IRS's acting

18    general counsel was no longer employed at IRS starting on

19    June 27th, which was the time that the response was made, but

20    you represented that IRS reviewed the legal sufficiency of the

21    request for address information.

22          So who looked at this in terms of did somebody legally

23    actually look?  Who reviewed or led the review of ICE's

24    June 27th request; do you know?

25          MR. HUMPHREYS:  I mean, Mr. Walker testified as the

1    chief privacy officer.  I don't know if it was him who was

2    looking at the actual data.

3            THE COURT:  Well, I think -- I think Mr. Walker

4    indicated who was at ICE's end, but I don't believe indicated

5    who was at IRS's end.  I'll get to that a little later, but I

6    don't think there was an individual.  It just said it requested

7    information.

8            But, anyway, you don't know whether it was anybody in

9    the general counsel's office or there was an actual legal

10   review of any of this?

11           MR. HUMPHREYS:  I'm certain that the legal -- that the

12   IRS general counsel's office was involved in the MOU process,

13   but I don't know as to the actual data request, Your Honor.

14           THE COURT:  Okay.  Then that's my certain initial

15   questions.  I'll get back to you later, but let me ask the

16   plaintiffs --

17           MR. HUMPHREYS:  There is a nuance that I think we

18   skipped over, but I want to make sure it's on the record.  I

19   talked about situations in which ICE provided a name and the

20   individual tax identification number.  There are certain

21   instances in which there was no tax identification number

22   provided and therefore IRS looked to make sure that there was

23   an exact match between the address in the system and the one

24   that ICE provided, and so IRS can have multiple addresses in

25   its system, and so long as the address matched an address in

1    the system at IRS, then it would have provided the last known

2    address of the individual.

3         THE COURT:  Let me see if I understand.  So if you had

4    the name of the taxpayer -- we're looking at what ICE asked

5    for.  They have the name of the taxpayer, did not have Social

6    Security number or tax number, so you would just go by the

7    name.  But if the addresses were the same, in other words, what

8    IRS had in their database and what ICE was asking, then IRS

9    would have provided the information?

10        MR. HUMPHREYS:  That's right.  If you had an exact

11   match on the name, no variations, so not "Brad" or "Bradley,"

12   exactly "Bradley" for me, and the exact address in the system

13   to give IRS the confidence that we're providing information

14   about the right person, then it would have responded with the

15   last known address.

16        THE COURT:  I have to say for a lot of Hispanic names,

17   there are issues, and we have this issue with the Court in

18   terms of the names and in terms of how people use their

19   surnames with the mother's maiden name and the father's name,

20   sometimes they do it together, sometimes they choose one or the

21   other.  If they had exactly the same names then, even if they

22   didn't have the other identifying information, but the other

23   aspect was they had the same addresses, then you would provide

24   it?

25        MR. HUMPHREYS:  Exact same name and exact same

1    address, then that information.

2            THE COURT:  Thank you.  That's helpful.

3            Let me move to plaintiffs.  So what I'm going to move

4    into is some of the questions and breaking them out relating to

5    the preliminary injunction in terms of what your burdens are

6    without likelihood of success on the merits, irreparable harm,

7    et cetera, et cetera.

8            Then I will -- so I'm going to break them out that

9    way, just for your information.  So starting with standing to

10   show that they are likely to succeed on the merits, the first

11   thing the plaintiffs have to do is show a substantial

12   likelihood of standing supported by affidavits or other

13   credible evidence.

14           And as I understand it, the plaintiffs assert two

15   theories of standing; organizational and associational.  The

16   Center for Taxpayer Rights, I believe, is the only plaintiff

17   asserting organizational standing.

18           And I have read the briefs, et cetera.  I only have

19   really one question for the Center in terms of associational

20   standing.  In your brief you describe, quote, "funding-related

21   obligations to educate certain taxpayer populations about their

22   rights and responsibilities," unquote.

23           Can you explain to me what the Center's

24   funding-related obligations are and how they might have been

25   affected by the IRS's data sharing with ICE?  It's sort of two

1    parts.

2          MS. GITOMER:  Yes, Your Honor.  Madeline Gitomer for

3    the plaintiffs.  Before I answer that, I just want to note that

4    we have also alleged third-party standing.  I just wanted to

5    make sure --

6          THE COURT:  As I mentioned at the beginning, I've

7    pulled out what I have questions about.

8          MS. GITOMER:  Thank you, Your Honor.

9          THE COURT:  Doesn't mean I haven't considered or --

10   it's no conclusions to be drawn.

11         MS. GITOMER:  I wanted to make sure it was in the

12   record.

13         THE COURT:  No problem.

14         MS. GITOMER:  With respect to the Center's funding

15   that you referred to, the Center runs a low income taxpayer

16   clinic.  Those are statutorily created and receive federal

17   funding.  As part of the obligations for those clinics, they

18   need to conduct outreach to provide services to certain

19   populations.  So the Center's mission more broadly is to

20   increase access, for example, to justice within the taxpayer

21   system to promote trust in the taxpayer system, but that

22   statute specifically requires outreach to taxpayers -- what the

23   statute and what the Center refer to as ESL taxpayers.  That's

24   taxpayers for whom English is a second language.  As you would

25   understand, Your Honor, those often include immigrant

1    populations.

2          And so the Center is required to conduct outreach and

3    provide services as a condition for their federal funding as a

4    low income taxpayer clinic.  They also run a network where they

5    provide support to other low -- in part to other low income

6    taxpayer clinics who, as a condition for federal funding, have

7    those same obligations.

8          THE COURT:  Okay.  So that helps me understand what

9    you're talking about in terms of the -- so how is the sharing,

10   how is it affected?  In other words, how are they affected by

11   this IRS data sharing with ICE in terms of those particular

12   functions that you have talked about?

13         MS. GITOMER:  The Center is suffering significant

14   harms in its ability to counsel its clients.  It's also

15   impacting its ability to provide educational and outreach

16   services.

17         For example, the actions taken by defendant in

18   changing the way that the confidential information of taxpayers

19   is treated has harmed their ability, for example, to advise

20   their clients with respect to their obligations under the law

21   to receive the benefits to which they are entitled.

22         So the clinic has clients who are entitled under law

23   to tax credits.  For example, if a Center client has a child

24   who is a citizen or a dependent who is a citizen, they may be

25   entitled to a tax credit.  The Center has a client who

1    attempted to file for an ITIN for their child, that ITIN was

2    not provided to the child, so there, there is administrative

3    error.

4           The typical response of the Center would be to

5    continue to represent that client in front of the IRS in order

6    to help them obtain that ITIN and thus obtain that financial

7    benefit, which is quite significant for many of the clients in

8    the communities that the Center serves.

9           In this case, clients are deeply, deeply fearful of

10   further engagement with the IRS as a result of the defendants'

11   actions.  And it has really harmed -- significantly harmed and

12   perceptibly impaired the Center's ability to serve these

13   clients because they are no longer willing to engage with the

14   IRS.

15          This is quite similar to what we see in a lot of the

16   voter registration cases where the actions of a defendant do

17   not simply -- do not directly prohibit an organization from

18   providing services, but perceptibly impair their ability to do

19   so.  I think the nature of the harms that -- the nature of the

20   advice that the clinics -- that the clinic is able to provide

21   to its clients has also become materially harder.  The clinic's

22   mission in part is to promote engagement with the taxpayer

23   system among low income voters.

24          And what we have is a case where the clinic typically

25   was encouraging them do so by advising their clients to file

1    for ITINs, advising their clients to engage with the taxpayer

2    system to obtain the benefits to which they were legally

3    entitled.  And now that mission and those services are impaired

4    and even frustrated because folks do -- folks are fearful of

5    engaging, but also the clinic is unable to give advice in the

6    same way they could.

7         In the past, they were able to say, this is what the

8    law requires and this is how the IRS has both interpreted and

9    acted on this law for decades.  Now they can no longer say

10   that.  They can say this is what the law requires, but in

11   addition, this is what is happening in ways that previously was

12   not permitted, and there has not been an explanation for that.

13   It leaves the clinic unable to provide advice in the same way

14   that it has.

15        THE COURT:  Let me interrupt for a second.  Does this

16   affect the funding?  In other words, since you're getting

17   taxpayer money, federal funding for this, are there

18   requirements in terms of getting -- receiving the funding in

19   terms of your having to provide the advice or make -- show in

20   some way that the money that they are giving you is actually

21   being used for this?  In other words, is the funding at issue

22   from the federal government in any way affected by the fact

23   that you have got clients now or potential clients that are

24   reluctant to seek advice or to proceed based on what's

25   happening?

1          I understand that portion of it.  But what does that

2   have to do with the actual funding that you're getting?  In

3   other words, are there requirements associated with the funding

4   that you're not able to meet that would indicate that perhaps

5   there is some risk with the federal funding that you're getting

6   if you're not able to actually do what the funding is giving

7   you money for?

8          MS. GITOMER:  Yes, Your Honor.  The funding from the

9   government requires that you conduct outreach and provide

10  representation for specific populations.  And the Center is no

11  longer able to do so as effectively in ways that could

12  jeopardize its funding.  When the Center is required to conduct

13  outreach, for example, to ESL taxpayers, last year it

14  provided -- it had ten events where it was able to do so,

15  specifically for ESL taxpayers, that is a condition of this

16  funding to have those types of outreach events.  At those

17  events, they also provide confidential advice and also have

18  folks who want to be clients.

19         THE COURT:  Do you have to do any kind of reporting in

20  order to get the funding?  Is there some way for those who

21  are giving you the funding where they would look at it and say

22  you don't seem to be -- although maybe not through your

23  fault -- not seem to be being effective with outreach or these

24  other things.

25         I mean, is there some way that they can look at it and

1    decide the money is not being spent as it's intended based on

2    the fact that you're not able to carry out some of these

3    responsibilities?

4              Is there any reporting system or something else that

5    would actually indicate that there might be a risk?

6              MS. GITOMER:  I believe that there are, Your Honor,

7    and I can get you a specific answer to that shortly.  But my

8    understanding is that for federal funding requirements, there

9    are reporting requirements as to how money was spent and how

10   services were offered.  I will confirm that, Your Honor.

11             THE COURT:  If you could, and if you could confirm

12   whether there are some requirements or it's just you report or

13   they have some standards that you're supposed to do -- so many

14   individuals get -- are provided these services or something of

15   that nature would be helpful.

16             MS. GITOMER:  Yes, Your Honor.

17             THE COURT:  Let me move to associational standing,

18   which all the plaintiffs assert.  And the Center for Taxpayer

19   Rights asserts associational standing and their basis that the

20   IRS data sharing with ICE harms its clients and its use of the

21   low income taxpayer clinic, the LITC, and then the plaintiffs

22   Main Street Alliance and the other ones also assert

23   associational standing on the basis that its members face harm

24   from the data sharing, so just putting that as a background.

25             The Center For Taxpayer Rights asserts associational

1   standing on behalf of its clients.  It doesn't appear from the

2   record that the Center's clients are actually members of the

3   organization, if I understand it correctly.

4           So what's your best precedent or authority for the

5   proposition that an organization can assert associational

6   standing on behalf of, quote, "clients," rather than members

7   who pay dues or, like, board of directors and so forth?

8           MS. GITOMER:  Yes, Your Honor.  The Center is

9   asserting third-party standing on behalf of its clients, not

10  associational standing.  And I'm happy to talk about the best

11  case.

12          THE COURT:  Okay.  So on the third-party, you were

13  discussing it in terms of that they don't have to be members,

14  they can be clients.

15          MS. GITOMER:  That's right.

16          THE COURT:  So I was mistaken in indicating that it's

17  associational.  You're talking about -- I read the third-party.

18  So my understanding is the traditional associational standing

19  is not what that's being raised for; is that correct?

20          MS. GITOMER:  That's correct, Your Honor.

21          THE COURT:  Okay.  So the defendants argue that the

22  harms to individual members are too speculative to support

23  standing, there is no indication there will be any future data

24  sharing between IRS and ICE.

25          So what's your best evidence whether the MOU or the

1   implementation agreement or some other way that there will be

2   future data sharing that harms your clients' interests or

3   members' interests as distinct from what they have already

4   done?

5           MS. GITOMER:  Yes, Your Honor.  There is -- I did not

6   hear defendants state today that there are no future requests

7   anticipated or that there was any --

8           THE COURT:  I can only go by the record I have got,

9   which I don't have IRS.  That's why I asked them as to whether

10  IRS, in terms of knowing what they had presently and what they

11  were aware of.  And I agree with you, I don't know what ICE is

12  going to do.

13          MS. GITOMER:  So the unlawful disclosure of

14  confidential information is itself an irreparable injury where

15  there is imminent risk of impermissible use, and we think that

16  exists here for several reasons.

17          First, the IRS received a request for 7.3 million, as

18  Your Honor mentioned.  The day after that request was rejected,

19  the chief counsel was removed from his position.

20          After the -- after the IRS sent over data in response

21  to the 1.28 million requests, the next day or two days later,

22  the IRS commissioner was removed following reports that the

23  White House expressed significant displeasure with the amount

24  of information disclosed.

25          At every point the individuals who have stood in the

1    way of these disclosures have been removed or left office

2    because they have -- or left their position because they have

3    been worried about these disclosures being lawful.

4         This suggests that -- this indicates that these

5    disclosures will continue, and there is nothing in the record

6    to indicate that they will not.  Mr. Walker's declaration says

7    that no requests are pending.

8         And there is -- in addition, Your Honor, what we just

9    heard defendants say that an address -- what defendants just

10   said is that for thousands of individuals whose information was

11   disclosed where a name and address were an exact match, any

12   address in the system for that individual, additional address

13   information was disclosed.

14        That is evidence that there is significant risk of

15   misidentification.  We know -- for example, to use an analogy

16   to John Doe, we know that a Jose Diaz name, many times

17   immigrant families not only have, as Your Honor mentioned,

18   certain conventions in their naming systems that would lead to

19   misidentification, but in addition, the families often live

20   together.  If a family lived together and a father and a son

21   had identical names and then that son moved and that son is a

22   U.S. citizen and his name was matched, that's a significant

23   risk of misidentification.

24        So it is the case that our client members are fearful,

25   and rightfully so, that their information has been disclosed

1    even if they were not part of this group that was listed.

2         But beyond that, we think there is imminent risk that

3    the IRS is going to continue to receive these requests because

4    the President has stated that this deportation agenda is part

5    of his priority and the White House has stated that this

6    request -- that this system is -- the purpose of this system is

7    for its deportation purposes.

8         THE COURT:  Okay.  Let me move on in terms of the

9    standing arguments.  Under the *TransUnion*, which I'm sure

10   you're familiar with, I need to decide whether the harms that

11   you allege to the plaintiffs' members are analogous to harms,

12   quote, "traditionally recognized as providing a basis for

13   lawsuit in American courts," unquote.

14        You raise analogies to two common law torts, intrusion

15   upon seclusion and breach of confidence.  Does your argument

16   regarding the intrusion upon seclusion support standing for

17   members who might have had their data shared in the future, or

18   does it apply only to those who have already had their data

19   shared?

20        MS. GITOMER:  It would apply to both.  The requirement

21   for inclusion upon seclusion is that clients hold a reasonable

22   expectation that the data be kept private and that the

23   intrusion would be highly offensive to a reasonable person, and

24   that the harm be imminent.

25        These individuals have already given their data to the

1    IRS, and so unlike in cases like *Alliance For Retired Americans*

2    or *AFL-CIO v. Department of Labor*, where the Court, the DC

3    District Court, found there was no evidence of likely further

4    misuse or -- or additional disclosure once the data was

5    disclosed to the agency by the individual, by the taxpayer,

6    that's not the case here.  There is significant evidence on the

7    record that indicates that such misuse is imminent or has

8    already occurred.

9         And I think what we see from the implementation

10   agreement that was recently made public is that when these

11   individuals' data is being disclosed to ICE, it is being put

12   into three very large databases, one of which is the A file

13   database.  That is a database that permits broad access, not

14   only to ICE, but to other components at DHS.  It's used very

15   broadly for immigration purposes, and there is nothing in the

16   record or the implementation agreement that indicates that

17   access to that data is limited.

18        And so this is a significant intrusion upon seclusion

19   because there's a reasonable expectation for decades based on

20   decades of statements and behavior by the IRS that that

21   information would be kept private.  And in this case, there's a

22   likely risk of misuse given that a reasonable person would find

23   it offensive to disclose information in ways in which it has

24   been promised that it would not be disclosed.

25        THE COURT:  Okay.  Let me move to -- the government

1    argues that breach of confidence analogy would fail because,

2    among other things, the tort was not, quote, "traditionally

3    recognized as providing a basis for a lawsuit in American

4    courts under *TransUnion*."

5         Can you explain your support for your argument that is

6    sufficient support for standing under *TransUnion*?

7         MS. GITOMER:  Yes, Your Honor.  I think what the law

8    requires for a breach of confidence is that information that

9    has been given to a private -- that where private information

10   has been given to a third-party in confidence, any further

11   disclosure that breaches the plaintiff members' trust is

12   sufficient for that injury.

13        The good precedent in this circuit is *Jeffries*, and

14   the case to which defendants cite doesn't actually come to the

15   conclusion that they would like.  The Court considers it and

16   discusses it and even questions it, but does not state that

17   that's not good law.  But in any case, here, controlling

18   precedent is *Jeffries*, and that is a breach of confidence.

19        THE COURT:  All right.  Let me move on to some of the

20   other requirements.  Just to put in context, I'll be moving to

21   final agency action, et cetera.

22        On the likelihood of success on the merits, as I

23   understand it, your argument is that the MOU and subsequent

24   data sharing is final agency action for which there is no other

25   adequate remedy.  And you argue that you're likely to succeed

1    on your APA claims because this final agency action is contrary

2    to 6103(i)(2) of the Internal Revenue Code, and because it

3    represents a policy change that's arbitrary and capricious.

4    That's what I understand your argument is.

5         So moving to final agency action, let me get to the

6    finality of the conduct at issue here.

7         Section 704 of APA provides for judicial review of

8    only financial agency action.  So the one thing I wanted to

9    clarify is that in your reply brief you indicated you're not

10   arguing that the defendants' changes to the Internal Revenue

11   Manual themselves amount to final agency action.  Am I correct

12   about that?

13        MS. GITOMER:  That's correct.

14        THE COURT:  Can you explain the relationship among,

15   moving to the prior Internal Revenue Manual and the present

16   one, and what you have called the Data Policy, which there is

17   no document that's labeled Data Policy, but the Data Policy

18   that you contend is final agency action in terms of trying to

19   figure out the source of the Data Policy.

20        MS. GITOMER:  Yes, Your Honor.  Plaintiffs are arguing

21   that the final agency action is a policy of disclosing data to

22   ICE, as Your Honor said, pursuant to 6103(i)(2).  That is --

23   and the DC courts have said, for example, in *Her Majesty, the*

24   *Queen, v. EPA* and Hispanic -- *HAP v. Acosta*, that where there

25   is evidence of an agency's actual process, an agency's policy

1    is reviewable.

2         In terms of finality --  I'm sorry, Your Honor.  Let

3    me start with the existence of the policy.

4         It is clear that the policy exists.  We know that

5    because prior to effectuation of the policy, the disclosures at

6    issue in this case were not permissible under law.

7         THE COURT:  What's the source of what you're calling

8    the Data Policy?  I mean, is it their actions or procedures, or

9    is it a combination of the documents?  What is it?

10        MS. GITOMER:  It is their actions and procedures.  It

11   is also -- though the IRS -- the Internal Revenue Code Manual

12   is not itself an agency action, it is -- the changes that they

13   have made are reflective of that change in policy and are

14   evidence of that change in policy.

15        I think taking -- and I think *Venetian Casino* is a

16   good analogy to that point.  In that case, the manual itself

17   was not legally binding, but the treatment of data with respect

18   to that manual was evidence that the policy existed.  In this

19   case, it is -- there is significant evidence the policy exists.

20        And I would point also Your Honor to *AFL-CIO v. Labor*

21   and *Alliance For Retired Americans* and a few of the other DOGE

22   data places where in each case, the government denied the

23   existence of a policy, but courts found that based on the

24   evidence, a policy granting access to data certainly existed.

25        In this case, you have an agreement that sets forth in

1    the MOU that these data transfers will be occurring.  You have

2    an implementation agreement.  You also have the changes to the

3    Internal Revenue Manual.

4         In addition, you have the actual disclosures of data

5    that would not have previously been possible.  Taken together,

6    that is a wealth of evidence that suggests that there has been

7    a policy change and that the policy exists, even if the

8    government has not explicitly presented and published the

9    policy.

10         The DC Circuit has made clear that it need not be a

11   written policy, because requiring a written policy in order to

12   capture an agency action could provide an incentive for a lack

13   of transparency or publication, which is not what the Court

14   would want to do.

15         THE COURT:  Moving over to the question that I had

16   about the final agency action, so are you claiming it's the MOU

17   alone or are there other additional conduct that you think

18   beyond the adoption of the MOU shows that there's a final

19   agency action?

20         I'm trying to figure out from your perspective.  I

21   want to make sure I understand fully what you view as the final

22   agency action.

23         MS. GITOMER:  Yes, Your Honor.  Under the APA, a rule

24   can be a final agency action.  A rule can be a statement or an

25   interpretation or an intention of policy.  The final agency

1    action is that the IRS has adopted a policy of consolidating

2    and sharing statutorily protected information of taxpayers with

3    the IRS.  Or said another way, the IRS has adopted a policy of

4    disclosing en mass and under 6103(i)(2) sensitive taxpayer data

5    to ICE.

6         THE COURT:  Is that a combination of the MOU and their

7    actions?  Is that what you're saying?

8         MS. GITOMER:  Yes.  I think the way I would

9    characterize it is that that is the policy that would be

10   defined under the APA as a final agency action.  The MOU, the

11   actual disclosure and the Internal Revenue Manual and the

12   implementation agreement are all evidence that the policy

13   exists.

14        THE COURT:  Okay.  Moving to adequate alternative

15   remedy.  The -- 704 of the APA provides for judicial review for

16   only those final agency actions, quote, "for which there is no

17   other adequate remedy in court."  And the defendants argue that

18   Section 6103 of IRS provides a comprehensive remedial scheme

19   for violations.  They note the availability of civil damages as

20   well as firing and criminal prosecution of federal employees

21   who violate it, and indicate that these provisions are adequate

22   remedies that preclude the relief that you're seeking.

23        So why are civil damages and criminal penalties for

24   violators not adequate alternative remedies in the case?

25        MS. GITOMER:  Your Honor, I think we start with the

strong presumption of reviewability that the APA provides.
Following that, I would point to numerous cases where the
privacy -- where courts have found that the Privacy Act's
similar provisions do not foreclose APA review.

The Internal Revenue Code has limited damages
provisions and criminal sanctions, which address discrete prior
instances of unlawful disclosures.  That doesn't provide an
adequate remedy to challenge the ongoing policy of future
disclosures.

In addition, the Center For Taxpayer Rights as an
organization has no ability to take -- to employ the use of
those criminal sanctions in order to challenge the unlawful
policy that plaintiffs are challenging today.  The APA's
broad -- strong presumption of reviewability would not
foreclose this type of claim.

And the cases that are cited by defendants are
primarily ones about improper -- they are out-of-circuit
criminal cases where the exclusionary rule is a sanction on the
government conduct, and there are direct remedies for that type
of behavior in the Internal Revenue Code.

Here, a better analogy is to look at the Privacy Act
with similar construction and treatment of data to determine
that, in fact, the remedy is not adequate.

THE COURT:  Okay.  Anything additional besides what
you have got about supporting your argument that the IRS code

1    doesn't implicitly preclude the kind of injunctive relief that

2    you're seeking here, which is one of the arguments they raise?

3    Anything to support that the idea that injunctive relief is not

4    precluded?

5            You have some argument there.  I just wanted to see if

6    there was anything else that you wanted to say.

7            MS. GITOMER:  I'm going to invite my colleague up.

8            THE COURT:  No problem.

9            MR. McGRATH:  Daniel McGrath for the plaintiffs.  Your

10   Honor, I think that was dealt with just very briefly in the

11   briefing.  But defendants gestured at some instances, such as

12   under the CSRA, the Civil Service Reform Act, where courts have

13   found that an extensive administrative scheme with legislative

14   history surrounding it that it intended to supplant existing

15   schemes of adjudication precluded review under the APA.

16           And here, we really have a very different situation

17   where there are individual damages provisions within the

18   Internal Revenue Code that would help provide retrospective

19   relief for individual instances of disclosure, but not an

20   extensive scheme of administrative adjudication like the one in

21   the cases that defendants provided that would indicate a desire

22   to supplant APA review.

23           And I think the DC Circuit has said in *Vilsack v.*

24   *Garcia* that the Court should look for clear and convincing

25   evidence that Congress intended to supplant APA review, and

1    that's not evident in the Internal Revenue Code.

2         I think as my colleague said, the Privacy Act -- the

3    case law surrounding the Privacy Act in *Doe v. Stephens* and in

4    *Radack* really concerns very similar damages provisions.  And in

5    those cases, the courts found that APA review was still

6    appropriate for policies of disclosure.

7         And I think the final point I would make is that in

8    that Privacy Act context, which we do think is analogous, the

9    Supreme Court observed in *Doe v. Chao* that the absence of

10    injunctive remedies within that scheme suggested that APA

11    review was intended to provide that avenue -- or that type of

12    remedy, and we think that's the case here as well.

13         THE COURT:  Okay.  Thank you.

14         MR. McGRATH:  Thank you, Your Honor.

15         THE COURT:  Let me get back to you.

16         Moving on to contrary to law.  You have indicated

17    should be enjoined under Section 705, 706 of APA contrary to

18    the requirements of the statute, and I understand your

19    arguments about Section 6103 and I don't really have anything.

20    I'll have some questions for the defendant.

21         But Section 6103(i)(2)(B)(i) requires that a

22    requesting agency provide the IRS with, as I said, the name,

23    address of the taxpayer with respect to whom the requested

24    return information relates.

25         Do you read the statute to require IRS to make an

1    independent determination about the validity of the name and
2    address provided by the requesting agency or not?

3              MS. GITOMER:  Madeline Gitomer for plaintiffs, Your
4    Honor.  I do.  6103 only permits disclosure -- 6103 protects
5    the confidentiality of taxpayer information and only permits
6    disclosures when the requirements of this provision, or
7    whichever provision is at issue, are met.

8              And the 6103 and IRS data, because it is so sensitive,
9    is a bit unique to how other statutory schemes might protect
10   data.  The IRS has a continued obligation as the data leaves
11   the IRS to be involved and secure its -- to ensure that that
12   data is further protected.

13             So, for example, the IRS has reporting requirements to
14   the Joint Committee on Taxation for all the disclosures of that
15   data.  If you look at Publication 1075, that requires the IRS
16   to stay involved to protect the privacy and security of that
17   information.

18             To your specific question about whether specific
19   verification is needed, the answer is yes.  What defendants
20   have stated is that the only verification conducted is to
21   ensure that a spreadsheet is filled out.

22             That is contrasted by what has been the practice of
23   the IRS in order to sufficiently ensure that they are
24   protecting data under 6103 and to ensure that the requirements
25   are met, which is the IRS's obligation, not ICE.

 1          Regardless of what the MOU says, the obligation under

 2    6103(i)(2) is to ensure that data is only provided and

 3    disclosed under these circumstances.  And so the idea that

 4    because a cell on a spreadsheet is populated, that cannot be

 5    the best reading of the rule -- of the law that Congress

 6    intended given these very specific requirements that just some

 7    information be provided.

 8          Instead, a better reading, and perhaps the best

 9    reading, of the statute is the way the IRS has treated it for

10    decades, which is that each individual request is assessed

11    individually.  It is discussed with the requester to ensure

12    that the information is relevant and necessary and that less

13    information wouldn't be appropriate or possible to disclose.

14          6103 is a statute designed to protect the statutory

15    rights of taxpayers because Congress understood that this was

16    the most sensitive type of information being disclosed to the

17    government, and IRS employees have a responsibility to carry

18    that out in every single requirement set forth.  It is not

19    enough, and the MOU cannot override that, by simply stating

20    that if ICE represents it, it will do so.

21          And I would look to 6103(p), which -- (p)(4) which

22    puts in safeguards, and the Publication 1075, which demonstrate

23    that the IRS must have continued involvement to ensure that

24    disclosures are, in fact, permissible under the statute.

25          THE COURT:  Okay.  Arbitrary and capricious.  You

1    argue that I should enjoin the practice of sharing data with

2    ICE at the scale that we're talking about because the practice

3    reflects an arbitrary and capricious change in agency policy.

4        What's your best argument that the data sharing

5    practices that have been presented here today are unreasonable

6    and therefore arbitrary and capricious?

7        MS. GITOMER:  There are three main reasons why they

8    are unreasonable.  Significantly, this is a policy change that

9    very seriously implicates the rights of taxpayers.

10   Administrations, for decades, and Congress have promised

11   taxpayers, including the first Trump administration, that data

12   would not be sent to ICE for immigration purposes.

13       And what we have here is a reversal of that promise in

14   ways that affect the taxpayers' rights.  Any change in policy

15   like that is one that must be both acknowledged and explained

16   to the taxpayer.  Instead, it has -- the defendants deny the

17   existence of it and have provided no good justification for it.

18       Relatedly, they have -- in not providing such a

19   justification, they have failed to consider key issues like the

20   need to protect taxpayer privacy, which is something that

21   Congress has repeatedly discussed and considered in both

22   enacting 6103 and amending it on several occasions or

23   considering to amend it in other instances.

24       Taxpayer privacy is critical because it promotes and

25   encourages participation and trust in the tax system, which is

1    critical for our country's ability to collect revenue and

2    confer benefits on people for whom they are legally entitled.

3    And there is no evidence they considered this.

4        Finally, they haven't considered this significant

5    reliance interest of people who have participated in the tax

6    system, many of them providing the tax system with revenue and

7    not receiving benefits in return because they either -- because

8    they are -- they want to contribute to the country that has

9    given them so much.  And they also want to show good behavior,

10   perhaps to put them on a path to citizenship.  And that has --

11   that is something that USCIS considers.  It's something

12   Congress has talked about in some of its legislative proposals.

13   None of that was considered in the significant changes that the

14   administration -- that the government has made.

15       I would also note that while the Internal Revenue

16   Manual is not legally binding, it also shows that there has

17   been an effort to not justify the changes that have been made

18   in this policy.  So, for example, key sections of the Internal

19   Revenue Manual that reflect how this process has been carried

20   out in the past have been removed, and they have stated that

21   that information is simply contained in another section of the

22   Internal Revenue Manual.  Our review of that indicates that

23   that is not the case.

24       The explanations that they are providing are not

25   acknowledging the changes that have been made, and that is, on

1    its face, arbitrary and capricious.

2           THE COURT:  Okay.  I have some questions for that for

3    the defendant.

4           All right.  Moving closer to the end here for you.

5    Irreparable harm beyond remediation, et cetera.

6           So if the record shows that there are currently, as

7    they have indicated, no pending requests from ICE to the IRS

8    for taxpayer address information under the MOU, why should I

9    hold that the potential future harms are more than theoretical?

10          You've touched on it in various ways, but if you could

11   do it in summary, succinct form, I would appreciate it.

12          MS. GITOMER:  I will start with the Center.  The

13   Center is organizationally irreparably harmed because its

14   ability to provide services is perceptibly impaired by the

15   policy itself.  The policy has already begun to be implemented,

16   but given that we have a final policy that has already begun to

17   be implemented, that itself, is already causing the imminent

18   harm to the Center's ability to counsel its clients and to

19   provide its services and outreach.

20          So, for example, when the Center counsels a client, it

21   is -- the Center previously could counsel the client that 6103

22   provided certain protections under the law and counsel the

23   client as to what their legal obligations were to file taxes.

24          Now, even without a pending request, the policy has

25   changed, and the ability for them to effectively advise their

1    client -- their hands are tied.

2            This is also time-bound because many of the benefits

3    or filing deadlines for these clients are coming up.  So, for

4    example, the filing deadline to file our taxes, as you know,

5    Your Honor, is April 15th.  The upcoming deadline is

6    October 15th for anyone who received an extension.  In these

7    cases where decisions have to be made, once these opportunities

8    are lost, they are lost forever.

9            For example, during the pandemic, the child tax credit

10   was offered to children of individuals who may not have a

11   Social Security number.  For individuals who could have claimed

12   that benefit in 2021, this tax year is the last year that they

13   are able to retroactively claim that benefit.

14           So these are time-bound questions for these clients

15   and this is -- they cannot be addressed prior to a certain

16   deadline by the Court.  Certain disputes must be raised within

17   30 or 90 days before the IRS and before a court in order to

18   adjudicate for those rights.

19           But more specifically, the Center is unable to hold --

20   to counsel its clients and hold the events in the way it used

21   to.  Last year, the Center had 14 new ESL taxpayer clients.

22   This year, it is only one.  That is a perceptible impairment of

23   their ability to conduct outreach and to counsel their clients

24   in ways that conflict with their mission.

25           And so what we're talking about here, you know,

1    defendants argued in their brief that you would suspect that

2    maybe the Center would get more questions if they --

3    more questions from immigrant taxpayers in light of the policy,

4    that -- the policy changes that they have denied exist.

5            Instead, what we have seen is a severe drop-off.  The

6    LITC member network has said that phone calls from immigrant

7    and Hispanic taxpayers has almost stopped completely.  Folks

8    are scared to interact with the tax system, immigrants in

9    particular, and that directly impairs and significantly impairs

10   the Center's ability to provide its services to its clients and

11   to the community.

12           THE COURT:  Okay.  Are you familiar with the *Alliance*

13   *For Retired Americans versus Bessent* --

14           MS. GITOMER:  Yes, Your Honor.

15           THE COURT:  -- which is one of the cases that I have?

16           How would you distinguish my decision in that case on

17   the issue of harm?  What makes the harm or the interest of the

18   plaintiff members irreparable in this case when the harm to the

19   associational plaintiffs in *Alliance* was not, I found,

20   irreparable?  What would you consider --

21           MS. GITOMER:  Yes, Your Honor.  Sorry, one moment.

22           THE COURT:  Sure.

23       (Pause)

24           THE COURT:  I have my own views about this, but I want

25   to hear yours.

1          MS. GITOMER:  Yes, Your Honor.  Two points.  First, I

2     would note the existence of an organizational plaintiff here

3     who is asserting their organizational harms.

4          But with respect to the associational plaintiffs, in

5     that case, the Court found that, though there had been a

6     disclosure from the individual to the agency, so the

7     information was already out of the individual's hand, that

8     exists here as well, I believe that the Court found that an

9     imminent, impermissible misuse or disclosure of that data was

10     not imminent.

11          Here, that secondary impermissible use or disclosure

12     is imminent, and we know that because the White House and the

13     defendants have stated that their goal -- and they have removed

14     folks who have been opposed to this goal -- their goal is to

15     identify the addresses for 7.3 million immigrants in order to

16     use their address information for deportation purposes.

17          And so in *Alliance For Retired Americans*, there was

18     evidence of access, but no evidence of misuse.  Here, there is

19     significant existing evidence of misuse of the data.  I would

20     point to the 45 -- I'm sorry, 47,000 individuals whose data has

21     already been subsequently misused and placed -- disclosed not

22     solely to -- I mean, I think I'll go back to the language of

23     (i)(2), which requires "disclosure only solely to an

24     individual," as Your Honor mentioned, "personally and directly

25     engaged solely for the preparation of that criminal

1    investigation."

2        The way defendants read that part of the statute to

3    allow further disclosure within ICE, if they make an

4    attestation that such use is necessary, is not -- does not

5    comport with what 6103 requires.  The disclosure under (i)(2)

6    can only be solely for that use.  Because they have already

7    disclosed that information more broadly than to that one person

8    who was responsible for 47 individual criminal investigations

9    leading to 47,000 criminal proceedings, because they have

10   already disclosed that data further, and because that's now in

11   the A file over at ICE, which has broad access, there is

12   already evidence of significant misuse and further disclosure.

13   That distinguishes this case from *Alliance for Americans*.

14        THE COURT:  Okay.  Now, one last question on this harm

15   issue.  If I conclude that you have shown the likelihood of

16   irreparable damage to the Center's organizational interest but

17   not to the interests of any of the other plaintiff members, how

18   would that affect the remedy that I should order?

19        MS. GITOMER:  In the DC Circuit, the traditional

20   remedy for an unlawful agency action is to vacate that agency

21   action.  At the preliminary stage, that would be under 705, a

22   stay of that action.  So I would -- I think under DC Circuit

23   precedent, that would be the appropriate remedy.

24        In addition, because the Center is -- serves clients

25   and also serves a member network of LITCs nationwide, it is --

1    their mission impacts and their ability to support that network

2    is nationwide, and, therefore, relief, if Your Honor decided to

3    go the injunctive route, which I think is not what the DC

4    Circuit precedent would suggest is the best action under

5    precedent where an APA -- where a challenge is brought under

6    the APA, an injunctive relief, I think, would necessarily need

7    to be nationwide or quite broad in order to protect individuals

8    to whom the Center serves.

9         THE COURT:  So let me get into sort of the remedy.  If

10   I conclude that you are likely to succeed in showing that some

11   or all of the data sharing from IRS to ICE on August 7th was

12   reviewable final agency action that was arbitrary and

13   capricious or contrary to law or whatever finding, but that

14   some future sharing of IRS data with DHS and its components

15   could be lawful, what would be an appropriate prospective

16   remedy?

17        MS. GITOMER:  Your Honor, plaintiffs are not taking

18   the position that any prospective disclosures from the IRS to

19   ICE would necessarily be prohibited by law.  What plaintiffs

20   are requesting is a return to the status quo before this policy

21   was effectuated and these disclosures occurred.

22        And so we would ask for -- and, Your Honor, we would

23   be happy to provide an amended proposed order if that would be

24   helpful as soon as possible, but we would propose that this

25   order stay any disclosure that does not comply with the law as

1  it was interpreted and effectuated by the IRS prior to the Data

2  Policy.

3          So, for example, it would stay all disclosures that

4  would not be further disclosed beyond the individual personally

5  and directly engaged in the criminal proceeding as listed and

6  represented to the IRS.  It would stay any disclosures of

7  address only information or where it is -- where there is

8  indicia that the request is for purposes of locating the

9  individual, or, for example, it shall not disclose information

10 to ICE where defendants know or should know that ICE intends to

11 use the information for civil immigration purposes.

12         So I think the goal would be a tailored order that

13 returns the types of disclosures -- the disclosures permissible

14 under (2) to what was the status quo before this action was

15 challenged.  That would permit, for example, individualized

16 disclosures to law enforcement officers as was permitted prior.

17 That would include, for example, a discussion between the

18 requesting officer at DOJ or ICE and the IRS officer or a case

19 worker responsible for evaluating that disclosure.

20         There's a pretty involved process that was part of

21 this in order to ensure that taxpayer information was

22 appropriately statutorily protected.  And we would ask to

23 return to that status quo that was violated by the unlawful and

24 arbitrary and capricious acts.

25         THE COURT:  What's the framework for it?  Wouldn't it

1 still have to be injunctive relief, basically putting it back

2 to where it was while the case proceeds?

3       MS. GITOMER:  I think 705 would allow for a stay of

4 the policy, and Your Honor could detail --

5       THE COURT:  You're discussing it in the context of a

6 stay then.  I'm trying to figure out -- so a stay, which would,

7 according to you, put it back to their policies beforehand;

8 would that be accurate?

9       MS. GITOMER:  Yes.  While I don't have the case on

10 hand, there is case law that states that a stay can apply to

11 conduct that has already begun.

12       THE COURT:  Okay.  So let me just move to this last

13 question for you.  In terms of what about all of the data

14 that's already been shared with ICE?  ICE is not a party to

15 this, so anything you're proposing for that, for what's already

16 done?

17       MS. GITOMER:  Yes, Your Honor.  We understand that the

18 Court cannot tie the hands of ICE, a nonparty.  But because of

19 the sensitivity of this data, Congress has required and IRS

20 policy implements an ongoing role for the IRS in the protection

21 of this data to ensure it's stored and used appropriately.

22       I would point to 6103(p), which provides for a lot of

23 safeguards and reporting and audit powers for the IRS to ensure

24 that it is appropriately safeguarded.  There is also

25 Publication 1075, which, for example, states that federal tax

1    information should not be commingled with other agency

2    information at the recipient agency, and if it is, every single

3    piece of information in that database should be treated as

4    federal tax information.

5        This is all to say that Congress contemplated a heavy

6    level of involvement by the IRS in the protection of this data

7    on an ongoing basis.  And so we think that the IRS -- that it

8    would be appropriate for Your Honor to order the defendants to

9    inform ICE that any disclosures of address information under

10   the Data Policy by the IRS to ICE under 6103(i)(2) have been

11   deemed unlawful and thus the IRS shall inform ICE that the

12   information must be destroyed or returned.

13       The IRS has the authority to restrict access and use

14   of returned information under 6103(p).  And I think that Your

15   Honor could require that the IRS, because it can restrict that

16   use of information, I think it would -- and because the MOU and

17   6103 require that after the IRS -- after ICE complete --

18   complete use of the information for its authorized purposes, it

19   must return or destroy the information, we think that it would

20   be appropriate for Your Honor to direct the IRS to direct ICE

21   to return or destroy the information and then for the IRS to

22   submit a report to the Court sharing that such actions have

23   been taken.

24       THE COURT:  Okay.  Let me -- it's ten until 3:00.  I'm

25   just asking the court reporter whether she needed a break.

1    She's indicated no.  But if everybody else would like a break,

2    I can take one now before we move to the defendant.  Don't be

3    shy in speaking up if you need a break.

4            Okay.  Looks like not.  So let's proceed with the

5    defendants.

6            Let me move to you for a couple of questions.

7            You have raised a number of reasons why the plaintiffs

8    are unlikely to succeed on the merits.  I understand your

9    standing arguments, which are well and persuasively briefed.

10   So I want to focus on your arguments under the APA and the

11   Internal Revenue Code.  Some of these, I'm not getting into.

12   I'm just explaining why I don't need to hear them anymore.

13           Final agency action is focused on the ultimate sharing

14   of taxpayer information beyond any agency in the federal

15   government, but this case actually talks about IRS entering an

16   agreement with another federal one, and also you can't really

17   undo the sharing that's already been done with ICE.

18           So it seems to me that the plaintiffs have a strong

19   argument that the data sharing they challenge here is the

20   consummation of the IRS's decision-making process and not

21   merely what you have claimed is tentative or interlocutory and

22   is the decision by which rights or obligations have been

23   determined or from which legal consequences would flow, so

24   that's why I'm getting into the final agency action.

25           With all of that in mind, how is the act of sharing

1    information outside the IRS not a final agency action of the

2    IRS, particularly the one that has provided the information?

3            MR. HUMPHREYS:  We disagree, Your Honor.  We think

4    it's not final agency action for the reasons stated in our

5    brief.  I mean, in some sense, I guess it is consummated.  But

6    no legal consequences flow and therefore plaintiffs

7    challenge --

8            THE COURT:  No legal consequences to whom?

9            MR. HUMPHREYS:  Well, to anyone.  Let me start.  There

10   is a fundamental mismatch in plaintiffs' motion for a

11   preliminary injunction and the allegations in their complaint.

12   The allegations in their complaint are focused on a Data Policy

13   that's creating some alleged API and the broad policy to change

14   data sharing practices with a lot of different agencies, as I

15   heard plaintiffs' counsel here today, and now they are squarely

16   focussed on whether or not there is a Data Policy, but only

17   with respect --

18           THE COURT:  Well, they have called it a Data Policy,

19   but she explained what it was.  She explained that it was the

20   MOU, the implementing and what's been done, changes that have

21   been made in the manual.  You disagree with what the changes

22   are?

23           MR. HUMPHREYS:  My first point is I don't think that

24   matches up in any concrete way with what's in the amended

25   complaint.

1          But putting that aside, there is no policy of final

2    agency action, no quote/unquote, "Data Policy," because what

3    IRS is doing is doing what is required under the statute

4    itself, interpreting the statute and providing the information

5    that --

6          THE COURT:  It's only required if all of what the

7    statute and the implementing regulation, not the MOU

8    necessarily, because what controls really is the statute.  If

9    all of the things, the preconditions, I'll call them, before

10   data is shared have been met, then you can, I think, make an

11   argument that it's all been met and therefore would comply in

12   terms of a request if it complied with all of this in terms of

13   providing -- going ahead and say it's sharing the data.

14         They have argued that what has been done, which you

15   claim it meets all of those preconditions, I have some question

16   about that, but meets all of these preconditions and therefore

17   they are required to provide it.  They are really only -- if

18   they follow through with what they are obliged to do under the

19   statute and all of these preconditions are met, then I would

20   agree that they then have the authority to provide this

21   information, assuming everything has been met.

22         They have argued about a number of things that have

23   not been met, which I think at least is certainly an argument

24   to be made that certain things would not have been -- you could

25   argue correctly that there are -- some of the actions don't

1    meet the preconditions.

2          And the MOU that talks about, well, we'll give the

3    information, we'll share it at a later point, it doesn't have

4    to be the initial people that receive it as required by

5    personally and directly.  Just because the MOU has some

6    language in there, although they still quote from the statute,

7    the statute is what really controls.

8          So the requirement, I would agree, they are authorized

9    to do it as long as all of the preconditions are met in terms

10   of IRS and the requesting, which in this case is ICE.  From

11   that perspective, I think it's correct.

12         But they have an MOU.  You have got the implementing,

13   and you have this interesting change in the manual, which I

14   fully agree is not binding but certainly provides some

15   guidance.  That's why federal government agencies have these

16   implementing -- and/or manuals that give guidance to the

17   employees in terms of implementing what their regulations and

18   what their responsibilities are.

19         So you are going to have to give me more of a

20   requirement in terms of they just did what they were required,

21   quote, "to do," that they met the preconditions and therefore

22   somehow this is not a final agency action on their part.

23         MR. HUMPHREYS:  I suppose, Your Honor, they merge

24   together.  I mean, IRS's position reading the statute, is that

25   what -- the data requests it received, that it was required to

1    fulfill them under the statute, that ICE, in fact, did meet the

2    requirements and the purpose of the MOU is to make sure that

3    all the boxes are checked for 6103(i)(2) and that ICE is aware

4    of its own statutory responsibilities when it gets the

5    information.

6          And so it is not a change in -- there is no final

7    agency action --

8          THE COURT:  Isn't it a final agency action as a

9    practical matter in terms of, even if you take your argument

10   that they followed all of the preconditions and did everything

11   and they implemented the MOU, so they've made a final agency

12   action, that they are required to provide it?  Isn't that a

13   final agency action?  What's left?

14         MR. HUMPHREYS:  I don't think so under *Bennett v.*

15   *Spear* because there's no policy change from which legal

16   consequences flow.  Legal consequences flow from the statute

17   itself.

18         THE COURT:  You would admit that there was a change in

19   the manual?

20         MR. HUMPHREYS:  Yes.  But, I mean, plaintiffs I think

21   acknowledge that that cannot be final agency action.  They did

22   this morning -- or this afternoon.

23         THE COURT:  I'm just saying you indicated as if they

24   have been doing the same thing all the way across, they have

25   obviously made some change.  But what would you consider a

1   final agency action into these circumstances where you have got

2   a statute that sets out under what circumstances IRS can

3   provide information, so what would be a final agency action

4   from your perspective?

5          Here, they have set it out, they have got the statute,

6   they have the two, the implementing, the MOU, et cetera, and

7   they have actually provided the information, and it's a

8   completed sharing of the information, as you have described it.

9          Why is that not a final agency action on their part?

10  What would be one that you would accept as a final one?

11         MR. HUMPHREYS:  If there were a regulation, for

12  instance, Your Honor, that imposed some requirement on

13  requesters.

14         THE COURT:  But there isn't.  At this point, there is

15  the statute, there is regulations, there is the MOU and the

16  implementing, but there are regulations in addition to the

17  statute, and it's actually been implemented, according to IRS,

18  in terms of the data sharing that they provided with ICE.

19         So why does that not show this is the statute, this is

20  the regulation, and we have followed them and have provided

21  this information, it's a completed transaction on our part and

22  we would continue, according to you, to follow it for any

23  future requests that would be made, say, by ICE or DHS.

24         MR. HUMPHREYS:  Again, Your Honor, because there are

25  no separate legal consequences under the second prong of

1   *Bennett v. Spear* that flow from the MOU or the sharing of data.

2   It is merely a -- it is an extension of the statutory

3   requirement itself for IRS to share that information with law

4   enforcement agencies when the boxes are checked under the

5   statute.

6           THE COURT:  Let me move on to something else.

7           You have argued that the civil damages under Section

8   7431 of the IRS code as well as Section 7712(A), which is the

9   one about the firing, criminal prosecution of federal employees

10  who violate 6103, provide an adequate alternative remedy that

11  precludes the relief that the plaintiffs are seeking.

12          Why should I hold that civil damages and criminal

13  penalties for past violations redress the potential future

14  harms that plaintiffs are alleging in this particular case?

15          MR. HUMPHREYS:  I think that defendants and plaintiffs

16  agree that if you look at what Congress intended -- we have a

17  disagreement as to which way that comes out, but here compared

18  to the Privacy Act, for instance, the statutory scheme of the

19  Internal Revenue Code is much more complex and provides for

20  other additional types of relief that are not present in the

21  Privacy Act.

22          THE COURT:  Let me make it more specific in terms of

23  the Center For Taxpayer Rights that -- how would you redress

24  what they claim is their harm in terms of their organizational

25  mission, activities, the services they are providing and the

1    funding -- federal funding that's geared towards actually

2    carrying out these responsibilities, which they claim are being

3    affected based on the decision that has been made in this

4    particular instance?

5         How would you say that these available remedies in

6    some way redress that?  Because that's obviously not the same

7    thing.

8         MR. HUMPHREYS:  I would start, Your Honor, by saying

9    those are not injuries that can serve as a basis for

10   jurisdiction of this Court, and they don't have standing to

11   bring them.  They are not in fact injured and therefore do not

12   need redress.

13        THE COURT:  You're ducking my question, though.  Let's

14   assume that I found that they have been damaged -- irreparably

15   damaged for doing it.  The remedies that you have set out

16   aren't going to work for them; would you agree with that?

17        MR. HUMPHREYS:  I would agree that the Internal

18   Revenue Code does not provide a specific remedy for that

19   organization.  I mean, I think that Congress, through its very

20   complicated scheme, demonstrated that it intended the remedies

21   provided to be the only ones available for courts and they are

22   not just civil damages.  They are injunctive relief in limited

23   circumstances, and they are criminal penalties against

24   individuals who violate the statute.

25        I think the statute as a whole is incredibly complex

1   and shows that Congress intended for the Internal Revenue Code

2   to be -- the remedies provided in that statute to be the

3   exclusive ones.

4           THE COURT:  I will agree with you that it's very

5   complex.

6           MR. HUMPHREYS:  Thank you, Your Honor.

7           THE COURT:  Let me move to --

8           MR. HUMPHREYS:  Can I make -- I do want to address the

9   *Doe v. Chao* and *Doe v. Stephens* point.  I mean, that is dicta

10  as to the Privacy Act only.

11          THE COURT:  I'll let you go ahead.  You can respond

12  now.  I was going to have you do at the end, but that's okay.

13          MR. HUMPHREYS:  The Fourth Circuit decision in

14  *American Federation of Teachers* recently published addressed

15  that issue.  Even as to the Privacy Act, we think the arguments

16  for why there is an adequate alternative remedy as to the

17  Internal Revenue Code are even stronger for the reasons we

18  discussed.

19          THE COURT:  Contrary to law kind of questions about

20  the MOU.  And this is -- establishes this general rule that a

21  taxpayer return and return information should be confidential.

22  And Section 6103(i)(2) provision on which the IRS and ICE have

23  an agreement to share the taxpayer provides an exception to

24  that general rule allowing the disclosure of return information

25  as opposed to taxpayer return information, which is a

1    distinction, which is a separate category for use in criminal

2    investigation.  So we have that already.

3         But the MOU notes that certain details and procedures

4    will be included in a separate implementation agreement.  Let

5    me move to that.  I did get a copy of that.

6         So plaintiffs raise concerns about the implementation

7    agreement in terms of the centralized structure that

8    establishes for housing information within DHS, which includes

9    not only data from IRS, but also information provided and

10   obtained from other sources.

11        So it sounds like this information from IRS is going

12   to be commingled with information, I assume, from other federal

13   agencies.  How is that keeping this information confidential?

14        MR. HUMPHREYS:  That's not correct, Your Honor.

15        THE COURT:  What's not correct?

16        MR. HUMPHREYS:  It is not correct, as plaintiffs do,

17   to assume that because information is in the same system of

18   records that everyone has access to it.

19        THE COURT:  I thought the implementation agreement

20   seemed to suggest it was in a database and they had collected

21   other information as well.  So you're telling me that the IRS

22   information that they received is in a separate database?

23        MR. HUMPHREYS:  I mean, ICE is not my client, Your

24   Honor.  I will say that just because a system -- it is

25   contained in a system of records does not mean that it cannot

1    be walled off with confidentiality within that system of

2    records.

3         THE COURT:  What I'm doing is looking at the

4    implementation agreement, which the implementation agreement

5    seems to suggest that there is some sort of centralized

6    structure.  Granted, ICE is not here and you're not their

7    client, but even from DHS's perspective, I would assume they

8    have some interest in knowing what happens to the confidential

9    information they provide.

10        MR. HUMPHREYS:  I don't think it shows that at all,

11   Your Honor.  The system of record is specified -- and that's a

12   Privacy Act term of art.  You're very familiar with the Privacy

13   Act, I know, and so the implementation agreement specifies the

14   system of records.  However, if you look at the MOU itself, it

15   does require that this information be walled off.

16        THE COURT:  And that's where?  I have it out.

17        MR. HUMPHREYS:  That is at MOU Section 9(a).

18        THE COURT:  Hang on a second.

19     (Pause)

20        THE COURT:  So this is under (a), the additional -- I

21   guess it's -- in terms of the safeguards, this is what you're

22   relying on?

23        MR. HUMPHREYS:  The individual safeguards.  So even

24   though the information may be in a system of records to which

25   other employees have access, within that system of records, MOU

1    Section 9(a) provides a whole host of ways in which that

2    information must be restricted.

3            For example, in 4, ICE will restrict access to federal

4    tax returns and return information solely to officers --

5            THE COURT:  You need to slow down a little bit.

6            MR. HUMPHREYS:  I apologize, Your Honor.  In

7    paragraph 4, "ICE will restrict access to federal tax return

8    and return information solely to officers and employees of ICE

9    as described in this MOU for the purposes of carrying out this

10   MOU.

11           "Prior to access, ICE must evaluate which employees

12   require access," and part of those requirements for access are

13   that they be personally and directly involved in criminal

14   prosecution or criminal investigation.

15           THE COURT:  So from your perspective, there is a

16   centralized database which seems to be in the implementation,

17   and then you would look to the MOU to indicate what is supposed

18   to happen with the material that ICE received; is that the

19   argument?

20           MR. HUMPHREYS:  Yes.  And those sort of walling off

21   within systems of records are common.  I mean, systems of

22   records are incredibly broad.  And as a technical matter, I

23   mean, ICE is required under this agreement to provide checks to

24   make sure that people, even if they have other access to the

25   system of records, don't get access to this particular

1    information, Your Honor.

2           THE COURT:  All right.  Okay.  Let me move to, in the

3    declaration of John Walker, it says that IRS received a letter,

4    but doesn't say who received the letter from ICE and they

5    indicate who at ICE sent it, which is the acting director,

6    Todd M. Lyons, making this request for June 27th.

7           But who is it at IRS received the request, do you

8    know?

9           MR. HUMPHREYS:  I don't know the specific person

10   responsible.

11          THE COURT:  Or what position they had?

12          MR. HUMPHREYS:  Not at this moment, Your Honor.

13          THE COURT:  So there is two that at some point you're

14   going to get me the person or their request in terms of who it

15   is that it was the material that was sent -- that ICE indicated

16   was the requester in terms of personally and directly involved

17   with it, and if you could give me who it is at IRS received it

18   and presumably was involved in making the decision as to how

19   they were going to proceed.

20          MR. HUMPHREYS:  And maybe provide only the titles of

21   those people.

22          THE COURT:  Yes.  The title is more important,

23   frankly, than who they are in terms of what position they would

24   have been in.

25          Okay.  So moving along here and getting back to the

1    issue about the -- disclosing the return information to

2    officers, employees, personally directed, et cetera, solely for

3    the use of those in preparation, investigation of grand jury

4    proceedings, which are pretty specific.

5          So how did -- how does IRS define the phrase

6    "personally and directly engaged" within the context of the

7    statute, because it sounds as if you -- I mean, is there

8    something that provided some guidance?  I think the

9    expectation -- and it would appear that the past procedures

10   have been that there have been individualized investigations,

11   so you had very specific attorneys or other investigators

12   involved in a criminal investigation, so you would be able to

13   identify them that way in terms of requesting it and the

14   information would help them in their investigation.

15         Here, as I understand it, there was just one person

16   requesting it who clearly was not the one who investigated

17   everything in the 47,000 people.  And your view of it is, well,

18   they then passed it on to other people, if I understood you

19   correctly, within ICE who might have something to do with the

20   investigations.

21         So is there some other thing that documents or

22   something else that you can indicate how they would have

23   defined it, because those are two totally different ways of

24   doing it.

25         MR. HUMPHREYS:  I do not know that ICE passed it along

1    to anyone else who was personally and directly involved.  What

2    was received by IRS from ICE was an attestation from its sister

3    agency that this person is personally involved in the

4    investigation for the data requests, the one person.

5         THE COURT:  And so they accept it at face value that

6    this one individual was involved in the removal proceedings of,

7    since that's what it relates to, 47,000 people?

8         MR. HUMPHREYS:  I don't think it has anything to do

9    with the removal proceedings, Your Honor.  This is --

10        THE COURT:  The point is isn't the criminal conduct

11   that's at issue that the defendants are relying on is the fact

12   that they overstayed the order that's out there about their

13   removal, so it does relate to the criminal investigation or

14   criminal conduct is remaining beyond the removal.

15        So the investigation, I'm assuming, has to do with the

16   removal and what happens if you violate the removal.  Is there

17   something else?

18        MR. HUMPHREYS:  Yes, it's a separate criminal

19   proceeding.

20        THE COURT:  What is it, though?  Isn't it something

21   relating to the removal?  I mean, I think the problem with

22   what's been set up is that ordinarily you would have a very

23   specific investigation, tax cheats or some other kinds of

24   things where they would be investigating a very specific thing,

25   they talk about grand jury proceedings, et cetera.  So you

1    would have a very specific -- with specific people

2    investigating it asking for this particular information.  And I

3    have a couple of cases that would certainly support that in

4    terms of their asking for it.

5            Here, the criminal conduct, as I understand it, the

6    lynchpin to the criminal conduct is they remained beyond the

7    orders for removal.  So I'm assuming that's the criminal

8    investigation, unless you can say something else.

9            So if the criminal investigation, they have one person

10   they have indicated is involved in -- and we don't know since

11   we don't have the request.  It would be helpful at some point

12   to actually get the request.

13           One person they attest to is involved in the criminal

14   investigation of 47,000 people, I'm assuming, related to

15   removal since that's the criminal conduct.

16           MR. HUMPHREYS:  The removal is established.  The

17   person who is investigating the criminal conduct does not need

18   to be involved in the removal proceedings.  He or she --

19           THE COURT:  So that's what I'm asking:  What's the

20   investigation?  It's staying beyond the period for the removal.

21           MR. HUMPHREYS:  As Judge Friedrich sort of explained

22   in *Centro*, if someone had stayed beyond 90 days and you knew

23   the removal date, and then you knew they were here after

24   90 days --

25           THE COURT:  So let me put it in the way you have it.

1    They have attested that one individual is involved in the

2    investigation of 47,000 people personally and directly as to

3    their remaining beyond the date of the court-ordered removal.

4    So, in other words, this person -- the IRS accepted that one

5    person would have been involved in this investigation of

6    finding out that they are beyond -- they are beyond the date of

7    the removal, so you have to know the removal date.  You would

8    also have to know that they are still here.

9         And one person, IRS accepted as, yes, one person was

10   involved in 47,000 cases of knowing personally and directly and

11   solely for this investigation was doing this.

12        MR. HUMPHREYS:  IRS relied on the representation, the

13   attestation of ICE.  And I think that that is plausible on its

14   face given, again, it's a calculation of days.  So if you know

15   the removal date and you know the person is still --

16        THE COURT:  So how would you -- if the manual -- in

17   terms of how the manual would discuss in terms of how you're

18   going to be doing this, personally and directly engaged, since

19   I think generally speaking you would expect it to be individual

20   people doing an individual investigation, not one doing it for

21   47,000 people.

22        So is there anything that is out there that would

23   actually set out the definition of how that's to be

24   implemented?  Because the expectation would certainly be that

25   it would be those more intimately, directly and personally

1    involved in the investigation of deciding that they overstayed

2    their removal order.

3            It seems somewhat implausible that you have one person

4    that actually was involved in the investigation, not just that

5    they know, but actually involved in the investigation of 47,000

6    people.

7            MR. HUMPHREYS:  I mean, again --

8            THE COURT:  I know you're left with what you have.

9    I'm trying to figure out how this would be for future cases in

10   terms of whether somebody could file an attestation.

11           The question is:  They assumed the attestation was not

12   for 47,000 people, but was for 1 million, whatever, because

13   they made the request for the 1 million names and what was

14   provided was for 47,000.

15           So you have one person who is attesting that they were

16   personally and directly involved in this investigation of

17   1 million-some -- whatever, 1.3 or 1.8, I forget which, and

18   that is viewed by IRS as a reasonable interpretation of

19   "personally and directly".

20           MR. HUMPHREYS:  In large part, IRS needs to rely on --

21   IRS cannot impose additional requirements beyond what's in the

22   statute.

23           THE COURT:  But they interpret it.  They interpret,

24   obviously, what personally and directly engaged in.

25           MR. HUMPHREYS:  Yes, Your Honor.  And, again, my point

1    is given the simplicity of the criminal statute in determining

2    whether there is a violation that this can be done or could be,

3    again, it is plausible for ICE to request that because it can

4    be done at a data level, at a large level.

5         You can see when the removal order was and when --

6    what today's date is, and, if it's more than 90 days, that is

7    an investigation.

8         THE COURT:  They have to have information that the

9    person is still around, right?  You can certainly look up in a

10   computer program and say, well, yes, potentially this is --

11   there's a date that they are supposed to be removed by X date.

12   Then the question would be how do you know what investigation

13   have they conducted about the rest of it as to when the -- why

14   they are still here or how they would actually know that they

15   were still here and not out and they hadn't self-deported or

16   something else.  That portion, it's not clear to me how you

17   would do sort of an investigation of it.

18        MR. HUMPHREYS:  The statute doesn't say that this

19   person has to be involved in all aspects of the investigation.

20   This could be in preparation for one part of it, which is

21   determining who has exceeded the 90-day statutory limit.

22        THE COURT:  I'm not going to beat a horse to death

23   here.  As I understand it, the language makes a distinction

24   between agency personnel can make the request, which is

25   expected agency leaders would be making the request in terms

1    of -- and then there would be -- the data is to be received by

2    those that are actually, as I said, personally involved.

3            So let me move on.

4            MR. HUMPHREYS:  May I identify a nuance, Your Honor?

5            THE COURT:  Sure.

6            MR. HUMPHREYS:  It is true that the person receiving

7    the information under the MOU has to be personally and directly

8    involved, but there are sort of, like, technical people who can

9    also be involved, like mailroom carriers, the people who

10   handled the data file, the MOU provides for that.

11           THE COURT:  The MOU is not -- you still have the

12   statute, okay, and the regulation.  And the statute doesn't

13   make these additional little changes to it.  You could point

14   out that that's the way you could view it as a further sharing,

15   but they don't identify -- they never identify to IRS who else

16   was going to be shared -- have this information.  They have one

17   person asking presumably -- I don't know whether it's the same

18   person or not -- who was expected to get one-point-something

19   million information in terms of addresses.

20           And as I -- they don't identify who else is then going

21   to get it that would be viewed as directly and personally

22   involved by ICE.

23           MR. HUMPHREYS:  Well, again, IRS relied on the

24   attestation that this particular person would be personally and

25   directly involved.

1          THE COURT:  Okay.  Let me move on here.

2          So did IRS have anything to do with ensuring that the

3    August 7th disclosures to ICE were used, quote, "solely in

4    criminal preparation, investigation or grand jury proceedings"?

5          Did they have any role in it at all?

6          MR. HUMPHREYS:  In requiring it in the MOU, Your

7    Honor, to make sure that ICE is aware of that and it is IRS's

8    understanding to comply with 6103.

9          THE COURT:  There is an assumption that ICE would have

10   complied with this?

11         MR. HUMPHREYS:  There is an explicit agreement between

12   the heads of the agencies that they will do so.

13         THE COURT:  Wouldn't it be nice in a world where

14   everybody complied with what they were supposed to?  That's not

15   a world that I am accustomed to in my job.

16         MR. HUMPHREYS:  That is sort of the problem we think

17   with plaintiffs' motion on the whole.  In order to prevail, it

18   assumes that people will break the law, and that's entirely

19   speculative.

20         THE COURT:  No.  I would not say that.  It assumes

21   that everybody is going to break the law.  I don't see it that

22   way.  The question is whether this was followed or not

23   followed.  And they have their argument.  You certainly have

24   your argument.

25         So let me move on and pick up on a couple of other

 1  things that we have not gone over.

 2          MR. HUMPHREYS:  Yes, Your Honor.

 3          THE COURT:  Do you happen to know what the format was

 4  that IRS received since their request was -- and I should --

 5  let me just look at something.  Hold on a minute.

 6      (Pause)

 7          THE COURT:  So 1.2 million was actually the request.

 8  Do you know what the format was?  Did they get a spreadsheet or

 9  something else, in term of the request from ICE to IRS since

10  it's 1.2 million people?

11          MR. HUMPHREYS:  Yes, Your Honor.  It was a data file,

12  a letter plus a data file, spreadsheet.

13          THE COURT:  A letter and a data file.  What would have

14  been included in the data file?

15          MR. HUMPHREYS:  Check my notes to make sure.

16          THE COURT:  No problem.

17      (Pause)

18          THE COURT:  You may have gone over it before, but I

19  just want to make sure if you have got more specific

20  information.

21          MR. HUMPHREYS:  I don't believe we have, Your Honor,

22  gone over it.

23          So the data file itself created the ICE case ID, which

24  is not really a concept under the Internal Revenue Code, the

25  reason for the investigation, the date of the final order.

1          THE COURT:  What kind of things did they put down for

2     the reason?

3          MR. HUMPHREYS:  In order to investigate whether a -- I

4     mean, this is not verbatim, but in order to investigate whether

5     there is a violation of 8 U.S.C. 1253(a)(1).

6          THE COURT:  In terms of the removal -- overstaying and

7     the removal.

8          MR. HUMPHREYS:  And IRS required in the MOU that ICE

9     also provide, like we discussed, the removal order date itself

10    to provide additional information really probably beyond what

11    is required by the statute.

12         So the ICE case ID, the reason, the date of the final

13    removal order, the individual's first and last name, the

14    individual's address.

15         THE COURT:  So one of the questions is that --

16    requires authority for criminal investigation that's being

17    conducted.  So does it mean the statute prohibits IRS from

18    making disclosures for requests based on, say, future or things

19    anticipated but not already started in criminal investigations

20    or ones that are currently in the process?

21         MR. HUMPHREYS:  I mean, it can be for an investigation

22    of a criminal violation.

23         THE COURT:  What I'm asking is, is it ones that

24    already concluded and/or are in the process or is it -- what

25    does that have to do based on future or anticipated criminal

1    investigations?  Does it cover that or no?

2          I mean, it talks about criminal investigations.  So

3    disclose return information authorizes for use in nontax

4    criminal proceedings or investigations.

5          You've indicated what the statutory authority is, but

6    in terms of for criminal investigation or proceedings that's

7    being conducted, so does that mean that you would only be able

8    to share it if they are in the process of doing this

9    investigation?  It wouldn't cover if they were future

10   anticipated criminal investigations, or would they?

11         MR. HUMPHREYS:  No, I think that's right.  It would

12   have to be one that is being conducted.

13         THE COURT:  Okay.  Section 6103 also authorizes the

14   return information, again, only if the request for information

15   sets forth the specific reason or reasons why this disclosure

16   is or may be relevant to the proceedings.

17         And what process did they have -- did they just cite

18   the statute or was there something beyond as to what the term

19   "specific" actually means in terms of how it was implemented?

20         MR. HUMPHREYS:  It provided both, Your Honor.  One is

21   the statute itself to satisfy (iii) in that subparagraph, and

22   then the specific reason is in order to investigate to

23   determine if there is a violation of that statute, and then

24   with the additional return information -- sorry, removal order

25   information that is required by the MOU.

1        So taken together, the specific reason is because we

2    are investigating for a criminal violation of 8 U.S.C.

3    1253(a)(1), and with the additional information of the

4    person-specific removal order date, we think that easily

5    satisfies subparagraph (iii).

6        THE COURT:  Plaintiffs argue that the data sharing

7    with ICE is only plausibly possible through automated

8    mechanisms in terms of being able to come back with, and

9    whether they gave sort of the same answer for each of these,

10    the statutory information, that that was the -- what was

11    specific.

12        Did IRS employees have anything to do with the review

13    or providing the information or was all of this automatic, do

14    you know?

15        MR. HUMPHREYS:  I mean, there is some automation in

16    comparing data files for sure, but, again, I mean, IRS ensured

17    that each of the data required under the MOU and by the

18    statute, understanding that the MOU mirrors the statute, was

19    included in the data file sent over by ...

20        THE COURT:  Presumably, all of this matching up the

21    1.2 million individuals, it sounds as if it would all be done

22    electronically of some sort, I'll put it that way, as opposed

23    to people looking at things individually, especially if you're

24    talking about 1.2 million.

25        MR. HUMPHREYS:  I think it's fair to say that the

1  yeoman's work is probably done by comparing databases to see if

2  there's a direct match.

3          THE COURT:  I'm trying to figure out in terms of how

4  they might have done it.  Then we have sets forth a specific

5  reason or reasons why the disclosure is or may be relevant to

6  the proceeding.

7          So in terms of the term "relevant," was there any

8  specific assessment as to what was relevant?

9          What I'm trying to do is figure out did anybody

10  actually look to see whether there was anything that was

11  individualized or was this all done sort of electronically

12  where they set out the statute and somebody decided, okay, the

13  statute, the relevance is this and it's sort of all automatic

14  without any individualized review of all of these files to see

15  whether it actually -- whether what they've listed is relevant,

16  even if they listed it for all 47,000, whether that actually

17  fits.

18          MR. HUMPHREYS:  I mean, the specific reason here,

19  again, is that there are specific -- specific removal order

20  dates for each person.  And if the date were less than 90 days

21  from the removal order when the information was being

22  provided --

23          THE COURT:  The whole issue is the removal order is

24  there.  The criminal conduct is the person hasn't removed

25  themselves.  So you have to have some information to indicate

1    they are still in the country, and that presumably is more

2    individualized information in terms of whether somebody -- they

3    know it because they are still working or they are not or some

4    other thing or their kids are in the school or whatever.  So

5    that's individualized.

6        It doesn't sound like any individualized information

7    was provided or considered in deciding whether he is still

8    here.  You have got the removal order, which you can do, but

9    what is the reason the investigation is and the criminal

10   penalty goes to that you're still here, you have not

11   self-deported or been deported.

12       MR. HUMPHREYS:  I don't represent ICE, Your Honor.

13       THE COURT:  I know.  I'm talking about the information

14   you got, that IRS got.  I'm talking about what information --

15   I'm just saying in order to -- it's not just the date of the

16   removal.  It's the information in terms of the investigation,

17   as you've described it, has to do with their overstaying their

18   removal order, which has to be some individualized information.

19   Did they provide that information, because that would be the

20   ongoing investigation to the IRS.

21       MR. HUMPHREYS:  I think the question assumes that an

22   investigation is one thing, and, like, that same person has to

23   be involved in the entire investigation.  I take your point

24   that to determine if the person is still here, it may at a

25   future time require more individualized review.

1            But as a matter of sorting data and seeing if people

2    in this country meet one part of the criminal requirement for

3    prosecution, I mean, that can be done on a data level.  I think

4    that's why it's plausible on its face.

5            THE COURT:  So let me see what you're saying.  Are you

6    saying that it was enough for them to simply indicate that

7    these individuals had orders of removal and they had not

8    provided information or may not have done -- have figured out

9    or investigated that the people were still here, which would go

10   to the issue of there being able to be a criminal case based on

11   the fact that they were still here and had not removed

12   themselves.

13           Under this, you would expect that information

14   individualized would have been provided to IRS by ICE.  You're

15   indicating it doesn't sound like they did provide

16   individualized information.

17           Are you indicating to me that it wouldn't have been

18   necessary to do that?

19           MR. HUMPHREYS:  It may be necessary for ICE in part of

20   their investigation --

21           THE COURT:  No, no, no.  I mean, the question is the

22   IRS gets information and they are supposed to identify who

23   these people are who are doing this investigation or something

24   relating, and it has -- the reason has to be relevant to the

25   investigation.

1              So it would seem to me the relevance issue gets to

2    what the investigation actually consists of.  It's not just a

3    removal order unless you think that that's enough.  It would be

4    the removal order and is the person still here.  If the person

5    is not here and has gone, there is no criminal penalty and you

6    could file beyond the, you know, I paid taxes and have

7    self-deported.

8              MR. HUMPHREYS:  The IRS obviously does not, like, make

9    the criminal determination or conduct the investigation.  It

10   sees if the statutory requirements are met.  Were these (i)

11   through (iv) provided?  Does ICE represent, as a law

12   enforcement agency, that getting this information is part of

13   its investigation?  And it doesn't have to be, as I read the

14   statute --

15             THE COURT:  The point is what did they provide that

16   suggested that there was specific reasons and it would be

17   relevant to it?  In other words, what did they actually provide

18   that IRS got?  I mean, granted, it's ICE who makes this

19   decision, but is it -- from your perspective, are you

20   indicating they would not look to see what they put in as to

21   why it was relevant or any other information relating to --

22   it's supposed to be specific reasons that are relevant to the

23   proceeding.

24             You would expect some individualized information or

25   something, unless you're indicating to me that it's enough to

1  just indicate there is a removal order.

2          MR. HUMPHREYS:  For the purposes of this statute,

3  6103(i)(2), and the criminal statute that ICE identified --

4          THE COURT:  The Title 8.

5          MR. HUMPHREYS:  Title 8, 1253(a)(1), yes, the specific

6  information in this case was satisfied because they indicated

7  Title 8.

8          THE COURT:  But you're not answering my question about

9  what specific information.

10         MR. HUMPHREYS:  The specific information is that

11 because they are investigating whether the statute has been

12 violated and the removal order date, that is the specific

13 information provided that satisfies (iv).

14         THE COURT:  Because they are investigating whether the

15 statute has been violated and they have a removal order, that

16 that's enough.  So they don't need to provide anything to

17 indicate that actually Title 8 is violated because they don't

18 provide you with any information to indicate the person is

19 actually still in the country or who is investigating whether

20 they are still in the country.

21         There is no information provided to IRS as to who is

22 investigating whether they actually violated Title 8, and we

23 don't have information as to specific reasons that are relevant

24 that would have some individuality to it as to, you know, what

25 they are investigating to show that Title 8 is actually

1    violated.  So we don't get that information.

2         MR. HUMPHREYS:  It's not an ultimate determination of

3    whether or not ICE can make out an actual violation of the

4    statute.  It's information specified in 6103 of what is

5    required to provide information relevant to an investigation.

6    It's in order to help ICE determine.

7         THE COURT:  But you have not -- you still -- I am

8    still missing here -- and we're beating a dead horse, so I'll

9    say it one more time.

10        The concern I have is that the IRS -- I can't control

11   what -- and you can't either in terms of IRS's behalf what ICE

12   does, but the expectation is what did ICE provide IRS that IRS

13   would look at to see that the statute and regulation was

14   complied with, which involves, one, identifying who these

15   people are, which in terms of the additional investigation,

16   it's unlikely that one person did an investigation of not only

17   the removal, but what the particular -- how they are

18   investigating and what information they have as to whether the

19   person is still here in the United States and therefore

20   violating the removal.

21        They have not identified the specific people.  And as

22   far as I can tell, no additional information was provided as to

23   what they are investigating in terms of specifically that's

24   relevant to the proceeding, what they are investigating that

25   would show that there's actually going to be a violation or

1    could be of Title 8.

2          Removal order by itself isn't illegal.  So it would

3    have to be that the person is still here.

4          So that information wasn't provided specifically to

5    the one-point-whatever, 2 million or the 47,000.  Can we agree

6    on that?  And then I'll move on.

7          MR. HUMPHREYS:  No.  I disagree, Your Honor.  I think

8    it was provided.

9          THE COURT:  What was provided?

10          MR. HUMPHREYS:  The specific information which IRS

11    believes satisfies (iv).

12          THE COURT:  Tell me what specifically ICE gave them

13    that satisfies it.

14          MR. HUMPHREYS:  The specific information is an

15    attestation that the information is being requested in order to

16    determine if there is a violation of 8 U.S.C. 1253(a)(1), plus

17    the date of the removal order, which is relevant to that

18    statute.

19          THE COURT:  And that's it.  So that's it, the removal

20    order, and the reason is to see whether Title 8 has been

21    violated.  Okay.  All right.

22          So let me move on to arbitrary and capricious.  Has

23    the IRS processed any disclosure requests, to your knowledge,

24    in the past under this section that only asked for the last

25    known address?

1          MR. HUMPHREYS:  I do not know, Your Honor.

2          THE COURT:  Plaintiffs cite a provision in the manual

3    that states that, quote, requests for addresses only are

4    invalid because, and they cite to the statute requires that the

5    requester provide an address.

6          Now, granted the manual is not binding, but it

7    certainly gives some insight into the agency's interpretation,

8    and you could interpret it, as you seem to have, is that -- to

9    say nothing more than the fact that a request made under that

10   statute must contain an address for the taxpayer in order to be

11   valid.

12         But wouldn't this reasonably support an interpretation

13   for not getting any requests for when you're only asking for

14   address information?  I would have read it not the way you did,

15   but I would have read it as indicating that they are only

16   asking for addresses that were not -- we don't provide.  At

17   least at one point the manual said that.

18         MR. HUMPHREYS:  And I don't know the historical

19   providence of the manual.  IRS interprets the statute as we

20   have been discussing today.  It is, in fact, not just

21   appropriate to provide the information to IRS when receiving

22   the information that it did, but that it's in fact required.

23         And given the nonbinding nature of the manual, even if

24   the Court reads it that way, we don't think it's relevant.

25         THE COURT:  Plaintiffs' claim -- and I don't know

1    whether -- I'm assuming this can be checked -- that prior to

2    April 17th of this year, the revenue model set forth a detailed

3    individualized process which these requests were carried out

4    with numerous safeguards, but that it was edited to move those

5    safeguards from the provision used to share here to the

6    safeguards to a different one that requires a court order.

7         So the safeguards that were originally in the manual

8    for the type of request that's at issue here have now been

9    moved to the ones that require a court order so that there are

10   no safeguards listed for the ones that are at issue here.

11        Do you have any reason why that would have been done

12   or that change, or you're not familiar with the change?

13        MR. HUMPHREYS:  I'm not, although, again, IRS

14   interpretation is that it is required to provide the

15   information when receiving a data request, so it would be sort

16   of inappropriate or beyond the statute to include additional

17   requirements that aren't listed there.

18        THE COURT:  Well, let's assume that changes have been

19   made.  Wouldn't that be a change of agency policy, which would

20   require some sort of an explanation, which doesn't seem to be

21   given?  That's quite a difference.  Safeguards that originally

22   were there for these kinds of requests are now moved to the

23   more stringent standard in terms of the court order and not in

24   the request that's at issue here.

25        MR. HUMPHREYS:  No, Your Honor, because those are not

1   binding policy, and there is no final agency action to begin

2   with for reasons we discussed earlier.  So I don't think that's

3   any evidence of an APA violation.

4           THE COURT:  It may be that I will need an

5   administrative record in this case ultimately.  How quickly can

6   the administrative record be put together?

7           MR. HUMPHREYS:  I would have to check with my clients.

8   We were hoping to get a decision on our motion to dismiss

9   first.

10          THE COURT:  I realize that.  But obviously, some of

11  this is intertwined since the motion to dismiss certainly

12  raised some of the initial decisions the Court has to make as

13  part of this stay and preliminary injunction request.

14          But at some point, I do need to have you indicate to

15  me so that I can do a time here and move this case along as

16  quickly as possible for everybody's benefit.

17          You appear to argue I can't award effective

18  retrospective remedy to redress any -- let's assume I find

19  unlawful data sharing with ICE -- while the case is pending.

20  But doesn't that sort of support the conclusion that the data

21  sharing would be an irreparable harm that weighs in favor of it

22  if there is no remedy?

23          MR. HUMPHREYS:  No, Your Honor, for a few reasons.  I

24  have other points I could make about irreparable harm.  But --

25          THE COURT:  Well, that was the only one that in terms

1    of -- that I needed at this point.  I'm going to take a break

2    and come back and each of you can raise whatever you want to

3    raise.  I sort of focused on what I needed as what I had sort

4    of questions about in terms of understanding the arguments.

5         MR. HUMPHREYS:  I do have a response to that, Your

6    Honor.  I think for the reasons Judge Moss included in

7    *University of California Student Association* case and in the DC

8    Circuit *Chaplaincy* case, even the possibility of remedy through

9    other means, which would be through the provisions included in

10   the Internal Revenue Code, mean that there is no irreparable

11   harm here.  So I don't think that the remedies question helps

12   plaintiff on that front.

13        THE COURT:  Let me take a break at this point.  I'm

14   sure the court reporter could use one.

15        It's about 18 minutes until 4:00.  Let's say five

16   after 4:00 so you get, everybody, 15 minutes.  And then I'll

17   let each side make whatever additional things you wish to bring

18   up, if you want to clarify or respond to the other arguments or

19   whatever.  No more than ten minutes.  I have read all of them.

20   I have been looking at it.  So if I haven't asked, it's not

21   that I'm giving it the back of my hand.  It's just that I don't

22   need any clarification.  I understand what's the issue.

23        Let's stop at this point and we'll be back.

24        If you could find out how quickly the administrative

25   record, that would be helpful.

1          (Recessed from 3:48 p.m. to 4:16 p.m.)

2          THE COURT:  All right.  So a couple of follow-ups in

3    terms of information that would be helpful.  So for plaintiffs,

4    if -- we talked about your claims of the effects of the IRS

5    actions on the Center's funding, federal funding.

6          If there is some reporting requirement or some

7    agreement, I mean, something that cannot be -- something that's

8    clearcut that you have filed or something, you know, maybe

9    there is something in writing that sets out what your

10   requirements are in terms of anything that you think would

11   support the idea that it may affect the federal funding based

12   on your activities, which would not get into what the reasons

13   for are, but if you're required to do certain things and you

14   don't show that, does that affect what your funding is,

15   whatever it is, and then share it of course with the

16   government.

17         In terms of the defendants, the titles -- I don't know

18   their names.  It's probably not going to make any difference to

19   me what the individuals are, but the individual who received

20   the June 27th request on behalf of ICE and the individual who

21   ICE identified as the person, quote, "personally and directly,"

22   unquote, engaged in the investigation.  If we could just get

23   titles or if it's the same person or whatever.

24         Yeah, if it's the same person and if you could

25   indicate the names because if you give titles, maybe different

1  people at different points since it would cover a period when

2  we're talking about different administrations.

3          The administrative record, do you have some sense of

4  how quickly that can be done?  I'm trying to do timing so that

5  we don't -- this all moves as fast as possible from everybody's

6  perspective.  So that's why I'm asking for a time now.

7          Obviously, I have to make some initial decisions.

8  Although you may not get it in writing, but I will make the

9  required decisions before requiring you to do the record.

10          MR. HUMPHREYS:  Thank you, Your Honor.  Your Honor, we

11  would ask for 45 days to put the record together.

12          THE COURT:  Okay.  Obviously, I'll give the plaintiffs

13  an opportunity if, for some reason, you say that it's not

14  complete or something and we think that's the only thing.  I

15  don't need a brief or something.  I would suggest you confer if

16  there are issues that you have about it so I only get any

17  problems you have got.  If you don't have any problems and you

18  have worked it out, I don't need to hear about it.

19          MS. GITOMER:  Yes, Your Honor.

20          THE COURT:  Okay.  In terms of providing me with some

21  additional information, I'll move forward and I have a couple

22  of these preliminary injunctions and other motions and this

23  type that I need to get out.

24          So it would be helpful to your factual representations

25  about IRS's plans to make or not make further disclosures to

1    ICE in the immediate future obviously are important to the

2    resolution of the plaintiffs' motions.  If something happens

3    along the way after this hearing, it would be helpful to make

4    sure I'm informed about it.

5        At this point we have the record of nothing further is

6    going on that you're aware of, which is fine.

7        Can you commit to notifying me within, say, 48 hours,

8    unless it's on the weekend, if we're talking about the motion

9    is pending, if IRS receives another request or makes plans to

10   share, and I'm only talking about DHS/ICE, not other groups.

11       MR. HUMPHREYS:  Yes, Your Honor.

12       THE COURT:  Just so I'm up to date on whatever the

13   facts are that I'm going to be relying on.

14       I also want to compliment counsel.  I have a number of

15   these hearings and I have had a number of these hearings on a

16   number of different issues, without specifying them, and the

17   briefing has been excellent, been most helpful.  You have done

18   a really good job on what I view as very complex issues and, in

19   many instances, unprecedented.  So you have had to do some work

20   in terms of coming up and reviewing cases and coming up with

21   the legal authority and making really cogent arguments, not

22   just giving me cases but why they are important, why particular

23   facts are intertwined along with this so that it's -- it's been

24   really a pleasure getting briefs like that.  I don't get them

25   often enough, so this was really excellent.

1           And I appreciate the argument today.  I realize that

2    being questioned by the judge is not fun.  I never viewed it as

3    fun when I was at the other side, although that was eons ago,

4    but still I appreciate the candor and the fact that you gave

5    very succinct -- and I am very comfortable relying on what you

6    have to say from everybody's perspective.

7           So I don't -- what you have told me I will rely on as

8    trustworthy and so I'm very happy about that.

9           And, Mr. Humphreys, I know I pushed you, but you

10   remained firm with your position and I appreciate that that's

11   not always easy to do that when judges are pushing you.  So

12   thank you very much.

13          It was an interesting and enjoyable afternoon.  So

14   take care, everybody.

15          MS. GITOMER:  Your Honor, I was under the impression

16   we would have a moment to respond to --

17          THE COURT:  Oh, yes.  Yes.  Go ahead.

18          MS. GITOMER:  Madeline Gitomer for the plaintiffs.

19   And as Your Honor requested, I'll try to be brief.

20          I wanted to respond to a few of defendants' points and

21   then provide some of the additional information that the Court

22   had requested.

23          THE COURT:  Oh, okay.

24          MS. GITOMER:  First I'll respond to some points that

25   defendants made.  What we have learned today supports a

1    conclusion that the data being sought by the IRS is for

2    purposes of a fishing expedition, not specific -- an

3    individualized criminal investigation.  We have learned that to

4    the IRS's view, one person was responsible for 1.28 million

5    specific investigations and the IRS received no specific

6    evidence that suggests that the individuals identified were

7    subject to those criminal proceedings.

8          Importantly, those criminal proceedings require a

9    willful overstay by 90 days.  And in many cases, it is

10   difficult to prove that willfulness because the order for

11   removal was given in absentia.  And so to what we have heard,

12   this supports a fishing expedition.  More broadly and what

13   defendants had argued that this was a high level review of

14   data, that is not what 6103 authorizes.

15         Defendants' second argument has largely been to trust

16   ICE.  That has never been what the IRS has done when disclosing

17   data under 6103.  6103 views the IRS as the gatekeeper of the

18   most sensitive information that individuals provide to the

19   government and the IRS -- the 6103 places on the IRS the

20   obligation to ensure that information remains confidential

21   unless the specific requirements are met.

22         In addition, we are -- the plaintiffs are alleging

23   that there has been a policy change.  That policy has never

24   been that the IRS has taken the other agency's word for it,

25   which is why there has always been a discernment and

1    conversations and discussions and an individualized assessment

2    to ensure that the information provided meets the statutory

3    provisions.

4            There are three statutory provisions that I think are

5    specifically not met in this instance and I don't believe that

6    defendants can point to the MOU to defend against violations of

7    the statute itself.  First, the evidence indicates that there

8    is not one person -- that the information is not disclosed to

9    someone -- to an individual personally and directly engaged in

10   the -- in a criminal proceeding or an investigation that will

11   lead to one.

12           Second -- and second, they are not -- they have not

13   provided specific reasons why that information is relevant to

14   that investigation.

15           Third, the statute requires that it only be used

16   solely for purposes of preparation for that criminal

17   proceeding.

18           What we have here instead is significant evidence that

19   indicates that this information is being used for other

20   purposes, in particular, civil deportation.  The evidence that

21   points that most strongly is one the administration when asked

22   about this data sharing said it is for purposes of mass

23   deportation.

24           And second, they have asked for the last known address

25   of each individual.  What that means is, for example, if

1    someone -- if they are investigating a criminal provision

2    violation that someone overstayed an order of removal from,

3    say, five weeks ago, and the last known address is from 2003,

4    that provides no assistance in indicating whether they have, in

5    fact, violated criminal law.  It does, however, provide an

6    address at which to locate that individual for purposes of

7    deportation.  This is further supported by the fact that right

8    now, the evidence indicates that all of these addresses are

9    going into the A file.

10          The defense has said that the MOU includes lots of

11    requirements for how that data will be protected.  That

12    information currently is -- that language is from the statute

13    and from Publication 1075.

14          What one would expect is that the implementation guide

15    would provide much more specific requirements as to how that

16    data is protected.  Instead, what we have seen in the

17    implementation guide is that the information is placed in the

18    files and there is no evidence it is further protected.  Again,

19    the defendants' answer is the IRS must trust ICE.  That has

20    never been the IRS's policy and it has changed unlawfully.

21          Lastly, I just want to address Your Honor's question

22    about the Center.  First, I just want to quickly speak to the

23    redressability question about their harm.

24          An order that stays this -- this action and this

25    policy would provide relief that redresses their harms, their

1    irreparable harms.  And that's because they would be able to

2    point to that in advising their clients and say, previously,

3    there was an interpretation -- a long interpretation and the

4    defendants are now disclosing data contrary to it.  Now they

5    would be able to point to a court order that says information

6    will only be disclosed under (i)(2) as it was before and if it

7    meets these requirements.  So that would meaningfully redress

8    the harms they have demonstrated.

9         Finally, Your Honor asked about the Center's reporting

10   requirements with respect to its funding under the LITC

11   statute, the low income taxpayer clinic statute.  I have some

12   information to share.  We can file something in writing if Your

13   Honor would find that helpful.

14        The Center is required to submit an annual and a

15   midyear report that includes the number of English as second

16   language events held by the Center, the number of people

17   attending each of these ESL events, the number of cases

18   involving ESL taxpayers and the number of cases involving the

19   ITIN unit, the taxpayer identification number unit.  This is

20   all required as a condition of receiving the grant funds and

21   these types of reporting requirements are typically used to

22   indicate the measure of performance on grant requirements.

23        So, Your Honor, given these reporting requirements, I

24   mean the number of people attending ESL events, the number of

25   cases involving ESL taxpayers, those numbers have significantly

1    been impaired by the actions taken by defendants such that

2    their ability to receive and continue to receive this funding

3    is at risk given their inability to provide the services that

4    further their mission and that further these statutory

5    requirements.

6            THE COURT:  If I could ask, is it a grant program that

7    they are receiving -- it's a competitive?  Grant programs

8    usually have some competition about the money as opposed to a

9    direct.

10           MS. GITOMER:  I believe it is, Your Honor, but I would

11   need to respond to the Court in writing.

12           THE COURT:  Sure.  I ask because some grant programs

13   you're basically competing with others as to which program gets

14   some funding.

15           MS. GITOMER:  Absolutely, Your Honor.  I just want to

16   confirm with my client before I enter that into the record.

17           THE COURT:  No problem.

18           MS. GITOMER:  Thank you, Your Honor.

19           THE COURT:  Anything else?

20           MS. GITOMER:  No, Your Honor.

21           THE COURT:  Okay.

22           MS. GITOMER:  Thank you.

23           THE COURT:  Mr. Humphreys?

24           MR. HUMPHREYS:  I was happy to end after the

25   compliment, Your Honor.

1            THE COURT:  I meant it as a compliment for both of

2    you.  It was interesting and enjoyable and it's the kind of --

3    judges always like really competent, well prepared counsel to

4    appear in front of them.

5            MR. HUMPHREYS:  I'll try not to ruin it.

6            THE COURT:  And that has been this afternoon.

7            MR. HUMPHREYS:  Thank you.

8            I think the MOU shows that IRS meticulously complied

9    with the law by making sure that all of the requirements of the

10   statute were followed and moreover that ICE was aware of all

11   the statutory requirements before receiving the data.  Nothing

12   in the statute itself requires that the requesting agency

13   identify every person who may be personally or directly

14   involved, only that it identify the person personally or

15   directly involved before IRS turns over the information.

16            Plaintiffs, at several points, have relied on the

17   prospect of civil deportation.  The MOU itself says that the

18   information can be used solely for the purposes of criminal

19   investigations.  I mean, it is wild speculation to suggest that

20   this information would be used contrary to the statute and

21   contrary to the MOU.  It would require the Court to abandon the

22   presumption of regularity in government officials and assume

23   that officials at ICE would open themselves up to potential

24   termination or criminal penalties which are associated with

25   violation of 6103.  It is not the basis for jurisdiction or for

1    irreparable harm.

2        Also, last known address is relevant despite what

3    plaintiffs say because it is part of determining if a violation

4    of 8 U.S.C. 1253(a)(1) has been violated, knowing the tax

5    period with which the address is associated were also provided,

6    the last known address is relevant to whether or not the person

7    is still here, which is part of the investigation into

8    1253(a)(1).

9        A few quick points, skip around.  Associational

10   standing, for the reasons we say in our brief, we think it is

11   just too speculative for any of plaintiffs' members to have

12   standing.  You can look at the numbers.  IRS returned data for

13   only 3.7 percent of the addresses requested.  Any harm is not

14   actual or imminent or certainly impending.

15       And even putting that aside, the type of information

16   requested, a mailing address, is not the type of information

17   protected by the tort of intrusion upon seclusion or breach of

18   confidence.

19       It is not -- it's not particularly private and, in

20   fact, Congress itself -- before I get there, neither of those

21   torts apply because it is not -- what's the phrase, highly

22   offensive to a reasonable person to share a mailing address

23   which is where one receives mail and is therefore not covered

24   by those common law torts.

25       Plaintiffs try to bootstrap, I think, the protections

1   in 6103 to say that, well, Congress made the information

2   private and therefore you can find a common law analogue in

3   inclusion upon seclusion or breach of confidence.  That is

4   contrary to *TransUnion* which says that the injury itself has to

5   have a common law basis and Congress can't create jurisdiction

6   that way.

7          And also I would point out that even though

8   plaintiffs, I think, try to frame this information as the most

9   private, the statute itself in 6103(i)(2)(C) makes clear that a

10  taxpayer identification information identity information can be

11  provided and taxpayer identity includes addresses.  So Congress

12  itself carved out this specific information as less protective

13  than other information covered by 6103.

14         Organizational standing, I would just that any loss of

15  funding is purely speculative.  There is no indication that any

16  federal funding will be reduced even if it were in a

17  competitive grant program.  It is more speculation than

18  Article III can support to rely on the possibility that maybe

19  another bidder for that funding may be successful.  I mean,

20  even going down that rabbit hole, presumably that bidder would

21  also face the same constraints that the Center does, so I don't

22  think that can support standing.

23         Lastly, Your Honor, on remedies, I think plaintiffs

24  suggested in their reply brief that the Court could order IRS

25  to require the destruction of information at ICE based on

1    6103(p)(4).  There is some oversight responsibility that IRS

2    conducts, but the remedy there is not to force a sister agency

3    to do anything.  It is simply to stop sharing information in

4    the future.  We don't think that a retroactive remedy could be

5    applied here to a nonparty.

6              That's all I have, Your Honor.

7              THE COURT:  Okay.  As I said, thank you.  And I'll be

8    in touch.  So I'll set out with the 45 days.  I'll take a look

9    at when I may put something out so that we have it and there is

10   not much of a delay.

11             Parties are excused.  Everybody take care and be well.

12        (Proceedings concluded at 4:37 p.m.)

13

14                          CERTIFICATE

15       I, Sonja L. Reeves, Federal Official Court Reporter in and
     for the United States District Court of the District of
16   Columbia, do hereby certify that the foregoing transcript is a
     true and accurate transcript from the original stenographic
17   record in the above-entitled matter and that the transcript
     page format is in conformance with the regulations of the
18   Judicial Conference of the United States.

19       Dated this 9th day of September, 2025.

20

21                      /s/ Sonja L. Reeves
                        SONJA L. REEVES, RDR-CRR
22                      FEDERAL OFFICIAL COURT REPORTER

23

24

25

## /

**/s** [1] - 114:21

## 1

**1** [5] - 26:16, 26:19, 83:12, 83:13, 83:17
**1-point-something** [1] - 29:7
**1.2** [5] - 11:20, 87:7, 87:10, 90:21, 90:24
**1.28** [6] - 5:20, 10:10, 11:11, 11:24, 41:21, 106:4
**1.3** [1] - 83:17
**1.8** [2] - 20:25, 83:17
**1075** [4] - 53:15, 54:22, 64:25, 108:13
**10th** [1] - 4:18
**110,000** [1] - 3:22
**1100** [1] - 1:18
**1253** [1] - 30:4
**1253(a** [1] - 16:8
**1253(a)(1** [7] - 25:10, 29:18, 30:15, 90:3, 95:5, 97:16, 112:4
**1253(a)(1)** [2] - 88:5, 112:8
**14** [1] - 58:21
**15** [1] - 101:16
**15th** [3] - 4:23, 58:5, 58:6
**16th** [1] - 4:17
**17th** [1] - 99:2
**18** [2] - 4:9, 101:15
**1:08** [2] - 1:11, 2:1
**1:25-cv-00457-CKK** [1] - 1:5
**1st** [1] - 4:22

## 2

**2** [2] - 63:14, 97:5
**20001** [1] - 1:24
**20005** [1] - 1:19
**2003** [1] - 108:3
**20043** [1] - 1:15
**2021** [1] - 58:12
**2025** [5] - 1:11, 4:9, 5:17, 5:18, 114:19
**20th** [1] - 4:25
**25-0457** [1] - 2:2
**25th** [3] - 4:15, 11:2, 12:13
**27** [1] - 5:18
**27th** [14] - 5:20, 6:6, 7:17, 10:22, 11:3, 11:10, 13:1, 13:7, 13:17, 25:21, 30:19,

30:24, 78:6, 102:20
**28th** [2] - 5:4, 13:1

## 3

**3.7** [2] - 5:22, 112:13
**30** [1] - 58:17
**333** [1] - 1:24
**34553** [1] - 1:15
**39,000** [1] - 29:5
**3:00** [1] - 65:24
**3:48** [1] - 102:1
**3rd** [1] - 5:6

## 4

**4** [2] - 77:3, 77:7
**40.3(a)** [1] - 4:14
**45** [3] - 60:20, 103:11, 114:8
**47** [2] - 21:2, 61:8
**47,000** [24] - 5:23, 10:11, 11:13, 11:24, 15:18, 19:13, 20:24, 21:4, 25:9, 29:6, 29:9, 60:20, 61:9, 79:17, 80:7, 81:14, 82:2, 82:10, 82:21, 83:5, 83:12, 83:14, 91:16, 97:5
**47-odd** [1] - 11:21
**48** [1] - 104:7
**4:00** [2] - 101:15, 101:16
**4:16** [1] - 102:1
**4:37** [2] - 1:11, 114:12

## 5

**5** [1] - 1:11
**501(c)(3** [1] - 3:13

## 6

**6** [3] - 26:13, 26:16, 26:19
**6(C** [1] - 26:11
**6(C)(6** [1] - 14:12
**6(C)(6)** [1] - 24:20
**6(D** [1] - 26:12
**6(E** [1] - 21:15
**6(E)** [2] - 22:2, 22:3
**6103** [23] - 14:2, 49:18, 52:19, 53:4, 53:8, 53:24, 54:14, 55:22, 57:21, 61:5, 65:17, 72:10, 86:8, 89:13, 96:4, 106:14, 106:17, 106:19,

111:25, 113:1, 113:13
**6103(i)(2** [11] - 6:10, 10:5, 13:14, 21:17, 46:2, 49:4, 54:2, 65:10, 70:3, 74:22, 95:3
**6103(i)(2)** [1] - 46:22
**6103(i)(2)(A** [1] - 14:4
**6103(i)(2)(B)(i** [1] - 52:21
**6103(i)(2)(C** [1] - 113:9
**6103(i)(2)(iii** [1] - 29:12
**6103(p** [2] - 54:21, 64:22
**6103(p)** [1] - 65:14
**6103(p)(4)** [1] - 114:1

## 7

**7** [1] - 5:17
**7.3** [4] - 6:2, 11:1, 41:17, 60:15
**704** [2] - 46:7, 49:15
**705** [4] - 5:1, 52:17, 61:21, 64:3
**706** [1] - 52:17
**7431** [1] - 72:8
**7712(A** [1] - 72:8
**7th** [9] - 5:21, 6:6, 6:7, 7:19, 10:21, 11:9, 16:15, 62:11, 86:3

## 8

**8** [15] - 25:10, 29:18, 30:4, 88:5, 90:2, 95:4, 95:5, 95:7, 95:17, 95:22, 95:25, 97:1, 97:16, 97:20, 112:4

## 9

**9(a** [1] - 77:1
**9(a)** [1] - 76:17
**90** [9] - 16:8, 25:12, 30:16, 58:17, 81:22, 81:24, 84:6, 91:20, 106:9
**90-day** [1] - 84:21
**9th** [1] - 114:19

## A

**abandon** [1] - 111:21
**ability** [14] - 35:14, 35:15, 35:19, 36:12, 36:18, 50:11, 56:1,

57:14, 57:18, 57:25, 58:23, 59:10, 62:1, 110:2
**able** [16] - 25:9, 29:2, 36:20, 37:7, 38:4, 38:6, 38:11, 38:14, 39:2, 58:13, 79:12, 89:7, 90:8, 93:10, 109:1, 109:5
**above-entitled** [1] - 114:17
**absence** [1] - 52:9
**absentia** [1] - 106:11
**absolutely** [1] - 110:15
**accept** [2] - 71:10, 80:5
**accepted** [1] - 19:22, 82:4, 82:9
**access** [16] - 34:20, 44:13, 44:17, 47:24, 60:18, 61:11, 65:13, 75:18, 76:25, 77:3, 77:7, 77:11, 77:12, 77:24, 77:25
**according** [3] - 64:7, 71:17, 71:22
**accordingly** [1] - 7:23
**accurate** [4] - 12:23, 12:24, 64:8, 114:16
**accustomed** [1] - 86:15
**acknowledge** [1] - 70:21
**acknowledged** [1] - 55:15
**acknowledging** [1] - 56:25
**Acosta** [1] - 46:24
**acronyms** [1] - 3:21
**Act** [12] - 6:14, 50:21, 51:12, 52:2, 52:3, 52:8, 72:18, 72:21, 74:10, 74:15, 76:12, 76:13
**act** [1] - 66:25
**Act's** [1] - 50:3
**acted** [1] - 37:9
**acting** [2] - 30:17, 78:5
**action** [38] - 45:21, 45:24, 46:1, 46:5, 46:8, 46:11, 46:18, 46:21, 47:12, 48:12, 48:16, 48:19, 48:22, 48:24, 49:1, 49:10, 61:20, 61:21, 61:22, 62:4, 62:12, 63:14, 66:13, 66:24, 67:1,

67:4, 68:2, 69:22, 70:7, 70:8, 70:12, 70:13, 70:21, 71:1, 71:3, 71:9, 100:1, 108:24
**actions** [11] - 35:17, 36:11, 36:16, 47:8, 47:10, 49:7, 49:16, 65:22, 68:25, 102:5, 110:1
**activities** [2] - 72:25, 102:12
**acts** [1] - 63:24
**actual** [9] - 31:2, 31:9, 31:13, 38:2, 46:25, 48:4, 49:11, 96:3, 112:14
**addition** [10] - 7:13, 16:4, 37:11, 42:8, 42:19, 48:4, 50:10, 61:24, 71:16, 106:22
**additional** [22] - 9:11, 11:12, 13:4, 13:8, 27:7, 42:12, 44:4, 48:17, 50:24, 72:20, 76:20, 83:21, 85:13, 88:10, 89:24, 90:3, 96:15, 96:22, 99:16, 101:17, 103:21, 105:21
**address** [57] - 5:19, 5:22, 10:10, 10:22, 11:18, 11:21, 12:8, 14:24, 16:5, 21:16, 24:21, 26:20, 27:21, 27:24, 27:25, 28:4, 28:5, 28:10, 28:11, 28:13, 28:15, 28:22, 30:21, 31:23, 31:25, 32:2, 32:12, 32:15, 33:1, 42:9, 42:11, 42:12, 50:6, 52:23, 53:2, 57:8, 60:16, 63:7, 65:9, 74:8, 88:14, 97:25, 98:5, 98:10, 98:14, 107:24, 108:3, 108:6, 108:21, 112:2, 112:5, 112:6, 112:16, 112:22
**addressed** [2] - 58:15, 74:14
**addresses** [18] - 25:20, 25:22, 25:23, 26:1, 26:2, 26:4, 28:24, 31:24, 32:7, 32:23, 60:15, 85:19, 98:3, 98:16, 108:8, 112:13, 113:11
**adequate** [9] - 45:25, 49:14, 49:17, 49:21,

49:24, 50:8, 50:23, 72:10, 74:16
**adjudicate** [1] - 58:18
**adjudication** [2] - 51:15, 51:20
**administration** [3] - 55:11, 56:14, 107:21
**administrations** [2] - 55:10, 103:2
**administrative** [7] - 36:2, 51:13, 51:20, 100:5, 100:6, 101:24, 103:3
**admit** [1] - 70:18
**adopted** [2] - 49:1, 49:3
**adoption** [1] - 48:18
**advance** [1] - 13:25
**advice** [6] - 36:20, 37:5, 37:13, 37:19, 37:24, 38:17
**advise** [2] - 35:19, 57:25
**advising** [3] - 36:25, 37:1, 109:2
**affect** [5] - 37:16, 55:14, 61:18, 102:11, 102:14
**affected** [5] - 33:25, 35:10, 37:22, 73:3
**affidavits** [1] - 33:12
**AFL** [4] - 3:20, 3:24, 44:2, 47:20
**AFL-CIO** [4] - 3:20, 3:24, 44:2, 47:20
**afternoon** [6] - 2:11, 2:24, 2:25, 70:22, 105:13, 111:6
**agencies** [9] - 3:17, 6:11, 6:18, 10:8, 67:14, 69:15, 72:4, 75:13, 86:12
**agency** [53] - 18:22, 19:24, 23:23, 44:5, 45:21, 45:24, 46:1, 46:5, 46:8, 46:11, 46:18, 46:21, 47:12, 48:12, 48:16, 48:19, 48:22, 48:24, 48:25, 49:10, 49:16, 52:22, 53:2, 55:3, 60:6, 61:20, 62:12, 65:1, 65:2, 66:13, 66:14, 66:24, 67:1, 67:4, 68:2, 69:22, 70:7, 70:8, 70:11, 70:13, 70:21, 71:1, 71:3, 71:9, 80:3, 84:24, 84:25, 94:12, 99:19,

100:1, 111:12, 114:2
**agency's** [4] - 46:25, 98:7, 106:24
**agenda** [1] - 43:4
**ago** [2] - 105:3, 108:3
**agree** [13] - 17:2, 17:4, 18:7, 22:19, 41:11, 68:20, 69:8, 69:14, 72:16, 73:16, 73:17, 74:4, 97:5
**agreement** [19] - 5:13, 41:1, 44:10, 44:16, 47:25, 48:2, 49:12, 66:16, 74:23, 75:4, 75:7, 75:19, 76:4, 76:13, 77:23, 86:11, 102:7
**ahead** [3] - 68:13, 74:11, 105:17
**airline** [1] - 4:1
**al** [4] - 1:3, 1:7, 2:3
**ALEXANDER** [1] - 1:14
**allegations** [2] - 67:11, 67:12
**allege** [2] - 10:8, 43:11
**alleged** [2] - 34:4, 67:13
**alleging** [2] - 72:14, 106:22
**Alliance** [10] - 2:13, 3:18, 4:12, 39:22, 44:1, 47:21, 59:12, 59:19, 60:17, 61:13
**allow** [3] - 9:7, 61:3, 64:3
**allowing** [1] - 74:24
**almost** [1] - 59:7
**alone** [1] - 48:17
**alternative** [4] - 49:14, 49:24, 72:10, 74:16
**amend** [1] - 55:23
**amended** [5] - 4:16, 4:19, 6:15, 62:23, 67:24
**amending** [1] - 55:22
**America** [2] - 2:13, 3:24
**American** [3] - 43:13, 45:3, 74:14
**Americans** [6] - 4:12, 44:1, 47:21, 59:13, 60:17, 61:13
**amount** [2] - 41:23, 46:11
**analogies** [1] - 43:14
**analogous** [2] -

43:11, 52:8
**analogue** [1] - 113:2
**analogy** [4] - 42:15, 45:1, 47:16, 50:21
**annual** [1] - 109:14
**answer** [11] - 8:15, 8:18, 8:20, 8:21, 19:22, 25:14, 34:3, 39:7, 53:19, 90:9, 108:19
**answering** [1] - 95:8
**anticipated** [4] - 41:7, 88:19, 88:25, 89:10
**anyway** [1] - 31:8
**APA** [18] - 6:9, 46:1, 46:7, 48:23, 49:10, 49:15, 50:1, 50:4, 51:15, 51:22, 51:25, 52:5, 52:10, 52:17, 62:5, 62:6, 66:10, 100:3
**APA's** [1] - 50:13
**API** [1] - 67:13
**apologize** [1] - 77:6
**appear** [5] - 16:25, 40:1, 79:9, 100:17, 111:4
**appeared** [2] - 8:6, 25:22
**appellate** [1] - 8:7
**appellate-style** [1] - 8:7
**applied** [1] - 114:5
**apply** [4] - 43:18, 43:20, 64:10, 112:21
**appreciate** [4] - 57:11, 105:1, 105:4, 105:10
**appropriate** [7] - 52:6, 54:13, 61:23, 62:15, 65:8, 65:20, 98:21
**appropriately** [3] - 63:22, 64:21, 64:24
**April** [5] - 4:15, 5:17, 6:6, 58:5, 99:2
**arbitrary** [8] - 46:3, 54:25, 55:3, 55:6, 57:1, 62:12, 63:24, 97:22
**argue** [7] - 40:21, 45:25, 49:17, 55:1, 68:25, 90:6, 100:17
**argued** [5] - 59:1, 68:14, 68:22, 72:7, 106:13
**argues** [1] - 45:1
**arguing** [2] - 46:10, 46:20

**argument** [17] - 8:8, 43:15, 45:5, 45:23, 46:4, 50:25, 51:5, 55:4, 66:19, 68:11, 68:23, 70:9, 77:19, 86:23, 86:24, 105:1, 106:15
**arguments** [12] - 8:10, 9:6, 9:8, 43:9, 51:2, 52:19, 66:9, 66:10, 74:15, 101:4, 101:18, 104:21
**art** [1] - 76:12
**Article** [1] - 113:18
**aside** [2] - 68:1, 112:15
**aspect** [1] - 32:23
**aspects** [1] - 84:19
**assert** [4] - 33:14, 39:18, 39:22, 40:5
**asserting** [3] - 33:17, 40:9, 60:3
**asserts** [2] - 39:19, 39:25
**assess** [1] - 29:20
**assessed** [1] - 54:10
**assessment** [3] - 10:7, 91:8, 107:1
**assigned** [4] - 4:9, 4:13, 26:22
**assistance** [1] - 108:4
**associated** [4] - 25:23, 38:3, 111:24, 112:5
**Association** [1] - 101:7
**associational** [13] - 33:15, 33:19, 39:17, 39:19, 39:23, 39:25, 40:5, 40:10, 40:17, 40:18, 59:19, 60:4, 112:9
**assume** [9] - 9:20, 23:10, 73:14, 75:12, 75:17, 76:7, 99:18, 100:18, 111:22
**assumed** [1] - 83:11
**assumes** [3] - 86:18, 86:20, 92:21
**assuming** [6] - 17:1, 68:21, 80:15, 81:7, 81:14, 99:1
**assumption** [1] - 86:9
**attempted** [1] - 36:1
**attending** [3] - 4:7, 109:17, 109:24
**attention** [2] - 9:15, 9:18

**attest** [1] - 81:13
**attestation** [9] - 18:19, 29:25, 61:4, 80:2, 82:13, 83:10, 83:11, 85:24, 97:15
**attested** [2] - 24:12, 82:1
**attesting** [1] - 83:15
**attorneys** [1] - 79:11
**audit** [2] - 25:21, 64:23
**August** [14] - 4:22, 4:23, 4:25, 5:4, 5:21, 6:7, 7:19, 10:21, 11:9, 13:1, 13:5, 16:15, 62:11, 86:3
**authority** [7] - 29:15, 40:4, 65:13, 68:20, 88:16, 89:5, 104:21
**authorized** [3] - 21:17, 65:18, 69:8
**authorizes** [5] - 14:4, 29:12, 89:3, 89:13, 106:14
**authorizing** [1] - 22:10
**automated** [1] - 90:7
**automatic** [2] - 90:13, 91:13
**automation** [1] - 90:15
**availability** [1] - 49:19
**available** [2] - 73:5, 73:21
**Avenue** [1] - 1:24
**avenue** [1] - 52:11
**award** [1] - 100:17
**aware** [7] - 6:24, 8:6, 41:11, 70:3, 86:7, 104:6, 111:10

**B**

**background** [5] - 6:23, 8:3, 10:2, 14:19, 39:24
**based** [14] - 12:20, 13:10, 20:12, 30:13, 37:24, 39:1, 44:19, 47:23, 73:3, 88:18, 88:25, 93:10, 102:11, 113:25
**basis** [8] - 39:19, 39:23, 43:12, 45:3, 65:7, 73:9, 111:25, 113:5
**bear** [1] - 14:3
**beat** [1] - 84:22
**beating** [2] - 20:7,

96:8
**become** [1] - 36:21
**BEFORE** [1] - 1:10
**beforehand** [1] - 64:7
**begin** [2] - 4:5, 100:1
**beginning** [1] - 34:6
**begun** [3] - 57:15, 57:16, 64:11
**behalf** [8] - 5:15, 5:16, 18:16, 40:1, 40:6, 40:9, 96:11, 102:20
**behavior** [3] - 44:20, 50:20, 56:9
**believes** [1] - 97:11
**benefit** [6] - 4:6, 8:22, 36:7, 58:12, 58:13, 100:16
**benefits** [5] - 35:21, 37:2, 56:2, 56:7, 58:2
**Bennett** [2] - 70:14, 72:1
**Bessent** [3] - 4:12, 7:1, 59:13
**best** [7] - 40:4, 40:10, 40:25, 54:5, 54:8, 55:4, 62:4
**better** [3] - 8:18, 50:21, 54:8
**between** [14] - 5:13, 5:15, 6:25, 7:3, 7:16, 10:18, 10:21, 13:23, 18:11, 31:23, 40:24, 63:17, 84:24, 86:11
**beyond** [19] - 17:12, 19:7, 43:2, 48:18, 57:5, 63:4, 66:14, 80:14, 81:6, 81:20, 81:22, 82:3, 82:6, 83:21, 88:10, 89:18, 94:6, 99:16
**bidder** [2] - 113:19, 113:20
**binding** [5] - 47:17, 56:16, 69:14, 98:6, 100:1
**bit** [4] - 13:22, 22:20, 53:9, 77:5
**board** [1] - 40:7
**bootstrap** [1] - 112:25
**bound** [2] - 58:2, 58:14
**Box** [1] - 1:15
**boxes** [2] - 70:3, 72:4
**Brad** [1] - 32:11
**Bradley** [3] - 2:25, 32:11, 32:12

**BRADLEY** [1] - 1:18
**breach** [6] - 43:15, 45:1, 45:8, 45:18, 112:17, 113:3
**breaches** [1] - 45:11
**break** [8] - 33:8, 65:25, 66:1, 66:3, 86:18, 86:21, 101:1, 101:13
**breaking** [1] - 33:4
**BRESSLER** [1] - 1:14
**Bressler** [1] - 2:22
**brief** [10] - 4:5, 9:8, 33:20, 46:9, 59:1, 67:5, 103:15, 105:19, 112:10, 113:24
**briefed** [1] - 66:9
**briefing** [2] - 51:11, 104:17
**briefly** [1] - 51:10
**briefs** [5] - 8:8, 8:9, 17:6, 33:18, 104:24
**bring** [6] - 9:11, 9:12, 9:15, 9:18, 73:11, 101:17
**bringing** [2] - 6:16, 8:16
**broad** [7] - 23:19, 44:13, 50:14, 61:11, 62:7, 67:13, 77:22
**broadcasting** [1] - 4:2
**broadly** [4] - 34:19, 44:15, 61:7, 106:12
**broken** [1] - 9:5
**brought** [3] - 6:15, 24:5, 62:5
**bullets** [1] - 26:16
**bunch** [1] - 18:3
**burden** [1] - 9:9
**burdens** [1] - 33:5
**businesses** [2] - 3:19, 25:23
**BY** [2] - 1:14, 1:18

**C**

**C)** [1] - 26:15
**cable** [1] - 4:2
**calculation** [1] - 82:14
**California** [1] - 101:7
**candor** [1] - 105:4
**cannot** [9] - 19:12, 54:4, 54:19, 58:15, 64:18, 70:21, 75:25, 83:21, 102:7
**capricious** [8] - 46:3, 54:25, 55:3, 55:6,

57:1, 62:13, 63:24, 97:22
**capture** [1] - 48:12
**care** [2] - 105:14, 114:11
**careful** [1] - 10:6
**carried** [2] - 56:19, 99:3
**carriers** [1] - 85:9
**carry** [2] - 39:2, 54:17
**carrying** [1] - 73:2, 77:9
**carved** [1] - 113:12
**CASE** [1] - 1:5
**Case** [1] - 2:2
**case** [49] - 3:12, 4:6, 4:10, 4:11, 6:20, 7:4, 7:10, 8:16, 14:7, 23:2, 23:18, 36:9, 36:24, 40:11, 42:24, 44:6, 44:21, 45:14, 45:17, 47:6, 47:16, 47:19, 47:22, 47:25, 49:24, 52:3, 52:12, 56:23, 59:16, 59:18, 60:5, 61:13, 63:18, 64:2, 64:9, 64:10, 66:15, 69:10, 72:14, 87:23, 88:12, 93:10, 95:6, 100:5, 100:15, 100:19, 101:7, 101:8
**cases** [21] - 7:5, 17:2, 24:8, 36:16, 44:1, 50:2, 50:16, 50:18, 51:21, 52:5, 58:7, 59:15, 81:3, 82:10, 83:9, 104:20, 104:22, 106:9, 109:17, 109:18, 109:25
**Casino** [1] - 47:15
**category** [1] - 75:1
**causing** [1] - 57:17
**cell** [1] - 54:4
**Center** [36] - 1:3, 2:2, 2:12, 3:12, 3:13, 3:14, 33:16, 33:19, 34:15, 34:23, 35:2, 35:13, 35:23, 35:25, 36:4, 36:8, 38:10, 38:12, 39:18, 39:25, 40:8, 50:10, 57:12, 57:13, 57:20, 57:21, 58:19, 58:21, 59:2, 61:24, 62:8, 72:23, 108:22, 109:14, 109:16, 113:21
**Center's** [10] - 33:23, 34:14, 34:19, 36:12,

40:2, 57:18, 59:10, 61:16, 102:5, 109:9
**centralized** [3] - 75:7, 76:5, 77:16
**Centro** [8] - 7:1, 7:9, 7:10, 7:12, 7:15, 7:20, 8:1, 81:22
**certain** [14] - 6:11, 7:11, 31:11, 31:14, 31:20, 33:21, 34:18, 42:18, 57:22, 58:15, 58:16, 68:24, 75:3, 102:13
**certainly** [11] - 24:2, 47:24, 68:23, 69:14, 81:3, 82:24, 84:9, 86:23, 98:7, 100:11, 112:14
**CERTIFICATE** [1] - 114:14
**Certified** [1] - 1:23
**certify** [1] - 114:16
**cetera** [10] - 20:5, 22:17, 33:7, 33:18, 45:21, 57:5, 71:6, 79:2, 80:25
**CFR** [1] - 24:22
**challenge** [7] - 5:12, 6:25, 50:8, 50:12, 62:5, 66:19, 67:7
**challenged** [1] - 63:15
**challenging** [1] - 50:13
**change** [17] - 46:3, 47:13, 47:14, 48:7, 55:3, 55:8, 55:14, 67:13, 69:13, 70:6, 70:15, 70:18, 70:25, 99:12, 99:19, 106:23
**changed** [3] - 9:19, 57:25, 108:20
**changes** [11] - 46:10, 47:12, 48:2, 56:13, 56:17, 56:25, 59:4, 67:20, 67:21, 85:13, 99:18
**changing** [1] - 35:18
**Chao** [2] - 52:9, 74:9
**Chaplaincy** [1] - 101:8
**characterize** [1] - 49:9
**charges** [2] - 14:16, 14:23
**cheats** [1] - 80:23
**check** [3] - 11:23, 87:15, 100:7
**checked** [4] - 27:1, 70:3, 72:4, 99:1

**checking** [2] - 23:5, 23:21
**checks** [1] - 77:23
**chief** [2] - 31:1, 41:19
**child** [4] - 35:23, 36:1, 36:2, 58:9
**children** [1] - 58:10
**choose** [1] - 32:20
**CIO** [4] - 3:20, 3:24, 44:2, 47:20
**circuit** [2] - 45:13, 50:17
**Circuit** [7] - 48:10, 51:23, 61:19, 61:22, 62:4, 74:13, 101:8
**circumstances** [5] - 28:18, 54:3, 71:1, 71:2, 72:23
**cite** [5] - 10:2, 45:14, 89:17, 98:2, 98:4
**cited** [1] - 50:16
**citizen** [1] - 35:24, 42:22
**citizenship** [1] - 56:10
**Civil** [2] - 4:14, 51:12
**civil** [11] - 2:2, 17:6, 17:17, 49:19, 49:23, 63:11, 72:7, 72:12, 73:22, 107:20, 111:17
**claim** [8] - 4:20, 6:15, 50:15, 58:13, 68:15, 72:24, 73:2, 98:25
**claimed** [2] - 58:11, 66:21
**claiming** [1] - 48:16
**claims** [2] - 46:1, 102:4
**clarification** [3] - 8:13, 9:14, 101:22
**clarify** [4] - 10:17, 22:11, 46:9, 101:18
**clarity** [1] - 8:14
**clear** [11] - 3:9, 5:11, 7:6, 8:25, 21:7, 28:3, 47:4, 48:10, 51:24, 84:16, 113:9
**clearcut** [1] - 102:8
**clearly** [3] - 3:6, 19:12, 79:16
**CLERK** [1] - 2:2
**Clerk** [2] - 4:9, 4:13
**client** [11] - 35:23, 35:25, 36:5, 42:24, 57:20, 57:21, 57:23, 58:1, 75:23, 76:7, 110:16
**clients** [30] - 8:24, 35:14, 35:20, 35:22,

36:7, 36:9, 36:13, 36:21, 36:25, 37:1, 37:23, 38:18, 39:20, 40:1, 40:2, 40:6, 40:9, 40:14, 43:21, 57:18, 58:3, 58:14, 58:20, 58:21, 58:23, 59:10, 61:24, 100:7, 109:2
**clients'** [1] - 41:2
**clinic** [10] - 3:15, 34:16, 35:4, 35:22, 36:20, 36:24, 37:5, 37:13, 39:21, 109:11
**clinic's** [1] - 36:21
**clinics** [3] - 34:17, 35:6, 36:20
**close** [1] - 18:15
**closer** [1] - 57:4
**Code** [15] - 6:10, 10:5, 46:2, 47:11, 50:5, 50:20, 51:18, 52:1, 66:11, 72:19, 73:18, 74:1, 74:17, 87:24, 101:10
**code** [4] - 10:3, 14:4, 50:25, 72:8
**cogent** [1] - 104:21
**colleague** [2] - 51:7, 52:2
**colleagues** [1] - 2:22
**collect** [1] - 56:1
**collected** [1] - 75:20
**COLLEEN** [1] - 1:10
**colloquially** [1] - 18:5
**color** [2] - 11:16, 22:20
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 114:16
**combination** [2] - 47:9, 49:6
**comedy** [1] - 7:24
**comfortable** [1] - 105:5
**coming** [3] - 58:3, 104:20
**commingled** [2] - 65:1, 75:12
**commissioner** [1] - 41:22
**commit** [1] - 104:7
**committed** [1] - 18:16
**Committee** [1] - 53:14
**common** [5] - 43:14, 77:21, 112:24, 113:2, 113:5
**Communication** [2] -

2:13, 3:23
**communities** [1] - 36:8
**community** [1] - 59:11
**compared** [1] - 72:17
**comparing** [2] - 90:16, 91:1
**competent** [1] - 111:3
**competing** [1] - 110:13
**competition** [1] - 110:8
**competitive** [2] - 110:7, 113:17
**complaint** [7] - 4:15, 4:16, 4:19, 6:15, 67:11, 67:12, 67:25
**complete** [4] - 11:15, 65:17, 65:18, 103:14
**completed** [2] - 71:8, 71:21
**completely** [1] - 59:7
**complex** [5] - 8:16, 72:19, 73:25, 74:5, 104:18
**complicated** [2] - 16:10, 73:20
**complied** [7] - 10:9, 18:12, 68:12, 86:10, 86:14, 96:14, 111:8
**compliment** [3] - 104:14, 110:25, 111:1
**comply** [3] - 62:25, 68:11, 86:8
**components** [2] - 44:14, 62:14
**comport** [1] - 61:5
**comprehensive** [1] - 49:18
**computer** [1] - 84:10
**concept** [1] - 87:24
**concern** [1] - 96:10
**concerns** [3] - 5:12, 52:4, 75:6
**conclude** [3] - 26:8, 61:15, 62:10
**concluded** [2] - 88:24, 114:12
**conclusion** [3] - 45:15, 100:20, 106:1
**conclusions** [1] - 34:10
**concrete** [1] - 67:24
**condition** [4] - 35:3, 35:6, 38:15, 109:20
**conduct** [20] - 6:14, 25:19, 30:13, 34:18, 35:2, 38:9, 38:12,

46:6, 48:17, 50:19, 58:23, 64:11, 80:10, 80:14, 81:5, 81:6, 81:15, 81:17, 91:24, 94:9
**conducted** [7] - 29:16, 29:21, 53:20, 84:13, 88:17, 89:7, 89:12
**conducts** [1] - 114:2
**confer** [2] - 56:2, 103:15
**Conference** [1] - 114:18
**confidence** [10] - 27:2, 27:4, 32:13, 43:15, 45:1, 45:8, 45:10, 45:18, 112:18, 113:3
**confident** [1] - 13:16
**confidential** [7] - 35:18, 38:17, 41:14, 74:21, 75:13, 76:8, 106:20
**confidentiality** [2] - 53:5, 76:1
**confirm** [4] - 6:1, 39:10, 39:11, 110:16
**conflict** [1] - 58:24
**conformance** [1] - 114:17
**Congress** [15] - 51:25, 54:5, 54:15, 55:10, 55:21, 56:12, 64:19, 65:5, 72:16, 73:19, 74:1, 112:20, 113:1, 113:5, 113:11
**consequences** [6] - 66:23, 67:6, 67:8, 70:16, 71:25
**consider** [3] - 55:19, 59:20, 70:25
**considered** [7] - 15:12, 34:9, 55:21, 56:3, 56:4, 56:13, 92:7
**considering** [2] - 17:22, 55:23
**considers** [2] - 45:15, 56:11
**consists** [1] - 94:2
**consolidating** [1] - 49:1
**Constitution** [1] - 1:24
**constraints** [1] - 113:21
**construction** [1] - 50:22
**consult** [1] - 8:20

**consummated** [1] - 67:5
**consummation** [1] - 66:20
**contact** [1] - 23:4
**contain** [1] - 98:10
**contained** [3] - 5:14, 56:21, 75:25
**contemplate** [1] - 10:6
**contemplated** [2] - 10:19, 65:5
**contend** [1] - 66:25
**context** [6] - 10:1, 13:23, 45:20, 52:8, 64:5, 79:6
**continue** [6] - 19:24, 36:5, 42:5, 43:3, 71:22, 110:2
**continued** [2] - 53:10, 54:23
**contracts** [1] - 4:2
**contrary** [9] - 46:1, 52:16, 52:17, 62:13, 74:19, 109:4, 111:20, 111:21, 113:4
**contrasted** [1] - 53:22
**contribute** [1] - 56:8
**control** [1] - 96:10
**controlling** [1] - 45:17
**controls** [2] - 68:8, 69:7
**conventions** [1] - 42:18
**conversations** [1] - 107:1
**convincing** [1] - 51:24
**copy** [1] - 75:5
**core** [1] - 6:9
**correct** [18] - 11:3, 11:5, 12:1, 12:17, 20:10, 20:11, 22:18, 27:2, 28:14, 29:8, 40:19, 40:20, 46:11, 46:13, 69:11, 75:14, 75:15, 75:16
**correctly** [4] - 19:21, 40:3, 68:25, 79:19
**counsel** [15] - 2:4, 3:2, 3:7, 8:19, 30:18, 35:14, 41:19, 57:18, 57:21, 57:22, 58:20, 58:23, 67:15, 104:14, 111:3
**counsel's** [2] - 31:9, 31:12
**counsels** [1] - 57:20

**country** [7] - 3:19, 16:9, 56:8, 92:1, 93:2, 95:19, 95:20
**country's** [1] - 56:1
**couple** [7] - 13:13, 19:14, 66:6, 81:3, 86:25, 102:2, 103:21
**course** [1] - 102:15
**Court** [30] - 1:23, 2:1, 4:9, 4:13, 5:2, 5:11, 7:14, 7:20, 10:12, 32:17, 44:2, 44:3, 45:15, 48:13, 51:24, 52:9, 58:16, 60:5, 60:8, 64:18, 65:22, 73:10, 98:24, 100:12, 105:21, 110:11, 111:21, 113:24, 114:15, 114:15
**COURT** [193] - 1:1, 2:6, 2:15, 2:18, 2:24, 3:4, 9:25, 10:24, 11:9, 11:23, 12:2, 12:11, 12:20, 12:25, 13:7, 13:19, 13:22, 15:1, 15:3, 15:5, 15:8, 15:11, 15:17, 15:24, 16:14, 16:24, 17:10, 17:20, 18:9, 18:24, 19:19, 20:2, 20:14, 20:18, 20:24, 21:2, 21:11, 21:22, 21:25, 22:3, 22:21, 23:25, 24:16, 25:14, 26:3, 26:7, 26:12, 26:15, 27:6, 27:13, 27:15, 27:19, 27:25, 28:7, 28:15, 28:21, 29:6, 29:11, 30:4, 30:9, 30:11, 30:17, 31:3, 31:14, 32:3, 32:16, 33:2, 34:6, 34:9, 34:13, 35:8, 37:15, 38:19, 39:11, 39:17, 40:12, 40:16, 40:21, 41:8, 43:8, 44:25, 45:19, 46:14, 47:7, 48:15, 49:6, 49:14, 50:24, 51:8, 52:13, 52:15, 54:25, 57:2, 59:12, 59:15, 59:22, 59:24, 61:14, 62:9, 63:25, 64:5, 64:12, 65:24, 67:8, 67:18, 68:6, 70:8, 70:18, 70:23, 71:14, 72:6, 72:22, 73:13, 74:4, 74:7, 74:11, 74:19, 75:15, 75:19, 76:3, 76:16, 76:18, 76:20,

77:5, 77:15, 78:2,
78:11, 78:13, 78:22,
80:5, 80:10, 80:20,
81:19, 81:25, 82:16,
83:8, 83:23, 84:8,
84:22, 85:5, 85:11,
86:1, 86:9, 86:13,
86:20, 87:3, 87:7,
87:13, 87:16, 87:18,
88:1, 88:6, 88:15,
88:23, 89:13, 90:6,
90:20, 91:3, 91:23,
92:13, 93:5, 93:21,
94:15, 95:4, 95:8,
95:14, 96:7, 97:9,
97:12, 97:19, 98:2,
98:25, 99:18, 100:4,
100:10, 100:25,
101:13, 102:2,
103:12, 103:20,
104:12, 105:17,
105:23, 110:6,
110:12, 110:17,
110:19, 110:21,
110:23, 111:1, 111:6,
114:7, 114:22
  **court** [12] - 16:17,
17:12, 17:13, 49:17,
58:17, 65:25, 82:3,
99:6, 99:9, 99:23,
101:14, 109:5
  **court-ordered** [1] -
82:3
  **courtroom** [2] - 4:7,
9:1
  **courts** [8] - 43:13,
45:4, 46:23, 47:23,
50:3, 51:12, 52:5,
73:21
  **cover** [3] - 89:1,
89:9, 103:1
  **covered** [2] - 112:23,
113:13
  **create** [1] - 113:5
  **created** [2] - 34:16,
87:23
  **creating** [1] - 67:13
  **credible** [1] - 33:13
  **credit** [2] - 35:25,
58:9
  **credits** [1] - 35:23
  **criminal** [84] - 6:12,
14:5, 14:8, 14:15,
14:16, 14:17, 14:22,
14:23, 15:13, 16:8,
17:7, 17:8, 17:10,
17:14, 17:18, 17:25,
19:5, 19:6, 19:9,
19:18, 20:5, 21:9,
23:17, 24:8, 25:9,

25:13, 29:13, 29:25,
30:5, 30:13, 49:20,
49:23, 50:6, 50:12,
50:18, 60:25, 61:8,
61:9, 63:5, 72:9,
72:12, 73:23, 75:1,
77:13, 77:14, 79:12,
80:10, 80:13, 80:14,
80:18, 81:5, 81:6,
81:7, 81:9, 81:13,
81:15, 81:17, 84:1,
86:4, 88:16, 88:19,
88:22, 88:25, 89:2,
89:4, 89:6, 89:10,
90:2, 91:24, 92:9,
93:2, 93:10, 94:5,
94:9, 95:3, 106:3,
106:7, 106:8, 107:10,
107:16, 108:1, 108:5,
111:18, 111:24
  **critical** [2] - 55:24,
56:1
  **CRR** [1] - 114:21
  **CSRA** [1] - 51:12
  **current** [1] - 25:12
  **CWA** [1] - 3:24

## D

  **damage** [1] - 61:16
  **damaged** [2] - 73:14,
73:15
  **damages** [8] - 49:19,
49:23, 50:5, 51:17,
52:4, 72:7, 72:12,
73:22
  **Dan** [1] - 2:22
  **Daniel** [1] - 51:9
  **DANIEL** [1] - 1:14
  **data** [98] - 5:12, 6:1,
6:3, 6:17, 6:21, 6:25,
7:18, 7:19, 10:7,
11:10, 11:12, 11:16,
11:18, 19:4, 21:3,
23:1, 23:8, 29:1, 31:2,
31:13, 33:25, 35:11,
39:20, 39:24, 40:23,
41:2, 41:20, 43:17,
43:18, 43:22, 43:25,
44:4, 44:11, 44:17,
45:24, 46:21, 47:17,
47:22, 47:24, 48:1,
48:4, 49:4, 50:22,
53:8, 53:10, 53:12,
53:15, 53:24, 54:2,
55:1, 55:4, 55:11,
60:9, 60:19, 60:20,
61:10, 62:11, 62:14,
64:13, 64:19, 64:21,
65:6, 66:19, 67:14,

68:10, 68:13, 69:25,
71:18, 72:1, 75:9,
80:4, 84:4, 85:1,
85:10, 87:11, 87:12,
87:13, 87:14, 87:23,
90:6, 90:16, 90:17,
90:19, 93:1, 93:3,
99:15, 100:19,
100:20, 106:1,
106:14, 106:17,
107:22, 108:11,
108:16, 109:4,
111:11, 112:12
  **Data** [11] - 46:16,
46:17, 46:19, 47:8,
63:1, 65:10, 67:12,
67:16, 67:18, 68:2
  **database** [7] - 32:8,
44:13, 65:3, 75:20,
75:22, 77:16
  **databases** [2] -
44:12, 91:1
  **date** [24] - 5:2, 16:7,
16:9, 17:19, 25:11,
25:12, 30:2, 81:23,
82:3, 82:6, 82:7,
82:15, 84:6, 84:11,
87:25, 88:9, 88:12,
90:4, 91:20, 92:15,
95:12, 97:17, 104:12
  **dated** [1] - 13:1
  **Dated** [1] - 114:19
  **dates** [1] - 91:20
  **days** [14] - 4:23,
16:8, 25:12, 30:16,
41:21, 58:17, 81:22,
81:24, 82:14, 84:6,
91:20, 103:11, 106:9,
114:8
  **DC** [12] - 1:12, 1:15,
1:19, 1:24, 44:2,
46:23, 48:10, 51:23,
61:19, 61:22, 62:3,
101:7
  **de** [1] - 7:1
  **dead** [2] - 20:7, 96:8
  **deadline** [1] - 58:4,
58:5, 58:16
  **deadlines** [2] - 5:8,
58:3
  **dealt** [1] - 51:10
  **death** [1] - 84:22
  **decades** [5] - 37:9,
44:19, 44:20, 54:10,
55:10
  **decide** [6] - 6:5,
6:13, 6:20, 7:8, 39:1,
43:10
  **decided** [2] - 62:2,
91:12

  **deciding** [2] - 83:1,
92:7
  **decision** [8] - 59:16,
66:20, 66:22, 73:3,
74:13, 78:18, 94:19,
100:8
  **decision-making** [1]
- 66:20
  **decisions** [4] - 58:7,
100:12, 103:7, 103:9
  **declaration** [3] -
12:25, 42:6, 78:3
  **deemed** [1] - 65:11
  **deeply** [2] - 36:9
  **defend** [1] - 107:6
  **defendant** [5] -
35:17, 36:16, 52:20,
57:3, 66:2
  **defendants** [35] -
3:2, 4:14, 4:18, 4:22,
4:23, 5:3, 9:3, 9:5,
9:9, 9:23, 40:21, 41:6,
42:9, 45:14, 49:17,
50:16, 51:11, 51:21,
53:19, 55:16, 59:1,
60:13, 61:2, 63:10,
65:8, 66:5, 72:15,
80:11, 102:17,
105:25, 106:13,
107:6, 109:4, 110:1
  **Defendants** [1] - 1:8
  **DEFENDANTS** [1] -
1:17
  **defendants'** [8] -
4:21, 5:5, 6:14, 36:10,
46:10, 105:20,
106:15, 108:19
  **defense** [1] - 108:10
  **define** [1] - 79:5
  **defined** [2] - 49:10,
79:23
  **definition** [1] - 82:23
  **degree** [3] - 15:19,
15:20, 27:2
  **delay** [1] - 114:10
  **Democracy** [1] - 1:13
  **demonstrate** [1] -
54:22
  **demonstrated** [2] -
73:20, 109:8
  **denied** [4] - 7:2,
7:21, 47:22, 59:4
  **denominator** [1] -
29:10
  **deny** [1] - 55:16
  **Department** [6] -
1:17, 3:1, 3:3, 5:15,
5:16, 44:2
  **dependent** [1] -
35:24

  **deport** [1] - 30:6
  **deportation** [9] -
17:6, 17:17, 43:4,
43:7, 60:16, 107:20,
107:23, 108:7, 111:17
  **deported** [5] - 19:8,
84:15, 92:11, 94:7
  **DEPUTY** [1] - 2:2
  **describe** [1] - 33:20
  **described** [3] - 71:8,
77:9, 92:17
  **designated** [4] -
4:10, 14:17, 29:18,
29:19
  **designed** [1] - 54:14
  **desire** [1] - 51:21
  **despite** [1] - 112:2
  **destroy** [2] - 65:19,
65:21
  **destroyed** [1] - 65:12
  **destruction** [1] -
113:25
  **detail** [1] - 64:4
  **detailed** [1] - 99:2
  **details** [1] - 75:3
  **determination** [3] -
53:1, 94:9, 96:2
  **determine** [7] - 25:9,
25:12, 50:22, 89:23,
92:24, 96:6, 97:16
  **determined** [3] -
18:22, 26:5, 66:23
  **determining** [3] -
84:1, 84:21, 112:3
  **DHS** [8] - 6:19,
18:11, 18:16, 44:14,
62:14, 71:23, 75:8
  **DHS's** [1] - 76:7
  **DHS/ICE** [1] - 104:10
  **Diaz** [1] - 42:16
  **dicta** [1] - 74:9
  **difference** [2] -
99:21, 102:18
  **different** [18] - 7:10,
7:14, 8:1, 14:20, 17:7,
26:16, 28:1, 28:11,
28:22, 28:24, 51:16,
67:14, 79:23, 99:6,
102:25, 103:1, 103:2,
104:16
  **difficult** [1] - 106:10
  **digging** [1] - 29:1
  **Diplomate** [1] - 1:22
  **direct** [6] - 7:12,
50:19, 65:20, 91:2,
110:9
  **directed** [3] - 5:5,
24:22, 79:2
  **directing** [1] - 5:3
  **directly** [49] - 14:8,

14:15, 14:22, 15:12, 15:14, 15:23, 15:25, 17:22, 17:24, 18:17, 19:1, 19:17, 20:1, 20:4, 20:22, 21:6, 21:9, 21:19, 22:6, 22:17, 23:2, 24:2, 24:7, 24:12, 24:15, 24:18, 24:24, 36:17, 59:9, 60:24, 63:5, 69:5, 77:13, 78:16, 79:6, 80:1, 82:2, 82:10, 82:18, 82:25, 83:16, 83:24, 85:7, 85:21, 85:25, 102:21, 107:9, 111:13, 111:15
**directly"** [1] - 83:19
**director** [1] - 78:5
**directors** [1] - 40:7
**disagree** [4] - 25:7, 67:3, 67:21, 97:7
**disagreement** [2] - 26:9, 72:17
**discernment** [1] - 106:25
**disclose** [7] - 14:5, 22:14, 29:12, 44:23, 54:13, 63:9, 89:3
**disclosed** [16] - 22:5, 41:24, 42:11, 42:13, 42:25, 44:5, 44:11, 44:24, 54:3, 54:16, 60:21, 61:7, 61:10, 63:4, 107:8, 109:6
**disclosing** [5] - 46:21, 49:4, 79:1, 106:16, 109:4
**disclosure** [24] - 6:7, 6:11, 21:18, 22:6, 41:13, 44:4, 45:11, 49:11, 51:19, 52:6, 53:4, 60:6, 60:9, 60:11, 60:23, 61:3, 61:5, 61:12, 62:25, 63:19, 74:24, 89:15, 91:5, 97:23
**disclosures** [23] - 16:15, 24:24, 42:1, 42:3, 42:5, 47:5, 48:4, 50:7, 50:9, 53:6, 53:14, 54:24, 62:18, 62:21, 63:3, 63:6, 63:13, 63:16, 65:9, 86:3, 88:18, 103:25
**discrete** [1] - 50:6
**discuss** [3] - 9:16, 24:1, 82:17
**discussed** [5] - 54:11, 55:21, 74:18, 88:9, 100:2

**discusses** [1] - 45:16
**discussing** [5] - 5:12, 7:7, 40:13, 64:5, 98:20
**discussion** [1] - 63:17
**discussions** [1] - 107:1
**dismiss** [6] - 4:15, 4:18, 4:22, 4:24, 100:8, 100:11
**disperse** [1] - 19:1
**displeasure** [1] - 41:23
**disputes** [2] - 3:16, 58:16
**distinct** [2] - 7:8, 41:3
**distinction** [4] - 28:16, 30:11, 75:1, 84:23
**distinguish** [1] - 59:16
**distinguishes** [1] - 61:13
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [3] - 44:3, 114:15
**district** [1] - 6:24
**document** [1] - 46:17
**documents** [2] - 47:9, 79:21
**Doe** [5] - 42:16, 52:3, 52:9, 74:9
**DOGE** [1] - 47:21
**DOJ** [1] - 63:18
**done** [18] - 25:4, 41:4, 64:16, 66:17, 67:20, 68:14, 84:2, 84:4, 90:21, 91:1, 91:4, 91:11, 93:3, 93:8, 99:11, 103:4, 104:17, 106:16
**down** [3] - 77:5, 88:1, 113:20
**drawn** [1] - 34:10
**drop** [1] - 59:5
**drop-off** [1] - 59:5
**ducking** [1] - 73:13
**dues** [1] - 40:7
**during** [1] - 58:9

## E

**easily** [1] - 90:4
**easy** [1] - 105:11
**ECF** [1] - 21:24
**edited** [1] - 99:4

**educate** [1] - 33:21
**education** [1] - 4:3
**educational** [1] - 35:15
**effective** [2] - 38:23, 100:17
**effectively** [2] - 38:11, 57:25
**effects** [1] - 102:4
**effectuated** [2] - 62:21, 63:1
**effectuation** [1] - 47:5
**efficiency** [1] - 7:24
**effort** [1] - 56:17
**either** [5] - 8:17, 12:5, 27:15, 56:7, 96:11
**either/or** [1] - 27:14
**electronically** [2] - 90:22, 91:11
**ELIZABETH** [1] - 1:18
**Elizabeth** [1] - 3:3
**employ** [1] - 50:11
**employed** [1] - 30:18
**employee** [2] - 15:12, 22:6
**Employees** [2] - 2:14, 3:20
**employees** [22] - 14:7, 14:10, 14:14, 14:21, 16:16, 17:23, 18:1, 20:4, 21:19, 22:14, 24:1, 24:6, 24:18, 49:20, 54:17, 69:17, 72:9, 76:25, 77:8, 77:11, 79:2, 90:12
**en** [1] - 49:4
**enacting** [1] - 55:22
**encourages** [1] - 55:25
**encouraging** [1] - 36:25
**end** [7] - 9:16, 25:14, 31:4, 31:5, 57:4, 74:12, 110:24
**enforcement** [5] - 18:22, 19:24, 63:16, 72:4, 94:12
**engage** [2] - 36:13, 37:1
**engaged** [24] - 6:12, 14:8, 14:15, 14:22, 15:12, 15:14, 17:24, 18:17, 19:17, 20:1, 20:5, 20:17, 20:23, 21:19, 22:7, 24:7, 24:18, 60:25, 63:5,

79:6, 82:18, 83:24, 102:22, 107:9
**engagement** [2] - 36:10, 36:22
**engaging** [1] - 37:5
**English** [2] - 34:24, 109:15
**enjoin** [1] - 55:1
**enjoined** [1] - 52:17
**enjoining** [1] - 7:2
**enjoyable** [2] - 105:13, 111:2
**ensure** [12] - 53:11, 53:21, 53:23, 53:24, 54:2, 54:11, 54:23, 63:21, 64:21, 64:23, 106:20, 107:2
**ensured** [1] - 90:16
**ensuring** [1] - 86:2
**enter** [1] - 110:16
**entering** [1] - 66:15
**entire** [1] - 92:23
**entirely** [1] - 86:18
**entitled** [6] - 35:21, 35:22, 35:25, 37:3, 56:2, 114:17
**eons** [1] - 105:3
**EPA** [1] - 46:24
**equates** [1] - 5:23
**error** [1] - 36:3
**ESL** [8] - 34:23, 38:13, 38:15, 58:21, 109:17, 109:18, 109:24, 109:25
**especially** [1] - 90:23
**essence** [1] - 18:6
**established** [1] - 81:16
**establishes** [2] - 74:20, 75:8
**et** [14] - 1:3, 1:6, 2:3, 20:5, 22:17, 33:7, 33:18, 45:21, 57:5, 71:6, 79:2, 80:25
**evaluate** [1] - 77:11
**evaluating** [1] - 63:19
**events** [7] - 38:14, 38:16, 38:17, 58:20, 109:16, 109:17, 109:24
**evidence** [25] - 33:13, 40:25, 42:14, 44:3, 44:6, 46:25, 47:14, 47:18, 47:19, 47:24, 48:6, 49:12, 51:25, 56:3, 60:18, 60:19, 61:12, 100:3, 106:6, 107:7, 107:18, 107:20, 108:8, 108:18

**evident** [1] - 52:1
**exact** [10] - 11:6, 11:19, 27:3, 27:8, 31:23, 32:10, 32:12, 32:25, 42:11
**exactly** [7] - 14:25, 20:2, 21:22, 22:4, 27:1, 32:12, 32:21
**example** [19] - 34:20, 35:17, 35:19, 35:23, 38:13, 42:15, 46:23, 53:13, 56:18, 57:20, 58:4, 58:9, 63:3, 63:9, 63:15, 63:17, 64:25, 77:3, 107:25
**examples** [1] - 29:18
**exceeded** [1] - 84:21
**excellent** [2] - 104:17, 104:25
**exception** [1] - 74:23
**exclusionary** [1] - 50:18
**exclusive** [1] - 74:3
**excuse** [3] - 16:7, 18:14, 28:6
**excused** [1] - 114:11
**executed** [3] - 5:14, 13:5, 18:10
**exist** [1] - 59:4
**existed** [2] - 47:18, 47:24
**existence** [4] - 47:3, 47:23, 55:17, 60:2
**existing** [2] - 51:14, 60:19
**exists** [6] - 41:16, 47:4, 47:19, 48:7, 49:13, 60:8
**expect** [7] - 15:24, 23:14, 24:3, 82:19, 93:13, 94:24, 108:14
**expectation** [7] - 23:9, 25:1, 43:22, 44:19, 79:9, 82:24, 96:12
**expected** [3] - 22:4, 84:25, 85:18
**expedition** [2] - 106:2, 106:12
**explain** [5] - 18:9, 33:23, 45:5, 46:14
**explained** [4] - 55:15, 67:19, 81:21
**explaining** [1] - 66:12
**explains** [1] - 24:13
**explanation** [2] - 37:12, 99:20
**explanations** [1] - 56:24

explicit [1] - 86:11
explicitly [1] - 48:8
expressed [1] -
41:23
expressly [1] - 6:16
extension [2] - 58:6,
72:2
extensive [2] -
51:13, 51:20

**F**

face [6] - 39:23, 57:1,
80:5, 82:14, 93:4,
113:21
fact [16] - 7:25,
37:22, 39:2, 50:23,
54:24, 70:1, 73:11,
80:11, 93:11, 98:9,
98:20, 98:22, 105:4,
108:5, 108:7, 112:20
factor [2] - 14:20,
16:11
facts [4] - 10:14,
10:16, 104:13, 104:23
factual [5] - 7:14,
9:6, 10:1, 13:25,
103:24
fail [1] - 45:1
failed [1] - 55:19
failing [1] - 30:5
failure [1] - 4:20
fair [1] - 90:25
familiar [4] - 43:10,
59:12, 76:12, 99:12
families [2] - 42:17,
42:19
family [1] - 42:20
far [1] - 96:22
fast [1] - 103:5
father [1] - 42:20
father's [1] - 32:19
fault [1] - 38:23
favor [1] - 100:21
fearful [3] - 36:9,
37:4, 42:24
February [1] - 4:9
Federal [3] - 2:14,
3:20, 114:15
FEDERAL [1] -
114:22
federal [27] - 1:23,
3:16, 3:22, 4:2, 6:11,
14:17, 34:16, 35:3,
35:6, 37:17, 37:22,
38:5, 39:8, 49:20,
64:25, 65:4, 66:14,
66:16, 69:15, 72:9,
73:1, 75:12, 77:3,
77:7, 102:5, 102:11,

113:16
federally [1] - 3:14
Federation [3] -
2:14, 3:20, 74:14
few [5] - 10:17,
47:21, 100:23,
105:20, 112:9
FFE [1] - 3:21
fields [1] - 4:4
figure [7] - 16:11,
46:19, 48:20, 64:6,
83:9, 91:3, 91:9
figured [1] - 93:8
file [18] - 11:18, 36:1,
36:25, 44:12, 57:23,
58:4, 61:11, 83:10,
85:10, 87:11, 87:12,
87:13, 87:14, 87:23,
90:19, 94:6, 108:9,
109:12
filed [5] - 4:16, 4:21,
4:23, 4:25, 102:8
files [4] - 12:9, 90:16,
91:14, 108:18
filing [2] - 58:3, 58:4
filled [1] - 53:21
final [38] - 6:23,
11:10, 30:6, 45:21,
45:24, 46:1, 46:5,
46:11, 46:18, 46:21,
48:16, 48:18, 48:21,
48:24, 48:25, 49:10,
49:16, 52:7, 57:16,
62:12, 66:13, 66:24,
67:1, 67:4, 68:1,
69:22, 70:6, 70:8,
70:11, 70:13, 70:21,
71:1, 71:3, 71:9,
71:10, 87:25, 88:12,
100:1
finality [2] - 46:6,
47:2
Finally [1] - 109:9
finally [3] - 6:19, 9:7,
56:4
financial [2] - 36:6,
46:8
fine [1] - 104:6
firing [2] - 49:20,
72:9
firm [1] - 105:10
first [15] - 6:24, 8:5,
23:3, 24:3, 26:5,
33:10, 41:17, 55:11,
60:1, 67:23, 88:13,
100:9, 105:24, 107:7,
108:22
fishing [2] - 106:2,
106:12
fits [1] - 91:17

five [3] - 4:23,
101:15, 108:3
flow [5] - 66:23, 67:6,
70:16, 72:1
focal [1] - 7:15
focus [1] - 66:10
focused [4] - 3:13,
66:13, 67:12, 101:3
focussed [1] - 67:16
folks [5] - 37:4,
38:18, 59:7, 60:14
follow [6] - 15:20,
19:16, 68:18, 71:22,
102:2
follow-ups [1] -
102:2
followed [5] - 70:10,
71:20, 86:22, 86:23,
111:10
following [3] - 30:6,
41:22, 50:2
follows [4] - 17:16
FOR [3] - 1:1, 1:13,
1:17
force [1] - 114:2
foreclose [2] - 50:4,
50:15
foregoing [1] -
114:16
forever [1] - 58:8
forget [2] - 11:19,
83:17
form [1] - 57:11
format [3] - 87:3,
87:8, 114:17
forth [6] - 40:7,
47:25, 54:18, 89:15,
91:4, 99:2
forward [2] - 26:1,
103:21
Forward [1] - 1:13
Foundation [1] -
1:13
four [1] - 2:23
Fourth [1] - 74:13
frame [1] - 113:8
framework [1] -
63:25
frankly [2] - 25:15,
78:23
free [2] - 3:15, 8:19
Friday [1] - 1:11
Friedrich [4] - 7:2,
7:9, 7:20, 81:21
front [5] - 7:20,
21:25, 36:5, 101:12,
111:4
frustrated [1] - 37:4
fulfill [1] - 70:1
fully [2] - 48:21,

69:14
fun [2] - 105:2, 105:3
functions [1] - 35:12
fundamental [1] -
67:10
funded [1] - 3:14
funding [32] - 33:20,
33:24, 34:14, 34:17,
35:3, 35:6, 37:16,
37:17, 37:18, 37:21,
38:2, 38:3, 38:5, 38:6,
38:8, 38:12, 38:16,
38:20, 38:21, 39:8,
73:1, 102:5, 102:11,
102:14, 109:10,
110:2, 110:14,
113:15, 113:16,
113:19
funding-related [2] -
33:20, 33:24
funds [1] - 109:20
future [16] - 40:23,
41:2, 41:6, 43:17,
50:8, 57:9, 62:14,
71:23, 72:13, 83:9,
88:18, 88:25, 89:9,
92:25, 104:1, 114:4

**G**

Garcia [1] - 51:24
gatekeeper [1] -
106:17
gather [1] - 14:1
geared [1] - 73:1
general [5] - 30:18,
31:9, 31:12, 74:20,
74:24
generally [3] - 13:10,
23:15, 82:19
gestured [1] - 51:11
Gitomer [4] - 2:12,
34:2, 53:3, 105:18
GITOMER [46] - 1:14,
2:11, 2:17, 2:21, 34:2,
34:8, 34:11, 34:14,
35:13, 38:8, 39:6,
39:16, 40:8, 40:15,
40:20, 41:5, 41:13,
43:20, 45:7, 46:13,
46:20, 47:10, 48:23,
49:8, 49:25, 51:7,
53:3, 55:7, 57:12,
59:14, 59:21, 60:1,
61:19, 62:17, 64:3,
64:9, 64:17, 103:19,
105:15, 105:18,
105:24, 110:10,
110:15, 110:18,
110:20, 110:22

given [15] - 22:10,
43:25, 44:22, 45:9,
45:10, 54:6, 56:9,
57:16, 82:14, 84:1,
98:23, 99:21, 106:11,
109:23, 110:3
goal [4] - 60:13,
60:14, 63:12
govern [1] - 6:10
government [15] -
3:22, 5:25, 37:22,
38:9, 44:25, 47:22,
48:8, 50:19, 54:17,
56:14, 66:15, 69:15,
102:16, 106:19,
111:22
grand [5] - 14:9,
14:11, 79:3, 80:25,
86:4
grant [6] - 109:20,
109:22, 110:6, 110:7,
110:12, 113:17
granted [2] - 94:18,
98:6
Granted [1] - 76:6
granting [1] - 47:24
group [2] - 23:19,
43:1
groups [1] - 104:10
guess [2] - 67:5,
76:21
guessing [1] - 10:3
guidance [3] - 69:15,
69:16, 79:8
guide [2] - 108:14,
108:17

**H**

hand [3] - 60:7,
64:10, 101:21
handled [1] - 85:10
handling [1] - 10:14
hands [3] - 23:24,
58:1, 64:18
hang [1] - 76:18
Hanna [1] - 2:22
HAP [1] - 46:24
happy [5] - 12:9,
40:10, 62:23, 105:8,
110:24
harder [2] - 27:8,
36:21
harm [17] - 7:11,
33:6, 39:23, 43:24,
57:5, 57:18, 59:17,
59:18, 61:14, 72:24,
100:21, 100:24,
101:11, 108:23,
112:1, 112:13

**harmed** [4] - 35:19, 36:11, 57:13
**harms** [13] - 35:14, 36:19, 39:20, 40:22, 41:2, 43:10, 43:11, 57:9, 60:3, 72:14, 108:25, 109:1, 109:8
**heads** [1] - 86:12
**healthcare** [1] - 4:3
**hear** [7] - 2:10, 3:9, 9:20, 41:6, 59:25, 66:12, 103:18
**heard** [3] - 42:9, 67:15, 106:11
**HEARING** [1] - 1:10
**hearing** [5] - 3:5, 8:4, 8:7, 9:16, 104:3
**hearings** [2] - 104:15
**heavy** [1] - 65:5
**held** [1] - 109:16
**help** [4] - 36:6, 51:18, 79:14, 96:6
**helpful** [13] - 12:11, 16:25, 25:15, 33:2, 39:15, 62:24, 81:11, 101:25, 102:3, 103:24, 104:3, 104:17, 109:13
**helps** [2] - 35:8, 101:11
**hereby** [1] - 114:16
**HICKMAN** [1] - 1:14
**Hickman** [1] - 2:22
**high** [3] - 27:2, 29:4, 106:13
**highly** [2] - 43:23, 112:21
**Hispanic** [3] - 32:16, 46:24, 59:7
**historical** [1] - 98:18
**history** [2] - 4:6, 51:14
**hold** [6] - 43:21, 57:9, 58:19, 58:20, 72:12, 87:5
**hole** [1] - 113:20
**Homeland** [1] - 5:16
**Honor** [111] - 2:11, 2:17, 2:21, 2:25, 9:24, 10:23, 11:5, 11:15, 12:10, 12:17, 12:24, 13:6, 13:12, 13:21, 14:25, 15:7, 15:9, 15:16, 16:2, 16:23, 17:5, 18:8, 19:15, 21:24, 22:20, 23:22, 25:7, 26:1, 26:18, 28:25, 29:24, 30:10, 31:13, 34:2, 34:8, 34:25, 38:8, 39:6,

39:10, 39:16, 40:8, 40:20, 41:5, 41:18, 42:8, 42:17, 45:7, 46:20, 46:22, 47:2, 47:20, 48:23, 49:25, 51:10, 52:14, 53:4, 58:5, 59:14, 59:21, 60:1, 60:24, 62:2, 62:17, 62:22, 64:4, 64:17, 65:8, 65:15, 65:20, 67:3, 69:23, 71:12, 71:24, 73:8, 74:6, 75:14, 75:24, 76:11, 77:6, 78:1, 78:12, 80:9, 83:25, 85:4, 86:7, 87:2, 87:11, 87:21, 89:20, 92:12, 97:7, 98:1, 99:25, 100:23, 101:6, 103:10, 103:19, 104:11, 105:15, 105:19, 109:9, 109:13, 109:23, 110:10, 110:15, 110:18, 110:20, 110:25, 113:23, 114:6
**Honor's** [1] - 108:21
**HONORABLE** [1] - 1:10
**hoping** [1] - 100:8
**horse** [3] - 20:7, 84:22, 96:8
**host** [1] - 77:1
**hours** [1] - 104:7
**House** [3] - 41:23, 43:5, 60:12
**housing** [1] - 75:8
**HUMPHREYS** [139] - 1:18, 2:25, 9:24, 10:23, 11:5, 11:15, 12:1, 12:5, 12:17, 12:24, 13:6, 13:12, 13:21, 14:25, 15:2, 15:4, 15:6, 15:9, 15:16, 15:19, 16:2, 16:22, 17:4, 17:15, 18:7, 18:10, 19:14, 19:23, 20:11, 20:16, 20:22, 21:1, 21:5, 21:14, 21:24, 22:2, 22:19, 23:22, 24:11, 25:7, 25:25, 26:4, 26:10, 26:13, 26:18, 27:9, 27:14, 27:17, 27:23, 28:2, 28:13, 28:18, 28:25, 29:9, 29:24, 30:8, 30:10, 30:15, 30:25, 31:11, 31:17, 32:10, 32:25, 67:3, 67:9, 67:23,

69:23, 70:14, 70:20, 71:11, 71:24, 72:15, 73:8, 73:17, 74:6, 74:8, 74:13, 75:14, 75:16, 75:23, 76:10, 76:17, 76:23, 77:6, 77:20, 78:9, 78:12, 78:20, 79:25, 80:8, 80:18, 81:16, 81:21, 82:12, 83:7, 83:20, 83:25, 84:18, 85:4, 85:6, 85:23, 86:6, 86:11, 86:16, 87:2, 87:11, 87:15, 87:21, 88:3, 88:8, 88:21, 89:11, 89:20, 90:15, 90:25, 91:18, 92:12, 92:21, 93:19, 94:8, 95:2, 95:5, 95:10, 96:2, 97:7, 97:10, 97:14, 98:1, 98:18, 99:13, 99:25, 100:7, 100:23, 101:5, 103:10, 104:11, 104:24, 111:5, 111:7
**Humphreys** [3] - 3:1, 105:9, 110:23
**hundreds** [1] - 3:24

---

**I**

**i)(2** [3] - 60:23, 61:5, 109:6
**IAM** [1] - 3:20
**ICE** [152] - 5:13, 5:16, 5:18, 5:21, 5:23, 6:3, 6:19, 6:25, 7:3, 7:17, 7:18, 10:15, 10:18, 10:21, 10:25, 11:17, 12:8, 13:3, 13:5, 13:8, 13:20, 13:23, 14:7, 14:13, 14:14, 14:18, 14:20, 14:21, 15:12, 16:6, 16:13, 17:23, 18:15, 18:16, 18:19, 18:20, 18:21, 18:24, 19:11, 19:15, 19:21, 19:25, 20:12, 20:19, 21:5, 21:18, 22:6, 22:11, 22:13, 22:14, 23:20, 24:14, 24:17, 25:20, 25:21, 26:5, 26:21, 26:23, 26:25, 27:22, 27:25, 28:6, 28:8, 28:12, 28:17, 28:22, 29:25, 31:19, 31:24, 32:4, 32:8, 33:25, 35:11, 39:20, 40:24, 41:11, 44:11, 44:14, 46:22, 49:5, 53:25, 54:20, 55:2,

55:12, 57:7, 61:3, 61:11, 62:11, 62:19, 63:10, 63:18, 64:14, 64:18, 65:9, 65:10, 65:11, 65:17, 65:20, 66:17, 69:10, 70:1, 70:3, 71:18, 71:23, 74:22, 75:23, 76:6, 77:3, 77:7, 77:8, 77:11, 77:18, 77:23, 78:4, 78:5, 78:15, 79:19, 79:25, 80:2, 82:13, 84:3, 85:22, 86:3, 86:7, 86:9, 87:9, 87:23, 88:8, 88:12, 90:7, 92:12, 93:14, 93:19, 94:11, 94:18, 95:3, 96:3, 96:6, 96:11, 96:12, 97:12, 100:19, 102:20, 102:21, 104:1, 106:16, 108:19, 111:10, 111:23, 113:25
**ICE's** [12] - 5:20, 6:6, 6:21, 10:10, 10:22, 11:10, 15:20, 20:12, 28:11, 30:23, 31:4
**ICE-provided** [1] - 25:21
**ID** [2] - 87:23, 88:12
**idea** [4] - 18:24, 51:3, 54:3, 102:11
**identical** [1] - 42:21
**identification** [13] - 25:1, 25:4, 26:21, 26:25, 27:7, 27:17, 28:3, 28:19, 29:4, 31:20, 31:21, 109:19, 113:10
**identified** [13] - 14:18, 19:20, 20:6, 20:12, 21:5, 23:2, 23:11, 24:7, 25:16, 95:3, 96:21, 102:21, 106:6
**identifies** [1] - 18:24
**identify** [21] - 2:4, 2:19, 3:11, 8:23, 14:21, 19:12, 22:15, 23:16, 23:17, 23:23, 24:4, 27:20, 60:15, 79:13, 85:4, 85:15, 85:20, 93:22, 111:13, 111:14
**identifying** [3] - 28:8, 32:22, 96:14
**identity** [5] - 14:14, 22:23, 24:17, 113:10, 113:11

**ignoring** [1] - 8:11
**iii** [1] - 89:21
**III** [1] - 113:18
**iii)** [1] - 90:5
**illegal** [1] - 97:2
**illegally** [1] - 19:8
**immediate** [1] - 104:1
**immigrant** [4] - 34:25, 42:17, 59:3, 59:6
**immigrants** [2] - 59:8, 60:15
**immigration** [3] - 44:15, 55:12, 63:11
**imminent** [9] - 41:15, 43:2, 43:24, 44:7, 57:17, 60:9, 60:10, 60:12, 112:14
**impacting** [1] - 35:15
**impacts** [1] - 62:1
**impair** [1] - 36:18
**impaired** [4] - 36:12, 37:3, 57:14, 110:1
**impairment** [1] - 58:22
**impairs** [2] - 59:9
**impending** [1] - 112:14
**impermissible** [3] - 41:15, 60:9, 60:11
**implausible** [1] - 83:3
**implementation** [14] - 41:1, 44:9, 44:16, 48:2, 49:12, 75:4, 75:6, 75:19, 76:4, 76:13, 77:16, 108:14, 108:17
**implemented** [8] - 21:17, 24:22, 57:15, 57:17, 70:11, 71:17, 82:24, 89:19
**implementing** [7] - 67:20, 68:7, 69:12, 69:16, 69:17, 71:6, 71:16
**implements** [1] - 64:20
**implicates** [1] - 55:9
**implicitly** [1] - 51:1
**important** [7] - 8:11, 9:12, 10:15, 16:4, 78:22, 104:1, 104:22
**importantly** [2] - 7:13, 106:8
**impose** [1] - 83:21
**imposed** [1] - 71:12
**impression** [1] - 105:15

**improper** [1] - 50:17
**inability** [1] - 110:3
**inappropriate** [1] -
99:16
**incentive** [1] - 48:12
**include** [3] - 34:25,
63:17, 99:16
**included** [7] - 11:18,
30:14, 75:4, 87:14,
90:19, 101:6, 101:9
**includes** [5] - 14:12,
75:8, 108:10, 109:15,
113:11
**including** [1] - 55:11
**inclusion** [2] - 43:21,
113:3
**income** [8] - 3:15,
3:16, 34:15, 35:4,
35:5, 36:23, 39:21,
109:11
**increase** [1] - 34:20
**incredibly** [2] -
73:25, 77:22
**independent** [2] -
25:20, 53:1
**indicate** [17] - 2:6,
38:4, 39:5, 42:6,
49:21, 51:21, 77:17,
78:5, 79:22, 91:25,
93:6, 95:1, 95:17,
95:18, 100:14,
102:25, 109:22
**indicated** [15] - 3:7,
24:9, 24:11, 27:21,
31:4, 46:9, 52:16,
57:7, 66:1, 70:23,
78:15, 81:10, 89:5,
95:6
**indicates** [7] - 42:4,
44:7, 44:16, 56:22,
107:7, 107:19, 108:8
**indicating** [9] - 24:4,
28:17, 40:16, 93:15,
93:17, 94:20, 94:25,
98:15, 108:4
**indication** [3] -
30:11, 40:23, 113:15
**indicia** [1] - 63:8
**individual** [38] -
12:7, 14:17, 15:3,
15:11, 15:15, 15:17,
21:12, 21:14, 22:10,
23:3, 25:6, 27:11,
27:20, 31:6, 31:20,
32:2, 40:22, 42:12,
44:5, 51:17, 51:19,
54:10, 60:6, 60:24,
61:8, 63:4, 63:9,
76:23, 80:6, 82:1,
82:19, 82:20, 102:19,

102:20, 107:9,
107:25, 108:6
**individual's** [3] -
60:7, 88:13, 88:14
**individuality** [1] -
95:24
**individualized** [16] -
10:7, 63:15, 79:10,
91:11, 91:14, 92:2,
92:5, 92:6, 92:18,
92:25, 93:14, 93:16,
94:24, 99:3, 106:3,
107:1
**individually** [2] -
54:11, 90:23
**individuals** [25] -
5:20, 5:22, 5:24,
14:20, 14:24, 18:17,
22:23, 23:8, 23:10,
23:12, 29:21, 39:14,
41:25, 42:10, 43:25,
58:10, 58:11, 60:20,
62:7, 73:24, 90:21,
93:7, 102:19, 106:6,
106:18
**individuals'** [1] -
44:11
**industry** [1] - 4:1
**inform** [2] - 65:9,
65:11
**information** [208] -
6:11, 7:2, 7:16, 7:19,
10:10, 10:18, 10:20,
10:22, 11:1, 11:8,
11:21, 11:24, 12:14,
12:22, 13:8, 13:11,
13:14, 13:18, 13:23,
14:1, 14:5, 14:14,
15:22, 17:8, 18:18,
18:20, 19:18, 19:25,
20:3, 20:8, 21:8,
21:15, 21:16, 22:5,
23:12, 23:24, 24:5,
24:14, 24:17, 24:21,
24:23, 25:16, 26:6,
26:7, 26:10, 26:19,
26:20, 28:8, 29:1,
29:12, 29:14, 30:14,
30:21, 31:7, 32:9,
32:13, 32:22, 33:1,
33:9, 35:18, 41:14,
41:24, 42:10, 42:13,
42:25, 44:21, 44:23,
45:8, 45:9, 49:2,
52:24, 53:5, 53:17,
54:7, 54:12, 54:13,
54:16, 56:21, 57:8,
60:7, 60:16, 61:7,
63:7, 63:9, 63:11,
63:21, 65:1, 65:2,

65:3, 65:4, 65:9,
65:12, 65:14, 65:16,
65:18, 65:19, 65:21,
66:14, 67:1, 67:2,
68:4, 68:21, 69:3,
70:5, 71:3, 71:7, 71:8,
71:21, 72:3, 74:21,
74:24, 74:25, 75:8,
75:9, 75:11, 75:12,
75:13, 75:17, 75:21,
75:22, 76:9, 76:15,
76:24, 77:2, 77:4,
77:8, 78:1, 79:1,
79:14, 81:2, 84:8,
85:7, 85:16, 85:19,
87:20, 88:10, 89:3,
89:14, 89:24, 89:25,
90:3, 90:10, 90:13,
91:21, 91:25, 92:2,
92:6, 92:13, 92:14,
92:16, 92:18, 92:19,
93:8, 93:13, 93:16,
93:22, 94:12, 94:21,
94:24, 95:6, 95:9,
95:10, 95:13, 95:18,
95:21, 95:23, 96:1,
96:4, 96:5, 96:18,
96:22, 97:4, 97:10,
97:14, 97:15, 98:14,
98:21, 98:22, 99:15,
102:3, 103:21,
105:21, 106:18,
106:20, 107:2, 107:8,
107:13, 107:19,
108:12, 108:17,
109:5, 109:12,
111:15, 111:18,
111:20, 112:15,
112:16, 113:1, 113:8,
113:10, 113:12,
113:13, 113:25, 114:3
**informed** [1] - 104:4
**initial** [4] - 31:14,
69:4, 100:12, 103:7
**injunction** [8] - 5:1,
5:4, 5:9, 7:21, 8:1,
33:5, 67:11, 100:13
**injunctions** [1] -
103:22
**injunctive** [7] - 51:1,
51:3, 52:10, 62:3,
62:6, 64:1, 73:22
**injured** [1] - 73:11
**injuries** [1] - 73:9
**injury** [3] - 41:14,
45:12, 113:4
**insight** [1] - 98:7
**inspection** [1] -
21:18, 22:5, 24:23
**instance** [8] - 7:12,

7:19, 25:21, 27:10,
71:12, 72:18, 73:4,
107:5
**instances** [6] -
31:21, 50:7, 51:11,
51:19, 55:23, 104:19
**instead** [5] - 54:8,
55:16, 59:5, 107:18,
108:16
**intended** [8] - 39:1,
51:14, 51:25, 52:1,
54:6, 72:16, 73:20,
74:1
**intends** [1] - 63:10
**intention** [2] - 12:21,
48:25
**interact** [1] - 59:8
**interest** [4] - 56:5,
59:17, 61:16, 76:8
**interesting** [3] -
69:13, 105:13, 111:2
**interests** [3] - 41:2,
41:3, 61:17
**interlocutory** [1] -
66:21
**Internal** [23] - 2:3,
6:10, 10:5, 46:2,
46:10, 46:15, 47:11,
48:3, 49:11, 50:5,
50:20, 51:18, 52:1,
56:15, 56:18, 56:22,
66:11, 72:19, 73:17,
74:1, 74:17, 87:24,
101:10
**INTERNAL** [1] - 1:6
**interpret** [1] - 83:23,
98:8
**interpretation** [8] -
22:12, 48:25, 83:18,
98:7, 98:12, 99:14,
109:3
**interpreted** [2] -
37:8, 63:1
**interpreting** [1] -
68:4
**interprets** [1] - 98:19
**interrupt** [1] - 37:15
**intertwined** [2] -
100:11, 104:23
**intimately** [1] - 82:25
**intrusion** [5] - 43:14,
43:16, 43:23, 44:18,
112:17
**invalid** [1] - 98:4
**investigate** [4] -
17:17, 88:3, 88:4,
89:22
**investigated** [2] -
79:16, 93:9
**investigating** [13] -

80:24, 81:2, 81:17,
90:2, 95:11, 95:14,
95:19, 95:22, 95:25,
96:18, 96:23, 96:24,
108:1
**investigation** [76] -
14:6, 14:9, 14:10,
14:16, 14:23, 15:13,
15:14, 16:3, 16:16,
17:7, 17:9, 17:11,
17:25, 18:23, 19:6,
19:18, 20:24, 23:17,
25:10, 25:13, 29:14,
29:15, 29:20, 30:1,
61:1, 75:2, 77:14,
79:3, 79:12, 79:14,
80:4, 80:13, 80:15,
80:23, 81:8, 81:9,
81:14, 81:20, 82:2,
82:5, 82:11, 82:20,
83:1, 83:4, 83:5,
83:16, 84:7, 84:12,
84:17, 84:19, 86:4,
87:25, 88:16, 88:21,
89:6, 89:9, 92:9,
92:16, 92:20, 92:22,
92:23, 93:20, 93:23,
93:25, 94:2, 94:9,
94:13, 96:5, 96:15,
96:16, 102:22, 106:3,
107:10, 107:14, 112:7
**investigations** [17] -
6:12, 15:18, 16:1,
16:23, 21:10, 21:20,
23:7, 61:8, 79:10,
79:20, 88:19, 89:1,
89:2, 89:4, 89:10,
106:5, 111:19
**investigators** [1] -
79:11
**investigatory** [1] -
18:22
**invite** [1] - 51:7
**involved** [44] - 15:17,
15:23, 16:1, 16:16,
16:18, 16:19, 17:16,
19:2, 21:6, 21:9,
22:18, 23:2, 24:12,
24:15, 31:12, 53:11,
53:16, 63:20, 77:13,
78:16, 78:18, 79:12,
80:1, 80:3, 80:6,
81:10, 81:13, 81:18,
82:1, 82:5, 82:10,
83:1, 83:4, 83:5,
83:16, 84:19, 85:2,
85:8, 85:9, 85:22,
85:25, 92:23, 111:14,
111:15
**involvement** [2] -

54:23, 65:6
**involves** [1] - 96:14
**involving** [3] - 109:18, 109:25
**irreparable** [12] - 7:11, 33:6, 41:14, 57:5, 59:18, 59:20, 61:16, 100:21, 100:24, 101:10, 109:1, 112:1
**irreparably** [2] - 57:13, 73:14
**IRS** [189] - 5:13, 5:15, 5:18, 5:20, 6:1, 6:2, 6:21, 6:25, 7:3, 7:16, 7:17, 10:6, 10:8, 10:13, 10:18, 10:21, 11:7, 11:12, 11:17, 12:7, 12:9, 12:18, 13:2, 13:4, 13:7, 13:13, 13:17, 13:23, 14:4, 14:13, 14:24, 15:19, 16:6, 16:14, 16:22, 17:21, 18:2, 18:14, 18:19, 18:25, 19:15, 19:22, 21:3, 22:15, 23:11, 23:21, 23:24, 24:12, 24:20, 25:19, 26:5, 26:20, 27:4, 28:1, 28:4, 28:5, 28:10, 29:3, 29:12, 29:20, 30:1, 30:18, 30:20, 31:12, 31:22, 31:24, 32:1, 32:8, 32:13, 35:11, 36:5, 36:10, 36:14, 37:8, 39:20, 40:24, 41:9, 41:10, 41:17, 41:20, 41:22, 43:3, 44:1, 44:20, 47:11, 49:1, 49:3, 49:18, 50:25, 52:22, 52:25, 53:8, 53:10, 53:11, 53:13, 53:15, 53:23, 54:9, 54:17, 54:23, 57:7, 58:17, 62:11, 62:14, 62:18, 63:1, 63:6, 63:18, 64:19, 64:20, 64:23, 65:6, 65:7, 65:10, 65:11, 65:13, 65:15, 65:17, 65:20, 65:21, 66:15, 67:1, 67:2, 68:3, 69:10, 71:2, 71:17, 72:3, 72:8, 74:22, 75:9, 75:11, 75:21, 78:3, 78:7, 78:17, 79:5, 80:2, 82:4, 82:9, 82:12, 83:18, 83:20, 83:21, 85:15, 85:23,

86:2, 87:4, 87:9, 88:8, 88:17, 90:12, 90:16, 92:14, 92:20, 93:14, 93:22, 94:8, 94:18, 95:21, 96:10, 96:12, 97:10, 97:23, 98:19, 98:21, 99:13, 102:4, 104:9, 106:1, 106:5, 106:16, 106:17, 106:19, 106:24, 108:19, 111:8, 111:15, 112:12, 113:24, 114:1
**IRS's** [23] - 6:7, 6:10, 6:17, 7:18, 10:14, 10:21, 11:9, 12:9, 16:10, 22:24, 25:8, 26:24, 30:17, 31:5, 33:25, 53:25, 66:20, 69:24, 86:7, 96:11, 103:25, 106:4, 108:20
**issue** [21] - 6:9, 7:4, 8:1, 11:3, 32:17, 37:21, 46:6, 47:6, 53:7, 59:17, 61:15, 74:15, 79:1, 80:11, 91:23, 93:10, 94:1, 99:8, 99:10, 99:24, 101:22
**issued** [2] - 5:2, 7:20
**issues** [13] - 5:11, 6:9, 7:8, 7:11, 7:24, 8:14, 8:16, 8:17, 32:17, 55:19, 103:16, 104:16, 104:18
**IT** [1] - 4:1
**items** [2] - 26:14, 26:19
**ITIN** [4] - 36:1, 36:6, 109:19
**ITINs** [1] - 37:1
**itself** [20] - 41:14, 47:12, 47:16, 57:15, 57:17, 68:4, 70:17, 72:3, 76:14, 87:23, 88:9, 89:21, 97:2, 107:7, 111:12, 111:17, 112:20, 113:4, 113:9, 113:12
**iv** [1] - 94:11
**iv)** [2] - 95:13, 97:11

## J

**Jeffries** [2] - 45:13, 45:18
**jeopardize** [1] - 38:12
**job** [2] - 86:15, 104:18

**JOHANNA** [1] - 1:14
**John** [3] - 12:25, 42:16, 78:3
**Joint** [1] - 53:14
**Jose** [1] - 42:16
**judge** [2] - 6:24, 105:2
**JUDGE** [1] - 1:10
**Judge** [5] - 7:1, 7:8, 7:20, 81:21, 101:6
**judges** [2] - 105:11, 111:3
**Judicial** [1] - 114:18
**judicial** [3] - 7:24, 46:7, 49:15
**July** [1] - 4:18
**June** [17] - 5:18, 5:20, 6:6, 7:17, 10:22, 11:2, 11:3, 11:10, 12:13, 13:1, 13:7, 13:17, 25:21, 30:19, 30:24, 78:6, 102:20
**jurisdiction** [4] - 4:20, 73:10, 111:25, 113:5
**jury** [5] - 14:9, 14:11, 79:3, 80:25, 86:4
**justice** [1] - 34:20
**Justice** [3] - 1:17, 3:1, 3:3
**justification** [2] - 55:17, 55:19
**justify** [1] - 56:17

## K

**keeping** [1] - 75:13
**kept** [2] - 43:22, 44:21
**key** [2] - 55:19, 56:18
**kids** [1] - 92:4
**kind** [6] - 9:17, 38:19, 51:1, 74:19, 88:1, 111:2
**kinds** [2] - 80:23, 99:22
**knowing** [4] - 41:10, 76:8, 82:10, 112:4
**knowledge** [1] - 97:23
**known** [17] - 5:19, 5:22, 12:8, 14:24, 26:20, 27:24, 28:5, 28:13, 28:15, 28:22, 32:1, 32:15, 97:25, 107:24, 108:3, 112:2, 112:6
**KOLLAR** [1] - 1:10
**KOLLAR-KOTELLY** [1] - 1:10

**KOTELLY** [1] - 1:10

## L

**label** [1] - 3:12
**labeled** [1] - 46:17
**Labor** [2] - 44:2, 47:20
**labor** [1] - 3:21
**lack** [2] - 4:19, 48:12
**language** [6] - 34:24, 60:22, 69:6, 84:23, 108:12, 109:16
**large** [4] - 15:20, 44:12, 83:20, 84:4
**largely** [2] - 16:13, 106:15
**last** [23] - 5:19, 5:21, 12:8, 14:24, 26:20, 27:23, 28:5, 28:13, 28:15, 28:22, 32:1, 32:15, 38:13, 58:12, 58:21, 61:14, 64:12, 88:13, 97:24, 107:24, 108:3, 112:2, 112:6
**lastly** [2] - 108:21, 113:23
**law** [31] - 18:22, 19:16, 19:24, 35:20, 35:22, 37:8, 37:9, 37:10, 43:14, 45:7, 45:17, 47:6, 52:3, 52:16, 54:5, 57:22, 62:13, 62:19, 62:25, 63:16, 64:10, 72:3, 74:19, 86:18, 86:21, 94:11, 108:5, 111:9, 112:24, 113:2, 113:5
**lawful** [4] - 6:8, 6:22, 42:3, 62:15
**lawsuit** [2] - 43:13, 45:3
**lead** [2] - 42:18, 107:11
**leaders** [1] - 84:25
**leading** [1] - 61:9
**learned** [2] - 105:25, 106:3
**least** [5] - 10:25, 24:3, 25:3, 68:23, 98:17
**leaves** [2] - 37:13, 53:10
**led** [1] - 30:23
**left** [4] - 42:1, 42:2, 70:13, 83:8
**legal** [14] - 6:8, 8:16, 9:6, 30:20, 31:9, 31:11, 57:23, 66:23, 67:6, 67:8, 70:15,

70:16, 71:25, 104:21
**legally** [5] - 30:22, 37:2, 47:17, 56:2, 56:16
**legislative** [2] - 51:13, 56:12
**less** [4] - 16:24, 54:12, 91:20, 113:12
**letter** [4] - 78:3, 78:4, 87:12, 87:13
**level** [6] - 24:3, 65:6, 84:4, 93:3, 106:13
**light** [1] - 59:3
**likelihood** [4] - 33:6, 33:12, 45:22, 61:15
**likely** [5] - 33:10, 44:3, 44:22, 45:25, 62:10
**limit** [1] - 84:21
**limitation** [1] - 14:13
**limited** [3] - 44:17, 50:5, 73:22
**line** [3] - 2:9, 3:5, 4:8
**list** [1] - 26:14
**listed** [7] - 26:10, 43:1, 63:5, 91:15, 91:16, 99:10, 99:17
**LITC** [3] - 39:21, 59:6, 109:10
**LITCs** [1] - 61:25
**live** [1] - 42:19
**lived** [1] - 42:20
**local** [1] - 3:17
**Local** [1] - 4:14
**locate** [1] - 108:6
**locating** [1] - 63:8
**look** [20] - 16:2, 20:3, 24:20, 30:23, 38:21, 38:25, 50:21, 51:24, 53:15, 54:21, 72:16, 76:14, 77:17, 84:9, 87:5, 91:10, 94:20, 96:13, 112:12, 114:8
**looked** [4] - 26:17, 26:20, 30:22, 31:22
**looking** [7] - 25:5, 25:11, 31:2, 32:4, 76:3, 90:23, 101:20
**looks** [1] - 66:4
**loss** [1] - 113:14
**lost** [2] - 58:8
**low** [9] - 3:15, 3:16, 34:15, 35:4, 35:5, 36:23, 39:21, 109:11
**lynchpin** [3] - 17:13, 19:9, 81:6
**Lyons** [1] - 78:6

## M

**Madeline** [4] - 2:11, 34:2, 53:3, 105:18
**MADELINE** [1] - 1:14
**maiden** [1] - 32:19
**mail** [1] - 112:23
**mailing** [2] - 112:16, 112:22
**mailroom** [1] - 85:9
**Main** [3] - 2:13, 3:18, 39:22
**main** [1] - 55:7
**Majesty** [1] - 46:23
**Manual** [8] - 46:11, 46:15, 47:11, 48:3, 49:11, 56:16, 56:19, 56:22
**manual** [13] - 47:16, 47:18, 67:21, 69:13, 70:19, 82:16, 82:17, 98:2, 98:6, 98:17, 98:19, 98:23, 99:7
**manuals** [1] - 69:16
**manufacturing** [1] - 4:1
**masks** [2] - 2:8, 3:8
**mass** [2] - 49:4, 107:22
**match** [8] - 11:18, 12:7, 26:24, 27:3, 31:23, 32:11, 42:11, 91:2
**matched** [6] - 27:1, 28:4, 28:10, 29:3, 31:25, 42:22
**matches** [1] - 67:24
**matching** [2] - 12:10, 90:20
**material** [2] - 77:18, 78:15
**materially** [2] - 28:22, 36:21
**materials** [1] - 8:9
**math** [1] - 12:2
**matter** [9] - 4:19, 7:25, 16:14, 22:16, 25:11, 70:9, 77:22, 93:1, 114:17
**McGrath** [5] - 1:14, 2:22, 51:9, 52:14
**mean** [40] - 16:3, 16:10, 19:3, 20:19, 24:9, 25:8, 30:6, 30:25, 34:9, 38:25, 47:8, 60:22, 67:5, 69:24, 70:20, 73:19, 74:9, 75:23, 75:25, 77:21, 77:23, 79:7, 80:21, 83:7, 88:4,

88:17, 88:21, 89:2, 89:7, 90:15, 90:16, 91:18, 93:3, 93:21, 94:18, 101:10, 102:7, 109:24, 111:19, 113:19
**meaningfully** [1] - 109:7
**means** [3] - 89:19, 101:9, 107:25
**meant** [1] - 111:1
**measure** [1] - 109:22
**mechanisms** [1] - 90:8
**media** [1] - 4:2
**meet** [5] - 22:14, 38:4, 69:1, 70:1, 93:2
**meets** [4] - 68:15, 68:16, 107:2, 109:7
**member** [2] - 59:6, 61:25
**members** [13] - 3:19, 4:6, 39:23, 40:2, 40:6, 40:13, 40:22, 42:24, 43:11, 43:17, 59:18, 61:17, 112:11
**members'** [2] - 41:3, 45:11
**memorandum** [1] - 6:6
**Memorandum** [2] - 5:14, 7:4
**mentioned** [5] - 7:15, 34:6, 41:18, 42:17, 60:24
**merely** [2] - 66:21, 72:2
**merge** [1] - 69:23
**merits** [4] - 33:6, 33:10, 45:22, 66:8
**met** [12] - 53:7, 53:25, 68:10, 68:11, 68:19, 68:21, 68:23, 69:9, 69:21, 94:10, 106:21, 107:5
**meticulously** [1] - 111:8
**microphone** [3] - 3:6, 8:23
**midyear** [1] - 109:15
**might** [9] - 16:16, 16:18, 26:8, 33:24, 39:5, 43:17, 53:9, 79:19, 91:4
**million** [22] - 5:20, 6:2, 10:10, 11:1, 11:11, 11:20, 11:24, 20:25, 29:7, 41:17, 41:21, 60:15, 83:12, 83:13, 83:17, 85:19,

87:7, 87:10, 90:21, 90:24, 97:5, 106:4
**million-some** [1] - 83:17
**mind** [3] - 8:3, 10:17, 66:25
**minute** [2] - 5:2, 87:5
**minutes** [4] - 9:10, 101:15, 101:16, 101:19
**mirrors** [1] - 90:18
**misidentification** [3] - 42:15, 42:19, 42:23
**mismatch** [1] - 67:10
**missing** [1] - 96:8
**mission** [7] - 34:19, 36:22, 37:3, 58:24, 62:1, 72:25, 110:4
**mistaken** [1] - 40:16
**misuse** [7] - 44:4, 44:7, 44:22, 60:9, 60:18, 60:19, 61:12
**misused** [1] - 60:21
**model** [1] - 99:2
**moment** [3] - 59:21, 78:12, 105:16
**money** [6] - 37:17, 37:20, 38:7, 39:1, 39:9, 110:8
**moreover** [1] - 111:10
**morning** [1] - 70:22
**Moss** [1] - 101:6
**most** [8] - 7:13, 25:15, 29:4, 54:16, 104:17, 106:18, 107:21, 113:8
**mother's** [1] - 32:19
**MOTION** [1] - 1:10
**motion** [24] - 4:22, 4:24, 4:25, 5:3, 5:8, 5:10, 5:12, 6:5, 6:13, 6:16, 6:20, 7:2, 7:7, 7:8, 7:16, 7:21, 8:4, 10:16, 67:10, 86:17, 100:8, 100:11, 104:8
**motions** [3] - 5:7, 103:22, 104:2
**MOU** [74] - 5:14, 5:19, 6:6, 10:21, 12:6, 13:2, 13:9, 13:10, 13:16, 13:19, 14:12, 15:21, 15:22, 16:6, 18:10, 18:14, 19:3, 19:16, 20:9, 21:7, 21:23, 21:25, 22:12, 22:15, 24:13, 26:6, 26:11, 26:19, 29:7, 30:2, 31:12, 40:25, 45:23, 48:1, 48:16,

48:18, 49:6, 49:10, 54:1, 54:19, 57:8, 65:16, 67:20, 68:7, 69:2, 69:5, 69:12, 70:2, 70:11, 71:6, 71:15, 72:1, 74:20, 75:3, 76:14, 76:17, 76:25, 77:9, 77:10, 77:17, 85:7, 85:10, 85:11, 86:6, 88:8, 89:25, 90:17, 90:18, 107:6, 108:10, 111:8, 111:17, 111:21
**move** [27] - 10:4, 22:11, 22:21, 25:3, 25:17, 25:19, 33:3, 39:17, 43:8, 44:25, 45:19, 64:12, 66:2, 66:6, 72:6, 74:7, 75:5, 78:2, 85:3, 86:1, 86:25, 97:6, 97:22, 99:4, 100:15, 103:21
**moved** [6] - 4:15, 4:18, 17:21, 42:21, 99:9, 99:22
**moves** [1] - 103:5
**moving** [9] - 12:25, 45:20, 46:5, 46:15, 48:15, 49:14, 52:16, 57:4, 78:25
**MR** [140] - 2:25, 9:24, 10:23, 11:5, 11:15, 12:1, 12:5, 12:17, 12:24, 13:6, 13:12, 13:21, 14:25, 15:2, 15:4, 15:6, 15:9, 15:16, 15:19, 16:2, 16:22, 17:4, 17:15, 18:7, 18:10, 19:14, 19:23, 20:11, 20:16, 20:22, 21:1, 21:5, 21:14, 21:24, 22:2, 22:19, 23:22, 24:11, 25:7, 25:25, 26:4, 26:10, 26:13, 26:18, 27:9, 27:14, 27:17, 27:23, 28:2, 28:13, 28:18, 28:25, 29:9, 29:24, 30:8, 30:10, 30:15, 30:25, 31:11, 31:17, 32:10, 32:25, 51:9, 52:14, 67:3, 67:9, 67:23, 69:23, 70:14, 70:20, 71:11, 71:24, 72:15, 73:8, 73:17, 74:6, 74:8, 74:13, 75:14, 75:16, 75:23, 76:10, 76:17, 76:23, 77:6, 77:20, 78:9, 78:12, 78:20,

79:25, 80:8, 80:18, 81:16, 81:21, 82:12, 83:7, 83:20, 83:25, 84:18, 85:4, 85:6, 85:23, 86:6, 86:11, 86:16, 87:2, 87:11, 87:15, 87:21, 88:3, 88:8, 88:21, 89:11, 89:20, 90:15, 90:25, 91:18, 92:12, 92:21, 93:19, 94:8, 95:2, 95:5, 95:10, 96:2, 97:7, 97:10, 97:14, 98:1, 98:18, 99:13, 99:25, 100:7, 100:23, 101:5, 103:10, 104:11, 110:24, 111:5, 111:7
**MS** [45] - 2:11, 2:17, 2:21, 34:2, 34:8, 34:11, 34:14, 35:13, 38:8, 39:6, 39:16, 40:8, 40:15, 40:20, 41:5, 41:13, 43:20, 45:7, 46:13, 46:20, 47:10, 48:23, 49:8, 49:25, 51:7, 53:3, 55:7, 57:12, 59:14, 59:21, 60:1, 61:19, 62:17, 64:3, 64:9, 64:17, 103:19, 105:15, 105:18, 105:24, 110:10, 110:15, 110:18, 110:20, 110:22
**multiple** [1] - 31:24
**must** [9] - 54:23, 55:15, 58:16, 65:12, 65:19, 77:2, 77:11, 98:10, 108:19

## N

**name** [23] - 12:7, 15:4, 16:4, 16:24, 27:4, 27:6, 27:19, 28:3, 28:9, 31:19, 32:4, 32:5, 32:7, 32:11, 32:19, 32:25, 42:11, 42:16, 42:22, 52:22, 53:1, 88:13
**names** [11] - 26:1, 26:4, 27:1, 27:8, 32:16, 32:18, 32:21, 42:21, 83:13, 102:18, 102:25
**naming** [1] - 42:18
**narrow** [1] - 23:19
**national** [1] - 3:21
**National** [2] - 2:14,

3:20
**nationwide** [4] -
3:18, 61:25, 62:2,
62:7
**nature** [4] - 36:19,
39:15, 98:23
**necessarily** [4] -
27:13, 62:6, 62:19,
68:8
**necessary** [6] -
18:18, 21:20, 54:12,
61:4, 93:18, 93:19
**need** [23] - 7:7, 8:13,
8:14, 17:16, 25:3,
34:18, 43:10, 48:10,
55:20, 62:6, 66:3,
66:12, 73:12, 77:5,
81:17, 95:16, 100:4,
100:14, 101:22,
103:15, 103:18,
103:23, 110:11
**needed** [5] - 9:14,
53:19, 65:25, 101:1,
101:3
**needs** [1] - 83:20
**network** [5] - 3:19,
35:4, 59:6, 61:25,
62:1
**never** [5] - 85:15,
105:2, 106:16,
106:23, 108:20
**new** [3] - 9:8, 28:6,
58:21
**news** [1] - 4:2
**next** [3] - 9:16,
13:22, 41:21
**nice** [1] - 86:13
**NO** [1] - 1:5
**nonbinding** [1] -
98:23
**none** [3] - 12:15,
30:14, 56:13
**nonparty** [2] - 64:18,
114:5
**nontax** [9] - 6:12,
14:5, 14:8, 14:15,
14:22, 17:24, 29:13,
29:18, 89:3
**note** [4] - 34:3,
49:19, 56:15, 60:2
**notes** [2] - 75:3,
87:15
**nothing** [8] - 13:20,
23:21, 23:22, 42:5,
44:15, 98:9, 104:5,
111:11
**notifying** [1] - 104:7
**nuance** [2] - 31:17,
85:4
**number** [35] - 8:17,

10:16, 11:7, 26:21,
26:22, 26:25, 27:3,
27:9, 27:10, 27:11,
27:15, 27:18, 28:3,
28:9, 28:19, 29:3,
29:4, 31:20, 31:21,
32:6, 58:11, 66:7,
68:22, 104:14,
104:15, 104:16,
109:15, 109:16,
109:17, 109:18,
109:19, 109:24
**numbered** [1] -
26:14
**numbers** [2] -
109:25, 112:12
**numerous** [2] - 50:2,
99:4
**NW** [2] - 1:18, 1:24

# O

**obligation** [4] -
53:10, 53:25, 54:1,
106:20
**obligations** [7] -
33:21, 33:24, 34:17,
35:7, 35:20, 57:23,
66:22
**obliged** [1] - 68:18
**observed** [1] - 52:9
**obtain** [3] - 36:6,
37:2
**obtained** [1] - 75:10
**obtaining** [1] - 16:20
**obviously** [10] -
10:12, 17:1, 70:25,
73:6, 83:24, 94:8,
100:10, 103:7,
103:12, 104:1
**occasions** [1] -
55:22
**occurred** [3] - 13:24,
44:8, 62:21
**occurring** [1] - 48:1
**October** [1] - 58:6
**OF** [2] - 1:1, 1:10
**offensive** [3] - 43:23,
44:23, 112:22
**offered** [2] - 39:10,
58:10
**office** [3] - 31:9,
31:12, 42:1
**officer** [4] - 15:12,
31:1, 63:18
**officers** [17] - 14:6,
14:10, 14:14, 14:21,
16:15, 17:23, 18:1,
20:4, 21:18, 22:6,
24:1, 24:6, 24:17,

63:16, 77:4, 77:8,
79:2
**OFFICIAL** [1] -
114:22
**Official** [2] - 1:23,
114:15
**officials** [2] - 111:22,
111:23
**often** [3] - 34:25,
42:19, 104:25
**once** [3] - 2:7, 44:4,
58:7
**one** [93] - 6:23, 8:18,
11:2, 11:4, 12:5,
12:13, 13:15, 13:17,
14:25, 15:2, 15:3,
15:11, 15:25, 16:20,
16:25, 18:3, 18:24,
18:25, 19:10, 19:12,
19:15, 19:19, 19:20,
19:21, 20:8, 20:11,
20:20, 21:5, 22:8,
22:9, 22:13, 23:3,
25:5, 25:7, 25:8, 28:5,
28:6, 31:23, 32:20,
33:19, 44:12, 46:8,
46:16, 51:2, 51:20,
55:15, 58:22, 59:15,
59:21, 61:7, 61:14,
66:2, 66:16, 67:2,
71:10, 72:9, 79:15,
79:16, 80:4, 80:6,
81:9, 81:13, 82:1,
82:4, 82:9, 82:20,
83:3, 83:15, 84:20,
85:16, 85:18, 88:15,
89:12, 89:20, 92:22,
93:2, 96:9, 96:14,
96:16, 97:5, 98:17,
99:6, 100:25, 101:14,
106:4, 107:8, 107:11,
107:21, 108:14,
112:23
**one-off** [1] - 13:15
**one-point-
something** [1] - 85:18
**one-point-whatever**
[1] - 97:5
**ones** [9] - 9:25,
39:22, 50:17, 73:21,
74:3, 88:20, 88:23,
99:9, 99:10
**ongoing** [4] - 50:8,
64:20, 65:7, 92:20
**open** [5] - 2:9, 21:18,
22:5, 24:23, 111:23
**operated** [1] - 23:15
**opinion** [1] - 7:21
**opportunities** [1] -
58:7

**opportunity** [3] -
9:15, 14:1, 103:13
**opposed** [5] - 25:23,
60:14, 74:25, 90:22,
110:8
**opposition** [1] - 4:21
**oral** [1] - 8:7
**Order** [1] - 2:1
**order** [67] - 5:2, 10:1,
16:7, 16:9, 16:17,
16:20, 17:17, 17:19,
17:25, 25:11, 29:22,
30:3, 30:6, 30:12,
30:16, 36:5, 38:20,
48:11, 50:12, 53:23,
58:17, 60:15, 61:18,
62:7, 62:23, 62:25,
63:12, 63:21, 65:8,
80:12, 83:2, 84:5,
86:17, 87:25, 88:3,
88:4, 88:9, 88:13,
89:22, 89:24, 90:4,
91:19, 91:21, 91:23,
92:8, 92:15, 92:18,
94:3, 94:4, 95:1,
95:12, 95:15, 96:6,
97:2, 97:15, 97:17,
97:20, 98:10, 99:6,
99:9, 99:23, 106:10,
108:2, 108:24, 109:5,
113:24
**ordered** [1] - 82:3
**orders** [8] - 16:18,
17:2, 17:12, 17:13,
18:4, 19:7, 81:7, 93:7
**ordinarily** [1] - 80:22
**organization** [8] -
2:6, 3:13, 3:21, 36:17,
40:3, 40:5, 50:11,
73:19
**organizational** [7] -
33:15, 33:17, 60:2,
60:3, 61:16, 72:24,
113:14
**organizationally** [1]
- 57:13
**organizations** [1] -
25:24
**original** [1] - 114:16
**originally** [2] - 99:7,
99:21
**otherwise** [1] - 2:8
**out-of-circuit** [1] -
50:17
**outreach** [10] -
34:18, 34:22, 35:2,
35:15, 38:9, 38:13,
38:16, 38:23, 57:19,
58:23
**outset** [2] - 7:6, 8:7

**outside** [1] - 67:1
**override** [1] - 54:19
**oversight** [1] - 114:1
**overstay** [1] - 106:9
**overstayed** [4] -
30:13, 80:12, 83:1,
108:2
**overstaying** [2] -
88:6, 92:17
**own** [2] - 59:24, 70:4

# P

**p)(4** [1] - 54:21
**p.m** [6] - 1:11, 2:1,
102:1, 114:12
**P.O** [1] - 1:15
**page** [2] - 26:15,
114:17
**paid** [1] - 94:6
**pandemic** [1] - 58:9
**paragraph** [3] -
26:10, 26:13, 77:7
**part** [19] - 34:17,
35:5, 36:22, 43:1,
43:4, 61:2, 63:20,
69:22, 71:9, 71:21,
77:12, 83:20, 84:20,
93:2, 93:19, 94:12,
100:13, 112:3, 112:7
**participated** [1] -
56:5
**participation** [1] -
55:25
**particular** [13] - 20:6,
23:18, 24:7, 35:11,
59:9, 72:14, 73:4,
77:25, 81:2, 85:24,
96:17, 104:22, 107:20
**particularly** [3] - 9:1,
67:2, 112:19
**parties** [3] - 3:11,
5:7, 114:11
**parts** [1] - 34:1
**party** [7] - 6:19, 34:4,
40:9, 40:12, 40:17,
45:10, 64:14
**passed** [3] - 25:12,
79:18, 79:25
**past** [7] - 16:9,
30:16, 37:7, 56:20,
72:13, 79:9, 97:24
**path** [1] - 56:10
**Pause** [4] - 59:23,
76:19, 87:6, 87:17
**pay** [1] - 40:7
**penalties** [5] - 30:5,
49:23, 72:13, 73:23,
111:24
**penalty** [2] - 92:10,

94:5
  **pending** [12] - 5:10, 6:20, 8:2, 8:4, 12:18, 13:19, 13:20, 42:7, 57:7, 57:24, 100:19, 104:9
  **people** [51] - 2:9, 11:7, 17:12, 18:4, 18:21, 19:5, 19:7, 19:13, 19:17, 20:6, 20:24, 22:10, 22:16, 23:6, 23:16, 23:19, 24:7, 24:14, 25:2, 25:9, 29:3, 32:18, 56:2, 56:5, 69:4, 77:24, 78:21, 79:17, 79:18, 80:7, 81:1, 81:14, 82:2, 82:20, 82:21, 83:6, 83:12, 85:8, 85:9, 86:18, 87:10, 90:23, 93:1, 93:9, 93:23, 96:15, 96:21, 103:1, 109:16, 109:24
  **percent** [2] - 5:22, 112:13
  **perceptible** [1] - 58:22
  **perceptibly** [3] - 36:12, 36:18, 57:14
  **perform** [1] - 10:6
  **performance** [1] - 109:22
  **perhaps** [5] - 7:13, 27:10, 38:4, 54:8, 56:10
  **period** [3] - 81:20, 103:1, 112:5
  **permissible** [3] - 47:6, 54:24, 63:13
  **permit** [1] - 63:15
  **permits** [3] - 44:13, 53:4, 53:5
  **permitted** [2] - 37:12, 63:16
  **person** [81] - 8:21, 15:2, 15:22, 15:25, 16:20, 16:25, 17:1, 17:16, 18:3, 18:25, 19:10, 19:12, 19:19, 19:20, 19:22, 20:9, 20:11, 20:12, 20:17, 20:20, 20:21, 20:22, 21:5, 22:8, 22:9, 22:13, 24:12, 25:8, 25:13, 26:22, 27:2, 27:5, 27:24, 32:14, 43:23, 44:22, 61:7, 78:9, 78:14, 79:15, 80:3, 80:4, 81:9,

81:13, 81:17, 82:4, 82:5, 82:9, 82:15, 83:3, 83:15, 84:9, 84:19, 85:6, 85:17, 85:18, 85:24, 90:4, 91:20, 91:24, 92:22, 92:24, 94:4, 95:18, 96:16, 96:19, 97:3, 102:21, 102:23, 102:24, 106:4, 107:8, 111:13, 111:14, 112:6, 112:22
  **person's** [1] - 15:4
  **person-specific** [1] - 90:4
  **personally** [49] - 14:7, 14:15, 14:22, 15:13, 15:22, 16:1, 17:24, 18:17, 19:17, 20:1, 20:4, 20:17, 20:23, 21:6, 21:9, 21:19, 22:6, 22:17, 23:1, 24:2, 24:6, 24:12, 24:15, 24:18, 24:24, 60:24, 63:4, 69:5, 77:13, 78:16, 79:2, 79:6, 80:1, 80:3, 82:2, 82:10, 82:18, 82:25, 83:16, 83:19, 83:24, 85:2, 85:7, 85:21, 85:24, 102:21, 107:9, 111:13, 111:14
  **personnel** [1] - 84:24
  **perspective** [11] - 16:10, 22:25, 25:8, 48:20, 69:11, 71:4, 76:7, 77:15, 94:19, 103:6, 105:6
  **persuasively** [1] - 66:9
  **phone** [1] - 59:6
  **phrase** [2] - 79:5, 112:21
  **pick** [1] - 86:25
  **piece** [2] - 16:4, 65:3
  **place** [2] - 7:16, 10:18
  **placed** [2] - 60:21, 108:17
  **places** [2] - 47:22, 106:19
  **plaintiff** [7] - 9:9, 33:16, 45:11, 59:18, 60:2, 61:17, 101:12
  **plaintiffs** [54] - 2:5, 2:12, 2:16, 2:23, 3:11, 4:10, 4:16, 4:21, 4:25, 5:5, 6:15, 7:9, 7:10, 8:24, 9:4, 9:7, 10:8, 10:11, 17:5, 31:16,

33:3, 33:11, 33:14, 34:3, 39:18, 39:21, 46:20, 50:13, 51:9, 53:3, 59:19, 60:4, 62:17, 62:19, 66:7, 66:18, 67:6, 70:20, 72:11, 72:14, 72:15, 75:6, 75:16, 90:6, 98:2, 102:3, 103:12, 105:18, 106:22, 111:16, 112:3, 112:25, 113:8, 113:23
  **Plaintiffs** [1] - 3:4
  **PLAINTIFFS** [1] - 1:13
  **plaintiffs'** [15] - 4:15, 4:19, 5:3, 5:8, 6:5, 7:15, 8:4, 10:16, 43:11, 67:10, 67:15, 86:17, 98:25, 104:2, 112:11
  **planning** [1] - 12:14
  **plans** [2] - 103:25, 104:9
  **plausible** [3] - 82:13, 84:3, 93:4
  **plausibly** [1] - 90:7
  **pleasure** [1] - 104:24
  **plus** [4] - 27:3, 27:19, 87:12, 97:16
  **podium** [3] - 2:9, 3:7, 8:23
  **point** [40] - 6:23, 7:15, 9:18, 12:21, 13:20, 17:5, 17:10, 17:20, 24:25, 25:4, 41:25, 47:16, 47:20, 50:2, 52:7, 60:20, 64:22, 67:23, 69:3, 71:14, 74:9, 78:13, 80:10, 81:11, 83:25, 85:13, 85:18, 92:23, 94:15, 97:5, 98:17, 100:14, 101:1, 101:13, 101:23, 104:5, 107:6, 109:2, 109:5, 113:7
  **points** [9] - 10:17, 60:1, 100:24, 103:1, 105:20, 105:24, 107:21, 111:16, 112:9
  **poised** [1] - 8:18
  **policies** [3] - 6:25, 52:6, 64:7
  **Policy** [11] - 46:16, 46:17, 46:19, 47:8, 63:2, 65:10, 67:12, 67:16, 67:18, 68:2
  **policy** [46] - 46:3, 46:21, 46:25, 47:3,

47:4, 47:5, 47:13, 47:14, 47:18, 47:19, 47:23, 47:24, 48:7, 48:9, 48:11, 48:25, 49:1, 49:3, 49:9, 49:12, 50:8, 50:13, 55:3, 55:8, 55:14, 56:18, 57:15, 57:16, 57:24, 59:3, 59:4, 62:20, 64:4, 64:20, 67:13, 68:1, 70:15, 99:19, 100:1, 106:23, 108:20, 108:25
  **populated** [1] - 54:4
  **populations** [4] - 33:21, 34:19, 35:1, 38:10
  **portion** [3] - 20:9, 38:1, 84:16
  **position** [7] - 41:19, 42:2, 62:18, 69:24, 78:11, 78:23, 105:10
  **possibility** [2] - 101:8, 113:18
  **possible** [7] - 11:12, 48:5, 54:13, 62:24, 90:7, 100:16, 103:5
  **possibly** [1] - 10:9
  **potential** [6] - 17:7, 17:8, 37:23, 57:9, 72:13, 111:23
  **potentially** [1] - 84:10
  **powers** [1] - 64:23
  **practical** [2] - 16:14, 70:9
  **practice** [3] - 53:22, 55:1, 55:2
  **practices** [5] - 6:17, 55:5, 67:14
  **precedent** [6] - 40:4, 45:13, 45:18, 61:23, 62:4, 62:5
  **preclude** [2] - 49:22, 51:1
  **precluded** [2] - 51:4, 51:15
  **precludes** [1] - 72:11
  **preconditions** [8] - 68:9, 68:15, 68:16, 68:19, 69:1, 69:9, 69:21, 70:10
  **preliminary** [12] - 5:1, 5:4, 5:9, 7:2, 7:21, 7:25, 9:3, 33:5, 61:21, 67:11, 100:13, 103:22
  **preparation** [2] - 14:8, 14:10, 17:25, 20:5, 60:25, 79:3,

84:20, 86:4, 107:16
  **prepared** [1] - 111:3
  **present** [5] - 4:25, 26:6, 26:19, 46:15, 72:20
  **presented** [4] - 6:24, 25:16, 48:8, 55:5
  **presently** [1] - 41:10
  **presents** [3] - 6:8, 7:8, 8:16
  **President** [1] - 43:4
  **presumably** [7] - 23:4, 23:9, 78:18, 85:17, 90:20, 92:1, 113:20
  **presumption** [3] - 50:1, 50:14, 111:22
  **pretty** [3] - 30:7, 63:20, 79:4
  **prevail** [1] - 86:17
  **previous** [1] - 4:11
  **previously** [5] - 4:13, 37:11, 48:5, 57:21, 109:2
  **primarily** [1] - 50:17
  **principal** [1] - 2:15
  **priority** [1] - 43:5
  **privacy** [5] - 31:1, 50:3, 53:16, 55:20, 55:24
  **Privacy** [12] - 6:14, 50:3, 50:21, 52:2, 52:3, 52:8, 72:18, 72:21, 74:10, 74:15, 76:12
  **private** [8] - 3:25, 43:22, 44:21, 45:9, 112:19, 113:2, 113:9
  **problem** [8] - 8:20, 8:21, 34:13, 51:8, 80:21, 86:16, 87:16, 110:17
  **problems** [2] - 103:17
  **Procedure** [1] - 4:14
  **procedures** [4] - 47:8, 47:10, 75:3, 79:9
  **proceed** [6] - 3:4, 8:4, 9:2, 37:24, 66:4, 78:19
  **proceeding** [14] - 14:6, 14:9, 14:11, 22:9, 29:13, 29:15, 29:20, 63:5, 80:19, 91:6, 94:23, 96:24, 107:10, 107:17
  **Proceedings** [1] - 114:12
  **proceedings** [16] -

6:12, 17:6, 21:20, 21:21, 61:9, 79:4, 80:6, 80:9, 80:25, 81:18, 86:4, 89:4, 89:6, 89:16, 106:7, 106:8
**proceeds** [1] - 64:2
**process** [12] - 12:9, 25:25, 31:12, 46:25, 56:19, 63:20, 66:20, 88:20, 88:24, 89:8, 89:17, 99:3
**processed** [1] - 97:23
**Produced** [1] - 1:25
**program** [4] - 84:10, 110:6, 110:13, 113:17
**programs** [2] - 110:7, 110:12
**prohibit** [1] - 36:17
**prohibited** [1] - 62:19
**prohibits** [1] - 88:17
**promise** [1] - 55:13
**promised** [2] - 44:24, 55:10
**promote** [2] - 34:21, 36:22
**promotes** [1] - 55:24
**prong** [1] - 71:25
**proportion** [1] - 28:23
**proposals** [1] - 56:12
**propose** [1] - 62:24
**proposed** [1] - 62:23
**proposing** [2] - 9:2, 64:15
**proposition** [1] - 40:5
**prosecution** [5] - 16:11, 49:20, 72:9, 77:14, 93:3
**prospect** [1] - 111:17
**prospective** [2] - 62:15, 62:18
**protect** [5] - 53:9, 53:16, 54:14, 55:20, 62:7
**protected** [7] - 49:2, 53:12, 63:22, 108:11, 108:16, 108:18, 112:17
**protecting** [1] - 53:24
**protection** [2] - 64:20, 65:6
**protections** [2] - 57:22, 112:25
**protective** [1] - 113:12

**protects** [1] - 53:4
**prove** [1] - 106:10
**provide** [63] - 6:3, 9:8, 10:14, 11:7, 11:12, 11:19, 12:3, 12:22, 14:13, 19:24, 26:9, 27:23, 28:8, 28:11, 28:20, 32:23, 34:18, 35:3, 35:5, 35:15, 36:20, 37:13, 37:19, 38:9, 38:17, 48:12, 50:7, 51:18, 52:11, 52:22, 57:14, 57:19, 59:10, 62:23, 68:17, 68:20, 70:12, 71:3, 72:10, 73:18, 76:9, 77:23, 78:20, 88:9, 88:10, 92:19, 93:15, 94:15, 94:17, 95:16, 95:18, 96:5, 96:12, 98:5, 98:16, 98:21, 99:14, 105:21, 108:15, 108:25, 110:3
**provided** [67] - 5:8, 11:13, 11:21, 11:25, 12:8, 13:18, 14:24, 15:12, 15:22, 16:6, 17:8, 19:25, 21:3, 22:24, 25:20, 25:21, 26:2, 26:3, 26:5, 26:21, 26:25, 27:25, 28:4, 28:6, 28:19, 28:23, 31:19, 31:22, 31:24, 32:1, 32:9, 36:2, 38:14, 39:14, 51:21, 53:2, 54:2, 54:7, 55:17, 57:22, 67:2, 71:7, 71:18, 71:20, 73:21, 74:2, 75:9, 79:8, 83:14, 89:20, 91:22, 92:7, 93:8, 93:14, 94:11, 95:13, 95:21, 96:22, 97:4, 97:8, 97:9, 107:2, 107:13, 112:5, 113:11
**providence** [1] - 98:19
**provides** [16] - 3:15, 22:5, 24:23, 29:17, 30:5, 46:7, 49:15, 49:18, 50:1, 64:22, 69:14, 72:19, 74:23, 77:1, 85:10, 108:4
**providing** [16] - 5:21, 12:14, 18:20, 32:13, 36:18, 43:12, 45:3, 55:18, 56:6, 56:24, 68:4, 68:13, 72:25,

90:13, 103:20
**provision** [6] - 53:6, 53:7, 74:22, 98:2, 99:5, 108:1
**provisions** [8] - 49:21, 50:4, 50:6, 51:17, 52:4, 101:9, 107:3, 107:4
**public** [6] - 3:5, 3:25, 4:3, 4:6, 4:7, 44:10
**publication** [1] - 48:13
**Publication** [4] - 53:15, 54:22, 64:25, 108:13
**published** [2] - 48:8, 74:14
**pulled** [1] - 34:7
**purely** [1] - 113:15
**purpose** [5] - 16:3, 18:10, 23:11, 43:6, 70:2
**purposes** [15] - 43:7, 44:15, 55:12, 60:16, 63:8, 63:11, 65:18, 77:9, 95:2, 106:2, 107:16, 107:20, 107:22, 108:6, 111:18
**pursuant** [6] - 4:14, 5:19, 13:2, 13:9, 13:16, 46:22
**pushed** [1] - 105:9
**pushing** [1] - 105:11
**put** [17] - 10:1, 11:16, 12:21, 18:5, 20:20, 23:14, 44:11, 45:20, 56:10, 64:7, 81:25, 88:1, 90:22, 94:20, 100:6, 103:11, 114:9
**puts** [2] - 29:14, 54:22
**putting** [4] - 39:24, 64:1, 68:1, 112:15

## Q

**Queen** [1] - 46:24
**questioned** [1] - 105:2
**questions** [25] - 8:10, 8:12, 8:15, 8:19, 9:3, 9:4, 9:5, 9:22, 13:24, 14:3, 22:22, 25:18, 31:15, 33:4, 34:7, 45:16, 52:20, 57:2, 58:14, 59:2, 59:3, 66:6, 74:19, 88:15, 101:4
**quick** [1] - 112:9
**quickly** [5] - 100:5,

100:16, 101:24, 103:4, 108:22
**quite** [6] - 19:3, 29:4, 36:7, 36:15, 62:7, 99:21
**quo** [3] - 62:20, 63:14, 63:23
**quote** [15] - 4:11, 13:1, 14:6, 14:13, 14:21, 33:20, 40:6, 43:12, 45:2, 49:16, 69:6, 69:21, 86:3, 98:3, 102:21
**quote/unquote** [1] - 68:2

## R

**rabbit** [1] - 113:20
**Radack** [1] - 52:4
**raise** [5] - 43:14, 51:2, 75:6, 101:2, 101:3
**raised** [5] - 9:9, 40:19, 58:16, 66:7, 100:12
**rather** [1] - 40:6
**RDR** [1] - 114:21
**RDR-CRR** [1] - 114:21
**read** [10] - 8:8, 9:13, 33:18, 40:17, 52:25, 61:2, 94:13, 98:14, 98:15, 101:19
**reading** [5] - 21:22, 54:5, 54:8, 54:9, 69:24
**reads** [1] - 98:24
**ready** [1] - 8:3
**realize** [2] - 12:11, 100:10, 105:1
**really** [18] - 2:8, 23:20, 33:19, 36:11, 51:16, 52:4, 52:19, 66:16, 68:8, 68:17, 69:7, 87:24, 88:10, 104:18, 104:21, 104:24, 104:25, 111:3
**Realtime** [1] - 1:23
**reason** [13] - 87:25, 88:2, 88:12, 89:15, 89:22, 90:1, 91:5, 91:18, 92:9, 93:24, 97:20, 99:11, 103:13
**reasonable** [6] - 43:21, 43:23, 44:19, 44:22, 83:18, 112:22
**reasonably** [1] - 98:12
**reasons** [16] - 41:16,

55:7, 66:7, 67:4, 74:17, 89:15, 91:5, 94:16, 94:22, 95:23, 100:2, 100:23, 101:6, 102:12, 107:13, 112:10
**receive** [6] - 34:16, 35:21, 43:3, 69:4, 110:2
**received** [25] - 5:18, 6:1, 7:17, 11:1, 11:3, 12:18, 13:2, 13:4, 13:8, 18:19, 23:4, 41:17, 58:6, 69:25, 75:22, 77:18, 78:3, 78:4, 78:7, 78:17, 80:2, 85:1, 87:4, 102:19, 106:5
**receives** [1] - 13:13, 104:9, 112:23
**receiving** [9] - 18:18, 37:18, 56:7, 85:6, 98:21, 99:15, 109:20, 110:7, 111:11
**recently** [2] - 44:10, 74:14
**Recessed** [1] - 102:1
**recipient** [1] - 65:2
**recognized** [2] - 43:12, 45:3
**Record** [1] - 1:25
**record** [24] - 2:5, 2:8, 3:9, 7:14, 8:25, 9:20, 31:18, 34:12, 40:2, 41:8, 42:5, 44:7, 44:16, 57:6, 76:11, 100:5, 100:6, 101:25, 103:3, 103:9, 103:11, 104:5, 110:16, 114:17
**records** [9] - 75:18, 75:25, 76:2, 76:14, 76:24, 76:25, 77:21, 77:22, 77:25
**redisclose** [2] - 21:16, 24:21
**redress** [6] - 72:13, 72:23, 73:6, 73:12, 100:18, 109:7
**redressability** [1] - 108:23
**redresses** [1] - 108:25
**reduced** [1] - 113:16
**REEVES** [2] - 1:22, 114:21
**Reeves** [2] - 114:15, 114:21
**refer** [1] - 34:23
**referred** [1] - 34:15
**reflect** [1] - 56:19

**reflective** [1] - 47:13
**reflects** [1] - 55:3
**Reform** [1] - 51:12
**refrain** [1] - 6:16
**regarding** [4] - 6:2, 10:17, 11:11, 43:16
**regardless** [1] - 54:1
**Registered** [1] - 1:22
**registration** [1] - 36:16
**regularity** [1] - 111:22
**regulation** [6] - 22:4, 68:7, 71:11, 71:20, 85:12, 96:13
**regulations** [5] - 21:17, 69:17, 71:15, 71:16, 114:17
**rejected** [1] - 41:18
**relate** [1] - 80:13
**related** [5] - 4:11, 21:3, 33:20, 33:24, 81:14
**relatedly** [1] - 55:18
**relates** [3] - 29:19, 52:24, 80:7
**relating** [5] - 23:8, 33:4, 80:21, 93:24, 94:21
**relation** [1] - 7:12
**relationship** [1] - 46:14
**relevance** [2] - 91:13, 94:1
**relevant** [19] - 14:8, 54:12, 89:16, 91:5, 91:7, 91:8, 91:15, 93:24, 94:17, 94:21, 94:22, 95:23, 96:5, 96:24, 97:17, 98:24, 107:13, 112:2, 112:6
**reliance** [1] - 56:5
**relied** [4] - 18:3, 82:12, 85:23, 111:16
**relief** [11] - 49:22, 51:1, 51:3, 51:19, 62:2, 62:6, 64:1, 72:11, 72:20, 73:22, 108:25
**relies** [2] - 15:19, 19:15
**reluctant** [1] - 37:24
**rely** [3] - 83:20, 105:7, 113:18
**relying** [5] - 16:13, 76:22, 80:11, 104:13, 105:5
**remained** [3] - 17:12, 81:6, 105:10
**remaining** [2] -

80:14, 82:3
**remains** [1] - 106:20
**remedial** [1] - 49:18
**remediation** [1] - 57:5
**remedies** [10] - 49:22, 49:24, 50:19, 52:10, 73:5, 73:15, 73:20, 74:2, 101:11, 113:23
**remedy** [19] - 45:25, 49:15, 49:17, 50:8, 50:23, 52:12, 61:18, 61:20, 61:23, 62:9, 62:16, 72:10, 73:18, 74:16, 100:18, 100:22, 101:8, 114:2, 114:4
**removal** [60] - 16:7, 16:9, 16:17, 16:19, 17:2, 17:13, 17:19, 18:4, 19:7, 25:11, 29:19, 29:22, 30:3, 30:6, 30:12, 30:16, 80:6, 80:9, 80:13, 80:14, 80:16, 80:21, 81:7, 81:15, 81:16, 81:18, 81:20, 81:23, 82:3, 82:7, 82:15, 83:2, 84:5, 88:6, 88:7, 88:9, 88:13, 89:24, 90:4, 91:19, 91:21, 91:23, 92:8, 92:16, 92:18, 93:7, 94:3, 94:4, 95:1, 95:12, 95:15, 96:17, 96:20, 97:2, 97:17, 97:19, 106:11, 108:2
**remove** [1] - 3:7
**removed** [9] - 17:13, 41:19, 41:22, 42:1, 56:20, 60:13, 84:11, 91:24, 93:11
**repeat** [1] - 17:5
**repeatedly** [1] - 55:21
**replied** [1] - 4:22
**reply** [4] - 4:24, 5:5, 46:9, 113:24
**report** [3] - 39:12, 65:22, 109:15
**REPORTER** [1] - 114:22
**reporter** [2] - 65:25, 101:14
**Reporter** [4] - 1:22, 1:23, 1:23, 114:15
**reporting** [9] - 38:19, 39:4, 39:9, 53:13, 64:23, 102:6, 109:9,

109:21, 109:23
**reports** [1] - 41:22
**represent** [3] - 36:5, 92:12, 94:11
**representation** [5] - 3:15, 15:20, 20:14, 38:10, 82:12
**representations** [3] - 19:15, 20:13, 103:24
**represented** [2] - 30:20, 63:6
**representing** [5] - 2:7, 2:23, 3:2, 3:22, 8:25
**represents** [2] - 46:3, 54:20
**request** [55] - 5:18, 5:21, 6:1, 6:4, 6:7, 6:21, 7:17, 7:25, 8:1, 10:10, 10:22, 11:6, 11:8, 11:10, 11:13, 12:22, 13:2, 13:17, 14:21, 18:19, 22:23, 24:6, 24:17, 25:5, 29:14, 30:21, 30:24, 31:13, 41:17, 41:18, 43:6, 54:10, 57:24, 63:8, 68:12, 78:6, 78:7, 78:14, 81:11, 81:12, 83:13, 84:3, 84:24, 84:25, 87:4, 87:7, 87:9, 89:14, 98:9, 99:8, 99:15, 99:24, 100:13, 102:20, 104:9
**requested** [10] - 5:22, 25:6, 30:2, 31:6, 52:23, 97:15, 105:19, 105:22, 112:13, 112:16
**requester** [3] - 54:11, 78:16, 98:5
**requesters** [1] - 71:13
**requesting** [9] - 23:23, 52:22, 53:2, 62:20, 63:18, 69:10, 79:13, 79:16, 111:12
**requests** [25] - 10:15, 10:25, 12:15, 12:19, 12:20, 13:4, 13:8, 13:10, 13:14, 13:15, 41:6, 41:21, 42:7, 43:3, 57:7, 69:25, 71:23, 80:4, 88:18, 97:23, 98:3, 98:13, 99:3, 99:22
**require** [14] - 12:15, 19:16, 29:1, 52:25, 65:15, 65:17, 76:15,

77:12, 92:25, 99:9, 99:20, 106:8, 111:21, 113:25
**required** [27] - 16:5, 16:6, 17:22, 26:6, 30:1, 35:2, 38:12, 64:19, 68:3, 68:6, 68:17, 69:4, 69:20, 69:25, 70:12, 77:23, 88:8, 88:11, 89:25, 90:17, 96:5, 98:22, 99:14, 102:13, 103:9, 109:14, 109:20
**requirement** [9] - 24:16, 43:20, 54:18, 69:8, 69:20, 71:12, 72:3, 93:2, 102:6
**requirements** [33] - 10:9, 12:5, 15:21, 18:12, 21:7, 37:18, 38:3, 39:8, 39:9, 39:12, 45:20, 52:18, 53:6, 53:13, 53:24, 54:6, 70:2, 77:12, 83:21, 94:10, 99:17, 102:10, 106:21, 108:11, 108:15, 109:7, 109:10, 109:21, 109:22, 109:23, 110:5, 111:9, 111:11
**requires** [15] - 23:23, 34:22, 37:8, 37:10, 38:9, 45:8, 52:21, 53:15, 60:23, 61:5, 88:16, 98:4, 99:6, 107:15, 111:12
**requiring** [5] - 14:13, 16:4, 48:11, 86:6, 103:9
**rescind** [1] - 21:4
**residential** [1] - 25:22
**resolution** [1] - 104:2
**resolving** [1] - 10:15
**respect** [7] - 34:14, 35:20, 47:17, 52:23, 60:4, 67:17, 109:10
**respective** [1] - 5:7
**respond** [7] - 5:3, 74:11, 101:18, 105:16, 105:20, 105:24, 110:11
**responded** [3] - 5:20, 11:23, 32:14
**response** [22] - 4:16, 5:6, 6:3, 7:18, 9:8, 10:9, 10:22, 11:8, 11:9, 11:10, 11:13,

11:15, 11:17, 11:20, 20:9, 20:14, 20:16, 20:19, 30:19, 36:4, 41:20, 101:5
**responses** [3] - 11:14, 12:18, 28:23
**responsibilities** [5] - 33:22, 39:3, 69:18, 70:4, 73:2
**responsibility** [2] - 54:17, 114:1
**responsible** [5] - 18:23, 61:8, 63:19, 78:10, 106:4
**rest** [2] - 12:3, 84:13
**restrict** [4] - 65:13, 65:15, 77:3, 77:7
**restricted** [1] - 77:2
**result** [5] - 14:16, 14:23, 21:20, 24:19, 36:10
**Retired** [5] - 4:12, 44:1, 47:21, 59:13, 60:17
**retroactive** [1] - 114:4
**retroactively** [1] - 58:13
**retrospective** [2] - 51:18, 100:18
**return** [22] - 14:5, 16:6, 20:3, 22:5, 29:12, 52:24, 56:7, 62:20, 63:23, 65:19, 65:21, 74:21, 74:24, 74:25, 77:4, 77:7, 77:8, 79:1, 89:3, 89:14, 89:24
**returned** [3] - 65:12, 65:14, 112:12
**returns** [3] - 15:18, 63:13, 77:4
**REVENUE** [1] - 1:6
**Revenue** [23] - 2:3, 6:10, 10:5, 46:2, 46:10, 46:15, 47:11, 48:3, 49:11, 50:5, 50:20, 51:18, 52:1, 56:15, 56:19, 56:22, 66:11, 72:19, 73:18, 74:1, 74:17, 87:24, 101:10
**revenue** [3] - 56:1, 56:6, 99:2
**reversal** [1] - 55:13
**review** [17] - 6:9, 25:20, 30:23, 31:10, 46:7, 49:15, 50:4, 51:15, 51:22, 51:25, 52:5, 52:11, 56:22,

90:12, 91:14, 92:25,
106:13
**reviewability** [2] -
50:1, 50:14
**reviewable** [2] -
47:1, 62:12
**reviewed** [2] - 30:20,
30:23
**reviewing** [1] -
104:20
**revisited** [1] - 12:22
**rightfully** [1] - 42:25
**rights** [6] - 33:22,
54:15, 55:9, 55:14,
58:18, 66:22
**Rights** [9] - 1:3, 2:3,
2:12, 3:12, 33:16,
39:19, 39:25, 50:10,
72:23
**ripe** [1] - 5:9
**risk** [8] - 38:5, 39:5,
41:15, 42:14, 42:23,
43:2, 44:22, 110:3
**role** [2] - 64:20, 86:5
**route** [1] - 62:3
**rows** [1] - 11:18
**ruin** [1] - 111:5
**Rule** [1] - 4:14
**rule** [7] - 6:17, 48:23,
48:24, 50:18, 54:5,
74:20, 74:24
**ruled** [1] - 7:9
**rules** [1] - 4:11
**run** [1] - 35:4
**runs** [2] - 3:14, 34:15

## S

**safeguarded** [1] -
64:24
**safeguards** [10] -
54:22, 64:23, 76:21,
76:23, 99:4, 99:5,
99:6, 99:7, 99:10,
99:21
**sanction** [1] - 50:18
**sanctions** [2] - 50:6,
50:12
**satisfied** [2] - 12:6,
95:6
**satisfies** [5] - 21:6,
90:5, 95:13, 97:11,
97:13
**satisfy** [1] - 89:21
**scale** [1] - 55:2
**scared** [1] - 59:8
**schedule** [1] - 9:17
**scheme** [6] - 49:18,
51:13, 51:20, 52:10,
72:18, 73:20

**schemes** [2] - 51:15,
53:9
**school** [1] - 92:4
**seclusion** [6] -
43:15, 43:16, 43:21,
44:18, 112:17, 113:3
**second** [10] - 29:11,
34:24, 37:15, 71:25,
76:18, 106:15,
107:12, 107:24,
109:15
**secondary** [1] -
60:11
**Section** [16] - 5:1,
6:10, 10:5, 14:4,
14:12, 16:8, 49:18,
52:17, 52:19, 52:21,
72:7, 72:8, 74:22,
76:17, 77:1, 89:13
**section** [3] - 46:7,
56:21, 97:24
**sections** [2] - 10:2,
56:18
**sector** [1] - 3:25
**secure** [1] - 53:11
**Security** [7] - 5:16,
27:10, 27:11, 27:15,
28:9, 32:6, 58:11
**security** [1] - 53:16
**see** [17] - 15:13,
23:5, 25:22, 27:1,
32:3, 36:15, 44:9,
51:5, 84:5, 86:21,
91:1, 91:10, 91:14,
93:5, 94:20, 96:13,
97:20
**seeing** [1] - 93:1
**seek** [1] - 37:24
**seeking** [5] - 5:1,
16:19, 49:22, 51:2,
72:11
**seem** [5] - 38:22,
38:23, 94:1, 98:8,
99:20
**sees** [1] - 94:10
**self** [3] - 84:15,
92:11, 94:7
**self-deported** [3] -
84:15, 92:11, 94:7
**sense** [4] - 28:21,
28:23, 67:5, 103:3
**sensitive** [5] - 7:24,
49:4, 53:8, 54:16,
106:18
**sensitivity** [1] -
64:19
**sent** [6] - 11:17,
41:20, 55:12, 78:5,
78:15, 90:19
**separate** [6] - 10:25,

71:25, 75:1, 75:4,
75:22, 80:18
**September** [3] -
1:11, 5:6, 114:19
**seriously** [1] - 55:9
**serve** [2] - 36:12,
73:9
**serves** [4] - 36:8,
61:24, 61:25, 62:8
**service** [2] - 4:2, 4:3
**SERVICE** [1] - 1:6
**Service** [2] - 2:3,
51:12
**services** [12] - 34:18,
35:3, 35:16, 36:18,
37:3, 39:10, 39:14,
57:14, 57:19, 59:10,
72:25, 110:3
**set** [9] - 14:2, 54:18,
71:5, 73:15, 80:22,
82:23, 91:12, 99:2,
114:8
**sets** [5] - 47:25, 71:2,
89:15, 91:4, 102:9
**several** [3] - 41:16,
55:22, 111:16
**severe** [1] - 59:5
**shall** [4] - 21:18,
24:14, 63:9, 65:11
**SHAPIRO** [1] - 1:18
**Shapiro** [1] - 3:3
**share** [10] - 20:21,
69:3, 72:3, 74:23,
89:8, 99:5, 102:15,
104:10, 109:12,
112:22
**shared** [12] - 13:24,
21:8, 23:6, 23:9, 24:5,
24:14, 24:16, 43:17,
43:19, 64:14, 68:10,
85:16
**sharing** [41] - 5:13,
6:17, 6:25, 7:3, 7:16,
7:18, 7:19, 10:7,
10:18, 10:20, 13:23,
15:21, 33:25, 35:9,
35:11, 39:20, 39:24,
40:24, 41:2, 45:24,
49:2, 55:1, 55:4,
62:11, 62:14, 65:22,
66:13, 66:17, 66:19,
66:25, 67:14, 68:13,
71:8, 71:18, 72:1,
85:14, 90:6, 100:19,
100:21, 107:22, 114:3
**shortly** [1] - 39:7
**show** [8] - 33:10,
33:11, 37:19, 56:9,
71:19, 95:25, 96:25,
102:14

**showing** [1] - 62:10
**shown** [1] - 61:15
**shows** [6] - 48:18,
56:16, 57:6, 74:1,
76:10, 111:8
**shy** [1] - 66:3
**side** [3] - 8:17,
101:17, 105:3
**significant** [13] -
35:13, 36:7, 41:23,
42:14, 42:22, 44:6,
44:18, 47:19, 56:4,
56:13, 60:19, 61:12,
107:18
**significantly** [4] -
36:11, 55:8, 59:9,
109:25
**similar** [5] - 14:12,
36:15, 50:4, 50:22,
52:4
**similarly** [1] - 29:17
**simplicity** [1] - 84:1
**simply** [6] - 25:10,
36:17, 54:19, 56:21,
93:6, 114:3
**single** [2] - 54:18,
65:2
**sister** [2] - 80:2,
114:2
**situation** [1] - 51:16
**situations** [1] - 31:19
**six** [2] - 13:14, 26:14
**skip** [1] - 112:9
**skipped** [1] - 31:18
**slow** [1] - 77:5
**small** [1] - 3:19
**Social** [6] - 27:10,
27:11, 27:15, 28:9,
32:5, 58:11
**solely** [16] - 14:9,
15:14, 18:1, 20:5,
24:7, 60:22, 60:23,
60:25, 61:6, 77:4,
77:8, 79:2, 82:11,
86:3, 107:16, 111:18
**someone** [5] - 8:17,
81:22, 107:9, 108:1,
108:2
**sometimes** [3] -
27:8, 32:20
**somewhat** [1] - 83:3
**son** [3] - 42:20,
42:21
**Sonja** [2] - 114:15,
114:21
**SONJA** [2] - 1:22,
114:21
**soon** [1] - 62:24
**sorry** [6] - 15:1, 15:6,
47:2, 59:21, 60:20,

89:24
**sort** [20] - 8:8, 11:17,
17:21, 33:25, 62:9,
76:5, 77:20, 81:21,
84:17, 85:8, 86:16,
90:9, 90:22, 91:11,
91:13, 99:15, 99:20,
100:20, 101:3
**sorting** [1] - 93:1
**sought** [1] - 106:1
**sound** [2] - 92:6,
93:15
**sounds** [4] - 24:2,
75:11, 79:7, 90:21
**source** [2] - 46:19,
47:7
**sources** [2] - 13:15,
75:10
**speaker** [1] - 2:15
**speaking** [6] - 2:7,
3:8, 9:1, 17:11, 66:3,
82:19
**spear** [1] - 70:15
**Spear** [1] - 72:1
**specially** [1] - 29:17
**specific** [48] - 8:14,
12:6, 19:4, 23:7,
23:16, 38:10, 39:7,
53:18, 54:6, 72:22,
73:18, 78:9, 79:4,
79:11, 80:23, 80:24,
81:1, 87:19, 89:15,
89:19, 89:22, 90:1,
90:4, 90:11, 91:4,
91:8, 91:18, 91:19,
94:16, 94:22, 95:5,
95:9, 95:10, 95:12,
95:23, 96:21, 97:10,
97:14, 106:2, 106:5,
106:21, 107:13,
108:15, 113:12
**specifically** [10] -
7:17, 14:17, 21:16,
34:22, 38:15, 58:19,
96:23, 97:4, 97:12,
107:5
**specifics** [1] - 10:12
**specified** [2] - 76:11,
96:4
**specifies** [1] - 76:13
**specifying** [1] -
104:16
**speculation** [2] -
111:19, 113:17
**speculative** [4] -
40:22, 86:19, 112:11,
113:15
**spent** [2] - 39:1, 39:9
**spreadsheet** [4] -
53:21, 54:4, 87:8,

87:12
**squarely** [1] - 67:15
**stage** [1] - 61:21
**standard** [1] - 99:23
**standards** [1] - 39:13
**standing** [26] - 6:9, 7:11, 33:9, 33:12, 33:15, 33:17, 33:20, 34:4, 39:17, 39:19, 39:23, 40:1, 40:6, 40:9, 40:10, 40:18, 40:23, 43:9, 43:16, 45:6, 66:9, 73:10, 112:10, 112:12, 113:14, 113:22
**start** [10] - 2:7, 7:9, 9:17, 9:22, 9:25, 47:3, 49:25, 57:12, 67:9, 73:8
**started** [1] - 88:19
**starting** [2] - 2:5, 30:18, 33:9
**state** [4] - 3:16, 4:20, 41:6, 45:16
**statement** [2] - 22:18, 48:24
**statements** [1] - 44:20
**states** [3] - 64:10, 64:25, 98:3
**STATES** [1] - 1:1
**States** [5] - 3:1, 3:23, 96:19, 114:15, 114:18
**stating** [1] - 54:19
**status** [3] - 62:20, 63:14, 63:23
**statute** [80] - 6:9, 12:6, 14:18, 15:20, 16:5, 16:12, 17:18, 18:12, 19:3, 19:23, 20:9, 21:7, 23:23, 24:19, 29:11, 30:1, 30:15, 34:22, 34:23, 52:18, 52:25, 54:9, 54:14, 54:24, 61:2, 68:3, 68:4, 68:7, 68:8, 68:19, 69:6, 69:7, 69:24, 70:1, 70:16, 71:2, 71:5, 71:15, 71:17, 71:19, 72:5, 73:24, 73:25, 74:2, 79:7, 83:22, 84:1, 84:18, 85:12, 88:11, 88:17, 89:18, 89:21, 89:23, 90:18, 91:12, 91:13, 94:14, 95:2, 95:3, 95:11, 95:15, 96:4, 96:13, 97:18, 98:4, 98:10, 98:19, 99:16, 107:7, 107:15,

108:12, 109:11, 111:10, 111:12, 111:20, 113:9
**statutorily** [1] - 34:16, 49:2, 63:22
**statutory** [14] - 29:15, 53:9, 54:14, 70:4, 72:2, 72:18, 84:21, 89:5, 90:10, 94:10, 107:2, 107:4, 110:4, 111:11
**stay** [11] - 5:1, 53:16, 61:22, 62:25, 63:3, 63:6, 64:3, 64:6, 64:10, 100:13
**stayed** [1] - 39:7, 30:16, 81:22
**staying** [2] - 16:8, 81:20
**stays** [1] - 108:24
Stenographic [1] - 1:25
**stenographic** [1] - 114:16
**step** [1] - 30:2
**Stephens** [2] - 52:3, 74:9
**steps** [1] - 9:16
**Steve** [1] - 2:22
**STEVEN** [1] - 1:14
**still** [26] - 18:4, 52:5, 64:1, 69:6, 82:8, 82:15, 84:9, 84:14, 84:15, 85:11, 92:1, 92:3, 92:7, 92:10, 92:24, 93:9, 93:11, 94:4, 95:19, 95:20, 96:7, 96:8, 96:19, 97:3, 105:4, 112:7
**stood** [1] - 41:25
**stop** [2] - 101:23, 114:3
**stopped** [1] - 59:7
**stored** [1] - 64:21
**straight** [1] - 24:19
**Street** [4] - 1:18, 2:13, 3:18, 39:22
**stringent** [1] - 99:23
**strong** [3] - 50:1, 50:14, 66:18
**stronger** [1] - 74:17
**strongly** [1] - 107:21
**structure** [2] - 75:7, 76:6
**Student** [1] - 101:7
**style** [1] - 8:7
**subject** [6] - 4:19, 16:11, 25:9, 25:13, 29:25, 106:7
**submit** [3] - 5:5,

65:22, 109:14
**submitted** [1] - 5:7
**subparagraph** [2] - 89:21, 90:5
**subsequent** [2] - 7:18, 45:23
**subsequently** [1] - 60:21
**substantial** [1] - 33:11
**succeed** [4] - 33:10, 45:25, 62:10, 66:8
**success** [2] - 33:6, 45:22
**successful** [1] - 113:19
**succinct** [2] - 57:11, 105:5
**suffering** [1] - 35:13
**sufficiency** [1] - 30:20
**sufficient** [3] - 29:23, 45:6, 45:12
**sufficiently** [1] - 53:23
**suggest** [5] - 62:4, 75:20, 76:5, 103:15, 111:19
**suggested** [3] - 52:10, 94:16, 113:24
**suggests** [3] - 42:4, 48:6, 106:6
**summarizing** [1] - 8:8
**summary** [1] - 57:11
**supplant** [3] - 51:14, 51:22, 51:25
**support** [14] - 4:24, 35:5, 40:22, 43:16, 45:5, 45:6, 51:3, 62:1, 81:3, 98:12, 100:20, 102:11, 113:18, 113:22
**supported** [2] - 33:12, 108:7
**supporting** [1] - 50:25
**supports** [2] - 105:25, 106:12
**suppose** [1] - 69:23
**supposed** [8] - 19:1, 19:4, 39:13, 77:17, 84:11, 86:14, 93:22, 94:22
**supposedly** [2] - 22:14, 22:17
**Supreme** [1] - 52:9
**surnames** [1] - 32:19
**surrounding** [2] - 51:14, 52:3

**suspect** [1] - 59:1
**switch** [1] - 8:19
**system** [29] - 3:14, 26:24, 27:1, 28:20, 31:23, 31:25, 32:1, 32:12, 34:21, 36:23, 37:2, 39:4, 42:12, 43:6, 55:25, 56:6, 59:8, 75:17, 75:24, 75:25, 76:1, 76:11, 76:14, 76:24, 76:25, 77:25
**systems** [3] - 42:18, 77:21

## T

**table** [1] - 3:2
**tailored** [1] - 63:12
**talks** [4] - 30:16, 66:15, 69:2, 89:2
**tax** [22] - 3:14, 3:16, 3:17, 15:18, 28:9, 31:20, 31:21, 32:6, 35:23, 35:25, 55:25, 56:5, 56:6, 58:9, 58:12, 59:8, 64:25, 65:4, 77:4, 77:7, 80:23, 112:4
**Taxation** [1] - 53:14
**taxes** [3] - 57:23, 58:4, 94:6
**Taxpayer** [9] - 1:3, 2:2, 2:12, 3:12, 33:16, 39:18, 39:25, 50:10, 72:23
**taxpayer** [42] - 3:15, 6:3, 6:11, 10:25, 26:21, 26:25, 27:7, 27:17, 28:3, 28:19, 29:3, 32:4, 32:5, 33:21, 34:15, 34:20, 34:21, 35:4, 35:6, 36:22, 37:1, 37:17, 39:21, 44:5, 49:4, 52:23, 53:5, 55:16, 55:20, 55:24, 57:8, 58:21, 63:21, 66:14, 74:21, 74:23, 74:25, 98:10, 109:11, 109:19, 113:10, 113:11
**taxpayers** [19] - 3:16, 6:2, 10:11, 11:1, 11:11, 34:22, 34:23, 34:24, 35:18, 38:13, 38:15, 49:2, 54:15, 55:9, 55:11, 59:3, 59:7, 109:18, 109:25
**taxpayers'** [1] -

55:14
**Teachers** [1] - 74:14
**technical** [2] - 77:22, 85:8
**telecommunication s** [1] - 4:1
**television** [1] - 4:3
**ten** [5] - 9:10, 14:20, 38:14, 65:24, 101:19
**tens** [1] - 13:13
**tentative** [1] - 66:21
**term** [4] - 76:12, 87:9, 89:18, 91:7
**termination** [1] - 111:24
**terms** [63] - 12:13, 18:14, 19:4, 20:19, 23:17, 24:1, 25:17, 28:21, 30:22, 32:18, 33:5, 33:19, 35:9, 35:11, 37:18, 37:19, 40:13, 41:10, 43:8, 46:18, 47:2, 64:13, 68:12, 69:9, 69:17, 69:20, 70:9, 71:18, 72:22, 72:24, 75:7, 76:21, 78:14, 78:16, 78:23, 79:13, 81:4, 82:17, 83:10, 84:25, 85:19, 88:6, 89:6, 89:19, 90:8, 91:3, 91:7, 92:2, 92:16, 96:11, 96:15, 96:23, 99:23, 100:25, 101:4, 102:3, 102:10, 102:17, 103:20, 104:20
**testified** [1] - 30:25
**THE** [195] - 1:1, 1:10, 1:13, 1:17, 2:6, 2:15, 2:18, 2:24, 3:4, 9:25, 10:24, 11:9, 11:23, 12:2, 12:11, 12:20, 12:25, 13:7, 13:19, 13:22, 15:1, 15:3, 15:5, 15:8, 15:11, 15:17, 15:24, 16:14, 16:24, 17:10, 17:20, 18:9, 18:24, 19:19, 20:2, 20:14, 20:18, 20:24, 21:2, 21:11, 21:22, 21:25, 22:3, 22:21, 23:25, 24:16, 25:14, 26:3, 26:7, 26:12, 26:15, 27:6, 27:13, 27:15, 27:19, 27:25, 28:7, 28:15, 28:21, 29:6, 29:11, 30:4, 30:9, 30:11, 30:17, 31:3, 31:14,

32:3, 32:16, 33:2,
34:6, 34:9, 34:13,
35:8, 37:15, 38:19,
39:11, 39:17, 40:12,
40:16, 40:21, 41:8,
43:8, 44:25, 45:19,
46:14, 47:7, 48:15,
49:6, 49:14, 50:24,
51:8, 52:13, 52:15,
54:25, 57:2, 59:12,
59:15, 59:22, 59:24,
61:14, 62:9, 63:25,
64:5, 64:12, 65:24,
67:8, 67:18, 68:6,
70:8, 70:18, 70:23,
71:14, 72:6, 72:22,
73:13, 74:4, 74:7,
74:11, 74:19, 75:15,
75:19, 76:3, 76:16,
76:18, 76:20, 77:5,
77:15, 78:2, 78:11,
78:13, 78:22, 80:5,
80:10, 80:20, 81:19,
81:25, 82:16, 83:8,
83:23, 84:8, 84:22,
85:5, 85:11, 86:1,
86:9, 86:13, 86:20,
87:3, 87:7, 87:13,
87:16, 87:18, 88:1,
88:6, 88:15, 88:23,
89:13, 90:6, 90:20,
91:3, 91:23, 92:13,
93:5, 93:21, 94:15,
95:4, 95:8, 95:14,
96:7, 97:9, 97:12,
97:19, 98:2, 98:25,
99:18, 100:4, 100:10,
100:25, 101:13,
102:2, 103:12,
103:20, 104:12,
105:17, 105:23,
110:6, 110:12,
110:17, 110:19,
110:21, 110:23,
111:1, 111:6, 114:7
   **themselves** [4] -
46:11, 91:25, 93:12,
111:23
   **theoretical** [1] - 57:9
   **theories** [1] - 33:15
   **therefore** [14] - 7:10,
19:8, 29:22, 31:22,
55:6, 62:2, 67:6,
68:11, 68:16, 69:21,
73:11, 96:19, 112:23,
113:2
   **they've** [2] - 70:11,
91:15
   **third** [6] - 34:4, 40:9,
40:12, 40:17, 45:10,

107:15
   **third-party** [5] - 34:4,
40:9, 40:12, 40:17,
45:10
   **thousand** [1] - 11:22
   **thousands** [3] - 3:25,
13:14, 42:10
   **three** [3] - 44:12,
55:7, 107:4
   **throughout** [1] - 17:6
   **tie** [1] - 64:18
   **tied** [1] - 58:1
   **time-bound** [2] -
58:2, 58:14
   **timing** [1] - 103:4
   **title** [4] - 15:5, 15:6,
78:22, 95:5
   **Title** [7] - 95:4, 95:7,
95:17, 95:22, 95:25,
97:1, 97:20
   **titles** [4] - 78:20,
102:17, 102:23,
102:25
   **today** [12] - 5:11, 7:7,
8:2, 10:20, 29:2, 41:6,
50:13, 55:5, 67:15,
98:20, 105:1, 105:25
   **today's** [2] - 3:5,
84:6
   **Todd** [1] - 78:6
   **together** [9] - 6:7,
32:20, 42:20, 48:5,
69:24, 90:1, 100:6,
103:11
   **took** [1] - 7:16
   **tort** [2] - 45:2, 112:17
   **torts** [3] - 43:14,
112:21, 112:24
   **totally** [1] - 79:23
   **touch** [2] - 23:24,
114:8
   **touched** [1] - 57:10
   **towards** [1] - 73:1
   **Trabajadores** [1] -
7:1
   **traditional** [2] -
40:18, 61:19
   **traditionally** [2] -
43:12, 45:2
   **transaction** [1] -
71:21
   **Transcript** [1] - 1:25
   **TRANSCRIPT** [1] -
1:10
   **transcript** [3] -
114:16, 114:16,
114:17
   **transfers** [1] - 48:1
   **transparency** [1] -
48:13

   **TransUnion** [4] -
43:9, 45:4, 45:6,
113:4
   **Treasury** [2] - 5:15,
18:11
   **treated** [3] - 35:19,
54:9, 65:3
   **treatment** [2] -
47:17, 50:22
   **tried** [1] - 28:25
   **tripping** [1] - 18:15
   **true** [4] - 17:15,
19:23, 85:6, 114:16
   **Trump** [1] - 55:11
   **trust** [5] - 34:21,
45:11, 55:25, 106:15,
108:19
   **trustworthy** [1] -
105:8
   **try** [4] - 105:19,
111:5, 112:25, 113:8
   **trying** [7] - 46:18,
48:20, 64:6, 83:9,
91:3, 91:9, 103:4
   **turning** [1] - 5:10
   **turns** [1] - 111:15
   **two** [11] - 10:25,
12:7, 29:24, 33:14,
33:25, 41:21, 43:14,
60:1, 71:6, 78:13,
79:23
   **type** [8] - 50:15,
50:19, 52:11, 54:16,
99:8, 103:23, 112:15,
112:16
   **types** [4] - 38:16,
63:13, 72:20, 109:21
   **typical** [1] - 36:4
   **typically** [2] - 36:24,
109:21

   **U**

   **U.S** [3] - 1:17, 3:14,
42:22
   **U.S.C** [7] - 25:10,
29:18, 30:4, 88:5,
90:2, 97:16, 112:4
   **ultimate** [2] - 66:13,
96:2
   **ultimately** [4] -
10:11, 18:21, 23:1,
100:5
   **unable** [3] - 37:5,
37:13, 58:19
   **under** [63] - 4:11,
7:3, 10:21, 13:14,
13:16, 14:17, 15:22,
16:11, 18:14, 19:23,
24:20, 25:10, 26:19,

30:4, 30:9, 35:20,
35:22, 43:9, 45:4,
45:6, 47:6, 48:23,
49:4, 49:10, 51:12,
51:15, 52:17, 53:24,
54:1, 54:3, 54:24,
57:8, 57:22, 61:5,
61:21, 61:22, 62:4,
62:5, 63:14, 65:9,
65:10, 65:14, 66:10,
68:3, 68:18, 70:1,
70:14, 71:2, 71:25,
72:4, 72:7, 76:20,
77:23, 85:7, 87:24,
90:17, 93:13, 97:24,
98:9, 105:15, 106:17,
109:6, 109:10
   **understood** [3] -
19:21, 54:15, 79:18
   **undo** [1] - 66:17
   **Unidos** [1] - 7:1
   **union** [2] - 3:21, 3:24
   **unique** [5] - 26:22,
27:3, 27:9, 27:17,
53:9
   **unit** [2] - 109:19
   **UNITED** [1] - 1:1
   **United** [5] - 3:1, 3:23,
96:19, 114:15, 114:18
   **University** [1] - 101:7
   **unlawful** [7] - 41:13,
50:7, 50:12, 61:20,
63:23, 65:11, 100:19
   **unlawfully** [1] -
108:20
   **unless** [6] - 2:19,
81:8, 94:3, 94:25,
104:8, 106:21
   **unlike** [1] - 44:1
   **unlikely** [2] - 66:8,
96:16
   **unnamed** [1] - 22:10
   **unprecedented** [1] -
104:19
   **unquote** [4] - 13:3,
33:22, 43:13, 102:22
   **unreasonable** [2] -
55:5, 55:8
   **up** [22] - 8:16, 8:22,
9:5, 9:11, 9:12, 18:15,
18:21, 28:4, 28:10,
51:7, 58:3, 66:3,
67:24, 80:22, 84:9,
86:25, 90:20, 101:18,
104:12, 104:20,
111:23
   **upcoming** [1] - 58:5
   **ups** [1] - 102:2
   **USCIS** [1] - 56:11
   **usual** [1] - 8:7

   **V**

   **vacate** [1] - 61:20
   **valid** [1] - 98:11
   **validity** [1] - 53:1
   **value** [1] - 80:5
   **variations** [1] - 32:11
   **variety** [1] - 6:8
   **various** [1] - 57:10
   **Venetian** [1] - 47:15
   **verbatim** [1] - 88:4
   **verbiage** [1] - 11:19
   **verification** [3] -
22:24, 53:19, 53:20
   **verify** [2] - 22:22,
22:25
   **versus** [5] - 2:3,
4:12, 7:1, 9:6, 59:13
   **view** [5] - 48:21,
79:17, 85:14, 104:18,
106:4
   **viewed** [3] - 83:18,
85:21, 105:2
   **views** [2] - 59:24,
106:17
   **Vilsack** [1] - 51:23
   **violate** [4] - 49:21,
72:10, 73:24, 80:16
   **violated** [10] - 6:14,
63:23, 95:12, 95:15,
95:17, 95:22, 96:1,
97:21, 108:5, 112:4
   **violating** [1] - 96:20
   **violation** [13] -
17:18, 84:2, 88:5,
88:22, 89:23, 90:2,
96:3, 96:25, 97:16,
100:3, 108:2, 111:25,
112:3
   **violations** [3] -
49:19, 72:13, 107:6
   **violators** [1] - 49:24
   **visa** [1] - 30:13
   **voter** [1] - 36:16
   **voters** [1] - 36:23
   **vs** [1] - 1:5

   **W**

   **Walker** [1] - 78:3
   **walker** [2] - 30:25,
31:3
   **walker's** [1] - 42:6
   **Walker's** [1] - 12:25
   **walled** [2] - 76:1,
76:15
   **walling** [1] - 77:20
   **Washington** [4] -
1:12, 1:15, 1:19, 1:24
   **ways** [8] - 37:11,

38:11, 44:23, 55:14, 57:10, 58:24, 77:1, 79:23

**wealth** [1] - 48:6
**weekend** [1] - 104:8
**weeks** [1] - 108:3
**weighs** [1] - 100:21
**whichever** [1] - 53:7
**White** [3] - 41:23, 43:5, 60:12
**whole** [4] - 73:25, 77:1, 86:17, 91:23
**wild** [1] - 111:19
**willful** [1] - 106:9
**willfulness** [1] - 106:10
**willing** [1] - 36:13
**wish** [2] - 9:11, 101:17
**word** [1] - 106:24
**words** [10] - 11:11, 13:9, 16:17, 32:7, 35:10, 37:16, 37:21, 38:3, 82:4, 94:17
**worker** [1] - 63:19
**Workers** [2] - 2:13, 3:23
**workers** [2] - 3:22, 3:25
**world** [2] - 86:13, 86:15
**worried** [1] - 42:3
**writing** [5] - 20:15, 102:9, 103:8, 109:12, 110:11
**written** [4] - 20:2, 20:16, 48:11

## Y

**year** [7] - 5:21, 38:13, 58:12, 58:21, 58:22, 99:2
**yeoman's** [1] - 91:1
**yourself** [2] - 2:4, 8:23