# Exhibit 14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR TAXPAYER RIGHTS et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br><br><br>INTERNAL REVENUE SERVICE et al.,<br><br>*Defendants*. | Civil Action No. 25-cv-457-CKK |

**THIRD DECLARATION OF NINA E. OLSON**

I, Nina E. Olson, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old and of sound mind, and I am fully competent to make this declaration.

2. I serve as the Executive Director and Founder of the Center for Taxpayer Rights ("the Center" or "CTR"). I am personally knowledgeable about the organization's mission and operations. I previously served as the Internal Revenue Service ("IRS") National Taxpayer Advocate from 2001 to 2019, and earlier represented taxpayers in disputes with the IRS in private practice and at The Community Tax Law Project, the nation's first independent low-income taxpayer clinic. I've also testified before Congress on topics relating to taxpayer rights and tax administration on more than 70 occasions.

1

3. The Low Income Taxpayer Clinic ("LITC") Grant Program was established by Congress in 1998. *See* 26 U.S.C. § 7526. The authorizing statute defines a "qualified low-income taxpayer clinic" as one that "represents low-income taxpayers in controversies with the Internal Revenue Service" or "operates programs to inform individuals for whom English is a second language about their rights and responsibilities under [the Internal Revenue Code]." *Id.* Congress directed the Secretary to consider several factors in evaluating grant recipients, including "the number of taxpayers who will be served by the clinic, including the number of taxpayers in the geographical area for whom English is a second language." *Id.*

4. Consistent with these statutory requirements, the grant program requirements (discussed below), and our mission, the Center for Taxpayer Rights has dedicated significant resources to providing programming and services to taxpayers for whom English is a second language ("ESL taxpayers"). Since 2023, the Center has applied for and received an annual LITC Grant. As we stated in our 2025 continuation grant application, "the LITC Support Center operates nationwide" and "will serve all cities, counties, and states."

5. Importantly, this grant program requires a one-to-one match by the recipient organization, which means that the Center is dedicating substantial non-federal resources to meeting these statutory requirements as well; it is not the case that the Center simply dedicates the federal funding it receives to these efforts. Reaching, educating, and counseling ESL taxpayers, many of whom are immigrants, are core parts of the services provided by the Center.

6. The Center currently has a grant that runs from 2024 to 2026. Each year, the Center must submit an updated application for the continuation of the grant, which is a non-competitive continuation. Application deadlines for the following year are typically in the summer of the year

prior, so the Center must submit a new application for a competitive grant cycle next year, likely by July 2026, to continue receiving a grant for future years.

7. Each year, the Center also is required to submit information to the LITC Program Office. It must submit annual goals, in particular numerical goals as to consultations with low-income and ESL taxpayers, number of education activities targeted to low-income and ESL taxpayers, and the number of low-income and ESL taxpayers reached by the educational activities.

8. The Center must also submit two reports each grant year—an Interim Report and a Year-End Report. The LITC Program Office "uses the reports to assess the grant recipient's progress in meeting its stated goals and objectives and to measure the quality of clinic operations, including the services provided to low-income and ESL taxpayers."[1] This information is submitted through Form 13424-R, a new form approved in August 2025. It requires that the grant recipient include the following information:

- Number of cases involving a dispute with the ITIN Unit
- Number of cases involving representation of ESL taxpayers
- Number of consultations conducted with ESL taxpayers
- Number tax returns prepared ancillary to ESL activities
- Number of ITIN applications prepared ancillary to ESL activities
- Number of educational activities whose primary audience is ESL taxpayers
- Number of events targeted to ESL taxpayers
- Number of events targeted to ESL service providers
- Number of ESL taxpayer attendees

---

[1] Low Income Taxpayer Clinics, 2026 Grant Application Package and Guidelines (May 2025), https://perma.cc/33UY-5CKE.

3

- Number of staff of ESL service provider attendees

9. Each of these reporting requirements (among other less-directly-related requirements) is directly tied to the Center's work with immigrant taxpayers. This year, as a result of publication of plans for potential data sharing between ICE and the IRS, and particularly since the Memorandum of Understanding between the IRS and ICE was made public in April, the Center's work in each of these areas has been impacted negatively by Defendants' actions.

10. The Center has experienced a drop in almost all of the data points listed above, compared to 2023 and 2024. It is quite simply the case that the Center's efforts to effectively counsel immigrant clients, represent immigrant clients in disputes before the IRS, and offer educational services and programming to ESL taxpayers and those that serve them, are impaired by Defendants' actions. In particular, while the Center is still dedicating significant resources towards broad outreach to ESL taxpayers, there is significant hesitance for these taxpayers to engage with the Center on an individualized basis. There is much less demand for interaction or consultation with the Center, given the concerns with engaging with the IRS. In addition, we have had to revise our outreach strategy to account for these obstacles.

11. As stated in my prior declaration, ECF 31-8, last year the Center held 10 ESL-focused events; this year, the Center has been able to hold only one, due to fear in the immigrant community to engage with the IRS as a result of data sharing with ICE. Last year, the Center represented 14 taxpayers with ITINs. This year, it is only 1 thus far. Similarly, the Center's number of consultations and representations of ESL taxpayers has dropped dramatically. Some of our immigrant clients have also determined that they no longer want to obtain the benefits to which they are legally entitled, choosing to forgo needed funds to avoid interacting with the IRS, given its about-face on data-sharing with ICE. See ECF 31-8, ¶¶ 48-50, 61-67, 89-90.

12. Defendants' actions not only significantly impair our ability to provide services in furtherance of our mission, but also jeopardize our funding under the LITC Grant Program. This competitive grant program requires that we set annual goals regarding our services to ESL taxpayers, many of whom are immigrants, and that we report how many ESL taxpayers we serve each year. If we do not meet the goals we set, or if our reporting indicates that we are providing less services than prior years—we are at risk of losing our federal funding. The LITC Grant Program office assesses an applicant's ability to meet its goals that further the statutory mission of the program, which include providing *pro bono* representation and ESL outreach and education. I am very concerned that despite dedicating more resources towards the priorities identified by this federal program, based on the trends since the IRS-ICE data sharing became public, we will likely not meet the goals we set forth. The goals we set were based on our past work, the resources we are able to dedicate to these priorities, and our expectations regarding the Center's projected impact. However, it was impossible to plan for the huge impact that IRS-ICE data sharing would have on our work. I am worried that our potential inability to meet these goals will impact our ability to continue our grant or obtain additional funding when we apply for another competitive grant as part of the LITC Grant Program.

13. As the Center's director, I am deeply concerned that because our ability to provide services and representation to immigrant taxpayers has been impaired this year, our continued funding, particularly when we are required to apply for a new competitive grant next year—is in jeopardy.

14. For example, the IRS requires that all recipients "apply annually to renew the grant." 2026 LITC Notice of Funding Opportunity.[2] Though the application for second- and third-year grants is abbreviated, an applicant must "meet satisfactory performance levels" to receive continued funding. *Id*. As discussed below, I am concerned that Defendants' actions may jeopardize our ability to meet these levels, despite meeting them in years prior, and dedicating additional resources to doing so this year.

15. Further, for each new grant cycle, each grant application undergoes a technical evaluation by a Ranking Panel of Taxpayer Advocate Service Staff. Each application is scored, and applicants that obtain a certain score, or higher, will advance to the next level of review. The IRS will consider a "variety of factors" in awarding grants, including "the number of taxpayers who will be assisted by the organization," and "the quality of the program offered by the organization including… its record in providing services to low-income and ESL taxpayers." *Id.*

16. The Center is a relatively new LITC grantee, receiving its first grant for the last six months of calendar year 2023. During 2024 we made significant progress in establishing relationships with ESL taxpayers and groups serving those individuals. I am proud of our record of providing services and representation to ESL taxpayers and we looked forward to building upon and expanding those client representations and organizational relationships in 2025. But this year, our efforts to do so have been significantly hampered by the IRS's data sharing with ICE. Despite continued and increased outreach efforts, it has been exceedingly difficult to reach ESL taxpayers as a result of the Defendants' actions. In addition, it has been difficult to represent our existing

---

[2] 2026 LITC Notice of Funding Opportunity, https://perma.cc/LE5U-JJ9R (archived Sept. 17, 2025); *see also* Low Income Taxpayer Clinic Grant Program; Availability of 2026 Grant Application Package, 90 Fed. Reg. 19594 (May 8, 2025), *available at* https://perma.cc/6AQG-VWHC.

ESL taxpayer clients in their current disputes or filings with the IRS, as I described in my prior declaration. *See* ECF 30-8, ¶¶ 40-54. It has also been more difficult to provide support and guidance to our network, LITC Connect, which also advises ESL taxpayer clients. *See* ECF 30-8, ¶¶ 55-70. I worry that these impairments will jeopardize our continued funding, especially when we re-enter the competitive grant cycle next year. Our significant drop in the amount of programing and number of representations for ESL taxpayers may be viewed unfavorably as the IRS evaluates our grant application.

17. In my experience, the failure to meet stated goals could be a basis for reducing funding for an LITC; the program office wants to see progress and an increase over time, especially from relatively newer grantees, like the Center. Much of our building up of a network of referrals and relationships, particularly among the ESL taxpayer community, has been derailed by the policy change. This has harmed our ability to continue to grow our representation, outreach, and education.

18. And regardless of whether the Center continues to receive federal funding, our mission to advance taxpayer rights, promote trust in the tax system, and increase access to justice in the tax system, particularly for the most vulnerable populations, including immigrants, has been and continues to be severely impaired by this new policy of data sharing with ICE. A loss of federal funding would further frustrate our efforts to fulfil our mission.

19. In addition, the Court's order requiring 24-hour notice prior to any further data sharing may help protect against further disclosures, but the Center's ability to advise its clients on how their data will be protected by the IRS, and to provide services and programming to ESL taxpayers, continues to be impaired absent longer-term relief that clarifies the agency's legal obligations with respect to taxpayer data.

7

Washington, D.C.

September 17, 2025

_____

Nina E. Olson