*(CE-8) Route Traffic to Authenticated Proxy Servers*: Route internal communications traffic to external networks through authenticated proxy servers at managed interfaces.

Supplemental Guidance: External networks are networks outside of organizational control. A proxy server is a server (i.e., system or application) that acts as an intermediary for clients requesting system resources from non-organizational or other organizational servers. These system resources can include, for example, files, connections, web pages or services. Client requests established through an initial connection to the proxy server are evaluated to manage complexity and to provide additional protection by limiting direct connectivity. Web content filtering devices are one of the most common proxy servers providing access to the Internet. Proxy servers can support logging of individual Transmission Control Protocol sessions and blocking specific Uniform Resource Locators, Internet Protocol addresses and domain names. Web proxies can be configured with organization-defined lists of authorized and unauthorized websites.

*(CE-9) Restrict Threatening Outgoing Communications Traffic*:

    a.   Detect and deny outgoing communications traffic posing a threat to external systems; and

    b.   Audit the identity of internal users associated with denied communications.

*(CE-10) Prevent Exfiltration*:

    a.   Prevent the exfiltration of information; and

    b.   Conduct exfiltration tests at least semi-annually.

*(CE-11) Restrict Incoming Communications Traffic*: Only allow incoming communications from agency-defined authorized sources to be routed to agency-defined authorized destinations.

*(CE-12) Host-Based Protection*: Implement firewalls and intrusion detection systems at access points and end user equipment as appropriate.

*(CE-15) Networked Privileged Accesses*: Route networked, privileged accesses through a dedicated, managed interface for purposes of access control and auditing.

*(CE-17) Automated Enforcement of Protocol Format*: Enforce adherence to protocol formats.

*(CE-18) Fail Secure*: Prevent systems from entering unsecure states in the event of an operations failure of a boundary protection area.

*(IRS-Defined)*: Agencies shall implement and manage boundary protection (typically using firewalls) at trust boundaries. Each trust boundary shall be monitored and communications across each boundary shall be controlled.

Supplemental Guidance: For the purposes of this requirement, trust boundary is defined as a border between two connected zones with different trust levels.

Supplemental Guidance: This requirement is meant for border firewalls only. Internal firewalls used for network segmentation do not need to be stateful.

Supplemental Guidance: This capability should be placed inline. Wherever possible, intrusion prevention capabilities should be utilized.

TD_0000405

*(IRS-Defined)*: Agencies must block known malicious sites (inbound or outbound), as identified to the agency from US-CERT, MS-ISAC or other sources, at each Internet Access Point (unless explicit instructions are provided to agencies not to block specific sites). Blocking is to be accomplished within two business days following release of such sites.

Supplemental Guidance: US-CERT issues a monthly list of known malicious/suspicious sites as well as ad hoc notices as needed. MS-ISAC provides information to its member organizations about potential threat vectors as well.

Supplemental Guidance: Malicious beaconing activity can sometimes be detected by enabling log capture on network devices such as proxies, DNS servers and routers to record a log of possible communications with specific domains. Creating logs allows an administrator to see precisely which internal network hosts are originating communications to those domains. The internal IP addresses responsible for the communications should be the first places for incident response and mitigation for removal of malware.

## SC-8: Transmission Confidentiality and Integrity

Protect the confidentiality and integrity of transmitted information.

Supplemental Guidance: This control applies to both internal and external networks and all types of information system components from which information can be transmitted (e.g., servers, mobile devices, notebook computers, printers, copiers, scanners, fax machines).

### Control Enhancements:

*(CE-1) Cryptographic Protection*: Implement cryptographic mechanisms to prevent unauthorized disclosure of information and detect changes to information during transmission.

*(IRS-Defined)*: Agencies shall ensure appropriate transmission protections are in place commensurate with the highest sensitivity of information to be discussed over video and voice telecommunication and teleconferences.

Supporting Guidance: Voice, video and multimedia communications can occur over traditional or digital telephone systems, cellular or other wireless networks or data networks. Transmitting voice, video, or multimedia communications over packet-switched networks (such as Local Area Networks) that were designed for data transfer rather than over dedicated circuit networks raises security concerns.

Supporting Guidance: Wireless communications are vulnerable to interception, denial of service and deception. Under any circumstances, use of wireless to transmit or receive information sensitive to disclosure can present significant risks. When implementing this policy, bureaus should recognize the convergence of (point-to-point) PTP devices with those described.

## SC-10: Network Disconnect

Terminate the network connection associated with a communications session at the end of the session or after 30 minutes of inactivity.

Supplemental Guidance: This control applies to internal and external networks. Terminating network connections associated with specific communications sessions include, for example, de-allocating associated TCP/IP address or port pairs at the operating system level and de-allocating networking assignments at the application level if multiple application sessions are using a single operating system-level network connection. Periods of inactivity may be established by organizations and include, for example, time-periods by type of network access or for specific network accesses.

TD_0000406

## SC-12: Cryptographic Key Establishment and Management

The agency must establish and manage cryptographic keys when cryptography is employed within the system in accordance with the following key management requirements: NIST SP 800-57, Recommendation for Key Management, for key generation, distribution, storage, access, and destruction.

<u>Supplemental Guidance</u>: Cryptographic key management and establishment can be performed using manual procedures or automated mechanisms with supporting manual procedures. Organizations define their key management requirements in accordance with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines, specifying appropriate options, levels, and parameters. Organizations manage trust stores to ensure that only approved trust anchors are in such trust stores. This includes certificates with visibility external to organizational systems and certificates related to the internal operations of systems.

## SC-13: Cryptographic Protection

    a.   Determine the cryptographic uses; and

    b.   Implement the following types of cryptography required for each specified cryptographic use: Latest FIPS-140 validated encryption mechanism, NIST 800-52, Guidelines for the Selection, Configuration, and Use of Transport Layer Security (TLS) Implementations, Encryption in transit (payload encryption). Use of SHA-1 for digital signatures is prohibited.

## SC-15: Collaborative Computing Devices and Applications

    a.   Prohibit remote activation of collaborative computing devices and applications with the following exceptions: users are notified by signage of the presence of such devices; and

    b.   Provide an explicit indication of use to users physically present at the devices.

<u>Supplemental Guidance</u>: Collaborative computing devices and applications include, for example, remote meeting devices and applications, networked white boards, cameras, and microphones. Explicit indication of use includes, for example, signals to users when collaborative computing devices and applications are activated.

### Control Enhancements:

*(CE-4) Explicitly Indicate Current Participants*: Provide an explicit indication of current participants in meetings that involve FTI.

<u>Supplemental Guidance</u>: Explicitly indicating current participants prevents unauthorized individuals from participating in collaborative computing sessions without the explicit knowledge of other participants.

## SC-17: Public Key Infrastructure Certificates

    a.   Issue public key certificates under an agency-defined certificate authority or obtain public key certificates from an approved service provider; and

    b.   Include only approved trust anchors in trust stores or certificate stores managed by the organization.

<u>Supplemental Guidance</u>: For all certificates, organizations manage system trust stores to ensure only approved trust anchors are in the trust stores. This control addresses certificates with visibility external to organizational systems and certificates related to the internal operations of systems, for example, application-specific time services.

TD_0000407

## SC-18: Mobile Code

    a. Define acceptable and unacceptable mobile code and mobile code technologies; and

    b. Authorize, monitor, and control the use of mobile code within the system.

Supplemental Guidance: Decisions regarding the use of mobile code within organizational systems are based on the potential for the code to cause damage to the systems if used maliciously. Mobile code technologies include, for example, Java, JavaScript, ActiveX, Postscript, PDF, Shockwave movies, Flash animations and VBScript. Usage restrictions and implementation guidelines apply to both the selection and use of mobile code installed on servers and mobile code downloaded and executed on individual workstations and devices including, for example, notebook computers and smart phones. Mobile code policy and procedures address the specific actions taken to prevent the development, acquisition, and introduction of unacceptable mobile code within organizational systems.

Control Enhancements

*(CE-1) Identify Unacceptable Code and Take Corrective Actions:* Identify unacceptable mobile code and take corrective actions.

*(CE-2) Acquisition, Development and Use:* Verify that the acquisition, development, and use of mobile code to be deployed in the system meets IRS Publication 1075 requirements.

## SC-20: Secure Name/Address Resolution Service (Authoritative Source)

    a. Provide additional data origin authentication and integrity verification artifacts along with the authoritative name resolution data the system returns in response to external name/address resolution queries; and

    b. Provide the means to indicate the security status of child zones and (if the child supports secure resolution services) to enable verification of a chain of trust among parent and child domains, when operating as part of a distributed, hierarchical namespace.

Supplemental Guidance: This control enables external clients including, for example, remote Internet clients, to obtain origin authentication and integrity verification assurances for the host/service name to network address resolution information obtained through the service. Systems that provide name and address resolution services include, for example, domain name system (DNS) servers. Additional artifacts include, for example, DNS Security (DNSSEC) digital signatures and cryptographic keys. DNS resource records are examples of authoritative data. The means to indicate the security status of child zones includes, for example, the use of delegation signer resource records in the DNS. Systems that use technologies other than the DNS to map between host and service names and network addresses provide other means to assure the authenticity and integrity of response data.

Control Enhancements

*(CE-2) Data Origin and Integrity:* Provide data origin and integrity protection artifacts for internal name/address resolution queries.

## SC-21: Secure Name/Address Resolution Service (Recursive or Caching Resolver)

Request and perform data origin authentication and data integrity verification on the name/address resolution responses the system receives from authoritative sources.

TD_0000408

Supplemental Guidance: Each client of name resolution services either performs this validation on its own or has authenticated channels to trusted validation providers. Systems that provide name and address resolution services for local clients include, for example, recursive resolving or caching DNS servers. DNS client resolvers either perform validation of DNSSEC signatures, or clients use authenticated channels to recursive resolvers that perform such validations. Systems that use technologies other than the DNS to map between host/service names and network addresses provide some other means to enable clients to verify the authenticity and integrity of response data.

## SC-22: Architecture and Provisioning for Name/Address Resolution Service

Ensure the systems that collectively provide name/address resolution service for an organization are fault-tolerant and implement internal and external role separation.

Supplemental Guidance: Systems that provide name and address resolution services include, for example, DNS servers. To eliminate single points of failure and to enhance redundancy, organizations employ at least two authoritative domain name system servers; one configured as the primary server and the other configured as the secondary server. Additionally, organizations typically deploy the servers in two geographically separated network subnetworks (i.e., not located in the same physical facility). For role separation, DNS servers with internal roles only process name and address resolution requests from within organizations (i.e., from internal clients). DNS servers with external roles only process name and address resolution information requests from clients external to organizations (i.e., on external networks including the Internet). Organizations specify clients that can access authoritative DNS servers in certain roles, for example, by address ranges and explicit lists.

## SC-23: Session Authenticity

Protect the authenticity of communications sessions.

Supplemental Guidance: This control addresses communications protection at the session, versus packet level. Such protection establishes grounds for confidence at both ends of communications sessions in the ongoing identities of other parties and in the validity of information transmitted. Authenticity protection includes, for example, protecting against man-in-the-middle attacks and session hijacking and the insertion of false information into sessions.

Control Enhancements:

*(CE-1) Invalidate Session Identifies at Logout*: Invalidate session identifiers upon user logout or other session termination.

*(CE-3) Unique System-Generate Session Identifiers*: Generate a unique session identifier for each session with session with agency-defined randomness requirements and recognize only session identifiers that are system-generated.

Supplemental Guidance: Generating unique session identifiers curtails the ability of adversaries to reuse previously valid session IDs. Employing the concept of randomness in the generation of unique session identifiers protects against brute-force attacks to determine future session identifiers.

*(CE-5) Allowed Certificate Authorities*: Only allow the use of agency-defined certificate authorities for verification of the establishment of protected sessions.

## SC-28: Protection of Information at Rest

Protect the confidentiality and integrity of the following information at rest:

a.  FTI

TD_0000409

b.   IT System-related information (e.g., configurations, rule sets);

Control Enhancements:

*(CE-1) Cryptographic Protection*: Implement cryptographic mechanisms to prevent unauthorized disclosure and modification of FTI at rest on end user computing systems (i.e., desktop computers, laptop computers, mobile devices, portable and removable storage devices) in non-volatile storage.

## SC-35: External Malicious Code Identification

Include system components that proactively seek to identify network-based malicious code or malicious websites.

## SC-39: Process Isolation

Maintain a separate execution domain for each executing system process.

Supplemental Guidance: Systems can maintain separate execution domains for each executing process by assigning each process a separate address space. Each system process has a distinct address space so that communication between processes is performed in a manner controlled through the security functions and one process cannot modify the executing code of another process. Maintaining separate execution domains for executing processes can be achieved, for example, by implementing separate address spaces. This capability is readily available in most commercial operating systems that employ multi-state processor technologies.

## SC-45: System Time Synchronization

Synchronize system clocks within and between systems and system components.

Control Enhancements:

*(CE-1) Synchronization with Authoritative Time Source*:

a.   Compare the internal system clocks daily with an agency-defined authoritative time source; and

b.   Synchronize the internal system clocks to the authoritative time source when the time difference is greater than agency-defined time period.

TD_0000410

## 4.19 SYSTEM AND INFORMATION INTEGRITY

### SI-1: System and Information Integrity Policy and Procedures

    a.  Develop, document, and disseminate to designated agency officials:

        1.  An agency or organization-level system and information integrity policy that:

            (a)  Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

            (b)  Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

        2.  Procedures to facilitate the implementation of the system and information integrity policy and the associated system and information integrity controls;

    b.  Designate an agency official to manage the development, documentation, and dissemination of the system and information integrity policy and procedures; and

    c.  Review and update the current system and information integrity:

        1.  Policy **every three (3) years (or if there is a significant change)**; and

        2.  Procedures **every three (3) years (or if there is a significant change)**.

### SI-2: Flaw Remediation

    a.  Identify, report and correct system flaws;

    b.  Test software and firmware updates related to flaw remediation for effectiveness and potential side effects before installation;

    c.  Install security-relevant software and firmware updates promptly after the release of the updates; and

    d.  Incorporate flaw remediation into the organizational configuration management process.

Supplemental Guidance: Organizations identify systems affected by software flaws including potential vulnerabilities resulting from those flaws and report this information to designated organizational personnel with information security and privacy responsibilities. Security-relevant software updates include, for example, patches, service packs, hot fixes, and anti-virus signatures. Organizations also address flaws discovered during assessments, continuous monitoring, incident response activities and system error handling. By incorporating flaw remediation into ongoing configuration management processes, required remediation actions can be tracked and verified. Organization-defined time-periods for updating security-relevant software and firmware may vary based on a variety of factors including, for example, the security category of the system or the criticality of the update (i.e., severity of the vulnerability related to the discovered flaw). Some types of flaw remediation may require more testing than other types. Organizations determine the type of testing needed for the specific type of flaw remediation activity under consideration and the types of changes that are to be configuration-managed. In some situations, organizations may determine that testing of software or firmware updates is not necessary or practical, for example, when implementing simple anti-virus signature updates. Organizations also consider in testing decisions, whether security-relevant software or firmware updates are obtained from authorized sources with appropriate digital signatures.

TD_0000411

Control Enhancements

*(CE-2) Automated Flaw Remediation Status:* Determine if system components have applicable security-relevant software and firmware updates installed using automated mechanisms at a minimum monthly; daily for networked workstations and malicious code protection.

*(CE-3) Time to Remediate Flaws and Benchmarks for Corrective Actions:*

a.  Measure the time between flaw identification and flaw remediation; and
b.  Establish the following benchmarks for taking corrective actions: Agency defined based on criticality.

*(CE-4) Automated Patch Management Tools:* Employ automated patch management tools to facilitate flaw remediation to all FTI systems that includes but not limited to mainframes, workstations, applications, and network components

*(CE-5) Automatic Software and Firmware Updates:* Install security-relevant software and firmware updates automatically to all FTI systems.

*(CE-6) Removal of Previous Versions of Software and Firmware:* Remove previous versions of security relevant software and firmware components after updated versions have been installed.

*(IRS-Defined):* The agency shall ensure that, upon daily power up and connection to the agency's network, workstations (as defined in policy and including remote connections using GFE workstations) are checked to ensure that the most recent agency-approved patches have been applied and that any absent or new patches are applied as necessary or otherwise checked not less than once every 24 hours (excluding weekends, holidays, etc.)

## SI-3: Malicious Code Protection

a.  Implement signature-based and/or non-signature-based malicious code protection mechanisms at system entry and exit points to detect and eradicate malicious code;

b.  Automatically update malicious code protection mechanisms as new releases are available in accordance with organizational configuration management policy and procedures;

c.  Configure malicious code protection mechanisms to:

  1.  Perform periodic scans of the system and implement weekly and real-time scans of files from external sources at endpoint and network entry/exit points as the files are downloaded, opened, or executed in accordance with agency security policy; and

  2.  Either block or quarantine take and send alert to system administrator in response to malicious code detection; and

d.  Address the receipt of false positives during malicious code detection and eradication and the resulting potential impact on the availability of the system.

Control Enhancements

*(IRS-Defined):* All removable media must be scanned for malicious code upon introduction of the media into any system on the network and before users may access the media.

TD_0000412

*(IRS-Defined):* Not less than daily, the agency shall check for updates to malicious code scanning tools, including anti-virus (AV) and anti-spyware software and intrusion detection tools and when updates are available, implement on all devices on which such tools reside.

## SI-4: System Monitoring

a. Monitor the system to detect:

1. Attacks and indicators of potential attacks in accordance with the following monitoring objectives as defined in IT/Cybersecurity monitoring objectives as defined in the agency policy; and

2. Unauthorized local, network, and remote connections;

b. Identify unauthorized use of the system through a variety of techniques and methods

c. Invoke internal monitoring capabilities or deploy monitoring devices:

1. Strategically within the system to collect organization-determined essential information; and

2. At ad hoc locations within the system to track specific types of transactions of interest to the organization;

d. Analyze detected events and anomalies;

e. Adjust the level of system monitoring activity when there is a change in risk to organizational operations and assets, individuals, other organizations, or the Nation;

f. Obtain legal opinion regarding system monitoring activities; and

g. Provide the output from system monitoring to designated agency officials at a minimum every two weeks or sooner if deemed necessary.

Supplemental Guidance: System monitoring includes external and internal monitoring. External monitoring includes the observation of events occurring at system boundaries. Internal monitoring includes the observation of events occurring within the system. Organizations monitor systems, for example, by observing audit activities in real-time or by observing other system aspects such as access patterns, characteristics of access and other actions. The monitoring objectives guide and inform the determination of the events. System monitoring capability is achieved through a variety of tools and techniques, including, for example, intrusion detection systems, intrusion prevention systems, malicious code protection software, scanning tools, audit record monitoring software and network monitoring software. The distribution and configuration of monitoring devices can impact throughput at key internal and external boundaries and at other locations across a network due to the introduction of network throughput latency. Therefore, such devices are strategically located and deployed as part of an established organization-wide security architecture. Strategic locations for monitoring devices include, for example, selected perimeter locations and near key servers and server farms supporting critical applications. Monitoring devices are typically employed at the managed interfaces associated with controls SC-7 and AC-17. The information collected is a function of the organizational monitoring objectives and the capability of systems to support such objectives. Specific types of transactions of interest include, for example, Hyper Text Transfer Protocol (HTTP) traffic that bypasses HTTP proxies. System monitoring is an integral part of organizational continuous monitoring and incident response programs and output from system monitoring serves as input to those programs. Adjustments to levels of system monitoring are based on law enforcement information, intelligence information or other credible

TD_0000413

sources of information. The legality of system monitoring activities is based on applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines.

## Control Enhancements

*(CE-1) System-wide Intrusion Detection System:* Connect and configure individual intrusion detection tools into a system-wide intrusion detection system.

*(CE-2) Automated Tools and Mechanisms for Real-Time Analysis:* Employ automated tools and mechanisms to support near real-time analysis of events.

Supplemental Guidance: Automated tools and mechanisms include, for example, host-based, network-based, transport-based, or storage-based event monitoring tools and mechanisms or Security Information and Event Management technologies that provide real-time analysis of alerts and notifications generated by organizational systems.

*(CE-4) Inbound and Outbound Communications Traffic:*

   a. Determine criteria for unusual or unauthorized activities or conditions for inbound and outbound communications traffic;
   b. Monitor inbound and outbound communications traffic continuously for unusual or unauthorized activities or conditions.

*(CE-5) System-Generated Alerts:* Alert the appropriate agency personnel when the following system generated indications of compromise or potential compromise occur: suspicious activity reported from firewalls, intrusion detection systems, malware detection systems, and other agency-defined security tools that report indications of compromise or potential compromise.

Supplemental Guidance: Alerts may be generated from a variety of sources, including, for example, audit records or inputs from malicious code protection mechanisms, intrusion detection or prevention mechanisms or boundary protection devices such as firewalls, gateways, and routers. Alerts can be automated, or they may be transmitted, for example, telephonically, by electronic mail messages or by text messaging. Organizational personnel on the alert notification list can include, for example, system administrators, mission or business owners, system owners, system security officers or privacy officers. This control enhancement focuses on the security alerts generated by the system. Alternatively, alerts generated by organizations in SI-4(12) focus on information sources external to the system such as suspicious activity reports and reports on potential insider threats.

*(CE-10) Visibility of Encrypted Communications:* Make provisions so that agency-defined encrypted communications traffic is visible to agency-defined system monitoring tools and mechanisms.

Supplemental Guidance: Organizations balance the need to encrypt communications traffic to protect data confidentiality with the need to maintain visibility into such traffic from a monitoring perspective. Organizations determine whether the visibility requirement applies to internal encrypted traffic, encrypted traffic intended for external destinations, or a subset of the traffic types.

*(CE-11) Analyze Communications Traffic Anomalies:* Analyze outbound communications traffic at the external interfaces to the system and selected agency defined interior points within the system to discover anomalies.

Supplemental Guidance: Agency defined interior points include subnetworks and subsystems. Anomalies within agency systems include large file transfers, long-time persistent connections, attempts to access information from unexpected locations, the use of unusual protocols and ports, the use of unmonitored

TD_0000414

network protocols (e.g., IPv6 usage during IPv4 transition) and attempted communications with suspected malicious external addresses.

*(CE-12) Automated Organization-Generated Alerts:* Alert agency-defined personnel or roles using automated mechanisms when the following indications of inappropriate or unusual activities with security or privacy implications occur: agency-defined activities that trigger events.

*(CE-18) Analyze Traffic and Covert Exfiltration:* Analyze outbound communications traffic at external interfaces to the system and at the following interior points to detect covert exfiltration of information at agency defined interior points within the system.

*(CE-24) Indicators of Compromise:* Discover, collect, and distribute to organization-defined personnel or roles, indicators of compromise provided by government and non-government sources.

*(IRS-Defined):* All Internet Access Points/portals shall capture and retain, for at least one year, inbound and outbound traffic header information, with the exclusion of approved Internet "anonymous" connections, as may be approved by the agency CISO.

<u>Supplemental Guidance</u>: If/when this information is captured and retained (one year) by DHS via Project Einstein (or a similar service) (for the Internet access point at hand) duplicative capturing/retention is not required.

## SI-5: Security Alerts, Advisories and Directives

a.  Receive system security alerts, advisories, and directives from third parties such as <u>US-CERT</u>, <u>MS-ISAC</u>, product vendors, etc. on an ongoing basis;

b.  Generate internal security alerts, advisories, and directives as deemed necessary;

c.  Disseminate security alerts, advisories, and directives to appropriate personnel with security responsibilities (e.g., system administrators, ISSOs, system owners, incident response capabilities, etc.) and;

d.  Implement security directives in accordance with established time frames or notify the issuing organization of the degree of noncompliance.

<u>Supplemental Guidance</u>: The United States Computer Emergency Readiness Team (US-CERT) is an organization within the Department of Homeland Security's Cybersecurity & Infrastructure Security Agency (CISA) that generates security alerts and advisories to maintain situational awareness across the federal government. Security directives are issued by OMB or other designated organizations with the responsibility and authority to issue such directives. Compliance to security directives is essential due to the critical nature of many of these directives and the potential immediate adverse effects on organizational operations and assets, individuals, other organizations, the state and the Nation should the directives not be implemented in a timely manner. External organizations include, for example, external mission or business partners, supply chain partners, external service providers and other peer or supporting organizations.

## SI-7: Software, Firmware and Information Integrity

a.  Employ integrity verification tools to detect unauthorized changes to the following software, firmware, and information: system kernels, drivers, firmware (e.g., BIOS, UEFI), software (e.g., OS, applications, middleware) and security attributes.

TD_0000415

b. Take the following actions when unauthorized changes to the software, firmware, and information are detected: immediately disconnect the device from the network and notify designated agency officials.

Control Enhancements

*(CE-1) Integrity Checks:* Perform an integrity check of software, firmware, and information at startup; at the identification of a new threat to which the information system is susceptible; the installation of new hardware, software, or firmware; or at a minimum annually.

*(CE-7) Integration of Detection and Response:* Incorporate the detection of the following unauthorized changes into the organizational incident response capability:

a. Unauthorized changes to baseline configuration setting; and

b. Unauthorized elevation of system privileges.

*(CE-10) Protection of Boot Firmware:* Implement the following mechanisms to protect the integrity of boot firmware in system where FTI is accessed, processed, stored, and transmitted: verifying the checksum of downloaded firmware.

## SI-8: Spam Protection

a. Employ spam protection mechanisms at system entry and exit points to detect and act on unsolicited messages; and

b. Update spam protection mechanisms when new releases are available in accordance with agency configuration management policy and procedures.

Control Enhancements

*(CE-2) Automatic Updates:* Automatically update spam protection mechanisms at a minimum quarterly.

## SI-10: Information Input Validation

Check the validity of information inputs. (e.g., character set, length, numerical range, acceptable values).

## SI-11: Error Handling

a. Generate error messages that provide information necessary for corrective actions without revealing information that could be exploited; and

b. Reveal error messages only to designated agency officials.

## SI-12: Information Management and Retention

Manage and retain information within the system and information output from the system in accordance with applicable laws, executive orders, directives, regulations, policies, standards, guidelines, and operational requirements.

Control Enhancements

*(CE-2) Minimize Personally identifiable Information in Testing, Training, and Research:* Use the following techniques to minimize the use of personally identifiable information for research, testing, or training: Submission of the DTR form for review and approval by IRS Office of Safeguards.

TD_0000416

## SI-16: Memory Protection

Implement the following controls to protect the system memory from unauthorized code execution: hardware-based or software-based data execution prevention.

<u>Supplemental Guidance</u>: Some adversaries launch attacks with the intent of executing code in non-executable regions of memory or in memory locations that are prohibited. Security safeguards employed to protect memory include, for example, data execution prevention and address space layout randomization. Data execution prevention safeguards can either be hardware-enforced or software-enforced with hardware enforcement providing the greater strength of mechanism.

TD_0000417

## 4.20 SUPPLY CHAIN RISK MANAGEMENT

### SR-1: Supply Chain Risk Management Policy and Procedures

a. Develop, document, and disseminate to designated agency officials:

  1. An agency or organization-level supply chain risk management policy that:

     (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

     (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

  2. Procedures to facilitate the implementation of the supply chain risk management policy and the associated supply chain risk management controls;

b. Designate an agency official to manage the development, documentation, and dissemination of the supply chain risk management policy and procedures; and

c. Review and update the current supply chain risk management:

  1. Policy **every three (3) years (or if there is a significant change)**; and

  2. Procedures **every three (3) years (or if there is a significant change)**.

### SR-2: Supply Chain Risk Management Plan

a. Develop a plan for managing supply chain risks associated with the research and development, design, manufacturing, acquisition, delivery, integration, operations and maintenance, and disposal of the following systems, system components or system services: Information systems that process, store, or transmit FTI

b. Review and update the supply chain risk management plan every three (3) years or as required, to address threat, organizational or environmental changes; and

c. Protect the supply chain risk management plan from unauthorized disclosure and modification.

#### Control Enhancements

*(CE-1) Establish SCRM Team:* Establish a supply chain risk management team consisting of agency-defined personnel to lead and support the following SCRM activities: provide expertise in acquisition processes, legal practices, vulnerabilities, threats, and attack vectors, as well as an understanding of the technical aspects and dependencies of systems.

### SR-3: Supply Chain Controls and Processes

a. Establish a process or processes to identify and address weaknesses or deficiencies in the supply chain elements and processes of systems that access, process, store, or transmit FTI in coordination with agency-defined supply chain personnel;

b. Employ the following controls to protect against supply chain risks to the system, system component, or system service and to limit the harm or consequences from supply chain related events: Agency-defined Supply Chain Risk Controls and controls identified in Pub 1075; and

TD_0000418

c. Document the selected and implemented supply chain processes and controls in security and privacy plans; supply chain risk management plan; Agency System Security Plan.

Control Enhancements

*(CE-2) Limitation of Harm:* Employ the following controls to limit harm from potential adversaries identifying and targeting the organizational supply chain: agency-defined controls.

**Supplemental Guidance**: Controls that can be implemented to reduce the probability of adversaries successfully identifying and targeting the supply chain include avoiding the purchase of custom or non-standardized configurations, employing approved vendor lists with standing reputations in industry, following pre-agreed maintenance schedules and update and patch delivery mechanisms, maintaining a contingency plan in case of a supply chain event, using procurement carve-outs that provide exclusions to commitments or obligations, using diverse delivery routes, and minimizing the time between purchase decisions and delivery.

*(CE-3) Sub-Tier Flow Down:* Ensure that the controls included in the contracts of prime contractors are also included in the contracts of s.

## SR-6: Supplier Assessments and Reviews

Assess and review the supply chain-related risks associated with suppliers or contractors and the system, system component, or system service they provide at a minimum annually.

## SR-10: Inspection of Systems and Components

Inspect the following systems or system components at agency-defined frequency, upon delivery to detect tampering: hardware /software components that access, process, store, or transmit FTI.

## SR-11: Component Authenticity

a. Develop and implement anti-counterfeit policy and procedures that include the means to detect and prevent counterfeit components from entering the system; and

b. Report counterfeit system components to source of counterfeit component; agency-defined personnel or roles.

Control Enhancements

*(CE-1) Anti-Counterfeit Training:* Train agency-defined personnel or roles to detect counterfeit system components (including hardware, software, and firmware).

*(CE-2) Configuration Control for Component Service and Repair:* Maintain configuration control over the following system components awaiting service or repair and serviced or repaired components awaiting return to service: hardware used to receive, access, process, store, transmit or protect FTI.

TD_0000419

## Exhibit 1 IRC §§ 6103(a) and (b)

a.  General rule: Returns and return information shall be confidential and except as authorized by this title—

    (1) no officer or employee of the United States,

    (2) no officer or employee of any State, any local law enforcement agency receiving information under subsection (i)(7)(C) or (7)(A), any local child support enforcement agency, or any local agency administering a program listed in subsection (l)(7)(D) who has or had access to returns or return information under this section or section 6104(c), and

    (3) no other person (or officer or employee thereof) who has or had access to returns or return information under subsection (c), subsection (e)(1)(D)(iii), paragraph (10), (13), or (14) of subsection (k), paragraph (6), (10), (12), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (19), (20), or (21) of subsection (l), paragraph (2) or (4)(B) of subsection (m), or subsection (n),

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section. For purposes of this subsection, the term "officer or employee" includes a former officer or employee.

b.  Definitions: For purposes of this section—

    (1) Return: The term "return" means any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

    (2) Return information: The term "return information" means—

        (A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, over assessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

        (B) any part of any written determination or any background file document relating to such written determination (as such terms are defined in section 6110 (b)) which is not open to public inspection under section 6110,

        (C) any advance pricing agreement entered into by a taxpayer and the Secretary and any background information related to such agreement or any application for an advance pricing agreement and

        (D) any agreement under section 7121 and any similar agreement and any background information related to such an agreement or request for such an agreement, but such term does not include data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer. Nothing in the preceding sentence, or in any other provision of law, shall be construed to require the disclosure of standards used or to be used for the selection of returns for examination, or data used or to be used for determining such

TD_0000420

standards, if the Secretary determines that such disclosure will seriously impair assessment, collection, or enforcement under the internal revenue laws.

(3) Taxpayer return information: The term "taxpayer return information" means return information as defined in paragraph (2) which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates.

(4) Tax administration: The term "tax administration"—

  (A) means—

    (i) the administration, management, conduct, direction and supervision of the execution and application of the internal revenue laws or related statutes (or equivalent laws and statutes of a State) and tax conventions to which the United States is a party, and

    (ii) the development and formulation of Federal tax policy relating to existing or proposed internal revenue laws, related statutes, and tax conventions, and

  (B) includes assessment, collection, enforcement, litigation, publication and statistical gathering functions under such laws, statutes, or conventions.

(5) State

  (A) In general, the term "State" means—

    (i) any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands,

    (ii) for purposes of subsections (a)(2), (b)(4), (d)(1), (h)(4) and (p), any municipality—

      (I) with a population in excess of 250,000 (as determined under the most recent decennial United States census data available),

      (II) which imposes a tax on income or wages, and

      (III) with which the Secretary (in his sole discretion) has entered into an agreement regarding disclosure, and

    (iii) for purposes of subsections (a)(2), (b)(4), (d)(1), (h)(4) and (p), any governmental entity—

      (I) which is formed and operated by a qualified group of municipalities, and

      (II) with which the Secretary (in his sole discretion) has entered into an agreement regarding disclosure.

  (B) Regional income tax agencies: For purposes of subparagraph (A)(iii)—

    (i) Qualified group of municipalities: The term "qualified group of municipalities" means, with respect to any governmental entity, 2 or more municipalities—

      (I) each of which imposes a tax on income or wages,

(II) each of which, under the authority of a State statute, administers the laws relating to the imposition of such taxes through such entity, and

(III) which collectively have a population in excess of 250,000 (as determined under the most recent decennial United States census data available).

(ii) References to State law, etc. For purposes of applying subparagraph (A)(iii) to the subsections referred to in such subparagraph, any reference in such subsections to State law, proceedings, or tax returns shall be treated as references to the law, proceedings, or tax returns, as the case may be, of the municipalities which form and operate the governmental entity referred to in such subparagraph.

(iii) Disclosure to contractors and other agents; Notwithstanding any other provision of this section, no return or return information shall be disclosed to any contractor or other agent of a governmental entity referred to in subparagraph (A)(iii) unless such entity, to the satisfaction of the Secretary—

(I) has requirements in effect which require each such contractor or other agent which would have access to returns or return information to provide safeguards (within the meaning of subsection (p)(4)) to protect the confidentiality of such returns or return information,

(II) agrees to conduct a review every 3 years (or a mid-point review in the case of contracts or agreements of less than 3 years in duration) of each contractor or other agent to determine compliance with such requirements,

(III) submits the findings of the most recent review conducted under sub-clause (II) to the Secretary as part of the report required by subsection (p)(4)(E), and

(IV) certifies to the Secretary for the most recent annual period that such contractor or other agent is in compliance with all such requirements. The certification required by sub- clause (IV) shall include the name and address of each contractor and other agent, a description of the contract or agreement with such contractor or other agent, and the duration of such contract or agreement. The requirements of this clause shall not apply to disclosures pursuant to subsection (n) for purposes of Federal tax administration and a rule similar to the rule of subsection (p)(8)(B) shall apply for purposes of this clause.

## (6) Taxpayer identity

The term "taxpayer identity" means the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number (as described in section 6109), or a combination thereof.

## (7) Inspection

The terms "inspected", and "inspection" means any examination of a return or return information.

## (8) Disclosure

The term "disclosure" means providing return or return information known to any person.

TD_0000422

(9) **Federal agency**

The term "Federal agency" means an agency within the meaning of section 551(1) of Title 5, United States Code.

(10) **Chief executive officer**

The term "chief executive officer" means, with respect to any municipality, any elected official and the chief official (even if not elected) of such municipality

(11) **Terrorist incident**, **threat, or activity**

The term "terrorist incident, threat, or activity" means an incident, threat, or activity involving an act of domestic terrorism (as defined in section 2331(5) of Title 18, United States Code) or international terrorism (as defined in section 2331(1) of such title).

TD_0000423

## Exhibit 2 IRC § 6103(p)(4)

Any Federal agency described in subsection (h)(2), (h)(5), (i)(1), (2), (3), (5), or (7), (j)(1), (2), or (5), (k)(8), (10), or (11), (l)(1), (2), (3), (5), (10), (11), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (17), or (22), (o)(1)(A), or (o)(3), the Government Accountability Office, the Congressional Budget Office, or any agency, body, or commission described in subsection (d), (i)(1)(C), (3)(B)(i), or (7)(A)(ii), or (k)(10), (l)(6), (7), (8), (9), (12), (15), or (16), any appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10), subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20), or any entity described in subsection (l)(21), shall, as a condition for receiving returns or return information—

(A) establish and maintain, to the satisfaction of the Secretary, a permanent system of standardized records with respect to any request, the reason for such request and the date of such request made by or of it and any disclosure of return or return information made by or to it;

(B) establish and maintain, to the satisfaction of the Secretary, a secure area or place in which such returns or return information shall be stored;

(C) restrict, to the satisfaction of the Secretary, access to the returns or return information only to persons whose duties or responsibilities require access and to whom disclosure may be made under the provisions of this title;

(D) provide such other safeguards which the Secretary determines (and which he prescribes in regulations) to be necessary or appropriate to protect the confidentiality of the returns or return information;

(E) furnish a report to the Secretary, at such time and containing such information as the Secretary may prescribe, which describes the procedures established and utilized by such agency, body, or commission, the Government Accountability Office, or the Congressional Budget Office for ensuring the confidentiality of returns and return information required by this paragraph; and

(F) upon completion of use of such returns or return information—

    (i)    in the case of an agency, body, or commission described in subsection (d), (i)(3)(B)(i), (k)(10), or (l)(6), (7), (8), (9), or (16), any appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) return to the Secretary such returns or return information (along with any copies made therefrom) or make such returns or return information undisclosable in any manner and furnish a written report to the Secretary describing such manner,

    (ii)   in the case of an agency described in subsections (h)(2), (h)(5), (i)(1), (2), (3), (5) or (7), (j)(1), (2), or (5), (k)(8), (10), or (11), (l)(1), (2), (3), (5), (10), (11), (12), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (15), (17), or (22), (o)(1)(A), or (o)(3) or any entity described in subsection (l)21, the Government Accountability Office, or the Congressional Budget Office, either—

        (I)   return to the Secretary such returns or return information (along with any copies made therefrom),

        (II)  otherwise make such returns or return information undisclosable, or

TD_0000424

(II) to the extent not so returned or made undisclosable, ensure that the conditions of subparagraphs (A), (B), (C), (D) and (E) of this paragraph continue to be met with respect to such returns or return information, and

(iii)    in the case of the Department of Health and Human Services for purposes of subsection (m)(6), destroy all such return information upon completion of its use in providing the notification for which the information was obtained, so as to make such information undisclosable;

except that the conditions of subparagraphs (A), (B), (C), (D) and (E) shall cease to apply with respect to any return or return information if, and to the extent that, such return or return information is disclosed in the course of any judicial or administrative proceeding and made a part of the public record thereof. If the Secretary determines that any such agency, body, or commission, including an agency, an appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) or any entity described in subsection (l)(21), or the Government Accountability Office or the Congressional Budget Office has failed to, or does not, meet the requirements of this paragraph, he may, after any proceedings for review established under paragraph (7), take such actions as are necessary to ensure such requirements are met, including refusing to disclose returns or return information to such agency, body, or commission, including an agency, an appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) or any entity described in subsection (l)(21), or the Government Accountability Office or the Congressional Budget Office, until he determines that such requirements have been or will be met. In the case of any agency which receives any mailing address under paragraph (2), (4), (6), or (7) of subsection (m) and which discloses any such mailing address to any agent or which receives any information under paragraph (6)(A), (10), (12)(B), or (16) of subsection (l) and which discloses any such information to any agent, or any person including an agent described in subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), or (16), this paragraph shall apply to such agency and each such agent or other person (except that, in the case of an agent, or any person including an agent described in subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), or (16), any report to the Secretary or other action with respect to the Secretary shall be made or taken through such agency). For purposes of applying this paragraph in any case to which subsection (m)(6) applies, the term "return information" includes related blood donor records (as defined in section 1141(h)(2) of the Social Security Act).

TD_0000425

## Exhibit 3 Code of Federal Regulations (CFR) § 301.6103(p)(7)-1 [T.D. 9445, 74 FR 6830, Feb. 11, 2009]

USC Title 26, Section 6103(p)(4), requires external agencies and other authorized recipients of federal tax return and return information (FTI) to establish procedures to ensure the adequate protection of the FTI they receive. That provision of the United States Code also authorizes the IRS to take actions, including suspending or terminating FTI disclosures to any external agencies and other authorized recipients, if there is misuse, or if the safeguards in place are inadequate to protect the confidentiality of the information, or both.

Procedures for administrative review of a determination that an authorized recipient has failed to safeguard returns or return information:

(a) *In general.* Notwithstanding any section of the Internal Revenue Code (Code), the Internal Revenue Service (IRS) may terminate or suspend disclosure of returns and return information to any authorized recipient specified in section (p)(4) of section 6103, if the IRS determines that:

   (1) The authorized recipient has allowed an unauthorized inspection or disclosure of returns or return information and that the authorized recipient has not taken adequate corrective action to prevent the recurrence of an unauthorized inspection or disclosure; or

   (2) The authorized recipient does not satisfactorily maintain the safeguards prescribed by section 6103(p)(4) and has made no adequate plan to improve its system to maintain the safeguards satisfactorily.

(b) *Notice of IRS's intention to terminate or suspend disclosure.* Prior to terminating or suspending authorized disclosures, the IRS will notify the authorized recipient in writing of the IRS's preliminary determination and of the IRS's intention to discontinue disclosure of returns and return information to the authorized recipient. Upon so notifying the authorized recipient, the IRS, if it determines that tax administration otherwise would be seriously impaired, may suspend further disclosures of returns and return information to the authorized recipient pending a final determination by the Commissioner or a Deputy Commissioner described in paragraph (d)(2) of this section.

(c) *Authorized recipient's right to appeal.* An authorized recipient shall have 30 days from the date of receipt of a notice described in paragraph (b) of this section to appeal the preliminary determination described in paragraph (b) of this section. The appeal shall be made directly to the Commissioner.

(d) *Procedures for administrative review.*

   (1) To appeal a preliminary determination described in paragraph (b) of this section, the authorized recipient shall send a written request for a conference to: Commissioner of Internal Revenue (Attention: SE:S:CLD:GLD), 1111 Constitution Avenue, NW., Washington, DC 20224. The request must include a complete description of the authorized recipient's present system of safeguarding returns or return information received by the authorized recipient (and its authorized contractors or agents, if any). The request must state the reason or reasons the authorized recipient believes that such system or practice (including improvements, if any, to such system or practice expected to be made in the near future) is or will be adequate to safeguard returns or return information.

   (2) Within 45 days of the receipt of the request made in accordance with the provisions of paragraph (d)(1) of this section, the Commissioner or Deputy Commissioner personally shall hold a conference with representatives of the authorized recipient, after which the Commissioner or Deputy Commissioner shall make a final determination with respect to the appeal.

TD_0000426

(e) *Effective/applicability date.* This section applies to all authorized recipients of returns and return information that are subject to the safeguard requirements set forth in section 6103(p)(4) on or after February 11, 2009.

TD_0000427

## Exhibit 4 IRC §§ 7213 and 7213A – Sanctions for Unauthorized Disclosure and Access

**IRC § 7213 UNAUTHORIZED DISCLOSURE OF INFORMATION**

(a)  RETURNS AND RETURN INFORMATION

    (1)  FEDERAL EMPLOYEES AND OTHER PERSONS – It shall be unlawful for any officer or employee of the United States or any person described in section 6103(n) (or an officer or employee of any such person), or any former officer or employee, willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b)). Any violation of this paragraph shall be a felony punishable upon conviction by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution, and if such offense is committed by any officer or employee of the United States, he shall, in addition to any other punishment, be dismissed from office or discharged from employment upon conviction for such offense.

    (2)  STATE AND OTHER EMPLOYEES—It shall be unlawful for any person (not described in paragraph (1)) willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b)) acquired by him or another person under subsection (d), (i)(1)(C), (3)(B)(i), or (7)(A)(ii), (k)(10), (13), or (14), (l)(6), (7), (8), (9), (10), (12), (15), (16), (19), (20), or (21) or (m)(2), (4), (5), (6), or (7) of section 6103 or under section 6104(c). Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the cost of prosecution.

    (3)  OTHER PERSONS – It shall be unlawful for any person to whom any return or return information (as defined in section 6103(b)) is disclosed in an manner unauthorized by this title thereafter willfully to print or publish in any manner not provided by law any such return or return information. Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the cost of prosecution.

    (4)  SOLICITATION – It shall be unlawful for any person willfully to offer any item of material value in exchange for any return or return information (as defined in 6103(b)) and to receive as a result of such solicitation any such return or return information. Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the cost of prosecution.

    (5)  SHAREHOLDERS – It shall be unlawful for any person to whom return or return information (as defined in 6103(b)) is disclosed pursuant to the provisions of 6103(e)(1)(D)(iii) willfully to disclose such return or return information in any manner not provided by law. Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the cost of prosecution.

**IRC § 7213A. UNAUTHORIZED INSPECTION OF RETURNS OR RETURN INFORMATION**

(a)  PROHIBITIONS

    (1)  FEDERAL EMPLOYEES AND OTHER PERSONS – It shall be unlawful for

        (A)  any officer or employee of the United States, or

        (B)  any person described in subsection (l)(18) or (n) of section 6103 or an officer or employee of such person,

TD_0000428

willfully to inspect, except as authorized in this title, any return or return information.

    (2)  STATE AND OTHER EMPLOYEES – It shall be unlawful for any person (not described in paragraph (1)) willfully to inspect, except as authorized by this title, any return or return information acquired by such person or another person under a provision of section 6103 referred to in section 7213(a)(2) or under section 6104(c).

(b)  PENALTY

    (1)  IN GENERAL – Any violation of subsection (a) shall be punishable upon conviction by a fine in any amount not exceeding $1,000, or imprisonment of not more than 1 year, or both, together with the costs of prosecution.

    (2)  FEDERAL OFFICERS OR EMPLOYEES – An officer or employee of the United States who is convicted of any violation of subsection (a) shall, in addition to any other punishment, be dismissed from office or discharged from employment.

(c)  DEFINITIONS – For purposes of this section, the terms "inspect" "return" and "return information" have respective meanings given such terms by section 6103(b).

TD_0000429

## Exhibit 5 IRC § 7431 - Civil Damages for Unauthorized Inspection or Disclosure of Returns and Return Information

IRC § 7431 CIVIL DAMAGES FOR UNAUTHORIZED INSPECTION OR DISCLOSURE OF RETURNS AND RETURN INFORMATION.

(a) In general

    (1) Inspection or Disclosure by employee of United States

    If any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

    (2) Inspection or disclosure by a person who is not an employee of United States

    If any person who is not an officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103 or in violation of section 6104(c), such taxpayer may bring a civil action for damages against such person in a district court of the United States.

(b) Exceptions

No liability shall arise under this section with respect to any inspection or disclosure-

(1) which results from good faith, but erroneous, interpretation of section 6103, or

(2) which is requested by the taxpayer.

(c) Damages

In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of –

(1) the greater of –

    (A) $1,000 for each act of unauthorized inspection or disclosure of a return or return information with respect to which such defendant is found liable, or

    (B) the sum of –

        (i) the actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure, plus

        (ii) in the case of a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, punitive damages, plus

(2) the cost of the action, plus

(3) in the case of a plaintiff which is described in section 7430(c)(4)(A)(ii), reasonable attorneys fees, except that if the defendant is the United States, reasonable attorneys fees may be awarded only if the plaintiff is the prevailing party (as determined under section 7430(c)(4)).

TD_0000430

(d)  Period for Bringing Action

Notwithstanding any other provision of law, an action to enforce any liability created under this section may be brought, without regard to the amount in controversy, at any time within 2 years after the date of discovery by the plaintiff of the unauthorized inspection or disclosure.

(e)  Notification of Unlawful Inspection and Disclosure

If any person is criminally charged by indictment or information with inspection or disclosure of a taxpayer's return or return information in violation of –

(1)  paragraph (1) or (2) of section 7213 (a),

(2)  section 7213A(a), or

(3)  subparagraph (B) of section 1030(a)(2) of title 18, United States Code,

the Secretary shall notify such taxpayer as soon as practicable of such inspection or disclosure. The Secretary shall also notify such taxpayer if the Internal Revenue Service or a Federal or State agency (upon notice to the Secretary by such Federal or State agency) proposes an administrative determination as to disciplinary or adverse action against an employee arising from the employee's unauthorized inspection or disclosure of the taxpayer's return or return information. The notice described in this subsection shall include the date of the unauthorized inspection or disclosure and the rights of the taxpayer under such administrative determination.

(f)  Definitions

For purposes of this section, the terms "inspect", "inspection", "return" and "return information" have the respective meanings given such terms by section 6103(b).

(g)  Extension to information obtained under section 3406

For purposes of this section –

(1)  any information obtained under section 3406 (including information with respect to any payee certification failure under subsection (d) thereof) shall be treated as return information, and

(2)  any inspection or use of such information other than for purposes of meeting any requirement under section 3406 or (subject to the safeguards set forth in section 6103) for purposes permitted under section 6103 shall be treated as a violation of section 6103.

For purposes of subsection (b), the reference to section 6103 shall be treated as including a reference to section 6311 (e).

(h)  Special rule for information obtained under section 6103(k)(9)

For purposes of this section, any reference to section 6103 shall be treated as including a reference to section 3406.

TD_0000431

## Exhibit 6 Contractor 45-Day Notification Procedures

Federal agencies, state tax agencies and state child support enforcement agencies in the possession of FTI may use contractors, sometimes in limited circumstances.

- State tax authorities are authorized by statute to disclose information to contractors for the purpose of, and to the extent necessary in, administering state tax laws, pursuant to Treasury Regulation 301.6103(n)-1.

Agencies that receive FTI under authority of IRC § 6103(l)(7) (human services agencies) may not disclose FTI to contractors for any purpose.  Contractors consist of, but are not limited to, cloud computing providers, consolidated data centers, off-site storage facilities, disposal companies, information technology support, or tax modeling or revenue forecasting providers.

Agencies must notify the IRS prior to executing any agreement to disclose FTI to a contractor, or at least 45 days prior to the disclosure of FTI, to ensure that appropriate contractual language is included and that contractors are held to safeguarding requirements. Further, any contractors authorized access to or possession of FTI must notify and secure the approval of the IRS prior to making any redisclosures to sub-contractors. For additional information, see Section 2.E.6.2, Contractor or Sub-contractor Access.

To provide agency notification of intent to enter into an agreement to make disclosures of FTI to a contractor, submit a letter in electronic format, on agency letterhead over the head of agency's or their delegate's signature, to SafeguardReports@irs.gov. Ensure that the letter contains the following specific information:

- Name, address, phone number and email address of agency point of contact

- Name and address of contractor

- Contract number and date awarded

- Contract period covered (e.g., 2021–2024)

- Type of service covered by the contract

- Number of contracted workers

- Name and description of agency program that contractor will support

- Detailed description of FTI to be disclosed to contractor

- Description of work to be performed by contractor, including phased timing, how FTI will be accessed, and how tasks may change throughout the different phases

- Procedures for agency oversight on contractor access, storage and destruction of FTI, disclosure awareness training and incident reporting

- Location where work will be performed (contractor site or agency location) and how data will be secured if it is moved from the secure agency location

- Statement whether sub-contractor(s) will have access to FTI

- Name(s) and address(es) of all sub-contractor(s), if applicable

TD_0000432

- Description of FTI to be disclosed to sub-contractor(s)

- Description of work to be performed by sub-contractor(s)

- Location(s) where work will be performed by sub-contractor(s) and how data will be secured if it is moved from a secure agency location

- Certification that contractor personnel accessing FTI and contractor information systems containing FTI are all located within the United States or territories, given that FTI is not allowed offshore.

After receipt of an agency's request, the IRS will analyze the information provided to ensure that contractor access is authorized and consistent with all requirements. The IRS will send the agency an email acknowledgement of receipt of agency notification. A written response, along with a reminder of the requirements associated with the contract, is issued once the notification review process is complete. Agency disclosure personnel may wish to discuss local procedures with their procurement colleagues to ensure that they are part of the contract review process and that the appropriate contract language is included from the beginning of the contract.

If the 45-day notification pertains to the use of a contractor to conduct tax modeling, estimate revenue, or employ FTI for other statistical purposes, the agency must also submit a separate statement detailing the methodology and data to be used by the contractor. The Office of Safeguards will forward the methodology and data statement to the IRS Statistics of Income office for approval of the methodology (see Section 2.E.6.2, Contractor or Sub-contractor Access). Templates can be located on the Office of Safeguards website.

If the 45-day notification is not possible, please contact the Safeguards mailbox at SafeguardReports@irs.gov for assistance.

TD_0000433

## Exhibit 7 Safeguarding Contract Language

**I. PERFORMANCE**

In performance of this contract, the Contractor agrees to comply with and assume responsibility for compliance by officers or employees with the following requirements:

(1) All work will be performed under the supervision of the contractor.

(2) The contractor and contractor's officers or employees to be authorized access to FTI must meet background check requirements defined in IRS Publication 1075. The contractor will maintain a list of officers or employees authorized access to FTI. Such list will be provided to the agency and, upon request, to the IRS.

(3) FTI in hardcopy or electronic format shall be used only for the purpose of carrying out the provisions of this contract. FTI in any format shall be treated as confidential and shall not be divulged or made known in any manner to any person except as may be necessary in the performance of this contract. Inspection or disclosure of FTI to anyone other than the contractor or the contractor's officers or employees authorized is prohibited.

(4) FTI will be accounted for upon receipt and properly stored before, during, and after processing. In addition, any related output and products require the same level of protection as required for the source material.

(5) The contractor will certify that FTI processed during the performance of this contract will be completely purged from all physical and electronic data storage with no output to be retained by the contractor at the time the work is completed. If immediate purging of physical and electronic data storage is not possible, the contractor will certify that any FTI in physical or electronic storage will remain safeguarded to prevent unauthorized disclosures.

(6) Any spoilage or any intermediate hard copy printout that may result during the processing of FTI will be given to the agency. When this is not possible, the contractor will be responsible for the destruction of the spoilage or any intermediate hard copy printouts and will provide the agency with a statement containing the date of destruction, description of material destroyed, and the destruction method.

(7) All computer systems receiving, processing, storing, or transmitting FTI must meet the requirements in IRS Publication 1075. To meet functional and assurance requirements, the security features of the environment must provide for the managerial, operational, and technical controls. All security features must be available and activated to protect against unauthorized use of and access to FTI.

(8) No work involving FTI furnished under this contract will be subcontracted without the prior written approval of the IRS.

(9) Contractor will ensure that the terms of FTI safeguards described herein are included, without modification, in any approved subcontract for work involving FTI.

(10) To the extent the terms, provisions, duties, requirements, and obligations of this contract apply to performing services with FTI, the contractor shall assume toward the subcontractor all obligations, duties and responsibilities that the agency under this contract assumes toward the contractor, and the subcontractor shall assume toward the contractor all the same obligations, duties and responsibilities which the contractor assumes toward the agency under this contract.

(11) In addition to the subcontractor's obligations and duties under an approved subcontract, the terms and conditions of this contract apply to the subcontractor, and the subcontractor is bound and obligated to the contractor hereunder by the same terms and conditions by which the contractor is bound and

TD_0000434

obligated to the agency under this contract.

(12) For purposes of this contract, the term "contractor" includes any officer or employee of the contractor with access to or who uses FTI, and the term "subcontractor" includes any officer or employee of the subcontractor with access to or who uses FTI.

(13) The agency will have the right to void the contract if the contractor fails to meet the terms of FTI safeguards described herein.

## II. CRIMINAL/CIVIL SANCTIONS

(1) Each officer or employee of a contractor to whom FTI is or may be disclosed shall be notified in writing that FTI disclosed to such officer or employee can be used only for a purpose and to the extent authorized herein, and that further disclosure of any FTI for a purpose not authorized herein constitutes a felony punishable upon conviction by a fine of as much as $5,000 or imprisonment for as long as 5 years, or both, together with the costs of prosecution.

(2) Each officer or employee of a contractor to whom FTI is or may be accessible shall be notified in writing that FTI accessible to such officer or employee may be accessed only for a purpose and to the extent authorized herein, and that access/inspection of FTI without an official need-to-know for a purpose not authorized herein constitutes a criminal misdemeanor punishable upon conviction by a fine of as much as $1,000 or imprisonment for as long as 1 year, or both, together with the costs of prosecution.

(3) Each officer or employee of a contractor to whom FTI is or may be disclosed shall be notified in writing that any such unauthorized access, inspection or disclosure of FTI may also result in an award of civil damages against the officer or employee in an amount equal to the sum of the greater of $1,000 for each unauthorized access, inspection, or disclosure, or the sum of actual damages sustained as a result of such unauthorized access, inspection, or disclosure, plus in the case of a willful unauthorized access, inspection, or disclosure or an unauthorized access/inspection or disclosure which is the result of gross negligence, punitive damages, plus the cost of the action. These penalties are prescribed by IRC sections 7213, 7213A and 7431 and set forth at 26 CFR 301.6103(n)-1.

(3) Additionally, it is incumbent upon the contractor to inform its officers and employees of the penalties for improper disclosure imposed by the Privacy Act of 1974, 5 U.S.C. 552a. Specifically, 5 U.S.C. 552a(i)(1), which is made applicable to contractors by 5 U.S.C. 552a(m)(1), provides that any officer or employee of a contractor, who by virtue of his/her employment or official position, has possession of or access to agency records which contain individually identifiable information, the disclosure of which is prohibited by the Privacy Act or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.

(4) Granting a contractor access to FTI must be preceded by certifying that each officer or employee understands the agency's security policy and procedures for safeguarding FTI. A contractor and each officer or employee must maintain their authorization to access FTI through annual recertification of their understanding of the agency's security policy and procedures for safeguarding FTI. The initial certification and recertifications must be documented and placed in the agency's files for review. As part of the certification and at least annually afterwards, a contractor and each officer or employee must be advised of the provisions of IRC sections 7213, 7213A, and 7431 (see Exhibit 4, *Sanctions for Unauthorized Disclosure,* and Exhibit 5, *Civil Damages for Unauthorized Disclosure*). The training on the agency's security policy and procedures provided before the initial certification and annually thereafter must also cover the incident response policy and procedure for reporting unauthorized disclosures and data breaches. (See Section 10) For the initial certification and the annual recertifications, the contractor and each officer or employee must sign, either with ink or electronic signature, a confidentiality statement certifying their understanding of the security requirements.

TD_0000435

**III. INSPECTION**

The IRS and the Agency, with 24 hour notice, shall have the right to send its inspectors into the offices and plants of the contractor to inspect facilities and operations performing any work with FTI under this contract for compliance with requirements defined in IRS Publication 1075. The IRS' right of inspection shall include the use of manual and/or automated scanning tools to perform compliance and vulnerability assessments of information technology (IT) assets that access, store, process or transmit FTI. Based on the inspection, corrective actions may be required in cases where the contractor is found to be noncompliant with FTI safeguard requirements.

TD_0000436

## Exhibit 8 Warning Banner Examples

A warning banner is required when access is provided to any information system that receives, processes, stores, accesses, protects and/or transmits FTI. The following elements, as explained in <u>AC-8, System Use Notification</u>, must be contained within the warning banner: (i) the system may contain government information, (ii) user actions are monitored and audited, (iii) unauthorized use of the system is prohibited, and (iv) unauthorized use of the system is subject to criminal and civil sanctions.

The following warning banners are acceptable examples for use by agencies.

> **WARNING**
>
> This system may contain government information, which is restricted to authorized users ONLY. Unauthorized access, use, misuse, or modification of this computer system or of the data contained herein or in transit to/from this system constitutes a violation of Title 18, United States Code, Section 1030, and may subject the individual to criminal and civil penalties pursuant to Title 26, United States Code, Sections 7213, 7213A (the Taxpayer Browsing Protection Act), and 7431. This system and equipment are subject to monitoring to ensure proper performance of applicable security features or procedures. Such monitoring may result in the acquisition, recording, and analysis of all data being communicated, transmitted, processed, or stored in this system by a user. If monitoring reveals possible evidence of criminal activity, such evidence may be provided to Law Enforcement Personnel.
>
> ANYONE USING THIS SYSTEM EXPRESSLY CONSENTS TO SUCH MONITORING.

The following two banners are approved by the Department of Justice for systems that have limited space for the warning banner.

> WARNING! BY ACCESSING AND USING THIS GOVERNMENT COMPUTER SYSTEM, YOU ARE CONSENTING TO SYSTEM MONITORING FOR LAW ENFORCEMENT AND OTHER PURPOSES. UNAUTHORIZED USE OF, OR ACCESS TO, THIS COMPUTER SYSTEM MAY SUBJECT YOU TO CRIMINAL PROSECUTION AND PENALTIES.

> WARNING! THIS SYSTEM CONTAINS U.S. GOVERNMENT INFORMATION. BY ACCESSING AND USING THIS COMPUTER SYSTEM, YOU ARE CONSENTING TO SYSTEM MONITORING FOR LAW ENFORCEMENT AND OTHER PURPOSES. UNAUTHORIZED USE OF, OR ACCESS TO, THIS COMPUTER SYSTEM MAY SUBJECT YOU TO STATE AND FEDERAL CRIMINAL PROSECUTION AND PENALTIES AS WELL AS CIVIL PENALTIES.

TD_0000437

## Exhibit 9 Record Retention Schedules

This table only addresses retention for documentation associated with safeguard requirements. FTI must be destroyed when there is no longer a need or use for it and in accordance with agency record retention schedules.

| Table 9   Record Retention Schedules | | |
|---|---|---|
| **Document Type** | **Document Elements** | **Retention Schedule** |
| Formal Agreements | Agreement with IRS or other agency documenting IRC § 6103 authority to receive FTI from IRS or other agency <br><br> See Section 1.1 | Five (5) Years |
| Logs of FTI (FTI Log and FTI Bulk Transfer Log) | See Section 2.A.2 | Five (5) Years |
| Converted Media | Requirements listed for FTI in its current form (electronic or non-electronic) <br><br> See Section 2.A.3 | Five (5) Years |
| State Auditor Disclosures | Approximate number of records, date of inspection, description of records, name of individual making inspection <br><br> See Section 2.A.4 | Five (5) Years |
| Visitor Access Logs | See Section 2.B.3.1 | Five (5) Years |
| Disclosure Awareness Certification | Signed disclosure awareness confidentiality statement that certify completion and understanding of FTI security and privacy requirements <br><br> See Section 2.D.2.1 | Five (5) Years |
| Safeguard Security Report (SSR) | Reviewed in the Management Operational & Technical (MOT) Assessment <br><br> See Section 2.E.4 | Most Current SSR must be maintained |

TD_0000438

## GLOSSARY AND KEY TERMS

**Access**: Access is defined as the time when an individual is permitted into some security point or system. Access also means the authority to access restricted records, such as FTI when authorized under 6103 and with a need-to-know.

**Accountability:** A process of holding users responsible for actions performed on an information system.

**Adverse Action**: A suspension of 15 days or more, a reduction in pay, or termination of employment.

**Adequate security:** Security commensurate with the risk and magnitude of harm resulting from the loss, misuse, unauthorized access to, or modification of information.

**Affordable Care Act:** U.S. federal statute signed into law on March 23, 2010, with the goal of expanding public and private insurance coverage and reducing the cost of healthcare for individuals and the government.

**Alternative work site:** Any working area that is attached to the wide area network either through a public switched data network or through the Internet.

**Assurance:** A measure of confidence that management, operational and technical controls are operating as intended and achieving the security requirements for the system.

**Assurance testing:** A process used to determine if security features of a system are implemented as designed and are adequate for the proposed operating environment. This process may include hands-on functional testing, penetration testing and/or verification.

**Audit:** An independent examination of security controls associated with a representative subset of organizational information systems to determine the operating effectiveness of system controls; to ensure compliance with established policy and operational procedures; and to recommend changes in controls, policy or procedures where needed.

**Audit trail:** A chronological record of system activities sufficient to enable the reconstruction, review and examination of security events related to an operation, procedure, or event in a transaction from its inception to final results.

**Authentication:** Verification of the identity of a user, process, or device, often as a prerequisite to allowing access to resources in an information system; see *Identification*.

**Authorization:** Access privileges granted to a user, program, or process.

**Availability:** Timely, reliable access to information and information services for authorized users.

**Banner**: Display of an information system that outlines the parameters for system or information use.

**Baseline security requirements**: A description of the minimum-security requirements necessary for an information system to enforce the security policy and maintain an acceptable risk level.

**Basic Input/Output System (BIOS)**: In this publication, refers collectively to boot firmware based on the conventional BIOS, Extensible Firmware Interface (EFI), and the Unified Extensible Firmware Interface (UEFI).

**Blurring**: The act of obscuring data so that it cannot be read or reconstructed.

TD_0000439

**Classified:** National security information classified pursuant to Executive Order 12958.

**Compromise:** The disclosure of sensitive information to persons not authorized to receive such information.

**Commingling:** The presence of FTI and non-FTI data together on the same paper or electronic media.

**Confidentiality:** The preservation of authorized restrictions on information access and disclosure.

**Configuration management:** A structured process of managing and controlling changes to hardware, software, firmware, communications, and documentation throughout the system development life cycle.

**Container:** An object that can be used to hold or transport something.

**Containerize:** To package (freight) in uniform, sealed containers for shipment.

**Contractor**: Independent entity that agrees to furnish certain number or quantity of goods, material, equipment, personnel, and/or services that meet or exceed stated requirements or specifications, at a mutually agreed upon price and within a specified timeframe to another independent entity called contractee, principal, or project owner.

**Control number:** A code that identifies a unique document or record.

**Control schedule:** A record retention and disposal schedule established by the agency.

**Corrective Action Plan (CAP):** A report required to be filed semi-annually, detailing the agency's planned and completed actions to resolve findings identified during an IRS safeguard review.

**Countermeasure:** Action, device, procedure, mechanism, technique, or other measure that reduces the vulnerability of an information system.

**Cryptography:** The process of rendering plain text information unreadable and restoring such unreadable information to a readable form.

**Data:** A representation of facts, concepts, information, or instruction suitable for communication, processing or interpretation by people or information systems.

**Decryption:** The process of converting encrypted information into a readable form. This term is also referred to as deciphering.

**Degauss:** To erase information electromagnetically from a magnetic disk or other storage device.

**Digital subscription line:** A public telecommunications technology that delivers high bandwidth over conventional copper wire that covers limited distances.

**Disciplinary Action**: An admonishment, written reprimand, or suspension of 14 days or less.

**Discretionary access control:** A method of restricting logical access to information system objects (e.g., files, directories, devices, permissions, rules) based on the identity and need-to-know of users, groups or processes.

**Extensible Firmware Interface (EFI)**: See Unified Extensible Firmware Interface (UEFI).

**Encryption**: See Cryptography.

TD_0000440

**Encryption algorithm**: A formula used to convert information into an unreadable format.

**Enterprise life cycle:** A robust methodology used to implement business change and information technology modernization.

**External network**: Any network that resides outside the security perimeter established by the telecommunications system.

**Exchange**: An online marketplace in which individuals and small businesses can compare policies and buy insurance (with a government subsidy, if eligible).

**Extranet**: A private data network that uses the public telephone network to establish a secure communications medium among authorized users (e.g., organization, vendors, business partners). An Extranet extends a private network (often referred to as an Intranet) to external parties in cases in which all parties may benefit from the exchange of information quickly and privately.

**External information systems**: See Non-Agency-Owned Equipment.

**External Systems**: External information systems, or non-agency-owned equipment, include any technology used to receive, process, store, access, protect and/or transmit FTI that is not owned and managed by 1) the agency or the agency-run mobile device management system, 2) a state's consolidated IT office, 3) one of the agency's approved contractors or sub-contractors (e.g., print vendors, collections agencies, application development contractors, network engineers at a state consolidated IT office, etc.) or 4) one of the agency's constituent counties.  To ensure a third-party contractor system is not considered an external information system, the agency must include Exhibit 7 language in its contract with the service provider. Examples of external information systems include but are not limited to: 1) personally owned devices, which includes any device owned by an individual employee, rather than the agency itself; and 2) devices owned and managed by agency stakeholders that do not have proper approvals to receive, process, store, access, protect and/or transmit FTI.

**File permission:** A method of implementing discretionary access control by establishing and enforcing rules to restrict logical access of information system resources to authorized users and processes.

**File server:** A local area network computer dedicated to providing files and data storage to other network stations.

**Firewall:** Telecommunication device used to regulate logical access authorities between network systems.

**Firmware**: Microcode programming instructions permanently embedded into the read- only memory control block of a computer system. Firmware is a machine component of computer system, similar to a computer circuit component.

**Gateway:** An interface that provides compatibility between heterogeneous networks by converting transmission speeds, protocols, codes, or security rules. This interface is sometimes referred to as a protocol converter.

**Host:** A computer dedicated to providing services to many users. Examples of such systems include mainframes, minicomputers or servers that provide dynamic host configuration protocol services.

**Local access**: Is any access to agency systems by users or processes acting on behalf of users, where such access is obtained through direct connections without the use of networks.

TD_0000441

**Identification:** A mechanism used to request access to system resources by providing a recognizable unique form of identification such as a Login ID, User ID or token; see *Authentication*.

**Inadvertent Access:** Access to FTI without authority that is non-willful and unanticipated or accidental.

**Incidental Access:** Access to FTI without a need-to-know that may occur in extraordinary circumstances (i.e., system failure, data incident response, disaster response).

**Information:** See *Data*.

**Information Spillage**: Instances where classified or controlled unclassified information (e.g., FTI) is inadvertently placed on systems that are not authorized to process such information. Such information spills occur when information that is initially thought to be of lower sensitivity is transmitted to a system and then subsequently determined to be of higher sensitivity.

**Information system:** A collection of computer hardware, software, firmware, applications, information, communications, and personnel organized to accomplish a specific function or set of functions under direct management control.

**Information system security:** The protection of information systems and information against unauthorized access, use modification or disclosure to ensure the confidentiality, integrity and availability of information systems and information.

**Insider Threat**: The threat that an insider will use her/his authorized access, wittingly or unwittingly, to do harm to the security of organizational operations and assets, individuals, other organizations, the state, and the nation. This threat can include damage through espionage, terrorism, unauthorized disclosure of national security information or through the loss or degradation of organizational resources or capabilities.

**Integrity:** The protection of information systems and information from unauthorized modification to ensure the quality, accuracy, completeness, nonrepudiation, and authenticity of information.

**Internet:** Two or more networks connected by a router; the world's largest network, which uses TCP/IP to connect government, university, and commercial institutions.

**Intranet:** A private network that uses TCP/IP, the Internet and World Wide Web technologies to share information quickly and privately between authorized user communities, including organizations, vendors, and business partners.

**Key**: Information used to establish and periodically change the operations performed in cryptographic devices for the purpose of encrypting and decrypting information.

**Least privilege**: A security principle under which users or processes are assigned the most restrictive set of privileges necessary to perform routine job responsibilities.

**Management controls**: Security controls focused on managing organizational risk and information system security and devising sufficient countermeasures or safeguards to mitigate risk to acceptable levels. Management control families include risk assessment, security planning, system and services acquisition and security assessment.

**Malicious code**: Rogue computer programs designed to inflict a magnitude of harm by diminishing the confidentiality, integrity and availability of information systems and information.

**Mobile code**: Software programs or parts of programs obtained from remote systems, transmitted across a network, and executed on a local system without explicit installation or execution by the recipient.

TD_0000442

**Mobile device**: A computing device (other than a laptop) that has a small form factor such that it can easily be carried by a single individual; is designed to operate without a physical connection; possesses local, non-removable or removable data storage; and includes a self-contained power source.

**Need-to-Know**: Is established when individuals require FTI to perform their official duties and are authorized under the IRC.

**Network**: A communications infrastructure and all components attached thereto whose primary objective is to transfer information among a collection of interconnected systems. Examples of networks include local area networks, wide area networks, metropolitan area networks and wireless area networks.

**Network access**: Is access to agency systems by users (or processes acting on behalf of users) where such access is obtained through network connections (i.e., nonlocal accesses).

**Node**: A device or object connected to a network.

**Non-Agency-Owned Equipment**: Any technology used to receive, process, store, access, protect and/or transmit FTI that is not owned and managed by the agency but is owned by a contractor and centrally managed by their own IT department.

**Nonrepudiation**: The use of audit trails or secure messaging techniques to ensure the origin and validity of source and destination targets (i.e., senders and recipients of information cannot deny their actions).

**Object**: Passive system-related entity including, for example, devices, files, records, tables, processes, programs, and domains, that contain or receive information. Access to an object (by a subject) implies access to the information it contains.

**Object reuse**: The reassignment of a storage medium, which contains residual information, to potentially unauthorized users or processes.

**Operational controls**: Security controls focused on mechanisms primarily implemented by people as opposed to systems. These controls are established to improve the security of a group, a specific system or group of systems. Operational controls require technical or specialized expertise and often rely on management and technical controls. Operational control families include personnel security, contingency planning, configuration management, maintenance, system and information integrity, incident response and awareness and training.

**Organization**: An agency or, as appropriate, any of its operational elements.

**Packet**: A unit of information that traverses a network.

**Password**: A private, protected, alphanumeric string used to authenticate users or processes to information system resources.

**Patient Protection and Affordable Care Act**: See Affordable Care Act.

**Penetration testing**: A testing method by which security evaluators attempt to circumvent the technical security features of the information system in efforts to identify security vulnerabilities.

**Personally identifiable information (PII)**: For Safeguarding purposes, PII within this Publication refers to FTI. Any information about an individual maintained by an agency with respect to, but not limited to, education, financial transactions, medical history and criminal or employment history and information that can be used to distinguish or trace an individual's identity (e.g., name, Social Security Number, date and

TD_0000443