place of birth, mother's maiden name, biometric records) including any other personal information linked or linkable to an individual.

**Personally Owned Devices**: Any equipment purchased and owned by an individual, not owned by the agency or contractor and not managed by an IT department.

**Personnel Sanction**:  A disciplinary or adverse action for individuals failing to comply with established information security policies and procedures.

**Plan of Action and Milestones (POA&M)**: A management tool used to assist organizations in identifying, assessing, prioritizing, and monitoring the progress of actions taken to correct security weaknesses found in programs and systems. The POA&M arises from agency-conducted internal inspections and highlights the corrections that result from such inspections (defined in OMB 02-01).

**Potential impact**: The loss of confidentiality, integrity or availability that could be expected to have a limited adverse effect, a serious adverse effect or a catastrophic adverse effect on organizational operations, organizational assets, or individuals.

**Privileged user**: A user that has advanced privileges with respect to computer systems. Such users in general include administrators.

**Protocol**: A set of rules and standards governing the communication process between two or more network entities.

**Remnants**: Residual information remaining on storage media after reallocation or reassignment of such storage media to different organizations, organizational elements, users, or processes. See Object reuse.

**Remote access**: Access to agency systems (or processes acting on behalf of users) communicating through external networks such as the Internet. Remote access methods include, for example, dial-up, broadband, and wireless.

**Residual risk**: Portions of risk that remain after security controls or countermeasures are applied.

**Risk**: The potential adverse impact on the operation of information systems, which is affected by threat occurrences on organizational operations, assets, and people.

**Risk assessment**: The process of analyzing threats to and vulnerabilities of an information system to determine the potential magnitude of harm and identify cost-effective countermeasures to mitigate the impact of such threats and vulnerabilities.

**Risk management**: The identification, assessment, and prioritization of risks.

**Router**: A device that forwards data packets between computer networks, creating an overlay internetwork.

**Safeguards**: Protective measures prescribed to enforce the security requirements specified for an information system; synonymous with security controls and countermeasures.

**Security policy**: The set of laws, rules, directives. and practices governing how organizations protect information systems and information.

**Security requirement**: The description of a specification necessary to enforce the security policy. See Baseline security requirements.

TD_0000444

**Standard user**: A general program user, who does not have administrative rights.

**Subject**: An individual, process or device causing information to flow among objects or change to the system state.

**Switch**: A computer networking device that links network segments or network devices.

**System**: See Information system.

**System Security Plan**: An official document that provides an overview of the security requirements for an information system and describes the security controls in place or planned for meeting those requirements (NIST SP 800-18).

**Tax modeling**: A large-scale microsimulation model of a tax system. Tax models come in all shapes and sizes, depending on the nature of the policy issues examined. The policy questions may relate to specific problems, concerning perhaps the revenue implications of a particular tax, or they may involve an extensive analysis of the cost and redistributive effects of a large number of taxes and transfer payments.

**Technical controls**: Security controls executed by the computer system through mechanisms contained in the hardware, software and firmware components of the system. Technical security control families include identification and authentication, access control, audit and accountability and system and communications protection.

**Threat**: An activity, event or circumstance with the potential for causing harm to information system resources.

**Unauthorized Access**: Occurs when a person gains logical or physical access to FTI without authority under 6103 and without a need-to-know.

**Unauthorized Disclosure**: Occurs when a person with access to FTI discloses it to another person without authority under 6103.

**Unified Extensible Firmware Interface (UEFI)**: A possible replacement for the conventional BIOS that is becoming widely deployed in new x86-based computer systems. The UEFI specifications were preceded by the EFI specifications.

**User**: A person or process authorized to access an information system.

**User identifier**: A unique string of characters used by an information system to identify a user or process for authentication.

**Virus**: A self-replicating, malicious program that attaches itself to executable programs.

**Voice over Internet Protocol (VoIP):** A methodology and group of technologies for the delivery of voice communications and multimedia sessions over Internet protocol networks, such as the Internet.

**Vulnerability**:   A known deficiency in an information system, which threat agents can exploit to gain unauthorized access to sensitive or classified information.

**Vulnerability assessment**: Systematic examination of an information system to determine its security posture, identify control deficiencies, propose countermeasures and validate the operating effectiveness of such security countermeasures after implementation.

TD_0000445

## INDEX

45-Day Notification.... 15, 29, 35, 43, 44, 46, 67, 76, 86, 91, 92, 212, 213

AAL .................................... 53, 96, 133, 155

Access 12, 13, 14, 16, 17, 18, 19, 21, 22, 26, 28, 29, 31, 32, 33, 35, 39, 40, 41, 42, 43, 45, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 69, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 84, 85, 86, 90, 91, 92, 94, 95, 96, 97,98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 109, 110, 111, 113, 114, 115, 117, 118, 122, 123, 126, 127, 130, 131, 132, 133, 134, 136, 137, 138, 139, 140, 143, 144, 146, 148, 149, 150, 152, 153, 154, 155, 157, 159, 160, 164, 167, 168, 169, 170, 171, 172, 174, 177, 178, 179, 181, 183, 184, 185, 186, 187, 189, 193, 195, 196, 198, 199, 200, 202, 204, 208, 212, 213, 214, 215, 216, 217, 219, 220, 221, 222, 223, 224, 226, 227

ACCESS .............................................. 97

adverse action..... 32, 33, 41, 42, 45, 62, 67, 211, 225

Adverse Action ................................. 32, 220

Alternate Work Site ... 13, 22, 55, 56, 57, 58, 156

Archiving ............................................. 38

Authentication 15, 16, 18, 20, 63, 78, 79, 92, 95, 96, 102, 103, 104, 105, 132, 133, 134, 135, 136, 137, 138, 148, 153, 159, 188, 189, 220, 223, 226, 227

Authorized Access List ......... 13, 52, 53, 155

Background Investigation 14, 59, 60, 61, 62, 64, 66, 92, 168

Badges ............... 13, 43, 51, 53, 58, 59, 170

Certification.... 14, 15, 45, 59, 72, 74, 76, 78, 84, 89, 136, 177, 202, 211, 213, 216, 219

Child Support ..... 29, 50, 64, 67, 68, 95, 188, 200, 212

Cloud 15, 31, 81, 85, 86, 90, 91, 92, 93, 115, 177, 212

CMS .................................................. 29, 68

Combinations .............................. 51, 54, 154

Commingling .............................. 63, 78, 221

Consolidated Data Center 14, 15, 28, 36, 42, 65, 66, 67, 74, 81, 86, 212

Container .... 31, 50, 51, 54, 55, 56, 105, 221

Contractor 15, 16, 17, 26, 28, 34, 35, 36, 38, 42, 43, 44, 45, 46, 47, 48, 52, 53, 56, 59, 60, 61, 62, 64, 65, 66, 67, 68, 69, 70, 71, 72, 74, 75, 77, 81, 85, 86, 89, 90, 91, 99, 106, 108, 132, 134, 142, 167, 177, 199, 202, 206, 212, 213, 214, 215, 216, 221, 222, 224, 225

Converted Media .............................. 49, 219

Corrective Action Plan .......... 26, 38, 83, 221

Cryptography .......................... 187, 221, 222

Data Breach .. 13, 29, 35, 39, 40, 42, 58, 67, 72, 216

Degauss ............................................... 221

Disciplinary Action .......................... 32, 222

Disclosure Awareness 14, 29, 35, 57, 58, 66, 67, 70, 71, 73, 74, 212, 219

Disposal .15, 38, 58, 64, 75, 87, 88, 89, 151, 179, 198, 212, 221

Encryption 29, 41, 55, 57, 76, 77, 80, 86, 91, 96, 102, 104, 105, 187, 222

Equipment 50, 55, 56, 57, 58, 59, 63, 65, 81, 90, 91, 95, 106, 146, 147, 151, 153, 155, 185, 217, 221, 222, 224, 225

Federal Tax Information .. 12, 16, 29, 31, 32, 33, 35, 36, 46, 50, 56, 100, 150, 173

Human Services .. 49, 50, 56, 64, 65, 68, 69, 205, 212

Incident ... 12, 13, 16, 20, 21, 29, 32, 35, 39, 40, 41, 42, 45, 53, 58, 60, 62, 67, 69, 71, 72, 79, 103, 108, 110, 112, 113, 114, 124, 129, 130, 140, 141, 142, 143, 144, 145, 147, 155, 156, 158, 164, 186, 191, 194, 195, 196, 203, 212, 216, 223, 225

INCIDENT ............................................. 140

Incident Response .... 13, 16, 20, 21, 32, 42, 58, 71, 72, 79, 110, 113, 124, 129, 130, 140, 141, 142, 143, 144, 145, 155, 158, 164, 186, 191, 194, 195, 196, 216, 223, 225

Internal Inspections ... 14, 29, 35, 56, 58, 66, 74, 75, 81, 117, 179, 225

Keys ... 31, 51, 54, 62, 63, 91, 152, 154, 179, 187, 188

Logs ... 13, 16, 48, 49, 52, 54, 56, 58, 63, 78, 112, 113, 129, 130, 154, 155, 186, 219

Mailbox.... 26, 29, 34, 37, 41, 45, 73, 76, 85, 213

TD_0000446

Media. 14, 15, 16, 21, 24, 28, 33, 37, 40, 42, 49, 55, 56, 57, 58, 59, 63, 65, 66, 67, 75, 79, 80, 88, 89, 102, 117, 122, 124, 128, 134, 135, 136, 141, 142, 146, 147, 150, 151, 152, 153, 159, 162, 173, 174, 180, 185, 186, 191, 192, 193, 195, 196, 214, 219, 221, 225, 227

Media Sanitization..... 15, 16, 21, 79, 88, 89, 151, 152, 159

MFD....................................... 13, 51, 94, 95

Minimum Protection Standards ... 13, 50, 53, 58

MPS............................................ 50, 51, 53

Need-to-Know 12, 16, 18, 32, 51, 57, 75, 98, 215, 220, 222, 223, 224, 227

NIST SP 800-53............... 12, 14, 51, 90, 97

Offshore Operations........... 14, 64, 105, 177

Other Safeguards........................ 57, 69, 204

Penalties.............. 26, 34, 72, 102, 215, 217

Personally Identifiable Information .... 16, 23, 29, 30, 79, 109, 112, 127, 145, 157, 159, 163, 166, 171, 172, 174, 175, 197, 225

Personnel Sanction... 14, 22, 32, 33, 45, 59, 62, 80, 170, 225

Personnel Security.... 14, 22, 43, 44, 59, 61, 62, 167, 170, 225

piggyback........................................... 54, 59

PII ........................... 16, 29, 30, 31, 36, 225

POA&M..15, 58, 75, 78, 101, 105, 117, 118, 162, 225

Policies ....14, 28, 33, 36, 37, 39, 42, 44, 51, 58, 59, 60, 62, 67, 74, 90, 97, 99, 102, 108, 109, 111, 116, 121, 123, 124, 127, 128, 132, 137, 138, 140, 146, 147, 150, 153, 154, 157, 158, 162, 164, 165, 166, 167, 170, 171, 172, 175, 178, 183, 187, 191, 194, 197, 198, 222, 225

Recordkeeping..... 13, 33, 48, 49, 56, 75, 78

Removable Media ... 55, 56, 63, 65, 75, 150, 152, 193

Reporting Requirements . 15, 33, 34, 44, 72, 76, 85, 87, 92, 114, 162, 175, 176

Restricted Area .51, 52, 53, 54, 56, 132, 155

Restricting Access.................. 14, 32, 57, 67

Safeguard Review 12, 26, 35, 36, 38, 39, 56, 65, 66, 74, 75, 76, 80, 221

Safeguard Security Report ... 26, 46, 74, 219

Secure Data Transfer .............................. 34

Secure Storage ........................... 50, 75, 151

Shared Facilities....................................... 65

SLA ........................... 14, 44, 66, 67, 91, 92

Social Security Administration ............ 26, 29

SRR ...................................... 26, 37, 83, 84

SSR ...15, 26, 28, 33, 34, 35, 36, 38, 43, 45, 46, 69, 74, 76, 77, 78, 80, 81, 82, 84, 87, 104, 112, 158, 219

State Auditors........................................... 49

State Tax. 14, 34, 35, 46, 49, 64, 86, 87, 89, 212

State Tax Agency .................. 34, 46, 49, 64

Statistical Reports .............................. 13, 45

Telework ........................................... 13, 56

Termination ... 13, 14, 15, 17, 18, 22, 32, 37, 38, 39, 43, 44, 59, 62, 63, 69, 98, 103, 117, 148, 158, 161, 165, 169, 170, 177, 189, 193, 200, 206, 207, 211, 220

TIGTA .............. 38, 40, 41, 42, 72, 142, 145

Training... 14, 16, 18, 20, 22, 35, 36, 42, 56, 57, 58, 59, 65, 66, 67, 69, 70, 71, 72, 73, 78, 81, 92, 108, 109, 110, 129, 130, 140, 141, 142, 164, 165, 197, 199, 212, 216, 225

Unauthorized Access 16, 29, 32, 33, 41, 42, 45, 50, 51, 53, 54, 57, 62, 66, 67, 72, 73, 75, 109, 114, 172, 215, 217, 220, 223, 227

Unauthorized Disclosure . 12, 16, 32, 39, 41, 42, 55, 57, 58, 64, 71, 72, 85, 86, 87, 114, 126, 129, 131, 135, 144, 153, 158, 161, 186, 190, 198, 208, 214, 216, 223, 227

Visitor Access.......................................... 13

Visitor Access Log................ 52, 56, 79, 219

Website... 16, 28, 37, 40, 48, 73, 74, 75, 80, 86, 87, 89, 91, 93, 94, 95, 103, 105, 106, 117, 122, 138, 143, 152, 159, 182, 185, 190, 213

TD_0000447

Publication 1075 (Rev. 11-2021)  Catalog Number 46937O
Department of the Treasury  **Internal Revenue Service**  www.irs.gov

United States Code Annotated
   Title 6. Domestic Security (Refs & Annos)
      Chapter 1. Homeland Security Organization
         Subchapter I. Department of Homeland Security

6 U.S.C.A. § 112

§ 112. Secretary; functions

Currentness

**(a) Secretary**

**(1) In general**

There is a Secretary of Homeland Security, appointed by the President, by and with the advice and consent of the Senate.

**(2) Head of Department**

The Secretary is the head of the Department and shall have direction, authority, and control over it.

**(3) Functions vested in Secretary**

All functions of all officers, employees, and organizational units of the Department are vested in the Secretary.

**(b) Functions**

The Secretary--

**(1)** except as otherwise provided by this chapter, may delegate any of the Secretary's functions to any officer, employee, or organizational unit of the Department;

**(2)** shall have the authority to make contracts, grants, and cooperative agreements, and to enter into agreements with other executive agencies, as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law; and

**(3)** shall take reasonable steps to ensure that information systems and databases of the Department are compatible with each other and with appropriate databases of other Departments.

**(c) Coordination with non-Federal entities**

TD_0000449

With respect to homeland security, the Secretary shall coordinate through the Office of State and Local Coordination [1] (established under section 361 of this title) (including the provision of training and equipment) with State and local government personnel, agencies, and authorities, with the private sector, and with other entities, including by--

**(1)** coordinating with State and local government personnel, agencies, and authorities, and with the private sector, to ensure adequate planning, equipment, training, and exercise activities;

**(2)** coordinating and, as appropriate, consolidating, the Federal Government's communications and systems of communications relating to homeland security with State and local government personnel, agencies, and authorities, the private sector, other entities, and the public; and

**(3)** distributing or, as appropriate, coordinating the distribution of, warnings and information to State and local government personnel, agencies, and authorities and to the public.

**(d) Meetings of National Security Council**

The Secretary may, subject to the direction of the President, attend and participate in meetings of the National Security Council.

**(e) Issuance of regulations**

The issuance of regulations by the Secretary shall be governed by the provisions of chapter 5 of Title 5, except as specifically provided in this chapter, in laws granting regulatory authorities that are transferred by this chapter, and in laws enacted after November 25, 2002.

**(f) Special Assistant to the Secretary**

The Secretary shall appoint a Special Assistant to the Secretary who shall be responsible for--

**(1)** creating and fostering strategic communications with the private sector to enhance the primary mission of the Department to protect the American homeland;

**(2)** advising the Secretary on the impact of the Department's policies, regulations, processes, and actions on the private sector;

**(3)** interfacing with other relevant Federal agencies with homeland security missions to assess the impact of these agencies' actions on the private sector;

**(4)** creating and managing private sector advisory councils composed of representatives of industries and associations designated by the Secretary to--

**(A)** advise the Secretary on private sector products, applications, and solutions as they relate to homeland security challenges;

TD_0000450

**(B)** advise the Secretary on homeland security policies, regulations, processes, and actions that affect the participating industries and associations; and

**(C)** advise the Secretary on private sector preparedness issues, including effective methods for--

**(i)** promoting voluntary preparedness standards to the private sector; and

**(ii)** assisting the private sector in adopting voluntary preparedness standards;

**(5)** working with Federal laboratories, federally funded research and development centers, other federally funded organizations, academia, and the private sector to develop innovative approaches to address homeland security challenges to produce and deploy the best available technologies for homeland security missions;

**(6)** promoting existing public-private partnerships and developing new public-private partnerships to provide for collaboration and mutual support to address homeland security challenges;

**(7)** assisting in the development and promotion of private sector best practices to secure critical infrastructure;

**(8)** providing information to the private sector regarding voluntary preparedness standards and the business justification for preparedness and promoting to the private sector the adoption of voluntary preparedness standards;

**(9)** coordinating industry efforts, with respect to functions of the Department of Homeland Security, to identify private sector resources and capabilities that could be effective in supplementing Federal, State, and local government agency efforts to prevent or respond to a terrorist attack;

**(10)** coordinating with the Commissioner of U.S. Customs and Border Protection and the Assistant Secretary for Trade Development of the Department of Commerce on issues related to the travel and tourism industries; and

**(11)** consulting with the Office of State and Local Government Coordination and Preparedness on all matters of concern to the private sector, including the tourism industry.

**(g) Standards policy**

All standards activities of the Department shall be conducted in accordance with section 12(d) of the National Technology Transfer Advancement Act of 1995 (15 U.S.C. 272 note) and Office of Management and Budget Circular A-119.

**(h) Planning requirements**

TD_0000451

The Secretary shall ensure the head of each office and component of the Department takes into account the needs of children, including children within under-served communities, in mission planning and mission execution. In furtherance of this subsection, the Secretary shall require each such head to seek, to the extent practicable, advice and feedback from organizations representing the needs of children. The Federal Advisory Committee Act (5 U.S.C. App.) [2] shall not apply whenever such advice or feedback is sought in accordance with this subsection.

## CREDIT(S)

(Pub.L. 107-296, Title I, § 102, Nov. 25, 2002, 116 Stat. 2142; Pub.L. 108-458, Title VII, § 7402, Dec. 17, 2004, 118 Stat. 3850; Pub.L. 110-53, Title IX, § 902, Aug. 3, 2007, 121 Stat. 371; Pub.L. 114-125, Title VIII, § 802(g)(1)(A)(i), Feb. 24, 2016, 130 Stat. 211; Pub.L. 117-130, § 2, June 6, 2022, 136 Stat. 1229.)

Notes of Decisions (5)

## Footnotes

1    So in original. Probably should be "Office of State and Local Government Coordination".

2    See, now, chapter 10 of Title 5, 5 U.S.C.A. § 1001 et seq., and see References in Text note set out under this section.

6 U.S.C.A. § 112, 6 USCA § 112
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000452

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter I. General Provisions (Refs & Annos)

8 U.S.C.A. § 1103

§ 1103. Powers and duties of the Secretary, the Under Secretary, and the Attorney General

Currentness

<For Memorandum of the President, "Preserving and Fortifying Deferred Action for Childhood
Arrivals (DACA)", see Presidential Memorandum, January 20, 2021, 86 F.R. 7051.>

**(a) Secretary of Homeland Security**

**(1)** The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

**(2)** He shall have control, direction, and supervision of all employees and of all the files and records of the Service.

**(3)** He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

**(4)** He may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.

**(5)** He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper.

**(6)** He is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

TD_0000453

**(7)** He may, with the concurrence of the Secretary of State, establish offices of the Service in foreign countries; and, after consultation with the Secretary of State, he may, whenever in his judgment such action may be necessary to accomplish the purposes of this chapter, detail employees of the Service for duty in foreign countries.

**(8)** After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws.

**(9)** Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.

**(10)** In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

**(11)** The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized--

**(A)** to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and

**(B)** to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

**(b) Land acquisition authority**

**(1)** The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this chapter.

**(2)** The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

TD_0000454

**(3)** When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to section 3113 of Title 40.

**(4)** The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).

**(c) Commissioner; appointment**

The Commissioner shall be a citizen of the United States and shall be appointed by the President, by and with the advice and consent of the Senate. He shall be charged with any and all responsibilities and authority in the administration of the Service and of this chapter which are conferred upon the Attorney General as may be delegated to him by the Attorney General or which may be prescribed by the Attorney General. The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.

**(d) Statistical information system**

**(1)** The Commissioner, in consultation with interested academicians, government agencies, and other parties, shall provide for a system for collection and dissemination, to Congress and the public, of information (not in individually identifiable form) useful in evaluating the social, economic, environmental, and demographic impact of immigration laws.

**(2)** Such information shall include information on the alien population in the United States, on the rates of naturalization and emigration of resident aliens, on aliens who have been admitted, paroled, or granted asylum, on nonimmigrants in the United States (by occupation, basis for admission, and duration of stay), on aliens who have not been admitted or have been removed from the United States, on the number of applications filed and granted for cancellation of removal, and on the number of aliens estimated to be present unlawfully in the United States in each fiscal year.

**(3)** Such system shall provide for the collection and dissemination of such information not less often than annually.

**(e) Annual report**

**(1)** The Commissioner shall submit to Congress annually a report which contains a summary of the information collected under subsection (d) and an analysis of trends in immigration and naturalization.

**(2)** Each annual report shall include information on the number, and rate of denial administratively, of applications for naturalization, for each district office of the Service and by national origin group.

**(f) Minimum number of agents in States**

The Attorney General shall allocate to each State not fewer than 10 full-time active duty agents of the Immigration and Naturalization Service to carry out the functions of the Service, in order to ensure the effective enforcement of this chapter.

**(g) Attorney General**

TD_0000455

**(1) In general**

The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

**(2) Powers**

The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.

**CREDIT(S)**

(June 27, 1952, c. 477, Title I, § 103, 66 Stat. 173; Pub.L. 100-525, § 9(c), Oct. 24, 1988, 102 Stat. 2619; Pub.L. 101-649, Title I, § 142, Nov. 29, 1990, 104 Stat. 5004; Pub.L. 104-208, Div. C, Title I, §§ 102(d), 125, 134(a), Title III, §§ 308(d)(4)(C), (e)(4), 372, 373, Sept. 30, 1996, 110 Stat. 3009-555, 3009-562, 3009-564, 3009-618, 3009-620, 3009-646, 3009-647; Pub.L. 107-296, Title XI, § 1102, Nov. 25, 2002, 116 Stat. 2273; Pub.L. 108-7, Div. L, § 105(a)(1), (2), Feb. 20, 2003, 117 Stat. 531; Pub.L. 108-458, Title V, § 5505(a), Dec. 17, 2004, 118 Stat. 3741; Pub.L. 111-122, § 2(a), Dec. 22, 2009, 123 Stat. 3480.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 12656**

Attorney General to develop national security emergency plans for regulation of immigration, regulation of nationals of enemy countries, and plans to implement laws for control of persons entering or leaving the United States, see section 1101(4) of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under 42 U.S.C.A. § 5195.

**EXECUTIVE ORDER NO. 13404**

<June 7, 2006, 71 F.R. 33593>

**Task Force on New Americans**

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to strengthen the efforts of the Department of Homeland Security and Federal, State, and local agencies to help legal immigrants embrace the common core of American civic culture, learn our common language, and fully become Americans, it is hereby ordered as follows:

**Section 1. Establishment.** The Secretary of Homeland Security (Secretary) shall immediately establish within the Department of Homeland Security (Department) a Task Force on New Americans (Task Force).

**Sec. 2. Membership and Operation. (a)** The Task Force shall be limited to the following members or employees designated by them at no lower than the Assistant Secretary level or its equivalent:

TD_0000456

**(i)** the Secretary of Homeland Security, who shall serve as Chair;

**(ii)** the Secretary of State;

**(iii)** the Secretary of the Treasury;

**(iv)** the Secretary of Defense;

**(v)** the Attorney General;

**(vi)** the Secretary of Agriculture;

**(vii)** the Secretary of Commerce;

**(viii)** the Secretary of Labor;

**(ix)** the Secretary of Health and Human Services;

**(x)** the Secretary of Housing and Urban Development;

**(xi)** the Secretary of Education;

**(xii)** such other officers or employees of the Department of Homeland Security as the Secretary may from time to time designate; and

**(xiii)** such other officers of the United States as the Secretary may designate from time to time, with the concurrence of the respective heads of departments and agencies concerned.

**(b)** The Secretary shall convene and preside at meetings of the Task Force, direct its work, and as appropriate, establish and direct subgroups of the Task Force that shall consist exclusively of Task Force members. The Secretary shall designate an official of the Department to serve as the Executive Secretary of the Task Force, and the Executive Secretary shall head the staff assigned to the Task Force.

**Sec. 3. Functions.** Consistent with applicable law, the Task Force shall:

**(a)** provide direction to executive departments and agencies (agencies) concerning the integration into American society of America's legal immigrants, particularly through instruction in English, civics, and history;

**(b)** promote public-private partnerships that will encourage businesses to offer English and civics education to workers;

**(c)** identify ways to expand English and civics instruction for legal immigrants, including through faith-based, community, and other groups, and ways to promote volunteer community service; and

**(d)** make recommendations to the President, through the Secretary, from time to time regarding:

**(i)** actions to enhance cooperation among agencies on the integration of legal immigrants into American society;

TD_0000457

**(ii)** actions to enhance cooperation among Federal, State, and local authorities responsible for the integration of legal immigrants;

**(iii)** changes in rules, regulations, or policy to improve the effective integration of legal immigrants into American society; and

**(iv)** proposed legislation relating to the integration of legal immigrants into American society.

**Sec. 4. Administration. (a)** To the extent permitted by law, the Department shall provide the funding and administrative support the Task Force needs to implement this order, as determined by the Secretary.

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** authority granted by law to an agency or the head thereof; or

**(ii)** functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals.

**(c)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(d)** This order is intended to improve the internal management of the Federal Government. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity against the United States, its departments, agencies, entities, instrumentalities, officers, employees, agents, or any other person.

GEORGE W. BUSH

### EXECUTIVE ORDER NO. 13767

Ex. Ord. No. 13767, Jan. 25, 2017, 82 F.R. 8793, which related to increased security on the southern border and removal of immigrants, was revoked by Ex. Ord. No. 14010, § 4(a)(ii)(F)(1), Feb. 2, 2021, 86 F.R. 8270.

### EXECUTIVE ORDER NO. 13768

Ex. Ord. No. 13768, Jan. 25, 2017, 82 F.R. 8799, relating to enhancing public safety in the interior of the United States, was revoked by Ex. Ord. No. 13993, Jan. 20, 2021, 86 F.R. 7051.

### EXECUTIVE ORDER NO. 13841

Ex. Ord. No. 13841, June 20, 2018, 83 F.R. 29345, which related to detention and separation of immigrant families, was revoked by Ex. Ord. No. 14011, § 6, Feb. 2, 2021, 86 F.R. 8274.

### EXECUTIVE ORDER NO. 13993

Ex. Ord. No. 13993, Jan. 20, 2021, 86 F.R. 7051, which related to the revision of civil immigration enforcement policies and priorities, was revoked by Ex. Ord. 14148, § 2(h), Jan. 20, 2025, 90 F.R. 8237.

### EXECUTIVE ORDER NO. 14010

TD_0000458

Case 1:25-cv-00457-CKK    Document 48-10    Filed 10/29/25    Page 16 of 152

Ex. Ord. No. 14010, Feb. 2, 2021, 86 F.R. 8267, relating to creating a comprehensive regional framework to address the causes of migration, to manage migration throughout north and central America, and to provide safe and orderly processing of asylum seekers at the United States border, was revoked by by Ex. Ord. 14148, § 2(u), Jan. 20, 2025, 90 F.R. 8238.

### EXECUTIVE ORDER NO. 14011

Ex. Ord. No. 14011, Feb. 2, 2021, 86 F.R. 8273, relating to the establishment of interagency task Force on the reunification of families, was revoked by Ex. Ord. 14148, § 2(v), Jan. 20, 2025, 90 F.R. 8238.

### EXECUTIVE ORDER NO. 14012

Ex. Ord. No. 14012, Feb. 2, 2021, 86 F.R. 8277, relating to restoring faith in our legal Immigration systems and strengthening integration and inclusion efforts for new Americans, was revoked by Ex. Ord. 14148, § 2(w), Jan. 20, 2025, 90 F.R. 8238.

### MEMORANDA OF PRESIDENT

### PRESIDENTIAL MEMORANDUM

<November 21, 2014, 79 F.R. 70765>

### Creating Welcoming Communities and Fully Integrating Immigrants and Refugees

Memorandum for the Heads of Executive Departments and Agencies

Our country has long been a beacon of hope and opportunity for people from around the world. Nearly 40 million foreign-born residents nationwide contribute to their communities every day, including 3 million refugees who have resettled here since 1975. These new Americans significantly improve our economy. They make up 13 percent of the population, but are over 16 percent of the labor force and start 28 percent of all new businesses. Moreover, immigrants or their children have founded more than 40 percent of Fortune 500 companies, which collectively employ over 10 million people worldwide and generate annual revenues of $4.2 trillion.

By focusing on the civic, economic, and linguistic integration of new Americans, we can help immigrants and refugees in the United States contribute fully to our economy and their communities. Civic integration provides new Americans with security in their rights and liberties. Economic integration empowers immigrants to be self-sufficient and allows them to give back to their communities and contribute to economic growth. English language acquisition allows new Americans to attain employment or career advancement and be more active civic participants.

Our success as a Nation of immigrants is rooted in our ongoing commitment to welcoming and integrating newcomers into the fabric of our country. It is important that we develop a Federal immigrant integration strategy that is innovative and competitive with those of other industrialized nations and supports mechanisms to ensure that our Nation's diverse people are contributing to society to their fullest potential.

Therefore, I am establishing a White House Task Force on New Americans, an interagency effort to identify and support State and local efforts at integration that are working and to consider how to expand and replicate successful models. The Task Force, which will engage with community, business, and faith leaders, as well as State and local elected officials, will help determine additional steps the Federal Government can take to ensure its programs and policies are serving diverse communities that include new Americans.

TD_0000459

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby order as follows:

**Section 1. White House Task Force on New Americans. (a)** There is established a White House Task Force on New Americans (Task Force) to develop a coordinated Federal strategy to better integrate new Americans into communities and support State and local efforts to do the same. It shall be co-chaired by the Director of the Domestic Policy Council and Secretary of Homeland Security, or their designees. In addition to the Co-Chairs, the Task Force shall consist of the following members:

**(i)** the Secretary of State;

**(ii)** the Attorney General;

**(iii)** the Secretary of Agriculture;

**(iv)** the Secretary of Commerce;

**(v)** the Secretary of Labor;

**(vi)** the Secretary of Health and Human Services;

**(vii)** the Secretary of Housing and Urban Development;

**(viii)** the Secretary of Transportation;

**(ix)** the Secretary of Education;

**(x)** the Chief Executive Officer of the Corporation for National and Community Service;

**(xi)** the Director of the Office of Management and Budget;

**(xii)** the Administrator of the Small Business Administration;

**(xiii)** the Senior Advisor and Assistant to the President for Intergovernmental Affairs and Public Engagement;

**(xiv)** the Director of the National Economic Council;

**(xv)** the Assistant to the President for Homeland Security and Counterterrorism; and

**(xvi)** the Director of the Office of Science and Technology Policy.

**(b)** A member of the Task Force may designate a senior-level official who is from the member's department, agency, or office, and is a full-time officer or employee of the Federal Government, to perform day-to-day Task Force functions of the member. At the direction of the Co-Chairs, the Task Force may establish subgroups consisting exclusively of Task Force members or their designees under this subsection, as appropriate.

**(c)** The Secretary of Homeland Security shall appoint an Executive Director who will determine the Task Force's agenda, convene regular meetings of the Task Force, and supervise work under the direction of the Co-Chairs. The Department of Homeland Security shall provide funding and administrative support for the Task Force to the extent permitted by law and

TD_0000460

subject to the availability of appropriations. Each executive department or agency shall bear its own expenses for participating in the Task Force.

**Sec. 2. Mission and Function of the Task Force. (a)** The Task Force shall, consistent with applicable law, work across executive departments and agencies to:

**(i)** review the policies and programs of all relevant executive departments and agencies to ensure they are responsive to the needs of new Americans and the receiving communities in which they reside, and identify ways in which such programs can be used to increase meaningful engagement between new Americans and the receiving community;

**(ii)** identify and disseminate best practices at the State and local level;

**(iii)** provide technical assistance, training, or other support to existing Federal grantees to increase their coordination and capacity to improve long-term integration and foster welcoming community climates;

**(iv)** collect and disseminate immigrant integration data, policies, and programs that affect numerous executive departments and agencies, as well as State and local governments and nongovernmental actors;

**(v)** conduct outreach to representatives of nonprofit organizations, State and local government agencies, elected officials, and other interested persons that can assist with the Task Force's development of recommendations;

**(vi)** work with Federal, State, and local entities to measure and strengthen equitable access to services and programs for new Americans, consistent with applicable law; and

**(vii)** share information with and communicate to the American public regarding the benefits that result from integrating new Americans into communities.

**(b)** Within 120 days of the date of this memorandum, the Task Force shall develop and submit to the President an Integration Plan with recommendations for agency actions to further the integration of new Americans. The Integration Plan shall include:

**(i)** an assessment by each Task Force member of the status and scope of the efforts by the member's department, agency, or office to further the civic, economic, and linguistic integration of new Americans, including a report on the status of any offices or programs that have been created to develop, implement, or monitor targeted initiatives concerning immigrant integration; and

**(ii)** recommendations for issues, programs, or initiatives that should be further evaluated, studied, and implemented, as appropriate.

**(c)** The Task Force shall provide, within 1 year of the date of this memorandum, a status report to the President regarding the implementation of this memorandum. The Task Force shall review and update the Integration Plan periodically, as appropriate, and shall present to the President any updated recommendations or findings.

**Sec. 3. General Provisions. (a)** Nothing in this memorandum shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department, agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

TD_0000461

**(c)** This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(d)** The Secretary of Homeland Security is hereby authorized and directed to publish this memorandum in the *Federal Register*.

BARACK OBAMA

### PRESIDENTIAL MEMORANDUM

<April 22, 2019, 84 F.R. 19853>

### Combating High Nonimmigrant Overstay Rates

Memorandum for the Secretary of State, the Attorney General, and the Secretary of Homeland Security

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, it is hereby ordered as follows:

**Section 1. Policy. (a)** My Administration is committed to securing the borders of the United States and fostering respect for the laws of our country, both of which are cornerstones of our Republic. Nonimmigrant visa (visa) overstay rates are unacceptably high for nationals of certain countries. Aliens must abide by the terms and conditions of their visas for our immigration system to function as intended. Although the United States benefits from legitimate nonimmigrant entry, individuals who abuse the visa process and decline to abide by the terms and conditions of their visas, including their visa departure dates, undermine the integrity of our immigration system and harm the national interest.

**(b)** The large numbers of aliens who overstay their period of lawful admission, failing to comply with the terms of a visa or the Visa Waiver Program, place significant strain on Department of Justice and Department of Homeland Security resources, which are currently needed to address the national emergency on our southern border.

**Sec. 2. Addressing High Visa Overstay Rates. (a)** The Secretary of State shall engage with the governments of countries with a total overstay rate greater than 10 percent in the combined B-1 and B-2 nonimmigrant visa category based on the Department of Homeland Security Fiscal Year 2018 Entry/Exit Overstay Report. This engagement should identify conditions contributing to high overstay rates among nationals of those countries and methods to address those conditions.

**(b)** Within 120 days of the date of this memorandum, the Secretary of State, in consultation with the Attorney General and the Secretary of Homeland Security, shall provide to the President recommendations to reduce B-1 and B-2 nonimmigrant visa overstay rates from the identified countries. With respect to any of the identified countries, the recommendations may include, as appropriate and to the extent consistent with applicable law, a proclamation, relying on authorities such as sections 212(f) and 215 of the INA (8 U.S.C. 1182(f) and 1185(a)), suspending or limiting entry of nationals of those countries who hold B-1 or B-2 visas; targeted suspension of visa issuance for certain nationals; limits to duration of admission, to be implemented by the Department of Homeland Security; and additional documentary requirements.

**(c)** The Secretary of State and the Secretary of Homeland Security shall immediately begin taking all appropriate actions that are within the scope of their respective authorities to reduce overstay rates for all classes of nonimmigrant visas.

TD_0000462

**(d)** Within 180 days of the date of this memorandum, the Secretary of Homeland Security shall provide to the President a summary of the Department of Homeland Security's ongoing efforts to reduce overstays from countries participating in the Visa Waiver Program, to include any recommendations for additional action necessary and appropriate to ensure the integrity and security of that Program.

**Sec. 3. Admission Bonds.** The Secretary of State and the Secretary of Homeland Security shall take steps to develop measures required for imposing admission bonds as a means for improving compliance with the terms and conditions of nonimmigrant visas. The Secretaries shall provide a status report to the President within 120 days of the date of this memorandum.

**Sec. 4. General Provisions. (a)** Nothing in this memorandum shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof;

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals; or

**(iii)** existing rights or obligations under international agreements.

**(b)** This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Sec. 5.** The Secretary of State is hereby authorized and directed to publish this memorandum in the Federal Register.

DONALD J. TRUMP

Notes of Decisions (211)

8 U.S.C.A. § 1103, 8 USCA § 1103
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000463

United States Code Annotated
    Title 44. Public Printing and Documents (Refs & Annos)
        Chapter 35. Coordination of Federal Information Policy (Refs & Annos)
            Subchapter II. Information Security

44 U.S.C.A. § 3551

§ 3551. Purposes

Currentness

The purposes of this subchapter are to--

**(1)** provide a comprehensive framework for ensuring the effectiveness of information security controls over information resources that support Federal operations and assets;

**(2)** recognize the highly networked nature of the current Federal computing environment and provide effective governmentwide management and oversight of the related information security risks, including coordination of information security efforts throughout the civilian, national security, and law enforcement communities;

**(3)** provide for development and maintenance of minimum controls required to protect Federal information and information systems;

**(4)** provide a mechanism for improved oversight of Federal agency information security programs, including through automated security tools to continuously diagnose and improve security;

**(5)** acknowledge that commercially developed information security products offer advanced, dynamic, robust, and effective information security solutions, reflecting market solutions for the protection of critical information infrastructures important to the national defense and economic security of the nation that are designed, built, and operated by the private sector; and

**(6)** recognize that the selection of specific technical hardware and software information security solutions should be left to individual agencies from among commercially developed products.

**CREDIT(S)**

(Added Pub.L. 113-283, § 2(a), Dec. 18, 2014, 128 Stat. 3073.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 14028**

<May 12, 2021, 86 F.R. 26633>

TD_0000464

**Improving the Nation's Cybersecurity**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Policy.** The United States faces persistent and increasingly sophisticated malicious cyber campaigns that threaten the public sector, the private sector, and ultimately the American people's security and privacy. The Federal Government must improve its efforts to identify, deter, protect against, detect, and respond to these actions and actors. The Federal Government must also carefully examine what occurred during any major cyber incident and apply lessons learned. But cybersecurity requires more than government action. Protecting our Nation from malicious cyber actors requires the Federal Government to partner with the private sector. The private sector must adapt to the continuously changing threat environment, ensure its products are built and operate securely, and partner with the Federal Government to foster a more secure cyberspace. In the end, the trust we place in our digital infrastructure should be proportional to how trustworthy and transparent that infrastructure is, and to the consequences we will incur if that trust is misplaced.

Incremental improvements will not give us the security we need; instead, the Federal Government needs to make bold changes and significant investments in order to defend the vital institutions that underpin the American way of life. The Federal Government must bring to bear the full scope of its authorities and resources to protect and secure its computer systems, whether they are cloud-based, on-premises, or hybrid. The scope of protection and security must include systems that process data (information technology (IT)) and those that run the vital machinery that ensures our safety (operational technology (OT)).

It is the policy of my Administration that the prevention, detection, assessment, and remediation of cyber incidents is a top priority and essential to national and economic security. The Federal Government must lead by example. All Federal Information Systems should meet or exceed the standards and requirements for cybersecurity set forth in and issued pursuant to this order.

**Sec. 2. Removing Barriers to Sharing Threat Information. (a)** The Federal Government contracts with IT and OT service providers to conduct an array of day-to-day functions on Federal Information Systems. These service providers, including cloud service providers, have unique access to and insight into cyber threat and incident information on Federal Information Systems. At the same time, current contract terms or restrictions may limit the sharing of such threat or incident information with executive departments and agencies (agencies) that are responsible for investigating or remediating cyber incidents, such as the Cybersecurity and Infrastructure Security Agency (CISA), the Federal Bureau of Investigation (FBI), and other elements of the Intelligence Community (IC). Removing these contractual barriers and increasing the sharing of information about such threats, incidents, and risks are necessary steps to accelerating incident deterrence, prevention, and response efforts and to enabling more effective defense of agencies' systems and of information collected, processed, and maintained by or for the Federal Government.

**(b)** Within 60 days of the date of this order, the Director of the Office of Management and Budget (OMB), in consultation with the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall review the Federal Acquisition Regulation (FAR) and the Defense Federal Acquisition Regulation Supplement contract requirements and language for contracting with IT and OT service providers and recommend updates to such requirements and language to the FAR Council and other appropriate agencies. The recommendations shall include descriptions of contractors to be covered by the proposed contract language.

**(c)** The recommended contract language and requirements described in subsection (b) of this section shall be designed to ensure that:

TD_0000465

(i) service providers collect and preserve data, information, and reporting relevant to cybersecurity event prevention, detection, response, and investigation on all information systems over which they have control, including systems operated on behalf of agencies, consistent with agencies' requirements;

(ii) service providers share such data, information, and reporting, as they relate to cyber incidents or potential incidents relevant to any agency with which they have contracted, directly with such agency and any other agency that the Director of OMB, in consultation with the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, deems appropriate, consistent with applicable privacy laws, regulations, and policies;

(iii) service providers collaborate with Federal cybersecurity or investigative agencies in their investigations of and responses to incidents or potential incidents on Federal Information Systems, including by implementing technical capabilities, such as monitoring networks for threats in collaboration with agencies they support, as needed; and

(iv) service providers share cyber threat and incident information with agencies, doing so, where possible, in industry-recognized formats for incident response and remediation.

(d) Within 90 days of receipt of the recommendations described in subsection (b) of this section, the FAR Council shall review the proposed contract language and conditions and, as appropriate, shall publish for public comment proposed updates to the FAR.

(e) Within 120 days of the date of this order, the Secretary of Homeland Security and the Director of OMB shall take appropriate steps to ensure to the greatest extent possible that service providers share data with agencies, CISA, and the FBI as may be necessary for the Federal Government to respond to cyber threats, incidents, and risks.

(f) It is the policy of the Federal Government that:

(i) information and communications technology (ICT) service providers entering into contracts with agencies must promptly report to such agencies when they discover a cyber incident involving a software product or service provided to such agencies or involving a support system for a software product or service provided to such agencies;

(ii) ICT service providers must also directly report to CISA whenever they report under subsection (f)(i) of this section to Federal Civilian Executive Branch (FCEB) Agencies, and CISA must centrally collect and manage such information; and

(iii) reports pertaining to National Security Systems, as defined in section 10(h) of this order, must be received and managed by the appropriate agency as to be determined under subsection (g)(i)(E) of this section.

(g) To implement the policy set forth in subsection (f) of this section:

(i) Within 45 days of the date of this order, the Secretary of Homeland Security, in consultation with the Secretary of Defense acting through the Director of the National Security Agency (NSA), the Attorney General, and the Director of OMB, shall recommend to the FAR Council contract language that identifies:

(A) the nature of cyber incidents that require reporting;

(B) the types of information regarding cyber incidents that require reporting to facilitate effective cyber incident response and remediation;

(C) appropriate and effective protections for privacy and civil liberties;

TD_0000466

**(D)** the time periods within which contractors must report cyber incidents based on a graduated scale of severity, with reporting on the most severe cyber incidents not to exceed 3 days after initial detection;

**(E)** National Security Systems reporting requirements; and

**(F)** the type of contractors and associated service providers to be covered by the proposed contract language.

**(ii)** Within 90 days of receipt of the recommendations described in subsection (g)(i) of this section, the FAR Council shall review the recommendations and publish for public comment proposed updates to the FAR.

**(iii)** Within 90 days of the date of this order, the Secretary of Defense acting through the Director of the NSA, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly develop procedures for ensuring that cyber incident reports are promptly and appropriately shared among agencies.

**(h)** Current cybersecurity requirements for unclassified system contracts are largely implemented through agency-specific policies and regulations, including cloud-service cybersecurity requirements. Standardizing common cybersecurity contractual requirements across agencies will streamline and improve compliance for vendors and the Federal Government.

**(i)** Within 60 days of the date of this order, the Secretary of Homeland Security acting through the Director of CISA, in consultation with the Secretary of Defense acting through the Director of the NSA, the Director of OMB, and the Administrator of General Services, shall review agency-specific cybersecurity requirements that currently exist as a matter of law, policy, or contract and recommend to the FAR Council standardized contract language for appropriate cybersecurity requirements. Such recommendations shall include consideration of the scope of contractors and associated service providers to be covered by the proposed contract language.

**(j)** Within 60 days of receiving the recommended contract language developed pursuant to subsection (i) of this section, the FAR Council shall review the recommended contract language and publish for public comment proposed updates to the FAR.

**(k)** Following any updates to the FAR made by the FAR Council after the public comment period described in subsection (j) of this section, agencies shall update their agency-specific cybersecurity requirements to remove any requirements that are duplicative of such FAR updates.

**(l)** The Director of OMB shall incorporate into the annual budget process a cost analysis of all recommendations developed under this section.

**Sec. 3. Modernizing Federal Government Cybersecurity. (a)** To keep pace with today's dynamic and increasingly sophisticated cyber threat environment, the Federal Government must take decisive steps to modernize its approach to cybersecurity, including by increasing the Federal Government's visibility into threats, while protecting privacy and civil liberties. The Federal Government must adopt security best practices; advance toward Zero Trust Architecture; accelerate movement to secure cloud services, including Software as a Service (SaaS), Infrastructure as a Service (IaaS), and Platform as a Service (PaaS); centralize and streamline access to cybersecurity data to drive analytics for identifying and managing cybersecurity risks; and invest in both technology and personnel to match these modernization goals.

**(b)** Within 60 days of the date of this order, the head of each agency shall:

**(i)** update existing agency plans to prioritize resources for the adoption and use of cloud technology as outlined in relevant OMB guidance;

TD_0000467

**(ii)** develop a plan to implement Zero Trust Architecture, which shall incorporate, as appropriate, the migration steps that the National Institute of Standards and Technology (NIST) within the Department of Commerce has outlined in standards and guidance, describe any such steps that have already been completed, identify activities that will have the most immediate security impact, and include a schedule to implement them; and

**(iii)** provide a report to the Director of OMB and the Assistant to the President and National Security Advisor (APNSA) discussing the plans required pursuant to subsection (b)(i) and (ii) of this section.

**(c)** As agencies continue to use cloud technology, they shall do so in a coordinated, deliberate way that allows the Federal Government to prevent, detect, assess, and remediate cyber incidents. To facilitate this approach, the migration to cloud technology shall adopt Zero Trust Architecture, as practicable. The CISA shall modernize its current cybersecurity programs, services, and capabilities to be fully functional with cloud-computing environments with Zero Trust Architecture. The Secretary of Homeland Security acting through the Director of CISA, in consultation with the Administrator of General Services acting through the Federal Risk and Authorization Management Program (FedRAMP) within the General Services Administration, shall develop security principles governing Cloud Service Providers (CSPs) for incorporation into agency modernization efforts. To facilitate this work:

**(i)** Within 90 days of the date of this order, the Director of OMB, in consultation with the Secretary of Homeland Security acting through the Director of CISA, and the Administrator of General Services acting through FedRAMP, shall develop a Federal cloud-security strategy and provide guidance to agencies accordingly. Such guidance shall seek to ensure that risks to the FCEB from using cloud-based services are broadly understood and effectively addressed, and that FCEB Agencies move closer to Zero Trust Architecture.

**(ii)** Within 90 days of the date of this order, the Secretary of Homeland Security acting through the Director of CISA, in consultation with the Director of OMB and the Administrator of General Services acting through FedRAMP, shall develop and issue, for the FCEB, cloud-security technical reference architecture documentation that illustrates recommended approaches to cloud migration and data protection for agency data collection and reporting.

**(iii)** Within 60 days of the date of this order, the Secretary of Homeland Security acting through the Director of CISA shall develop and issue, for FCEB Agencies, a cloud-service governance framework. That framework shall identify a range of services and protections available to agencies based on incident severity. That framework shall also identify data and processing activities associated with those services and protections.

**(iv)** Within 90 days of the date of this order, the heads of FCEB Agencies, in consultation with the Secretary of Homeland Security acting through the Director of CISA, shall evaluate the types and sensitivity of their respective agency's unclassified data, and shall provide to the Secretary of Homeland Security through the Director of CISA and to the Director of OMB a report based on such evaluation. The evaluation shall prioritize identification of the unclassified data considered by the agency to be the most sensitive and under the greatest threat, and appropriate processing and storage solutions for those data.

**(d)** Within 180 days of the date of this order, agencies shall adopt multi-factor authentication and encryption for data at rest and in transit, to the maximum extent consistent with Federal records laws and other applicable laws. To that end:

**(i)** Heads of FCEB Agencies shall provide reports to the Secretary of Homeland Security through the Director of CISA, the Director of OMB, and the APNSA on their respective agency's progress in adopting multifactor authentication and encryption of data at rest and in transit. Such agencies shall provide such reports every 60 days after the date of this order until the agency has fully adopted, agency-wide, multi-factor authentication and data encryption.

**(ii)** Based on identified gaps in agency implementation, CISA shall take all appropriate steps to maximize adoption by FCEB Agencies of technologies and processes to implement multifactor authentication and encryption for data at rest and in transit.

TD_0000468

**(iii)** Heads of FCEB Agencies that are unable to fully adopt multi-factor authentication and data encryption within 180 days of the date of this order shall, at the end of the 180-day period, provide a written rationale to the Secretary of Homeland Security through the Director of CISA, the Director of OMB, and the APNSA.

**(e)** Within 90 days of the date of this order, the Secretary of Homeland Security acting through the Director of CISA, in consultation with the Attorney General, the Director of the FBI, and the Administrator of General Services acting through the Director of FedRAMP, shall establish a framework to collaborate on cybersecurity and incident response activities related to FCEB cloud technology, in order to ensure effective information sharing among agencies and between agencies and CSPs.

**(f)** Within 60 days of the date of this order, the Administrator of General Services, in consultation with the Director of OMB and the heads of other agencies as the Administrator of General Services deems appropriate, shall begin modernizing FedRAMP by:

**(i)** establishing a training program to ensure agencies are effectively trained and equipped to manage FedRAMP requests, and providing access to training materials, including videos-on-demand;

**(ii)** improving communication with CSPs through automation and standardization of messages at each stage of authorization. These communications may include status updates, requirements to complete a vendor's current stage, next steps, and points of contact for questions;

**(iii)** incorporating automation throughout the lifecycle of FedRAMP, including assessment, authorization, continuous monitoring, and compliance;

**(iv)** digitizing and streamlining documentation that vendors are required to complete, including through online accessibility and pre-populated forms; and

**(v)** identifying relevant compliance frameworks, mapping those frameworks onto requirements in the FedRAMP authorization process, and allowing those frameworks to be used as a substitute for the relevant portion of the authorization process, as appropriate.

**Sec. 4. Enhancing Software Supply Chain Security. (a)** The security of software used by the Federal Government is vital to the Federal Government's ability to perform its critical functions. The development of commercial software often lacks transparency, sufficient focus on the ability of the software to resist attack, and adequate controls to prevent tampering by malicious actors. There is a pressing need to implement more rigorous and predictable mechanisms for ensuring that products function securely, and as intended. The security and integrity of "critical software"_software that performs functions critical to trust (such as affording or requiring elevated system privileges or direct access to networking and computing resources)_is a particular concern. Accordingly, the Federal Government must take action to rapidly improve the security and integrity of the software supply chain, with a priority on addressing critical software.

**(b)** Within 30 days of the date of this order, the Secretary of Commerce acting through the Director of NIST shall solicit input from the Federal Government, private sector, academia, and other appropriate actors to identify existing or develop new standards, tools, and best practices for complying with the standards, procedures, or criteria in subsection (e) of this section. The guidelines shall include criteria that can be used to evaluate software security, include criteria to evaluate the security practices of the developers and suppliers themselves, and identify innovative tools or methods to demonstrate conformance with secure practices.

**(c)** Within 180 days of the date of this order, the Director of NIST shall publish preliminary guidelines, based on the consultations described in subsection (b) of this section and drawing on existing documents as practicable, for enhancing software supply chain security and meeting the requirements of this section.

TD_0000469

**(d)** Within 360 days of the date of this order, the Director of NIST shall publish additional guidelines that include procedures for periodic review and updating of the guidelines described in subsection (c) of this section.

**(e)** Within 90 days of publication of the preliminary guidelines pursuant to subsection (c) of this section, the Secretary of Commerce acting through the Director of NIST, in consultation with the heads of such agencies as the Director of NIST deems appropriate, shall issue guidance identifying practices that enhance the security of the software supply chain. Such guidance may incorporate the guidelines published pursuant to subsections (c) and (i) of this section. Such guidance shall include standards, procedures, or criteria regarding:

**(i)** secure software development environments, including such actions as:

**(A)** using administratively separate build environments;

**(B)** auditing trust relationships;

**(C)** establishing multi-factor, risk-based authentication and conditional access across the enterprise;

**(D)** documenting and minimizing dependencies on enterprise products that are part of the environments used to develop, build, and edit software;

**(E)** employing encryption for data; and

**(F)** monitoring operations and alerts and responding to attempted and actual cyber incidents;

**(ii)** generating and, when requested by a purchaser, providing artifacts that demonstrate conformance to the processes set forth in subsection (e)(i) of this section;

**(iii)** employing automated tools, or comparable processes, to maintain trusted source code supply chains, thereby ensuring the integrity of the code;

**(iv)** employing automated tools, or comparable processes, that check for known and potential vulnerabilities and remediate them, which shall operate regularly, or at a minimum prior to product, version, or update release;

**(v)** providing, when requested by a purchaser, artifacts of the execution of the tools and processes described in subsection (e) (iii) and (iv) of this section, and making publicly available summary information on completion of these actions, to include a summary description of the risks assessed and mitigated;

**(vi)** maintaining accurate and up-to-date data, provenance (i.e., origin) of software code or components, and controls on internal and third-party software components, tools, and services present in software development processes, and performing audits and enforcement of these controls on a recurring basis;

**(vii)** providing a purchaser a Software Bill of Materials (SBOM) for each product directly or by publishing it on a public website;

**(viii)** participating in a vulnerability disclosure program that includes a reporting and disclosure process;

**(ix)** attesting to conformity with secure software development practices; and

TD_0000470

**(x)** ensuring and attesting, to the extent practicable, to the integrity and provenance of open source software used within any portion of a product.

**(f)** Within 60 days of the date of this order, the Secretary of Commerce, in coordination with the Assistant Secretary for Communications and Information and the Administrator of the National Telecommunications and Information Administration, shall publish minimum elements for an SBOM.

**(g)** Within 45 days of the date of this order, the Secretary of Commerce, acting through the Director of NIST, in consultation with the Secretary of Defense acting through the Director of the NSA, the Secretary of Homeland Security acting through the Director of CISA, the Director of OMB, and the Director of National Intelligence, shall publish a definition of the term "critical software" for inclusion in the guidance issued pursuant to subsection (e) of this section. That definition shall reflect the level of privilege or access required to function, integration and dependencies with other software, direct access to networking and computing resources, performance of a function critical to trust, and potential for harm if compromised.

**(h)** Within 30 days of the publication of the definition required by subsection (g) of this section, the Secretary of Homeland Security acting through the Director of CISA, in consultation with the Secretary of Commerce acting through the Director of NIST, shall identify and make available to agencies a list of categories of software and software products in use or in the acquisition process meeting the definition of critical software issued pursuant to subsection (g) of this section.

**(i)** Within 60 days of the date of this order, the Secretary of Commerce acting through the Director of NIST, in consultation with the Secretary of Homeland Security acting through the Director of CISA and with the Director of OMB, shall publish guidance outlining security measures for critical software as defined in subsection (g) of this section, including applying practices of least privilege, network segmentation, and proper configuration.

**(j)** Within 30 days of the issuance of the guidance described in subsection (i) of this section, the Director of OMB acting through the Administrator of the Office of Electronic Government within OMB shall take appropriate steps to require that agencies comply with such guidance.

**(k)** Within 30 days of issuance of the guidance described in subsection (e) of this section, the Director of OMB acting through the Administrator of the Office of Electronic Government within OMB shall take appropriate steps to require that agencies comply with such guidelines with respect to software procured after the date of this order.

**(l)** Agencies may request an extension for complying with any requirements issued pursuant to subsection (k) of this section. Any such request shall be considered by the Director of OMB on a case-by-case basis, and only if accompanied by a plan for meeting the underlying requirements. The Director of OMB shall on a quarterly basis provide a report to the APNSA identifying and explaining all extensions granted.

**(m)** Agencies may request a waiver as to any requirements issued pursuant to subsection (k) of this section. Waivers shall be considered by the Director of OMB, in consultation with the APNSA, on a case-by-case basis, and shall be granted only in exceptional circumstances and for limited duration, and only if there is an accompanying plan for mitigating any potential risks.

**(n)** Within 1 year of the date of this order, the Secretary of Homeland Security, in consultation with the Secretary of Defense, the Attorney General, the Director of OMB, and the Administrator of the Office of Electronic Government within OMB, shall recommend to the FAR Council contract language requiring suppliers of software available for purchase by agencies to comply with, and attest to complying with, any requirements issued pursuant to subsections (g) through (k) of this section.

**(o)** After receiving the recommendations described in subsection (n) of this section, the FAR Council shall review the recommendations and, as appropriate and consistent with applicable law, amend the FAR.

TD_0000471

**(p)** Following the issuance of any final rule amending the FAR as described in subsection (o) of this section, agencies shall, as appropriate and consistent with applicable law, remove software products that do not meet the requirements of the amended FAR from all indefinite delivery indefinite quantity contracts; Federal Supply Schedules; Federal Government-wide Acquisition Contracts; Blanket Purchase Agreements; and Multiple Award Contracts.

**(q)** The Director of OMB, acting through the Administrator of the Office of Electronic Government within OMB, shall require agencies employing software developed and procured prior to the date of this order (legacy software) either to comply with any requirements issued pursuant to subsection (k) of this section or to provide a plan outlining actions to remediate or meet those requirements, and shall further require agencies seeking renewals of software contracts, including legacy software, to comply with any requirements issued pursuant to subsection (k) of this section, unless an extension or waiver is granted in accordance with subsection (l) or (m) of this section.

**(r)** Within 60 days of the date of this order, the Secretary of Commerce acting through the Director of NIST, in consultation with the Secretary of Defense acting through the Director of the NSA, shall publish guidelines recommending minimum standards for vendors' testing of their software source code, including identifying recommended types of manual or automated testing (such as code review tools, static and dynamic analysis, software composition tools, and penetration testing).

**(s)** The Secretary of Commerce acting through the Director of NIST, in coordination with representatives of other agencies as the Director of NIST deems appropriate, shall initiate pilot programs informed by existing consumer product labeling programs to educate the public on the security capabilities of internet-of-Things (IoT) devices and software development practices, and shall consider ways to incentivize manufacturers and developers to participate in these programs.

**(t)** Within 270 days of the date of this order, the Secretary of Commerce acting through the Director of NIST, in coordination with the Chair of the Federal Trade Commission (FTC) and representatives of other agencies as the Director of NIST deems appropriate, shall identify IoT cybersecurity criteria for a consumer labeling program, and shall consider whether such a consumer labeling program may be operated in conjunction with or modeled after any similar existing government programs consistent with applicable law. The criteria shall reflect increasingly comprehensive levels of testing and assessment that a product may have undergone, and shall use or be compatible with existing labeling schemes that manufacturers use to inform consumers about the security of their products. The Director of NIST shall examine all relevant information, labeling, and incentive programs and employ best practices. This review shall focus on ease of use for consumers and a determination of what measures can be taken to maximize manufacturer participation.

**(u)** Within 270 days of the date of this order, the Secretary of Commerce acting through the Director of NIST, in coordination with the Chair of the FTC and representatives from other agencies as the Director of NIST deems appropriate, shall identify secure software development practices or criteria for a consumer software labeling program, and shall consider whether such a consumer software labeling program may be operated in conjunction with or modeled after any similar existing government programs, consistent with applicable law. The criteria shall reflect a baseline level of secure practices, and if practicable, shall reflect increasingly comprehensive levels of testing and assessment that a product may have undergone. The Director of NIST shall examine all relevant information, labeling, and incentive programs, employ best practices, and identify, modify, or develop a recommended label or, if practicable, a tiered software security rating system. This review shall focus on ease of use for consumers and a determination of what measures can be taken to maximize participation.

**(v)** These pilot programs shall be conducted in a manner consistent with OMB Circular A-119 and NIST Special Publication 2000-02 (Conformity Assessment Considerations for Federal Agencies).

**(w)** Within 1 year of the date of this order, the Director of NIST shall conduct a review of the pilot programs, consult with the private sector and relevant agencies to assess the effectiveness of the programs, determine what improvements can be made going forward, and submit a summary report to the APNSA.

TD_0000472

**(x)** Within 1 year of the date of this order, the Secretary of Commerce, in consultation with the heads of other agencies as the Secretary of Commerce deems appropriate, shall provide to the President, through the APNSA, a report that reviews the progress made under this section and outlines additional steps needed to secure the software supply chain.

**Sec. 5. Establishing a Cyber Safety Review Board. (a)** The Secretary of Homeland Security, in consultation with the Attorney General, shall establish the Cyber Safety Review Board (Board), pursuant to section 871 of the Homeland Security Act of 2002 (6 U.S.C. 451).

**(b)** The Board shall review and assess, with respect to significant cyber incidents (as defined under Presidential Policy Directive 41 of July 26, 2016 (United States Cyber Incident Coordination) (PPD-41)) affecting FCEB Information Systems or non-Federal systems, threat activity, vulnerabilities, mitigation activities, and agency responses.

**(c)** The Secretary of Homeland Security shall convene the Board following a significant cyber incident triggering the establishment of a Cyber Unified Coordination Group (UCG) as provided by section V(B)(2) of PPD-41; at any time as directed by the President acting through the APNSA; or at any time the Secretary of Homeland Security deems necessary.

**(d)** The Board's initial review shall relate to the cyber activities that prompted the establishment of a UCG in December 2020, and the Board shall, within 90 days of the Board's establishment, provide recommendations to the Secretary of Homeland Security for improving cybersecurity and incident response practices, as outlined in subsection (i) of this section.

**(e)** The Board's membership shall include Federal officials and representatives from private-sector entities. The Board shall comprise representatives of the Department of Defense, the Department of Justice, CISA, the NSA, and the FBI, as well as representatives from appropriate private-sector cybersecurity or software suppliers as determined by the Secretary of Homeland Security. A representative from OMB shall participate in Board activities when an incident under review involves FCEB Information Systems, as determined by the Secretary of Homeland Security. The Secretary of Homeland Security may invite the participation of others on a case-by-case basis depending on the nature of the incident under review.

**(f)** The Secretary of Homeland Security shall biennially designate a Chair and Deputy Chair of the Board from among the members of the Board, to include one Federal and one private-sector member.

**(g)** The Board shall protect sensitive law enforcement, operational, business, and other confidential information that has been shared with it, consistent with applicable law.

**(h)** The Secretary of Homeland Security shall provide to the President through the APNSA any advice, information, or recommendations of the Board for improving cybersecurity and incident response practices and policy upon completion of its review of an applicable incident.

**(i)** Within 30 days of completion of the initial review described in subsection (d) of this section, the Secretary of Homeland Security shall provide to the President through the APNSA the recommendations of the Board based on the initial review. These recommendations shall describe:

**(i)** identified gaps in, and options for, the Board's composition or authorities;

**(ii)** the Board's proposed mission, scope, and responsibilities;

**(iii)** membership eligibility criteria for private-sector representatives;

**(iv)** Board governance structure including interaction with the executive branch and the Executive Office of the President;

TD_0000473

**(v)** thresholds and criteria for the types of cyber incidents to be evaluated;

**(vi)** sources of information that should be made available to the Board, consistent with applicable law and policy;

**(vii)** an approach for protecting the information provided to the Board and securing the cooperation of affected United States individuals and entities for the purpose of the Board's review of incidents; and

**(viii)** administrative and budgetary considerations required for operation of the Board.

**(j)** The Secretary of Homeland Security, in consultation with the Attorney General and the APNSA, shall review the recommendations provided to the President through the APNSA pursuant to subsection (i) of this section and take steps to implement them as appropriate.

**(k)** Unless otherwise directed by the President, the Secretary of Homeland Security shall extend the life of the Board every 2 years as the Secretary of Homeland Security deems appropriate, pursuant to section 871 of the Homeland Security Act of 2002.

**Sec. 6. Standardizing the Federal Government's Playbook for Responding to Cybersecurity Vulnerabilities and Incidents. (a)** The cybersecurity vulnerability and incident response procedures currently used to identify, remediate, and recover from vulnerabilities and incidents affecting their systems vary across agencies, hindering the ability of lead agencies to analyze vulnerabilities and incidents more comprehensively across agencies. Standardized response processes ensure a more coordinated and centralized cataloging of incidents and tracking of agencies' progress toward successful responses.

**(b)** Within 120 days of the date of this order, the Secretary of Homeland Security acting through the Director of CISA, in consultation with the Director of OMB, the Federal Chief Information Officers Council, and the Federal Chief Information Security Council, and in coordination with the Secretary of Defense acting through the Director of the NSA, the Attorney General, and the Director of National Intelligence, shall develop a standard set of operational procedures (playbook) to be used in planning and conducting a cybersecurity vulnerability and incident response activity respecting FCEB Information Systems. The playbook shall:

**(i)** incorporate all appropriate NIST standards;

**(ii)** be used by FCEB Agencies; and

**(iii)** articulate progress and completion through all phases of an incident response, while allowing flexibility so it may be used in support of various response activities.

**(c)** The Director of OMB shall issue guidance on agency use of the playbook.

**(d)** Agencies with cybersecurity vulnerability or incident response procedures that deviate from the playbook may use such procedures only after consulting with the Director of OMB and the APNSA and demonstrating that these procedures meet or exceed the standards proposed in the playbook.

**(e)** The Director of CISA, in consultation with the Director of the NSA, shall review and update the playbook annually, and provide information to the Director of OMB for incorporation in guidance updates.

**(f)** To ensure comprehensiveness of incident response activities and build confidence that unauthorized cyber actors no longer have access to FCEB Information Systems, the playbook shall establish, consistent with applicable law, a requirement that the Director of CISA review and validate FCEB Agencies' incident response and remediation results upon an agency's completion

TD_0000474

of its incident response. The Director of CISA may recommend use of another agency or a third-party incident response team as appropriate.

**(g)** To ensure a common understanding of cyber incidents and the cybersecurity status of an agency, the playbook shall define key terms and use such terms consistently with any statutory definitions of those terms, to the extent practicable, thereby providing a shared lexicon among agencies using the playbook.

**Sec. 7. Improving Detection of Cybersecurity Vulnerabilities and Incidents on Federal Government Networks. (a)** The Federal Government shall employ all appropriate resources and authorities to maximize the early detection of cybersecurity vulnerabilities and incidents on its networks. This approach shall include increasing the Federal Government's visibility into and detection of cybersecurity vulnerabilities and threats to agency networks in order to bolster the Federal Government's cybersecurity efforts.

**(b)** FCEB Agencies shall deploy an Endpoint Detection and Response (EDR) initiative to support proactive detection of cybersecurity incidents within Federal Government infrastructure, active cyber hunting, containment and remediation, and incident response.

**(c)** Within 30 days of the date of this order, the Secretary of Homeland Security acting through the Director of CISA shall provide to the Director of OMB recommendations on options for implementing an EDR initiative, centrally located to support host-level visibility, attribution, and response regarding FCEB Information Systems.

**(d)** Within 90 days of receiving the recommendations described in subsection (c) of this section, the Director of OMB, in consultation with Secretary of Homeland Security, shall issue requirements for FCEB Agencies to adopt Federal Government-wide EDR approaches. Those requirements shall support a capability of the Secretary of Homeland Secretary, acting through the Director of CISA, to engage in cyber hunt, detection, and response activities.

**(e)** The Director of OMB shall work with the Secretary of Homeland Security and agency heads to ensure that agencies have adequate resources to comply with the requirements issued pursuant to subsection (d) of this section.

**(f)** Defending FCEB Information Systems requires that the Secretary of Homeland Security acting through the Director of CISA have access to agency data that are relevant to a threat and vulnerability analysis, as well as for assessment and threat-hunting purposes. Within 75 days of the date of this order, agencies shall establish or update Memoranda of Agreement (MOA) with CISA for the Continuous Diagnostics and Mitigation Program to ensure object level data, as defined in the MOA, are available and accessible to CISA, consistent with applicable law.

**(g)** Within 45 days of the date of this order, the Director of the NSA as the National Manager for National Security Systems (National Manager) shall recommend to the Secretary of Defense, the Director of National Intelligence, and the Committee on National Security Systems (CNSS) appropriate actions for improving detection of cyber incidents affecting National Security Systems, to the extent permitted by applicable law, including recommendations concerning EDR approaches and whether such measures should be operated by agencies or through a centralized service of common concern provided by the National Manager.

**(h)** Within 90 days of the date of this order, the Secretary of Defense, the Director of National Intelligence, and the CNSS shall review the recommendations submitted under subsection (g) of this section and, as appropriate, establish policies that effectuate those recommendations, consistent with applicable law.

**(i)** Within 90 days of the date of this order, the Director of CISA shall provide to the Director of OMB and the APNSA a report describing how authorities granted under section 1705 of Public Law 116-283, to conduct threat-hunting activities on FCEB networks without prior authorization from agencies, are being implemented. This report shall also recommend procedures to ensure that mission-critical systems are not disrupted, procedures for notifying system owners of vulnerable government

TD_0000475

systems, and the range of techniques that can be used during testing of FCEB Information Systems. The Director of CISA shall provide quarterly reports to the APNSA and the Director of OMB regarding actions taken under section 1705 of Public Law 116-283.

**(j)** To ensure alignment between Department of Defense Information Network (DODIN) directives and FCEB Information Systems directives, the Secretary of Defense and the Secretary of Homeland Security, in consultation with the Director of OMB, shall:

**(i)** within 60 days of the date of this order, establish procedures for the Department of Defense and the Department of Homeland Security to immediately share with each other Department of Defense Incident Response Orders or Department of Homeland Security Emergency Directives and Binding Operational Directives applying to their respective information networks;

**(ii)** evaluate whether to adopt any guidance contained in an Order or Directive issued by the other Department, consistent with regulations concerning sharing of classified information; and

**(iii)** within 7 days of receiving notice of an Order or Directive issued pursuant to the procedures established under subsection (j)(i) of this section, notify the APNSA and Administrator of the Office of Electronic Government within OMB of the evaluation described in subsection (j)(ii) of this section, including a determination whether to adopt guidance issued by the other Department, the rationale for that determination, and a timeline for application of the directive, if applicable.

**Sec. 8. Improving the Federal Government's Investigative and Remediation Capabilities. (a)** Information from network and system logs on Federal Information Systems (for both on-premises systems and connections hosted by third parties, such as CSPs) is invaluable for both investigation and remediation purposes. It is essential that agencies and their IT service providers collect and maintain such data and, when necessary to address a cyber incident on FCEB Information Systems, provide them upon request to the Secretary of Homeland Security through the Director of CISA and to the FBI, consistent with applicable law.

**(b)** Within 14 days of the date of this order, the Secretary of Homeland Security, in consultation with the Attorney General and the Administrator of the Office of Electronic Government within OMB, shall provide to the Director of OMB recommendations on requirements for logging events and retaining other relevant data within an agency's systems and networks. Such recommendations shall include the types of logs to be maintained, the time periods to retain the logs and other relevant data, the time periods for agencies to enable recommended logging and security requirements, and how to protect logs. Logs shall be protected by cryptographic methods to ensure integrity once collected and periodically verified against the hashes throughout their retention. Data shall be retained in a manner consistent with all applicable privacy laws and regulations. Such recommendations shall also be considered by the FAR Council when promulgating rules pursuant to section 2 of this order.

**(c)** Within 90 days of receiving the recommendations described in subsection (b) of this section, the Director of OMB, in consultation with the Secretary of Commerce and the Secretary of Homeland Security, shall formulate policies for agencies to establish requirements for logging, log retention, and log management, which shall ensure centralized access and visibility for the highest level security operations center of each agency.

**(d)** The Director of OMB shall work with agency heads to ensure that agencies have adequate resources to comply with the requirements identified in subsection (c) of this section.

**(e)** To address cyber risks or incidents, including potential cyber risks or incidents, the proposed recommendations issued pursuant to subsection (b) of this section shall include requirements to ensure that, upon request, agencies provide logs to the Secretary of Homeland Security through the Director of CISA and to the FBI, consistent with applicable law. These requirements should be designed to permit agencies to share log information, as needed and appropriate, with other Federal agencies for cyber risks or incidents.

TD_0000476

**Sec. 9. National Security Systems. (a)** Within 60 days of the date of this order, the Secretary of Defense acting through the National Manager, in coordination with the Director of National Intelligence and the CNSS, and in consultation with the APNSA, shall adopt National Security Systems requirements that are equivalent to or exceed the cybersecurity requirements set forth in this order that are otherwise not applicable to National Security Systems. Such requirements may provide for exceptions in circumstances necessitated by unique mission needs. Such requirements shall be codified in a National Security Memorandum (NSM). Until such time as that NSM is issued, programs, standards, or requirements established pursuant to this order shall not apply with respect to National Security Systems.

**(b)** Nothing in this order shall alter the authority of the National Manager with respect to National Security Systems as defined in National Security Directive 42 of July 5, 1990 (National Policy for the Security of National Security Telecommunications and Information Systems) (NSD-42). The FCEB network shall continue to be within the authority of the Secretary of Homeland Security acting through the Director of CISA.

**Sec. 10. Definitions.** For purposes of this order:

**(a)** the term "agency" has the meaning ascribed to it under 44 U.S.C. 3502.

**(b)** the term "auditing trust relationship" means an agreed-upon relationship between two or more system elements that is governed by criteria for secure interaction, behavior, and outcomes relative to the protection of assets.

**(c)** the term "cyber incident" has the meaning ascribed to an "incident" under 44 U.S.C. 3552(b)(2).

**(d)** the term "Federal Civilian Executive Branch Agencies" or "FCEB Agencies" includes all agencies except for the Department of Defense and agencies in the Intelligence Community.

**(e)** the term "Federal Civilian Executive Branch Information Systems" or "FCEB Information Systems" means those information systems operated by Federal Civilian Executive Branch Agencies, but excludes National Security Systems.

**(f)** the term "Federal Information Systems" means an information system used or operated by an agency or by a contractor of an agency or by another organization on behalf of an agency, including FCEB Information Systems and National Security Systems.

**(g)** the term "Intelligence Community" or "IC" has the meaning ascribed to it under 50 U.S.C. 3003(4).

**(h)** the term "National Security Systems" means information systems as defined in 44 U.S.C. 3552(b)(6), 3553(e)(2), and 3553(e)(3).

**(i)** the term "logs" means records of the events occurring within an organization's systems and networks. Logs are composed of log entries, and each entry contains information related to a specific event that has occurred within a system or network.

**(j)** the term "Software Bill of Materials" or "SBOM" means a formal record containing the details and supply chain relationships of various components used in building software. Software developers and vendors often create products by assembling existing open source and commercial software components. The SBOM enumerates these components in a product. It is analogous to a list of ingredients on food packaging. An SBOM is useful to those who develop or manufacture software, those who select or purchase software, and those who operate software. Developers often use available open source and third-party software components to create a product; an SBOM allows the builder to make sure those components are up to date and to respond quickly to new vulnerabilities. Buyers can use an SBOM to perform vulnerability or license analysis, both of which can be used to evaluate risk in a product. Those who operate software can use SBOMs to quickly and easily determine whether they are at potential risk of a newly discovered vulnerability. A widely used, machine-readable SBOM format allows for greater benefits through automation and tool integration. The SBOMs gain greater value when collectively stored in a repository that can be

TD_0000477

easily queried by other applications and systems. Understanding the supply chain of software, obtaining an SBOM, and using it to analyze known vulnerabilities are crucial in managing risk.

**(k)** the term "Zero Trust Architecture" means a security model, a set of system design principles, and a coordinated cybersecurity and system management strategy based on an acknowledgement that threats exist both inside and outside traditional network boundaries. The Zero Trust security model eliminates implicit trust in any one element, node, or service and instead requires continuous verification of the operational picture via real-time information from multiple sources to determine access and other system responses. In essence, a Zero Trust Architecture allows users full access but only to the bare minimum they need to perform their jobs. If a device is compromised, zero trust can ensure that the damage is contained. The Zero Trust Architecture security model assumes that a breach is inevitable or has likely already occurred, so it constantly limits access to only what is needed and looks for anomalous or malicious activity. Zero Trust Architecture embeds comprehensive security monitoring; granular risk-based access controls; and system security automation in a coordinated manner throughout all aspects of the infrastructure in order to focus on protecting data in real-time within a dynamic threat environment. This data-centric security model allows the concept of least-privileged access to be applied for every access decision, where the answers to the questions of who, what, when, where, and how are critical for appropriately allowing or denying access to resources based on the combination of sever.

**Sec. 11. General Provisions. (a)** Upon the appointment of the National Cyber Director (NCD) and the establishment of the related Office within the Executive Office of the President, pursuant to section 1752 of Public Law 116-283, portions of this order may be modified to enable the NCD to fully execute its duties and responsibilities.

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(c)** This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

**(d)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(e)** Nothing in this order confers authority to interfere with or to direct a criminal or national security investigation, arrest, search, seizure, or disruption operation or to alter a legal restriction that requires an agency to protect information learned in the course of a criminal or national security investigation.

J.R. BIDEN JR.

44 U.S.C.A. § 3551, 44 USCA § 3551
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000478

United States Code Annotated
    Title 44. Public Printing and Documents (Refs & Annos)
        Chapter 35. Coordination of Federal Information Policy (Refs & Annos)
            Subchapter II. Information Security

44 U.S.C.A. § 3552

§ 3552. Definitions

Currentness

**(a) In general.**--Except as provided under subsection (b), the definitions under section 3502 shall apply to this subchapter.

**(b) Additional definitions.**--As used in this subchapter:

(1) The term "binding operational directive" means a compulsory direction to an agency that--

**(A)** is for purposes of safeguarding Federal information and information systems from a known or reasonably suspected information security threat, vulnerability, or risk;

**(B)** shall be in accordance with policies, principles, standards, and guidelines issued by the Director; and

**(C)** may be revised or repealed by the Director if the direction issued on behalf of the Director is not in accordance with policies and principles developed by the Director.

(2) The term "incident" means an occurrence that--

**(A)** actually or imminently jeopardizes, without lawful authority, the integrity, confidentiality, or availability of information or an information system; or

**(B)** constitutes a violation or imminent threat of violation of law, security policies, security procedures, or acceptable use policies.

(3) The term "information security" means protecting information and information systems from unauthorized access, use, disclosure, disruption, modification, or destruction in order to provide--

**(A)** integrity, which means guarding against improper information modification or destruction, and includes ensuring information nonrepudiation and authenticity;

**(B)** confidentiality, which means preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information; and

**(C)** availability, which means ensuring timely and reliable access to and use of information.

**(4)** The term "information technology" has the meaning given that term in section 11101 of title 40.

**(5)** The term "intelligence community" has the meaning given that term in section 3(4) of the National Security Act of 1947 (50 U.S.C. 3003(4)).

**(6)(A)** The term "national security system" means any information system (including any telecommunications system) used or operated by an agency or by a contractor of an agency, or other organization on behalf of an agency--

**(i)** the function, operation, or use of which--

**(I)** involves intelligence activities;

**(II)** involves cryptologic activities related to national security;

**(III)** involves command and control of military forces;

**(IV)** involves equipment that is an integral part of a weapon or weapons system; or

**(V)** subject to subparagraph (B), is critical to the direct fulfillment of military or intelligence missions; or

**(ii)** is protected at all times by procedures established for information that have been specifically authorized under criteria established by an Executive order or an Act of Congress to be kept classified in the interest of national defense or foreign policy.

**(B)** Subparagraph (A)(i)(V) does not include a system that is to be used for routine administrative and business applications (including payroll, finance, logistics, and personnel management applications).

**(7)** The term "Secretary" means the Secretary of Homeland Security.

**CREDIT(S)**

(Added Pub.L. 113-283, § 2(a), Dec. 18, 2014, 128 Stat. 3074.)

TD_0000480

44 U.S.C.A. § 3552, 44 USCA § 3552

Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000481

United States Code Annotated

Title 44. Public Printing and Documents (Refs & Annos)

Chapter 35. Coordination of Federal Information Policy (Refs & Annos)

Subchapter II. Information Security

44 U.S.C.A. § 3553

§ 3553. Authority and functions of the Director and the Secretary

Currentness

**(a) Director.**--The Director shall oversee agency information security policies and practices, including--

**(1)** developing and overseeing the implementation of policies, principles, standards, and guidelines on information security, including through ensuring timely agency adoption of and compliance with standards promulgated under section 11331 of title 40;

**(2)** requiring agencies, consistent with the standards promulgated under such section 11331 and the requirements of this subchapter, to identify and provide information security protections commensurate with the risk and magnitude of the harm resulting from the unauthorized access, use, disclosure, disruption, modification, or destruction of--

**(A)** information collected or maintained by or on behalf of an agency; or

**(B)** information systems used or operated by an agency or by a contractor of an agency or other organization on behalf of an agency;

**(3)** ensuring that the Secretary carries out the authorities and functions under subsection (b);

**(4)** coordinating the development of standards and guidelines under section 20 of the National Institute of Standards and Technology Act (15 U.S.C. 278g-3) with agencies and offices operating or exercising control of national security systems (including the National Security Agency) to assure, to the maximum extent feasible, that such standards and guidelines are complementary with standards and guidelines developed for national security systems;

**(5)** overseeing agency compliance with the requirements of this subchapter and section 1326 of title 41, including through any authorized action under section 11303 of title 40, to enforce accountability for compliance with such requirements; and

**(6)** coordinating information security policies and procedures with related information resources management policies and procedures.

**(b) Secretary.**--The Secretary, in consultation with the Director, shall administer the implementation of agency information security policies and practices for information systems, except for national security systems and information systems described in paragraph (2) or (3) of subsection (e), including--

**(1)** assisting the Director in carrying out the authorities and functions under paragraphs (1), (2), (3), (5), and (6) of subsection (a);

**(2)** developing and overseeing the implementation of binding operational directives to agencies to implement the policies, principles, standards, and guidelines developed by the Director under subsection (a)(1) and the requirements of this subchapter, which may be revised or repealed by the Director if the operational directives issued on behalf of the Director are not in accordance with policies, principles, standards, and guidelines developed by the Director, including--

**(A)** requirements for reporting security incidents to the Federal information security incident center established under section 3556;

**(B)** requirements for the contents of the annual reports required to be submitted under section 3554(c)(1);

**(C)** requirements for the mitigation of exigent risks to information systems; and

**(D)** other operational requirements as the Director or Secretary, in consultation with the Director, may determine necessary;

**(3)** monitoring agency implementation of information security policies and practices;

**(4)** convening meetings with senior agency officials to help ensure effective implementation of information security policies and practices;

**(5)** coordinating Government-wide efforts on information security policies and practices, including consultation with the Chief Information Officers Council established under section 3603 and the Director of the National Institute of Standards and Technology;

**(6)** providing operational and technical assistance to agencies in implementing policies, principles, standards, and guidelines on information security, including implementation of standards promulgated under section 11331 of title 40, including by--

**(A)** operating the Federal information security incident center established under section 3556;

**(B)** upon request by an agency, deploying, operating, and maintaining technology to assist the agency to continuously diagnose and mitigate against cyber threats and vulnerabilities, with or without reimbursement;

**(C)** compiling and analyzing data on agency information security; and

TD_0000483

**(D)** developing and conducting targeted operational evaluations, including threat and vulnerability assessments, on the information systems;

**(7)** hunting for and identifying, with or without advance notice to or authorization from agencies, threats and vulnerabilities within Federal information systems;

**(8)** upon request by an agency, and at the Secretary's discretion, with or without reimbursement--

**(A)** providing services, functions, and capabilities, including operation of the agency's information security program, to assist the agency with meeting the requirements set forth in section 3554(b); and

**(B)** deploying, operating, and maintaining secure technology platforms and tools, including networks and common business applications, for use by the agency to perform agency functions, including collecting, maintaining, storing, processing, disseminating, and analyzing information; and

**(9)** other actions as the Director or the Secretary, in consultation with the Director, may determine necessary to carry out this subsection.

**(c) Report.**--Not later than March 1 of each year, the Director, in consultation with the Secretary, shall submit to Congress a report on the effectiveness of information security policies and practices during the preceding year, including--

**(1)** a summary of the incidents described in the annual reports required to be submitted under section 3554(c)(1), including a summary of the information required under section 3554(c)(1)(A)(iii);

**(2)** a description of the threshold for reporting major information security incidents;

**(3)** a summary of the results of evaluations required to be performed under section 3555;

**(4)** an assessment of agency compliance with standards promulgated under section 11331 of title 40; and

**(5)** an assessment of agency compliance with data breach notification policies and procedures issued by the Director.

**(d) National security systems.**--Except for the authorities and functions described in subsection (a)(5) and subsection (c), the authorities and functions of the Director and the Secretary under this section shall not apply to national security systems.

**(e) Department of Defense and intelligence community systems.**--**(1)** The authorities of the Director described in paragraphs (1) and (2) of subsection (a) shall be delegated to the Secretary of Defense in the case of systems described in paragraph (2) and to the Director of National Intelligence in the case of systems described in paragraph (3).

TD_0000484

**(2)** The systems described in this paragraph are systems that are operated by the Department of Defense, a contractor of the Department of Defense, or another entity on behalf of the Department of Defense that processes any information the unauthorized access, use, disclosure, disruption, modification, or destruction of which would have a debilitating impact on the mission of the Department of Defense.

**(3)** The systems described in this paragraph are systems that are operated by an element of the intelligence community, a contractor of an element of the intelligence community, or another entity on behalf of an element of the intelligence community that processes any information the unauthorized access, use, disclosure, disruption, modification, or destruction of which would have a debilitating impact on the mission of an element of the intelligence community.

**(f) Consideration.**--

   **(1) In general.**--In carrying out the responsibilities under subsection (b), the Secretary shall consider any applicable standards or guidelines developed by the National Institute of Standards and Technology and issued by the Secretary of Commerce under section 11331 of title 40.

   **(2) Directives.**--The Secretary shall--

      **(A)** consult with the Director of the National Institute of Standards and Technology regarding any binding operational directive that implements standards and guidelines developed by the National Institute of Standards and Technology; and

      **(B)** ensure that binding operational directives issued under subsection (b)(2) do not conflict with the standards and guidelines issued under section 11331 of title 40.

   **(3) Rule of construction.**--Nothing in this subchapter shall be construed as authorizing the Secretary to direct the Secretary of Commerce in the development and promulgation of standards and guidelines under section 11331 of title 40.

**(g) Exercise of authority.**--To ensure fiscal and policy consistency, the Secretary shall exercise the authority under this section subject to direction by the President, in coordination with the Director.

**(h) Direction to agencies.**--

   **(1) Authority.**--

      **(A) In general.**--Subject to subparagraph (B), in response to a known or reasonably suspected information security threat, vulnerability, or incident that represents a substantial threat to the information security of an agency, the Secretary may issue an emergency directive to the head of an agency to take any lawful action with respect to the operation of the information system, including such systems used or operated by another entity on behalf of an agency, that collects, processes, stores, transmits, disseminates, or otherwise maintains agency information, for the purpose of protecting the information system from, or mitigating, an information security threat.

TD_0000485

**(B) Exception.**--The authorities of the Secretary under this subsection shall not apply to a system described subsection (d) or to a system described in paragraph (2) or (3) of subsection (e).

**(2) Procedures for use of authority.**--The Secretary shall--

**(A)** in coordination with the Director, and in consultation with Federal contractors as appropriate, establish procedures governing the circumstances under which a directive may be issued under this subsection, which shall include--

**(i)** thresholds and other criteria;

**(ii)** privacy and civil liberties protections; and

**(iii)** providing notice to potentially affected third parties;

**(B)** specify the reasons for the required action and the duration of the directive;

**(C)** minimize the impact of a directive under this subsection by--

**(i)** adopting the least intrusive means possible under the circumstances to secure the agency information systems; and

**(ii)** limiting directives to the shortest period practicable;

**(D)** notify the Director and the head of any affected agency immediately upon the issuance of a directive under this subsection;

**(E)** consult with the Director of the National Institute of Standards and Technology regarding any directive under this subsection that implements standards and guidelines developed by the National Institute of Standards and Technology;

**(F)** ensure that directives issued under this subsection do not conflict with the standards and guidelines issued under section 11331 of title 40;

**(G)** consider any applicable standards or guidelines developed by the National Institute of Standards and Technology issued by the Secretary of Commerce under section 11331 of title 40; and

**(H)** not later than February 1 of each year, submit to the appropriate congressional committees a report regarding the specific actions the Secretary has taken pursuant to paragraph (1)(A).

TD_0000486

**(3) Imminent threats.**--

**(A) In general.**--Notwithstanding section 3554, the Secretary may authorize the use under this subsection of the intrusion detection and prevention capabilities established under section 230(b)(1) of the Homeland Security Act of 2002 for the purpose of ensuring the security of agency information systems, if--

**(i)** the Secretary determines there is an imminent threat to agency information systems;

**(ii)** the Secretary determines a directive under subsection (b)(2)(C) or paragraph (1)(A) is not reasonably likely to result in a timely response to the threat;

**(iii)** the Secretary determines the risk posed by the imminent threat outweighs any adverse consequences reasonably expected to result from the use of the intrusion detection and prevention capabilities under the control of the Secretary;

**(iv)** the Secretary provides prior notice to the Director, and the head and chief information officer (or equivalent official) of each agency to which specific actions will be taken pursuant to this paragraph, and notifies the appropriate congressional committees and authorizing committees of each such agency within 7 days of taking an action under this paragraph of--

**(I)** any action taken under this paragraph; and

**(II)** the reasons for and duration and nature of the action;

**(v)** the action of the Secretary is consistent with applicable law; and

**(vi)** the Secretary authorizes the use of the intrusion detection and prevention capabilities in accordance with the advance procedures established under subparagraph (C).

**(B) Limitation on delegation.**--The authority under this paragraph may not be delegated by the Secretary.

**(C) Advance procedures.**--The Secretary shall, in coordination with the Director, and in consultation with the heads of Federal agencies, establish procedures governing the circumstances under which the Secretary may authorize the use of the intrusion detection and prevention capabilities under subparagraph (A). The Secretary shall submit the procedures to Congress.

**(4) Limitation.**--The Secretary may direct or authorize lawful action or the use of the intrusion detection and prevention capabilities under this subsection only to--

**(A)** protect agency information from unauthorized access, use, disclosure, disruption, modification, or destruction; or

TD_0000487

**(B)** require the remediation of or protect against identified information security risks with respect to--

**(i)** information collected or maintained by or on behalf of an agency; or

**(ii)** that portion of an information system used or operated by an agency or by a contractor of an agency or other organization on behalf of an agency.

**(i) Annual report to Congress.**--Not later than February 1 of each year, the Director and the Secretary shall submit to the appropriate congressional committees a report regarding the specific actions the Director and the Secretary have taken pursuant to subsection (a)(5), including any actions taken pursuant to section 11303(b)(5) of title 40.

**(j) Rule of construction.**--Nothing in this section shall be construed to require the Secretary to provide notice to any private entity before the Secretary issues a binding operational directive under subsection (b)(2).

**(k) Appropriate congressional committees defined.**--In this section, the term "appropriate congressional committees" means--

**(1)** the Committee on Appropriations and the Committee on Homeland Security and Governmental Affairs of the Senate; and

**(2)** the Committee on Appropriations, the Committee on Homeland Security, the Committee on Oversight and Government Reform, and the Committee on Science, Space, and Technology of the House of Representatives.

**(l) Information sharing.**--

**(1) In general.**--Notwithstanding any other provision of law, including any provision of law that would otherwise restrict or prevent the head of an agency from disclosing information to the Secretary, the Secretary in carrying out this section and title XXII of the Homeland Security Act of 2002 (6 U.S.C. 651 et seq.) may access, use, retain, and disclose, and the head of an agency may disclose to the Secretary, information, for the purpose of protecting information and information systems from cybersecurity risks.

**(2) Exception.**--Paragraph (1) shall not apply to national security systems or to information systems described in paragraph (2) or (3) of subsection (e).

## CREDIT(S)

(Added Pub.L. 113-283, § 2(a), Dec. 18, 2014, 128 Stat. 3075; amended Pub.L. 114-113, Div. N, Title II, §§ 224(e), 229(a), Dec. 18, 2015, 129 Stat. 2967, 2972; Pub.L. 115-390, Title II, § 204(a)(1), Dec. 21, 2018, 132 Stat. 5192; Pub.L. 116-92, Div. E, Title LXIV, § 6432, Dec. 20, 2019, 133 Stat. 2200; Pub.L. 116-283, Div. A, Title XVII, § 1705, Jan. 1, 2021, 134 Stat. 4082.)

44 U.S.C.A. § 3553, 44 USCA § 3553

TD_0000488

Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000489

United States Code Annotated
  Title 44. Public Printing and Documents (Refs & Annos)
    Chapter 35. Coordination of Federal Information Policy (Refs & Annos)
      Subchapter II. Information Security

44 U.S.C.A. § 3554

§ 3554. Federal agency responsibilities

Currentness

**(a) In general.**--The head of each agency shall--

**(1)** be responsible for--

**(A)** providing information security protections commensurate with the risk and magnitude of the harm resulting from unauthorized access, use, disclosure, disruption, modification, or destruction of--

**(i)** information collected or maintained by or on behalf of the agency; and

**(ii)** information systems used or operated by an agency or by a contractor of an agency or other organization on behalf of an agency;

**(B)** complying with the requirements of this subchapter, subchapter III of chapter 13 of title 41, and related policies, procedures, standards, and guidelines, including--

**(i)** information security standards promulgated under section 11331 of title 40;

**(ii)** operational directives developed by the Secretary under section 3553(b);

**(iii)** policies and procedures issued by the Director;

**(iv)** information security standards and guidelines for national security systems issued in accordance with law and as directed by the President;

**(v)** emergency directives issued by the Secretary under section 3553(h); and

**(vi)** responsibilities relating to assessing and avoiding, mitigating, transferring, or accepting supply chain risks under section 1326 of title 41, and complying with exclusion and removal orders issued under section 1323 of such title; and

**(C)** ensuring that information security management processes are integrated with agency strategic, operational, and budgetary planning processes;

**(2)** ensure that senior agency officials provide information security for the information and information systems that support the operations and assets under their control, including through--

**(A)** assessing the risk and magnitude of the harm that could result from the unauthorized access, use, disclosure, disruption, modification, or destruction of such information or information systems;

**(B)** determining the levels of information security appropriate to protect such information and information systems in accordance with standards promulgated under section 11331 of title 40, for information security classifications and related requirements;

**(C)** implementing policies and procedures to cost-effectively reduce risks to an acceptable level; and

**(D)** periodically testing and evaluating information security controls and techniques to ensure that they are effectively implemented;

**(3)** delegate to the agency Chief Information Officer established under section 3506 (or comparable official in an agency not covered by such section) the authority to ensure compliance with the requirements imposed on the agency under this subchapter, including--

**(A)** designating a senior agency information security officer who shall--

**(i)** carry out the Chief Information Officer's responsibilities under this section;

**(ii)** possess professional qualifications, including training and experience, required to administer the functions described under this section;

**(iii)** have information security duties as that official's primary duty; and

**(iv)** head an office with the mission and resources to assist in ensuring agency compliance with this section;

**(B)** developing and maintaining an agencywide information security program as required by subsection (b);

**(C)** developing and maintaining information security policies, procedures, and control techniques to address all applicable requirements, including those issued under section 3553 of this title and section 11331 of title 40;

TD_0000491

**(D)** training and overseeing personnel with significant responsibilities for information security with respect to such responsibilities; and

**(E)** assisting senior agency officials concerning their responsibilities under paragraph (2);

**(4)** ensure that the agency has trained personnel sufficient to assist the agency in complying with the requirements of this subchapter and related policies, procedures, standards, and guidelines;

**(5)** ensure that the agency Chief Information Officer, in coordination with other senior agency officials, reports annually to the agency head on the effectiveness of the agency information security program, including progress of remedial actions;

**(6)** ensure that senior agency officials, including chief information officers of component agencies or equivalent officials, carry out responsibilities under this subchapter as directed by the official delegated authority under paragraph (3); and

**(7)** ensure that all personnel are held accountable for complying with the agency-wide information security program implemented under subsection (b).

**(b) Agency program.**--Each agency shall develop, document, and implement an agency-wide information security program to provide information security for the information and information systems that support the operations and assets of the agency, including those provided or managed by another agency, contractor, or other source, that includes--

**(1)** periodic assessments of the risk and magnitude of the harm that could result from the unauthorized access, use, disclosure, disruption, modification, or destruction of information and information systems that support the operations and assets of the agency, which may include using automated tools consistent with standards and guidelines promulgated under section 11331 of title 40;

**(2)** policies and procedures that--

   **(A)** are based on the risk assessments required by paragraph (1);

   **(B)** cost-effectively reduce information security risks to an acceptable level;

   **(C)** ensure that information security is addressed throughout the life cycle of each agency information system; and

   **(D)** ensure compliance with--

     **(i)** the requirements of this subchapter;

TD_0000492

**(ii)** policies and procedures as may be prescribed by the Director, and information security standards promulgated under section 11331 of title 40;

**(iii)** minimally acceptable system configuration requirements, as determined by the agency; and

**(iv)** any other applicable requirements, including standards and guidelines for national security systems issued in accordance with law and as directed by the President;

**(3)** subordinate plans for providing adequate information security for networks, facilities, and systems or groups of information systems, as appropriate;

**(4)** security awareness training to inform personnel, including contractors and other users of information systems that support the operations and assets of the agency, of--

**(A)** information security risks associated with their activities; and

**(B)** their responsibilities in complying with agency policies and procedures designed to reduce these risks;

**(5)** periodic testing and evaluation of the effectiveness of information security policies, procedures, and practices, to be performed with a frequency depending on risk, but no less than annually, of which such testing--

**(A)** shall include testing of management, operational, and technical controls of every information system identified in the inventory required under section 3505(c); [1]

**(B)** may include testing relied on in an evaluation under section 3555; and

**(C)** shall include using automated tools, consistent with standards and guidelines promulgated under section 11331 of title 40;

**(6)** a process for planning, implementing, evaluating, and documenting remedial action to address any deficiencies in the information security policies, procedures, and practices of the agency;

**(7)** procedures for detecting, reporting, and responding to security incidents, which--

**(A)** shall be consistent with the standards and guidelines described in section 3556(b);

**(B)** may include using automated tools; and

TD_0000493

**(C)** shall include--

    **(i)** mitigating risks associated with such incidents before substantial damage is done;

    **(ii)** notifying and consulting with the Federal information security incident center established in section 3556; and

    **(iii)** notifying and consulting with, as appropriate--

        **(I)** law enforcement agencies and relevant Offices of Inspector General and Offices of General Counsel;

        **(II)** an office designated by the President for any incident involving a national security system;

        **(III)** for a major incident, the committees of Congress described in subsection (c)(1)--

            **(aa)** not later than 7 days after the date on which there is a reasonable basis to conclude that the major incident has occurred; and

            **(bb)** after the initial notification under item (aa), within a reasonable period of time after additional information relating to the incident is discovered, including the summary required under subsection (c)(1)(A)(i); and

        **(IV)** any other agency or office, in accordance with law or as directed by the President; and

**(8)** plans and procedures to ensure continuity of operations for information systems that support the operations and assets of the agency.

**(c) Agency reporting.**--

    **(1) Annual report.**--

    **(A) In general.**--Each agency shall submit to the Director, the Secretary, the Committee on Government Reform, the Committee on Homeland Security, and the Committee on Science of the House of Representatives, the Committee on Homeland Security and Governmental Affairs and the Committee on Commerce, Science, and Transportation of the Senate, the appropriate authorization and appropriations committees of Congress, and the Comptroller General a report on the adequacy and effectiveness of information security policies, procedures, and practices, including--

        **(i)** a description of each major information security incident or related sets of incidents, including summaries of--

            **(I)** the threats and threat actors, vulnerabilities, and impacts relating to the incident;

TD_0000494

**(II)** the risk assessments conducted under section 3554(a)(2)(A) of the affected information systems before the date on which the incident occurred;

**(III)** the status of compliance of the affected information systems with applicable security requirements at the time of the incident; and

**(IV)** the detection, response, and remediation actions;

**(ii)** the total number of information security incidents, including a description of incidents resulting in significant compromise of information security, system impact levels, types of incident, and locations of affected systems;

**(iii)** a description of each major information security incident that involved a breach of personally identifiable information, as defined by the Director, including--

**(I)** the number of individuals whose information was affected by the major information security incident; and

**(II)** a description of the information that was breached or exposed; and

**(iv)** any other information as the Director or the Secretary, in consultation with the Director, may require.

**(B) Unclassified report.**--

**(i) In general.**--Each report submitted under subparagraph (A) shall be in unclassified form, but may include a classified annex.

**(ii) Access to information.**--The head of an agency shall ensure that, to the greatest extent practicable, information is included in the unclassified version of the reports submitted by the agency under subparagraph (A).

**(2) Other plans and reports.**--Each agency shall address the adequacy and effectiveness of information security policies, procedures, and practices in management plans and reports.

**(d) Performance plan.--(1)** In addition to the requirements of subsection (c), each agency, in consultation with the Director, shall include as part of the performance plan required under section 1115 of title 31 a description of--

**(A)** the time periods; and

TD_0000495

**(B)** the resources, including budget, staffing, and training, that are necessary to implement the program required under subsection (b).

**(2)** The description under paragraph (1) shall be based on the risk assessments required under subsection (b)(1).

**(e) Public notice and comment.**--Each agency shall provide the public with timely notice and opportunities for comment on proposed information security policies and procedures to the extent that such policies and procedures affect communication with the public.

## CREDIT(S)

(Added Pub.L. 113-283, § 2(a), Dec. 18, 2014, 128 Stat. 3078; amended Pub.L. 114-113, Div. N, Title II, § 229(b), Dec. 18, 2015, 129 Stat. 2974; Pub.L. 115-390, Title II, § 204(a)(2), Dec. 21, 2018, 132 Stat. 5193.)

Notes of Decisions (2)

---

## Footnotes

1        So in original. Section 3505 contains two subsecs. (c).

44 U.S.C.A. § 3554, 44 USCA § 3554
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 44. Public Printing and Documents (Refs & Annos)
      Chapter 35. Coordination of Federal Information Policy (Refs & Annos)
         Subchapter II. Information Security

44 U.S.C.A. § 3555

§ 3555. Annual independent evaluation

Currentness

**(a) In general.**--**(1)** Each year each agency shall have performed an independent evaluation of the information security program and practices of that agency to determine the effectiveness of such program and practices.

**(2)** Each evaluation under this section shall include--

**(A)** testing of the effectiveness of information security policies, procedures, and practices of a representative subset of the agency's information systems;

**(B)** an assessment of the effectiveness of the information security policies, procedures, and practices of the agency; and

**(C)** separate presentations, as appropriate, regarding information security relating to national security systems.

**(b) Independent auditor.**--Subject to subsection (c)--

**(1)** for each agency with an Inspector General appointed under chapter 4 of title 5, the annual evaluation required by this section shall be performed by the Inspector General or by an independent external auditor, as determined by the Inspector General of the agency; and

**(2)** for each agency to which paragraph (1) does not apply, the head of the agency shall engage an independent external auditor to perform the evaluation.

**(c) National security systems.**--For each agency operating or exercising control of a national security system, that portion of the evaluation required by this section directly relating to a national security system shall be performed--

**(1)** only by an entity designated by the agency head; and

**(2)** in such a manner as to ensure appropriate protection for information associated with any information security vulnerability in such system commensurate with the risk and in accordance with all applicable laws.

TD_0000497

**(d) Existing evaluations.**--The evaluation required by this section may be based in whole or in part on an audit, evaluation, or report relating to programs or practices of the applicable agency.

**(e) Agency reporting.**--**(1)** Each year, not later than such date established by the Director, the head of each agency shall submit to the Director the results of the evaluation required under this section.

**(2)** To the extent an evaluation required under this section directly relates to a national security system, the evaluation results submitted to the Director shall contain only a summary and assessment of that portion of the evaluation directly relating to a national security system.

**(f) Protection of information.**--Agencies and evaluators shall take appropriate steps to ensure the protection of information which, if disclosed, may adversely affect information security. Such protections shall be commensurate with the risk and comply with all applicable laws and regulations.

**(g) OMB reports to Congress.**--**(1)** The Director shall summarize the results of the evaluations conducted under this section in the report to Congress required under section 3553(c).

**(2)** The Director's report to Congress under this subsection shall summarize information regarding information security relating to national security systems in such a manner as to ensure appropriate protection for information associated with any information security vulnerability in such system commensurate with the risk and in accordance with all applicable laws.

**(3)** Evaluations and any other descriptions of information systems under the authority and control of the Director of National Intelligence or of National Foreign Intelligence Programs systems under the authority and control of the Secretary of Defense shall be made available to Congress only through the appropriate oversight committees of Congress, in accordance with applicable laws.

**(h) Comptroller General.**--The Comptroller General shall periodically evaluate and report to Congress on--

**(1)** the adequacy and effectiveness of agency information security policies and practices; and

**(2)** implementation of the requirements of this subchapter.

**(i) Assessment technical assistance.**--The Comptroller General may provide technical assistance to an Inspector General or the head of an agency, as applicable, to assist the Inspector General or head of an agency in carrying out the duties under this section, including by testing information security controls and procedures.

**(j) Guidance.**--The Director, in consultation with the Secretary, the Chief Information Officers Council established under section 3603, the Council of the Inspectors General on Integrity and Efficiency, and other interested parties as appropriate, shall ensure the development of guidance for evaluating the effectiveness of an information security program and practices.

TD_0000498

## CREDIT(S)

(Added Pub.L. 113-283, § 2(a), Dec. 18, 2014, 128 Stat. 3082; amended Pub.L. 117-286, § 4(b)(89), Dec. 27, 2022, 136 Stat. 4352.)

44 U.S.C.A. § 3555, 44 USCA § 3555
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000499

United States Code Annotated
    Title 44. Public Printing and Documents (Refs & Annos)
        Chapter 35. Coordination of Federal Information Policy (Refs & Annos)
            Subchapter II. Information Security

44 U.S.C.A. § 3556

§ 3556. Federal information security incident center

Currentness

**(a) In general.**--The Secretary shall ensure the operation of a central Federal information security incident center to--

**(1)** provide timely technical assistance to operators of agency information systems regarding security incidents, including guidance on detecting and handling information security incidents;

**(2)** compile and analyze information about incidents that threaten information security;

**(3)** inform operators of agency information systems about current and potential information security threats, and vulnerabilities;

**(4)** provide, as appropriate, intelligence and other information about cyber threats, vulnerabilities, and incidents to agencies to assist in risk assessments conducted under section 3554(b); and

**(5)** consult with the National Institute of Standards and Technology, agencies or offices operating or exercising control of national security systems (including the National Security Agency), and such other agencies or offices in accordance with law and as directed by the President regarding information security incidents and related matters.

**(b) National security systems.**--Each agency operating or exercising control of a national security system shall share information about information security incidents, threats, and vulnerabilities with the Federal information security incident center to the extent consistent with standards and guidelines for national security systems, issued in accordance with law and as directed by the President.

**CREDIT(S)**

(Added Pub.L. 113-283, § 2(a), Dec. 18, 2014, 128 Stat. 3084.)

44 U.S.C.A. § 3556, 44 USCA § 3556
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**                             © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000500

§ 3557. National security systems, 44 USCA § 3557

United States Code Annotated
    Title 44. Public Printing and Documents (Refs & Annos)
        Chapter 35. Coordination of Federal Information Policy (Refs & Annos)
            Subchapter II. Information Security

44 U.S.C.A. § 3557

§ 3557. National security systems

Currentness

The head of each agency operating or exercising control of a national security system shall be responsible for ensuring that the agency--

**(1)** provides information security protections commensurate with the risk and magnitude of the harm resulting from the unauthorized access, use, disclosure, disruption, modification, or destruction of the information contained in such system;

**(2)** implements information security policies and practices as required by standards and guidelines for national security systems, issued in accordance with law and as directed by the President; and

**(3)** complies with the requirements of this subchapter.

**CREDIT(S)**

(Added Pub.L. 113-283, § 2(a), Dec. 18, 2014, 128 Stat. 3084.)

44 U.S.C.A. § 3557, 44 USCA § 3557
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000501

United States Code Annotated
  Title 44. Public Printing and Documents (Refs & Annos)
    Chapter 35. Coordination of Federal Information Policy (Refs & Annos)
      Subchapter II. Information Security

44 U.S.C.A. § 3558

§ 3558. Effect on existing law

Currentness

Nothing in this subchapter, section 11331 of title 40, or section 20 of the National Standards [1] and Technology Act (15 U.S.C. 278g-3) may be construed as affecting the authority of the President, the Office of Management and Budget or the Director thereof, the National Institute of Standards and Technology, or the head of any agency, with respect to the authorized use or disclosure of information, including with regard to the protection of personal privacy under section 552a of title 5, the disclosure of information under section 552 of title 5, the management and disposition of records under chapters [2] 29, 31, or 33 of title 44, the management of information resources under subchapter I of chapter 35 of this title, or the disclosure of information to the Congress or the Comptroller General of the United States.

**CREDIT(S)**

(Added Pub.L. 113-283, § 2(a), Dec. 18, 2014, 128 Stat. 3084.)

Notes of Decisions (1)

---

**Footnotes**

1       So in original. Probably should read "National Institute of Standards".

2       So in original. Probably should be "chapter".

44 U.S.C.A. § 3558, 44 USCA § 3558
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000502

United States Code Annotated
   Title 44. Public Printing and Documents (Refs & Annos)
      Chapter 35. Coordination of Federal Information Policy (Refs & Annos)
         Subchapter II. Information Security

44 U.S.C.A. § 3559

§ 3559. Federal websites required to be mobile friendly

Currentness

**(a) In general.**--If, on or after the date that is 180 days after the date of the enactment of this section, an agency creates a website that is intended for use by the public or conducts a redesign of an existing legacy website that is intended for use by the public, the agency shall ensure to the greatest extent practicable that the website is mobile friendly.

**(b) Definitions.**--In this section:

  **(1) Agency.**--The term "agency" has the meaning given that term in section 551 of title 5.

  **(2) Mobile friendly.**--The term "mobile friendly" means, with respect to a website, that the website is configured in such a way that the website may be navigated, viewed, and accessed on a smartphone, tablet computer, or similar mobile device.

**CREDIT(S)**

(Added Pub.L. 115-114, § 2(a), Jan. 10, 2018, 131 Stat. 2278.)

44 U.S.C.A. § 3559, 44 USCA § 3559
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1346

§ 1346. United States as defendant

Currentness

**(a)** The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

**(1)** Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;

**(2)** Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

**(b)(1)** Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

**(2)** No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18).

**(c)** The jurisdiction conferred by this section includes jurisdiction of any set-off, counterclaim, or other claim or demand whatever on the part of the United States against any plaintiff commencing an action under this section.

**(d)** The district courts shall not have jurisdiction under this section of any civil action or claim for a pension.

TD_0000504

**(e)** The district courts shall have original jurisdiction of any civil action against the United States provided in section 6226, 6228(a), 7426, or 7428 (in the case of the United States district court for the District of Columbia) or section 7429 of the Internal Revenue Code of 1986.

**(f)** The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States.

**(g)** Subject to the provisions of chapter 179, the district courts of the United States shall have exclusive jurisdiction over any civil action commenced under section 453(2) of title 3, by a covered employee under chapter 5 of such title.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 933; Apr. 25, 1949, c. 92, § 2(a), 63 Stat. 62; May 24, 1949, c. 139, § 80(a), (b), 63 Stat. 101; Oct. 31, 1951, c. 655, § 50(b), 65 Stat. 727; July 30, 1954, c. 648, § 1, 68 Stat. 589; Pub.L. 85-508, § 12(e), July 7, 1958, 72 Stat. 348; Pub.L. 88-519, Aug. 30, 1964, 78 Stat. 699; Pub.L. 89-719, Title II, § 202(a), Nov. 2, 1966, 80 Stat. 1148; Pub.L. 91-350, § 1(a), July 23, 1970, 84 Stat. 449; Pub.L. 92-562, § 1, Oct. 25, 1972, 86 Stat. 1176; Pub.L. 94-455, Title XII, § 1204(c)(1), Title XIII, § 1306(b)(7), Oct. 4, 1976, 90 Stat. 1697, 1719; Pub.L. 95-563, § 14(a), Nov. 1, 1978, 92 Stat. 2389; Pub.L. 97-164, Title I, § 129, Apr. 2, 1982, 96 Stat. 39; Pub.L. 97-248, Title IV, § 402(c)(17), Sept. 3, 1982, 96 Stat. 669; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 102-572, Title IX, § 902(b)(1), Oct. 29, 1992, 106 Stat. 4516; Pub.L. 104-134, Title I, § 101[(a)][Title VIII, § 806], Apr. 26, 1996, 110 Stat. 1321, 1321-75; renumbered Title I, Pub.L. 104-140, § 1(a), May 2, 1996, 110 Stat. 1327; amended Pub.L. 104-331, § 3(b)(1), Oct. 26, 1996, 110 Stat. 4069; Pub.L. 111-350, § 5(g)(6), Jan. 4, 2011, 124 Stat. 3848; Pub.L. 113-4, Title XI, § 1101(b), Mar. 7, 2013, 127 Stat. 134.)

Notes of Decisions (4305)

28 U.S.C.A. § 1346, 28 USCA § 1346
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000505

Federal Register

Vol. 90, No. 19

Thursday, January 30, 2025

# Presidential Documents

Title 3—

The President

## Executive Order 14161 of January 20, 2025

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2**. *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3.** *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

PL 113-283, December 18, 2014, 128 Stat 3073

UNITED STATES PUBLIC LAWS

113th Congress - Second Session

Convening January 04, 2014

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed
Vetoes are indicated by ~~Text~~ ;
stricken material by ~~Text~~ .

PL 113–283 [S 2521]

December 18, 2014

FEDERAL INFORMATION SECURITY MODERNIZATION ACT OF 2014

An Act To amend chapter 35 of title 44, United States Code, to provide for reform to Federal information security.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

## SECTION 1. SHORT TITLE.

<< 44 USCA § 101 NOTE >>

This Act may be cited as the "Federal Information Security Modernization Act of 2014".

## SEC. 2. FISMA REFORM.

<< 44 USCA T. 44 ch. 35 subch. II prec. § 3531 >>

<< 44 USCA § 3531 >>

<< 44 USCA § 3532 >>

<< 44 USCA § 3533 >>

<< 44 USCA § 3534 >>

<< 44 USCA § 3535 >>

<< 44 USCA § 3536 >>

<< 44 USCA § 3537 >>

<< 44 USCA § 3538 >>

<< 44 USCA T. 44 ch. 35 subch. III prec. § 3541 >>

<< 44 USCA § 3541 >>

TD_0000509

<< 44 USCA § 3542 >>

<< 44 USCA § 3543 >>

<< 44 USCA § 3544 >>

<< 44 USCA § 3545 >>

<< 44 USCA § 3546 >>

<< 44 USCA § 3547 >>

<< 44 USCA § 3548 >>

<< 44 USCA § 3549 >>

(a) IN GENERAL.—Chapter 35 of title 44, United States Code, is amended by striking subchapters II and III and inserting the following:

T. 44 ch. 35 subch. II prec. § 3551

"SUBCHAPTER II—INFORMATION SECURITY

<< 44 USCA § 3551 >>

### § 3551. Purposes

"The purposes of this subchapter are to—

"(1) provide a comprehensive framework for ensuring the effectiveness of information security controls over information resources that support Federal operations and assets;

"(2) recognize the highly networked nature of the current Federal computing environment and provide effective governmentwide management and oversight of the related information security risks, including coordination of information security efforts throughout the civilian, national security, and law enforcement communities;

"(3) provide for development and maintenance of minimum controls required to protect Federal information and information systems;

"(4) provide a mechanism for improved oversight of Federal agency information security programs, including through automated security tools to continuously diagnose and improve security;

"(5) acknowledge that commercially developed information security products offer advanced, dynamic, robust, and effective information security solutions, reflecting market solutions for the protection of critical information infrastructures important to the national defense and economic security of the nation that are designed, built, and operated by the private sector; and

"(6) recognize that the selection of specific technical hardware and software information security solutions should be  **\*3074** left to individual agencies from among commercially developed products.

<< 44 USCA § 3552 >>

### § 3552. Definitions

"(a) IN GENERAL.—Except as provided under subsection (b), the definitions under section 3502 shall apply to this subchapter.

TD_0000510

"(b) ADDITIONAL DEFINITIONS.—As used in this subchapter:

"(1) The term 'binding operational directive' means a compulsory direction to an agency that—

"(A) is for purposes of safeguarding Federal information and information systems from a known or reasonably suspected information security threat, vulnerability, or risk;

"(B) shall be in accordance with policies, principles, standards, and guidelines issued by the Director; and

"(C) may be revised or repealed by the Director if the direction issued on behalf of the Director is not in accordance with policies and principles developed by the Director.

"(2) The term 'incident' means an occurrence that—

"(A) actually or imminently jeopardizes, without lawful authority, the integrity, confidentiality, or availability of information or an information system; or

"(B) constitutes a violation or imminent threat of violation of law, security policies, security procedures, or acceptable use policies.

"(3) The term 'information security' means protecting information and information systems from unauthorized access, use, disclosure, disruption, modification, or destruction in order to provide—

"(A) integrity, which means guarding against improper information modification or destruction, and includes ensuring information nonrepudiation and authenticity;

"(B) confidentiality, which means preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information; and

"(C) availability, which means ensuring timely and reliable access to and use of information.

"(4) The term 'information technology' has the meaning given that term in section 11101 of title 40.

"(5) The term 'intelligence community' has the meaning given that term in section 3(4) of the National Security Act of 1947 (50 U.S.C. 3003(4)).

"(6)(A) The term 'national security system' means any information system (including any telecommunications system) used or operated by an agency or by a contractor of an agency, or other organization on behalf of an agency—

"(i) the function, operation, or use of which—

"(I) involves intelligence activities;

"(II) involves cryptologic activities related to national security;

"(III) involves command and control of military forces;

"(IV) involves equipment that is an integral part of a weapon or weapons system; or

*3075
"(V) subject to subparagraph (B), is critical to the direct fulfillment of military or intelligence missions; or

"(ii) is protected at all times by procedures established for information that have been specifically authorized under criteria established by an Executive order or an Act of Congress to be kept classified in the interest of national defense or foreign policy.

"(B) Subparagraph (A)(i)(V) does not include a system that is to be used for routine administrative and business applications (including payroll, finance, logistics, and personnel management applications).

"(7) The term 'Secretary' means the Secretary of Homeland Security.

<< 44 USCA § 3553 >>

### § 3553. Authority and functions of the Director and the Secretary

"(a) DIRECTOR.—The Director shall oversee agency information security policies and practices, including—

"(1) developing and overseeing the implementation of policies, principles, standards, and guidelines on information security, including through ensuring timely agency adoption of and compliance with standards promulgated under section 11331 of title 40;

"(2) requiring agencies, consistent with the standards promulgated under such section 11331 and the requirements of this subchapter, to identify and provide information security protections commensurate with the risk and magnitude of the harm resulting from the unauthorized access, use, disclosure, disruption, modification, or destruction of—

"(A) information collected or maintained by or on behalf of an agency; or

"(B) information systems used or operated by an agency or by a contractor of an agency or other organization on behalf of an agency;

"(3) ensuring that the Secretary carries out the authorities and functions under subsection (b);

"(4) coordinating the development of standards and guidelines under section 20 of the National Institute of Standards and Technology Act (15 U.S.C. 278g–3) with agencies and offices operating or exercising control of national security systems (including the National Security Agency) to assure, to the maximum extent feasible, that such standards and guidelines are complementary with standards and guidelines developed for national security systems;

"(5) overseeing agency compliance with the requirements of this subchapter, including through any authorized action under section 11303 of title 40, to enforce accountability for compliance with such requirements; and

"(6) coordinating information security policies and procedures with related information resources management policies and procedures.

"(b) SECRETARY.—The Secretary, in consultation with the Director, shall administer the implementation of agency information security policies and practices for information systems, except for national security systems and information systems described in paragraph (2) or (3) of subsection (e), including—

**\*3076**

"(1) assisting the Director in carrying out the authorities and functions under paragraphs (1), (2), (3), (5), and (6) of subsection (a);

"(2) developing and overseeing the implementation of binding operational directives to agencies to implement the policies, principles, standards, and guidelines developed by the Director under subsection (a)(1) and the requirements of this

TD_0000512

subchapter, which may be revised or repealed by the Director if the operational directives issued on behalf of the Director are not in accordance with policies, principles, standards, and guidelines developed by the Director, including—

"(A) requirements for reporting security incidents to the Federal information security incident center established under section 3556;

"(B) requirements for the contents of the annual reports required to be submitted under section 3554(c)(1);

"(C) requirements for the mitigation of exigent risks to information systems; and

"(D) other operational requirements as the Director or Secretary, in consultation with the Director, may determine necessary;

"(3) monitoring agency implementation of information security policies and practices;

"(4) convening meetings with senior agency officials to help ensure effective implementation of information security policies and practices;

"(5) coordinating Government-wide efforts on information security policies and practices, including consultation with the Chief Information Officers Council established under section 3603 and the Director of the National Institute of Standards and Technology;

"(6) providing operational and technical assistance to agencies in implementing policies, principles, standards, and guidelines on information security, including implementation of standards promulgated under section 11331 of title 40, including by—

"(A) operating the Federal information security incident center established under section 3556;

"(B) upon request by an agency, deploying technology to assist the agency to continuously diagnose and mitigate against cyber threats and vulnerabilities, with or without reimbursement;

"(C) compiling and analyzing data on agency information security; and

"(D) developing and conducting targeted operational evaluations, including threat and vulnerability assessments, on the information systems; and

"(7) other actions as the Director or the Secretary, in consultation with the Director, may determine necessary to carry out this subsection.

"(c) REPORT.—Not later than March 1 of each year, the Director, in consultation with the Secretary, shall submit to Congress a report on the effectiveness of information security policies and practices during the preceding year, including—

"(1) a summary of the incidents described in the annual reports required to be submitted under section 3554(c)(1), **\*3077** including a summary of the information required under section 3554(c)(1)(A)(iii);

"(2) a description of the threshold for reporting major information security incidents;

"(3) a summary of the results of evaluations required to be performed under section 3555;

"(4) an assessment of agency compliance with standards promulgated under section 11331 of title 40; and

"(5) an assessment of agency compliance with data breach notification policies and procedures issued by the Director.

"(d) NATIONAL SECURITY SYSTEMS.—Except for the authorities and functions described in subsection (a)(5) and subsection (c), the authorities and functions of the Director and the Secretary under this section shall not apply to national security systems.

TD_0000513

"(e) DEPARTMENT OF DEFENSE AND INTELLIGENCE COMMUNITY SYSTEMS.—(1) The authorities of the Director described in paragraphs (1) and (2) of subsection (a) shall be delegated to the Secretary of Defense in the case of systems described in paragraph (2) and to the Director of National Intelligence in the case of systems described in paragraph (3).

"(2) The systems described in this paragraph are systems that are operated by the Department of Defense, a contractor of the Department of Defense, or another entity on behalf of the Department of Defense that processes any information the unauthorized access, use, disclosure, disruption, modification, or destruction of which would have a debilitating impact on the mission of the Department of Defense.

"(3) The systems described in this paragraph are systems that are operated by an element of the intelligence community, a contractor of an element of the intelligence community, or another entity on behalf of an element of the intelligence community that processes any information the unauthorized access, use, disclosure, disruption, modification, or destruction of which would have a debilitating impact on the mission of an element of the intelligence community.

"(f) CONSIDERATION.—

"(1) IN GENERAL.—In carrying out the responsibilities under subsection (b), the Secretary shall consider any applicable standards or guidelines developed by the National Institute of Standards and Technology and issued by the Secretary of Commerce under section 11331 of title 40.

"(2) DIRECTIVES.—The Secretary shall—

"(A) consult with the Director of the National Institute of Standards and Technology regarding any binding operational directive that implements standards and guidelines developed by the National Institute of Standards and Technology; and

"(B) ensure that binding operational directives issued under subsection (b)(2) do not conflict with the standards and guidelines issued under section 11331 of title 40.

"(3) RULE OF CONSTRUCTION.—Nothing in this subchapter shall be construed as authorizing the Secretary to direct the Secretary of Commerce in the development and promulgation of standards and guidelines under section 11331 of title 40.

"(g) EXERCISE OF AUTHORITY.—To ensure fiscal and policy consistency, the Secretary shall exercise the authority under this **\*3078** section subject to direction by the President, in coordination with the Director.

<< 44 USCA § 3554 >>

### § 3554. Federal agency responsibilities

"(a) IN GENERAL.—The head of each agency shall—

"(1) be responsible for—

"(A) providing information security protections commensurate with the risk and magnitude of the harm resulting from unauthorized access, use, disclosure, disruption, modification, or destruction of—

"(i) information collected or maintained by or on behalf of the agency; and

"(ii) information systems used or operated by an agency or by a contractor of an agency or other organization on behalf of an agency;

"(B) complying with the requirements of this subchapter and related policies, procedures, standards, and guidelines, including—

TD_0000514

"(i) information security standards promulgated under section 11331 of title 40;

"(ii) operational directives developed by the Secretary under section 3553(b);

"(iii) policies and procedures issued by the Director; and

"(iv) information security standards and guidelines for national security systems issued in accordance with law and as directed by the President; and

"(C) ensuring that information security management processes are integrated with agency strategic, operational, and budgetary planning processes;

"(2) ensure that senior agency officials provide information security for the information and information systems that support the operations and assets under their control, including through—

"(A) assessing the risk and magnitude of the harm that could result from the unauthorized access, use, disclosure, disruption, modification, or destruction of such information or information systems;

"(B) determining the levels of information security appropriate to protect such information and information systems in accordance with standards promulgated under section 11331 of title 40, for information security classifications and related requirements;

"(C) implementing policies and procedures to cost-effectively reduce risks to an acceptable level; and

"(D) periodically testing and evaluating information security controls and techniques to ensure that they are effectively implemented;

"(3) delegate to the agency Chief Information Officer established under section 3506 (or comparable official in an agency not covered by such section) the authority to ensure compliance with the requirements imposed on the agency under this subchapter, including—

"(A) designating a senior agency information security officer who shall—

"(i) carry out the Chief Information Officer's responsibilities under this section;

**\*3079**
"(ii) possess professional qualifications, including training and experience, required to administer the functions described under this section;

"(iii) have information security duties as that official's primary duty; and

"(iv) head an office with the mission and resources to assist in ensuring agency compliance with this section;

"(B) developing and maintaining an agencywide information security program as required by subsection (b);

"(C) developing and maintaining information security policies, procedures, and control techniques to address all applicable requirements, including those issued under section 3553 of this title and section 11331 of title 40;

"(D) training and overseeing personnel with significant responsibilities for information security with respect to such responsibilities; and

"(E) assisting senior agency officials concerning their responsibilities under paragraph (2);

TD_0000515

"(4) ensure that the agency has trained personnel sufficient to assist the agency in complying with the requirements of this subchapter and related policies, procedures, standards, and guidelines;

"(5) ensure that the agency Chief Information Officer, in coordination with other senior agency officials, reports annually to the agency head on the effectiveness of the agency information security program, including progress of remedial actions;

"(6) ensure that senior agency officials, including chief information officers of component agencies or equivalent officials, carry out responsibilities under this subchapter as directed by the official delegated authority under paragraph (3); and

"(7) ensure that all personnel are held accountable for complying with the agency-wide information security program implemented under subsection (b).

"(b) AGENCY PROGRAM.—Each agency shall develop, document, and implement an agency-wide information security program to provide information security for the information and information systems that support the operations and assets of the agency, including those provided or managed by another agency, contractor, or other source, that includes—

"(1) periodic assessments of the risk and magnitude of the harm that could result from the unauthorized access, use, disclosure, disruption, modification, or destruction of information and information systems that support the operations and assets of the agency, which may include using automated tools consistent with standards and guidelines promulgated under section 11331 of title 40;

"(2) policies and procedures that—

"(A) are based on the risk assessments required by paragraph (1);

"(B) cost-effectively reduce information security risks to an acceptable level;

"(C) ensure that information security is addressed throughout the life cycle of each agency information system; and

**\*3080**

"(D) ensure compliance with—

"(i) the requirements of this subchapter;

"(ii) policies and procedures as may be prescribed by the Director, and information security standards promulgated under section 11331 of title 40;

"(iii) minimally acceptable system configuration requirements, as determined by the agency; and

"(iv) any other applicable requirements, including standards and guidelines for national security systems issued in accordance with law and as directed by the President;

"(3) subordinate plans for providing adequate information security for networks, facilities, and systems or groups of information systems, as appropriate;

"(4) security awareness training to inform personnel, including contractors and other users of information systems that support the operations and assets of the agency, of—

"(A) information security risks associated with their activities; and

TD_0000516

"(B) their responsibilities in complying with agency policies and procedures designed to reduce these risks;

"(5) periodic testing and evaluation of the effectiveness of information security policies, procedures, and practices, to be performed with a frequency depending on risk, but no less than annually, of which such testing—

"(A) shall include testing of management, operational, and technical controls of every information system identified in the inventory required under section 3505(c);

"(B) may include testing relied on in an evaluation under section 3555; and

"(C) shall include using automated tools, consistent with standards and guidelines promulgated under section 11331 of title 40;

"(6) a process for planning, implementing, evaluating, and documenting remedial action to address any deficiencies in the information security policies, procedures, and practices of the agency;

"(7) procedures for detecting, reporting, and responding to security incidents, which—

"(A) shall be consistent with the standards and guidelines described in section 3556(b);

"(B) may include using automated tools; and

"(C) shall include—

"(i) mitigating risks associated with such incidents before substantial damage is done;

"(ii) notifying and consulting with the Federal information security incident center established in section 3556; and

"(iii) notifying and consulting with, as appropriate—

"(I) law enforcement agencies and relevant Offices of Inspector General and Offices of General Counsel;

"(II) an office designated by the President for any incident involving a national security system;

"(III) for a major incident, the committees of Congress described in subsection (c)(1)—

**\*3081**

"(aa) not later than 7 days after the date on which there is a reasonable basis to conclude that the major incident has occurred; and

"(bb) after the initial notification under item (aa), within a reasonable period of time after additional information relating to the incident is discovered, including the summary required under subsection (c)(1)(A)(i); and

"(IV) any other agency or office, in accordance with law or as directed by the President; and

"(8) plans and procedures to ensure continuity of operations for information systems that support the operations and assets of the agency.

"(c) AGENCY REPORTING.—

TD_0000517

"(1) ANNUAL REPORT.—

"(A) IN GENERAL.—Each agency shall submit to the Director, the Secretary, the Committee on Government Reform, the Committee on Homeland Security, and the Committee on Science of the House of Representatives, the Committee on Homeland Security and Governmental Affairs and the Committee on Commerce, Science, and Transportation of the Senate, the appropriate authorization and appropriations committees of Congress, and the Comptroller General a report on the adequacy and effectiveness of information security policies, procedures, and practices, including—

"(i) a description of each major information security incident or related sets of incidents, including summaries of—

"(I) the threats and threat actors, vulnerabilities, and impacts relating to the incident;

"(II) the risk assessments conducted under section 3554(a)(2)(A) of the affected information systems before the date on which the incident occurred;

"(III) the status of compliance of the affected information systems with applicable security requirements at the time of the incident; and

"(IV) the detection, response, and remediation actions;

"(ii) the total number of information security incidents, including a description of incidents resulting in significant compromise of information security, system impact levels, types of incident, and locations of affected systems;

"(iii) a description of each major information security incident that involved a breach of personally identifiable information, as defined by the Director, including—

"(I) the number of individuals whose information was affected by the major information security incident; and

"(II) a description of the information that was breached or exposed; and

**\*3082**
"(iv) any other information as the Director or the Secretary, in consultation with the Director, may require.

"(B) UNCLASSIFIED REPORT.—

"(i) IN GENERAL.—Each report submitted under subparagraph (A) shall be in unclassified form, but may include a classified annex.

"(ii) ACCESS TO INFORMATION.—The head of an agency shall ensure that, to the greatest extent practicable, information is included in the unclassified version of the reports submitted by the agency under subparagraph (A).

"(2) OTHER PLANS AND REPORTS.—Each agency shall address the adequacy and effectiveness of information security policies, procedures, and practices in management plans and reports.

"(d) PERFORMANCE PLAN.—(1) In addition to the requirements of subsection (c), each agency, in consultation with the Director, shall include as part of the performance plan required under section 1115 of title 31 a description of—

"(A) the time periods; and

TD_0000518

"(B) the resources, including budget, staffing, and training, that are necessary to implement the program required under subsection (b).

"(2) The description under paragraph (1) shall be based on the risk assessments required under subsection (b)(1).

"(e) PUBLIC NOTICE AND COMMENT.—Each agency shall provide the public with timely notice and opportunities for comment on proposed information security policies and procedures to the extent that such policies and procedures affect communication with the public.

<< 44 USCA § 3555 >>

### § 3555. Annual independent evaluation

"(a) IN GENERAL.—(1) Each year each agency shall have performed an independent evaluation of the information security program and practices of that agency to determine the effectiveness of such program and practices.

"(2) Each evaluation under this section shall include—

"(A) testing of the effectiveness of information security policies, procedures, and practices of a representative subset of the agency's information systems;

"(B) an assessment of the effectiveness of the information security policies, procedures, and practices of the agency; and

"(C) separate presentations, as appropriate, regarding information security relating to national security systems.

"(b) INDEPENDENT AUDITOR.—Subject to subsection (c)—

"(1) for each agency with an Inspector General appointed under the Inspector General Act of 1978, the annual evaluation required by this section shall be performed by the Inspector General or by an independent external auditor, as determined by the Inspector General of the agency; and

"(2) for each agency to which paragraph (1) does not apply, the head of the agency shall engage an independent external auditor to perform the evaluation.

"(c) NATIONAL SECURITY SYSTEMS.—For each agency operating or exercising control of a national security system, that portion **\*3083** of the evaluation required by this section directly relating to a national security system shall be performed—

"(1) only by an entity designated by the agency head; and

"(2) in such a manner as to ensure appropriate protection for information associated with any information security vulnerability in such system commensurate with the risk and in accordance with all applicable laws.

"(d) EXISTING EVALUATIONS.—The evaluation required by this section may be based in whole or in part on an audit, evaluation, or report relating to programs or practices of the applicable agency.

"(e) AGENCY REPORTING.—(1) Each year, not later than such date established by the Director, the head of each agency shall submit to the Director the results of the evaluation required under this section.

"(2) To the extent an evaluation required under this section directly relates to a national security system, the evaluation results submitted to the Director shall contain only a summary and assessment of that portion of the evaluation directly relating to a national security system.

TD_0000519

"(f) PROTECTION OF INFORMATION.—Agencies and evaluators shall take appropriate steps to ensure the protection of information which, if disclosed, may adversely affect information security. Such protections shall be commensurate with the risk and comply with all applicable laws and regulations.

"(g) OMB REPORTS TO CONGRESS.—(1) The Director shall summarize the results of the evaluations conducted under this section in the report to Congress required under section 3553(c).

"(2) The Director's report to Congress under this subsection shall summarize information regarding information security relating to national security systems in such a manner as to ensure appropriate protection for information associated with any information security vulnerability in such system commensurate with the risk and in accordance with all applicable laws.

"(3) Evaluations and any other descriptions of information systems under the authority and control of the Director of National Intelligence or of National Foreign Intelligence Programs systems under the authority and control of the Secretary of Defense shall be made available to Congress only through the appropriate oversight committees of Congress, in accordance with applicable laws.

"(h) COMPTROLLER GENERAL.—The Comptroller General shall periodically evaluate and report to Congress on—

    "(1) the adequacy and effectiveness of agency information security policies and practices; and

    "(2) implementation of the requirements of this subchapter.

"(i) ASSESSMENT TECHNICAL ASSISTANCE.—The Comptroller General may provide technical assistance to an Inspector General or the head of an agency, as applicable, to assist the Inspector General or head of an agency in carrying out the duties under this section, including by testing information security controls and procedures.

"(j) GUIDANCE.—The Director, in consultation with the Secretary, the Chief Information Officers Council established under section 3603, the Council of the Inspectors General on Integrity and Efficiency, and other interested parties as appropriate, shall ensure the development of guidance for evaluating the effectiveness of an information security program and practices.

**\*3084**

<< 44 USCA § 3556 >>

### § 3556. Federal information security incident center

"(a) IN GENERAL.—The Secretary shall ensure the operation of a central Federal information security incident center to—

    "(1) provide timely technical assistance to operators of agency information systems regarding security incidents, including guidance on detecting and handling information security incidents;

    "(2) compile and analyze information about incidents that threaten information security;

    "(3) inform operators of agency information systems about current and potential information security threats, and vulnerabilities;

    "(4) provide, as appropriate, intelligence and other information about cyber threats, vulnerabilities, and incidents to agencies to assist in risk assessments conducted under section 3554(b); and

TD_0000520

"(5) consult with the National Institute of Standards and Technology, agencies or offices operating or exercising control of national security systems (including the National Security Agency), and such other agencies or offices in accordance with law and as directed by the President regarding information security incidents and related matters.

"(b) NATIONAL SECURITY SYSTEMS.—Each agency operating or exercising control of a national security system shall share information about information security incidents, threats, and vulnerabilities with the Federal information security incident center to the extent consistent with standards and guidelines for national security systems, issued in accordance with law and as directed by the President.

<< 44 USCA § 3557 >>

### § 3557. National security systems

"The head of each agency operating or exercising control of a national security system shall be responsible for ensuring that the agency—

"(1) provides information security protections commensurate with the risk and magnitude of the harm resulting from the unauthorized access, use, disclosure, disruption, modification, or destruction of the information contained in such system;

"(2) implements information security policies and practices as required by standards and guidelines for national security systems, issued in accordance with law and as directed by the President; and

"(3) complies with the requirements of this subchapter.

<< 44 USCA § 3558 >>

### § 3558. Effect on existing law

"Nothing in this subchapter, section 11331 of title 40, or section 20 of the National Standards and Technology Act (15 U.S.C. 278g–3) may be construed as affecting the authority of the President, the Office of Management and Budget or the Director thereof, the National Institute of Standards and Technology, or the head of any agency, with respect to the authorized use or disclosure of information, including with regard to the protection of personal privacy under section 552a of title 5, the disclosure of information under section 552 of title 5, the management and disposition of records under chapters 29, 31, or 33 of title 44, the management of information resources under subchapter I of chapter 35 of this  **\*3085**  title, or the disclosure of information to the Congress or the Comptroller General of the United States.".

<< 44 USCA § 3554 NOTE >>

(b) MAJOR INCIDENT.—The Director of the Office of Management and Budget shall—

(1) develop guidance on what constitutes a major incident for purposes of section 3554(b) of title 44, United States Code, as added by subsection (a); and

(2) provide to Congress periodic briefings on the status of the developing of the guidance until the date on which the guidance is issued.

(c) CONTINUOUS DIAGNOSTICS.—During the 2 year period beginning on the date of enactment of this Act, the Director of the Office of Management and Budget, with the assistance of the Secretary of Homeland Security, shall include in each report

TD_0000521

submitted under section 3553(c) of title 44, United States Code, as added by subsection (a), an assessment of the adoption by agencies of continuous diagnostics technologies, including through the Continuous Diagnostics and Mitigation program, and other advanced security tools to provide information security, including challenges to the adoption of such technologies or security tools.

<< 44 USCA § 3553 NOTE >>

(d) BREACHES.—

(1) REQUIREMENTS.—The Director of the Office of Management and Budget shall ensure that data breach notification policies and guidelines are updated periodically and require—

(A) except as provided in paragraph (4), notice by the affected agency to each committee of Congress described in section 3554(c)(1) of title 44, United States Code, as added by subsection (a), the Committee on the Judiciary of the Senate, and the Committee on the Judiciary of the House of Representatives, which shall—

(i) be provided expeditiously and not later than 30 days after the date on which the agency discovered the unauthorized acquisition or access; and

(ii) include—

(I) information about the breach, including a summary of any information that the agency knows on the date on which notification is provided about how the breach occurred;

(II) an estimate of the number of individuals affected by the breach, based on information that the agency knows on the date on which notification is provided, including an assessment of the risk of harm to affected individuals;

(III) a description of any circumstances necessitating a delay in providing notice to affected individuals; and

TD_0000522

(IV) an estimate of whether and when the agency will provide notice to affected individuals; and

(B) notice by the affected agency to affected individuals, pursuant to data breach notification policies and guidelines, which shall be provided as expeditiously as practicable and without unreasonable delay after the agency discovers the unauthorized acquisition or access.

(2) NATIONAL SECURITY; LAW ENFORCEMENT; REMEDIATION.—The Attorney General, the head of an element of the intelligence community (as such term is defined under section **\*3086** 3(4) of the National Security Act of 1947 (50 U.S.C. 3003(4)), or the Secretary of Homeland Security may delay the notice to affected individuals under paragraph (1)(B) if the notice would disrupt a law enforcement investigation, endanger national security, or hamper security remediation actions.

(3) REPORTS.—

(A) DIRECTOR OF OMB.—During the first 2 years beginning after the date of enactment of this Act, the Director of the Office of Management and Budget shall, on an annual basis—

(i) assess agency implementation of data breach notification policies and guidelines in aggregate; and

(ii) include the assessment described in clause (i) in the report required under section 3553(c) of title 44, United States Code.

(B) SECRETARY OF HOMELAND SECURITY.—During the first 2 years beginning after the date of enactment of this Act, the Secretary of Homeland Security shall include an assessment of the status of agency implementation of data breach notification policies and guidelines in the requirements under section 3553(b)(2)(B) of title 44, United States Code.

(4) EXCEPTION.—Any element of the intelligence community (as such term is defined under section 3(4) of the National Security Act of 1947 (50 U.S.C. 3003(4)) that is required to provide notice under paragraph (1)(A) shall only provide such notice to appropriate committees of Congress.

(5) RULE OF CONSTRUCTION.—Nothing in paragraph (1) shall be construed to alter any authority of a Federal agency or department.

TD_0000523

(e) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 44 USCA T. 44 ch. 35 subch. I prec. § 3501 >>

(1) TABLE OF SECTIONS.—The table of sections for chapter 35 of title 44, United States Code is amended by striking the matter relating to subchapters II and III and inserting the following:
SUBCHAPTER II—INFORMATION SECURITY

"3551. Purposes.

"3552. Definitions.

"3553. Authority and functions of the Director and the Secretary.

"3554. Federal agency responsibilities.

"3555. Annual independent evaluation.

"3556. Federal information security incident center.

"3557. National security systems.

"3558. Effect on existing law.".

<< 15 USCA § 7406 >>

(2) CYBERSECURITY RESEARCH AND DEVELOPMENT ACT.—Section 8(d)(1) of the Cybersecurity Research and Development Act (15 U.S.C. 7406) is amended by striking "section 3534" and inserting "section 3554".

(3) HOMELAND SECURITY ACT OF 2002.—The Homeland Security Act of 2002 (6 U.S.C. 101 et seq.) is amended—

(A) in section 223 (6 U.S.C. 143)

<< 6 USCA § 143 >>

(i) in the section heading, by inserting "**FEDERAL AND**" BEFORE "**NON–FEDERAL**";

<< 6 USCA § 143 >>

TD_0000524

(ii) in the matter preceding paragraph (1), by striking "the Under Secretary for Intelligence and Analysis, in cooperation with the Assistant Secretary for Infrastructure Protection" and inserting "the Under Secretary appointed under section 103(a)(1)(H)";

**\*3087**

<< 6 USCA § 143 >>

(iii) in paragraph (2), by striking the period at the end and inserting "; and"; and

(iv) by adding at the end the following:

<< 6 USCA § 143 >>

"(3) fulfill the responsibilities of the Secretary to protect Federal information systems under subchapter II of chapter 35 of title 44, United States Code.";

<< 6 USCA § 511 >>

(B) in section 1001(c)(1)(A) (6 U.S.C. 511(c)(1)(A)), by striking "section 3532(3)" and inserting "section 3552(b)(5)"; and

(C) in the table of contents in section 1(b), by striking the item relating to section 223 and inserting the following: "Sec. 223. Enhancement of Federal and non-Federal cybersecurity.".

(4) NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY ACT.—Section 20 of the National Institute of Standards and Technology Act (15 U.S.C. 278g–3) is amended—

<< 15 USCA § 278g–3 >>

(A) in subsection (a)(2), by striking "section 3532(b)(2)" and inserting "section 3552(b)(5)"; and

(B) in subsection (e)—

TD_0000525

<< 15 USCA § 278g–3 >>

(i) in paragraph (2), by striking "section 3532(1)" and inserting "section 3552(b)(2)"; and

<< 15 USCA § 278g–3 >>

(ii) in paragraph (5), by striking "section 3532(b)(2)" and inserting "section 3552(b)(5)".

(5) TITLE 10.—Title 10, United States Code, is amended—

<< 10 USCA § 2222 >>

(A) in section 2222(j)(5), by striking "section 3542(b)(2)" and inserting "section 3552(b)(5)";

<< 10 USCA § 2223 >>

(B) in section 2223(c)(3), by striking "section 3542(b)(2)" and inserting "section 3552(b)(5)"; and

<< 10 USCA § 2315 >>

(C) in section 2315, by striking "section 3542(b)(2)" and inserting "section 3552(b)(5)".

(f) OTHER PROVISIONS.—

(1) CIRCULAR A–130.—Not later than 1 year after the date of enactment of this Act, the Director of the Office of Management and Budget shall amend or revise Office of Management and Budget Circular A–130 to eliminate inefficient or wasteful reporting. The Director of the Office of Management and Budget shall provide quarterly briefings to Congress on the status of the amendment or revision required under this paragraph.

(2) ISPAB.—Section 21(b) of the National Institute of Standards and Technology Act (15 U.S.C. 278g–4(b)) is amended—

<< 15 USCA § 278g–4 >>

(A) in paragraph (2), by inserting ", the Secretary of Homeland Security," after "the Institute"; and

TD_0000526

**\*3088**

<< 15 USCA § 278g–4 >>

(B) in paragraph (3), by inserting "the Secretary of Homeland Security," after "the Secretary of Commerce,".

Approved December 18, 2014.

<u>LEGISLATIVE HISTORY</u>—S. 2521:

SENATE REPORTS: No. 113–256 (Comm. on Homeland Security and Governmental Affairs).

CONGRESSIONAL RECORD, Vol. 160 (2014):

Dec. 8, considered and passed Senate.

Dec. 10, considered and passed House.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**NIST Special Publication 800-53**
**Revision 5**

# Security and Privacy Controls for Information Systems and Organizations

**JOINT TASK FORCE**

This publication is available free of charge from:
https://doi.org/10.6028/NIST.SP.800-53r5



NIST Special Publication 800-53
Revision 5

# Security and Privacy Controls for Information Systems and Organizations

**JOINT TASK FORCE**

This publication is available free of charge from:
https://doi.org/10.6028/NIST.SP.800-53r5

**September 2020**
INCLUDES UPDATES AS OF 12-10-2020; SEE PAGE XVII



U.S. Department of Commerce
*Wilbur L. Ross, Jr., Secretary*

National Institute of Standards and Technology
*Walter Copan, NIST Director and Under Secretary of Commerce for Standards and Technology*

# Authority

This publication has been developed by NIST to further its statutory responsibilities under the Federal Information Security Modernization Act (FISMA), 44 U.S.C. § 3551 *et seq.*, Public Law (P.L.) 113-283. NIST is responsible for developing information security standards and guidelines, including minimum requirements for federal information systems. Such information security standards and guidelines shall not apply to national security systems without the express approval of the appropriate federal officials exercising policy authority over such systems. This guideline is consistent with the requirements of the Office of Management and Budget (OMB) Circular A-130.

Nothing in this publication should be taken to contradict the standards and guidelines made mandatory and binding on federal agencies by the Secretary of Commerce under statutory authority. Nor should these guidelines be interpreted as altering or superseding the existing authorities of the Secretary of Commerce, OMB Director, or any other federal official. This publication may be used by nongovernmental organizations on a voluntary basis and is not subject to copyright in the United States. Attribution would, however, be appreciated by NIST.

National Institute of Standards and Technology Special Publication 800-53, Revision 5
Natl. Inst. Stand. Technol. Spec. Publ. 800-53, Rev. 5, **492 pages** (September 2020)

CODEN: NSPUE2

This publication is available free of charge from:
https://doi.org/10.6028/NIST.SP.800-53r5

Certain commercial entities, equipment, or materials may be identified in this document to describe an experimental procedure or concept adequately. Such identification is not intended to imply recommendation or endorsement by NIST, nor is it intended to imply that the entities, materials, or equipment are necessarily the best available for the purpose.

There may be references in this publication to other publications currently under development by NIST in accordance with its assigned statutory responsibilities. The information in this publication, including concepts, practices, and methodologies may be used by federal agencies even before the completion of such companion publications. Thus, until each publication is completed, current requirements, guidelines, and procedures, where they exist, remain operative. For planning and transition purposes, federal agencies may wish to closely follow the development of these new publications by NIST.

Organizations are encouraged to review draft publications during the designated public comment periods and provide feedback to NIST. Many NIST publications, other than the ones noted above, are available at https://csrc.nist.gov/publications.

**Comments on this publication may be submitted to:**

National Institute of Standards and Technology
Attn: Computer Security Division, Information Technology Laboratory
100 Bureau Drive (Mail Stop 8930) Gaithersburg, MD 20899-8930
Email: sec-cert@nist.gov

All comments are subject to release under the Freedom of Information Act (FOIA) [FOIA96].

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

TD_0000530

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

## Reports on Computer Systems Technology

The National Institute of Standards and Technology (NIST) Information Technology Laboratory (ITL) promotes the U.S. economy and public welfare by providing technical leadership for the Nation's measurement and standards infrastructure. ITL develops tests, test methods, reference data, proof of concept implementations, and technical analyses to advance the development and productive use of information technology (IT). ITL's responsibilities include the development of management, administrative, technical, and physical standards and guidelines for the cost-effective security of other than national security-related information in federal information systems. The Special Publication 800-series reports on ITL's research, guidelines, and outreach efforts in information systems security and privacy and its collaborative activities with industry, government, and academic organizations.

## Abstract

This publication provides a catalog of security and privacy controls for information systems and organizations to protect organizational operations and assets, individuals, other organizations, and the Nation from a diverse set of threats and risks, including hostile attacks, human errors, natural disasters, structural failures, foreign intelligence entities, and privacy risks. The controls are flexible and customizable and implemented as part of an organization-wide process to manage risk. The controls address diverse requirements derived from mission and business needs, laws, executive orders, directives, regulations, policies, standards, and guidelines. Finally, the consolidated control catalog addresses security and privacy from a functionality perspective (i.e., the strength of functions and mechanisms provided by the controls) and from an assurance perspective (i.e., the measure of confidence in the security or privacy capability provided by the controls). Addressing functionality and assurance helps to ensure that information technology products and the systems that rely on those products are sufficiently trustworthy.

## Keywords

Assurance; availability; computer security; confidentiality; control; cybersecurity; FISMA; information security; information system; integrity; personally identifiable information; Privacy Act; privacy controls; privacy functions; privacy requirements; Risk Management Framework; security controls; security functions; security requirements; system; system security.

TD_0000531

# Acknowledgements

This publication was developed by the *Joint Task Force* Interagency Working Group. The group includes representatives from the civil, defense, and intelligence communities. The National Institute of Standards and Technology wishes to acknowledge and thank the senior leaders from the Department of Commerce, Department of Defense, the Office of the Director of National Intelligence, the Committee on National Security Systems, and the members of the interagency working group whose dedicated efforts contributed significantly to this publication.

## Department of Defense

Dana Deasy
*Chief Information Officer*

John Sherman
*Principal Deputy CIO*

Mark Hakun
*Deputy CIO for Cybersecurity and DoD SISO*

Kevin Dulany
*Director, Cybersecurity Policy and Partnerships*

## Office of the Director of National Intelligence

Matthew A. Kozma
*Chief Information Officer*

Michael E. Waschull
*Deputy Chief Information Officer*

Clifford M. Conner
*Cybersecurity Group and IC CISO*

Vacant
*Director, Security Coordination Center*

## National Institute of Standards and Technology

Charles H. Romine
*Director, Information Technology Laboratory*

Kevin Stine
*Acting Cybersecurity Advisor, ITL*

Matthew Scholl
*Chief, Computer Security Division*

Kevin Stine
*Chief, Applied Cybersecurity Division*

Ron Ross
*FISMA Implementation Project Leader*

## Committee on National Security Systems

Mark G. Hakun
*Chair*

Susan Dorr
*Co-Chair*

Kevin Dulany
*Tri-Chair—Defense Community*

Chris Johnson
*Tri-Chair—Intelligence Community*

Vicki Michetti
*Tri-Chair—Civil Agencies*

## Joint Task Force Working Group

Victoria Pillitteri
*NIST, JTF Leader*

Ehijele Olumese
*The MITRE Corporation*

Esten Porter
*The MITRE Corporation*

David Black
*The MITRE Corporation*

Eduardo Takamura
*NIST*

McKay Tolboe
*DoD*

Lydia Humphries
*Booz Allen Hamilton*

Julie Nethery Snyder
*The MITRE Corporation*

Rich Graubart
*The MITRE Corporation*

Ned Goren
*NIST*

Dorian Pappas
*Intelligence Community*

Daniel Faigin
*Aerospace Corporation*

Christina Sames
*The MITRE Corporation*

Peter Duspiva
*Intelligence Community*

Andrew Regenscheid
*NIST*

Kelley Dempsey
*NIST*

Naomi Lefkovitz
*NIST*

Christian Enloe
*NIST*

Kaitlin Boeckl
*NIST*

Jon Boyens
*NIST*

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

In addition to the above acknowledgments, a special note of thanks goes to Jeff Brewer, Jim Foti, and the NIST web team for their outstanding administrative support. The authors also wish to recognize Kristen Baldwin, Carol Bales, John Bazile, Jennifer Besceglie, Sean Brooks, Ruth Cannatti, Kathleen Coupe, Keesha Crosby, Charles Cutshall, Ja'Nelle DeVore, Jennifer Fabius, Jim Fenton, Hildy Ferraiolo, Ryan Galluzzo, Robin Gandhi, Mike Garcia, Paul Grassi, Marc Groman, Matthew Halstead, Kevin Herms, Scott Hill, Ralph Jones, Martin Kihiko, Raquel Leone, Jason Marsico, Kirsten Moncada, Ellen Nadeau, Elaine Newton, Michael Nieles, Michael Nussdorfer, Taylor Roberts, Jasmeet Seehra, Joe Stuntz, Jeff Williams, the professional staff from the NIST Computer Security Division and Applied Cybersecurity Division, and the representatives from the Federal CIO Council, Federal CISO Council, Federal Privacy Council, Control Baseline Interagency Working Group, Security and Privacy Collaboration Working Group, and Federal Privacy Council Risk Management Subcommittee for their ongoing contributions in helping to improve the content of the publication. Finally, the authors gratefully acknowledge the contributions from individuals and organizations in the public and private sectors, both nationally and internationally, whose insightful and constructive comments improved the overall quality, thoroughness, and usefulness of this publication.

### HISTORICAL CONTRIBUTIONS TO NIST SPECIAL PUBLICATION 800-53

The authors wanted to acknowledge the many individuals who contributed to previous versions of Special Publication 800-53 since its inception in 2005. They include Marshall Abrams, Dennis Bailey, Lee Badger, Curt Barker, Matthew Barrett, Nadya Bartol, Frank Belz, Paul Bicknell, Deb Bodeau, Paul Brusil, Brett Burley, Bill Burr, Dawn Cappelli, Roger Caslow, Corinne Castanza, Mike Cooper, Matt Coose, Dominic Cussatt, George Dinolt, Randy Easter, Kurt Eleam, Denise Farrar, Dave Ferraiolo, Cita Furlani, Harriett Goldman, Peter Gouldmann, Tim Grance, Jennifer Guild, Gary Guissane, Sarbari Gupta, Priscilla Guthrie, Richard Hale, Peggy Himes, Bennett Hodge, William Hunteman, Cynthia Irvine, Arnold Johnson, Roger Johnson, Donald Jones, Lisa Kaiser, Stuart Katzke, Sharon Keller, Tom Kellermann, Cass Kelly, Eustace King, Daniel Klemm, Steve LaFountain, Annabelle Lee, Robert Lentz, Steven Lipner, William MacGregor, Thomas Macklin, Thomas Madden, Robert Martin, Erika McCallister, Tim McChesney, Michael McEvilley, Rosalie McQuaid, Peter Mell, John Mildner, Pam Miller, Sandra Miravalle, Joji Montelibano, Douglas Montgomery, George Moore, Rama Moorthy, Mark Morrison, Harvey Newstrom, Sherrill Nicely, Robert Niemeyer, LouAnna Notargiacomo, Pat O'Reilly, Tim Polk, Karen Quigg, Steve Quinn, Mark Riddle, Ed Roback, Cheryl Roby, George Rogers, Scott Rose, Mike Rubin, Karen Scarfone, Roger Schell, Jackie Snouffer, Ray Snouffer, Murugiah Souppaya, Gary Stoneburner, Keith Stouffer, Marianne Swanson, Pat Toth, Glenda Turner, Patrick Viscuso, Joe Weiss, Richard Wilsher, Mark Wilson, John Woodward, and Carol Woody.

TD_0000533

## Patent Disclosure Notice

*NOTICE: The Information Technology Laboratory (ITL) has requested that holders of patent claims whose use may be required for compliance with the guidance or requirements of this publication disclose such patent claims to ITL. However, holders of patents are not obligated to respond to ITL calls for patents and ITL has not undertaken a patent search in order to identify which, if any, patents may apply to this publication.*

*As of the date of publication and following call(s) for the identification of patent claims whose use may be required for compliance with the guidance or requirements of this publication, no such patent claims have been identified to ITL.*

*No representation is made or implied by ITL that licenses are not required to avoid patent infringement in the use of this publication.*

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

v

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

---

**RISK MANAGEMENT**

Organizations must exercise *due diligence* in managing information security and privacy risk. This is accomplished, in part, by establishing a comprehensive risk management program that uses the flexibility inherent in NIST publications to categorize systems, select and implement security and privacy controls that meet mission and business needs, assess the effectiveness of the controls, authorize the systems for operation, and continuously monitor the systems. Exercising due diligence and implementing robust and comprehensive information security and privacy risk management programs can facilitate compliance with applicable laws, regulations, executive orders, and governmentwide policies. Risk management frameworks and risk management processes are essential in developing, implementing, and maintaining the protection measures necessary to address stakeholder needs and the current threats to organizational operations and assets, individuals, other organizations, and the Nation. Employing effective risk-based processes, procedures, methods, and technologies ensures that information systems and organizations have the necessary trustworthiness and resiliency to support essential mission and business functions, the U.S. critical infrastructure, and continuity of government.

TD_0000535

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

**COMMON SECURITY AND PRIVACY FOUNDATIONS**

In working with the Office of Management and Budget to develop standards and guidelines required by FISMA, NIST consults with federal agencies, state, local, and tribal governments, and private sector organizations to improve information security and privacy, avoid unnecessary and costly duplication of effort, and help ensure that its publications are complementary with the standards and guidelines used for the protection of national security systems. In addition to a comprehensive and transparent public review and comment process, NIST is engaged in a collaborative partnership with the Office of Management and Budget, Office of the Director of National Intelligence, Department of Defense, Committee on National Security Systems, Federal CIO Council, and Federal Privacy Council to establish a Risk Management Framework (RMF) for information security and privacy for the Federal Government. This common foundation provides the Federal Government and their contractors with cost-effective, flexible, and consistent ways to manage security and privacy risks to organizational operations and assets, individuals, other organizations, and the Nation. The framework provides a basis for the reciprocal acceptance of security and privacy control assessment evidence and authorization decisions and facilitates information sharing and collaboration. NIST continues to work with public and private sector entities to establish mappings and relationships between the standards and guidelines developed by NIST and those developed by other organizations. NIST anticipates using these mappings and the gaps they identify to improve the control catalog.

TD_0000536

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

---

**DEVELOPMENT OF INFORMATION SYSTEMS, COMPONENTS, AND SERVICES**

With a renewed emphasis on the use of trustworthy, secure information systems and supply chain security, it is essential that organizations express their security and privacy requirements with clarity and specificity in order to obtain the systems, components, and services necessary for mission and business success. Accordingly, this publication provides controls in the System and Services Acquisition (SA) and Supply Chain Risk Management (SR) families that are directed at developers. The scope of the controls in those families includes information system, system component, and system service development *and* the associated developers whether the development is conducted internally by organizations or externally through the contracting and acquisition processes. The affected controls in the control catalog include SA-8, SA-10, SA-11, SA-15, SA-16, SA-17, SA-20, SA-21, SR-3, SR-4, SR-5, SR-6, SR-7, SR-8, SR-9, and SR-11.

---

TD_0000537

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

### INFORMATION SYSTEMS — A BROAD-BASED PERSPECTIVE

As we push computers to "the edge," building an increasingly complex world of interconnected systems and devices, security and privacy continue to dominate the national dialogue. There is an urgent need to further strengthen the underlying systems, products, and services that we depend on in every sector of the critical infrastructure to ensure that those systems, products, and services are sufficiently trustworthy and provide the necessary resilience to support the economic and national security interests of the United States. NIST Special Publication 800-53, Revision 5, responds to this need by embarking on a proactive and systemic approach to develop and make available to a broad base of public and private sector organizations a comprehensive set of security and privacy safeguarding measures for all types of computing platforms, including general purpose computing systems, cyber-physical systems, cloud systems, mobile systems, industrial control systems, and Internet of Things (IoT) devices. Safeguarding measures include both security and privacy controls to protect the critical and essential operations and assets of organizations and the privacy of individuals. The objective is to make the systems we depend on more penetration resistant to attacks, limit the damage from those attacks when they occur, and make the systems resilient, survivable, and protective of individuals' privacy.

**CONTROL BASELINES**

The control baselines that have previously been included in NIST Special Publication 800-53 have been relocated to NIST Special Publication 800-53B. SP 800-53B contains security and privacy control baselines for federal information systems and organizations. It provides guidance for tailoring control baselines and for developing overlays to support the security and privacy requirements of stakeholders and their organizations. CNSS Instruction 1253 provides control baselines and guidance for security categorization and security control selection for national security systems.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

x

**USE OF EXAMPLES IN THIS PUBLICATION**

Throughout this publication, *examples* are used to illustrate, clarify, or explain certain items in chapter sections, controls, and control enhancements. These examples are illustrative in nature and are *not* intended to limit or constrain the application of controls or control enhancements by organizations.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

TD_0000540

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

---

**FEDERAL RECORDS MANAGEMENT COLLABORATION**

Federal records management processes have a nexus with certain information security and privacy requirements and controls. For example, records officers may be managing records retention, including when records will be deleted. Collaborating with records officers on the selection and implementation of security and privacy controls related to records management can support consistency and efficiency and ultimately strengthen the organization's security and privacy posture.

---

TD_0000541

# Table of Contents

**CHAPTER ONE** INTRODUCTION ....................................................................................................1
   1.1 PURPOSE AND APPLICABILITY ................................................................................... 2
   1.2 TARGET AUDIENCE .................................................................................................. 3
   1.3 ORGANIZATIONAL RESPONSIBILITIES......................................................................... 3
   1.4 RELATIONSHIP TO OTHER PUBLICATIONS................................................................... 5
   1.5 REVISIONS AND EXTENSIONS ................................................................................... 5
   1.6 PUBLICATION ORGANIZATION ................................................................................. 5
**CHAPTER TWO** THE FUNDAMENTALS ..........................................................................................7
   2.1 REQUIREMENTS AND CONTROLS .............................................................................. 7
   2.2 CONTROL STRUCTURE AND ORGANIZATION ............................................................. 8
   2.3 CONTROL IMPLEMENTATION APPROACHES .............................................................. 11
   2.4 SECURITY AND PRIVACY CONTROLS ......................................................................... 13
   2.5 TRUSTWORTHINESS AND ASSURANCE ...................................................................... 14
**CHAPTER THREE** THE CONTROLS .............................................................................................16
   3.1 ACCESS CONTROL .................................................................................................. 18
   3.2 AWARENESS AND TRAINING .................................................................................. 59
   3.3 AUDIT AND ACCOUNTABILITY ................................................................................ 65
   3.4 ASSESSMENT, AUTHORIZATION, AND MONITORING................................................... 83
   3.5 CONFIGURATION MANAGEMENT ............................................................................ 96
   3.6 CONTINGENCY PLANNING ..................................................................................... 115
   3.7 IDENTIFICATION AND AUTHENTICATION ................................................................. 131
   3.8 INCIDENT RESPONSE ............................................................................................. 149
   3.9 MAINTENANCE .................................................................................................... 162
   3.10 MEDIA PROTECTION ........................................................................................... 171
   3.11 PHYSICAL AND ENVIRONMENTAL PROTECTION ....................................................... 179
   3.12 PLANNING ......................................................................................................... 194
   3.13 PROGRAM MANAGEMENT .................................................................................. 203
   3.14 PERSONNEL SECURITY ......................................................................................... 222
   3.15 PERSONALLY IDENTIFIABLE INFORMATION PROCESSING AND TRANSPARENCY ...................... 229
   3.16 RISK ASSESSMENT ............................................................................................... 238
   3.17 SYSTEM AND SERVICES ACQUISITION .................................................................... 249
   3.18 SYSTEM AND COMMUNICATIONS PROTECTION ....................................................... 292
   3.19 SYSTEM AND INFORMATION INTEGRITY ................................................................. 332
   3.20 SUPPLY CHAIN RISK MANAGEMENT ...................................................................... 363
**REFERENCES** ........................................................................................................................374
**APPENDIX A** GLOSSARY.........................................................................................................394
**APPENDIX B** ACRONYMS.......................................................................................................424
**APPENDIX C** CONTROL SUMMARIES .......................................................................................428

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

TD_0000542

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

# Executive Summary

As we push computers to "the edge," building an increasingly complex world of connected information systems and devices, security and privacy will continue to dominate the national dialogue. In its 2017 report, *Task Force on Cyber Deterrence* [DSB 2017], the Defense Science Board (DSB) provides a sobering assessment of the current vulnerabilities in the U.S. critical infrastructure and the information systems that support mission-essential operations and assets in the public and private sectors.

> *"…The Task Force notes that the cyber threat to U.S. critical infrastructure is outpacing efforts to reduce pervasive vulnerabilities, so that for the next decade at least the United States must lean significantly on deterrence to address the cyber threat posed by the most capable U.S. adversaries. It is clear that a more proactive and systematic approach to U.S. cyber deterrence is urgently needed…"*

There is an urgent need to further strengthen the underlying information systems, component products, and services that the Nation depends on in every sector of the critical infrastructure—ensuring that those systems, components, and services are sufficiently trustworthy and provide the necessary resilience to support the economic and national security interests of the United States. This update to NIST Special Publication (SP) 800-53 responds to the call by the DSB by embarking on a proactive and systemic approach to develop and make available to a broad base of public and private sector organizations a comprehensive set of safeguarding measures for all types of computing platforms, including general purpose computing systems, cyber-physical systems, cloud-based systems, mobile devices, Internet of Things (IoT) devices, weapons systems, space systems, communications systems, environmental control systems, super computers, and industrial control systems. Those safeguarding measures include implementing security and privacy controls to protect the critical and essential operations and assets of organizations and the privacy of individuals. The objectives are to make the information systems we depend on more penetration-resistant, limit the damage from attacks when they occur, make the systems cyber-resilient and survivable, and protect individuals' privacy.

Revision 5 of this foundational NIST publication represents a multi-year effort to develop the next generation of security and privacy controls that will be needed to accomplish the above objectives. It includes changes to make the controls more usable by diverse consumer groups (e.g., enterprises conducting mission and business functions; engineering organizations developing information systems, IoT devices, and systems-of-systems; and industry partners building system components, products, and services). The most significant changes to this publication include:

- Making the controls more *outcome-based* by removing the entity responsible for satisfying the control (i.e., information system, organization) from the control statement;

- Integrating information security and privacy controls into a seamless, consolidated control catalog for information systems and organizations;

- Establishing a new supply chain risk management control family;

- Separating control selection *processes* from the *controls*, thereby allowing the controls to be used by different communities of interest, including systems engineers, security architects, software developers, enterprise architects, systems security and privacy engineers, and mission or business owners;

TD_0000543

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

- Removing control baselines and tailoring guidance from the publication and transferring the content to NIST SP 800-53B, *Control Baselines for Information Systems and Organizations*;

- Clarifying the relationship between requirements and controls and the relationship between security and privacy controls; and

- Incorporating new, state-of-the-practice controls (e.g., controls to support cyber resiliency, support secure systems design, and strengthen security and privacy governance and accountability) based on the latest threat intelligence and cyber-attack data.

In separating the process of control selection from the controls and removing the control baselines, a significant amount of guidance and other informative material previously contained in SP 800-53 was eliminated. That content will be moved to other NIST publications such as SP 800-37 (Risk Management Framework) and SP 800-53B during the next update cycle. In the near future, NIST also plans to offer the content of SP 800-53, SP 800-53A, and SP 800-53B to a web-based portal to provide its customers interactive, online access to all control, control baseline, overlay, and assessment information.

TD_0000544

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

# Prologue

*"…Through the process of risk management, leaders must consider risk to US interests from adversaries using cyberspace to their advantage and from our own efforts to employ the global nature of cyberspace to achieve objectives in military, intelligence, and business operations… "*

*"…For operational plans development, the combination of threats, vulnerabilities, and impacts must be evaluated in order to identify important trends and decide where effort should be applied to eliminate or reduce threat capabilities; eliminate or reduce vulnerabilities; and assess, coordinate, and deconflict all cyberspace operations…"*

*"…Leaders at all levels are accountable for ensuring readiness and security to the same degree as in any other domain…"*

THE NATIONAL STRATEGY FOR CYBERSPACE OPERATIONS
OFFICE OF THE CHAIRMAN, JOINT CHIEFS OF STAFF, U.S. DEPARTMENT OF DEFENSE

---

*"Networking and information technology [are] transforming life in the 21st century, changing the way people, businesses, and government interact. Vast improvements in computing, storage, and communications are creating new opportunities for enhancing our social wellbeing; improving health and health care; eliminating barriers to education and employment; and increasing efficiencies in many sectors such as manufacturing, transportation, and agriculture.*

*The promise of these new applications often stems from their ability to create, collect, transmit, process, and archive information on a massive scale. However, the vast increase in the quantity of personal information that is being collected and retained, combined with the increased ability to analyze it and combine it with other information, is creating valid concerns about privacy and about the ability of entities to manage these unprecedented volumes of data responsibly…. A key challenge of this era is to assure that growing capabilities to create, capture, store, and process vast quantities of information will not damage the core values of the country….*

*"…When systems process personal information, whether by collecting, analyzing, generating, disclosing, retaining, or otherwise using the information, they can impact privacy of individuals. System designers need to account for individuals as stakeholders in the overall development of the solution….Designing for privacy must connect individuals' privacy desires with system requirements and controls in a way that effectively bridges the aspirations with development…."*

THE NATIONAL PRIVACY RESEARCH STRATEGY
NATIONAL SCIENCE AND TECHNOLOGY COUNCIL, NETWORKING AND INFORMATION TECHNOLOGY RESEARCH AND DEVELOPMENT PROGRAM

# Errata

This table contains changes that have been incorporated into SP 800-53, Revision 5. Errata updates can include corrections, clarifications, or other minor changes in the publication that are either *editorial* or *substantive* in nature. Any potential updates for this document that are not yet published in an errata update or revision—including additional issues and potential corrections—will be posted as they are identified; see the SP 800-53, Revision 5 publication details.

| DATE | TYPE | REVISION | PAGE |
|------|------|----------|------|
| 12-10-2020 | Editorial | Acknowledgements (ODNI): Add "Matthew A. Kozma, Chief Information Officer" | iii |
| 12-10-2020 | Editorial | Acknowledgements (ODNI): Add "Michael E. Waschull, Deputy Chief Information Officer" | iii |
| 12-10-2020 | Editorial | Acknowledgements (ODNI): Add "Clifford M. Conner, Cybersecurity Group and IC CISO" | iii |
| 12-10-2020 | Editorial | Call Out Box: Change "Special Publication 800-53B contains control baselines" to "SP 800-53B contains security and privacy control baselines" | x |
| 12-10-2020 | Editorial | Chapter One (Footnote 7): Add "[SP 800-53A]" | 1 |
| 12-10-2020 | Editorial | Section 1.4: Delete "The controls have also been mapped to the requirements for federal information systems included in [OMB A-130]." | 5 |
| 12-10-2020 | Editorial | Section 1.4 (Footnote 23): Delete "[OMB A-130] establishes policy for the planning, budgeting, governance, acquisition, and management of federal information, personnel, equipment, funds, IT resources, and supporting infrastructure and services." | 5 |
| 12-10-2020 | Editorial | Section 2.4 (first paragraph): Change "personally identifiable information (PII)" to "PII" | 13 |
| 12-10-2020 | Editorial | Control AC-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 18 |
| 12-10-2020 | Editorial | Control AC-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 18 |
| 12-10-2020 | Editorial | Control Enhancement AC-3(2) Discussion: Change "authorization duties to other individuals" to "authorization duties" | 23 |
| 12-10-2020 | Editorial | Control Enhancement AC-3(9) Discussion: Change "mitigating control" to "mitigation measure" | 26 |
| 12-10-2020 | Editorial | Control Enhancement AC-3(14) Related Controls: Add ", PT-6" | 28 |
| 12-10-2020 | Editorial | Control Enhancement AC-4(17): Change "*organization, system, application, service, individual*" to "*organization; system; application; service; individual*" | 33 |
| 12-10-2020 | Editorial | Control Enhancement AC-4(25): Change "*Selection (one or more):*" to "*Selection (one or more):*" | 34 |
| 12-10-2020 | Editorial | Control AC-12: Change "*conditions,*" to "*conditions*" | 43 |
| 12-10-2020 | Editorial | Control AC-14 Discussion: Change "assignment" to "assignment operation" | 44 |
| 12-10-2020 | Editorial | Control AC-19 Discussion: Change "the organizational network" to "its network" | 52 |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

TD_0000546

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

| DATE | TYPE | REVISION | PAGE |
|---|---|---|---|
| 12-10-2020 | Editorial | Control AC-19 Discussion: Change "Many controls for mobile devices are reflected in other controls allocated to the initial control baselines as starting points for the development of security plans and overlays using the tailoring process. There may also be some overlap by the security controls within the different families of controls." to "Many safeguards for mobile devices are reflected in other controls." | 52 |
| 12-10-2020 | Editorial | Control AC-20 Discussion: Change "organizational systems" to "organizational systems," | 53 |
| 12-10-2020 | Editorial | Control Enhancement AC-20(3) Discussion: Change "AC-20(6)" to "AC-20 b." | 54 |
| 12-10-2020 | Editorial | Control AT-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 59 |
| 12-10-2020 | Editorial | Control AT-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 59 |
| 12-10-2020 | Editorial | Control AT-2d.: Change "security or privacy incidents" to "security incidents or breaches" | 60 |
| 12-10-2020 | Editorial | Control AT-2 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 60 |
| 12-10-2020 | Editorial | Control AT-3c.: Change "security or privacy incidents" to "security incidents or breaches" | 62 |
| 12-10-2020 | Editorial | Control AT-3 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 63 |
| 12-10-2020 | Editorial | Control AT-3 Related Controls: Change "IR-10" to "IR-4" | 63 |
| 12-10-2020 | Editorial | Control AT-6 Discussion: Change "assessment and update" to "evaluation and update" | 64 |
| 12-10-2020 | Editorial | Control AT-6 Discussion: Change "organization training" to "organizational training" | 64 |
| 12-10-2020 | Editorial | Control AU-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 65 |
| 12-10-2020 | Editorial | Control AU-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 65 |
| 12-10-2020 | Editorial | Control CA-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 83 |
| 12-10-2020 | Editorial | Control CA-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 83 |
| 12-10-2020 | Editorial | Control CA-1 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 84 |
| 12-10-2020 | Editorial | Control CA-1 References: Add "[SP 800-137A]," | 84 |
| 12-10-2020 | Editorial | Control Enhancement CA-2(2): Change "*data loss assessment*" to "*data loss assessment;*" | 86 |
| 12-10-2020 | Editorial | Control CA-3 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 88 |
| 12-10-2020 | Editorial | Control CA-7 Discussion: Change "SC-18c" to "SC-18b" | 91 |
| 12-10-2020 | Editorial | Control CM-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 96 |
| 12-10-2020 | Editorial | Control CM-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 96 |
| 12-10-2020 | Editorial | Control CM-2b.2.: Change "*Assignment*" to "*Assignment:*" | 97 |
| 12-10-2020 | Editorial | Control Enhancement CM-7(4) Title: Change "UNAUTHORIZED SOFTWARE" to "UNAUTHORIZED SOFTWARE – DENY-BY-EXCEPTION" | 106 |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

| DATE | TYPE | REVISION | PAGE |
|---|---|---|---|
| 12-10-2020 | Editorial | Control Enhancement CM-7(5) Title: Change "AUTHORIZED SOFTWARE" to "AUTHORIZED SOFTWARE – ALLOW-BY-EXCEPTION" | 106 |
| 12-10-2020 | Editorial | Control CM-8 Related Controls: Add "CP-9," | 108 |
| 12-10-2020 | Editorial | Control CP-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 115 |
| 12-10-2020 | Editorial | Control CP-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 115 |
| 12-10-2020 | Editorial | Control CP-3 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 119 |
| 12-10-2020 | Editorial | Control Enhancement CP-9(7) Title: Change "DUAL AUTHORIZATION" to "DUAL AUTHORIZATION FOR DELETION OR DESTRUCTION" | 127 |
| 12-10-2020 | Editorial | Control Enhancement CP-10(3): Change "tailoring procedures" to "tailoring" | 128 |
| 12-10-2020 | Editorial | Control IA-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 131 |
| 12-10-2020 | Editorial | Control IA-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 131 |
| 12-10-2020 | Editorial | Control Enhancement IA-2(1) Discussion: Change "Common Access Card" to "Common Access Card (CAC)" | 132 |
| 12-10-2020 | Editorial | Control Enhancement IA-2(7) Title: Change "ACCESS" to "NETWORK ACCESS" | 134 |
| 12-10-2020 | Editorial | Control Enhancement IA-8(5) Discussion: Change "Personal Identity Verification (PIV)" to "PIV" | 145 |
| 12-10-2020 | Editorial | Control IR-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 149 |
| 12-10-2020 | Editorial | Control IR-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 149 |
| 12-10-2020 | Editorial | Control Enhancement IR-2(1) Discussion: Delete "Incident response training includes tabletop exercises that simulate a breach. See IR-2(3)." | 150 |
| 12-10-2020 | Editorial | Control IR-4 Related Controls: Add "IR-5," | 152 |
| 12-10-2020 | Editorial | Control IR-5 Related Controls: Add "IR-4, IR-6," | 156 |
| 12-10-2020 | Editorial | Control Enhancement IR-5(1) Related Controls: Change "AU-7, IR4" to "None" | 156 |
| 12-10-2020 | Editorial | Control IR-10: Change "Incident Analysis" to "Integrated Information Security Analysis Team" | 161 |
| 12-10-2020 | Editorial | Control IR-10: Change "Incorporated into" to "Moved to" | 161 |
| 12-10-2020 | Editorial | Control MA-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 162 |
| 12-10-2020 | Editorial | Control MA-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 162 |
| 12-10-2020 | Editorial | Control Enhancement MA-4(2): Change "MA-1, MA-4" to "MA-1 and MA-4" | 166 |
| 12-10-2020 | Editorial | Control MP-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 171 |
| 12-10-2020 | Editorial | Control MP-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 171 |
| 12-10-2020 | Editorial | Control MP-3 References: Add "[EO 13556]," | 172 |

TD_0000548

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

| DATE | TYPE | REVISION | PAGE |
|------|------|----------|------|
| 12-10-2020 | Editorial | Control PE-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 179 |
| 12-10-2020 | Editorial | Control PE-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 179 |
| 12-10-2020 | Editorial | Control Enhancement PE-3(8) Discussion: Delete ", or mantrap," | 183 |
| 12-10-2020 | Editorial | Control Enhancement PE-3(8) Discussion: Change "Mantraps" to "Vestibules" | 183 |
| 12-10-2020 | Editorial | Control Enhancement PE-19(1) Title: Delete "AND TEMPEST" | 192 |
| 12-10-2020 | Editorial | Control PL-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 194 |
| 12-10-2020 | Editorial | Control PL-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 194 |
| 12-10-2020 | Editorial | Control PL-2 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 196 |
| 12-10-2020 | Editorial | Control PL-7 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 198 |
| 12-10-2020 | Editorial | Control PL-11 Discussion: Change "[FISMA] and [PRIVACT]" to "[FISMA], [PRIVACT], and [OMB A-130]" | 201 |
| 12-10-2020 | Editorial | Control PM-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 204 |
| 12-10-2020 | Editorial | Control PM-2 References: Add ", [SP 800-181]" | 204 |
| 12-10-2020 | Editorial | Control PM-5 References: Add "[OMB A-130]," | 206 |
| 12-10-2020 | Editorial | Control PM-8 References: Add "[EO 13636]," | 207 |
| 12-10-2020 | Editorial | Control PM-10 References: Add ", [SP 800-181]" | 208 |
| 12-10-2020 | Editorial | Control PM-11 Related Controls: Add "RA-9," | 209 |
| 12-10-2020 | Editorial | Control PM-12 References: Add "[NITP12]," | 210 |
| 12-10-2020 | Editorial | Control PM-17 References: Add "[SP 800-172]," | 212 |
| 12-10-2020 | Editorial | Control PM-19 Related Controls: Add ", PM-27" | 213 |
| 12-10-2020 | Editorial | Control PM-22 References: Add "[OMB M-19-15]," | 216 |
| 12-10-2020 | Editorial | Control PM-24 Related Controls: Add "PT-2," | 216 |
| 12-10-2020 | Editorial | Control PM-24 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 217 |
| 12-10-2020 | Editorial | Control PM-25 Related Controls: Add ", SI-12" | 217 |
| 12-10-2020 | Editorial | Control PM-25 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 217 |
| 12-10-2020 | Editorial | Control PM-29 References: Add ", [SP 800-181]" | 219 |
| 12-10-2020 | Editorial | Control PM-30 References: Add "[CNSSD 505]," | 220 |
| 12-10-2020 | Editorial | Control PM-31 Discussion: Change "SC-18c" to "SC-18b" | 220 |
| 12-10-2020 | Editorial | Control PM-31 References: Add ", [SP 800-137A]" | 221 |
| 12-10-2020 | Editorial | Control PM-32 References: Change "[SP 800-137]" to "[SP 800-160-1], [SP 800-160-2]" | 221 |
| 12-10-2020 | Editorial | Control PS-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 222 |
| 12-10-2020 | Editorial | Control PS-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 222 |
| 12-10-2020 | Editorial | Control Enhancement PS-3(3) Title: Change "WITH" to "REQUIRING" | 224 |
| 12-10-2020 | Editorial | Control PT-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 229 |
| 12-10-2020 | Editorial | Control PT-1 Discussion: Change "privacy breaches" to "breaches" | 229 |

TD_0000549

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

| DATE | TYPE | REVISION | PAGE |
|---|---|---|---|
| 12-10-2020 | Editorial | Control Enhancement PT-2(1): Change "permissible" to "authorized" | 230 |
| 12-10-2020 | Editorial | Control PT-2 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 231 |
| 12-10-2020 | Editorial | Control PT-3a.: Change "[Assignment organization-defined purpose(s)]" to "[*Assignment: organization-defined purpose(s)]*" | 231 |
| 12-10-2020 | Editorial | Control PT-3 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 232 |
| 12-10-2020 | Editorial | Control PT-5 Related Controls: Add "SC-42," | 234 |
| 12-10-2020 | Editorial | Control Enhancement PT-6(2): Change "[Assignment: organization-defined frequency]" to "[*Assignment: organization-defined frequency]*" | 235 |
| 12-10-2020 | Editorial | Control PT-7 References: Add ", [NARA CUI]" | 236 |
| 12-10-2020 | Editorial | Control PT-8 References: Add "[CMPPA]," | 237 |
| 12-10-2020 | Editorial | Control RA-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 238 |
| 12-10-2020 | Editorial | Control RA-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 238 |
| 12-10-2020 | Editorial | Control RA-2 References: Add ", [NARA CUI]" | 240 |
| 12-10-2020 | Editorial | Control RA-3 Related Controls: Add "PT-2," | 240 |
| 12-10-2020 | Editorial | Control RA-8 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 247 |
| 12-10-2020 | Editorial | Control RA-9 Related Controls: Add "PM-11," | 247 |
| 12-10-2020 | Editorial | Control SA-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 249 |
| 12-10-2020 | Editorial | Control SA-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 249 |
| 12-10-2020 | Editorial | Control SA-2 References: Add "[SP 800-37], " | 250 |
| 12-10-2020 | Editorial | Control SA-4 References: Add "[ISO 29148], " | 255 |
| 12-10-2020 | Editorial | Control Enhancement SA-9(5) Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 273 |
| 12-10-2020 | Editorial | Control Enhancement SA-10(2) Title: Change "ALTERNATIVE CONFIGURATION MANAGEMENT" to "ALTERNATIVE CONFIGURATION MANAGEMENT PROCESSES" | 274 |
| 12-10-2020 | Editorial | Control SA-11a.: Change "assessments" to "control assessments" | 276 |
| 12-10-2020 | Editorial | Control Enhancement SA-12(13): Change "MA-6, RA-9" to "MA-6 and RA-9" | 280 |
| 12-10-2020 | Editorial | Control Enhancement SA-12(14): Change "SR-4(1), SR-4(2)" to "SR-4(1) and SR-4(2)" | 280 |
| 12-10-2020 | Editorial | Control Enhancement SA-17(4)(b): Change "*informal demonstration,*" to "*informal demonstration;*" | 286 |
| 12-10-2020 | Editorial | Control SA-23: Change "*design modification, augmentation, reconfiguration*" to "*design; modification; augmentation; reconfiguration*" | 291 |
| 12-10-2020 | Editorial | Control SC-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 292 |
| 12-10-2020 | Editorial | Control SC-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 292 |
| 12-10-2020 | Editorial | Control SC-6: Change "*Selection (one or more);*" to "*Selection (one or more):*" | 297 |

TD_0000550

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

| DATE | TYPE | REVISION | PAGE |
|------|------|----------|------|
| 12-10-2020 | Substantive | Control SC-7 Discussion: Add "[SP 800-189] provides additional information on source address validation techniques to prevent ingress and egress of traffic with spoofed addresses." | 297 |
| 12-10-2020 | Substantive | Control Enhancement SC-7(4) Discussion: Delete "Unauthorized control plane traffic can occur through a technique known as spoofing." | 298 |
| 12-10-2020 | Substantive | Control Enhancement SC-7(4) Discussion: Change "routing" to "Border Gateway Protocol (BGP) routing" | 298 |
| 12-10-2020 | Substantive | Control Enhancement SC-7(4) Discussion: Change "management" to "management protocols" | 298 |
| 12-10-2020 | Substantive | Control Enhancement SC-7(4) Discussion: Add "See [SP 800-189] for additional information on the use of the resource public key infrastructure (RPKI) to protect BGP routes and detect unauthorized BGP announcements." | 298 |
| 12-10-2020 | Editorial | Control Enhancement SC-7(4) Related Controls: Add ", SC-20, SC-21, SC-22" | 298 |
| 12-10-2020 | Editorial | Control Enhancement SC-7(5): Change *Selection (one or more);* to *Selection (one or more):* | 298 |
| 12-10-2020 | Editorial | Control SC-14: Change "SI-7," to "SI-7, and" | 309 |
| 12-10-2020 | Editorial | Control SC-17 Discussion: Change "Public Key Infrastructure" to "Public Key Infrastructure (PKI)" | 311 |
| 12-10-2020 | Editorial | Control SC-19: Change "addressed by other controls for protocols" to "addressed as any other technology or protocol" | 313 |
| 12-10-2020 | Editorial | Control Enhancement SC-30(4) Related Controls: Change "SC-26" to "None" | 319 |
| 12-10-2020 | Editorial | Control Enhancement SC-31(2): Change *Selection (one or more);* to *Selection (one or more):* | 320 |
| 12-10-2020 | Editorial | Control SC-42b.: Change *class of users* to *group of users* | 326 |
| 12-10-2020 | Editorial | Control SI-1a.1.: Change *organization-level; mission/business process-level; system-level* to *Organization-level; Mission/business process-level; System-level* | 332 |
| 12-10-2020 | Editorial | Control SI-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 332 |
| 12-10-2020 | Editorial | Control SI-3c.1.: Change *Selection (one or more);* to *Selection (one or more):* | 334 |
| 12-10-2020 | Editorial | Control SI-9: Change "AC-5," to "AC-5, and" | 349 |
| 12-10-2020 | Editorial | Control SI-10 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 351 |
| 12-10-2020 | Editorial | Control Enhancement SI-12(1): Change "PII" to "personally identifiable information" | 352 |
| 12-10-2020 | Editorial | Control Enhancement SI-12(1) Related Controls: Delete "PT-2, PT-3, RA-3" | 352 |
| 12-10-2020 | Editorial | Control Enhancement SI-12(3) Related Controls: Change "MP-6" to "None" | 353 |
| 12-10-2020 | Editorial | Control SI-12 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 353 |
| 12-10-2020 | Editorial | Control SI-18 Related Controls: Add "PT-2," | 356 |
| 12-10-2020 | Editorial | Control Enhancement SI-18(1) Related Controls: Delete "PM-22," | 357 |
| 12-10-2020 | Editorial | Control Enhancement SI-18(4) Related Controls: Change "PM-22" to "None" | 358 |
| 12-10-2020 | Editorial | Control SI-18 References: Add "[OMB M-19-15]," | 358 |
| 12-10-2020 | Editorial | Control SI-19 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 360 |
| 12-10-2020 | Editorial | Control SI-20 References: Change "[OMB A-130, Appendix II]" to "[OMB A-130]" | 361 |

TD_0000551

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

| DATE | TYPE | REVISION | PAGE |
|---|---|---|---|
| 12-10-2020 | Editorial | Control SR-1a.1.: Change "*organization-level; mission/business process-level; system-level*" to "*Organization-level; Mission/business process-level; System-level*" | 363 |
| 12-10-2020 | Editorial | Control SR-1 Discussion: Change "security or privacy incidents" to "security incidents or breaches" | 363 |
| 12-10-2020 | Editorial | Control SR-1 References: Add "[CNSSD 505]," | 364 |
| 12-10-2020 | Editorial | Control SR-2 References: Add "[SP 800-181]," | 365 |
| 12-10-2020 | Editorial | Control SR-2 References: Add "[CNSSD 505]," | 365 |
| 12-10-2020 | Editorial | Control Enhancement SR-5(2) Related Controls: Delete "SR-9" | 369 |
| 12-10-2020 | Editorial | Control Enhancement SR-6(1): Change "*organizational analysis, independent third-party analysis, organizational testing, independent third-party testing*" to "*organizational analysis; independent third-party analysis; organizational testing; independent third-party testing*" | 370 |
| 12-10-2020 | Editorial | References [ATOM54]: Change "Atomic Energy Act (P.L. 107)" to "Atomic Energy Act (P.L. 83-703)" | 374 |
| 12-10-2020 | Editorial | References [ISO 15026-1]: Change "International Organization for Standardization/International Electrotechnical Commission (ISO/IEC) 15026-1:2013, Systems and software engineering — Systems and software assurance — Part 1: Concepts and vocabulary, November 2013. https://www.iso.org/standard/62526.html" to "International Organization for Standardization/International Electrotechnical Commission/Institute of Electrical and Electronics Engineers (ISO/IEC/IEEE) 15026-1:2019, Systems and software engineering — Systems and software assurance — Part 1: Concepts and vocabulary, March 2019. https://www.iso.org/standard/73567.html" | 377 |
| 12-10-2020 | Editorial | References: Delete "[ISO 28001]" | 378 |
| 12-10-2020 | Editorial | References [ISO 29148]: Change "International Organization for Standardization/International Electrotechnical Commission/Institute of Electrical and Electronics Engineers (ISO/IEC/IEEE) 29148:2011, Systems and software engineering—Life cycle processes—Requirements engineering, December 2011. https://www.iso.org/standard/45171.html" to "International Organization for Standardization/International Electrotechnical Commission/Institute of Electrical and Electronics Engineers (ISO/IEC/IEEE) 29148:2018, Systems and software engineering—Life cycle processes—Requirements engineering, November 2018. https://www.iso.org/standard/72089.html" | 379 |
| 12-10-2020 | Editorial | References [SP 800-53B]: Change "Draft NIST" to "NIST" | 381 |
| 12-10-2020 | Editorial | References [SP 800-53B]: Change "https://doi.org/10.6028/NIST.SP.800-53B-draft" to "https://doi.org/10.6028/NIST.SP.800-53B" | 381 |
| 12-10-2020 | Editorial | References: Delete "[SP 800-58]" | 382 |
| 12-10-2020 | Editorial | References: Add "[SP 800-137A] Dempsey KL, Pillitteri VY, Baer C, Niemeyer R, Rudman R, Urban S (2020) Assessing Information Security Continuous Monitoring (ISCM) Programs: Developing an ISCM Program Assessment. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) 800-137A. https://doi.org/10.6028/NIST.SP.800-137A" | 387 |
| 12-10-2020 | Editorial | References: Delete "[SP 800-161-1]" | 387 |

TD_0000552

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

| DATE | TYPE | REVISION | PAGE |
|---|---|---|---|
| 12-10-2020 | Editorial | References [SP 800-181]: Change "Newhouse WD, Witte GA, Scribner B, Keith S (2017) National Initiative for Cybersecurity Education (NICE) Cybersecurity Workforce Framework. (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) 800-181. https://doi.org/10.6028/NIST.SP.800-181" to "Petersen R, Santos D, Smith MC, Wetzel KA, Witte G (2020) Workforce Framework for Cybersecurity (NICE Framework). (National Institute of Standards and Technology, Gaithersburg, MD), NIST Special Publication (SP) 800-181, Rev. 1. https://doi.org/10.6028/NIST.SP.800-181r1" | 388 |
| 12-10-2020 | Editorial | References [DODTERMS]: Change "http://www.dtic.mil/dtic/tr/fulltext/u2/a485800.pdf" to "https://www.jcs.mil/Portals/36/Documents/Doctrine/pubs/dictionary.pdf" | 391 |
| 12-10-2020 | Editorial | Appendix A Glossary (counterfeit): Change "[SP 800-161-1]" to [SP 800-161]" | 400 |
| 12-10-2020 | Editorial | Appendix A Glossary (supplier): Delete "[SP 800-161-1]" | 419 |
| 12-10-2020 | Editorial | Appendix A Glossary (supply chain): Delete "[SP 800-161-1]" | 419 |
| 12-10-2020 | Editorial | Appendix A Glossary (supply chain risk): Delete "[SP 800-161-1]" | 420 |
| 12-10-2020 | Editorial | Appendix A Glossary (supply chain risk assessment): Delete "[SP 800-161-1]" | 420 |
| 12-10-2020 | Editorial | Appendix A Glossary (supply chain risk management): Delete "[SP 800-161-1]" | 420 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "BGP Border Gateway Protocol" | 424 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "CAC Common Access Card" | 424 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "CONOPS Concept of Operations" | 424 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "DSB Defense Science Board" | 424 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "FICAM Federal Identity, Credential, and Access Management" | 425 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "IEEE Institute of Electrical and Electronics Engineers" | 425 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "ISAC Information Sharing and Analysis Centers" | 425 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "ISAO Information Sharing and Analysis Organizations" | 425 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "ITL Information Technology Laboratory" | 425 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "MLS Multilevel Secure" | 425 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "NDA Non-Disclosure Agreement" | 426 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "ODNI Office of the Director of National Intelligence" | 426 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "OPM Office of Personnel Management" | 426 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "PDS Position Designation System" | 426 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "RPKI Resource Public Key Infrastructure" | 426 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "SCRM Supply Chain Risk Management" | 426 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "SDLC System Development Life Cycle" | 426 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "SIEM Security Information and Event Management" | 426 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "SWID Software Identification" | 427 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "TIC Trusted Internet Connections" | 427 |
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "UEFI Unified Extensible Firmware Interface" | 427 |

TD_0000553

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

| DATE | TYPE | REVISION | PAGE |
|------|------|----------|------|
| 12-10-2020 | Editorial | Appendix B Acronyms: Add "UPS Uninterruptible Power Supply" | 427 |
| 12-10-2020 | Editorial | Appendix C Control Summaries: Change "w" to "W" | 428 |
| 12-10-2020 | Editorial | Table C-1 (AC-3(1)) Title: Change "FUNCTION" to "FUNCTIONS" | 429 |
| 12-10-2020 | Editorial | Table C-1 (AC-3(6)): Change "MP-4, SC-28" to "MP-4 and SC-28" | 429 |
| 12-10-2020 | Editorial | Table C-1 (AC-13): Change "AC-2, AU-6" to "AC-2 and AU-6" | 431 |
| 12-10-2020 | Editorial | Table C-3 (AU-7(2)) Title: Change "SEARCH AND SORT" to "SORT AND SEARCH" | 434 |
| 12-10-2020 | Editorial | Table C-3 AU-15: Change "Incorporated into" to "Moved to" | 435 |
| 12-10-2020 | Editorial | Table C-4 (CA-3(1)) Title: Change "CONNECTIONS" to "SYSTEM CONNECTIONS" | 436 |
| 12-10-2020 | Editorial | Table C-5 (CM-7(4)) Title: Change "UNAUTHORIZED SOFTWARE" to "UNAUTHORIZED SOFTWARE – DENY-BY-EXCEPTION" | 437 |
| 12-10-2020 | Editorial | Table C-5 (CM-7(5)) Title: Change "AUTHORIZED SOFTWARE" to "AUTHORIZED SOFTWARE – ALLOW-BY-EXCEPTION" | 437 |
| 12-10-2020 | Editorial | Table C-5: Delete duplicate row CM-8(5). | 438 |
| 12-10-2020 | Editorial | Table C-6 (CP-9(7)) Title: Change "DUAL AUTHORIZATION" to "DUAL AUTHORIZATION FOR DELETION OR DESTRUCTION" | 440 |
| 12-10-2020 | Editorial | Table C-7 (IA-5(11)): Change "IA-2(1)(2)" to "IA-2(1) and IA-2(2)" | 441 |
| 12-10-2020 | Editorial | Table C-8 (IR-10) Title: Change "Integrated Information Security Analysis" to "Integrated Information Security Analysis Team" | 444 |
| 12-10-2020 | Editorial | Table C-9 (MA-4(2)): Change "MA-1, MA-4" to "MA-1 and MA-4" | 445 |
| 12-10-2020 | Editorial | Table C-11 (PE-7): Change "PE-2, PE-3" to "PE-2 and PE-3" | 447 |
| 12-10-2020 | Editorial | Table C-11 (PE-19(1)) Title: Delete "AND TEMPEST" | 448 |
| 12-10-2020 | Editorial | Table C-14 (PS-3(1)) Title: Change "INFORMATION" to "information" | 451 |
| 12-10-2020 | Editorial | Table C-14 (PS-3(3)) Title: Change "WITH" to "REQUIRING" | 451 |
| 12-10-2020 | Editorial | Table C-17 (SA-6): Change "CM-10, SI-7" to "CM-10 and SI-7" | 454 |
| 12-10-2020 | Editorial | Table C-17 (SA-7): Change "CM-11, SI-7" to "CM-11 and SI-7" | 454 |
| 12-10-2020 | Editorial | Table C-17 (SA-12(13)): Change "MA-6, RA-9" to "MA-6 and RA-9" | 456 |
| 12-10-2020 | Editorial | Table C-17 (SA-12(14)): Change "SR-4(1)(2)" to "SR-4(1) and SR-4(2)" | 456 |
| 12-10-2020 | Editorial | Table C-17 (SA-12(15)) Title: Change "PROCESS" to "PROCESSES" | 456 |
| 12-10-2020 | Editorial | Table C-18 (SC-7(25)) Title: Change "CONNECTIONS" to "SYSTEM CONNECTIONS" | 459 |
| 12-10-2020 | Editorial | Table C-18 (SC-12(4)): Change "SC-12" to "SC-12(3)" | 459 |
| 12-10-2020 | Editorial | Table C-18 (SC-12(5)): Change "SC-12" to "SC-12(3)" | 459 |
| 12-10-2020 | Editorial | Table C-18 (SC-14): Change "SI-7," to "SI-7, and" | 459 |
| 12-10-2020 | Editorial | Table C-18 (SC-19): Change "addressed by other controls for protocols" to "addressed as any other technology or protocol." | 460 |
| 12-10-2020 | Editorial | Table C-19 (SI-9): Change "AC-5," to "AC-5, and" | 463 |
| 12-10-2020 | Editorial | Table C-19 (SI-19(7)) Title: Change "SOFTWARE" to "AND SOFTWARE" | 464 |

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

CHAPTER ONE

# INTRODUCTION

THE NEED TO PROTECT INFORMATION, SYSTEMS, ORGANIZATIONS, AND INDIVIDUALS

Modern information systems[1] can include a variety of computing platforms (e.g., industrial control systems, general purpose computing systems, cyber-physical systems, super computers, weapons systems, communications systems, environmental control systems, medical devices, embedded devices, sensors, and mobile devices such as smart phones and tablets). These platforms all share a common foundation—computers with complex hardware, software and firmware providing a capability that supports the essential mission and business functions of organizations.[2]

Security controls are the safeguards or countermeasures employed within a system or an organization to protect the confidentiality, integrity, and availability of the system and its information and to manage information security[3] risk. Privacy controls are the administrative, technical, and physical safeguards employed within a system or an organization to manage privacy risks and to ensure compliance with applicable privacy requirements.[4] Security and privacy controls are selected and implemented to satisfy security and privacy requirements levied on a system or organization. Security and privacy requirements are derived from applicable laws, executive orders, directives, regulations, policies, standards, and mission needs to ensure the confidentiality, integrity, and availability of information processed, stored, or transmitted and to manage risks to individual privacy.

The selection, design, and implementation of security and privacy controls[5] are important tasks that have significant implications for the operations[6] and assets of organizations as well as the welfare of individuals and the Nation. Organizations should answer several key questions when addressing information security and privacy controls:

- What security and privacy controls are needed to satisfy security and privacy requirements and to adequately manage mission/business risks or risks to individuals?

- Have the selected controls been implemented or is there a plan in place to do so?

- What is the required level of assurance (i.e., grounds for confidence) that the selected controls, as designed and implemented, are effective?[7]

---

[1] An *information system* is a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information [OMB A-130].

[2] The term *organization* describes an entity of any size, complexity, or positioning within an organizational structure (e.g., a federal agency or, as appropriate, any of its operational elements).

[3] The two terms *information security* and *security* are used synonymously in this publication.

[4] [OMB A-130] defines *security* and *privacy controls*.

[5] Controls provide safeguards and countermeasures in systems security and privacy engineering processes to reduce risk during the system development life cycle.

[6] Organizational operations include mission, functions, image, and reputation.

[7] Security and privacy control effectiveness addresses the extent to which the controls are implemented correctly, operating as intended, and producing the desired outcome with respect to meeting the designated security and privacy requirements [SP 800-53A].

TD_0000555

_____

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

The answers to these questions are not given in isolation but rather in the context of a risk management process for the organization that identifies, assesses, responds to, and monitors security and privacy risks arising from its information and systems on an ongoing basis.[8] The security and privacy controls in this publication are recommended for use by organizations to satisfy their information security and privacy requirements. The control catalog can be viewed as a toolbox containing a collection of safeguards, countermeasures, techniques, and processes to respond to security and privacy risks. The controls are employed as part of a well-defined risk management process that supports organizational information security and privacy programs. In turn, those information security and privacy programs lay the foundation for the success of the mission and business functions of the organization.

It is important that responsible officials understand the security and privacy risks that could adversely affect organizational operations and assets, individuals, other organizations, and the Nation.[9] These officials must also understand the current status of their security and privacy programs and the controls planned or in place to protect information, information systems, and organizations in order to make informed judgments and investments that respond to identified risks in an acceptable manner. The objective is to manage these risks through the selection and implementation of security and privacy controls.

## 1.1 PURPOSE AND APPLICABILITY

This publication establishes controls for systems and organizations. The controls can be implemented within any organization or system that processes, stores, or transmits information. The use of these controls is mandatory for federal information systems[10] in accordance with Office of Management and Budget (OMB) Circular A-130 [OMB A-130] and the provisions of the Federal Information Security Modernization Act[11] [FISMA], which requires the implementation of minimum controls to protect federal information and information systems.[12] This publication, along with other supporting NIST publications, is designed to help organizations identify the security and privacy controls needed to manage risk and to satisfy the security and privacy requirements in FISMA, the Privacy Act of 1974 [PRIVACT], OMB policies (e.g., [OMB A-130]), and designated Federal Information Processing Standards (FIPS), among others. It accomplishes this objective by providing a comprehensive and flexible catalog of security and privacy controls to meet current and future protection needs based on changing threats, vulnerabilities, requirements, and technologies. The publication also improves communication among organizations by providing a common lexicon that supports the discussion of security, privacy, and risk management concepts.

---

[8] The Risk Management Framework in [SP 800-37] is an example of a comprehensive risk management process.

[9] This includes risk to critical infrastructure and key resources described in [HSPD-7].

[10] A *federal information system* is an information system used or operated by an agency, a contractor of an agency, or another organization on behalf of an agency.

[11] Information systems that have been designated as national security systems, as defined in 44 U.S.C., Section 3542, are not subject to the requirements in [FISMA]. However, the controls established in this publication may be selected for national security systems as otherwise required (e.g., the Privacy Act of 1974) or with the approval of federal officials exercising policy authority over such systems. [CNSSP 22] and [CNSSI 1253] provide guidance for national security systems. [DODI 8510.01] provides guidance for the Department of Defense.

[12] While the controls established in this publication are mandatory for federal information systems and organizations, other organizations such as state, local, and tribal governments as well as private sector organizations are encouraged to consider using these guidelines, as appropriate. See [SP 800-53B] for federal control baselines.

TD_0000556

Finally, the controls are independent of the process employed to select those controls. The control selection process can be part of an organization-wide risk management process, a systems engineering process [SP 800-160-1],[13] the Risk Management Framework [SP 800-37], the Cybersecurity Framework [NIST CSF], or the Privacy Framework [NIST PF].[14] The control selection criteria can be guided and informed by many factors, including mission and business needs, stakeholder protection needs, threats, vulnerabilities, and requirements to comply with federal laws, executive orders, directives, regulations, policies, standards, and guidelines. The combination of a catalog of security and privacy controls and a risk-based control selection process can help organizations comply with stated security and privacy requirements, obtain adequate security for their information systems, and protect the privacy of individuals.

## 1.2  TARGET AUDIENCE

This publication is intended to serve a diverse audience, including:

- Individuals with system, information security, privacy, or risk management and oversight responsibilities, including authorizing officials, chief information officers, senior agency information security officers, and senior agency officials for privacy;

- Individuals with system development responsibilities, including mission owners, program managers, system engineers, system security engineers, privacy engineers, hardware and software developers, system integrators, and acquisition or procurement officials;

- Individuals with logistical or disposition-related responsibilities, including program managers, procurement officials, system integrators, and property managers;

- Individuals with security and privacy implementation and operations responsibilities, including mission or business owners, system owners, information owners or stewards, system administrators, continuity planners, and system security or privacy officers;

- Individuals with security and privacy assessment and monitoring responsibilities, including auditors, Inspectors General, system evaluators, control assessors, independent verifiers and validators, and analysts; and

- Commercial entities, including industry partners, producing component products and systems, creating security and privacy technologies, or providing services or capabilities that support information security or privacy.

## 1.3  ORGANIZATIONAL RESPONSIBILITIES

Managing security and privacy risks is a complex, multifaceted undertaking that requires:

- Well-defined security and privacy requirements for systems and organizations;

- The use of trustworthy information system components based on state-of-the-practice hardware, firmware, and software development and acquisition processes;

---

[13] Risk management is an integral part of systems engineering, systems security engineering, and privacy engineering.

[14] [OMB A-130] requires federal agencies to implement the NIST Risk Management Framework for the selection of controls for federal information systems. [ EO 13800] requires federal agencies to implement the NIST *Framework for Improving Critical Infrastructure Cybersecurity* to manage cybersecurity risk. The NIST frameworks are also available to nonfederal organizations as optional resources.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

- Rigorous security and privacy planning and system development life cycle management;

- The application of system security and privacy engineering principles and practices to securely develop and integrate system components into information systems;

- The employment of security and privacy practices that are properly documented and integrated into and supportive of the institutional and operational processes of organizations; and

- Continuous monitoring of information systems and organizations to determine the ongoing effectiveness of controls, changes in information systems and environments of operation, and the state of security and privacy organization-wide.

Organizations continuously assess the security and privacy risks to organizational operations and assets, individuals, other organizations, and the Nation. Security and privacy risks arise from the planning and execution of organizational mission and business functions, placing information systems into operation, or continuing system operations. Realistic assessments of risk require a thorough understanding of the susceptibility to threats based on the specific vulnerabilities in information systems and organizations and the likelihood and potential adverse impacts of successful exploitations of such vulnerabilities by those threats.[15] Risk assessments also require an understanding of privacy risks.[16]

To address the organization's concerns about assessment and determination of risk, security and privacy requirements are satisfied with the knowledge and understanding of the organizational risk management strategy.[17] The risk management strategy considers the cost, schedule, performance, and supply chain issues associated with the design, development, acquisition, deployment, operation, sustainment, and disposal of organizational systems. A risk management process is then applied to manage risk on an ongoing basis.[18]

The catalog of security and privacy controls can be effectively used to protect organizations, individuals, and information systems from traditional and advanced persistent threats and privacy risks arising from the processing of personally identifiable information (PII) in varied operational, environmental, and technical scenarios. The controls can be used to demonstrate compliance with a variety of governmental, organizational, or institutional security and privacy requirements. Organizations have the responsibility to select the appropriate security and privacy controls, to implement the controls correctly, and to demonstrate the effectiveness of the controls in satisfying security and privacy requirements.[19] Security and privacy controls can also be used in developing specialized *baselines* or *overlays* for unique or specialized missions or business applications, information systems, threat concerns, operational environments, technologies, or communities of interest.[20]

---

[15] [SP 800-30] provides guidance on the risk assessment process.

[16] [IR 8062] introduces privacy risk concepts.

[17] [SP 800-39] provides guidance on risk management processes and strategies.

[18] [SP 800-37] provides a comprehensive risk management process.

[19] [SP 800-53A] provides guidance on assessing the effectiveness of controls.

[20] [SP 800-53B] provides guidance for tailoring security and privacy control baselines and for developing overlays to support the specific protection needs and requirements of stakeholders and their organizations.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

Organizational risk assessments are used, in part, to inform the security and privacy control selection process. The selection process results in an agreed-upon set of security and privacy controls addressing specific mission or business needs consistent with organizational risk tolerance.[21] The process preserves, to the greatest extent possible, the agility and flexibility that organizations need to address an increasingly sophisticated and hostile threat space, mission and business requirements, rapidly changing technologies, complex supply chains, and many types of operational environments.

## 1.4  RELATIONSHIP TO OTHER PUBLICATIONS

This publication defines controls to satisfy a diverse set of security and privacy requirements that have been levied on information systems and organizations and that are consistent with and complementary to other recognized national and international information security and privacy standards. To develop a broadly applicable and technically sound set of controls for information systems and organizations, many sources were considered during the development of this publication. These sources included requirements and controls from the manufacturing, defense, financial, healthcare, transportation, energy, intelligence, industrial control, and audit communities as well as national and international standards organizations. In addition, the controls in this publication are used by the national security community in publications such as Committee on National Security Systems (CNSS) Instruction No. 1253 [CNSSI 1253] to provide guidance specific to systems designated as national security systems. Whenever possible, the controls have been mapped to international standards to help ensure maximum usability and applicability.[22] The relationship of this publication to other risk management, security, privacy, and publications can be found at [FISMA IMP].

## 1.5  REVISIONS AND EXTENSIONS

The security and privacy controls described in this publication represent the state-of-the-practice protection measures for individuals, information systems, and organizations. The controls are reviewed and revised periodically to reflect the experience gained from using the controls; new or revised laws, executive orders, directives, regulations, policies, and standards; changing security and privacy requirements; emerging threats, vulnerabilities, attack and information processing methods; and the availability of new technologies.

The security and privacy controls in the control catalog are also expected to change over time as controls are withdrawn, revised, and added. In addition to the need for change, the need for stability is addressed by requiring that proposed modifications to security and privacy controls go through a rigorous and transparent public review process to obtain public and private sector feedback and to build a consensus for such change. The review process provides a technically sound, flexible, and stable set of security and privacy controls for the organizations that use the control catalog.

## 1.6  PUBLICATION ORGANIZATION

The remainder of this special publication is organized as follows:

---

[21] Authorizing officials or their designated representatives, by accepting the security and privacy plans, agree to the security and privacy controls proposed to meet the security and privacy requirements for organizations and systems.

[22] Mapping tables are available at [SP 800-53 RES].

- <u>Chapter Two</u> describes the fundamental concepts associated with security and privacy controls, including the structure of the controls, how the controls are organized in the consolidated catalog, control implementation approaches, the relationship between security and privacy controls, and trustworthiness and assurance.

- <u>Chapter Three</u> provides a consolidated catalog of security and privacy controls including a discussion section to explain the purpose of each control and to provide useful information regarding control implementation and assessment, a list of related controls to show the relationships and dependencies among controls, and a list of references to supporting publications that may be helpful to organizations.

- <u>References</u>, <u>Glossary</u>, <u>Acronyms</u>, and <u>Control Summaries</u> provide additional information on the use of security and privacy controls.[23]

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

---

[23] Unless otherwise stated, all references to NIST publications refer to the most recent version of those publications.

_____

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

## CHAPTER TWO

# THE FUNDAMENTALS

STRUCTURE, TYPE, AND ORGANIZATION OF SECURITY AND PRIVACY CONTROLS

This chapter presents the fundamental concepts associated with security and privacy controls, including the relationship between requirements and controls, the structure of controls, how controls are organized in the consolidated control catalog, the different control implementation approaches for information systems and organizations, the relationship between security and privacy controls, the importance of the concepts of trustworthiness and assurance for security and privacy controls, and the effects of the controls on achieving trustworthy, secure, and resilient systems.

## 2.1  REQUIREMENTS AND CONTROLS

It is important to understand the relationship between requirements and controls. For federal information security and privacy policies, the term *requirement* is generally used to refer to information security and privacy obligations imposed on organizations. For example, [OMB A-130] imposes information security and privacy requirements with which federal agencies must comply when managing information resources. The term *requirement* can also be used in a broader sense to refer to an expression of stakeholder protection needs for a particular system or organization. Stakeholder protection needs and the corresponding security and privacy requirements may be derived from many sources (e.g., laws, executive orders, directives, regulations, policies, standards, mission and business needs, or risk assessments). The term *requirement*, as used in this guideline, includes both legal and policy requirements, as well as an expression of the broader set of stakeholder protection needs that may be derived from other sources. All of these requirements, when applied to a system, help determine the necessary characteristics of the system—encompassing security, privacy, and assurance.[24]

Organizations may divide security and privacy requirements into more granular categories, depending on where the requirements are employed in the system development life cycle (SDLC) and for what purpose. Organizations may use the term *capability requirement* to describe a capability that the system or organization must provide to satisfy a stakeholder protection need. In addition, organizations may refer to system requirements that pertain to particular hardware, software, and firmware components of a system as *specification requirements*—that is, capabilities that implement all or part of a control and that may be assessed (i.e., as part of the verification, validation, testing, and evaluation processes). Finally, organizations may use the term *statement of work requirements* to refer to actions that must be performed operationally or during system development.

---

[24] The system characteristics that impact security and privacy vary and include the system type and function in terms of its primary purpose; the system make-up in terms of its technology, mechanical, physical, and human elements; the modes and states within which the system delivers its functions and services; the criticality or importance of the system and its constituent functions and services; the sensitivity of the data or information processed, stored, or transmitted; the consequence of loss, failure, or degradation relative to the ability of the system to execute correctly and to provide for its own protection (i.e., self-protection); and monetary or other value [SP 800-160-1].

TD_0000561

_____

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

*Controls* can be viewed as descriptions of the safeguards and protection capabilities appropriate for achieving the particular security and privacy objectives of the organization and reflecting the protection needs of organizational stakeholders. Controls are selected and implemented by the organization in order to satisfy the system requirements. Controls can include administrative, technical, and physical aspects. In some cases, the selection and implementation of a control may necessitate additional specification by the organization in the form of *derived requirements* or instantiated control parameter values. The derived requirements and control parameter values may be necessary to provide the appropriate level of implementation detail for particular controls within the SDLC.

## 2.2 CONTROL STRUCTURE AND ORGANIZATION

Security and privacy controls described in this publication have a well-defined organization and structure. For ease of use in the security and privacy control selection and specification process, controls are organized into 20 *families*.[25] Each family contains controls that are related to the specific topic of the family. A two-character identifier uniquely identifies each control family (e.g., *PS* for Personnel Security). Security and privacy controls may involve aspects of policy, oversight, supervision, manual processes, and automated mechanisms that are implemented by systems or actions by individuals. Table 1 lists the security and privacy control families and their associated family identifiers.

**TABLE 1: SECURITY AND PRIVACY CONTROL FAMILIES**

| ID | FAMILY | ID | FAMILY |
|----|--------|----|--------|
| AC | Access Control | PE | Physical and Environmental Protection |
| AT | Awareness and Training | PL | Planning |
| AU | Audit and Accountability | PM | Program Management |
| CA | Assessment, Authorization, and Monitoring | PS | Personnel Security |
| CM | Configuration Management | PT | PII Processing and Transparency |
| CP | Contingency Planning | RA | Risk Assessment |
| IA | Identification and Authentication | SA | System and Services Acquisition |
| IR | Incident Response | SC | System and Communications Protection |
| MA | Maintenance | SI | System and Information Integrity |
| MP | Media Protection | SR | Supply Chain Risk Management |

Families of controls contain base controls and control enhancements, which are directly related to their base controls. Control enhancements either add functionality or specificity to a base control or increase the strength of a base control. Control enhancements are used in systems and environments of operation that require greater protection than the protection provided by the base control. The need for organizations to select and implement control enhancements is due to the potential adverse organizational or individual impacts or when organizations require additions to the base control functionality or assurance based on assessments of risk. The

---

[25] Of the 20 control families in NIST SP 800-53, 17 are aligned with the minimum security requirements in [FIPS 200]. The Program Management (PM), PII Processing and Transparency (PT), and Supply Chain Risk Management (SR) families address enterprise-level program management, privacy, and supply chain risk considerations pertaining to federal mandates emergent since [FIPS 200].

TD_0000562

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

selection and implementation of control enhancements *always* requires the selection and implementation of the base control.

The families are arranged in alphabetical order, while the controls and control enhancements within each family are in numerical order. The order of the families, controls, and control enhancements does *not* imply any logical progression, level of prioritization or importance, or order in which the controls or control enhancements are to be implemented. Rather, it reflects the order in which they were included in the catalog. Control designations are not re-used when a control is withdrawn.

Security and privacy controls have the following structure: a *base control* section, a *discussion* section, a *related controls* section, a *control enhancements* section, and a *references* section. Figure 1 illustrates the structure of a typical control.



**FIGURE 1: CONTROL STRUCTURE**

The *control* section prescribes a security or privacy capability to be implemented. Security and privacy capabilities are achieved by the activities or actions, automated or nonautomated, carried out by information systems and organizations. Organizations designate the responsibility for control development, implementation, assessment, and monitoring. Organizations have the

Case 1:25-cv-00457-CKK     Document 48-10     Filed 10/29/25     Page 121 of 152

flexibility to implement the controls selected in whatever manner that satisfies organizational mission or business needs consistent with law, regulation, and policy.

The *discussion* section provides additional information about a control. Organizations can use the information as needed when developing, tailoring, implementing, assessing, or monitoring controls. The information provides important considerations for implementing controls based on mission or business requirements, operational environments, or assessments of risk. The additional information can also explain the purpose of controls and often includes examples. Control enhancements may also include a separate discussion section when the discussion information is applicable only to a specific control enhancement.

The *related controls* section provides a list of controls from the control catalog that impact or support the implementation of a particular control or control enhancement, address a related security or privacy capability, or are referenced in the discussion section. Control enhancements are inherently related to their base control. Thus, related controls that are referenced in the base control are not repeated in the control enhancements. However, there may be related controls identified for control enhancements that are not referenced in the base control (i.e., the related control is only associated with the specific control enhancement). Controls may also be related to enhancements of other base controls. When a control is designated as a related control, a corresponding designation is made on that control in its source location in the catalog to illustrate the two-way relationship. Additionally, each control in a given family is inherently related to the -1 control (Policy and Procedures) in the same family. Therefore, the relationship between the -1 control and the other controls in the same family is not specified in the *related controls* section for each control.

The *control enhancements* section provides statements of security and privacy capability that augment a base control. The control enhancements are numbered sequentially within each control so that the enhancements can be easily identified when selected to supplement the base control. Each control enhancement has a short subtitle to indicate the intended function or capability provided by the enhancement. In the AU-4 example, if the control enhancement is selected, the control designation becomes AU-4(1). The numerical designation of a control enhancement is used only to identify that enhancement within the control. The designation is not indicative of the strength of the control enhancement, level of protection, priority, degree of importance, or any hierarchical relationship among the enhancements. Control enhancements are not intended to be selected independently. That is, if a control enhancement is selected, then the corresponding base control is also selected and implemented.

The *references* section includes a list of applicable laws, policies, standards, guidelines, websites, and other useful references that are relevant to a specific control or control enhancement.[26] The references section also includes hyperlinks to publications for obtaining additional information for control development, implementation, assessment, and monitoring.

For some controls, additional flexibility is provided by allowing organizations to define specific values for designated parameters associated with the controls. Flexibility is achieved as part of a tailoring process using *assignment* and *selection* operations embedded within the controls and

---

[26] References are provided to assist organizations in understanding and implementing the security and privacy controls and are not intended to be inclusive or complete.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

enclosed by brackets. The assignment and selection operations give organizations the capability to customize controls based on organizational security and privacy requirements. In contrast to assignment operations which allow complete flexibility in the designation of parameter values, selection operations narrow the range of potential values by providing a specific list of items from which organizations choose.

Determination of the organization-defined parameters can evolve from many sources, including laws, executive orders, directives, regulations, policies, standards, guidance, and mission or business needs. Organizational risk assessments and risk tolerance are also important factors in determining the values for control parameters. Once specified by the organization, the values for the assignment and selection operations become a part of the control. Organization-defined control parameters used in the base controls also apply to the control enhancements associated with those controls. The implementation of the control is assessed for effectiveness against the completed control statement.

In addition to assignment and selection operations embedded in a control, additional flexibility is achieved through *iteration* and *refinement* actions. Iteration allows organizations to use a control multiple times with different assignment and selection values, perhaps being applied in different situations or when implementing multiple policies. For example, an organization may have multiple systems implementing a control but with different parameters established to address different risks for each system and environment of operation. Refinement is the process of providing additional implementation detail to a control. Refinement can also be used to narrow the scope of a control in conjunction with iteration to cover all applicable scopes (e.g., applying different authentication mechanisms to different system interfaces). The combination of assignment and selection operations and iteration and refinement actions when applied to controls provides the needed flexibility to allow organizations to satisfy a broad base of security and privacy requirements at the organization, mission and business process, and system levels of implementation.

---

### SECURITY AS A DESIGN PROBLEM

"Providing satisfactory security controls in a computer system is….a system design problem. A combination of hardware, software, communications, physical, personnel and administrative-procedural safeguards is required for comprehensive security….software safeguards alone are not sufficient."

-- ***The Ware Report***
*Defense Science Board Task Force on Computer Security, 1970*

---

## 2.3  CONTROL IMPLEMENTATION APPROACHES

There are three approaches to implementing the controls in Chapter Three: (1) a *common* (inheritable) control implementation approach, (2) a *system-specific* control implementation approach, and (3) a *hybrid* control implementation approach. The control implementation approaches define the scope of applicability for the control, the shared nature or inheritability of the control, and the responsibility for control development, implementation, assessment, and

authorization. Each control implementation approach has a specific objective and focus that helps organizations select the appropriate controls, implement the controls in an effective manner, and satisfy security and privacy requirements. A specific control implementation approach may achieve cost benefits by leveraging security and privacy capabilities across multiple systems and environments of operation.[27]

Common controls are controls whose implementation results in a capability that is *inheritable* by multiple systems or programs. A control is deemed inheritable when the system or program receives protection from the implemented control, but the control is developed, implemented, assessed, authorized, and monitored by an internal or external entity other than the entity responsible for the system or program. The security and privacy capabilities provided by common controls can be inherited from many sources, including mission or business lines, organizations, enclaves, environments of operation, sites, or other systems or programs. Implementing controls as common controls can introduce the risk of a single point of failure.

Many of the controls needed to protect organizational information systems—including many physical and environmental protection controls, personnel security controls, and incident response controls—are inheritable and, therefore, are good candidates for common control status. Common controls can also include technology-based controls, such as identification and authentication controls, boundary protection controls, audit and accountability controls, and access controls. The cost of development, implementation, assessment, authorization, and monitoring can be amortized across multiple systems, organizational elements, and programs using the common control implementation approach.

Controls not implemented as common controls are implemented as *system-specific* or *hybrid* controls. System-specific controls are the primary responsibility of the system owner and the authorizing official for a given system. Implementing system-specific controls can introduce risk if the control implementations are not interoperable with common controls. Organizations can implement a control as *hybrid* if one part of the control is common (inheritable) and the other part is system-specific. For example, an organization may implement control CP-2 using a predefined template for the contingency plan for all organizational information systems with individual system owners tailoring the plan for system-specific uses, where appropriate. The division of a hybrid control into its common (inheritable) and system-specific parts may vary by organization, depending on the types of information technologies employed, the approach used by the organization to manage its controls, and assignment of responsibilities. When a control is implemented as a hybrid control, the common control provider is responsible for ensuring the implementation, assessment, and monitoring of the *common* part of the hybrid control, and the system owner is responsible for ensuring the implementation, assessment, and monitoring of the *system-specific* part of the hybrid control. Implementing controls as hybrid controls can introduce risk if the responsibility for the implementation and ongoing management of the common and system-specific parts of the controls is unclear.

The determination as to the appropriate control implementation approach (i.e., common, hybrid, or system-specific) is context-dependent. The control implementation approach cannot be determined to be common, hybrid, or system-specific simply based on the language of the

---

[27] [SP 800-37] provides additional guidance on control implementation approaches (formerly referred to as control designations) and how the different approaches are used in the *Risk Management Framework*.

control. Identifying the control implementation approach can result in significant savings to organizations in implementation and assessment costs and a more consistent application of the controls organization-wide. Typically, the identification of the control implementation approach is straightforward. However, the implementation takes significant planning and coordination.

Planning for the implementation approach of a control (i.e., common, hybrid, or system-specific) is best carried out early in the system development life cycle and coordinated with the entities providing the control [SP 800-37]. Similarly, if a control is to be inheritable, coordination is required with the inheriting entity to ensure that the control meets its needs. This is especially important given the nature of control parameters. An inheriting entity cannot assume that controls are the same and mitigate the appropriate risk to the system just because the control identifiers (e.g., AC-1) are the same. It is essential to examine the control parameters (e.g., assignment or selection operations) when determining if a common control is adequate to mitigate system-specific risks.

## 2.4  SECURITY AND PRIVACY CONTROLS

The selection and implementation of security and privacy controls reflect the objectives of information security and privacy programs and how those programs manage their respective risks. Depending on the circumstances, these objectives and risks can be independent or overlapping. Federal information security programs are responsible for protecting information and information systems from unauthorized access, use, disclosure, disruption, modification, or destruction (i.e., unauthorized activity or system behavior) to provide confidentiality, integrity, and availability. Those programs are also responsible for managing security risk and for ensuring compliance with applicable security requirements. Federal privacy programs are responsible for managing risks to individuals associated with the creation, collection, use, processing, storage, maintenance, dissemination, disclosure, or disposal (collectively referred to as "processing") of PII and for ensuring compliance with applicable privacy requirements.[28] When a system processes PII, the information security program and the privacy program have a shared responsibility for managing the security risks for the PII in the system. Due to this overlap in responsibilities, the controls that organizations select to manage these security risks will generally be the same regardless of their designation as security or privacy controls in control baselines or program or system plans.

There also may be circumstances in which the selection and/or implementation of the control or control enhancement affects the ability of a program to achieve its objectives and manage its respective risks. The control discussion section may highlight specific security and/or privacy considerations so that organizations can take these considerations into account as they determine the most effective method to implement the control. However, these considerations are not exhaustive.

For example, an organization might select AU-3 (Content of Audit Records) to support monitoring for unauthorized access to an information asset that does not include PII. Since the

---

[28] Privacy programs may also choose to consider the risks to individuals that may arise from their interactions with information systems, where the processing of personally identifiable information may be less impactful than the effect that the system has on individuals' behavior or activities. Such effects would constitute risks to individual autonomy, and organizations may need to take steps to manage those risks in addition to information security and privacy risks.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

potential loss of confidentiality of the information asset does not affect privacy, security objectives are the primary driver for the selection of the control. However, the implementation of the control with respect to monitoring for unauthorized access could involve the processing of PII which may result in privacy risks and affect privacy program objectives. The discussion section in AU-3 includes privacy risk considerations so that organizations can take those considerations into account as they determine the best way to implement the control. Additionally, the control enhancement AU-3(3) (Limit Personally Identifiable Information Elements) could be selected to support managing these privacy risks.

Due to permutations in the relationship between information security and privacy program objectives and risk management, there is a need for close collaboration between programs to select and implement the appropriate controls for information systems processing PII. Organizations consider how to promote and institutionalize collaboration between the two programs to ensure that the objectives of both disciplines are met and risks are appropriately managed.[29]

## 2.5 TRUSTWORTHINESS AND ASSURANCE

The trustworthiness of systems, system components, and system services is an important part of the risk management strategies developed by organizations.[30] *Trustworthiness*, in this context, means worthy of being trusted to fulfill whatever requirements may be needed for a component, subsystem, system, network, application, mission, business function, enterprise, or other entity.[31] Trustworthiness requirements can include attributes of reliability, dependability, performance, resilience, safety, security, privacy, and survivability under a range of potential adversity in the form of disruptions, hazards, threats, and privacy risks. Effective measures of trustworthiness are meaningful only to the extent that the requirements are complete, well-defined, and can be accurately assessed.

Two fundamental concepts that affect the trustworthiness of systems are *functionality* and *assurance*. Functionality is defined in terms of the security and privacy features, functions, mechanisms, services, procedures, and architectures implemented within organizational systems and programs and the environments in which those systems and programs operate. Assurance is the measure of confidence that the system functionality is implemented correctly, operating as intended, and producing the desired outcome with respect to meeting the security and privacy requirements for the system—thus possessing the capability to accurately mediate and enforce established security and privacy policies.

In general, the task of providing meaningful assurance that a system is likely to do what is expected of it can be enhanced by techniques that simplify or narrow the analysis by, for example, increasing the discipline applied to the system architecture, software design, specifications, code style, and configuration management. Security and privacy controls address functionality and assurance. Certain controls focus primarily on functionality while other controls focus primarily on assurance. Some controls can support functionality and assurance.

---

[29] Resources to support information security and privacy program collaboration are available at [SP 800-53 RES].

[30] [SP 800-160-1] provides guidance on systems security engineering and the application of security design principles to achieve trustworthy systems.

[31] See [NEUM04].

_____

Organizations can select assurance-related controls to define system development activities, generate evidence about the functionality and behavior of the system, and trace the evidence to the system elements that provide such functionality or exhibit such behavior. The evidence is used to obtain a degree of confidence that the system satisfies the stated security and privacy requirements while supporting the organization's mission and business functions. Assurance-related controls are identified in the control summary tables in Appendix C.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

---

### EVIDENCE OF CONTROL IMPLEMENTATION

During control selection and implementation, it is important for organizations to consider the evidence (e.g., artifacts, documentation) that will be needed to support current and future control assessments. Such assessments help determine whether the controls are implemented correctly, operating as intended, and satisfying security and privacy policies—thus, providing essential information for senior leaders to make informed *risk-based* decisions.

---

TD_0000569

_____

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

## CHAPTER THREE

# THE CONTROLS

SECURITY AND PRIVACY CONTROLS AND CONTROL ENHANCEMENTS

This catalog of security and privacy controls provides protective measures for systems, organizations, and individuals.[32] The controls are designed to facilitate risk management and compliance with applicable federal laws, executive orders, directives, regulations, policies, and standards. With few exceptions, the security and privacy controls in the catalog are policy-, technology-, and sector-neutral, meaning that the controls focus on the fundamental measures necessary to protect information and the privacy of individuals across the information life cycle. While the security and privacy controls are largely policy-, technology-, and sector-neutral, that does not imply that the controls are policy-, technology-, and sector-unaware. Understanding policies, technologies, and sectors is necessary so that the controls are relevant when they are implemented. Employing a policy-, technology-, and sector-neutral control catalog has many benefits. It encourages organizations to:

- Focus on the security and privacy functions and capabilities required for mission and business success and the protection of information and the privacy of individuals, irrespective of the technologies that are employed in organizational systems;

- Analyze each security and privacy control for its applicability to specific technologies, environments of operation, mission and business functions, and communities of interest; and

- Specify security and privacy policies as part of the tailoring process for controls that have variable parameters.

In the few cases where specific technologies are referenced in controls, organizations are cautioned that the need to manage security and privacy risks may go beyond the requirements in a single control associated with a technology. The additional needed protection measures are obtained from the other controls in the catalog. Federal Information Processing Standards, Special Publications, and Interagency/Internal Reports provide guidance on selecting security and privacy controls that reduce risk for specific technologies and sector-specific applications, including smart grid, cloud, healthcare, mobile, industrial control systems, and Internet of Things (IoT) devices.[33] NIST publications are cited as references as applicable to specific controls in Sections 3.1 through 3.20.

Security and privacy controls in the catalog are expected to change over time as controls are withdrawn, revised, and added. To maintain stability in security and privacy plans, controls are not renumbered each time a control is withdrawn. Rather, notations of the controls that have been withdrawn are maintained in the control catalog for historical purposes. Controls may be withdrawn for a variety of reasons, including when the function or capability provided by the control has been incorporated into another control, the control is redundant to an existing control, or the control is deemed to be no longer necessary or effective.

---

[32] The controls in this publication are available online and can be obtained in various formats. See [ NVD 800-53].

[33] For example, [SP 800-82] provides guidance on risk management and control selection for industrial control systems.

TD_0000570

New controls are developed on a regular basis using threat and vulnerability information and information on the tactics, techniques, and procedures used by adversaries. In addition, new controls are developed based on a better understanding of how to mitigate information security risks to systems and organizations and risks to the privacy of individuals arising from information processing. Finally, new controls are developed based on new or changing requirements in laws, executive orders, regulations, policies, standards, or guidelines. Proposed modifications to the controls are carefully analyzed during each revision cycle, considering the need for stability of controls and the need to be responsive to changing technologies, threats, vulnerabilities, types of attack, and processing methods. The objective is to adjust the level of information security and privacy over time to meet the needs of organizations and individuals.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

TD_0000571

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

## 3.1 ACCESS CONTROL

**Quick link to Access Control Summary Table**

AC-1    **POLICY AND PROCEDURES**

Control:

a. Develop, document, and disseminate to [*Assignment: organization-defined personnel or roles*]:

　　1. [*Selection (one or more): Organization-level; Mission/business process-level; System-level*] access control policy that:

　　　　(a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities, and compliance; and

　　　　(b) Is consistent with applicable laws, executive orders, directives, regulations, policies, standards, and guidelines; and

　　2. Procedures to facilitate the implementation of the access control policy and the associated access controls;

b. Designate an [*Assignment: organization-defined official*] to manage the development, documentation, and dissemination of the access control policy and procedures; and

c. Review and update the current access control:

　　1. Policy [*Assignment: organization-defined frequency*] and following [*Assignment: organization-defined events*]; and

　　2. Procedures [*Assignment: organization-defined frequency*] and following [*Assignment: organization-defined events*].

Discussion: Access control policy and procedures address the controls in the AC family that are implemented within systems and organizations. The risk management strategy is an important factor in establishing such policies and procedures. Policies and procedures contribute to security and privacy assurance. Therefore, it is important that security and privacy programs collaborate on the development of access control policy and procedures. Security and privacy program policies and procedures at the organization level are preferable, in general, and may obviate the need for mission- or system-specific policies and procedures. The policy can be included as part of the general security and privacy policy or be represented by multiple policies reflecting the complex nature of organizations. Procedures can be established for security and privacy programs, for mission or business processes, and for systems, if needed. Procedures describe how the policies or controls are implemented and can be directed at the individual or role that is the object of the procedure. Procedures can be documented in system security and privacy plans or in one or more separate documents. Events that may precipitate an update to access control policy and procedures include assessment or audit findings, security incidents or breaches, or changes in laws, executive orders, directives, regulations, policies, standards, and guidelines. Simply restating controls does not constitute an organizational policy or procedure.

Related Controls: IA-1, PM-9, PM-24, PS-8, SI-12.

Control Enhancements: None.

References: [OMB A-130], [SP 800-12], [SP 800-30], [SP 800-39], [SP 800-100], [IR 7874].

_____

AC-2     **ACCOUNT MANAGEMENT**

Control:

a.  Define and document the types of accounts allowed and specifically prohibited for use within the system;

b.  Assign account managers;

c.  Require [*Assignment: organization-defined prerequisites and criteria*] for group and role membership;

d.  Specify:

   1.  Authorized users of the system;

   2.  Group and role membership; and

   3.  Access authorizations (i.e., privileges) and [*Assignment: organization-defined attributes (as required)*] for each account;

e.  Require approvals by [*Assignment: organization-defined personnel or roles*] for requests to create accounts;

f.  Create, enable, modify, disable, and remove accounts in accordance with [*Assignment: organization-defined policy, procedures, prerequisites, and criteria*];

g.  Monitor the use of accounts;

h.  Notify account managers and [*Assignment: organization-defined personnel or roles*] within:

   1.  [*Assignment: organization-defined time period*] when accounts are no longer required;

   2.  [*Assignment: organization-defined time period*] when users are terminated or transferred; and

   3.  [*Assignment: organization-defined time period*] when system usage or need-to-know changes for an individual;

i.  Authorize access to the system based on:

   1.  A valid access authorization;

   2.  Intended system usage; and

   3.  [*Assignment: organization-defined attributes (as required)*]];

j.  Review accounts for compliance with account management requirements [*Assignment: organization-defined frequency*];

k.  Establish and implement a process for changing shared or group account authenticators (if deployed) when individuals are removed from the group; and

l.  Align account management processes with personnel termination and transfer processes.

Discussion:  Examples of system account types include individual, shared, group, system, guest, anonymous, emergency, developer, temporary, and service. Identification of authorized system users and the specification of access privileges reflect the requirements in other controls in the security plan. Users requiring administrative privileges on system accounts receive additional scrutiny by organizational personnel responsible for approving such accounts and privileged access, including system owner, mission or business owner, senior agency information security officer, or senior agency official for privacy. Types of accounts that organizations may wish to prohibit due to increased risk include shared, group, emergency, anonymous, temporary, and guest accounts.

Where access involves personally identifiable information, security programs collaborate with the senior agency official for privacy to establish the specific conditions for group and role membership; specify authorized users, group and role membership, and access authorizations for each account; and create, adjust, or remove system accounts in accordance with organizational policies. Policies can include such information as account expiration dates or other factors that trigger the disabling of accounts. Organizations may choose to define access privileges or other attributes by account, type of account, or a combination of the two. Examples of other attributes required for authorizing access include restrictions on time of day, day of week, and point of origin. In defining other system account attributes, organizations consider system-related requirements and mission/business requirements. Failure to consider these factors could affect system availability.

Temporary and emergency accounts are intended for short-term use. Organizations establish temporary accounts as part of normal account activation procedures when there is a need for short-term accounts without the demand for immediacy in account activation. Organizations establish emergency accounts in response to crisis situations and with the need for rapid account activation. Therefore, emergency account activation may bypass normal account authorization processes. Emergency and temporary accounts are not to be confused with infrequently used accounts, including local logon accounts used for special tasks or when network resources are unavailable (may also be known as accounts of last resort). Such accounts remain available and are not subject to automatic disabling or removal dates. Conditions for disabling or deactivating accounts include when shared/group, emergency, or temporary accounts are no longer required and when individuals are transferred or terminated. Changing shared/group authenticators when members leave the group is intended to ensure that former group members do not retain access to the shared or group account. Some types of system accounts may require specialized training.

Related Controls: AC-3, AC-5, AC-6, AC-17, AC-18, AC-20, AC-24, AU-2, AU-12, CM-5, IA-2, IA-4, IA-5, IA-8, MA-3, MA-5, PE-2, PL-4, PS-2, PS-4, PS-5, PS-7, PT-2, PT-3, SC-7, SC-12, SC-13, SC-37.

Control Enhancements:

**(1)** ACCOUNT MANAGEMENT | AUTOMATED SYSTEM ACCOUNT MANAGEMENT

**Support the management of system accounts using [*Assignment: organization-defined automated mechanisms*].**

Discussion: Automated system account management includes using automated mechanisms to create, enable, modify, disable, and remove accounts; notify account managers when an account is created, enabled, modified, disabled, or removed, or when users are terminated or transferred; monitor system account usage; and report atypical system account usage. Automated mechanisms can include internal system functions and email, telephonic, and text messaging notifications.

Related Controls: None.

**(2)** ACCOUNT MANAGEMENT | AUTOMATED TEMPORARY AND EMERGENCY ACCOUNT MANAGEMENT

**Automatically [*Selection: remove; disable*] temporary and emergency accounts after [*Assignment: organization-defined time period for each type of account*].**

Discussion: Management of temporary and emergency accounts includes the removal or disabling of such accounts automatically after a predefined time period rather than at the convenience of the system administrator. Automatic removal or disabling of accounts provides a more consistent implementation.

Related Controls: None.

**(3)** ACCOUNT MANAGEMENT | DISABLE ACCOUNTS

**Disable accounts within [*Assignment: organization-defined time period*] when the accounts:**

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

(a)  **Have expired;**

(b)  **Are no longer associated with a user or individual;**

(c)  **Are in violation of organizational policy; or**

(d)  **Have been inactive for [*Assignment: organization-defined time period*].**

Discussion:  Disabling expired, inactive, or otherwise anomalous accounts supports the concepts of least privilege and least functionality which reduce the attack surface of the system.

Related Controls:  None.

**(4)** ACCOUNT MANAGEMENT | AUTOMATED AUDIT ACTIONS

**Automatically audit account creation, modification, enabling, disabling, and removal actions.**

Discussion:  Account management audit records are defined in accordance with AU-2 and reviewed, analyzed, and reported in accordance with AU-6.

Related Controls:  AU-2, AU-6.

**(5)** ACCOUNT MANAGEMENT | INACTIVITY LOGOUT

**Require that users log out when [*Assignment: organization-defined time period of expected inactivity or description of when to log out*].**

Discussion:  Inactivity logout is behavior- or policy-based and requires users to take physical action to log out when they are expecting inactivity longer than the defined period. Automatic enforcement of inactivity logout is addressed by AC-11.

Related Controls:  AC-11.

**(6)** ACCOUNT MANAGEMENT | DYNAMIC PRIVILEGE MANAGEMENT

**Implement [*Assignment: organization-defined dynamic privilege management capabilities*].**

Discussion:  In contrast to access control approaches that employ static accounts and predefined user privileges, dynamic access control approaches rely on runtime access control decisions facilitated by dynamic privilege management, such as attribute-based access control. While user identities remain relatively constant over time, user privileges typically change more frequently based on ongoing mission or business requirements and the operational needs of organizations. An example of dynamic privilege management is the immediate revocation of privileges from users as opposed to requiring that users terminate and restart their sessions to reflect changes in user privileges. Dynamic privilege management can also include mechanisms that change user privileges based on dynamic rules as opposed to editing specific user profiles. Examples include automatic adjustments of user privileges if they are operating out of their normal work times, if their job function or assignment changes, or if systems are under duress or in emergency situations. Dynamic privilege management includes the effects of privilege changes, for example, when there are changes to encryption keys used for communications.

Related Controls:  AC-16.

**(7)** ACCOUNT MANAGEMENT | PRIVILEGED USER ACCOUNTS

(a)  **Establish and administer privileged user accounts in accordance with [*Selection: a role-based access scheme; an attribute-based access scheme*];**

(b)  **Monitor privileged role or attribute assignments;**

(c)  **Monitor changes to roles or attributes; and**

(d)  **Revoke access when privileged role or attribute assignments are no longer appropriate.**

TD_0000575

Discussion: Privileged roles are organization-defined roles assigned to individuals that allow those individuals to perform certain security-relevant functions that ordinary users are not authorized to perform. Privileged roles include key management, account management, database administration, system and network administration, and web administration. A role-based access scheme organizes permitted system access and privileges into roles. In contrast, an attribute-based access scheme specifies allowed system access and privileges based on attributes.

Related Controls: None.

(8)  ACCOUNT MANAGEMENT | DYNAMIC ACCOUNT MANAGEMENT

**Create, activate, manage, and deactivate [*Assignment: organization-defined system accounts*] dynamically.**

Discussion: Approaches for dynamically creating, activating, managing, and deactivating system accounts rely on automatically provisioning the accounts at runtime for entities that were previously unknown. Organizations plan for the dynamic management, creation, activation, and deactivation of system accounts by establishing trust relationships, business rules, and mechanisms with appropriate authorities to validate related authorizations and privileges.

Related Controls: AC-16.

(9)  ACCOUNT MANAGEMENT | RESTRICTIONS ON USE OF SHARED AND GROUP ACCOUNTS

**Only permit the use of shared and group accounts that meet [*Assignment: organization-defined conditions for establishing shared and group accounts*].**

Discussion: Before permitting the use of shared or group accounts, organizations consider the increased risk due to the lack of accountability with such accounts.

Related Controls: None.

(10) ACCOUNT MANAGEMENT | SHARED AND GROUP ACCOUNT CREDENTIAL CHANGE

[Withdrawn: Incorporated into AC-2k.]

(11) ACCOUNT MANAGEMENT | USAGE CONDITIONS

**Enforce [*Assignment: organization-defined circumstances and/or usage conditions*] for [*Assignment: organization-defined system accounts*].**

Discussion: Specifying and enforcing usage conditions helps to enforce the principle of least privilege, increase user accountability, and enable effective account monitoring. Account monitoring includes alerts generated if the account is used in violation of organizational parameters. Organizations can describe specific conditions or circumstances under which system accounts can be used, such as by restricting usage to certain days of the week, time of day, or specific durations of time.

Related Controls: None.

(12) ACCOUNT MANAGEMENT | ACCOUNT MONITORING FOR ATYPICAL USAGE

**(a)  Monitor system accounts for [*Assignment: organization-defined atypical usage*]; and**

**(b)  Report atypical usage of system accounts to [*Assignment: organization-defined personnel or roles*].**

Discussion: Atypical usage includes accessing systems at certain times of the day or from locations that are not consistent with the normal usage patterns of individuals. Monitoring for atypical usage may reveal rogue behavior by individuals or an attack in progress. Account monitoring may inadvertently create privacy risks since data collected to identify atypical usage may reveal previously unknown information about the behavior of individuals. Organizations assess and document privacy risks from monitoring accounts for atypical

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

TD_0000576

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

usage in their privacy impact assessment and make determinations that are in alignment with their privacy program plan.

Related Controls: AU-6, AU-7, CA-7, IR-8, SI-4.

**(13)** ACCOUNT MANAGEMENT │ DISABLE ACCOUNTS FOR HIGH-RISK INDIVIDUALS

**Disable accounts of individuals within [*Assignment: organization-defined time period*] of discovery of [*Assignment: organization-defined significant risks*].**

Discussion: Users who pose a significant security and/or privacy risk include individuals for whom reliable evidence indicates either the intention to use authorized access to systems to cause harm or through whom adversaries will cause harm. Such harm includes adverse impacts to organizational operations, organizational assets, individuals, other organizations, or the Nation. Close coordination among system administrators, legal staff, human resource managers, and authorizing officials is essential when disabling system accounts for high-risk individuals.

Related Controls: AU-6, SI-4.

References: [SP 800-162], [SP 800-178], [SP 800-192].

**AC-3    ACCESS ENFORCEMENT**

Control: Enforce approved authorizations for logical access to information and system resources in accordance with applicable access control policies.

Discussion: Access control policies control access between active entities or subjects (i.e., users or processes acting on behalf of users) and passive entities or objects (i.e., devices, files, records, domains) in organizational systems. In addition to enforcing authorized access at the system level and recognizing that systems can host many applications and services in support of mission and business functions, access enforcement mechanisms can also be employed at the application and service level to provide increased information security and privacy. In contrast to logical access controls that are implemented within the system, physical access controls are addressed by the controls in the Physical and Environmental Protection (PE) family.

Related Controls: AC-2, AC-4, AC-5, AC-6, AC-16, AC-17, AC-18, AC-19, AC-20, AC-21, AC-22, AC-24, AC-25, AT-2, AT-3, AU-9, CA-9, CM-5, CM-11, IA-2, IA-5, IA-6, IA-7, IA-11, MA-3, MA-4, MA-5, MP-4, PM-2, PS-3, PT-2, PT-3, SA-17, SC-2, SC-3, SC-4, SC-12, SC-13, SC-28, SC-31, SC-34, SI-4, SI-8.

Control Enhancements:

**(1)** ACCESS ENFORCEMENT │ RESTRICTED ACCESS TO PRIVILEGED FUNCTIONS

[Withdrawn: Incorporated into AC-6.]

**(2)** ACCESS ENFORCEMENT │ DUAL AUTHORIZATION

**Enforce dual authorization for [*Assignment: organization-defined privileged commands and/or other organization-defined actions*].**

Discussion: Dual authorization, also known as two-person control, reduces risk related to insider threats. Dual authorization mechanisms require the approval of two authorized individuals to execute. To reduce the risk of collusion, organizations consider rotating dual authorization duties. Organizations consider the risk associated with implementing dual authorization mechanisms when immediate responses are necessary to ensure public and environmental safety.

Related Controls: CP-9, MP-6.

**(3)** ACCESS ENFORCEMENT │ MANDATORY ACCESS CONTROL

Enforce [*Assignment: organization-defined mandatory access control policy*] over the set of covered subjects and objects specified in the policy, and where the policy:

(a)  Is uniformly enforced across the covered subjects and objects within the system;

(b)  Specifies that a subject that has been granted access to information is constrained from doing any of the following:

(1)  Passing the information to unauthorized subjects or objects;

(2)  Granting its privileges to other subjects;

(3)  Changing one or more security attributes (specified by the policy) on subjects, objects, the system, or system components;

(4)  Choosing the security attributes and attribute values (specified by the policy) to be associated with newly created or modified objects; and

(5)  Changing the rules governing access control; and

(c)  Specifies that [*Assignment: organization-defined subjects*] may explicitly be granted [*Assignment: organization-defined privileges*] such that they are not limited by any defined subset (or all) of the above constraints.

Discussion:  Mandatory access control is a type of nondiscretionary access control. Mandatory access control policies constrain what actions subjects can take with information obtained from objects for which they have already been granted access. This prevents the subjects from passing the information to unauthorized subjects and objects. Mandatory access control policies constrain actions that subjects can take with respect to the propagation of access control privileges; that is, a subject with a privilege cannot pass that privilege to other subjects. The policy is uniformly enforced over all subjects and objects to which the system has control. Otherwise, the access control policy can be circumvented. This enforcement is provided by an implementation that meets the reference monitor concept as described in AC-25. The policy is bounded by the system (i.e., once the information is passed outside of the control of the system, additional means may be required to ensure that the constraints on the information remain in effect).

The trusted subjects described above are granted privileges consistent with the concept of least privilege (see AC-6). Trusted subjects are only given the minimum privileges necessary for satisfying organizational mission/business needs relative to the above policy. The control is most applicable when there is a mandate that establishes a policy regarding access to controlled unclassified information or classified information and some users of the system are not authorized access to all such information resident in the system. Mandatory access control can operate in conjunction with discretionary access control as described in AC-3(4). A subject constrained in its operation by mandatory access control policies can still operate under the less rigorous constraints of AC-3(4), but mandatory access control policies take precedence over the less rigorous constraints of AC-3(4). For example, while a mandatory access control policy imposes a constraint that prevents a subject from passing information to another subject operating at a different impact or classification level, AC-3(4) permits the subject to pass the information to any other subject with the same impact or classification level as the subject. Examples of mandatory access control policies include the Bell-LaPadula policy to protect confidentiality of information and the Biba policy to protect the integrity of information.

Related Controls:  SC-7.

(4)  ACCESS ENFORCEMENT | DISCRETIONARY ACCESS CONTROL

Enforce [*Assignment: organization-defined discretionary access control policy*] over the set of covered subjects and objects specified in the policy, and where the policy specifies that a subject that has been granted access to information can do one or more of the following:

(a)  Pass the information to any other subjects or objects;

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

(b)  **Grant its privileges to other subjects;**

(c)  **Change security attributes on subjects, objects, the system, or the system's components;**

(d)  **Choose the security attributes to be associated with newly created or revised objects; or**

(e)  **Change the rules governing access control.**

Discussion:  When discretionary access control policies are implemented, subjects are not constrained with regard to what actions they can take with information for which they have already been granted access. Thus, subjects that have been granted access to information are not prevented from passing the information to other subjects or objects (i.e., subjects have the discretion to pass). Discretionary access control can operate in conjunction with mandatory access control as described in AC-3(3) and AC-3(15). A subject that is constrained in its operation by mandatory access control policies can still operate under the less rigorous constraints of discretionary access control. Therefore, while AC-3(3) imposes constraints that prevent a subject from passing information to another subject operating at a different impact or classification level, AC-3(4) permits the subject to pass the information to any subject at the same impact or classification level. The policy is bounded by the system. Once the information is passed outside of system control, additional means may be required to ensure that the constraints remain in effect. While traditional definitions of discretionary access control require identity-based access control, that limitation is not required for this particular use of discretionary access control.

Related Controls:  None.

(5)  ACCESS ENFORCEMENT │ SECURITY-RELEVANT INFORMATION

**Prevent access to [*Assignment: organization-defined security-relevant information*] except during secure, non-operable system states.**

Discussion:  Security-relevant information is information within systems that can potentially impact the operation of security functions or the provision of security services in a manner that could result in failure to enforce system security and privacy policies or maintain the separation of code and data. Security-relevant information includes access control lists, filtering rules for routers or firewalls, configuration parameters for security services, and cryptographic key management information. Secure, non-operable system states include the times in which systems are not performing mission or business-related processing, such as when the system is offline for maintenance, boot-up, troubleshooting, or shut down.

Related Controls:  CM-6, SC-39.

(6)  ACCESS ENFORCEMENT │ PROTECTION OF USER AND SYSTEM INFORMATION

[Withdrawn: Incorporated into MP-4 and SC-28.]

(7)  ACCESS ENFORCEMENT │ ROLE-BASED ACCESS CONTROL

**Enforce a role-based access control policy over defined subjects and objects and control access based upon [*Assignment: organization-defined roles and users authorized to assume such roles*].**

Discussion:  Role-based access control (RBAC) is an access control policy that enforces access to objects and system functions based on the defined role (i.e., job function) of the subject. Organizations can create specific roles based on job functions and the authorizations (i.e., privileges) to perform needed operations on the systems associated with the organization-defined roles. When users are assigned to specific roles, they inherit the authorizations or privileges defined for those roles. RBAC simplifies privilege administration for organizations because privileges are not assigned directly to every user (which can be a large number of individuals) but are instead acquired through role assignments. RBAC can also increase

privacy and security risk if individuals assigned to a role are given access to information beyond what they need to support organizational missions or business functions. RBAC can be implemented as a mandatory or discretionary form of access control. For organizations implementing RBAC with mandatory access controls, the requirements in AC-3(3) define the scope of the subjects and objects covered by the policy.

Related Controls: None.

**(8)** ACCESS ENFORCEMENT | REVOCATION OF ACCESS AUTHORIZATIONS

**Enforce the revocation of access authorizations resulting from changes to the security attributes of subjects and objects based on [*Assignment: organization-defined rules governing the timing of revocations of access authorizations*].**

Discussion: Revocation of access rules may differ based on the types of access revoked. For example, if a subject (i.e., user or process acting on behalf of a user) is removed from a group, access may not be revoked until the next time the object is opened or the next time the subject attempts to access the object. Revocation based on changes to security labels may take effect immediately. Organizations provide alternative approaches on how to make revocations immediate if systems cannot provide such capability and immediate revocation is necessary.

Related Controls: None.

**(9)** ACCESS ENFORCEMENT | CONTROLLED RELEASE

**Release information outside of the system only if:**

**(a)  The receiving [*Assignment: organization-defined system or system component*] provides [*Assignment: organization-defined controls*]; and**

**(b)  [*Assignment: organization-defined controls*] are used to validate the appropriateness of the information designated for release.**

Discussion: Organizations can only directly protect information when it resides within the system. Additional controls may be needed to ensure that organizational information is adequately protected once it is transmitted outside of the system. In situations where the system is unable to determine the adequacy of the protections provided by external entities, as a mitigation measure, organizations procedurally determine whether the external systems are providing adequate controls. The means used to determine the adequacy of controls provided by external systems include conducting periodic assessments (inspections/tests), establishing agreements between the organization and its counterpart organizations, or some other process. The means used by external entities to protect the information received need not be the same as those used by the organization, but the means employed are sufficient to provide consistent adjudication of the security and privacy policy to protect the information and individuals' privacy.

Controlled release of information requires systems to implement technical or procedural means to validate the information prior to releasing it to external systems. For example, if the system passes information to a system controlled by another organization, technical means are employed to validate that the security and privacy attributes associated with the exported information are appropriate for the receiving system. Alternatively, if the system passes information to a printer in organization-controlled space, procedural means can be employed to ensure that only authorized individuals gain access to the printer.

Related Controls: CA-3, PT-7, PT-8, SA-9, SC-16.

**(10)** ACCESS ENFORCEMENT | AUDITED OVERRIDE OF ACCESS CONTROL MECHANISMS

**Employ an audited override of automated access control mechanisms under [*Assignment: organization-defined conditions*] by [*Assignment: organization-defined roles*].**

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

TD_0000580

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

Discussion:  In certain situations, such as when there is a threat to human life or an event that threatens the organization's ability to carry out critical missions or business functions, an override capability for access control mechanisms may be needed. Override conditions are defined by organizations and used only in those limited circumstances. Audit events are defined in AU-2. Audit records are generated in AU-12.

Related Controls:  AU-2, AU-6, AU-10, AU-12, AU-14.

**(11)** ACCESS ENFORCEMENT | RESTRICT ACCESS TO SPECIFIC INFORMATION TYPES

**Restrict access to data repositories containing [*Assignment: organization-defined information types*].**

Discussion:  Restricting access to specific information is intended to provide flexibility regarding access control of specific information types within a system. For example, role-based access could be employed to allow access to only a specific type of personally identifiable information within a database rather than allowing access to the database in its entirety. Other examples include restricting access to cryptographic keys, authentication information, and selected system information.

Related Controls:  CM-8, CM-12, CM-13, PM-5.

**(12)** ACCESS ENFORCEMENT | ASSERT AND ENFORCE APPLICATION ACCESS

**(a) Require applications to assert, as part of the installation process, the access needed to the following system applications and functions: [*Assignment: organization-defined system applications and functions*];**

**(b) Provide an enforcement mechanism to prevent unauthorized access; and**

**(c) Approve access changes after initial installation of the application.**

Discussion:  Asserting and enforcing application access is intended to address applications that need to access existing system applications and functions, including user contacts, global positioning systems, cameras, keyboards, microphones, networks, phones, or other files.

Related Controls:  CM-7.

**(13)** ACCESS ENFORCEMENT | ATTRIBUTE-BASED ACCESS CONTROL

**Enforce attribute-based access control policy over defined subjects and objects and control access based upon [*Assignment: organization-defined attributes to assume access permissions*].**

Discussion:  Attribute-based access control is an access control policy that restricts system access to authorized users based on specified organizational attributes (e.g., job function, identity), action attributes (e.g., read, write, delete), environmental attributes (e.g., time of day, location), and resource attributes (e.g., classification of a document). Organizations can create rules based on attributes and the authorizations (i.e., privileges) to perform needed operations on the systems associated with organization-defined attributes and rules. When users are assigned to attributes defined in attribute-based access control policies or rules, they can be provisioned to a system with the appropriate privileges or dynamically granted access to a protected resource. Attribute-based access control can be implemented as either a mandatory or discretionary form of access control. When implemented with mandatory access controls, the requirements in AC-3(3) define the scope of the subjects and objects covered by the policy.

Related Controls:  None.

**(14)** ACCESS ENFORCEMENT | INDIVIDUAL ACCESS

TD_0000581

Provide [*Assignment: organization-defined mechanisms*] to enable individuals to have access to the following elements of their personally identifiable information: [*Assignment: organization-defined elements*].

<u>Discussion</u>:  Individual access affords individuals the ability to review personally identifiable information about them held within organizational records, regardless of format. Access helps individuals to develop an understanding about how their personally identifiable information is being processed. It can also help individuals ensure that their data is accurate. Access mechanisms can include request forms and application interfaces. For federal agencies, [<u>PRIVACT</u>] processes can be located in systems of record notices and on agency websites. Access to certain types of records may not be appropriate (e.g., for federal agencies, law enforcement records within a system of records may be exempt from disclosure under the [<u>PRIVACT</u>]) or may require certain levels of authentication assurance. Organizational personnel consult with the senior agency official for privacy and legal counsel to determine appropriate mechanisms and access rights or limitations.

<u>Related Controls</u>:  <u>IA-8</u>, <u>PM-22</u>, <u>PM-20</u>, <u>PM-21</u>, <u>PT-6</u>.

**(15)** ACCESS ENFORCEMENT | <u>DISCRETIONARY AND MANDATORY ACCESS CONTROL</u>

    **(a)** Enforce [*Assignment: organization-defined mandatory access control policy*] over the set of covered subjects and objects specified in the policy; and

    **(b)** Enforce [*Assignment: organization-defined discretionary access control policy*] over the set of covered subjects and objects specified in the policy.

<u>Discussion</u>:  Simultaneously implementing a mandatory access control policy and a discretionary access control policy can provide additional protection against the unauthorized execution of code by users or processes acting on behalf of users. This helps prevent a single compromised user or process from compromising the entire system.

<u>Related Controls</u>:  <u>SC-2</u>, <u>SC-3</u>, <u>AC-4</u>.

<u>References</u>:  [<u>PRIVACT</u>], [<u>OMB A-130</u>], [<u>SP 800-57-1</u>], [<u>SP 800-57-2</u>], [<u>SP 800-57-3</u>], [<u>SP 800-162</u>], [<u>SP 800-178</u>], [<u>IR 7874</u>].

<u>AC-4</u>    **INFORMATION FLOW ENFORCEMENT**

<u>Control</u>:  Enforce approved authorizations for controlling the flow of information within the system and between connected systems based on [*Assignment: organization-defined information flow control policies*].

<u>Discussion</u>:  Information flow control regulates where information can travel within a system and between systems (in contrast to who is allowed to access the information) and without regard to subsequent accesses to that information. Flow control restrictions include blocking external traffic that claims to be from within the organization, keeping export-controlled information from being transmitted in the clear to the Internet, restricting web requests that are not from the internal web proxy server, and limiting information transfers between organizations based on data structures and content. Transferring information between organizations may require an agreement specifying how the information flow is enforced (see <u>CA-3</u>). Transferring information between systems in different security or privacy domains with different security or privacy policies introduces the risk that such transfers violate one or more domain security or privacy policies. In such situations, information owners/stewards provide guidance at designated policy enforcement points between connected systems. Organizations consider mandating specific architectural solutions to enforce specific security and privacy policies. Enforcement includes prohibiting information transfers between connected systems (i.e., allowing access only), verifying write permissions before accepting information from another security or privacy domain or connected system, employing hardware mechanisms to enforce one-way information

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

TD_0000582

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

flows, and implementing trustworthy regrading mechanisms to reassign security or privacy attributes and labels.

Organizations commonly employ information flow control policies and enforcement mechanisms to control the flow of information between designated sources and destinations within systems and between connected systems. Flow control is based on the characteristics of the information and/or the information path. Enforcement occurs, for example, in boundary protection devices that employ rule sets or establish configuration settings that restrict system services, provide a packet-filtering capability based on header information, or provide a message-filtering capability based on message content. Organizations also consider the trustworthiness of filtering and/or inspection mechanisms (i.e., hardware, firmware, and software components) that are critical to information flow enforcement. Control enhancements 3 through 32 primarily address cross-domain solution needs that focus on more advanced filtering techniques, in-depth analysis, and stronger flow enforcement mechanisms implemented in cross-domain products, such as high-assurance guards. Such capabilities are generally not available in commercial off-the-shelf products. Information flow enforcement also applies to control plane traffic (e.g., routing and DNS).

Related Controls:  AC-3, AC-6, AC-16, AC-17, AC-19, AC-21, AU-10, CA-3, CA-9, CM-7, PL-9, PM-24, SA-17, SC-4, SC-7, SC-16, SC-31.

Control Enhancements:

**(1)** INFORMATION FLOW ENFORCEMENT | OBJECT SECURITY AND PRIVACY ATTRIBUTES

**Use [*Assignment: organization-defined security and privacy attributes*] associated with [*Assignment: organization-defined information, source, and destination objects*] to enforce [*Assignment: organization-defined information flow control policies*] as a basis for flow control decisions.**

Discussion:  Information flow enforcement mechanisms compare security and privacy attributes associated with information (i.e., data content and structure) and source and destination objects and respond appropriately when the enforcement mechanisms encounter information flows not explicitly allowed by information flow policies. For example, an information object labeled *Secret* would be allowed to flow to a destination object labeled *Secret*, but an information object labeled *Top Secret* would not be allowed to flow to a destination object labeled *Secret*. A dataset of personally identifiable information may be tagged with restrictions against combining with other types of datasets and, thus, would not be allowed to flow to the restricted dataset. Security and privacy attributes can also include source and destination addresses employed in traffic filter firewalls. Flow enforcement using explicit security or privacy attributes can be used, for example, to control the release of certain types of information.

Related Controls:  None.

**(2)** INFORMATION FLOW ENFORCEMENT | PROCESSING DOMAINS

**Use protected processing domains to enforce [*Assignment: organization-defined information flow control policies*] as a basis for flow control decisions.**

Discussion:  Protected processing domains within systems are processing spaces that have controlled interactions with other processing spaces, enabling control of information flows between these spaces and to/from information objects. A protected processing domain can be provided, for example, by implementing domain and type enforcement. In domain and type enforcement, system processes are assigned to domains, information is identified by types, and information flows are controlled based on allowed information accesses (i.e., determined by domain and type), allowed signaling among domains, and allowed process transitions to other domains.

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

Related Controls:  SC-39.

**(3)**  INFORMATION FLOW ENFORCEMENT | DYNAMIC INFORMATION FLOW CONTROL

**Enforce [*Assignment: organization-defined information flow control policies*].**

Discussion:  Organizational policies regarding dynamic information flow control include allowing or disallowing information flows based on changing conditions or mission or operational considerations. Changing conditions include changes in risk tolerance due to changes in the immediacy of mission or business needs, changes in the threat environment, and detection of potentially harmful or adverse events.

Related Controls:  SI-4.

**(4)**  INFORMATION FLOW ENFORCEMENT | FLOW CONTROL OF ENCRYPTED INFORMATION

**Prevent encrypted information from bypassing [*Assignment: organization-defined information flow control mechanisms*] by [*Selection (one or more): decrypting the information; blocking the flow of the encrypted information; terminating communications sessions attempting to pass encrypted information; [*Assignment: organization-defined procedure or method*]].**

Discussion:  Flow control mechanisms include content checking, security policy filters, and data type identifiers. The term encryption is extended to cover encoded data not recognized by filtering mechanisms.

Related Controls:  SI-4.

**(5)**  INFORMATION FLOW ENFORCEMENT | EMBEDDED DATA TYPES

**Enforce [*Assignment: organization-defined limitations*] on embedding data types within other data types.**

Discussion:  Embedding data types within other data types may result in reduced flow control effectiveness. Data type embedding includes inserting files as objects within other files and using compressed or archived data types that may include multiple embedded data types. Limitations on data type embedding consider the levels of embedding and prohibit levels of data type embedding that are beyond the capability of the inspection tools.

Related Controls:  None.

**(6)**  INFORMATION FLOW ENFORCEMENT | METADATA

**Enforce information flow control based on [*Assignment: organization-defined metadata*].**

Discussion:  Metadata is information that describes the characteristics of data. Metadata can include structural metadata describing data structures or descriptive metadata describing data content. Enforcement of allowed information flows based on metadata enables simpler and more effective flow control. Organizations consider the trustworthiness of metadata regarding data accuracy (i.e., knowledge that the metadata values are correct with respect to the data), data integrity (i.e., protecting against unauthorized changes to metadata tags), and the binding of metadata to the data payload (i.e., employing sufficiently strong binding techniques with appropriate assurance).

Related Controls:  AC-16, SI-7.

**(7)**  INFORMATION FLOW ENFORCEMENT | ONE-WAY FLOW MECHANISMS

**Enforce one-way information flows through hardware-based flow control mechanisms.**

Discussion:  One-way flow mechanisms may also be referred to as a unidirectional network, unidirectional security gateway, or data diode. One-way flow mechanisms can be used to prevent data from being exported from a higher impact or classified domain or system while permitting data from a lower impact or unclassified domain or system to be imported.

Related Controls:  None.

TD_0000584

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

**(8)** INFORMATION FLOW ENFORCEMENT | <u>SECURITY AND PRIVACY POLICY FILTERS</u>

    **(a)** **Enforce information flow control using [*Assignment: organization-defined security or privacy policy filters*] as a basis for flow control decisions for [*Assignment: organization-defined information flows*]; and**

    **(b)** **[*Selection (one or more): Block; Strip; Modify; Quarantine*] data after a filter processing failure in accordance with [*Assignment: organization-defined security or privacy policy*].**

    <u>Discussion</u>: Organization-defined security or privacy policy filters can address data structures and content. For example, security or privacy policy filters for data structures can check for maximum file lengths, maximum field sizes, and data/file types (for structured and unstructured data). Security or privacy policy filters for data content can check for specific words, enumerated values or data value ranges, and hidden content. Structured data permits the interpretation of data content by applications. Unstructured data refers to digital information without a data structure or with a data structure that does not facilitate the development of rule sets to address the impact or classification level of the information conveyed by the data or the flow enforcement decisions. Unstructured data consists of bitmap objects that are inherently non-language-based (i.e., image, video, or audio files) and textual objects that are based on written or printed languages. Organizations can implement more than one security or privacy policy filter to meet information flow control objectives.

    <u>Related Controls</u>:  None.

**(9)** INFORMATION FLOW ENFORCEMENT | <u>HUMAN REVIEWS</u>

    **Enforce the use of human reviews for [*Assignment: organization-defined information flows*] under the following conditions: [*Assignment: organization-defined conditions*].**

    <u>Discussion</u>:  Organizations define security or privacy policy filters for all situations where automated flow control decisions are possible. When a fully automated flow control decision is not possible, then a human review may be employed in lieu of or as a complement to automated security or privacy policy filtering. Human reviews may also be employed as deemed necessary by organizations.

    <u>Related Controls</u>:  None.

**(10)** INFORMATION FLOW ENFORCEMENT | <u>ENABLE AND DISABLE SECURITY OR PRIVACY POLICY FILTERS</u>

    **Provide the capability for privileged administrators to enable and disable [*Assignment: organization-defined security or privacy policy filters*] under the following conditions: [*Assignment: organization-defined conditions*].**

    <u>Discussion</u>:  For example, as allowed by the system authorization, administrators can enable security or privacy policy filters to accommodate approved data types. Administrators also have the capability to select the filters that are executed on a specific data flow based on the type of data that is being transferred, the source and destination security domains, and other security or privacy relevant features, as needed.

    <u>Related Controls</u>:  None.

**(11)** INFORMATION FLOW ENFORCEMENT | <u>CONFIGURATION OF SECURITY OR PRIVACY POLICY FILTERS</u>

    **Provide the capability for privileged administrators to configure [*Assignment: organization-defined security or privacy policy filters*] to support different security or privacy policies.**

    <u>Discussion</u>:  Documentation contains detailed information for configuring security or privacy policy filters. For example, administrators can configure security or privacy policy filters to include the list of inappropriate words that security or privacy policy mechanisms check in accordance with the definitions provided by organizations.

    <u>Related Controls</u>:  None.

TD_0000585

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

**(12)** INFORMATION FLOW ENFORCEMENT | DATA TYPE IDENTIFIERS

**When transferring information between different security domains, use [*Assignment: organization-defined data type identifiers*] to validate data essential for information flow decisions.**

Discussion:  Data type identifiers include filenames, file types, file signatures or tokens, and multiple internal file signatures or tokens. Systems only allow transfer of data that is compliant with data type format specifications. Identification and validation of data types is based on defined specifications associated with each allowed data format. The filename and number alone are not used for data type identification. Content is validated syntactically and semantically against its specification to ensure that it is the proper data type.

Related Controls:  None.

**(13)** INFORMATION FLOW ENFORCEMENT | DECOMPOSITION INTO POLICY-RELEVANT SUBCOMPONENTS

**When transferring information between different security domains, decompose information into [*Assignment: organization-defined policy-relevant subcomponents*] for submission to policy enforcement mechanisms.**

Discussion:  Decomposing information into policy-relevant subcomponents prior to information transfer facilitates policy decisions on source, destination, certificates, classification, attachments, and other security- or privacy-related component differentiators. Policy enforcement mechanisms apply filtering, inspection, and/or sanitization rules to the policy-relevant subcomponents of information to facilitate flow enforcement prior to transferring such information to different security domains.

Related Controls:  None.

**(14)** INFORMATION FLOW ENFORCEMENT | SECURITY OR PRIVACY POLICY FILTER CONSTRAINTS

**When transferring information between different security domains, implement [*Assignment: organization-defined security or privacy policy filters*] requiring fully enumerated formats that restrict data structure and content.**

Discussion:  Data structure and content restrictions reduce the range of potential malicious or unsanctioned content in cross-domain transactions. Security or privacy policy filters that restrict data structures include restricting file sizes and field lengths. Data content policy filters include encoding formats for character sets, restricting character data fields to only contain alpha-numeric characters, prohibiting special characters, and validating schema structures.

Related Controls:  None.

**(15)** INFORMATION FLOW ENFORCEMENT | DETECTION OF UNSANCTIONED INFORMATION

**When transferring information between different security domains, examine the information for the presence of [*Assignment: organization-defined unsanctioned information*] and prohibit the transfer of such information in accordance with the [*Assignment: organization-defined security or privacy policy*].**

Discussion:  Unsanctioned information includes malicious code, information that is inappropriate for release from the source network, or executable code that could disrupt or harm the services or systems on the destination network.

Related Controls:  SI-3.

**(16)** INFORMATION FLOW ENFORCEMENT | INFORMATION TRANSFERS ON INTERCONNECTED SYSTEMS

[Withdrawn: Incorporated into AC-4.]

**(17)** INFORMATION FLOW ENFORCEMENT | DOMAIN AUTHENTICATION

TD_0000586

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

**Uniquely identify and authenticate source and destination points** by [*Selection (one or more): organization; system; application; service; individual*] **for information transfer.**

Discussion: Attribution is a critical component of a security and privacy concept of operations. The ability to identify source and destination points for information flowing within systems allows the forensic reconstruction of events and encourages policy compliance by attributing policy violations to specific organizations or individuals. Successful domain authentication requires that system labels distinguish among systems, organizations, and individuals involved in preparing, sending, receiving, or disseminating information. Attribution also allows organizations to better maintain the lineage of personally identifiable information processing as it flows through systems and can facilitate consent tracking, as well as correction, deletion, or access requests from individuals.

Related Controls: IA-2, IA-3, IA-9.

**(18)** INFORMATION FLOW ENFORCEMENT | SECURITY ATTRIBUTE BINDING

[Withdrawn: Incorporated into AC-16.]

**(19)** INFORMATION FLOW ENFORCEMENT | VALIDATION OF METADATA

**When transferring information between different security domains, implement** [*Assignment: organization-defined security or privacy policy filters*] **on metadata.**

Discussion: All information (including metadata and the data to which the metadata applies) is subject to filtering and inspection. Some organizations distinguish between metadata and data payloads (i.e., only the data to which the metadata is bound). Other organizations do not make such distinctions and consider metadata and the data to which the metadata applies to be part of the payload.

Related Controls: None.

**(20)** INFORMATION FLOW ENFORCEMENT | APPROVED SOLUTIONS

**Employ** [*Assignment: organization-defined solutions in approved configurations*] **to control the flow of** [*Assignment: organization-defined information*] **across security domains.**

Discussion: Organizations define approved solutions and configurations in cross-domain policies and guidance in accordance with the types of information flows across classification boundaries. The National Security Agency (NSA) National Cross Domain Strategy and Management Office provides a listing of approved cross-domain solutions. Contact ncdsmo@nsa.gov for more information.

Related Controls: None.

**(21)** INFORMATION FLOW ENFORCEMENT | PHYSICAL OR LOGICAL SEPARATION OF INFORMATION FLOWS

**Separate information flows logically or physically using** [*Assignment: organization-defined mechanisms and/or techniques*] **to accomplish** [*Assignment: organization-defined required separations by types of information*].

Discussion: Enforcing the separation of information flows associated with defined types of data can enhance protection by ensuring that information is not commingled while in transit and by enabling flow control by transmission paths that are not otherwise achievable. Types of separable information include inbound and outbound communications traffic, service requests and responses, and information of differing security impact or classification levels.

Related Controls: SC-32.

**(22)** INFORMATION FLOW ENFORCEMENT | ACCESS ONLY

**Provide access from a single device to computing platforms, applications, or data residing in multiple different security domains, while preventing information flow between the different security domains.**

_____

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

Discussion:  The system provides a capability for users to access each connected security domain without providing any mechanisms to allow users to transfer data or information between the different security domains. An example of an access-only solution is a terminal that provides a user access to information with different security classifications while assuredly keeping the information separate.

Related Controls:  None.

**(23)** INFORMATION FLOW ENFORCEMENT | MODIFY NON-RELEASABLE INFORMATION

**When transferring information between different security domains, modify non-releasable information by implementing [*Assignment: organization-defined modification action*].**

Discussion:  Modifying non-releasable information can help prevent a data spill or attack when information is transferred across security domains. Modification actions include masking, permutation, alteration, removal, or redaction.

Related Controls:  None.

**(24)** INFORMATION FLOW ENFORCEMENT | INTERNAL NORMALIZED FORMAT

**When transferring information between different security domains, parse incoming data into an internal normalized format and regenerate the data to be consistent with its intended specification.**

Discussion:  Converting data into normalized forms is one of most of effective mechanisms to stop malicious attacks and large classes of data exfiltration.

Related Controls:  None.

**(25)** INFORMATION FLOW ENFORCEMENT | DATA SANITIZATION

**When transferring information between different security domains, sanitize data to minimize [*Selection (one or more): delivery of malicious content, command and control of malicious code, malicious code augmentation, and steganography encoded data; spillage of sensitive information*] in accordance with [*Assignment: organization-defined policy*]].**

Discussion:  Data sanitization is the process of irreversibly removing or destroying data stored on a memory device (e.g., hard drives, flash memory/solid state drives, mobile devices, CDs, and DVDs) or in hard copy form.

Related Controls:  MP-6.

**(26)** INFORMATION FLOW ENFORCEMENT | AUDIT FILTERING ACTIONS

**When transferring information between different security domains, record and audit content filtering actions and results for the information being filtered.**

Discussion:  Content filtering is the process of inspecting information as it traverses a cross-domain solution and determines if the information meets a predefined policy. Content filtering actions and the results of filtering actions are recorded for individual messages to ensure that the correct filter actions were applied. Content filter reports are used to assist in troubleshooting actions by, for example, determining why message content was modified and/or why it failed the filtering process. Audit events are defined in AU-2. Audit records are generated in AU-12.

Related Controls:  AU-2, AU-3, AU-12.

**(27)** INFORMATION FLOW ENFORCEMENT | REDUNDANT/INDEPENDENT FILTERING MECHANISMS

**When transferring information between different security domains, implement content filtering solutions that provide redundant and independent filtering mechanisms for each data type.**

Discussion:  Content filtering is the process of inspecting information as it traverses a cross-domain solution and determines if the information meets a predefined policy. Redundant

_____

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

and independent content filtering eliminates a single point of failure filtering system. Independence is defined as the implementation of a content filter that uses a different code base and supporting libraries (e.g., two JPEG filters using different vendors' JPEG libraries) and multiple, independent system processes.

Related Controls: None.

**(28)** INFORMATION FLOW ENFORCEMENT | LINEAR FILTER PIPELINES

**When transferring information between different security domains, implement a linear content filter pipeline that is enforced with discretionary and mandatory access controls.**

Discussion: Content filtering is the process of inspecting information as it traverses a cross-domain solution and determines if the information meets a predefined policy. The use of linear content filter pipelines ensures that filter processes are non-bypassable and always invoked. In general, the use of parallel filtering architectures for content filtering of a single data type introduces bypass and non-invocation issues.

Related Controls: None.

**(29)** INFORMATION FLOW ENFORCEMENT | FILTER ORCHESTRATION ENGINES

**When transferring information between different security domains, employ content filter orchestration engines to ensure that:**

**(a) Content filtering mechanisms successfully complete execution without errors; and**

**(b) Content filtering actions occur in the correct order and comply with [*Assignment: organization-defined policy*].**

Discussion: Content filtering is the process of inspecting information as it traverses a cross-domain solution and determines if the information meets a predefined security policy. An orchestration engine coordinates the sequencing of activities (manual and automated) in a content filtering process. Errors are defined as either anomalous actions or unexpected termination of the content filter process. This is not the same as a filter failing content due to non-compliance with policy. Content filter reports are a commonly used mechanism to ensure that expected filtering actions are completed successfully.

Related Controls: None.

**(30)** INFORMATION FLOW ENFORCEMENT | FILTER MECHANISMS USING MULTIPLE PROCESSES

**When transferring information between different security domains, implement content filtering mechanisms using multiple processes.**

Discussion: The use of multiple processes to implement content filtering mechanisms reduces the likelihood of a single point of failure.

Related Controls: None.

**(31)** INFORMATION FLOW ENFORCEMENT | FAILED CONTENT TRANSFER PREVENTION

**When transferring information between different security domains, prevent the transfer of failed content to the receiving domain.**

Discussion: Content that failed filtering checks can corrupt the system if transferred to the receiving domain.

Related Controls: None.

**(32)** INFORMATION FLOW ENFORCEMENT | PROCESS REQUIREMENTS FOR INFORMATION TRANSFER

**When transferring information between different security domains, the process that transfers information between filter pipelines:**

**(a) Does not filter message content;**

**(b) Validates filtering metadata;**

TD_0000589

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

    (c)  **Ensures the content associated with the filtering metadata has successfully completed filtering; and**

    (d)  **Transfers the content to the destination filter pipeline.**

<u>Discussion</u>:  The processes transferring information between filter pipelines have minimum complexity and functionality to provide assurance that the processes operate correctly.

<u>Related Controls</u>:  None.

<u>References</u>:  [SP-800-160-1], [SP 800-162], [SP 800-178], [IR 8111].

## AC-5    SEPARATION OF DUTIES

<u>Control</u>:

a.   Identify and document [*Assignment: organization-defined duties of individuals requiring separation*]; and

b.   Define system access authorizations to support separation of duties.

<u>Discussion</u>:  Separation of duties addresses the potential for abuse of authorized privileges and helps to reduce the risk of malevolent activity without collusion. Separation of duties includes dividing mission or business functions and support functions among different individuals or roles, conducting system support functions with different individuals, and ensuring that security personnel who administer access control functions do not also administer audit functions. Because separation of duty violations can span systems and application domains, organizations consider the entirety of systems and system components when developing policy on separation of duties. Separation of duties is enforced through the account management activities in AC-2, access control mechanisms in AC-3, and identity management activities in IA-2, IA-4, and IA-12.

<u>Related Controls</u>:  AC-2, AC-3, AC-6, AU-9, CM-5, CM-11, CP-9, IA-2, IA-4, IA-5, IA-12, MA-3, MA-5, PS-2, SA-8, SA-17.

<u>Control Enhancements</u>:  None.

<u>References</u>:  None.

## AC-6    LEAST PRIVILEGE

<u>Control</u>:  Employ the principle of least privilege, allowing only authorized accesses for users (or processes acting on behalf of users) that are necessary to accomplish assigned organizational tasks.

<u>Discussion</u>:  Organizations employ least privilege for specific duties and systems. The principle of least privilege is also applied to system processes, ensuring that the processes have access to systems and operate at privilege levels no higher than necessary to accomplish organizational missions or business functions. Organizations consider the creation of additional processes, roles, and accounts as necessary to achieve least privilege. Organizations apply least privilege to the development, implementation, and operation of organizational systems.

<u>Related Controls</u>:  AC-2, AC-3, AC-5, AC-16, CM-5, CM-11, PL-2, PM-12, SA-8, SA-15, SA-17, SC-38.

<u>Control Enhancements</u>:

(1)   LEAST PRIVILEGE | <u>AUTHORIZE ACCESS TO SECURITY FUNCTIONS</u>

    **Authorize access for [*Assignment: organization-defined individuals or roles*] to:**

    (a)  **[*Assignment: organization-defined security functions (deployed in hardware, software, and firmware)*]; and**

    (b)  **[*Assignment: organization-defined security-relevant information*].**

TD_0000590

_____

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

Discussion:  Security functions include establishing system accounts, configuring access authorizations (i.e., permissions, privileges), configuring settings for events to be audited, and establishing intrusion detection parameters. Security-relevant information includes filtering rules for routers or firewalls, configuration parameters for security services, cryptographic key management information, and access control lists. Authorized personnel include security administrators, system administrators, system security officers, system programmers, and other privileged users.

Related Controls:  AC-17, AC-18, AC-19, AU-9, PE-2.

**(2)** LEAST PRIVILEGE | NON-PRIVILEGED ACCESS FOR NONSECURITY FUNCTIONS

**Require that users of system accounts (or roles) with access to [*Assignment: organization-defined security functions or security-relevant information*] use non-privileged accounts or roles, when accessing nonsecurity functions.**

Discussion:  Requiring the use of non-privileged accounts when accessing nonsecurity functions limits exposure when operating from within privileged accounts or roles. The inclusion of roles addresses situations where organizations implement access control policies, such as role-based access control, and where a change of role provides the same degree of assurance in the change of access authorizations for the user and the processes acting on behalf of the user as would be provided by a change between a privileged and non-privileged account.

Related Controls:  AC-17, AC-18, AC-19, PL-4.

**(3)** LEAST PRIVILEGE | NETWORK ACCESS TO PRIVILEGED COMMANDS

**Authorize network access to [*Assignment: organization-defined privileged commands*] only for [*Assignment: organization-defined compelling operational needs*] and document the rationale for such access in the security plan for the system.**

Discussion:  Network access is any access across a network connection in lieu of local access (i.e., user being physically present at the device).

Related Controls:  AC-17, AC-18, AC-19.

**(4)** LEAST PRIVILEGE | SEPARATE PROCESSING DOMAINS

**Provide separate processing domains to enable finer-grained allocation of user privileges.**

Discussion:  Providing separate processing domains for finer-grained allocation of user privileges includes using virtualization techniques to permit additional user privileges within a virtual machine while restricting privileges to other virtual machines or to the underlying physical machine, implementing separate physical domains, and employing hardware or software domain separation mechanisms.

Related Controls:  AC-4, SC-2, SC-3, SC-30, SC-32, SC-39.

**(5)** LEAST PRIVILEGE | PRIVILEGED ACCOUNTS

**Restrict privileged accounts on the system to [*Assignment: organization-defined personnel or roles*].**

Discussion:  Privileged accounts, including super user accounts, are typically described as system administrator for various types of commercial off-the-shelf operating systems. Restricting privileged accounts to specific personnel or roles prevents day-to-day users from accessing privileged information or privileged functions. Organizations may differentiate in the application of restricting privileged accounts between allowed privileges for local accounts and for domain accounts provided that they retain the ability to control system configurations for key parameters and as otherwise necessary to sufficiently mitigate risk.

Related Controls:  IA-2, MA-3, MA-4.

TD_0000591

---

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

**(6)** LEAST PRIVILEGE | PRIVILEGED ACCESS BY NON-ORGANIZATIONAL USERS

**Prohibit privileged access to the system by non-organizational users.**

Discussion: An organizational user is an employee or an individual considered by the organization to have the equivalent status of an employee. Organizational users include contractors, guest researchers, or individuals detailed from other organizations. A non-organizational user is a user who is not an organizational user. Policies and procedures for granting equivalent status of employees to individuals include a need-to-know, citizenship, and the relationship to the organization.

Related Controls: AC-18, AC-19, IA-2, IA-8.

**(7)** LEAST PRIVILEGE | REVIEW OF USER PRIVILEGES

**(a)** Review [*Assignment: organization-defined frequency*] the privileges assigned to [*Assignment: organization-defined roles or classes of users*] to validate the need for such privileges; and

**(b)** Reassign or remove privileges, if necessary, to correctly reflect organizational mission and business needs.

Discussion: The need for certain assigned user privileges may change over time to reflect changes in organizational mission and business functions, environments of operation, technologies, or threats. A periodic review of assigned user privileges is necessary to determine if the rationale for assigning such privileges remains valid. If the need cannot be revalidated, organizations take appropriate corrective actions.

Related Controls: CA-7.

**(8)** LEAST PRIVILEGE | PRIVILEGE LEVELS FOR CODE EXECUTION

**Prevent the following software from executing at higher privilege levels than users executing the software: [*Assignment: organization-defined software*].**

Discussion: In certain situations, software applications or programs need to execute with elevated privileges to perform required functions. However, depending on the software functionality and configuration, if the privileges required for execution are at a higher level than the privileges assigned to organizational users invoking such applications or programs, those users may indirectly be provided with greater privileges than assigned.

Related Controls: None.

**(9)** LEAST PRIVILEGE | LOG USE OF PRIVILEGED FUNCTIONS

**Log the execution of privileged functions.**

Discussion: The misuse of privileged functions, either intentionally or unintentionally by authorized users or by unauthorized external entities that have compromised system accounts, is a serious and ongoing concern and can have significant adverse impacts on organizations. Logging and analyzing the use of privileged functions is one way to detect such misuse and, in doing so, help mitigate the risk from insider threats and the advanced persistent threat.

Related Controls: AU-2, AU-3, AU-12.

**(10)** LEAST PRIVILEGE | PROHIBIT NON-PRIVILEGED USERS FROM EXECUTING PRIVILEGED FUNCTIONS

**Prevent non-privileged users from executing privileged functions.**

Discussion: Privileged functions include disabling, circumventing, or altering implemented security or privacy controls, establishing system accounts, performing system integrity checks, and administering cryptographic key management activities. Non-privileged users are individuals who do not possess appropriate authorizations. Privileged functions that require protection from non-privileged users include circumventing intrusion detection and

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

prevention mechanisms or malicious code protection mechanisms. Preventing non-privileged users from executing privileged functions is enforced by AC-3.

Related Controls:  None.

References:  None.

### AC-7    UNSUCCESSFUL LOGON ATTEMPTS

Control:

a.  Enforce a limit of [*Assignment: organization-defined number*] consecutive invalid logon attempts by a user during a [*Assignment: organization-defined time period*]; and

b.  Automatically [*Selection (one or more): lock the account or node for an* [*Assignment: organization-defined time period*]; *lock the account or node until released by an administrator; delay next logon prompt per* [*Assignment: organization-defined delay algorithm*]; *notify system administrator; take other* [*Assignment: organization-defined action*]] when the maximum number of unsuccessful attempts is exceeded.

Discussion:  The need to limit unsuccessful logon attempts and take subsequent action when the maximum number of attempts is exceeded applies regardless of whether the logon occurs via a local or network connection. Due to the potential for denial of service, automatic lockouts initiated by systems are usually temporary and automatically release after a predetermined, organization-defined time period. If a delay algorithm is selected, organizations may employ different algorithms for different components of the system based on the capabilities of those components. Responses to unsuccessful logon attempts may be implemented at the operating system and the application levels. Organization-defined actions that may be taken when the number of allowed consecutive invalid logon attempts is exceeded include prompting the user to answer a secret question in addition to the username and password, invoking a lockdown mode with limited user capabilities (instead of full lockout), allowing users to only logon from specified Internet Protocol (IP) addresses, requiring a CAPTCHA to prevent automated attacks, or applying user profiles such as location, time of day, IP address, device, or Media Access Control (MAC) address. If automatic system lockout or execution of a delay algorithm is not implemented in support of the availability objective, organizations consider a combination of other actions to help prevent brute force attacks. In addition to the above, organizations can prompt users to respond to a secret question before the number of allowed unsuccessful logon attempts is exceeded. Automatically unlocking an account after a specified period of time is generally not permitted. However, exceptions may be required based on operational mission or need.

Related Controls:  AC-2, AC-9, AU-2, AU-6, IA-5.

Control Enhancements:

**(1)**  UNSUCCESSFUL LOGON ATTEMPTS │ AUTOMATIC ACCOUNT LOCK

[Withdrawn: Incorporated into AC-7.]

**(2)**  UNSUCCESSFUL LOGON ATTEMPTS │ PURGE OR WIPE MOBILE DEVICE

**Purge or wipe information from [*Assignment: organization-defined mobile devices*] based on [*Assignment: organization-defined purging or wiping requirements and techniques*] after [*Assignment: organization-defined number*] consecutive, unsuccessful device logon attempts.**

Discussion:  A mobile device is a computing device that has a small form factor such that it can be carried by a single individual; is designed to operate without a physical connection; possesses local, non-removable or removable data storage; and includes a self-contained power source. Purging or wiping the device applies only to mobile devices for which the organization-defined number of unsuccessful logons occurs. The logon is to the mobile

TD_0000593

_____

device, not to any one account on the device. Successful logons to accounts on mobile devices reset the unsuccessful logon count to zero. Purging or wiping may be unnecessary if the information on the device is protected with sufficiently strong encryption mechanisms.

Related Controls: AC-19, MP-5, MP-6.

**(3)** UNSUCCESSFUL LOGON ATTEMPTS | BIOMETRIC ATTEMPT LIMITING

**Limit the number of unsuccessful biometric logon attempts to [*Assignment: organization-defined number*].**

Discussion: Biometrics are probabilistic in nature. The ability to successfully authenticate can be impacted by many factors, including matching performance and presentation attack detection mechanisms. Organizations select the appropriate number of attempts for users based on organizationally-defined factors.

Related Controls: IA-3.

**(4)** UNSUCCESSFUL LOGON ATTEMPTS | USE OF ALTERNATE AUTHENTICATION FACTOR

**(a) Allow the use of [*Assignment: organization-defined authentication factors*] that are different from the primary authentication factors after the number of organization-defined consecutive invalid logon attempts have been exceeded; and**

**(b) Enforce a limit of [*Assignment: organization-defined number*] consecutive invalid logon attempts through use of the alternative factors by a user during a [*Assignment: organization-defined time period*].**

Discussion: The use of alternate authentication factors supports the objective of availability and allows a user who has inadvertently been locked out to use additional authentication factors to bypass the lockout.

Related Controls: IA-3.

References:  [SP 800-63-3], [SP 800-124].

AC-8    **SYSTEM USE NOTIFICATION**

Control:

a. Display [*Assignment: organization-defined system use notification message or banner*] to users before granting access to the system that provides privacy and security notices consistent with applicable laws, executive orders, directives, regulations, policies, standards, and guidelines and state that:

1. Users are accessing a U.S. Government system;

2. System usage may be monitored, recorded, and subject to audit;

3. Unauthorized use of the system is prohibited and subject to criminal and civil penalties; and

4. Use of the system indicates consent to monitoring and recording;

b. Retain the notification message or banner on the screen until users acknowledge the usage conditions and take explicit actions to log on to or further access the system; and

c. For publicly accessible systems:

1. Display system use information [*Assignment: organization-defined conditions*], before granting further access to the publicly accessible system;

2. Display references, if any, to monitoring, recording, or auditing that are consistent with privacy accommodations for such systems that generally prohibit those activities; and

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

Case 1:25-cv-00457-CKK    Document 48-10    Filed 10/29/25    Page 152 of 152

NIST SP 800-53, Rev. 5                    SECURITY AND PRIVACY CONTROLS FOR INFORMATION SYSTEMS AND ORGANIZATIONS
_____

This publication is available free of charge from: https://doi.org/10.6028/NIST.SP.800-53r5

3.   Include a description of the authorized uses of the system.

Discussion:  System use notifications can be implemented using messages or warning banners displayed before individuals log in to systems. System use notifications are used only for access via logon interfaces with human users. Notifications are not required when human interfaces do not exist. Based on an assessment of risk, organizations consider whether or not a secondary system use notification is needed to access applications or other system resources after the initial network logon. Organizations consider system use notification messages or banners displayed in multiple languages based on organizational needs and the demographics of system users. Organizations consult with the privacy office for input regarding privacy messaging and the Office of the General Counsel or organizational equivalent for legal review and approval of warning banner content.

Related Controls:  AC-14, PL-4, SI-4.

Control Enhancements:  None.

References:  None.

**AC-9**    **PREVIOUS LOGON NOTIFICATION**

Control:  Notify the user, upon successful logon to the system, of the date and time of the last logon.

Discussion:  Previous logon notification is applicable to system access via human user interfaces and access to systems that occurs in other types of architectures. Information about the last successful logon allows the user to recognize if the date and time provided is not consistent with the user's last access.

Related Controls:  AC-7, PL-4.

Control Enhancements:

**(1)**  PREVIOUS LOGON NOTIFICATION | UNSUCCESSFUL LOGONS

**Notify the user, upon successful logon, of the number of unsuccessful logon attempts since the last successful logon.**

Discussion:  Information about the number of unsuccessful logon attempts since the last successful logon allows the user to recognize if the number of unsuccessful logon attempts is consistent with the user's actual logon attempts.

Related Controls:  None.

**(2)**  PREVIOUS LOGON NOTIFICATION | SUCCESSFUL AND UNSUCCESSFUL LOGONS

**Notify the user, upon successful logon, of the number of [*Selection: successful logons; unsuccessful logon attempts; both*] during [*Assignment: organization-defined time period*].**

Discussion:  Information about the number of successful and unsuccessful logon attempts within a specified time period allows the user to recognize if the number and type of logon attempts are consistent with the user's actual logon attempts.

Related Controls:  None.

**(3)**  PREVIOUS LOGON NOTIFICATION | NOTIFICATION OF ACCOUNT CHANGES

**Notify the user, upon successful logon, of changes to [*Assignment: organization-defined security-related characteristics or parameters of the user's account*] during [*Assignment: organization-defined time period*].**

Discussion:  Information about changes to security-related account characteristics within a specified time period allows users to recognize if changes were made without their knowledge.

TD_0000595